**United States District Court**
Southern District of New York
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

Date:6-1-07

Our case # : 06cv11496
Case Name: "In re Connetics Securities Litigation"

Dear Sir/Madam,

Enclosed is a certified copy of the civil docket sheet for the above referenced case that is being transferred to the United States District Court- Northern District of California. The case file can be accessed through our CM/ECF System for the Southern District of New York. Please contact Ms. Antonia Espinell at (212) 805-0618 and she will furnish you with a CM/ECF Login and Password.

The enclosed copy of this letter is for your convenience in acknowledging receipt of these documents.

**Court policy for USDC-SDNY states that all ECF actions require only original, manual paper filings for the initiating documents. You may access our CM/ECF website for any additional documents that your court may require for processing.**

Yours truly,

J. Michael McMahon
Clerk of Court

Deputy Clerk,
    J. Scheib
    RDZ

Fed Ex Air bill# 8582 4870 2065

---

**RECEIPT IS ACKNOWLEDGED OF THE DOCUMENTS DESCRIBED HEREIN**
    **AND ASSIGNED CASE NUMBER:**

CASE #_____ON DATE: _____

CASE TRANSFERRED OUT FORM

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FISHBURY, LIMITED

          Plaintiff,

     vs.

CONNETICS CORP., THOMAS G. WIGGANS,
C. GREGORY VONTZ and ALEXANDER J.
YAROSHINSKY,

          Defendants.

**06 CV 11496**

Civil Action No.

**RULE 7.1 CERTIFICATION**

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, and to enable judges and magistrate judges of the court to evaluate possible disqualification or recusal, the undersigned counsel for Fishbury, Limited (a private non-governmental party) certifies that it has no parent companies that are publicly held.

**ZIMMERMAN, LEVI & KORSINSKY, LLP**

By: _Eduard Korsinsky_

Eduard Korsinsky (EK8989)
39 Broadway, Suite 1601
New York, New York 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
E-Mail: jlevi@zlk.com

Attorneys for Plaintiff Fishbury, Limited

October 31, 2006

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**06 CV 11496**

———————————————————————x
FISHBURY, LIMITED, Individually and on behalf of All
Others Similarly Situated,

                        Plaintiff,

                         vs.

CONNETICS CORP., THOMAS G. WIGGANS, C.
GREGORY VONTZ, and ALEXANDER J.
YAROSHINSKY,

                         Defendants.
———————————————————————x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No.

**CLASS ACTION**

**COMPLAINT FOR VIOLATION**
**OF THE SECURITIES**
**EXCHANGE ACT OF 1934**

**DEMAND FOR JURY TRIAL**

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which

included a review of United States Securities and Exchange Commission ("SEC") filings by

Connetics Corp. ("Connetics" or the "Company"), as well as regulatory filings and reports,

securities analysts reports and advisories about the Company, press releases, and media reports

about the Company, and plaintiff believes that substantial additional evidentiary support will

exist for the allegations set forth herein after a reasonable opportunity for discovery.

### INTRODUCTION

1.     This is a securities class action on behalf of all purchasers of the publicly traded

securities of Connetics between June 28, 2004 and July 9, 2006, inclusive (the "Class Period"),

against Connetics and certain of its officers and directors for violations of the Securities

Exchange Act of 1934 (the "1934 Act").

2.     Connetics is a specialty pharmaceutical company, with shares listed and actively

traded on NASDAQ, which is engaged in the development, manufacture and marketing of

medications that treat dermatological diseases

3.      During the Class Period, Connetics consistently reported "record" growth, quarter after quarter, and defendants issued very positive earnings and income growth forecasts of greater than 30% throughout that time. In truth and in fact, during this time, Connetics concealed a significant finding regarding the Company's key new acne drug (Velac), which would likely bar FDA approval. During this time, defendants also failed to disclose material adverse facts about the Company's financial well-being. Specifically, Connetics reported false financial results by understating its rebate reserves. As a result of Connetics' allegedly materially misleading misrepresentations to the market, shares of Connetics securities continued to trade at artificially inflated levels and defendants, excluding defendant Yaroshinsky, were able to sell 165,779 shares of their Connetics stock for more than $3.6 million in profits.

4.      On April 13, 2005, the FDA informed defendant Yaroshinsky that Connetics would likely be unable to obtain FDA approval for Velac due, in part, to a high incidence of tumors in a carcinogenicity study. Defendants, including Yaroshinsky, failed to disclose this information to the public. In fact, not only did defendant Yaroshinsky conceal this information from the public, he sold 15,100 shares of Connetics stock and bought 2,076 put option contracts on Connetics common stock for $680,000 in profits from his scheme.

5.      On June 13, 2005, Connetics stunned investors when the Company announced that it had received a non-approvable letter from the FDA for Velac. However, in order to conceal the seriousness of the problem, defendant Wiggans declared that, "We remain committed to bringing Velac to market, and will be working with FDA representatives to determine what is required to do so." On this news, shares of Velac crashed more than 27% to $15.13 per share.

2

6.    On March 28, 2006, the SEC announced it had filed suit in the United States District Court for the Southern District of New York against defendant Yaroshinsky charging him with illegally trading on the basis of non-public inside information after learning the FDA'S preliminary reactions to a study relating to cancer tests of Velac. Specifically, the SEC's complaint alleged that Yaroshinsky, who participated in tests which resulted in the FDA concluding that Velac was unsafe, learned of the FDA's findings during the April 13, 2005 call with the FDA. The complaint alleges that, upon learning of the FDA's conclusions, Yaroshinsky sold 15,100 shares of Connectics stock and bought 2,076 put option contracts, which permitted him to sell Connectics shares at a fixed price and for a profit when the shares fell below that price, resulting in a profit of more than $680,000.

7.    On May 3, 2006, Connetics, after the market closed, announced that the Company's financial statements for the year ended December 31, 2005, and likely additional periods, could no longer be relied upon. The Company acknowledged that its financial statements were not accurate based on a determination that it's "rebate reserves as of the end of 2005 were understated." Specifically, the Company announced that, as "[it] has concluded that the rebate rates and methods used to calculate the rebate liability did not fully capture the impact of these factors in its historical provision," it could not file its quarterly report on time due to this improper accounting. However, the Company cautioned that, "We do not believe that this restatement will have an impact on the Company's historical case position or operating expenses."

8.    On this news, shares of Connetics stock declined to $13.76 per share.

3

9.     On July 10, 2006, Connetics announced that the Company expected revenues and earnings per share for the full year 2006 to be materially below the amounts the Company provided on May 3, 2006.

10.     On this news, shares of Connetics plunged $3.93, or 33.6%, to close, on July 10, 2006, at $7.76 per share.

11.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Throughout the Class Period, defendants were aware that the carcinogenicity study of Velac had indicated that a high incidence of mice treated with Velac developed tumors;

(b)     At all relevant times, defendants were aware that the Company's new Velac drug would be deemed unsafe by the FDA and would not provide the revenue and income promised by the Company; and

(c)     The Company was improperly accounting for rebates and, therefore, falsifying its financials for at least 2005 and likely earlier.

12.     As a result of defendants' issuance of materially false and misleading statements, Connetics' securities traded at inflated levels during the Class Period, which allowed the Individual Defendants to profit millions of dollars in insider trading proceeds. However, after the public was made aware of the Company's previous false financial statements, the Company's publicly traded securities plummeted by approximately 45% from their high. Upon information and belief, the securities currently trade at $10-$11 per share, approximately 60% below the Class Period high of $29.92.

4

## JURISDICTION AND VENUE

13.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

14.    Venue is proper in this District pursuant to §27 of the 1934 Act. A substantial amount of events giving rise to the claims alleged herein, including the listing and trading of the Company's publicly traded securities on NASDAQ, occurred in this District. Furthermore, the related action of *SEC v. Alexander J. Yaroshinsky and Victor E. Zak*, 06-Civ-2401 (RCC), is pending in this District before the Honorable Richard Conway Casey. The claims asserted herein arise under the same transactions, acts, and practices alleged in *SEC v. Yaroshinsky, et al.*

## THE PARTIES

15.    Plaintiff Fishbury, Limited purchased publicly traded securities of Connetics during the Class Period as described in the attached certification, incorporated herein by reference, and was damaged thereby.

16.    Connetics is a specialty pharmaceutical company, with shares listed and actively traded on NASDAQ, which is engaged in the development, manufacture and marketing of medications that treat dermatological diseases.

17.    Defendant Thomas G. Wiggans ("Wiggans") was, at all relevant times, the Company's Chief Executive Officer and a director. Defendant Wiggans was also named Chairman of the Board of Connetics effective January 1, 2006. Upon information and belief, during the Class Period, defendant Wiggans acquired more than $3 million dollars in profit from insider trading as a result of his concealment of material adverse information.

5

18.     Defendant C. Gregory Vontz ("Vontz") was, at all relevant times, the Company's

Chief Operating Officer. Defendant Vontz has also served as the Company's President since

February 2005, and as a director of the Company since March 2005. Upon information and

belief, during the Class Period, defendant Vontz acquired more than $580,000 in profit from

insider trading as a result of his concealment of material adverse information.

19.     Defendant Yaroshinsky was, at all relevant times, a Vice President of the

Company. Upon information and belief, during the Class Period, defendant Yaroshinky acquired

approximately $680,000 in profit from insider trading as a result of his concealment of material

adverse information.

20.     Defendants Wiggans, Vontz and Yaroshinsky are referred to herein as the

"Individual Defendants." The Individual Defendants, because of their positions with the

Company, and involvement in the Velac studies, possessed the power and authority to control the

contents of Connetics' quarterly reports, press releases and presentations to presentations to

securities analysts, money and portfolio managers and institutional investors. Each defendant

was provided with copies of the Company's reports and press releases alleged herein to be

misleading prior to or shortly after their issuance and had the ability and opportunity to prevent

their issuance or cause them to be corrected.

21.     Because of their positions and access to material non-public information, each of

the Individual Defendants knew that the adverse facts specified herein had not been disclosed to

and were being concealed from the public and that the positive representations which were being

made were then materially false and misleading. The Individual Defendants are liable for the

6

false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

22.    Each Individual Defendant had knowledge of Connetics' problems and was motivated to conceal such problems. As Chief Executive Officer, defendant Wiggans reviewed or was responsible for the preparation of many of the internal reports showing Connetics' forecasted and actual growth and thus defendant Wiggans, as well as Vontz, who served as the Company's COO, were aware of the Company's significant operational and financial problems before these problems became known to the investing public. Defendants, as directors and/or officers of Connetics were responsible for the financial results and press releases issued by the Company. Each Individual Defendant sought to demonstrate that they could lead the Company successfully and generate the growth expected by the market.

23.    Defendants knew or deliberately disregarded that the materially false and misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's securities and would artificially inflate the price of the Company's publicly-traded securities. Defendants acted knowingly or with such deliberate disregard of such facts as they should have known in such a manner as to constitute a fraud and deceit upon plaintiff and other members of the Class.

24.    During the Class Period, and with the Company's stock trading at artificially inflated prices, the Individual Defendants sold 165,779 shares of the Company's stock for gross proceeds of 3,699.512.00, including defendant Wiggans who was able to sell shares of his Connetics stock for more than $3 million in profits.

7

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

25.    Each defendant is liable for: (i) making false statements; and (ii) failing to disclose adverse facts known to him about Connetics. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Connetics publicly traded securities were a success, as they (i) deceived the investing public regarding the Company's prospects and business; (ii) artificially inflated the prices of the Company's publicly-traded securities; and (iii) caused plaintiff and other members of the Class to purchase the Company's publicly traded securities at artificially inflated prices.

26.    In December 2002, Connetics initiated the Phase III program for Velac, a first-in-class combination of clindamycin and tretinoin, for the treatment of acne. The market reacted favorably to Connetics' disclosures about Velac, including the Company's announcement in March 2004 that the outcome of the Phase III clinical trials of Velac was favorable. Specifically, the Company stated that the data from each trial demonstrated a superior treatment effect for Velac, as compared with clindamycin gel, tretinoin gel and placebo gel on both of the primary endpoints. Furthermore, Connetics advised that the clinical trials also demonstrated that Velac was safe and well tolerated, with the most common adverse effects consisting of application site reactions such as burning, dryness, redness and peeling.

27.    Following this allegedly positive clinical outcome, Connetics submitted a new drug application ("NDA") with the FDA for Velac in August 2004. The NDA was accepted for filing by the FDA in October 2004 with a filing date of August 23, 2004 and a user fee goal date of June 25, 2005. If approved by the FDA, Velac would have competed with topical retinoids as well as topical antibiotics, representing approximately $988 million in the U.S. prescriptions

8

during the 12 months ended December 2004. Undoubtedly, Velac was a pivotal drug for Connetics' business and the market expected favorable results once it was approved by the FDA.

28. Despite defendants' positive representations about Velac, defendants actually were aware of severe adverse news about Velac. From January 2004 through June 2004, Connetics had performed a carcinogenicity study on mice. The carcinogenicity study results revealed that a high incidence of mice treated with Velac Gel developed tumors. In fact, the Company's carcinogenicity study results indicated that of the 160 mice treated with Velac Gel, 89 (55%) of the mice developed tumors. On June 28, 2004, during a discussion with a panel of toxicology experts concerning the carcinogenicity study results, Connetics employees, including defendant Yaroshinsky, were informed by the panel that it was unaware of any drug exhibiting a "positive dermal" similar to Velac Gel that had been approved by the FDA. On August 24, 2004, Connetics submitted the Velac Gel drug application to the FDA. Included with the application were the results of the carcinogenicity study. In light of the results of the carcinogenicity study and what the toxicology experts had advised, defendants knew it was highly unlikely the FDA would approve Velac.

29. Immediately prior to the Class Period, defendant Wiggins appeared at the Company's Analyst and Investor Day on June 16, 2004 at The Mandarin Oriental Hotel. After the Investor Day, Comtex News Network reported that, "Connetics continues to position itself to become one of the top dermatology pharmaceutical companies as it....lays the foundation to successfully enter the acne market with new products, Actiza and Velac. Management articulated its strategy and optimistic outlook at a meeting with investors yesterday."

9

## DEFENDANTS FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

30.     Despite the adverse news the Company had received on June 28, 2004, defendants made no effort to correct the prior positive statements about Velac which they then knew were not true. In fact, the defendants continued to make misleading statements about Velac, at the same time falsifying the Company's financials through improper accounting for rebates.

31.     On July 1, 2004, Dermatology Times, with information provided by the Company, reported on the many favorable aspects of Velac. Specifically noting that, "Lead investigator of the Velac program…says that…prescribing Velac…would be 'desirable' versus prescribing two agents separately [because]…what you have to show in any combination product is that the combined product is superior, and clearly that's what you find here."

32.     On July 28, 2004, Connetics reported favorable net income for the second quarter ended June 30, 2004. Defendant Wiggans specifically noted in the release, "We are confident in our ability to achieve continued revenue growth with our current brands and look forward to launching up to three new products from our pipeline within the next 12 months…Looking ahead, we are diligently preparing to initiate two clinical trials while preparing our commercial operations for the introduction of Actiza, Extina and Velac."

33.     On October 25, 2004, Connetics announced that the total revenues for the third quarter of 2004 were $37.3 million, compared with total revenues of $19.7 million for the third quarter of 2003. The Company noted that it had "cash, cash equivalents and short-term investments of September 30, 2004 of $78.0 million." Commenting on these results, defendant Wiggins noted, "The Company continues to execute well on all fronts, and we are anticipating a strong finish to 2004." At that time, the Company also announced that the FDA had accepted for

10

filing the Company's new drug application for Velac. Specifically, the Company noted, "In March, Connetics announced positive results from the Phase III clinical trials with Velac versus clindamycin gel and tretinoin gel for the treatment of acne."

34.     On November 22, 2004, Connetics affirmed its Velac patent position. The Company issued a press release noting that, "The U.S. Food and Drug Administration has accepted for filing Connetics' New Drug Application for Velac as of August 23, 2004, with a user fee goal date of June 25, 2005."

35.     Connetics concealed the problems it knew would likely make it highly improbable that the FDA would approve Velac.

36.     The following day, on November 23, 2004, the Company announced that it had received an FDA non-approvable letter for Extina. Although the Company's stock price dropped significantly based on this news, it continued to trade at artificially inflated levels due to the Company's continued assurances about Velac. Specifically, the Company pledged that, "We have submitted an NDA for Velac® and have a robust pipeline of clinical and formulation-stage product candidates. "

37.     On January 25, 2005, Connetics announced financial results for the fourth quarter and year ended December 31, 2004. Commenting on total revenues for the fourth quarter rising 115% to $43.8 million, defendant Wiggans stated, "With four marketed brands, a substantially expanded commercial team and a robust product pipeline, we believe Connetics is poised for another exciting and highly productive year."

38.     On January 25, 2005, during a conference call for analysts, investors and media representatives, defendant Wiggans noted, "[A]s we prepare not only to expand the launch of

11

Evoclin, but prepare for a Velac launch, our plan encases (ph) that there will be a competitive product for Velac. But we have excellent data on Velac....[W]e are confident that we will be successful in this market with our acne franchise, and in particular, with Velac. Similarly, defendant Vontz noted during the conference call, "On the Velac front, as Tom mentioned, preparations are completely underway for getting ready to launch this product. And as part of our launch strategy, we have worked out kind of a pulsed release of clinical data....So stay tuned when that data comes out – very, very exciting news for this product."

39.    Based on defendants' statements, analysts and other market observers believed Velac would be approved in June 2005. For instance, on or about March 11, 2005, Piper Jaffray upgraded its rating on Connetics stock based on its belief Velac would be approved and its belief that Velac had great promise in the acne market.

40.    On April 13, 2005, defendant Yaroshinsky, who was involved in the Velac trial, received a call from the FDA, in which the FDA informed Yaroshinsky and Connetics that the FDA's Executive Carcinogenicity Assessment Committee ("ECAC"), which serves as the primary consulting body for the FDA on carcinogenicity issues, had concluded that the Velac Gel vehicle was positive and may be a "tumor promoter or a carcinogen," Additionally, the FDA staff further informed Yaroshinsky and Connetics stated that "this is a serious issue for a topical product for the treatment of acne." Yaroshinsky and Connetics failed to disclose this information to the public and, instead, Yaroshinsky positioned himself and a neighbor to benefit from this undisclosed adverse information.

41.    The following day, on April 14, 2005, during its 2005 Annual Analyst and Investor Day in New York City, Connetics noted the following in a press release, "This market

12

will grow from \$3.6 billion in 2000 to a projected \$6 billion by 2010. We have aggressive plans to capture an increasing share of this market, and we have set a goal to achieve annual product revenues of \$750 million by the end of the decade. This includes more than \$500 million in annual revenues from products that we currently market or are already in our development pipeline."

42. This press release failed to disclose to the public the important adverse information received from the FDA just one day earlier. Defendants, including Yaroshinsky, knew such concealment was material to keeping Connetics' stock price inflated.

43. On April 26, 2005, Connetics announced financial results for the first quarter of 2005. The Company reported net income of \$1.0 million and revenues of \$42.4 million. Commenting on these results, defendant Wiggans noted that, "We expect further revenue gains from our expanded sales force and new contract sales agreement with Ventiv for three of our products. Additionally, we have a number of near-term regulatory and clinical milestones as outlined during our Analyst and Investor Day event held April 14, 2005."

44. Also, on April 26, 2005, Connetics hosted a conference call for analysts and investors during which defendant Wiggans acknowledged that the FDA had requested additional information concerning the Company's new drug, Velac. Specifically, during the call defendant Wiggans stated, "I would point out that, as a rule, we do not feel it is appropriate, frankly, to provide regular updates on our discussions with the FDA, and we do not intend to provide further updates on this until we have more definitive information. Because, obviously, this is limited information for you as well as for us."

13

45.    On this news, despite Connetics stock dropping to $22.30 per share, it continued to trade at artificially inflated levels as defendants concealed the seriousness of the issue. Specifically, the SEC alleged that the Company's statement "stopped short of disclosing the full extent of the FDA's concerns and the incidence of tumors in the mice tested. Most notably, missing from the release was ECAC's conclusion that the 'vehicle was positive in this assay and may be a tumor promoter or a carcinogen.'"

46.    Yaroshinsky took advantage of the artificially inflated levels of Connetics' stock price by selling 15,100 shares and purchasing 51 put option contracts on Connetics stock in his own account and 2,076 put contracts in a nominal account he controlled.

47.    On June 13, 2005, before the market opened, the Company announced that it had received a non-approvable letter from the FDA for Velac. Commenting on the non-approvable letter, defendant Wiggans noted that, "We are disappointed in the FDA's decision. As discussed during our call on April 26, we were particularly disappointed that FDA did not notify us of this as a potential issue until two months prior to the PDUFA date... Despite this setback, Connetics will continue to expand its leading position in the dermatology field with four brands on the market and a robust and diverse pipeline."

48.    On this news, shares of Connetics stock sank to $15.13 per share, but continued to trade at artificially inflated levels as defendants concealed that 55% of the mice in its 2004 study of Velac had developed tumors, and the Company continued to report false financial results.

49.    On August 2, 2005, the Company announced financial results for the second quarter of 2005. In a press release entitled "Connetics Second Quarter Revenues Increase 19 Percent; OLUX, Soriatane and Evoclin Achieve All-Time Quarterly Prescription Highs;

14

Company Increases Full-Year Revenue Guidance," the Company noted that , "Selling, general

and administrative expenses for the second quarter of 2005 increased to $25.1 million from $17.2

million in the same period last year, reflecting… expenses related to a near doubling of the

Company's sales force, marketing and promotional activities related to the launch of Evoclin,

and expenses related to the anticipated launch of Velac®."

      50.    On November 1, 2005, the Company announced financial results for the third

quarter of 2005. In a press release entitled "Connetics Reports Third Quarter Revenues of $55.3

Million and Diluted EPS of $0.39," the Company stated, in relevant part:

> Connetics Corporation, a specialty pharmaceutical company that develops
> and commercializes dermatology products, announced today that its net income
> for the third quarter ended September 30, 2005 was $15.4 million, up from net
> income of $3.7 million for the third quarter of 2004. Diluted earnings per share
> increased to $0.39 from $0.10 for the comparable period in 2004. The Company's
> financial results for the 2005 third quarter include a $7.0 million revenue benefit
> due to a reserve adjustment, as described below.

> Total revenues for the third quarter of 2005 were $55.3 million, an
> increase of 48% over total revenues of $37.3 million in the third quarter of 2004.
> Total product revenues for the quarter increased 49% to $55.2 million, up from
> $37.0 million in the third quarter of 2004, reflecting contribution from sales of
> Evoclin™, which was launched in December 2004, and continued growth in sales
> of Soriatane® , OLUX® and Luxíq®. Third quarter product sales included:
> Soriatane $23.1 million, Evoclin $7.7 million, OLUX $17.3 million and Luxíq
> $7.0 million.

> Product revenues for the quarter include a one-time $7.0 million benefit
> from the reduction of revenue reserve estimates related to Soriatane. The original
> estimates, based on information available to the Company at the time it acquired
> the product rights from Roche in March 2004, were revised after Roche furnished
> actual product return and Medicaid information during the 2005 third quarter.
> Excluding the $7.0 million benefit, product revenues for the quarter were up 30%
> over the third quarter of 2004.

> Selling, general and administrative expenses for the third quarter of 2005
> increased to $23.4 million, from $16.8 million in the comparable period last year,
> primarily due to costs associated with a larger sales force and promotional
> activities related to Evoclin. Research and development expenses for the third

quarter of 2005 were \$8.2 million, compared with \$6.0 million in the third quarter of 2004, reflecting the Company's late-stage clinical activities, including Phase III trials with Primolux™ and Extina ®.

Connetics' cash and investments, including restricted cash, as of September 30, 2005, totaled \$273 million.

51. Commenting on these results, defendant Wiggans noted, "We are investing

significantly in our pipeline to drive our future growth, and we have several global licenses that

we expect will begin generating new royalty and contract revenues for the Company in the

coming year. In the final months of 2005, we continue to build a broad platform that will allow

Connetics to become the leading medical dermatology company in the U.S."

52. On January 31, 2006, the Company announced financial results for the fourth

quarter of 2005. In a press release entitled "Connetics Reports Fourth Quarter Revenues of

\$41.3 Million and EPS of \$0.40," the Company stated in part:

Connetics Corporation, a specialty pharmaceutical company that develops and commercializes dermatology products, today reported net income for the quarter ended December 31, 2005 of \$15.1 million, or \$0.40 earnings per share on a diluted "If-Converted" basis.

\*    \*    \*

Total revenues for the fourth quarter of 2005 were \$41.3 million, compared with total revenues of \$43.8 million in the fourth quarter of 2004.

53. Commenting on these results, defendant Wiggans observed, "We are delighted

that two of our partners, Pfizer and Novartis, recently received approvals to market products that

incorporate Connetics' patented topical deliver technologies…. [W]e believe Connetics is

positioned for continued growth in 2006."

54. On March 28, 2006, the SEC announced that it had filed suit in the United States

District Court for the Southern District of New York against defendant Yaroshinsky, charging

16

him with illegally trading on the basis of non-public, inside information after learning the FDA's

preliminary reactions to a study relating to cancer tests of Velac, Connetics' new drug for the

treatment of acne. Specifically, the SEC stated:

> On March 28, the Securities and Exchange Commission filed suit in the United States District Court for the Southern District of New York against Alexander J. Yaroshinsky, a Vice President at Palo Alto, California-based Connetics Corp., charging him with illegally trading on the basis of non-public, inside information after learning the FDA's preliminary reactions to a study relating to cancer tests of its acne drug. At the Commission's request, the Honorable Michael B. Mukasey issued an order freezing Yaroshinsky's assets, temporarily restraining him from further violations, and granting other emergency relief.
>
> The Commission's complaint alleges that Yaroshinsky, who participated in tests which led the FDA to ultimately conclude that the drug was "unsafe for use," learned the FDA's preliminary views with respect to the cancer tests in an April 13, 2005 call with the FDA. Shortly thereafter, Yaroshinsky positioned himself to profit from a fall in the price of Connetics' stock. In accounts he controlled, Yaroshinsky sold 15,100 previously acquired Connetics shares, and bought 2,076 put contracts which gave him the right to sell Connetics shares at a fixed price and profit when the shares fell below that price. Ultimately, on June 13, 2005, when news of the non-approval was made public, Connetics' share price fell 27% and Yaroshinsky reaped a benefit of at least $680,000.
>
> The complaint charges Yaroshinsky with violations of the anti-fraud provisions of the Securities Exchange Act of 1934, specifically Section 10(b) and rule 10-b5 thereunder, and seeks a permanent injunction, disgorgement of all ill-gotten gains plus prejudgment interest, and civil money penalties.

55.     By the beginning of May 2006, Connetics stock was trading at approximately

$15.30 per share.

56.     Then, on May 3, 2006, Connetics announced that the Company's financial

statements for the year ended December 31, 2005, and likely additional periods, could not be

relied upon. Specifically, in noting that it intended to restate its financial results for prior

17

periods, acknowledged that its rebate reserves at the end of 2005 were understated. The press

release stated in part:

> On May 3, 2006, Connetics Corporation, or the Company, issued a press release announcing its preliminary results for the quarter ended March 31, 2006, and its intent to restate financial results for prior periods. A copy of the earnings release is furnished as Exhibit 99.1 to this report.

> Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review. On May 3, 2006, the Company concluded that its financial statements for the year ended December 31, 2005, and potentially additional periods, should no longer be relied upon. The Company has determined that its rebate reserves as of the end of 2005 were understated. Rebates are contractual discounts offered to government programs and private health plans which are eligible for rebates at the time prescriptions are dispensed, subject to various conditions. The Company records quarterly reserve provisions for rebates by estimating rebate liability for product sold, based on factors such as timing and terms of plans under contract, time to process rebates, product pricing, sales volumes, units held by distributors, and prescription trends. Upon review, the Company has concluded that the rebate rates and method used to calculate the rebate liability did not fully capture the impact of these factors in its historical provision. Accordingly, the Company plans to restate its financial statements for the year ended December 31, 2005, and potentially additional periods.

> The Company intends to file an amended Form 10-K for the year ended December 31, 2005 and any other required amendments to its annual and periodic reports, which will include the restated financial statements, as soon as practicable after the Company completes its internal review and restatement of its financial statements and the external audit process is completed. The Company does not expect that it will be able to complete this process and make these filings before May 10, 2006, the deadline for timely filing the Form 10-Q for the quarter ended March 31, 2006.

> The increase in the historical provision for rebate reserves will have the effect of decreasing revenues and earnings, accrued liabilities and retained earnings figures contained in our historical financial statements. We do not believe that this restatement will have an impact on the Company's historical cash position or operating expenses.

> The Company and the audit committee of its board of directors have discussed the matters disclosed in this Current Report on Form 8-K with Ernst & Young LLP, the Company's independent registered public accounting firm.

18

Additionally, the Company is evaluating Management's Report on Internal Control Over Financial Reporting set forth in Item 9A on page 49 of the Company's 2005 Annual Report on Form 10-K. Although the Company has not yet completed its analysis of the impact of this situation on its internal controls over financial reporting, the need to restate prior period financial statements makes it highly likely that the Company had a material weakness in internal control over financial reporting as of December 31, 2005, and may have a material weakness in internal control over financial reporting as of other dates. A material weakness is a control deficiency, or a combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The existence of one or more material weaknesses means the Company could not conclude that its internal controls over financial reporting were effective as of year end. If the Company were to conclude that a material weakness existed as of December 31, 2005, it would expect to receive an adverse opinion on internal control over financial reporting from its independent registered public accounting firm.

57.     On this news, the Company's stock sank to as low as $13.70 per share before closing at $13.76 per share.

58.     On May 22, 2006, Connetics filed a Form 8-K with the SEC, which announced that the Company had received a Notice of Delisting due to its failure to file its quarterly report. After this news, the stock dropped to below $13 per share.

59.     On June 20, 2006, the SEC filed an amended complaint against defendant Yaroshinsky, which included details of the 2004 mice study for Velac. Additionally, the SEC also named one of Yaroshinsky's neighbors as a defendant, alleging that the individual had traded on inside information received from Yaroshinsky.

60.     By June 27, 2006, the Company's stock price had dropped to below $11 per share.

61.     As a result of the materially false and misleading statements and failures to disclose as alleged herein, Connetics' securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired

19

Connetics' securities relying upon the integrity of the market price of Connetics' securities and market information relating to Connetics and have been damaged thereby.

62.    During the Class Period, defendants materially misled the investing public as alleged herein, thereby inflating the price of Connetics' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein not false and misleading.  Defendants failed to disclose the material facts alleged herein at the times they made their statements to the market as concerning the Company's financial condition and operational results.

## FIRST CLAIM FOR RELIEF

### For Violation Of §10(b) Of The 1934 Act
### And Rule 10b-5 Against All Defendants

63.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

     (a)    Employed devices, schemes, and artifices to defraud;

     (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

     (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Biovail publicly traded securities during the Class Period.

20

66.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Connetics publicly traded securities. Plaintiff and the Class would not have purchased Connetics publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

67.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Connetics publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation Of §20(a) Of The 1934 Act
### Against All Defendants

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     The Individual Defendants acted as controlling persons of Connetics within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Connetics, and their ownership of Connetics' securities, the Individual Defendants had the power and authority to cause Connetics to engage in the wrongful conduct complained of herein. Connetics controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Connetics are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Connetics publicly traded

21

securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have a controlling interest.

71.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Connetics had more than 33 million shares of stock outstanding, owned by hundreds if not thousands of persons.

72.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)     Whether the 1934 Act was violated by defendants;
>
> (b)     Whether defendants omitted and/or misrepresented material facts;
>
> (c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
>
> (d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;
>
> (e)     Whether the prices of Connetics' publicly traded securities were artificially inflated; and
>
> (f)     The extent of damage sustained by Class members and the appropriate measure of damages.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22

74.    Plaintiff will adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests which may conflict with other members of the Class.

75.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members in impracticable.

## NO SAFE HARBOR

76.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false forward-looking statements pleaded in this Complaint. The safe harbor does not apply to Connetics' allegedly false statements made during the Class Period. None of the written forward-looking statements made were identified as forward-looking statements, nor was it stated that actual results "could differ materially from those projected." Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements accompany those forward-looking statements. Each of the forward-looking statements alleged herein to be false was authorized by an executive officer of Connetics and was actually known by each of the Individual Defendants to be false when made.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiff and the members of the Class compensatory damages;

C.    Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

23

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by

law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and

any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 31, 2006

**ZIMMERMAN, LEVI & KORSINSKY, LLP**

By:    _____

Eduard Korsinsky (EK8989)
Pamela Lynam Mahon (PM2380)
39 Broadway, Suite 1601
New York, NY 10006
Tel. (212) 363-7500
Fax (212) 363-7171
Attorneys for Plaintiff

24

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Fishbury, Limited duly certifies and says, as to the claims asserted under the

federal security laws, that:

1. We have reviewed the complaint and authorized its filing.

2. We did not purchase the security that is the subject of this action at the direction

of plaintiff's counsel or in order to participate in this private action.

3. We are willing to serve as a representative party on behalf of the class, including

providing testimony at deposition and trial, if necessary.

4. During the Class Period described in the Complaint, we have executed the

following transactions in the securities of Connetics Corporation:

| Dates | No. Call Contracts | Transaction | Price |
|-------|--------------------|-------------|-------|
| March 10, 2006 | 50 | Purchase | 0.4500 |
| March 10, 2006 | 40 | Purchase | 0.4500 |
| March 10, 2006 | 10 | Purchase | 0.4500 |
| March 13, 2006 | 20 | Purchase | 0.5500 |
| March 13, 2006 | 15 | Purchase | 0.5500 |
| March 13, 2006 | 15 | Purchase | 0.5500 |
| March 14, 2006 | 25 | Purchase | 0.6500 |
| March 15, 2006 | 25 | Purchase | 0.6500 |
| April 7, 2006 | 15 | Purchase | 0.4000 |
| April 7, 2006 | 15 | Purchase | 0.4000 |
| April 7, 2006 | 20 | Purchase | 0.4000 |

5. Within the last 3 years, we have not served as a class representative in any class

actions.

6. We will not accept any payment for serving as a representative party on behalf of

the class action beyond the Plaintiff's pro rata share of any recovery, except as ordered or

approved by the court, including any award for reasonable costs and expenses (including

lost wages) directly relating to the representation of the class.

We hereby certify, under penalty of perjury, that the foregoing it true and correct.

Executed this 26th day of October 2006.

FISHBURY, LIMITED

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 88
DATE FILED: 5/23/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   x
In re CONNETICS SECURITIES         x        06 Civ. 11496 (SWK)
LITIGATION                         x
                                   x        **OPINION AND ORDER**
                                   x
----------------------------------X

**SHIRLEY WOHL KRAM, U.S.D.J.**                    04698

On February 14, 2007, lead plaintiff Oklahoma Teachers'
Retirement System ("Oklahoma Teachers") filed its consolidated
amended complaint (the "Complaint"), which charges that
Connetics Corporation ("Connetics"), several of its former and
current officers and directors (collectively, the "Connetics
Defendants"), Ernst & Young LLP ("E&Y"), Alexander Yaroshinsky
("Yaroshinsky"), Victor Zak ("Zak"), and four underwriters (the
"Underwriter Defendants") engaged in securities fraud. The
Connetics Defendants now move the Court to transfer venue under
28 U.S.C. § 1404(a). For the reasons that follow, the Court
grants that motion and transfers this case to the United States
District Court for the Northern District of California.

**I.    BACKGROUND**

On October 31 and November 2, 2006, two class action
complaints were filed in this District, alleging that Connetics
and several of its officers and directors committed securities
fraud. In an Opinion and Order dated December 14, 2006, the
Court consolidated those two actions under the above caption,

A CERTIFIED COPY
J. MICHAEL McMAHON,    .   **CLERK**

BY _____
              DEPUTY CLERK

MICROFILM    -08 AM    MAY 24 2007

appointed Oklahoma Teachers lead plaintiff, and named Bernstein Litowitz Berger & Grossmann LLP lead counsel. Oklahoma Teachers is a government-sponsored retirement plan that resides in Oklahoma and manages assets for employees of Oklahoma educational institutions. On February 14, 2007, Oklahoma Teachers filed the Complaint on behalf of a putative nationwide class of individuals who purchased Connetics securities between January 27, 2004, and July 9, 2006 (the "Class Period").

The Complaint identifies various institutional and individual defendants. Connetics is a specialty pharmaceuticals company incorporated in Delaware, which focuses on the development of products for the dermatology market. At all relevant times, Connetics maintained its corporate headquarters in the Northern District of California, where nearly all of the Connetics Defendants also worked and continue to reside.[1] E&Y served as Connetics' outside auditor from its offices in Northern California. Yaroshinsky is the former Vice President of Biostatistics and Clinical Operations at Connetics and currently resides in California. Zak is a resident of Newton, Massachusetts who was employed in Connecticut during the Class Period. The Underwriter Defendants are: CIBC WorldMarkets Corp.

---

[1] Of the thirteen former or current officers and directors named as defendants in the Complaint, just two reside outside California. Specifically, Carl B. Feldbaum, a former Connetics director, resides in Idaho, while John C. Kane, who is also a former Connetics director, resides in Georgia.

("CIBC"), which maintains its principal place of business in New York City; Wachovia Securities International Limited, whose principal place of business is in Richmond, Virginia; KBC Financial Products USA, which holds its principal place of business in New York City; and DGAB London, whose principal place of business is in London, England.

The Complaint avers three basic securities fraud schemes. First, it alleges that the defendants misrepresented the safety and likelihood of Food and Drug Administration ("FDA") approval of a developmental-stage acne product called Velac Gel ("Velac"), which the defendants knew had caused a high incidence of cancer in the mice on which it was tested. Second, the Complaint charges that the defendants caused Connetics to issue materially false and misleading financial statements, predicated in part on revenue numbers that had been inflated through "channel-stuffing."[2] Third, the Complaint accuses Yaroshinsky and Zak of using insider knowledge about the pending non-approval of Velac to profit through insider sales of Connetics securities.[3]

---

[2] Channel-stuffing is a deceptive business practice designed to inflate a company's sales and earnings figures. The company accomplishes this inflation by deliberately sending retailers along its distribution channel more products than they are able to sell. These retailers eventually send the excess products, in lieu of cash, back to the company, which must readjust its accounts receivable and ultimately its bottom line.
[3] These insider-trading allegations are also the subject of a Securities and Exchange Commission ("SEC") enforcement action

Before answering these allegations on the merits, the Connetics Defendants filed the instant motion to transfer venue to the Northern District of California. The motion is supported by Yaroshinsky and E&Y.

## II.  DISCUSSION

A district court may transfer a civil action to any other district where the action might have been brought "[f]or the convenience of the parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). In determining the propriety of a motion to transfer venue, a district court must conduct a two-part inquiry. First, the district court must decide whether the action "might have been brought" in the transferee district. Id.; Fuji Photo Film Co. v. Lexar Media, Inc., 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (citation and internal quotation marks omitted). Second, the district court must analyze the extent to which the interest of justice and the convenience of the litigation warrant a transfer of venue. Fuji Photo Film Co., 415 F. Supp. 2d at 373; In re Nematron Corp. Sec. Litig., 30 F. Supp. 2d 397, 400 (S.D.N.Y. 1998) (citation omitted).

This second, case-specific analysis generally embraces the consideration of several factors, including: (1) the convenience of witnesses, (2) the convenience of the parties, (3) the

---

currently pending in this District. See Sec. & Exch. Comm. v. Yaroshinsky, 06 Civ. 2401 (RCC).

4

location of relevant documents and the relative ease of access to sources of proof, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded the plaintiff's choice of forum, and (9) trial efficiency and the interest of justice, based on the totality of the circumstances. Fuji Photo Film Co., 415 F. Supp. 2d at 373 (citation omitted); In re Nematron, 30 F. Supp. 2d at 400 (citations omitted). A district court should grant a motion for a transfer of venue only if the moving party has made a "clear and convincing" showing that transfer is appropriate in light of these and any other relevant factors. In re Nematron, 30 F. Supp. 2d at 400 (citations and internal quotation marks omitted).

Here, the parties do not dispute--nor could they--that the Connetics Defendants have satisfied the first prong of the venue inquiry. The Securities Exchange Act of 1934 (the "Exchange Act") provides that venue is proper in any district "wherein the defendant is found or is an inhabitant or transacts business . . . ." 15 U.S.C. § 78aa. The Northern District of California meets these criteria because many of the defendants reside and transacted business therein.

5

Therefore, the Connetics Defendants' motion to transfer venue turns on the nine factors mentioned above. As the following analysis demonstrates, the Connetics Defendants have shown that these factors weigh convincingly in favor of transfer.

## 1. The Convenience of Witnesses

The "[c]onvenience of both the party and non-party witnesses is probably the single-most important factor in the analysis of whether transfer should be granted." Berman v. Informix Corp., 30 F. Supp. 2d 653, 657 (S.D.N.Y. 1998) (citation and internal quotation marks omitted). In evaluating this factor, the Court must consider "the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." Royal & Sunalliance v. British Airways, 167 F. Supp. 2d 573, 577 (S.D.N.Y. 2001) (citation omitted). Here, the Connetics Defendants have made a convincing showing, by way of supplemental affidavits submitted to the Court, that the convenience of potential witnesses favors transfer. See Orb Factory, Ltd. v. Design Science Toys, Ltd., 6 F. Supp. 2d 203, 208 (S.D.N.Y. 1998) (stating that moving party "must support the transfer application with an affidavit containing detailed factual statements . . ., including the potential principal witnesses expected to be called and a general statement of the

6

substance of their testimony") (citation and internal quotation marks omitted).

In cases where, as here, the plaintiff alleges securities fraud, the key witnesses are frequently "officers and employees of [the issuer] who participated in drafting or distributing allegedly false and misleading statements." In re Stillwater Co. Mining Sec. Litig., No. 02 Civ. 2806 (DC), 2003 WL 21087953, at *4 (S.D.N.Y. May 12, 2003); accord In re Nematron, 30 F. Supp. 2d at 402 ("It is well known that trials in securities class actions focus almost entirely on the defendants' conduct."). The Connetics Defendants have identified dozens of such potential witnesses who were involved in the preparation and dissemination of Connetics' financial statements. (Wiggans Decl. ¶ 8-9, Mar. 16, 2007; Higgins ¶¶ 5-7, Mar. 16, 2007.) Furthermore, the Connetics Defendants have specified eight E&Y employees who possess information about Connetics' quarterly and annual audits, as well as its financial statements. (Morrison Decl. ¶¶ 4-7, Mar. 5, 2007.) The Connetics Defendants have also singled out persons with information regarding its sales practices and alleged channel-stuffing (Wiggans Decl. ¶ 13) and others with information concerning its application to the FDA for permission to market Velac (Wiggans Decl. ¶ 15; Krochmal Decl. ¶ 5, Mar. 16, 2007). Nearly all of these potential witnesses worked in

7

Northern California on matters related to this litigation and continue to reside there.

Lead plaintiff Oklahoma Teachers has attempted to rebut the Connetics Defendants' substantial showing of witness convenience by pointing to other potential witnesses who do not reside in Northern California. Specifically, Oklahoma Teachers points to: (1) FDA employees who work and reside in or around the Washington, D.C. area; (2) toxicologists located around the country who were involved in Velac testing; (3) Connetics' primary customers, which are located in Pennsylvania, Ohio, and Florida; (4) securities analysts who covered Connetics, the majority of whom are not located in California; and (5) Zak, who is a Massachusetts resident. Though some of these individuals-- in particular, the FDA employees in and around D.C. and the toxicology experts located throughout the nation--may possess information concerning what the defendants knew and when they knew it, most of them have no ties to this District. Thus, most of the potential witnesses cited by Oklahoma Teachers will be inconvenienced regardless of whether this litigation proceeds here or in the Northern District of California, a consideration which weighs in the Connetics Defendants' favor. See In re Hanger Orthopedic Group, Inc. Sec. Litig., 418 F. Supp. 2d 164, 168-69 (E.D.N.Y. 2006) (holding that convenience of witnesses tipped in defendants' favor where "plaintiffs' non-party

8

witnesses will be inconvenienced whether the case proceeds in New York or Maryland").

The only potential witnesses with alleged ties to this District are analysts working with CIBC, The Buckingham Research Group, and C.E. Unterberg, Towbin ("C.E. Unterberg"). Oklahoma Teachers has submitted several reports prepared by these analysts, whose names are accompanied by phone numbers beginning with a "212" area code. Although this may be evidence that the analysts in question work at offices in New York, it is not proof that they reside in this District. In addition, both CIBC and C.E. Unterberg maintain offices in California, from which these companies' analysts may have covered Connetics. In fact, Oklahoma Teachers' own submissions demonstrate that Connetics was covered by many analysts throughout the nation. (Pls.' Opp'n 8 n.5, Mar. 30, 2007.) Given the relative import of the evidence that might be presented by potential analyst-witnesses, and in light of these witnesses' unclear connections to this District, the analyst-witnesses do not significantly tip the venue inquiry in Oklahoma Teachers' favor. See Berman, 30 F. Supp. 2d at 657 (discounting plaintiff's reliance on analyst-witnesses where plaintiff only assumed that analysts resided in New York because important brokerages had offices there, but many of brokerages in fact also had offices elsewhere and a number of analysts reported on company from locations outside New York).

9

In sum, the convenience of witnesses favors the transfer of this litigation to the Northern District of California. Most of the potentially significant witnesses identified by the parties worked and continue to reside therein. Although some witnesses will be inconvenienced wherever this case moves forward, scarcely any will be worse off if the case proceeds in the Northern District of California, and many will be better off.

## 2. The Convenience of the Parties

In analyzing the convenience of the parties, "[t]he logical starting point is a consideration of [their] residence . . . ." U.S. Fidelity and Guar. Co. v. Republic Drug Co., Inc., 800 F. Supp. 1076, 1080 (E.D.N.Y. 1992). Here, the vast majority of the defendants--including nearly all of the former and current Connetics officers and directors named in the suit, Yaroshinsky, and E&Y--reside in California and have asserted that they would be inconvenienced by the prosecution of this suit in the Southern District of New York. Zak, who resides in Massachusetts, has not expressed any preference regarding the disposition of the instant motion for a transfer of venue, nor have the Underwriter Defendants, three of which are headquartered in New York.

On the other hand, lead plaintiff Oklahoma Teachers is a resident of Oklahoma and thus cannot claim that this District is the more convenient forum for it. In re Hanger, 418 F. Supp. 2d

10

at 169. Furthermore, Oklahoma Teachers purports to bring this action on behalf of a nationwide class of purchasers of Connetics securities, many of whom will not be New York residents. Since many class members will be inconvenienced regardless of whether the instant suit proceeds in this District or the Northern District of California, the plaintiffs' residence provides no support for keeping this suit in New York. See In re Collins & Aikman Corp. Sec. Litig., 438 F. Supp. 2d 392, 396 (S.D.N.Y. 2006); In re Hanger, 418 F. Supp. 2d at 169; In re Nematron, 30 F. Supp. 2d at 403.

Given the defendants' strong ties to Northern California and the plaintiffs' weak connections to this District, the convenience of parties tips decidedly in favor of the Connetics Defendants' motion to transfer venue. In re Collins & Aikman, 438 F. Supp. 2d at 396; In re Hanger, 418 F. Supp. 2d at 169.

## 3. The Location of Relevant Documents and Relevant Ease of Access to Sources of Proof

Although the location of relevant documents may be of less significance in light of modern copying and reproduction technologies, see In re Hanger, 418 F. Supp. 2d at 170, it nonetheless retains at least some relevance to the venue inquiry. In re Collins & Aikman, 438 F. Supp. 2d at 396-97; Ravenwoods Inv. Co. v. Bishop Capital Corp., No. 04 Civ. 9266 (KMK), 2005 WL 236440, at *6 (S.D.N.Y. Feb. 1, 2005); In re

11

Stillwater, 2003 WL 21087953, at *4. Most of the documents related to Connetics' allegedly misleading financial statements, including its financial records, press releases, and internal company reports and communications, were prepared in the Northern District of California and are maintained therein. (Wiggans Decl. ¶ 8; Higgins Decl. ¶ 7.) Likewise, most of the regulatory, pre-clinical, and product-development documents pertaining to Velac are located in the Northern District of California. (Wiggans Decl. ¶ 14; Krochmal Decl. ¶ 6.) Furthermore, additional evidence stemming from outside audits of Connetics is located at E&Y's offices in the Northern District of California. (Morrison Decl. ¶ 10.)

Nevertheless, lead plaintiff Oklahoma Teachers argues that substantial portions of the documents located outside New York will be present in this District in connection with the SEC's enforcement action against Yaroshinsky and Zak. See Sec. & Exch. Comm. v. Yaroshinsky, 06 Civ. 2401 (RCC). Although some documents relevant to this litigation may be available in this District, Oklahoma Teachers' argument misses the mark. The SEC enforcement action involves only insider-trading allegations. Those allegations overlap with the insider-trading allegations made in the Complaint, but they do not embrace the other claims at issue here, including those that pertain to alleged misrepresentations in Connetics' financial statements and

12

reports on Velac. In fact, given the differences in the subject matter of the SEC enforcement action and the instant action, Judge Casey previously declined to accept these actions as related. See Yaroshinsky, 06 Civ. 2401 (RCC), Dkt. # 38. Therefore, while the presence in this District of documents relating to the Complaint's insider-trading allegations may partially reduce the inconvenience of proceeding here, it by no means eliminates the advantage of proceeding in the Northern District of California, where documents relating to all of the Complaint's claims will be found.

In summary, because the majority of the documents pertaining to the allegations of the Complaint are located in the Northern District of California, that forum is at least a marginally better forum in which to proceed. See In re Collins & Aikman, 438 F. Supp. 2d at 396-97 (district where "financial statements, presses releases, earnings statements, and SEC filings" were prepared and located was "at least marginally more convenient"); In re Nematron, 30 F. Supp. 2d at 404 ("Of course the documents at issue here could be copied and shipped to New York. Yet this would impose an extra cost that is unnecessary . . . ."); accord In re Stillwater, 2003 WL 21087953, at *5 ("While it is true that documents can be transported from state to state, for purposes of weighing transfer factors, the fact

13

that the documents are all currently located in Montana favors transfer.").

## 4. The Locus of Operative Facts

Courts in this District have held that misrepresentations or omissions occur "where the misrepresentations are issued or the truth is withheld, not where the statements at issue are received." In re Collins & Aikman, 438 F. Supp. 2d at 397 (quoting Adair v. Microfield Graphics, Inc., 00 Civ. 0629 (MBM), 2000 WL 1716340, at *2 (S.D.N.Y. Nov. 16, 2000)). The allegedly misleading financial statements, press releases, and SEC filings enumerated in the Complaint were prepared and issued from Connetics' headquarters in the Northern District of California (Wiggans Decl. ¶¶ 8-10; Higgins Decl. ¶ 7), and are therefore deemed to have occurred therein. Since these alleged misrepresentations form the core of this litigation, significant portions of the operative facts occurred in the Northern District of California. See In re Hanger, 418 F. Supp. 2d at 169 ("As in any securities-fraud action, plaintiffs' claims are based on defendants' alleged misrepresentations and omissions . . . .").

Certain facts set forth in the Complaint undoubtedly occurred outside of California. In particular, the pre-clinical safety test that found a high incidence of cancerous tumors in mice exposed to Velac was conducted in the Washington, D.C.

14

area. Experts involved in the testing of Velac were located
throughout the country. Moreover, FDA employees located in or
near Rockville, Maryland contacted some of the Connetics
Defendants on April 13, 2005, in order to discuss Velac's
negative test results. However, these incidental occurrences do
not pull the "center of gravity" of this litigation away from
California, where the facts constituting the defendants' alleged
fraud took place. See In re Collins & Aikman, 438 F. Supp. 2d at
397; In re Stillwater, 2003 WL 21087953, at *4. Furthermore,
since these incidental occurrences did not take place in New
York, they scarcely connect the instant case to this District.
See In re Collins & Aikman, 438 F. Supp. 2d at 397 (discounting
plaintiff's reliance on facts that occurred outside Southern
District of New York in submission opposing transfer from that
district).

Lead plaintiff Oklahoma Teachers lays special emphasis on
Connetics' March 2005 issuance of bonds pursuant to an indenture
governed by New York law (the "Indenture"). Oklahoma Teachers
claims that the Indenture: (1) allowed the bonds to be
surrendered at a Connetics office in Manhattan; (2) required
that Connetics maintain a trustee with offices in Manhattan; (3)
stipulated that bondholders' meetings would be held in
Manhattan; and (4) obligated Connetics to retain offices in
Manhattan. (Pls.' Opp'n 6-7.) According to Oklahoma Teachers,

15

Connetics purposely availed itself of the opportunity to do business in New York and thus should not be surprised that it has been hauled into court in this District. (Pls.' Opp'n 17.) Oklahoma Teachers' argument, however, strays wide of the target.

Uncontradicted affidavits presented by the Connetics Defendants demonstrate that transactional documents relating to the bonds were prepared in the Northern District of California, wherein the due diligence conducted in connection with the bonds' issuance also occurred. (Higgins Decl. ¶ 8.) Moreover, Connetics never maintained an office in Manhattan, but rather employed J.P. Morgan as its agent in this District. (Higgins Decl. ¶ 8.) Connetics' ties to this District through the activities of J.P. Morgan are tenuous, especially in light of the more robust connections between the operative facts and California. See Lewis v. C.R.I., Inc., No. 03 Civ. 651 (MBM), 2003 WL 1900859, at *3 (S.D.N.Y. Apr. 17, 2003) (transferring venue in part because defendant had only a "tenuous" connection to New York through its solicitation agent). More importantly, Oklahoma Teachers' claims concerning the bond offering arise out of the bond registration statement's incorporation of the same alleged misrepresentations on which the remainder of the Complaint relies. The Court has already determined that these misrepresentations occurred where they were issued, i.e., in the Northern District of California. That the bonds were issued

16

under New York law is irrelevant, since this is not a dispute over the interpretation of the bond contract, but rather, a controversy that turns on whether the defendants misrepresented material information and possessed the requisite scienter in doing so. For purposes of the instant motion, the "New York" bond offering is comparable to the ordinary sale of stock on New York stock exchanges. Since a non-movant's sale of stock in New York cannot alone prevent a transfer of venue, nor can the bond offering. See In re Nematron, 30 F. Supp. 2d at 404 ("[T]hat the shares were directed to New York does not make it a forum which has a significant contact with the operative facts.").

In summary, the operative facts are centered around the Northern District of California, wherein the defendants allegedly issued the misrepresentations that constitute the basis of this litigation. Thus, the location of the operative facts weighs heavily in favor of a transfer of venue. See ZPC 2000, Inc. v. SCA Group, Inc., 86 F. Supp. 2d 274, 279 (S.D.N.Y. 2000) ("[T]he location of operative events is a 'primary factor' in determining a motion to transfer venue.") (quoting Smart v. Goord, 21 F. Supp. 2d 309, 316 (S.D.N.Y. 1998).

## 5. The Availability of Process to Compel Attendance of Unwilling Witnesses

Under Federal Rule of Civil Procedure 45(b)(2), a district court may compel the appearance only of those witnesses who

17

reside in the district in which the court sits, or within 100 miles of the place of trial. Here, the Connetics Defendants have identified many potential witnesses who reside in the Northern District of California, outside the reach of this Court's subpoena powers. See supra Part II.A. Nevertheless, many of these potential witnesses are parties to the instant litigation, whose attendance may be compelled by the district court wherever this suit is heard. See In re Geopharma, Inc. Sec. Litig., No. 04 Civ. 9463 (SAS), 2005 WL 1123883, at *3 (S.D.N.Y. May 11, 2005) (citing 15 U.S.C. § 78aa). Other potential witnesses identified by the Connetics Defendants are Connetics employees, whose testimony may be compelled by Connetics without the need for a subpoena. Fuji Photo Film Co., 415 F. Supp. 2d at 375 (citing Aerotel, Ltd. v. Sprint Corp., 100 F. Supp. 2d 189, 197 (S.D.N.Y. 2000)).

The Connetics Defendants point to several potential non-party witnesses who are no longer employed by Connetics, but continue to reside in the Northern District of California, beyond the subpoena power of this Court. (Wiggans Supp. Decl. ¶¶ 3-4, Apr. 13, 2007; Wiggans Decl. ¶ 15.) These potential witnesses include six particular former members of Connetics' management, as well as dozens of unidentified former employees in relevant Connetics' departments. (Defs.' Reply 3-4.) Although these individuals may indeed escape this Court's compulsory

18

process, the Connetics Defendants have failed to demonstrate, or even allege, that any of them would be unwilling to testify should this matter proceed to trial. As such, the Connetics Defendants have made only a weak preliminary showing of potential subpoena difficulties. See In re Collins & Aikman, 438 F. Supp. 2d at 397-98.

On the other hand, lead plaintiff Oklahoma Teachers has not identified any particular non-party witnesses who would be subject to process in this District, but are not subject to process in the Northern District of California. In fact, the majority of Oklahoma Teachers' non-party witnesses who reside outside the state of California are located in Washington, D.C., Maryland, Pennsylvania, Ohio, and Florida, well outside the reach of this Court's subpoena power.

Given the Connetics Defendants' weak preliminary showing of potential subpoena difficulties, in conjunction with the absence of any contrary showing by Oklahoma Teachers, this factor weighs slightly in favor of transfer. See id.

### 6. The Relative Means of the Parties

"Where disparity exists between the parties, such as an individual plaintiff suing a large corporation, the relative means of the parties may be considered." Berman, 30 F. Supp. 2d at 659 (citations omitted). Here, there is no relevant disparity between the resources available to Connetics and lead plaintiff

19

Oklahoma Teachers. Nonetheless, Oklahoma Teachers argues that the burden on Zak associated with litigating this action in the Northern District of California, while also litigating the SEC enforcement action in this District, would be substantial. Although Zak may indeed suffer some inconvenience from this arrangement, there are fourteen other individual defendants named in this action, twelve of whom reside in California, and all of whom have indicated that it would be more convenient to litigate therein. In the absence of any showing that Zak has fewer financial means than these fourteen individuals, or any contrary showing that the fourteen other individual defendants would be meaningfully impeded by the prosecution of this suit in New York, the Court finds that this factor is neutral.

**7. The Forum's Familiarity with the Governing Law**

Federal courts throughout the nation are equally capable of applying federal securities laws. In re Collins & Aikman, 438 F. Supp. 2d at 398. Accordingly, this factor is also neutral.

**8. The Weight Accorded the Plaintiff's Choice of Forum**

"A plaintiff's choice of forum is generally entitled to considerable weight . . . ." Berman, 30 F. Supp. 2d at 659 (citations omitted). That weight is reduced, however, where "the plaintiff is not a resident of the forum and the cause of action is minimally connected with the forum." Eichenholtz v. Brennan, 677 F. Supp. 198, 201 (S.D.N.Y. 1988) (citations omitted). A

20

plaintiff's choice of forum also "carries far less weight" in a stockholder class action, where members of the class are dispersed throughout the nation. Berman, 30 F. Supp. 2d at 659 (citing Shulof v. Westinghouse Elec. Corp., 402 F. Supp. 1262, 1263 (S.D.N.Y. 1975)); see also In re Warrick, 70 F.3d 736, 741 n.7 (2d Cir. 1995) ("[T]he plaintiff's choice of forum is a less significant consideration in a . . . class action than in an individual action.").

Here, Oklahoma Teachers is not a resident of this forum. Moreover, the Court has already determined that the operative facts of the instant litigation bear very little relation to this District. See supra Part II.D. In addition, Oklahoma Teachers purports to bring this securities class action on behalf of a widely dispersed, nationwide class of individuals. Under these circumstances, Oklahoma Teachers' choice of forum is entitled to substantially less deference. See, e.g., In re Collins & Aikman, 438 F. Supp. 2d at 398; In re Hanger, 418 F. Supp. 2d at 170.

## 9. Trial Efficiency and the Interest of Justice

"There is a strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, [duplicative] litigation can be avoided, thereby saving time and expense for both parties and witnesses, and inconsistent results can be

avoided." Savin v. CSX Corp., 657 F. Supp. 1210, 1214 (S.D.N.Y. 1988) (quoting Wyndham Associates v. Bintliff, A.G., 398 F.2d 614, 619 (2d Cir. 1968)). Here, lead plaintiff Oklahoma Teachers relies on this "strong policy" to argue that the instant litigation should not be transferred away from this District, wherein the "substantially similar" SEC enforcement action against Yaroshinsky and Zak is proceeding. Since there is some overlap between this litigation and the SEC enforcement action, it is conceivable that the parties and witnesses could better coordinate their trial preparation as to the overlapping subject matter if both cases proceeded in the same district. Nevertheless, Judge Casey has already determined that the SEC enforcement action is not related to this litigation. See Yaroshinsky, 06 Civ. 2401 (RCC), Dkt. # 38. Thus, these two cases will in any event proceed before different judges, which dampens whatever minimal efficiencies could have been garnered from the prosecution of concededly unrelated matters before a single tribunal. Moreover, this Court has already noted the wide divergence between the insider-trading allegations of the enforcement action and the much broader securities-fraud allegations of the Complaint. See supra Part II.C. Therefore, the "strong policy" regarding related cases has minimal implications for the instant venue inquiry.

22

In considering trial efficiency, a district court may also pay some mind to relative levels of docket congestion in the prospective transferor and transferee districts. See In re Hanger, 418 F. Supp. 2d at 171; see also In re Nematron, 30 F. Supp. 2d at 407 (noting that though docket conditions in the transferor and transferee courts "are relevant," they are "insufficient on [their] own to support a transfer motion") (citations and internal quotation marks omitted). Here, the Connetics Defendants have demonstrated that this District is slightly more congested than the Northern District of California. In particular, as of September 30, 2006, the average judge in this District presided over 716 cases, while the average judge in the Northern District presided over 583. See Administrative Office of the United States Courts, Federal Court Management Statistics ("FCMS"), available at http://www.uscourts.gov/cgi-bin/cmsd2006.pl (last visited May 21, 2007). Nevertheless, since this slight difference in caseload translated only into a one-month difference in median disposition time for a civil case (8.3 months in this District, as opposed to 7.4 months in the Northern District of California), it weighs only marginally, if at all, in the Connetics Defendants' favor. See In re Hanger, 418 F. Supp. 2d at 171 (finding 2.7 month difference in relative median disposition times to weigh marginally in favor of transfer).

23

Thus, the pendency of the SEC enforcement action and the relative docket congestion in this District and the Northern District of California figure only minimally in the Court's analysis of trial efficiency and the interest of justice.

Given the relative irrelevance of these last considerations, and since the people, papers, and events involved in this matter are centered around the Northern District of California, the Court finds that it would be more efficient and just for this litigation to proceed there, rather than in Oklahoma Teachers' chosen forum. See Berman, 30 F. Supp. 2d at 659 (finding that "plaintiff's choice of forum [was] far outweighed by the factors discussed above which point overwhelmingly in favor of transfer to California") (citing Giuliani, S.p.A. v. Vickers, Inc., 997 F. Supp. 501, 503 (S.D.N.Y. 1998)); accord In re Nematron, 30 F. Supp. 2d at 407 ("A denial of transfer will not be premised solely on choice of forum.").

In summary, the majority of the venue factors point decidedly in the direction of transfer, while the rest are either neutral, or in the case of Oklahoma Teachers' choice of forum, weigh only slightly against transfer. Under these circumstances, the Court concludes that the Connetics Defendants have shown by clear and convincing evidence that transfer is in the "best interests of the litigation." See Berman, 30 F. Supp.

24

2d at 656 (quoting Linzer v. EMI Blackwood Music, Inc., 904 F.
Supp. 207, 216 (S.D.N.Y. 1995)).

**III. CONCLUSION**

Although there is no per se rule favoring the transfer of a
securities-fraud action to the district of the issuer's
headquarters, many courts have nonetheless routinely reached
that result. In re Hanger, 418 F. Supp. 2d at 168 (listing
cases). Likewise, this Court's analysis of the venue factors as
they relate to the instant action demonstrates that the Northern
District of California--the location of Connetics' headquarters-
-is a far superior forum for this litigation.

Therefore, the Connetics Defendants' motion to transfer
venue is hereby granted and the Clerk is directed to transfer
this case, including all actions consolidated thereunder, to the
Northern District of California.

SO ORDERED.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          May 23, 2007