1   BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
2   DAVID R. STICKNEY   (Bar No. 188574)
    MATTHEW P. SIBEN   (Bar No. 223279)
3   TAKEO A. KELLAR   (Bar No. 234470)
    12481 High Bluff Drive, Suite 300
4   San Diego, CA 92130
    Tel:    (858) 793-0070
5   Fax:    (858) 793-0323
    davids@blbglaw.com
6   matthews@blbglaw.com
    takeok@blbglaw.com
7          -and-
    CHAD JOHNSON
8   1285 Avenue of the Americas, 38th Floor
    New York, NY 10019
9   Tel:    (212) 554-1400
    Fax:    (212) 554-1444
10  chad@blbglaw.com

11  Attorneys for Lead Plaintiff Teachers' Retirement
    System of Oklahoma and Lead Counsel to the Class

12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                SAN FRANCISCO DIVISION

16  | In re CONNETICS SECURITIES | Case No. C 07-02940 SI |
    | LITIGATION. | |
17  | | |
    | | **AMENDED CONSOLIDATED** |
18  | | **CLASS ACTION COMPLAINT FOR** |
    | | **VIOLATIONS OF THE FEDERAL** |
19  | | **SECURITIES LAWS** |
20  | | CLASS ACTION |
21  | | DEMAND FOR JURY TRIAL |

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................1

II.   JURISDICTION AND VENUE ............................................................5

III.  THE PARTIES ......................................................................................5

    A.    Lead Plaintiff .............................................................................5

    B.    Defendants .................................................................................6

        1.    The Company ...................................................................6

        2.    The Insider Defendants ....................................................6

        3.    Defendant Alexander J. Yaroshinsky.............................7

        4.    Defendant Victor E. Zak .................................................8

IV.   CLASS ACTION ALLEGATIONS .......................................................8

V.    FACTUAL ALLEGATIONS AND THE FRAUDULENT
    SCHEME ............................................................................................10

    A.    Historical And Regulatory Background Regarding
        The Company.............................................................................10

    B.    Defendants Actively Promoted The Sales And
        Revenue Potential Of Velac While Concealing The
        Fact That Defendants' Pre-Clinical Testing
        Revealed That Velac Causes Cancerous Tumors ................12

        1.    Connetics Acquired Velac And Touted Its
            Initially Positive Clinical Trial Results....................12

        2.    Connetics Learned That Velac Caused
            Cancerous Tumors In Laboratory Mice, But
            Did Not Disclose That Information To The
            Market ..........................................................................14

        3.    The Defendants Continued To Mislead The
            Market About Velac For Nearly A Year
            After They Learned That Velac Caused
            Cancer In Laboratory Mice ........................................16

        4.    The April 2005 Teleconference With The
            FDA And The Belated Partial Disclosure Of
            The Issues With Velac ................................................18

        5.    The FDA Sends A Non-Approval Letter On
            Velac ............................................................................21

6.    Yaroshinsky And Zak Made Hundreds Of Thousands Of Dollars Short-Selling Connetics' Securities Based On Their Inside Knowledge About The Problems With Velac .......................................................22

7.    The SEC Investigation Into Velac .......................24

C.    Connetics Issued Materially False And Misleading Financial Statements During The Class Period .......................25

1.    The Marketplace For Connetics' Products And The Company's Method For Recognizing Revenue ...............................25

2.    Connetics Engaged In Intentional Channel-Stuffing Throughout The Class Period .......................27

3.    Connetics Announced Its Intention To Restate Its Financial Statements, But Continued To Deliberately Deceive Investors .......................33

4.    The SEC Investigation Into Channel-Stuffing .......................34

5.    The Truth Is Finally Revealed .......................35

6.    The Restatement .......................36

7.    Impact On Financial Statements .......................37

8.    GAAP Violation .......................39

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER .......................43

A.    Evidence Of Intentional Or Reckless Misconduct .......................43

B.    The Insider Defendants And Connetics Raised $200 Million In A Private Bond Offering And Used The Proceeds For A Share Repurchase .......................46

C.    The Insider Defendants And Connetics Were Motivated To Meet Or Exceed Analyst Expectations .......................47

D.    Insider Sales .......................49

E.    Additional Indicia Of Scienter .......................52

VII.    ADDITIONAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS .......................56

1.    The January 27, 2004 Press Release .......................56

2.    The May 4, 2004 Press Release .......................56

3.   The May 4, 2004 Conference Call ...................................................57

4.   The 1Q 2004 10-Q ...........................................................................59

5.   The July 1, 2004 Article In The
     Dermatology Times .........................................................................60

6.   The July 28, 2004 Press Release ....................................................61

7.   The July 28, 2004 Conference Call ................................................62

8.   The 2Q 2004 10-Q ...........................................................................62

9.   The October 25, 2004 Press Release ..............................................64

10.  The October 25, 2004 Conference Call ..........................................65

11.  The 3Q 2004 10-Q ...........................................................................66

12.  The November 22, 2004 Press Release ...........................................68

13.  The January 25, 2005 Press Release ..............................................68

14.  The January 25, 2005 Conference Call ..........................................69

15.  The 2004 10-K .................................................................................71

16.  The April 26, 2005 Press Release ..................................................74

17.  The April 26, 2005 Conference Call ...............................................75

18.  The 1Q 2005 10-Q ...........................................................................76

19.  The June 13, 2005 Press Release ...................................................78

20.  The June 13, 2005 Conference Call ................................................79

21.  The August 2, 2005 Conference Call ..............................................80

22.  The 2Q 2005 10-Q ...........................................................................82

23.  The November 1, 2005 Press Release .............................................84

24.  The 3Q 2005 10-Q ...........................................................................85

25.  The December 19, 2005 Conference Call ........................................87

26.  The January 31, 2006 Press Release ..............................................89

27.  The 2005 10-K .................................................................................90

28.  The May 3, 2006 Press Release ......................................................92

29.  The May 3, 2006 Conference Call ..................................................93

VIII.  LOSS CAUSATION ...................................................................................97

IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ...............................................98

X.    PRESUMPTION OF RELIANCE .....................................................................................98

XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT...........................................100

COUNT ONE For Violations Of Section 10(b) Of The Exchange
       Act And Rule 10b-5 Promulgated Thereunder Against
       Defendants Connetics, Wiggans, Higgins, Vontz, Krochmal,
       Yaroshinsky and Zak .......................................................................................................100

COUNT TWO For Violations Of Section 20(a) Of The Exchange
       Act Against Defendants Wiggans, Higgins And Vontz.....................................................102

COUNT THREE For Violations Of Section 20A Of The Exchange
       Act Against Defendants Wiggans, Higgins, Vontz,
       Yaroshinsky And Zak .......................................................................................................105

XII.    PRAYER FOR RELIEF ..................................................................................................106

XIII.    JURY TRIAL DEMAND ................................................................................................107

Court-appointed Lead Plaintiff, the Teachers' Retirement System of Oklahoma ("Oklahoma Teachers" or "Lead Plaintiff"), brings this federal securities law class action on behalf of itself and all other persons and entities, other than Defendants and their affiliates, as specified below, who purchased or acquired the securities of Connetics Corp. (n/k/a Steiffel Laboratories, Inc. ("Connetics" or the "Company") between January 27, 2004 and July 9, 2006 (the "Class Period"), and were damaged by the conduct asserted herein.

I.    **INTRODUCTION**

1.    This case is about a Company that deliberately misled investors about its business prospects and financial performance.  During the Class Period, Connetics and its senior executives told investors that the Company was developing a revolutionary new acne medication for future sale in the United States, while at the same time experiencing strong sales and revenues from its existing products.  Both statements were false.  As Defendants knew, the acne medication had failed an important pre-clinical safety test and stood virtually no chance of being approved by the United States Food and Drug Administration ("FDA") during the Class Period. Defendants also knew that the Company's publicly reported financial results materially overstated the Company's revenues and profits in blatant violation of Generally Accepted Accounting Principles ("GAAP").

2.    Connetics is a specialty pharmaceutical company that develops, markets and sells prescription dermatological products.  During the Class Period, Connetics told investors that it was developing a new topical treatment for acne called Velac Gel ("Velac").  According to defendants, Velac was a ground-breaking product that would allow Connetics to participate in the lucrative prescription acne market – the largest segment of the dermatology market and worth approximately $1.6 billion in annual sales.  Indeed, the Defendants never missed an opportunity to tout Velac to the market, repeatedly referring to it as having the "potential to become our biggest selling product" and stating that it "will become the topical treatment of choice for inflammatory and noninflammatory acne."

3.    Analysts covering the Company followed the Defendants' statements about Velac and eagerly anticipated the product's launch.  They referred to Velac as a "unique" product and a

"fundamental catalyst" for the Company's future growth.  By the end of June 2004, the market expected Velac to bring in tens of millions of dollars in revenue for Connetics starting in fiscal year 2005, and for Velac to become the Company's best-selling product by fiscal year 2007.

4.     The Defendants did not tell the market, however, that Velac had failed a critical pre-clinical safety test.  Specifically, from January 2004 through June 2004, while Connetics was aggressively touting Velac to the market, the Company was also conducting a laboratory study on Velac known as a Tg.AC mouse dermal carcinogenicity study.  This study, required by the FDA, was designed to determine whether Velac was safe for long-term use and, in particular, whether it had any carcinogenic effects.  In mid-June 2004, Connetics received the results of the study and learned that ***89 out of 160 (approximately 56%) mice treated with Velac had developed cancerous skin tumors***.  This is an alarmingly high rate of carcinogenicity and raised grave issues about the safety and approvability of Velac.  On June 28, 2004, unbeknownst to investors, Connetics convened a panel of toxicology experts to provide feedback on the results of the study.  At that meeting, the expert toxicologists told Connetics that the panel did not know of any drug that exhibited a "positive dermal" similar to Velac that ever had been approved by the FDA.

5.     Rather than disclose this critical information to investors – and suffer the certain decline in the price of Connetics securities that would follow – the Defendants concealed the results of the study from the market and actively misled investors as to Velac's prospects for FDA approval.  They continued to issue public statements referring to Velac as "safe and well tolerated" in documents publicly-filed with the United States Securities and Exchange Commission ("SEC"), submitted a new drug application for Velac to the FDA, and told investors that they expected FDA approval in early to mid-2005.  The market did not know the truth, and analysts and investors continued to anticipate FDA approval of Velac and a resultant boost to Connetics' sales and revenues.

6.     Unbeknownst to investors, on April 13, 2005, Connetics held a conference call with the FDA to discuss the FDA's comments on the new drug application for Velac.  During that call, the FDA repeated the information that Connetics' own toxicology experts had told the

---

1    Company on June 28, 2004 – namely, that the carcinogenic result of the Tg.AC mouse study was

2    a serious impediment for the approval of Velac for sale in the United States.

3           7.     In keeping with their past practice of deceiving the market, the Defendants did not

4    disclose any aspect of the FDA's comments to the public for nearly two weeks.  During that

5    time, two of the Defendants named below (including Connetics' Vice President of Biostatics and

6    Clinical Operations) began selling their holdings of Connetics' stock and executing short-selling

7    transactions based on their insider knowledge that the Company's stock was artificially inflated.

8    On April 26, 2005, Connetics finally issued a press release partially disclosing limited aspects of

9    the issues raised by the FDA.  This press release stopped short, however, of revealing the major

10   issues surrounding Velac and falsely stated that Connetics had been told by its experts that the

11   carcinogenic results of the mouse study would not effect FDA approval.

12          8.     On June 13, 2005, Connetics shocked the market by disclosing that it had received

13   a "non-approvable" letter from the FDA regarding Velac.  In that press release, Connetics stated

14   that "the only issue raised in the non-approvable letter was a positive carcinogenicity signal that

15   was detected in a Tg.AC mouse dermal carcinogenicity study."  In other words, the FDA had

16   refused to approve Velac based on the results of a study that the Defendants had known of (but

17   hid from the market) for ***nearly a year***.  The price of Connetics' stock collapsed on this news,

18   dropping almost 27 percent on heavy volume.

19          9.     Even after the June 13, 2005 announcement, however, the market did not know

20   the full extent of the cover-up surrounding Velac.  This information was not revealed until nearly

21   a year later when the SEC filed a civil complaint in the Southern District of New York against

22   Defendants Alexander J. Yaroshinsky and Victor E. Zak for insider trading based on their

23   advance knowledge of the FDA's concerns about Velac.

24          10.    Unfortunately for investors, the culture of deceit at Connetics was not confined to

25   the Defendants' false statements about Velac.  Throughout the Class Period, Connetics and its

26   senior executives were also engaged in a massive financial fraud that – as the Company has now

27   admitted – rendered the Company's publicly-filed financial statements materially false and

28   misleading.  As discussed below, Lead Plaintiff's investigation has revealed that during the Class

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -3-
Case No. C 07-02940 SI

Period, Connetics systematically engaged in "channel-stuffing." Channel-stuffing is the fraudulent business practice whereby a company artificially inflates its sales and revenue by intentionally shipping more of its products to customers than the retail marketplace demands. By channel-stuffing, a company defrauds investors by booking sales in the near-term at the expense of future periods, which distorts the true state of the company's finances. Further, if sales of the company's products are subject to a right of return or potential rebates, as sales of Connetics' products were, then substantial portions of the shipments should not qualify as "sales" at all, and reporting them as such renders the Company's financial statements materially false and misleading in violation of GAAP.

11.    As a direct result of the fraudulent channel-stuffing described below, Connetics was eventually forced to restate its financial statements, and to admit that they were in violation of GAAP throughout the Class Period. Moreover, Connetics has admitted that the restatement was "***due to errors in the accounting***" for accruals for rebates, chargebacks and returns. By restating due to "errors" in its financial statements, Connetics has admitted that the Company's financial statements were materially false and misleading at the time they were filed with the SEC, and that the Company had in its possession (but chose to ignore) the necessary information to make truthful disclosures at the time it filed its financial statements. In addition, Connetics admitted in the restatement that it suffered from material weaknesses in its internal controls over financial reporting during the Class Period – despite the fact that the Company's senior executive officers repeatedly signed sworn certifications attesting to the adequacy of those controls.

12.    When the full truth about Connetics was finally revealed on July 10, 2006, investors were devastated. The price of Connetics' common stock, which traded as high as $29 per share immediately before the first partial disclosure of the issues with Velac, plunged to $7.76, resulting in a loss of hundreds of millions of dollars in market capitalization. The price of Connetics' publicly-traded bonds (many of which were issued during the Class Period) also declined significantly. Investors are now entitled to recover for the dramatic losses they have suffered.

## II.    JURISDICTION AND VENUE

13.    Certain claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.    In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## III.    THE PARTIES

### A.    Lead Plaintiff

17.    Lead Plaintiff Oklahoma Teachers is a government-sponsored retirement plan that manages approximately $8 billion dollars in assets, and is headquartered in Oklahoma City, Oklahoma.  Founded in 1943, Oklahoma Teachers provides retirement, disability and survivor benefits to thousands of employees of Oklahoma public schools and other state-supported educational institutions.  During the Class Period, Oklahoma Teachers purchased common stock in Connetics.  As a result of these purchases and the violation of the securities laws alleged herein, Oklahoma Teachers suffered substantial damages.  On December 14, 2006, the court in the United States District Court for the Southern District of New York, the Honorable Judge Shirley Wohl Kram presiding, appointed Oklahoma Teachers as Lead Plaintiff in this litigation for all claims and causes of action raised herein.

B.     **Defendants**

1.     **The Company**

18.     Connetics was incorporated in 1993 as a Delaware corporation.  Throughout the Class Period, Connetics operated as a pharmaceutical company specializing in the development, production, and distribution of dermatological products principally throughout North America.  Connetics was listed on the NASDAQ exchange during the Class Period, where its stock was publicly traded under the symbol "CNCT."

2.     **The Insider Defendants**

19.     Defendant Thomas G. Wiggans ("Wiggans") was Connetics' Chief Executive Officer and a director throughout the Class Period.  He also served as President of Connetics from July 1994 to February 2005.  He was appointed Chairman of the Board of Directors in January 2006. Wiggans signed each of Connetics' Form10-Ks and 10-Qs that were publicly-filed with the SEC during the Class Period, as well as the registration statement for Connetics' publicly issued bonds.  Pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of 2002 ("Sarbanes Oxley"), Wiggans certified the accuracy of Connetics' Form 10-Ks and 10-Qs and the accuracy and effectiveness of Connetics' financial disclosures and internal controls over financial reporting.  Throughout the Class Period, Wiggans also participated in numerous conference calls with analysts and investors.

20.     Defendant Gregory Vontz ("Vontz") began serving as Connetics' Executive Vice President and Chief Commercial Officer in December 2001.  He was appointed Chief Operating Officer in January 2001 and promoted to President in February 2005.  Throughout the Class Period, Vontz participated in numerous conference calls with analysts and investors.

21.     Defendant John Higgins ("Higgins") joined Connetics in 1997 as Chief Financial Officer.  He then served as Connetics' Vice President, Finance and Administration from September 1997 through December 1999.  From January 2000 to December 2001, Higgins served as Executive Vice President, Finance and Administration.  From January 2002 through the end of the Class Period, Higgins served as the Executive Vice President, Finance and Administration and Corporate Development.  Higgins signed Connetics' Form 10-Ks that were

1  publicly-filed with the SEC on or about March 16, 2005 and March 13, 2006 and each of the

2  each of the Form 10-Qs that were publicly-filed with the SEC during the Class Period, as well as

3  the registration statement for Connetics' publicly issued bonds.  Pursuant to Sections 302 and

4  906 of Sarbanes Oxley, Higgins certified the accuracy of Connetics' Form 10-Ks and 10-Qs and

5  the accuracy and effectiveness of Connetics' financial disclosures and internal controls over

6  financial reporting.   Throughout the Class Period, Higgins also participated in numerous

7  conference calls with analysts and investors.

8          22.    Defendant Lincoln Krochmal ("Krochmal") joined Connetics in October 2003 as

9  Executive Vice President of Research and Product Development.  Krochmal was directly

10  involved in preparing regulatory submissions and conducting FDA-required tests relating to

11  Velac.  Throughout the Class Period, Krochmal participated in numerous conference calls with

12  analysts and investors.

13          23.    Defendants Wiggans, Higgins, Vontz and Krochmal were members of Connetics'

14  Management Executive Committee, which was responsible for "the overall direction, strategy

15  and operations of Connetics, including, among other things, corporate financial performance,

16  commercial performance, research, development and product operations performance."  (2006

17  Schedule 14A Proxy at 11.)

18          24.    Defendants Wiggans, Higgins, Vontz and Krochmal are collectively referred to

19  herein as the "Insider Defendants."

20                  **3.    Defendant Alexander J. Yaroshinsky**

21          25.    Defendant Alexander J. Yaroshinsky ("Yaroshinsky") served as Vice President of

22  Biostatics and Clinical Operations for Connetics during the Class Period.  As a senior member of

23  Connetics' research and product development team, Yaroshinsky's duties included designing and

24  conducting drug development studies, analyzing the results of those studies and preparing

25  regulatory submissions to the FDA.   In order to carry out his responsibilities at Connetics,

26  Yaroshinsky was entrusted with non-public information concerning the approval process of

27  Connetics' developmental stage drugs.   Yaroshinsky is a named defendant in an amended

28  complaint dated June 20, 2006, and filed by the SEC in the United States District Court for the

Southern District of New York, which is pending before Judge Casey and captioned *United States Securities and Exchange Commission v. Alexander J. Yaroshinsky, et al.*, 06CV2401 (RCC) (the "SEC Complaint"). The SEC Complaint alleges that Defendant Yaroshinsky took advantage of material non-public information about the regulatory approval process for Velac, which he obtained in the course of his employment at Connetics, to conduct unlawful insider trades in Connetics securities. Yaroshinsky realized more than $650,000 in illicit profits from his insider trading during the Class Period.

### 4.    Defendant Victor E. Zak

26.    Defendant Victor E. Zak ("Zak") is a named Co-defendant with Defendant Yaroshinsky in the SEC Complaint. Zak is a resident of Newton, Massachusetts. On or about April 13, 2005, Zak received a telephone call from Yaroshinsky at Zak's office in Connecticut, during which Yaroshinsky conveyed to Zak material, non-public information regarding the approvability and safety issues with Velac. Defendant Zak used this material, non-public information to execute numerous transactions in Connetics securities. Zak unlawfully profited from insider trading during the Class Period by more than $900,000.

## IV.    CLASS ACTION ALLEGATIONS

27.    Oklahoma Teachers brings this action on its own behalf and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who acquired the securities of Connetics during the period from January 27, 2004, through July 9, 2006, inclusive, and who suffered damages as a result. Excluded from the Class are: (i) the defendants; (ii) members of the family of each individual defendant; (iii) any person who was an officer or director of Connetics during the Class Period; (iv) any person who is named as a defendant in any U.S. Government or state criminal or civil proceeding relating to Connetics; (v) any firm, trust, corporation, officer, or other entity in which any defendant has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

28.    The Class is so numerous that joinder of all Class members is impracticable. Connetics common stock was actively traded on the NASDAQ, an efficient market, throughout

the Class Period. The market for Connetics' convertible bonds was also an efficient market as they traded on the PORTAL exchange and other national exchanges during the Class Period. While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number in the tens of thousands. During the Class Period there were approximately 33.5 million shares of Connetics' common stock in the public float, and in excess of $200 million face value of Connetics' convertible bonds. Based upon the volume of trading of Connetics' common stock and bonds during the Class Period, it is believed that tens of thousands of investors purchased Connetics common stock and bonds during the Class Period, rendering joinder of all such purchasers impracticable.

29.    Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and all Class members sustained damages as a result of the wrongful conduct complained of herein.

30.    Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained Court-appointed counsel competent and experienced in class action and securities litigation. Lead Plaintiff has no interests that are contrary to or in conflict with those of the Class members that Lead Plaintiff seeks to represent.

31.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

32.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

      (i)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

      (ii)   whether documents, including the Company's SEC filings, press releases and public statements made by Defendants during the Class Period contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(iii)     whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(iv)     whether the market prices of Connetics' common stock and bonds during the Class Period were artificially inflated due to the material misrepresentations complained of herein; and

(v)     whether the Class members have sustained damages and, if so, the appropriate measure thereof.

33.     Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

34.     The names and addresses of the record owners of Connetics' securities purchased during the Class Period are obtainable from information in the possession of the Company's transfer agent(s) and the Company's underwriters.  Notice can be provided to the record owners of Connetics stock and bonds via first class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## V.     FACTUAL ALLEGATIONS AND THE FRAUDULENT SCHEME

### A.     Historical And Regulatory Background Regarding The Company

35.     Connetics is a specialty pharmaceutical company that develops and markets products for the medical dermatology market.  The Company was founded in 1993 under the name Connective Therapeutics and initially focused on developing products for connective tissue diseases.  Connetics conducted an initial public offering in February 1996, and changed its name to Connetics Corporation in 1997.  In 2001, Connetics began to focus its product development and commercial efforts exclusively on the medical specialty of dermatology.  Throughout the Class Period, Connetics' primary business was the development and marketing of dermatological products designed to treat skin conditions such as psoriasis, seborrheic dermatitis and acne.

36.     In order to gain FDA approval to market its dermatological products, Connetics, like other pharmaceutical companies, had to convince the FDA that a particular product was safe and effective.   This is accomplished through pre-clinical tests involving laboratory experimentation and animal testing, as well as a series of human clinical trials, which are conducted in three general "phases."  In "Phase I," the product is tested on a small number of

1    people (under 100). In "Phase II," between 100 and 300 patients are tested. Finally, "Phase III"

2    trials involve between 1000 to 3000 patients.

3        37.    Following the Phase III trials, a company seeking approval of its product must

4    submit a "New Drug Application" or "NDA" with the FDA. NDAs contain data from the pre-

5    clinical trials and the Phase I, II and III clinical trials, as well as other information required by

6    the FDA. For instance, 21 C.F.R. § 314.50 provides that an NDA must include a "section

7    describing . . . animal and in vitro studies with the drug, including the following:"

> Studies of the toxicological effects of the drug as they relate to the drug's intended clinical uses, including, as appropriate, studies assessing the drug's acute, subacute, and ***chronic toxicity carcinogenicity; and studies of toxicities related to the drug's particular mode of administration or conditions of use***.

21 C.F.R. § 314.50(d)(2) (emphasis added).

8

9

10

11        38.    Similarly, the FDA specifies that an NDA must include "a description and analysis

12    of each clinical pharmacology study of the drug, including a comparison of the results of the

13    human studies with the animal pharmacology and toxicology data." 21 C.F.R. § 314.50(d)(5)(i).

14        39.    Upon receipt of an NDA, the FDA assesses whether the submitted data is

15    complete, accurate and unbiased. Without solid clinical data demonstrating the efficacy and

16    safety of the product, the FDA will not approve the product for market and sale in the United

17    States. In particular, if the submitted data suggests that the product is unsafe for ordinary use,

18    the FDA has explicit statutory authority to refuse to approve an NDA. For instance, among other

19    reasons for non-approval, the FDA will refuse to approve an application if:

> The results of the tests show that the drug is unsafe for use under the conditions prescribed, recommended or suggested . . . or the results do not show that the drug product is safe for use under those conditions.

21 C.F.R. § 314.125(b)(3).

20

21

22

23

24

25

26

27

28

---

**B.    Defendants Actively Promoted The Sales And Revenue Potential Of Velac While Concealing The Fact That Defendants' Pre-Clinical Testing Revealed That Velac Causes Cancerous Tumors**

**1.    Connetics Acquired Velac And Touted Its Initially Positive Clinical Trial Results**

40.    In May 2002, Connetics acquired from another company the rights for Velac, which the Company described as "a first-in-class combination of 1% clindamycin and .025% tretinoin for the treatment of acne."

41.    In a pre-Class Period press release dated May 14, 2002, the Company reported that it "expects to file a New Drug Application (NDA) for Velac gel with the FDA during the second half of 2004."  In that press release, Defendant Wiggans emphasized the importance of Velac to the Company, stating:

> Velac gel will compete in the prescription acne market, the largest segment of the dermatology market worth more than $1.6 billion annually in the U.S., ***giving Velac Gel the potential to become our biggest selling product***[.]

(Emphasis added.)

42.    On a conference call with investors on July 23, 2002, Defendant Wiggans again touted the importance of Velac, stating:

> Velac was perfect for us.  We cannot imagine finding a better product . . . and when you look at the potential of that product on a full quadrant graph, Velac is right up there on the top right hand corner in terms of potential and opportunity.  So what we've got, we think is great.

43.    On that call, Wiggans also reiterated Connetics' anticipated timeline for obtaining regulatory approval of Velac, stating "we expect to meet with the FDA in the second half of the year and begin clinical trials [sic] early part of next year.  We remain committed to that time schedule, and we'll keep you updated as this very exciting program moves forward."

44.    In December 2002, Connetics initiated the Phase III clinical testing program for Velac.  According to Connetics, this phase involved two "pivotal" trials as well as two unspecified studies that the Company described as "two smaller supplemental clinical studies required by the FDA."

---

45.     By late 2003, the Company had completed enrollment in the clinical trials.  Many of the clinical trials of Velac took place in Rochester, New York and others took place at the University of Michigan in Ann Arbor, Michigan.

46.     As 2003 drew to a close, analysts covering the Company closely followed the Company's statements regarding the clinical trials for Velac, and stated that the drug would provide the Company with significant increases in its revenues and sales.  For instance, on January 8, 2004, an analyst from CIBC World Markets issued a report stating that "Connetics announced that it has completed enrollment in its two Phase III clinical trials for Velac Gel . . . our model currently assumes Velac sales of $18.5MM in 2005 and $45.0MM in 2006." (1/8/04 CIBC Report at 1.)  Another analyst wrote that "Velac has the largest sales potential, and as a result we believe the outcome of the [Phase III] trial will be one of the major determinants of the direction of [Connetics'] share price."  (1/5/04 C.E. Unterberg Report at 1.)

47.     On March 23, 2004, Connetics announced the completion of the Phase III testing program for Velac. In a press release issued that day, the Company reported that:

> The data from each trial demonstrated a consistently robust and statistically superior treatment effect for Velac . . . the data from these trials also demonstrated that Velac was safe and well tolerated, with the most commonly observed adverse effects being application site reactions (e.g. burning, dryness, redness and peeling).

48.     In commenting on the results of the Phase III trials, Defendant Wiggans stated in that press release that "We are delighted with the strength of the Velac pivotal data . . . as Velac is a patent-protected, first-in-class combination product, we expect it to play an important role as we build a strong franchise in the $1 billion U.S. acne market . . . and Velac, if approved . . . represents the largest sales potential of any product in our pipeline."

49.     Wiggans also gave investors an update on the timeline for the regulatory approval process relating to Velac, stating that "we look forward to submitting a New Drug Application (NDA) with the U.S. Food and Drug Administration (FDA) in the third quarter to seek approval to market Velac in the U.S."

50.     Analysts reacted favorably to this news.  On March 24, 2004 an analyst from Roth Capital Partners reported that "Connetics announced very strong phase III data in support of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -13-
Case No. C 07-02940 SI

Velac Gel . . . the clinical data was robust and showed statistically significant superiority for Velac," and "we believe Velac, a potential first-in-class product, once approved, will rapidly gain share among topical acne alternatives, a $600 million dollar drug class." (3/24/04 Roth Capital Report at 1.) Another analyst wrote on March 24, 2004 that "the data from these trials also demonstrated that Velac was **safe and well tolerated**" and "for '05, we estimate Velac sales of $18.5MM, ramping up to $45MM in '06." (CIBC Report at 2 (emphasis in original).)

51.      The Company continued to tout Velac through the first and second quarters of 2004. On a conference call with investors held on May 4, 2004, Defendant Krochmal stated "I believe that the exceptional result that we've seen for Velac for both efficacy and safety may lead me to conclude that Velac will become the topical treatment of choice for inflammatory and noninflammatory acne."

> **2.      Connetics Learned That Velac Caused Cancerous Tumors In Laboratory Mice, But Did Not Disclose That Information To The Market**

52.      Unbeknownst to investors, at the same time that Connetics was conducting its Phase III clinical testing of Velac and touting the supposedly positive clinical trial results to the market, the Company was also performing a related study to assess Velac's safety by determining whether Velac caused cancer in laboratory mice. As discussed below, Lead Plaintiff's investigation has revealed that, no later than June 2004, senior executives of Connetics were aware that Velac was carcinogenic and was unlikely to receive approval from the FDA.

53.      According to Confidential Witness 1, a former employee of Connetics' Strategic Market Planning group who was employed at Connetics from 2002 through April 2006, certain members of Connetics' Management Executive Committee held a meeting in late 2003 to discuss a pre-clinical study that was required by the FDA. Specifically, the FDA required that Connetics conduct a pre-clinical laboratory test to determine whether Velac had carcinogenic properties. Confidential Witness 1 attended this meeting, which was also attended by Defendants Wiggans, Higgins and Vontz, as well as Confidential Witness 2, a former Director of Toxicology who was employed at Connetics from 1999 to May 2004. At that meeting, there was

1    a discussion among the committee members (including Defendants Wiggans, Higgins and Vontz)

2    about how the Company would conduct the revised pre-clinical study.

3        54.    The Company had three possible options for satisfying the FDA's requirement.

4    First, it could attempt to purchase additional pre-clinical data from another company that would

5    hopefully satisfy the FDA's pre-clinical safety and carcinogenic-testing requirements.  Second,

6    the Company could conduct a laboratory study on transgenic mice that are specially bred for

7    laboratory tests, which could be completed in several months.  Third, the Company could conduct

8    a longer and more expensive mouse study using non-altered mice, which would take several

9    years to complete.  After a long discussion, the committee – including Defendants Wiggans,

10   Higgins and Vontz – chose to pursue the second course of action by performing a transgenic

11   mouse study.

12       55.    From January 2004 through June 2004, while Connetics aggressively touted

13   Velac to the market, the Company also performed on Velac a transgenic mouse study – known as

14   a Tg.AC mouse dermal carcinogenicity study (the "Mouse Study").  According to Confidential

15   Witness 2, the Mouse Study was conducted at an outside toxicology lab in the Washington, D.C.

16   area.  According to Confidential Witness 3, a former Regional Sales Director who worked at

17   Connetics for more than eight years and throughout the entire Class Period, Defendants

18   Yaroshinsky, Vontz and Krochmal were directly in charge of overseeing the pre-clinical testing

19   of Velac and were involved in every step of the developmental process for the drug (including

20   oversight of the Mouse Study).  Throughout the Class Period, Yaroshinsky reported directly to

21   Vontz and Krochmal and provided regular updates on the Velac regulatory process to certain

22   members of the Management Executive Committee, including Wiggans and Higgins.  According

23   to Confidential Witness 1, Wiggans and Higgins "absolutely" would have been kept apprised of

24   the testing process for Velac.

25       56.    As alleged in the SEC complaint, in mid-June 2004, Connetics received the

26   results of the Mouse Study and learned that ***89 out of 160 of the mice (approximately 56%)***

27   ***treated with Velac developed cancerous skin tumors***.  This was an alarmingly high rate of

28   carcinogenicity and raised serious issues about the safety and approvability of Velac.  Indeed,

according to a National Institutes of Health research paper published in October 2002, transgenic mouse models "made the 'correct' calls (positive for carcinogens; negative for noncarcinogens) 77-81%" of the time.

57.    On June 28, 2004, unbeknownst to investors, Connetics convened a panel of toxicology experts to provide feedback on the results of the Mouse Study.  At that meeting, the Company's hand-picked panel of expert toxicologists informed Connetics that the panel *did not know of any drug that exhibited a "positive dermal" similar to Velac that ever had been approved by the FDA*.

### 3. The Defendants Continued To Mislead The Market About Velac For Nearly A Year After They Learned That Velac Caused Cancer In Laboratory Mice

58.    At this point, Connetics and the Senior Management Defendants knew or should have known that Velac caused cancerous tumors in laboratory mice and that the FDA was unlikely to approve Velac.  However, rather than immediately disclose this critical information to investors – and risk the sudden and certain decline in the price of Connetics' securities that would ensue – the Insider Defendants and Connetics embarked on a scheme designed to hide the significant problems with Velac and actively mislead investors regarding Velac's prospects for approval by the FDA.

59.    The market did not know the truth. Indeed, on June 29, 2004 – just one day after Connetics' hand-picked toxicology experts told the Company that the FDA was unlikely to approve Velac – an analyst from Roth Capital Partners issued a report stating that Connetics was "undervalued in our view given the peak sales potential" of Velac. (6/29/04 Roth Capital Report at 1.)  On July 1, 2004, *The Dermatology Times* published an article that included information provided by Connetics.  In that article, Defendant Krochmal was quoted as stating that Velac's clinical trial results "revealed patients treated with the Velac gel had significantly lower lesion counts, and significantly less acne by investigator assessment, than either clindamycin or tretinoin gel alone."

60.    In a press release dated July 28, 2004, the Company announced its results of operations for the second quarter of 2004.  Among other things, Defendant Wiggans stated that

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                              -16-
Case No. C 07-02940 SI

Connetics was "preparing our commercial operations for the introduction" of Velac, and stated that the Company intended to launch Velac within the next twelve months.

61.    Analysts covering Connetics reacted favorably to the Company's (false) statements regarding Velac. For instance, in a report issued on July 28, 2004, an analyst from C.E. Unterberg, Towbin gave Connetics a "buy" rating based on "the robust list of events we are looking to occur over the next 12 months," including the filing of the Velac NDA in the third quarter of 2004 and the expected approval and launch of Velac in the second half of 2005. (C.E. Unterberg Report at 1.) Another analyst report issued on July 29, 2004 estimated that the Company would realize $18.5 million in revenue from sales of Velac in 2005. (7/29/04 CIBC Report at 5.)

62.    On July 29, 2004, Connetics common stock closed at $27.28 per share, an 18% increase on heavy trading volume, over its closing price of $23.22 on July 28, 2004.

63.    In the third quarter of 2004, Connetics filed with the FDA an NDA for Velac. This filing continued the flow of positive news that Defendants were pumping into the marketplace regarding Velac. For instance, on September 29, 2004, an analyst from Jefferies & Company, Inc. reported:

> **Velac could emerge as a leading therapy option for acne.** Velac combines two popular acne treatments, clindamycin and tretinoin. The NDA was filed this month ([exact]date was not disclosed for competitive reasons), and we expect a response in 3Q05. We believe Velac gets approved with minimal obstacles and becomes a significant growth driver for Connetics on its path to becoming a leading acne therapy.

This analyst also estimated that Velac could realize "$25-30 million in 2006 sales after a 4Q05 launch." (9/29/04 Jefferies Report at 1 (emphasis in original).)

64.    As discussed in Section VII below, throughout the remainder of 2004 and into the second quarter of 2005, Connetics continued to make positive statements regarding Velac. Analysts covering the Company reacted favorably to the Defendants' positive statements, and focused on Velac's anticipated positive impact on Connetics' future sales and profits.

65.    For instance, on March 16, 2005, Connetics filed its Form 10-K for the fiscal year ended 2004, which stated that "*Velac was safe and well tolerated*, with the most commonly

---

observed adverse effects being application site reactions such as burning, dryness, redness and peeling." (3/16/05 Form 10-K at 51 (emphasis added).) Responding to these disclosures by Defendants, an analyst wrote on March 16, 2005 that "we have moved Velac's [anticipated] launch into 3Q05 as *the company continues to express confidence in the product's timing* . . . this raised our '05 and '06 sales forecast from $8 mil to $40 mil and $15 mil to $45 mil, respectively." (3/16/05 C.E. Unterberg Report at 1 (emphasis added).)

66.    Because the Insider Defendants and Connetics concealed from the market the results of the Mouse Study and the conclusions of their own toxicology experts, the market remained unaware of the material problems with the safety and approvability of Velac. Indeed, based on Defendants' public statements about Velac (set forth above and in Section VII below), the market reasonably anticipated that Velac would be approved by the FDA in mid-2005 and begin generating millions of dollars in revenue for the Company by the second half of 2005.

67.    On April 13, 2005, Connetics common stock closed at nearly $28 per share, and its convertible notes traded as high as $12.60 per note.

### 4.    The April 2005 Teleconference With The FDA And The Belated Partial Disclosure Of The Issues With Velac

68.    Unbeknownst to investors, on April 13, 2005, Connetics held a conference call with members of the FDA's Executive Carcinogenicity Assessment Committee ("ECAC") for the purpose of discussing the FDA's comments and conclusions on the NDA for Velac. The FDA's ECAC is the primary resource for the FDA on carcinogenicity issues. It is responsible for, among other things, evaluating carcinogenicity study results, data generated from dose selection studies, and proposed carcinogenicity protocols. Defendant Yaroshinsky, in his capacity as Connetics' Vice President of Biostatistics and Clinical Operations, participated on that call along with other senior members of Connetics management including, on information and belief, Defendant Krochmal.

69.    During that call, members of the ECAC repeated the information that Connetics' own toxicology experts had told Connetics on June 28, 2004 – namely, that the "positive dermal" experienced in the Mouse Study was a serious impediment for the approval of Velac for market

1    and sale in the United States.   According to the SEC Complaint, the ECAC told Connetics

2    (including Defendant Yaroshinsky and, on information and belief, Defendant Krochmal) that:

3                (i)    "[Velac] may be a tumor promoter or a carcinogen"; and

4                (ii)    "*this is a serious issue for a topical product for the treatment of acne.*"

5    (SEC Complaint ¶20 (emphasis added).)

6            70.    These comments by the FDA's ECAC confirmed the serious issues regarding the

7    safety and approvability of Velac that the Insider Defendants, Yaroshinsky and Connetics had

8    known since at least June 28, 2004.

9            71.    The comments and conclusions of the FDA's ECAC were immediately relayed to

10   Connetics' senior management, including Defendants Wiggans, Higgins and Vontz.

11   Recognizing that a formal FDA non-approvable letter was now imminent (and the eventual the

12   receipt of such a letter could not be hidden from the market the way that the Insider Defendants

13   and Connetics had concealed the Mouse Study), Connetics' senior management imposed a ban

14   on trading in Connetics' securities, which prohibited any employees who had attended the

15   conference call with the FDA or were involved in preparing regulatory submissions for Velac

16   from trading in the Company's securities.   This trading ban could not have been put into place

17   without the approval of Wiggans, Higgins and Vontz, thus confirming that these Defendants were

18   promptly informed of the FDA's comments on the April 13, 2005 conference call (the substance

19   of which they already had known for nearly a year).

20           72.    In keeping with their practice of deceiving the market, the Insider Defendants and

21   Connetics did not disclose any aspect of the FDA's comments to the public for nearly **two weeks**.

22   During that time, the market was completely unaware of any issues surrounding Velac.  As far as

23   the market was concerned, Velac continued to be on track for approval in June 2005, and was

24   expected to soon become one of the Company's strongest selling products.   For instance, on

25   April 26, 2005, before the market opened, an analyst stated:

26           The Company has a fundamental catalyst in the pending FDA approval of Velac
             which has an FDA PDUFA date of June 25th, 2005.  *We see peak sales potential*
27           *of $150 million for Velac.*

28   (4/26/05 Buckingham Report at 1 (emphasis added).)

73.     From April 13, 2005 to April 26, 2005, as the Insider Defendants and Connetics continued to conceal the comments of the FDA's ECAC (and the other issues with Velac), Connetics' stock price increased nearly 9 percent, and the prices of its convertible notes increased nearly 6 percent.

74.     After the market closed on April 26, 2005, Connetics finally issued a press release that partially disclosed certain aspects of the issues raised by the FDA.  The press release stated that the FDA was "interpreting some of the results of a pre-clinical study for Velac Gel differently than the Company did in the NDA submission . . ."

75.     The April 26, 2005 press release also stated:

> The Company carefully analyzed the results with a panel of leading toxicologists and experts in this model.  *The experts advised the Company that the transgenic mouse model is known to have limitations, and the experts concluded that the positive response was the result of a limitation of the model.*  The advice of these experts is supported by other products which had a positive finding but were ultimately approved based on additional work in other animal models."

(Emphasis added.)

76.     Although it disclosed certain limited aspects of the issues with Velac, the April 26, 2005 Press Release was materially false and misleading because, among other things, (i) it failed to disclose the specific information that the ECAC told Connetics that "this is a serious issue for a topical product for the treatment of acne," (ii) it failed to inform investors that Connetics had been aware of the "positive dermal" in the Mouse Study for nearly a year; and (iii) it was directly contrary to the information that Connetics had received from its hand-picked panel of toxicology experts on or about June 28, 2004, that they were aware of no drug exhibiting a "positive dermal" such as Velac that had ***ever*** been approved by the FDA.

77.     Indeed, the SEC Complaint characterizes Connetics' April 26, 2005 press release as follows:

> On April 26, 2005, after the close of the market, Connetics made its first public statement regarding the FDA's April 13 comments . . . *[the release] stopped short of disclosing the full extent of the FDA's concerns and the incidence of tumors in the mice tested. Most notably, missing from the release was the ECAC's conclusion that the "vehicle was positive in this assay and may be a tumor promoter or a carcinogen."*

(SEC Complaint ¶28 (emphasis added).)

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -20-
Case No. C 07-02940 SI

78.     On a conference call with investors on April 26, 2005, Defendant Wiggans again misled the market regarding the issues surrounding Velac, repeating the statements set forth in the press release issued the same day.  In addition, despite the fact that Connetics had delayed nearly two weeks before partially informing the market (albeit in a misleading and limited fashion) of the comments of the FDA, and nearly a year to mention (but falsely downplay) the carcinogenic results of the Mouse Study, Defendant Wiggans falsely stated on this conference call that "this information is recent . . . *we're giving it to you pretty real time*."

79.     On that call, Defendant Higgins attempted to alleviate investor concern that Velac would not be approved by the FDA by reiterating the Company's previous EPS guidance of $0.88-$0.92, which assumed that Velac would be marketed and sold in 2005, thus generating millions in dollars of revenue for Connetics.  This information was noted by analysts, with one analyst stating in a report issued on April 27, 2005 that "Connetics hopes to satisfy FDA concerns [regarding Velac] before the June 25th PDUFA date and reiterated 2005 EPS guidance of $0.88-$0.92."

80.     Even though the April 26, 2005 press release and conference call failed to disclose the full extent of the serious issues facing Velac, Connetics' stock dropped upon those partial disclosures.  On April 27, 2005, Connetics common stock closed at $22.30, down $5.27 from its $28.24 closing price on April 26, 2005, a 17% decrease, on heavy trading volume.  Connetics' convertible notes dropped from a previous high of $133.90 to $111.66, a 20% decrease.

**5.     The FDA Sends A Non-Approval Letter On Velac**

81.     As the Insider Defendants and Connetics intended, following Connetics' April 26, 2005 announcement, the market remained optimistic that Velac ultimately would be approved by the FDA. For instance, before the market opened on June 10, 2005, an analyst from CIBC World Markets issued a report that stated, among other things:

> •     "according to [Connetics] management, its experts advised the [positive dermal] was apparently a false positive . . ." (6/10/05 CIBC Report at 2);
>
> •     "**management believes it can address FDA commentary with existing data**," (*Id*. (emphasis in original.));

- "**Velac could generate at least as much as the heavily genericized clindamycin market alone, indicating peak sales of over $100 MM**." (*Id.* at 3 (emphasis in original).).

82. After the close of the market on Friday, June 10, 2005, Connetics received from the FDA a formal "non-approvable" letter for Velac. According to the SEC Complaint, the FDA's letter stated that the drug was "unsafe for use."

83. On Monday, June 13, 2005, before the market opened, Connetics issued a press release and Form 8-K disclosing that the FDA had not approved Velac. The press release stated that "the only issue raised in the non-approvable letter was a positive carcinogenicity signal that was detected in a TgAC mouse dermal carcinogenicity study." In other words, the FDA had refused to approve Velac based solely on the results of the Mouse Study – results that the Defendants had known of (but did not disclose to the market) for ***nearly a year***.

84. In that press release, Connetics reduced its guidance to account for the non-approval of Velac, stating that: "as a result of today's announcement, Connetics now projects 2005 total revenues to be $182 million to $188 million, down from previous guidance of $195 million to $206 million. Combined SG&A and R&D expenses for 2005 are projected to be between $121.5 million and $125.0 million. Diluted EPS for 2005 is projected to be in the range of $0.66 to $0.70, versus previous guidance of $0.88 to $0.92."

85. The price of Connetics' stock collapsed on this news, dropping approximately 27% from its closing price of $20.77 on June 10, 2005 to $15.13, on heavy trading volume. Connetics' convertible notes dropped from $110.61 to $96.08, a 16% decrease.

**6.    Yaroshinsky And Zak Made Hundreds Of Thousands Of Dollars Short-Selling Connetics' Securities Based On Their Inside Knowledge About The Problems With Velac**

86. As set forth in the SEC Complaint, on April 13, 2005, shortly after the conference call with the FDA discussed above, Defendant Yaroshinsky telephoned an acquaintance and former neighbor, Defendant Zak, at Zak's office in Connecticut. On that call, Yaroshinsky told Zak about the comments and conclusions of the FDA's Executive Carcinogenicity Assessment Committee.

87. Following this call, and as set forth in the SEC Complaint, Defendant Zak immediately accessed his online brokerage account using his office computer, and sold short 7,000 shares of Connetics, and liquidated 3,000 shares from his previously held long position in Connetics common stock. Between April 14, 2005 and June 10, 2005, Zak sold short an additional 68,000 shares of Connetics common stock and purchased 430 "put contracts" in Connetics' common stock. Put contracts are a type of option where the value of the put contract increases as the price of the underlying security – in this case, Connetics' common stock – declines.

88. On April 14, 2005, Defendant Yaroshinsky opened a nominee brokerage account in the name of his mother-in-law.

89. On April 21, 2005, Defendant Yaroshinsky purchased 5 put contracts in the nominee account.

90. On April 27, 2005, following Connetics' partial disclosure of the FDA's concerns about Velac, Defendant Yaroshinsky sold 15,100 shares of his 16,913 share long position in Connetics common stock, which Yaroshinsky had accumulated over the course of several years. On the same day, Defendant Yaroshinsky purchased 41 put contracts on Connetics stock.

91. On May 12, 2005, Defendant Yaroshinsky funded the nominee account (held in his mother-in-law's name) with $363,000 from his own brokerage account. On June 6, 2005, Yaroshinsky deposited $150,000 from his checking account into the nominee account.

92. Between May 12, 2005 and June 10, 2005, Defendant Yaroshinsky purchased 2,020 put contracts in the nominee account.

93. Following the collapse of Connetics' stock price after the disclosure of the FDA's non-approvable letter on June 13, 2005, Defendant Yaroshinsky closed out more than 2,000 of his put contracts.

94. Defendant Yaroshinsky profited by more than $680,000 on his transactions in Connetics' securities while in possession of material non-public information.

95.    Defendant Zak profited by more than $900,000 on his transactions in Connetics' securities while in possession of material non-public information.

### 7.    The SEC Investigation Into Velac

96.    For nearly a year after Connetics announced its receipt of the FDA non-approvable letter for Velac, the Insider Defendants and Connetics managed to conceal from the market the fact that they had known of the serious issues relating to Velac long before they were disclosed to investors.  This information was not revealed until nearly a year later in a series of disclosures spurred by the SEC's investigation into Defendants Yaroshinsky and Zak's insider trading.

97.    On March 28, 2006, the SEC announced that it had filed suit in the United States District Court for the Southern District of New York against Defendant Yaroshinsky, charging him with illegally trading on non-public inside information about Velac. The SEC press release stated:

> The Commission's complaint alleges that Yaroshinsky, who participated in tests which led the FDA to ultimately conclude that the drug [Velac] was "unsafe for use," learned the FDA's preliminary views with respect to the cancer tests in an April 13, 2005 call with the FDA.  Shortly thereafter, Yaroshinsky positioned himself to profit from a fall in the price of Connetics' stock . . . .  Ultimately, on June 13, 2005, when news of the non-approval was made public, Connetics' share price fell 27% and Yaroshinsky reaped a benefit of at least $680,000.

98.    On June 22, 2006 the SEC filed an amended complaint against Defendant Yaroshinsky, which included more details regarding the Mouse Study and also named Defendant Zak as a co-defendant. The SEC issued a press release on June 23, 2006, which stated:

> The Amended Complaint alleges that Zak, a resident of Newton, Massachusetts, received material non-public information from Yaroshinsky concerning the FDA staff's preliminary analysis of the carcinogenicity tests of Velac Gel, an acne drug being developed by Yaroshinsky's then employer . . . the Amended Complaint alleges that both Zak and Yaroshinsky traded on the basis of this information.  In the end, Zak profited from his illegal trading by more than $900,000 and together, Yaroshinsky and Zak benefited financially by more than $1.58 million.

99.    Even though these disclosures only partially revealed the truth, following this announcement, the price of Connetics' common stock dropped from a closing price of $12.44 on June 22, 2006, to close at $11.96 on June 23, 2006, and continued to fall to a closing price of $10.74 on June 27, 2006.

C.    **Connetics Issued Materially**
      **False And Misleading Financial**
      **Statements During The Class Period**

100.    At the same time that the Insider Defendants were making material misstatements to the market regarding the safety and approvability of Velac, they were also causing Connetics to issue and publicly-file with the SEC materially false financial statements. Throughout the Class Period, Connetics regularly reported numbers that matched or exceeded Wall Street's published estimates for the Company's quarterly and yearly financial performance. As discussed below, however, Connetics was "making its numbers" only because the Company was engaged in an array of improper and fraudulent accounting manipulations that artificially inflated the Company's revenues and earnings in violation of the most basic principles of GAAP.

1.    **The Marketplace For Connetics' Products And**
      **The Company's Method For Recognizing Revenue**

101.    During the Class Period, Connetics, like most pharmaceutical companies, did not sell its products directly to doctors or patients. Rather, Connetics sold its products to a handful of large "distributors," and these distributors placed the products in inventory for subsequent sale into the retail marketplace. For instance, for the fiscal year ended December 31, 2005, Connetics sold the vast majority of its products to just three distributors – Cardinal Health, Inc. ("Cardinal"), located in Dublin, Ohio, McKesson Corporation ("McKesson"), located in San Francisco, California, and AmerisourceBergen Corporation ("AmerisourceBergen"), located in Chesterbrook, Pennsylvania. These distributors accounted for 36%, 34% and 11%, respectively, of Connetics' total reported product revenues for that year. Connetics also sold its products to an undisclosed "nationally based international distributor," which, on information and belief, is Pharmed Group Corp., located in Miami, Florida.

102.    The marketplace for Connetics' products during the Class Period worked as follows. Connetics would market its prescription medications primarily to doctors and other medical professionals. When a doctor wrote a prescription for a patient to use a Connetics product, patients, for the most part, would fill their prescriptions at retail pharmacies. The majority of retail pharmacies would, in turn, purchase their prescription medication from the large industry-wide distributors such as Cardinal Health, McKesson, and AmerisourceBergen that

1    served as Connetics' primary customers.  The distributors then sold their inventory of Connetics'

2    products to the pharmacies or other retail users to fulfill prescription demand.

3        103.    Throughout the Class Period, when Connetics sold products to its distributors,

4    those sales were subject to certain payment conditions pursuant to which the distributors could

5    return the products or receive significant refunds or discounts off of the sale price.  The three

6    largest conditions of sale were rebates, chargebacks and right of return.  These are discussed

7    below.

8        104.    <u>Rebates.</u>  Throughout the Class Period, Connetics offered rebates, or refunds, to

9    various government programs and private health organizations that purchased Connetics products.

10   Certain of these rebates were made available to managed care providers in exchange for these

11   customers purchasing large volumes of Connetics products.  Other rebates were extended under

12   the Federal Medicaid Rebate program, pursuant to which Connetics was required to pay a rebate

13   to state and federal governments for products purchased by state and local Medicaid programs.

14   In addition, Connetics was required to extend certain pricing discounts to various governmental

15   agencies so that those agencies would receive the "best price" that Connetics offered on its

16   products to any other wholesaler, distributor or other customer.

17       105.    <u>Chargebacks.</u>  Pursuant to the Veterans Health Care Act of 1992, certain federal

18   entities such as the Veterans Administration, the Department of Defense and the Coast Guard

19   were entitled to a discount of approximately 24% off of the average manufacturer price that

20   Connetics charged to non-federal customers.  When one of these federal entities purchased

21   Connetics' product from a wholesale distributor, the distributor would "charge back" to

22   Connetics the difference between the then-current retail price of the product and the price that

23   the federal entity paid to the distributor for the product.

24       106.    <u>Returns.</u>    Throughout the Class Period, Connetics allowed distributors and

25   pharmacies to return unused products that were within six months of expiration and to return

26   expired products within one year ***after*** their expiration date.  Connetics also allowed customers

27   to return damaged products.  When a distributor or pharmacy returned a product, Connetics

28

would provide the customer with a credit in the amount of ninety-five percent of the then-current wholesale price of the product.

107.   Despite refund, chargeback and return conditions that applied to each product Connetics sold to its distributors, throughout the Class Period, Connetics would "book" the revenue from the sales of its products at the same the products were shipped to the distributors. When Connetics booked the revenue from these "sales," it would set aside a fixed amount of accruals and allowances – *i.e.,* reserves – to account for the possibility that its "sales" revenue would be subsequently reduced by rebates, refunds, chargebacks or returns received from customers.  Connetics would determine the amount of accruals and allowances by evaluating factors including the Company's historical experience selling the product and the competitive marketplace.

108.   As discussed below, in order to comply with GAAP, Connetics was required to have a good faith basis for its estimated reserve accruals.  Indeed, it was critical that Connetics honestly and accurately estimate the future rebates, chargebacks and returns of its products and record appropriate accruals for those amounts.   If, for instance, Connetics deliberately underestimated these amounts, then its "sales" and "product revenue" would be artificially inflated, and when future returns and rebates came due, the Company would not have sufficient reserves to pay for them.

### 2.   Connetics Engaged In Intentional Channel-Stuffing Throughout The Class Period

109.   Lead Plaintiff's investigation has revealed that, throughout the Class Period, Connetics systematically engaged in a practice known as "channel-stuffing."  Channel-stuffing is a fraudulent business practice whereby a company artificially inflates its sales and revenue by intentionally "selling" more of its products to customers than what the retail marketplace demands.  By channel-stuffing, a company can temporarily increase its accounts receivables and revenue, but only at the cost of long-term sustainability and accurate financial statements.  Channel-stuffing defrauds investors because, by so doing, a company books sales in the near term at the expense of future periods, which distorts the true state of the company's finances.  Further, if the "sales" of products to customers are subject to a right of return or potential

rebates, as Connetics' products were, then substantial portions of the shipments may not qualify as "sales" at all, and reporting them as such renders the Company's financial statements materially false and misleading in violation of GAAP.

110.    Given the structure of the marketplace and the manner in which Connetics recognized revenue for sales of its products, it was important for Connetics to accurately estimate future retail demand so that it shipped the appropriate amount of product to its distributors.  In particular, it was critical that the Company's distributors did not become "overstocked" with excess inventory.  If distributors carried excess inventory of Connetics' products, it would, among other things, mean that (1) the distributors would be less likely to purchase additional product in the future, thus making it difficult for the Company to legitimately meet its sales and earnings goals in subsequent financial periods, and (2) there would be a materially higher chance that the distributors would eventually return large amounts of unsold product to Connetics for a full refund and/or become eligible for volume and other discounts at a far higher rate than the Company's historical experience would suggest (as discussed in more detail below).

111.    In an effort to estimate the future demand for its products and purportedly to avoid overstocking its distributors, throughout the Class Period, Connetics would prepare regular "forecast" reports that were reviewed by Connetics' senior management.  Lead Plaintiff's investigation has revealed substantial evidence regarding Connetics' forecasting process during the Class Period.  For instance, the Company's forecasts considered several factors, including competitor sales, historical sales experience, and the number of prescriptions written and filled for particular products in given periods.  The number of prescriptions filled and written for a particular product in any given time period were particularly useful metrics for estimating the retail sales of the product and anticipating the future retail demand.

112.    Nonetheless, according to Confidential Witness 3, the amount of products shipped (and therefore "sold") to distributors during the Class Period regularly exceeded the number of prescriptions that were being written for the products.  This created a situation where Connetics' sales representatives would be unable to meet their internal goals in terms of convincing doctors to write prescriptions for products, but the Company as a whole would meet its "sales" numbers

for the product because it would simply ship more of the product to distributors than the retail channel would demand in the future. Thus, according to Confidential Witness 3, the Company "always met its Wall Street numbers," but never meet its internal goals for prescriptions written. Also according to Confidential Witness 3, Defendants Wiggans and Vontz were repeatedly told during the Class Period that the amounts of product being shipped greatly exceeded the known data about the number of prescriptions written. However, rather than react to this with the concern of honest executives, Wiggans and Vontz "didn't want to hear it" and instead directed that **even more** product be put into the channel in order to make Wall Street's numbers.

113. Lead Plaintiff's investigation has also revealed that, throughout the Class Period, Defendants Wiggans, Higgins and Vontz deliberately manipulated Connetics' forecasting process in a fraudulent attempt to "justify" selling more product into the distribution channel than was needed to meet retail demand. According to Confidential Witness 1, who was directly involved in the forecasting process for more than three years (including throughout the Class Period), Confidential Witness 1 would assist in the preparation of the Company's initial annual forecasts and present them to, among others, Defendants Wiggans, Higgins and Vontz in October of each year. These facts were corroborated by Confidential Witness 3, who was also directly involved in the forecasting process and attended the annual October meetings throughout the Class Period.

114. Following the initial October meeting with Defendants Wiggans, Higgins and Vontz, Connetics would hold monthly forecast meetings that were attended by, among others, Confidential Witness 1, Confidential Witness 3 (for certain meetings) and Defendants Wiggans, Higgins and Vontz. At these monthly meetings, the forecast reports would be compared to the actual demand for the product as measured by factors including the number of prescriptions filled and written for the product during recent periods. Lead Plaintiff's investigation has revealed that Defendants Wiggans, Higgins and Vontz would regularly direct employees to increase the forecasts so that the Company could internally "justify" selling more products to distributors than a good-faith estimate of the future retail demand would permit. For instance:

(i)      Wiggans regularly instructed Confidential Witness 1 throughout the Class Period to increase the forecasts so that they were in line with Wall Street's expectations for Connetics' future sales.

(ii)     When Confidential Witness 1 presented the initial forecast for 2005 to certain members of the Executive Committee (including Wiggans, Higgins and Vontz), Confidential Witness 1 was scolded by Wiggans, who told Confidential Witness 1 that Wiggans had made it clear what the forecast had to be in order to meet Wall Street's expectations, and that the forecast was too low.  Wiggans – in the presence of Vontz and Higgins – directed Confidential Witness 1 to increase the forecast so that it met Wall Street's expectations for Connetics' sales.

(iii)    Confidential Witness 3 corroborated Confidential Witness 1's assertion that employees were forced to change forecasts without justification and in order to obtain preordained results.  According to Confidential Witness 3, at meetings attended by Confidential Witness 3, Confidential Witness 1 would be directed by Wiggans to change the hypotheses in the forecasts until the forecasts matched Wall Street's numbers.

(iv)     According to Confidential Witness 1, certain employees became so concerned about the pressure to constantly alter the forecasts without a legitimate business justification that they started keeping "CYA" folders to document certain activities that the employees did not feel comfortable with.  One employee involved with the forecasting process maintained a "CYA" file that contained *ninety-three* different iterations of the forecast that Defendants Wiggans, Higgins and Vontz required him to make in order to "justify" increasing the forecasts to meet Wall Street's expectations.

115.    In addition to the constant orders that Defendants Wiggans, Higgins and Vontz gave to Connetics' employees to make improper increases to Connetics' internal forecasts, Lead Plaintiff's investigation has revealed substantial additional evidence of the fraudulent channel-stuffing engaged in by Connetics during the Class Period.  These include the facts that, according to Confidential Witness 3:

(i)      A Connetics' employee who was concerned about the Company's channel-stuffing practices documented e-mails from Defendant Vontz, which instructed the employee to contact distributors at the end of certain quarters during the Class Period and pressure them to take more product than the Company knew was justified.

(ii)     The amount of product Connetics shipped to wholesalers consistently did not match the demand for the product, and during the last two weeks of *each quarter* during the Class Period, at the direction of Wiggans, Higgins and Vontz, Connetics would ship significant amounts of additional and unnecessary inventory for the sole purpose of meeting or exceeding Wall Street's expectations for the Company's sales and revenue for that period.

116.    The fact that these channel-stuffing practices were fraudulent efforts to mislead Connetics' investors is further confirmed by numerous additional former Connetics employees.

For instance, according to Confidential Witness 4, a former Senior Vice President in the sales department who worked at the Company for nearly three years before leaving in late 2005, Defendants Wiggans, Higgins and Vontz would consistently direct more product to be shipped to wholesalers than was needed to satisfy the demand.  According to Confidential Witness 3, Wiggans, Higgins and Vontz were each aware that inventory levels at distributors were excessive throughout the Class Period, but refused to take meaningful steps to reduce inventory to appropriate levels (which, of course, would have required reducing Connetics' sales and revenue as well).  According to Confidential Witness 5, a Territory Manager who worked at Connetics for four years and did not leave until after the Class Period, there were constant discussions among Connetics' employees that Connetics had overstocked with distributors.  In addition, Confidential Witness 5 corroborated the information provided by the other confidential witnesses in that Connetics would always hit its Wall Street numbers, even though Connetics' internal sales force would never hit its internal goals for number of prescriptions written.  Lead Plaintiff also contacted Confidential Witness 6, who was a Vice President of Sales after the Class Period, and Confidential Witness 6 stated that it was obvious that, during the Class Period, the forecast reports would be "changed on a whim," and were often changed on the whims and at the direction of Wiggans and Vontz.  According to Confidential Witness 7, a Regional Sales Director for Connetics from late 2003 through November 2005, there seemed to "always be way too much" inventory with Connetics' distributors.

117.    According to Confidential Witness 8, a Manager who worked for Connetics more than six months in 2005, it was made clear at sales meetings attended by Confidential Witness 8 in 2005 that prescription levels were not increasing fast enough to offset the buildup of excess inventory with wholesaler distributors.  At these sales meetings, it was also made clear that if Connetics had to accept the excess inventory back as a return (if, for instance, it expired before doctors wrote prescriptions for it), then Connetics would take a "big financial hit."  This is an acknowledgment that the Company knew it had inadequate reserves for returns.  According to Confidential Witness 8, it was a common belief within the Company – and particularly among the sales representatives who were in a position to know – that Connetics had overloaded its

wholesalers in order to increase its quarterly earnings, and it was unrealistic for Connetics to expect to sell all of the product that was building up in the wholesale inventory.  Confidential Witness 8 corroborated the information provided by the other confidential witnesses in that "nobody could understand what was going on" because prescription totals never matched the amount of product being shipped to distributors even though Connetics' Wall Street numbers always "looked good."

118.    Defendants Wiggans, Higgins and Vontz were able to perpetrate their fraudulent scheme throughout the Class Period in part because, according to several former Connetics' employees, they "ruled through fear" by creating an atmosphere of intimidation where they constantly threatened to terminate employees who displeased them.  According to Confidential Witness 3, although there were some "heated discussions" among the lower-level employees who were directed to change the Company's forecasts, this was mostly "water cooler discontent" because these employees knew that they would be fired if they challenged Wiggans, Higgins or Vontz.  According to Confidential Witness 1, employees lived in constant fear of being terminated and the senior executives regularly expressed a willingness to terminate employees who did not please them.

119.    As the Insider Defendants intended, Connetics' intentional channel-stuffing throughout the Class Period caused Connetics' accruals for rebates, chargebacks and returns to be materially understated, which, in turn, materially overstated the Company's earnings and caused its publicly-filed financial statements to violate GAAP.  By injecting excessive inventory into the distribution channel, Connetics and the Insider Defendants knew or should have known that significant amounts of Connetics' products would remain unsold through the expiration date and, therefore, would be returned to Connetics.  Likewise, as the Insider Defendants and Connetics knew or should have known, as Connetics deliberately shipped excess product into the distribution channel, it rendered the Company's internal estimates of anticipated rebates and chargebacks artificially low because, among other reasons, the Company continued to estimate future rebates based on historical experience, without adjusting for the fact that significant

1    amounts of additional product were now in the pipeline (thus rendering historical experience an

2    unreliable indicator of future returns).

3    120.    Connetics could not stuff the channel forever.  As Connetics' product languished

4    in distributor and pharmacy inventory for longer periods, customers began to return larger

5    amounts of expired or nearly-expired product.  As discussed below, by mid-2006, despite the

6    best efforts of Connetics' senior executives, Connetics' fraudulent practice of increasing sales

7    through channel-stuffing had caught up to the Company, the SEC launched an investigation, and

8    the Insider Defendants and Connetics were forced to restate Connetics' financial statements.

9       **3.    Connetics Announced Its Intention To**
10            **Restate Its Financial Statements, But**
             **Continued To Deliberately Deceive Investors**

11   121.    On May 3, 2006, Connetics announced in a Form 8-K and accompanying press

12   release filed with the SEC that the Company's "financial statements for the year ended

13   December 31, 2005, and potentially additional periods, *should no longer be relied upon*." (5/3/06

14   8-K at 1 (emphasis added).)  The press release announced that:

15       The Company records quarterly reserve provisions for rebates by estimating
         rebate liability for product sold taking into consideration a number of factors
16       including timing and terms of managed care contracts, time to process rebates,
         product pricing, sales volumes, units held by distributors and prescription trends.
17       Upon review, the Company has concluded that the rebate rates and method used to
         calculate the rebate liability in prior periods did not fully capture the impact of
18       these factors, and estimates that the cumulative impact of the change as of
         December 31, 2005 is approximately $8.0 million to $9.0 million.
19
20   *Id*.  This press release also announced that it was "highly likely" that Connetics had material

21   weaknesses in its internal controls over financial reporting.

22   122.    In reaction to this news, the price of Connetics' common stock, which had closed

23   at $15.27 per share on May 2, 2006, traded as low as $13.43 per share on May 4, 2006, a drop of

24   approximately 12%, on heavy trading volume.

25   123.    This announcement, however, failed to disclose Connetics' fraudulent channel-

26   stuffing practices discussed herein, and also failed to disclose the full effect of those practices on

27   the Company's prior financial statements and future financial performance.

28   124.    Indeed, the Insider Defendants and Connetics continued to intentionally mislead

investors on these points.  For instance, Connetics attempted to allay investor concerns by

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -33-
Case No. C 07-02940 SI

issuing adjusted financial guidance for fiscal year 2006 of revenues between $211 million and $217 million and diluted EPS between $0.44 to $0.50.  In order to convince investors that the adjusted guidance was complete and accurate, on a conference call held May 3, 2006, Defendants Wiggans and Vontz expressly assured investors that the new financial guidance ***took into account any future efforts to reduce inventory held at distributors***.

For instance:

> (i)     Defendant Vontz stated that "any destocking activities over the coming quarters *have been accounted for in our revised guidance given today*," (emphasis added);
>
> (ii)    Defendant Vontz stated that "in March we hit five all-time prescription highs for five of our nine product units out there";
>
> (iii)   Defendant Wiggans stated "the rebate accounting issue has no effect whatsoever on future trends.  And to the degree that we may do destocking over time, *that was built into the original guidance*," (emphasis added); and
>
> (iv)   Defendant Wiggans stated "I don't think you'll see any dramatic changes [in inventory levels,] even though our goal is over time to get the inventories down a little bit."

125.     On May 22, 2006, Connetics filed a Form 8-K with the SEC that announced that the Company had received a Notice of Delisting due to its failure to file its quarterly report.  In reaction to this news, the price of Connetics' common stock, which had closed at $13.26 per share on May 22, 2006, traded as low as $12.51 per share on May 23, 2006, a drop of approximately 6%.

### 4.    The SEC Investigation Into Channel-Stuffing

126.     In June 2006, the SEC served a subpoena on Connetics, which Connetics later described as "focused primarily on documents related to our wholesale distributors and the forecasted demand for our products."  (2005 Form 10-K/A at F-42.)  Connetics "concluded that there could be some overlap" between the SEC investigation and Connetics' restatement of its financial statements because "*the document production to the SEC included information on inventory in the distribution channel which is used in the reserve estimation process*."  (*Id.* (emphasis added).)  The SEC investigation is ongoing.

### 5.    **The Truth Is Finally Revealed**

127.    On July 10, 2006, Connetics shocked the market by announcing in a Form 8-K and accompanying press release filed with the SEC that:

> [Connetics] expects revenues and earnings per share for the second quarter, and for the full year 2006, to be materially below the amounts included in the guidance that the Company provided on May 3, 2006. *The shortfall in second quarter revenue is due, in part, to the Company's decision to reduce wholesaler inventory by shipping product volumes that were below estimated prescription demand* . . . by shipping less than demand, overall wholesaler inventory levels for the Company's products have been reduced by approximately $7 million, a greater amount than originally planned. *The Company intends to continue to ship below estimated prescription demand during the remainder of 2006, with a goal of further reducing average wholesaler inventory levels to approximately two months on hand by the end of 2006.*

(7/10/06 Press Release at 1 (emphasis added).)

128.    Analysts covering the Company reacted to this announcement with dismay. In a report issued on July 10, 2006, an analyst from CIBC World Markets reported "never say it can't get worse . . . things appear to [be] going from bad to worse at CNCT, where management has withdrawn '06 guidance and 2Q06 results will fall materially short." (7/10/06 CIBC Report at 1.) Another analyst wrote "we are starting to question management's ability to handle the current crises." (7/11/06 Jefferies Report at 1.) Still another analyst wrote:

> There is no way to paint a pretty picture under the various scenarios suggested by yesterday's news . . . it appears *management continues to be less than forthcoming about its accounting issues and the circumstances that have resulted in the revised guidance* . . .
>
> Management [had] indicated its channel inventory was higher than desired on Soriatane, but they had stated that efforts to reduce Soriatane inventory levels were incorporated into prior guidance. *Current disclosure suggests inventory levels are a far more severe problem that likely involves all of the company's products.* This also raises questions about how much of this issue results from prior sales to an "international distributor" who may have over purchased in prior periods and is either working down inventory or dumping the excess inventory back into the domestic market. *Either way, management's lack of transparency on the nature and value of the sales to this distributor remains a significant unresolved issue for investors.*

(7/11/06 RBC Report at 1, 2 (emphasis added).)

129.    In reaction to this news, the price of Connetics' common stock plummeted from a close of $11.69 per share on July 7, 2006 (the immediately preceding trading day), to close at $7.76 per share on July 10, 2006, a drop of approximately 34% on heavy trading volume.

### 6.    The Restatement

130.    On July 25, 2006, Connetics filed its Amended Form 10-K/A for fiscal year 2005 (the "Form 10-K/A" or "Restatement") with the SEC.  In the Restatement, Connetics admitted that its financial statements throughout the Class Period were materially false and misleading. The Restatement stated:

> . . . our previously filed consolidated financial statements should no longer be relied *upon due to errors in the accounting for accruals for estimated rebates and chargebacks for our products*.  Because we were already examining revenue reserves in prior years, management decided to apply the same resources to evaluate how we estimate accruals for returns of our products.  As a result of our evaluation, we determined that our *methodology for estimating future product returns had contained errors and resulted in an understatement of our returns accruals*.

(10-K/A at 43 (emphasis added).)  Thus, in the Restatement, Connetics admitted that during the Class Period the Company had materially understated its accruals for estimated product rebates, chargebacks, and the amount of future product returns.

131.    By restating due to admitted "errors" in its financial statements, Connetics admitted that the Company's financial statements were materially false and misleading at the time they were publicly filed with the SEC.  (*See* SFAS 16 and APB Opinion No. 20 (restatements are only permitted, and are required, for material accounting errors that existed at the time the financial statements were prepared).  In addition, by restating due to admitted "errors," the Company admitted that it had enough information on hand **at the time it filed its financial statements** to prepare them in accordance with GAAP, but it improperly ignored the available information.  (*See id*. (reporting a "correction of an error" involves "**the oversight or misuse** of facts that existed at the time the financial statements were prepared" as opposed to a "change in accounting estimate," which results from "new information or subsequent developments and accordingly from better insight or improved judgment").)

132.    In addition, Connetics has also admitted that, throughout the Class Period, the Company suffered from undisclosed material weaknesses in its internal controls over financial reporting.  A material weakness in internal controls "is defined as a significant deficiency or a combination of significant deficiencies which results *in more than a remote likelihood that material misstatement of our annual or interim financial statements would not be prevented . . . .*"

(7/25/06 10-K/A at 68 (emphasis added).)    These undisclosed material weaknesses, which stemmed from poor methodologies and lack of oversight of the Company's system for accruing rebates, chargebacks and product returns as well as a lack of involvement of trained employees, allowed the financial statement fraud at Connetics to continue undetected throughout the Class Period, and allowed the Insider Defendants and Connetics to perpetrate their fraudulent scheme unbeknownst to investors.

**7.    Impact On Financial Statements**

133.    The result (indeed, the goal) of understating the Company's estimated liability for future rebates, chargebacks and returns was to materially overstate the Company's reported net revenues, net product revenue, income from operations, net income, product-related accruals and stockholders' equity during the Class Period.  The impact that these financial manipulations had on Connetics' financial statements is set forth in the following charts.

| Year Ended December 31, 2005 (In Millions) | | |
|---|---|---|
| **Line Item** | **As Reported** | **As Restated** |
| Net Revenue | $184.2 | $176.3 |
| Net Product Revenue | $183.3 | $175.4 |
| Income from Operations | $23.8 | $15.9 |
| Net Income | $33.9 | $26.1 |
| Product-Related Accruals | $24.2 | $35.4 |
| Stockholders' Equity | $110.7 | $99.9 |

| Year Ended December 31, 2004 (In Millions) | | |
|---|---|---|
| **Line Item** | **As Reported** | **As Restated** |
| Net Revenue | $144.4 | $143.2 |
| Net Product Revenue | $142.0 | $140.9 |
| Income from Operations | $22.0 | $20.8 |
| Net Income | $19.0 | $17.9 |
| Product-Related Accruals | $18.4 | $21.6 |
| Stockholders' Equity | $127.9 | $124.8 |

134.    As a result of these material misstatements, for the full fiscal year ended December 31, 2005, Connetics' Net Revenue was overstated by 4.7%, Net Product Revenue by 5%, Income from operations by 34%, Net Income by 24%, and Stockholders' Equity by 10%, while Product-Related Accruals were understated by 32%.

135.    As set forth in the Restatement, the breakdown of the material misstatements in Connetics' financial statements for each quarter of 2005 is as follows:

| **Fiscal 2005 Quarters** (In Millions) | | |
|---|---|---|
| | **As Reported** | **As Restated** |
| **First Quarter 2005** | | |
| Net Revenue | $42.3 | $40.3 |
| Net Product Revenue | $42.1 | $40.2 |
| Income from Operations | $1.5 | ($0.5) |
| Net Income | $1.0 | ($1.0) |
| **Second Quarter 2005** | | |
| Net Revenue | $45.3 | $45.3 |
| Net Product Revenue | $45.2 | $45.3 |
| Income from Operations | $2.6 | $2.7 |
| Net Income | $2.5 | $2.6 |
| **Third Quarter 2005** | | |
| Net Revenue | $55.3 | $50.9 |
| Net Product Revenue | $55.1 | $50.7 |
| Income from Operations | $15.6 | $11.2 |
| Net Income | $15.3 | $10.9 |
| **Fourth Quarter 2005** | | |
| Net Revenue | $41.1 | $39.5 |
| Net Product Revenue | $40.7 | $39.0 |
| Income from Operations | $4.0 | $2.4 |
| Net Income | $15.0 | $13.4 |

136.    As set forth in the Restatement, the breakdown of the material misstatements in Connetics' financial statements for each quarter of 2004 is as follows:

| Fiscal 2004 Quarters (In Millions) | | |
|---|---|---|
| | **As Reported** | **As Restated** |
| **First Quarter 2004** | | |
| Net Revenue | $24.9 | $24.5 |
| Net Product Revenue | $23.5 | $23.1 |
| Income from Operations | $2.4 | $1.9 |
| Net Income | $1.8 | $1.4 |
| **Second Quarter 2004** | | |
| Net Revenue | $38.2 | $38.6 |
| Net Product Revenue | $37.9 | $38.6 |
| Income from Operations | $8.7 | $9.1 |
| Net Income | $7.5 | $7.8 |
| **Third Quarter 2004** | | |
| Net Revenue | $37.3 | $37.1 |
| Net Product Revenue | $36.9 | $36.7 |
| Income from Operations | $4.2 | $3.9 |
| Net Income | $3.7 | $3.4 |
| **Fourth Quarter 2004** | | |
| Net Revenue | $43.7 | $42.8 |
| Net Product Revenue | $43.5 | $42.6 |
| Income from Operations | $6.7 | $5.7 |
| Net Income | $6.0 | $5.1 |

## 8.    GAAP Violation

137.    Throughout the Class Period, Connetics represented that its financial statements were in conformance with GAAP.  These representations were false.  As set forth herein, the financial statements issued by the Company for fiscal years 2004 and 2005, and the financial statements for the fiscal quarters therein, did not fairly and accurately represent the Company's financial position and the results of its operations because they violated key provisions of GAAP.

138.    GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICAP").  GAAP consists of a collection of authoritative literature, including the Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion"), AICPA Accounting Research

Bulletins ("ARB"), and Emerging Issues Task Force ("EITF") guidance.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not prepared in accordance with GAAP will be presumed to be false or misleading.

139.    Connetics was required under GAAP to estimate the amount of any rebates, chargebacks and anticipated reserves and establish a reasonable reserve against revenues to account for them.  (*See* FASB Statement No. 5 (sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns).)

140.    With respect to recording accruals and reporting sales subject to a right of return, in order to comply with GAAP, Connetics had to adhere to SFAS 48, "Revenue Recognition When Right of Return Exists."  SFAS 48 provides:

> 6.  If an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met:
>
> a.  The seller's price to the buyer is substantially fixed or determinable at the date of sale.
>
> b.  The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.
>
> c.  The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.
>
> d.  The buyer acquiring the product for resale has economic substance apart from that provided by the seller.
>
> e.  The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.
>
> f.  The amount of future returns can be reasonably estimated. ***Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever comes first***.

(Emphasis added.)

141.    Thus, in order to comply with SFAS 48, Connetics had to be able to "reasonably estimate" its amount of future returns.  If Connetics was unable to do so, then under GAAP, Connetics could not recognize any revenue on the sale of the products until the right of return

expired.  Because Connetics' return policy allowed for products to be returned up to one year *after* their expiration date, and Connetics regularly shipped products that were between ten and fifteen months away from expiration, unless Connetics could "reasonably estimate" future returns, it would not be allowed, consistent with GAAP, to recognize any revenue on products for approximately *two and one-half years* after the products were shipped.  This would have been catastrophic to the Company.

142.    SFAS 48 also provides guidance on "the ability to make a reasonable estimate of the amount of future returns," and states that the ability to estimate returns may be impaired by a number of factors, including:

> c. Absence of historical experience with similar types of sales of similar products, *or inability to apply such experience because of changing circumstances* . . .

(Emphasis added.)

143.    As discussed above, Connetics was engaged in a fraudulent channel-stuffing scheme throughout the Class Period.  This scheme resulted in significantly greater amounts of inventory being placed into the distribution channel than was appropriate, and it was significantly out of line with Connetics' historical practices.  Thus, the scheme a "changing circumstance" that rendered Connetics' historical returns experience unreliable as a basis to estimate future returns.  Nonetheless, Connetics continued to use its historical returns experience (sometimes going back as far as three or four years) to estimate future returns in order to understate its estimated reserves and overstate its revenues.  Given the changing circumstances – *i.e.,* channel-stuffing – the Insider Defendants and Connetics knew that historical experience no longer provided a sound basis to make a reasonable estimate of future returns.  Nonetheless, in violation of GAAP, the Insider Defendants and Connetics applied the lower rate of "historical" returns to "estimate" future returns – which had the effect of understating the Company's accruals for future returns, and overstating its sales and revenue.  This practice violated GAAP and rendered Connetics' financial statements materially false and misleading.

1    144.    With respect to recording accruals and reporting sales subject to rebates and

2    chargebacks, in order to comply with GAAP, Connetics had to adhere to EITF No. 01-9

3    "Revenue Recognition When Right of Return Exists."  EITF No. 01-9 provides:

> The vendor should recognize the rebate or refund obligation as a reduction of
> revenue based on a *systematic and rational allocation of the cost of honoring*
> *rebates or refunds earned and claimed to each of the underlying revenue*
> *transactions that result in progress by the customer toward earning the rebate or*
> *refund*.  Measurement of the total rebate or refund obligation should be based on the
> estimated number of customers that will ultimately earn and claim rebates or refunds
> under the offer (that is, breakage should be considered if it can be reasonably
> estimated).  *However, if the amount of future rebates or refunds cannot be*
> *reasonably estimated, a liability should be recognized for the maximum potential*
> *amount of the refund or rebate (that is, no reduction for breakage should be*
> *made*) . . . the following factors may impair a vendor's ability to make a reasonable
> estimate:
>
> * * *
>
> b. Absence of historical experience with similar types of sales of similar
> products, *or inability to apply such experience because of changing*
> *circumstances* . . .

(Emphasis added.)

14    145.    Thus, as with the application of SFAS 48 discussed above, the fraudulent channel-

15   stuffing scheme was a "changing circumstance" that rendered Connetics' historical rebate and

16   chargeback experience unreliable as a basis to estimate future rebates and chargebacks.

17   Nonetheless, throughout the Class Period, Connetics continued to use its historical rebate

18   experience to estimate future rebates and chargebacks.  Given the changing circumstances – *i.e.,*

19   channel-stuffing – the Insider Defendants and Connetics knew that historical experience no longer

20   provided a "systematic and rational" basis to estimate future rebates and chargebacks.   In

21   violation of GAAP, however, the Insider Defendants and Connetics applied the lower rate of

22   "historical" rebates and chargebacks to determine future estimates – which had the effect of

23   understating the Company's accruals for future returns, and overstating its sales and revenue.

24   They followed this practice in order to ensure that Connetics' revenue and sales met or exceeded

25   Wall Street's expectations.   This practice violated GAAP and rendered Connetics' financial

26   statements materially false and misleading.

# VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

146.    The Insider Defendants and Connetics each acted with scienter with respect to the materially false and misleading statements discussed herein, in that they had actual knowledge that the statements were false or misleading, or acted with reckless disregard for the truth or falsity of those statements.    Defendants Yaroshinsky and Zak each acted with scienter with respect to their illegal trading in Connetics securities.    In addition to the allegations set forth above, Defendants' scienter is established by the following facts.

## A.    Evidence Of Intentional Or Reckless Misconduct

147.    Defendants Wiggans, Higgins, Vontz, Krochmal and Yaroshinsky had actual knowledge of the issues with the safety and approvability of Velac.    According to Confidential Witness 3, Defendants Yaroshinsky, Vontz and Krochmal were directly in charge of overseeing the pre-clinical testing of Velac and were involved in every step of the developmental process for the drug, including overseeing the Mouse Study.    Throughout the Class Period, Yaroshinsky reported directly to Vontz and Krochmal and provided regular updates on the Velac regulatory process and the progress of pre-clinical tests to Defendants Wiggans and Higgins.    In particular, each of these Defendants had actual knowledge of the carcinogenic results of the Mouse Study and the June 28, 2004 comments from Connetics' panel of expert toxicologists.    Indeed, according to Confidential Witness 3, "there was not a thing that went on in that organization that they [Wiggans, Higgins and Vontz] were not aware of."    According to Confidential Witness 3, Defendant Vontz was "very hands-on" and closely monitored the Velac pre-clinical trials.

148.    Further, Defendant Yaroshinsky was on the April 13, 2005 conference call where the FDA informed Connetics of its significant concerns about the safety of Velac (which reiterated the concerns of Connetics' own toxicology experts and was based on the results of the Mouse Study, both of which each of the Officer Defendants already knew) and Defendant Yaroshinsky and others immediately informed Defendants Wiggans, Higgins, Vontz and Krochmal of this call.    According to the SEC Complaint, Connetics immediately put in place a trading ban to prevent individuals with inside knowledge about the FDA call from conducting

transactions in Connetics' securities. This trading ban could only have been put in place with the knowledge and approval of Defendants Wiggans, Higgins and Vontz.

149. Defendant Yaroshinsky's actual knowledge of the issues with the safety and approvability of Velac is further demonstrated by the following additional facts:

(i) "Yaroshinsky's duties and responsibilities as Connetics' Vice President of Biostatistics and Clinical Operations included designing drug development studies, conducting the studies, analyzing the results and ultimately generating reports to the FDA for use in drug applications. In order to carry out his duties, Yaroshinsky was entrusted with, and had ready access to, non-public information concerning the approval process of Connetics' developmental stage drugs." (SEC Complaint ¶13.)

(ii) Yaroshinsky's insider trading activities as detailed herein.

(iii) "Defendant Yaroshinsky learned material, non-public information concerning the status of Velac Gel. He further knew, should have known, or was reckless in not knowing, that the information concerning the FDA's view of the carcinogenicity study was material and nonpublic." (SEC Complaint ¶37.)

(iv) "Defendant Yaroshinsky communicated the material, non-public information concerning the FDA's comments and conclusions concerning the Velac Gel carcinogenicity study to Zak, for his direct or indirect personal benefit." (*Id.* ¶39.)

150. The SEC Complaint also confirms Defendant Zak's scienter (as of April 13, 2005) and insider trading activities as discussed above. In addition, the SEC Complaint states that "Zak conducted the securities transactions in his accounts . . . while in possession of information that he knew, should have known, or was reckless in not knowing, that was material, nonpublic information that Yaroshinsky had conveyed to him . . ." (*Id.* ¶40.)

151. The scienter of Defendants Wiggans, Higgins, Vontz and Krochmal regarding the issues with Velac is further demonstrated by the fact that Velac was the single most important product for the future of the Company. Throughout the Class Period, analysts estimated that the drug would account for up to $18.5 million in sales for fiscal year 2005, as high as $62 million for fiscal year 2006, and approximately $90 million for fiscal year 2007. For fiscal year 2005, these sales figures would have represented – for this *single product* – a 13% increase in the Company's total sales for *all products* (as compared to fiscal year 2004), a 50% increase for fiscal year 2006, and a staggering *72%* increase for fiscal year 2007. Indeed, analysts regularly

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -44-
Case No. C 07-02940 SI

1   estimated that Velac would be the Company's largest selling product by fiscal year 2007.  (*See*

2   *e.g.*, 10/15/04 CIBC Report at 3.)

3       152.    Moreover, Defendants Wiggans, Higgins, Vontz and Krochmal repeatedly made

4   statements to the market demonstrating that they were focused on the development of Velac and

5   were keeping themselves apprised of the Velac regulatory and testing processes.   These

6   statements demonstrate that each of these Defendants knew or should have known of all

7   important developments relating to Velac.

8       153.    Thus, Defendants Wiggans, Higgins, Vontz and Krochmal – the most senior

9   executive officers of Connetics – actively monitored the status of this important drug

10  throughout the Class Period, and each of them knew the safety and approvability issues with

11  Velac that are discussed herein.

12      154.    The scienter of Defendants Wiggans, Higgins and Vontz regarding both the issues

13  with Velac and the financial statement fraud during the Class Period is also demonstrated by the

14  membership of each of these Defendants on Connetics' Management Executive Committee.

15  Connetics disclosed that the Management Executive Committee was responsible for "the overall

16  direction, strategy and operations of Connetics, including, among other things, ***corporate***

17  ***financial performance, commercial performance, research, development and product***

18  ***operations performance***."  (2006 Schedule 14A Proxy at 11 (emphasis added).)  As high-level

19  executives of Connetics and members of the Management Executive Committee, each of these

20  Defendants had access to material non-public information not available to the public, including

21  material non-public information regarding the regulatory approval process for Velac and the

22  fraudulent channel-stuffing practices alleged herein.  Indeed, as alleged in detail above, Lead

23  Plaintiff's investigation has revealed substantial evidence that the Management Executive

24  Committee played significant roles in the Velac approval process and in reviewing the

25  Company's internal forecast reports that were used to effect the fraudulent channel-stuffing

26  practices.

27

28

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                          -45-
Case No. C 07-02940 SI

1    155.    Additional direct evidence of Defendants Wiggans, Higgins and Vontz's actual

2    knowledge of and involvement in the fraudulent channel-stuffing practices described herein is set

3    forth above in Section V.C.

4    **B.    The Insider Defendants And Connetics Raised**
     **$200 Million In A Private Bond Offering**
5    **And Used The Proceeds For A Share Repurchase**

6    156.    In March 2005, the Insider Defendants leveraged their material misstatements

7    regarding Connetics into a $200 million windfall for the Company and themselves.  Specifically,

8    on or about March 23, 2005, while Defendants were actively concealing the significant issues

9    with the safety and approvability of Velac and causing the Company to issue materially false and

10   misleading financial statements in violation of GAAP, Connetics issued $200 million principal

11   amount of convertible senior notes maturing on March 30, 2015 (defined above as the "Bonds")

12   pursuant to Rule 144A of the Securities Act (defined above as the "Private Placement").

13   157.    The Private Placement was a highly unusual transaction for Connetics.   For

14   instance, the next largest such transaction that Connetics had conducted was a small issuance of

15   $90 million of convertible notes in May 2003.  After expenses of $7 million, Connetics received

16   proceeds of nearly $193 million from the Private Placement.

17   158.    The Insider Defendants were motivated to conceal the true state of the Company's

18   finances and the issues with Velac so that the Company could conduct the lucrative Private

19   Placement.  If the true facts about the Company had been known, the Company could not have

20   conducted the Private Placement.  Indeed, as set forth below, in the first quarter of 2005 – while

21   the Company reported profitability and earnings per share of 3 cents – the Company had actually

22   suffered a *loss of 3 cents per share*.  Had the market known the true state of the Company's

23   finances immediately prior to the Private Placement, investors would not have purchased the

24   Bonds, or paid anywhere near the price they did.

25   159.    The Insider Defendants also received a highly unusual and concrete benefit from

26   the completion of the Private Placement in the form of a share repurchase program that

27   Connetics funded with a portion of the proceeds it received in the Private Placement.

28   Specifically, the Insider Defendants caused Connetics to use $35 million of the proceeds to

repurchase 1,332,300 shares of Connetics' common stock at an average price of $26.27.  By reducing the amount of Connetics' common stock in the public float using the illicit proceeds of the Private Placement, the Insider Defendants were able to leverage their false statements to the market to immediately inflate the value of their own stock holdings – at no cost to themselves.

### C.    The Insider Defendants And Connetics Were Motivated To Meet Or Exceed Analyst Expectations

160.    Throughout the Class Period, Connetics was preoccupied with meeting or exceeding the estimates that Wall Street analysts published for the company's quarterly and year-end growth and earnings.  This obsession with meeting the "Wall Street numbers" is well-documented by the former Connetics employees contacted during Lead Plaintiffs' investigation and discussed above.  Indeed, as detailed herein, there was a consistent effort to manipulate Connetics' forecasting process to "justify" "selling" enough inventory into the channel to meet Wall Street's expectations for Connetics' sales and revenues.

161.    Connetics was covered by a number of securities analysts during the Class Period, and each of these analysts regularly reported on the Company's financial results and the major events impacting the Company.  These analysts would formulate an assessment of the Company's financial position and future potential based on its reported results and information provided to Wall Street by Connetics' senior management.  These assessments were reflected in the analysts' projected earnings for future fiscal periods, and published in their analysts' reports.

162.    During the Class Period, the Company regularly met or exceeded analysts' estimates for its financial performance.  However, as has now been admitted in the Restatement, had Connetics' financial statements been accurately reported, the Company regularly would have *missed* Wall Street's estimates during the Class Period.  Indeed, as alleged in detail above, Connetics was only able to consistently meet and exceed Wall Street's estimates by using the channel-stuffing scheme and accounting gimmickry specified herein.  But for these fraudulent practices, the Company would have fallen short of Wall Street's estimates for most financial periods during the Class Period.  The following chart shows Connetics' reported earnings per share ("EPS") as compared to its restated EPS for each quarter during the Class Period.

---

| Connectics' Reported EPS v. Restated EPS During the Class Period | | |
|---|---|---|
| **Period** | **Reported EPS** | **Restated EPS** |
| 1Q04 | $0.06 | $0.04 |
| 2Q04 | $0.19 | $0.21 |
| 3Q04 | $0.10 | $0.09 |
| 4Q04 | $0.17 | $0.14 |
| FY 2004 | $0.52 | $0.48 |
| 1Q05 | $0.03 | ($0.03) |
| 2Q05 | $0.07 | $0.07 |
| 3Q05 | $0.39 | $0.29 |
| 4Q05 | $0.40 | $0.36 |
| FY 2005 | $0.89 | $0.70 |

163.    As demonstrated by the positive analyst reaction to Connectics' reported EPS, these manipulations allowed the Company to project the illusion of success, which artificially inflated the price of the Company's publicly traded securities:

(i)    On January 25, 2005, Connectics reported fourth quarter 2005 EPS of 17 cents per share, which beat analyst expectations by 1 cent. Analysts reacted favorably to this announcement.  (*See* 1/26/05 Buckingham Report at 1 ("Connectics finished its first year of profitability with 2004 EPS of $0.52, *including 4Q04 EPS that topped our estimate and consensus by $0.01.*")  In reality, however, if Connectics had accurately reported its financial results for that quarter, the market would have known that the Company actually earned 14 cents per share, or *2 cents per share below Wall Street expectations* (emphasis added).)

(ii)    On April 26, 2005, Connectics reported first quarter 2005 EPS of 3 cents per share, which beat analyst expectations by 1 cent.  Analysts reacted favorably to this announcement.  (*See* 4/27/05 RBC Report at 1 ("Connectics reported 1Q05 EPS of $0.03 . . . this *beat our and consensus estimates of $0.02.*")  In reality, however, if Connectics had accurately reported its financial results for that quarter, the market would have known that the Company actually *suffered a 3 cents per share loss for that quarter* (emphasis added).)

(iii)    On November 1, 2005, Connectics reported third quarter 2005 EPS of 39 cents per share, which was in line with consensus analyst expectations, and exceeded the expectations of certain analysts by 1 cent.  (*See* 11/2/05 Jefferies Report at 1.)  In reality, however, if Connectics had accurately reported its financial results for that quarter, the market would have known that the Company actually earned 29

cents per share, *10 cents per share below Wall Street expectations.* (emphasis added.)

    (iv)    On January 31, 2006, Connetics reported fourth quarter 2005 EPS of 40 cents per share, which exceeded expectations by 1 cent. (*See* 2/1/06 FBR Report at 1 ("Connetics reported adjusted 4Q EPS last night a penny above our forecast and the consensus estimate.") In reality, however, if Connetics had accurately reported its financial results for that quarter, the market would have known that the Company actually earned 46 cents per share, *3 cents below Wall Street expectations*. (emphasis added.)

164.    As discussed above, there was constant pressure at Connetics – applied by Defendants Wiggans, Higgins and Vontz – to meet "Wall Street's numbers." Rather than meet these numbers through legitimate product launches and proper GAAP accounting, the Insider Defendants and Connetics used accounting gimmickry and fraudulently stuffed inventory into the Company's distribution channels in an effort to artificially inflate the Company's reported results.

## D.    <u>Insider Sales</u>

165.    During the Class Period, Defendants Wiggans, Higgins and Vontz collectively sold more than 1,000,000 shares of Connetics common stock, generating sale proceeds in excess of $9,000,000. Specifically, during the Class Period (1) Wiggans sold 207,280 shares of Connetics' common stock at artificially inflated prices for proceeds of approximately $4,096,000; (2) Higgins sold 130,517 shares of Connetics' common stock at artificially inflated prices for proceeds of approximately $3,398,221; and (3) Vontz sold 47,279 shares of Connetics' common stock at artificially inflated prices for proceeds of approximately $1,045,000. These sales are summarized in the tables below.

| | Date | # Shares sold | Price | Proceeds Received | Percentage of holdings |
|---|---|---|---|---|---|
| John Higgins | 2/9/2004 | 15,000 | $25.20 | $377,970.00 | 19.99% |
| John Higgins | 2/20/2004 | 5,809 | $21.28 | $123,615.52 | 6.68% |
| John Higgins | 3/12/2004 | 5,000 | $22.36 | $111,820.00 | 5.80% |
| John Higgins | 6/15/2004 | 10,000 | $20.77 | $207,740.00 | 11.98% |
| John Higgins | 7/30/2004 | 15,000 | $27.50 | $412,500.00 | 16.95% |
| John Higgins | 8/2/2004 | 4,554 | $27.63 | $125,827.02 | 5.15% |
| John Higgins | 8/2/2004 | 15,000 | $27.39 | $125,827.02 | 20.42% |
| John Higgins | 11/1/2004 | 7,500 | $26.62 | $199,665.00 | 8.94% |
| John Higgins | 11/10/2004 | 5,000 | $29.17 | $145,845.00 | 6.14% |
| John Higgins | 1/14/2005 | 12,500 | $22.76 | $284,500.00 | 13.92% |
| John Higgins | 3/15/2005 | 4,000 | $27.95 | $111,800.00 | 4.92% |
| John Higgins | 4/19/2005 | 5,000 | $29.00 | $145,000.00 | 6.08% |
| John Higgins | 5/31/2005 | 1,154 | $18.40 | $21,237.06 | 1.45% |

| | Date | # Shares sold | Price | Proceeds Received | Percentage of holdings |
|---|---|---|---|---|---|
| John Higgins | 6/10/2005 | 10,000 | $20.71 | $207,070.00 | 12.75% |
| John Higgins | 8/22/2005 | 6,407 | $17.73 | $265,935.00 | 8.56% |
| John Higgins | 8/22/2005 | 6,875 | $17.73 | $265,935.00 | 9.13% |
| John Higgins | 8/22/2005 | 1,718 | $17.73 | $265,935.00 | 2.45% |
| **TOTAL** | | **130,517** | | **$3,398,221.62** | |

| | Date | # Shares sold | Price | Proceeds Received | Percentage of holdings |
|---|---|---|---|---|---|
| Thomas Wiggans | 2/2/2004 | 2,000 | $21.92 | $43,840.00 | 1.19% |
| Thomas Wiggans | 2/2/2004 | 13,000 | $21.92 | $284,960.00 | 7.27% |
| Thomas Wiggans | 2/17/2004 | 6,880 | $21.40 | $147,232.00 | 3.17% |
| Thomas Wiggans | 3/10/2004 | 3,000 | $22.10 | $66,285.90 | 1.43% |
| Thomas Wiggans | 3/10/2004 | 9,000 | $22.10 | $198,857.70 | 4.17% |
| Thomas Wiggans | 3/10/2004 | 500 | $22.10 | $11,047.50 | 3.34% |
| Thomas Wiggans | 5/10/2004 | 10,000 | $18.48 | $184,770.00 | 5.76% |
| Thomas Wiggans | 5/10/2004 | 2,000 | $18.48 | $36,954.20 | 1.21% |
| Thomas Wiggans | 5/10/2004 | 500 | $18.48 | $9,238.50 | 3.45% |
| Thomas Wiggans | 8/9/2004 | 500 | $25.05 | $12,523.00 | 3.45% |
| Thomas Wiggans | 8/9/2004 | 12,000 | $25.05 | $300,552.00 | 6.11% |
| Thomas Wiggans | 11/8/2004 | 500 | $27.21 | $13,606.50 | 0.30% |
| Thomas Wiggans | 11/8/2004 | 12,000 | $27.21 | $326,556.00 | 48.03% |
| Thomas Wiggans | 2/7/2005 | 12,000 | $23.46 | $281,520.00 | 7.08% |
| Thomas Wiggans | 2/7/2005 | 500 | $23.46 | $11,730.00 | 3.85% |
| Thomas Wiggans | 3/14/2005 | 30,000 | $27.71 | $831,300.00 | 16.00% |
| Thomas Wiggans | 7/1/2005 | 8,000 | $17.43 | $139,440.00 | 4.82% |
| Thomas Wiggans | 7/1/2005 | 12,000 | $17.43 | $209,160.00 | 7.59% |
| Thomas Wiggans | 8/1/2005 | 8,000 | $18.53 | $148,240.00 | 5.19% |
| Thomas Wiggans | 8/1/2005 | 12,000 | $18.53 | $222,360.00 | 8.22% |
| Thomas Wiggans | 9/1/2005 | 12,000 | $19.08 | $228,924.00 | 8.22% |
| Thomas Wiggans | 9/1/2005 | 8,000 | $19.08 | $152,616.00 | 5.97% |
| Thomas Wiggans | 11/15/2005 | 2,000 | $13.20 | $26,400.00 | 1.56% |
| Thomas Wiggans | 11/15/2005 | 2,000 | $13.20 | $26,400.00 | 1.59% |
| Thomas Wiggans | 12/15/2005 | 2,500 | $14.86 | $37,140.00 | 1.98% |
| Thomas Wiggans | 12/15/2005 | 1,500 | $14.85 | $22,275.00 | 1.21% |
| Thomas Wiggans | 1/13/2006 | 2,000 | $14.54 | $29,088.00 | 1.61% |
| Thomas Wiggans | 1/13/2006 | 2,000 | $14.54 | $29,088.00 | 1.63% |
| Thomas Wiggans | 3/1/2006 | 4,000 | $16.06 | $64,248.00 | 1.52% |
| **TOTAL** | | **207,280** | | **$4,096,352.30** | |

| | Date | # Shares sold | Price | Proceeds Received | Percentage of holdings |
|---|---|---|---|---|---|
| Charles Vontz | 5/10/2004 | 10,000 | 18.363 | $183,630.00 | 31.46% |
| Charles Vontz | 5/10/2004 | 15,000 | 18.360 | $275,400.00 | 40.78% |
| Charles Vontz | 8/9/2004 | 10,000 | 25.046 | $250,460.00 | 30.18% |
| Charles Vontz | 11/8/2004 | 10,000 | 27.206 | $272,060.00 | 30.18% |
| Charles Vontz | 4/25/2005 | 2,279 | 28.000 | $ 63,812.00 | 8.72% |
| **TOTAL** | | **47,279** | | **$1,045,362.00** | |

166.   The transactions summarized above represent sales of Connetics stock by Defendants Wiggans, Higgins and Vontz that are unusual in scope and timing because, among other things:

(i)    In the two years prior to the Class Period, Defendant Wiggans sold a total of 122,465 Connetics shares for total proceeds of $1,703,453.72.[1]   During the Class Period, Defendant Wiggans sold 207,280 shares for total proceeds of $4,096,000.  This windfall profit from the sale of artificially inflated shares during the Class Period is nearly twice the amount that Wiggans received in salary and bonuses during the Class Period (*i.e.*, $2,369,000).

(ii)   In the two years prior to the Class Period, Defendant Higgins sold a total of 95,398 Connetics shares for total proceeds of $1,556,735.85.[2]   During the Class Period, Defendant Higgins sold 155,517 shares for total proceeds of $3,919,000.  This windfall profit from the sale of artificially inflated shares is almost three times the amount Higgins received in salary and bonuses during the Class Period (*i.e.*, 1,375,000).

(iii)  In the two years prior to the Class Period, Defendant Vontz sold a total of 54,910 Connetics shares for total proceeds of $769,450.45.[3]   During

---

[1]  Defendant Wiggans' pre-Class Period sales are as follows: (i) on March 1, 2002, he sold 15,000 shares at $10.30 for proceeds of $154,500; (ii) on May 1, 2002, he sold 15,000 shares at $11.64 for proceeds of $174,600; (iii) on August 1, 2002, he sold 15,000 shares at $10.47 for proceeds of $157,050; (iv) on November 29, 2002, he sold 1,752 shares at $4.196 for proceeds of $7351.39; (v) on February 3, 2003, he sold 7,500 shares at $12.93 for proceeds of $96,975; (vi) on February 4, 2003, he sold 7,500 shares at $12.93 for proceeds of $96,975; (vii) on March 10, 2003, he sold 3,000 shares at $14.66 for proceeds of $43,980; (viii) on March 10, 2003; he sold 12,000 shares at $14.66 for proceeds of $175,920; (ix) on April 30, 2003; he sold 2,500 shares at $16.75 for proceeds of $41,875; (x) on April 30, 2003, he sold 12,500 shares at $16.75 for proceeds of $209,375; (xi) on July 31, 2003, he sold 2,500 shares at $18.010 for proceeds of $45,025; (xii) on July 31, 2003, he sold 12,500 shares at $18.01 for proceeds of $225,125; (xiii) on October 31, 2003, he sold 3,000 shares at $17.824 for proceeds of $53,471.40; (xiv) on October 31, 2003, he sold 12,000 shares at $17.824 for proceeds of $213,885.60; (xv) on November 28, 2003, he sold 713 shares at $10.302 for proceeds of $7,345.33.

[2]  Defendant Higgins' pre-Class Period sales are as follows: (i) on April 1, 2002, he sold 2,000 shares at $9.610 for proceeds of $19,220; (ii) on June 5, 2002, he sold 3,000 shares at $12.69 for proceeds of $38,070; (iii) on August 1, 2002, he sold 4,000 shares at $10.66 for proceeds of $42,640; (iv) on October 1, 2002, he sold 5,000 shares at $9.28 for proceeds of $46,400; (v) on December 2, 2002, he sold 6,000 shares at $12.116 for proceeds of $72,696; (vi) on February 3, 2002, he sold 7,000 shares at $12.95 for proceeds of $90,650; (vii) on February 20, 2003 he sold 6,095 shares at $15.16 for proceeds of $92,400; (viii) on February 20, 2003, he sold 5,000 shares at $15.00 for proceeds of $75,000; (ix) on March 17, 2003, he sold 7,000 shares at $16.080 for proceeds of $112,560; (x) on April 7, 2003, he sold 8,000 shares at $17.50 for proceeds of $140,000; (xi) on September 3, 2003, he sold 5,119 shares at $18.32 for proceeds of $93,780; (xii) on October 14, 2003, he sold 10,000 shares at $19.00 for proceeds of $190,000; (xiii) on November 28, 2003, he sold 2,184 shares at $10.302 for proceeds of $22,499.57; (xiv) on January 20, 2004, he sold 15,000 shares at $20.054 for proceeds of $300,810; (xv) on January 21, 2004, he sold 10,000 shares at $22.001 for proceeds of $220,010.

[3]  Defendant Vontz's pre-Class Period sales are as follows: (i) On July 29, 2002, he sold 25,000 shares at $10.405 for proceeds of $260,125; (ii) on September 10, 2003, he sold 14,910 shares at

the Class Period, Defendant Vontz sold 47,279 shares for total proceeds of $1,045,000. This windfall profit from the sale of artificially inflated shares is nearly two-thirds of the amount Vontz received in salary and bonuses during the Class Period (*i.e.*, $1,579,000).

167. In addition, Defendants Yaroshinsky and Zak made approximately $680,000 and $900,000, respectively, by trading on material non-public information, as set forth above.

### E.    Additional Indicia Of Scienter

168. Salary and Bonus Compensations. Defendants Wiggans, Higgins, Vontz and Krochmal were motivated to misrepresent Connetics' true financial condition and the issues with Velac in order to continue receiving their lucrative salaries and bonuses. Throughout the Class Period, Defendants Wiggans, Higgins, Vontz and Krochmal received millions of dollars in compensation in the form of base salaries, bonuses and option grants. The table below summarizes the base salary and bonus compensation granted to these Defendants through the Class Period.

| Name | Salary | 2004 Bonus | Salary | 2005 Bonus | 2006 Salary | Total |
|------|--------|------------|--------|------------|-------------|-------|
| Wiggans | $514,000 | $425,000 | $530,000 | $325,000 | $575,000 | $2,369,000 |
| Vontz | $353,000 | $233,000 | $381,000 | $190,000 | $422,000 | $1,579,000 |
| Higgins | $315,000 | $208,000 | $325,000 | $167,000 | $360,000 | $1,375,000 |
| Krochmal | $375,000 | $192,000 | $386,000 | $154,000 | $400,000 | $1,507,000 |

169. As Connetics disclosed, Defendants Wiggans, Higgins, Vontz and Krochmal received bonuses based on "the annual performance" of Connetics throughout the Class Period. (2006 Proxy at 18.) The amounts of the bonuses could range between zero and 60 percent of their base salary, depending on Connetics' success in achieving goals such as enhancing revenue and earnings per share, achieving certain product development goals (such as filing NDA's), and share price.

---

$17.495 for proceeds of $260,850.45; and (iii) on December 10, 2003, he sold 15,000 shares at $16.565 for proceeds of $248,475.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -52-
Case No. C 07-02940 SI

170.    <u>Stock Option Grants</u>. Connetics awarded Defendants Wiggans, Higgins, Vontz and Krochmal millions of dollars in stock options during the Class Period.  The options became exercisable at a rate of 25% of the shares at the end of the first twelve month period following the grant and monthly thereafter until the fourth anniversary of the grant.  The following chart represents the number of stock options granted to these Defendants in fiscal years 2005 and 2004.

| Fiscal 2005 | | | |
| --- | --- | --- | --- |
| Name | Options Granted | Percentage (Of Options Granted to Employees in 2005) | Estimated Value* (As reported by Connetics) |
| **Wiggans** | 135,000 | 7.8% | $5,023,875 |
| **Vontz** | 90,000 | 5.2% | $3,349,250 |
| **Higgins** | 81,000 | 4.7% | $3,014,325 |
| **Krochmal** | 45,000 | 2.6% | $1,674,625 |

| Fiscal 2004 | | | |
| --- | --- | --- | --- |
| Name | Options Granted | Percentage (Of Options Granted to Employees in 2005) | Estimated Value* (As reported by Connetics) |
| **Wiggans** | 200,000 | 11.3% | $5,753,410 |
| **Vontz** | 112,000 | 6.3% | $3,221,910 |
| **Higgins** | 90,000 | 5.1% | $2,589,035 |
| **Krochmal** | 45,000 | 1.4%% | $719,176 |

*Estimated value assumes 10% stock price appreciation over option term and represents gains net of exercise price.

171.    In the aggregate, this group of Defendants received 798,000 stock options during the Class Period, with an estimated potential value of more than ***$25 million***.  These Defendants were motivated to perpetrate the fraudulent scheme described herein in order to artificially inflate the value of Connetics' stock and increase the value of their stock options.

172.    Moreover, these lucrative equity awards were granted primarily based on the Company's achievement of many of the same objectives that these Defendants manipulated during the Class Period.  For instance, Connetics disclosed that these "incentive awards" were determined by certain "performance goals" such as:

(i)     Revenue;

(ii)    Earnings per Share;

1

    (iii)    Product Launches;

2

    (iv)    Timely NDA and other regulatory filings;

3

    (v)    Achievement of various product development goals; and

4

    (vi)    Achievement of other goals such as "earnings; earnings growth . . . operating income . . . stock price."

5

6

(2006 Proxy at A-2.)  Thus, these Defendants had a uniquely strong incentive to commit the

7

financial fraud described herein in order to inflate the Company's revenue, Earnings per Share,

8

earnings, earnings growth, operating income and stock price so that they could receive millions of

9

dollars in valuable stock options and other compensation.  Likewise, these Defendants had direct

10

financial incentives to conceal the significant issues with Velac so that the Company could

11

complete the NDA and other regulatory filings, which would result in the seeming achievement

12

of "performance goals" that would result in lucrative stock grants and other compensation for

13

these Defendants.

        173.    <u>Direct Equity Interests</u>.  In addition to the significant stock options that were

14

granted to them during the Class Period and would vest over a period of years, during the Class

15

Period, Defendants Wiggans, Higgins, Vontz and Krochmal owned millions of additional shares

16

of Connetics' common stock valued at tens of millions of dollars.  These Defendants knew that,

17

if the truth about Connetics were revealed, the value of these stock holdings would plummet, and

18

severely reduce their personal net worth.  The following chart sets forth the stock owned by these

19

Defendants as of March 24, 2006 (as indicated in the Company's 2006 Proxy statement):

20

21

| **Stock Ownership** (As of March 24, 2006) | | |
|---|---|---|
| **Name** | **Shares Vesting** | **Estimated Value** (at 3/24/06 prices) |
| **Wiggans** | 281,972 | $4,793,524 |
| **Vontz** | 128,820 | $2,189,940 |
| **Higgins** | 135,369 | $2,301,273 |
| **Krochmal** | 60,860 | $1,034,620 |

22

23

24

25

26

        174.    In the aggregate, this group of Defendants owned 607,021 shares of Connetics

27

stock as of March 24, 2006, with value on that date of more than $10 million.  These Defendants

28

were motivated to perpetrate the fraudulent scheme described herein in order to create and

maintain the artificial inflation in the Connetics common stock that represented the vast majority of these Defendants' personal net worth.

175.     Significant Options Vesting at End of Class Period.    Additional motivation for these Defendants to perpetrate the fraudulent scheme throughout the Class Period is the fact that each of them owned significant options that had been granted prior to and during the Class Period, but would not vest until near the end of the Class Period.    The following chart sets forth the number of options that were scheduled to vest for each of these Defendants on or about May 23, 2006:

| Stock Ownership (As of May 23, 2006) | | |
|---|---|---|
| **Name** | **Shares Vesting** | **Estimated Value** (at 3/24/06 prices) |
| **Wiggans** | 1,244,275 | $21,152,675 |
| **Vontz** | 608,887 | $10,351,079 |
| **Higgins** | 468,256 | $7,960,352 |
| **Krochmal** | 153,333 | $2,606,661 |

176.     In the aggregate, a staggering 2,943,638 shares (a nearly 500% increase over the amount they currently owned) were about to vest for these Defendants near the end of the Class Period.    These shares had a value of more than ***$41.9 million*** as of March 24, 2006.    The promise of such staggering future personal riches provided a strong motivation for these Defendants to retain the artificial inflation in Connetics' stock price until after these shares had vested.

177.     Share Repurchase Program.     The Insider Defendants' scienter is further demonstrated by the significant number of shares that the Insider Defendants caused Connetics to repurchase during the Class Period.    In addition to the significant share repurchase program that was funded by a portion of the proceeds Connetics received from the Private Placement, in October 2005 Connetics authorized the repurchase of up to $50 million in additional common stock.    By December 31, 2005, the Company had repurchased 1.8 million shares at a cost of $24.4 million and repurchased another 143,000 shares by March 31, 2006.    These repurchases, which were designed and implemented by Wiggans, Higgins and Vontz, increased the value of the Insider Defendants' equity holdings and options at no cost to themselves.

---

**VII.    ADDITIONAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

178.    In addition to the materially false and misleading statements and omissions detailed above, Defendants (other than Yaroshinsky and Zak) made the following additional false and misleading statements and omissions during the Class Period.

**1.    The January 27, 2004 Press Release**

179.    On January 27, 2004, Connetics issued a press release entitled "Connetics Reports Fourth Quarter EPS of $0.05 on 41% Increase in Product Revenue" (the "January 27, 2004 Press Release"). The January 27, 2004 Press Release stated:

> The Company expects full-year 2004 product sales to be between $86 million and $492 million, and total revenues to be between $88 million and $96 million. Combined OLUX® and Luxiq® revenue for 2004 are projected to be $82 million to $86 million. Connetics projects combined SG&A and R&D expenses for 2004 to be between $71 million to $73 million. Net Interest expense for 2004 is projected to be $1.0 million to $1.5 million. Diluted earnings per share (EPS) for 2004 are projected to be $0.21 to $0.25, based on an estimated 34.5 million diluted shares and an estimated effective tax rate of 12%[.]

180.    The January 27, 2004 Press Release quoted Defendant Wiggans as stating "Connetics is now a profitable growth company with solid financial performance, significant progress in our product pipeline, and a bright future."

181.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

**2.    The May 4, 2004 Press Release**

182.    On May 4, 2004, Connetics issued a press release entitled "Connetics Reports First Quarter EPS of $0.05, Product Revenues Increase 65% to $23.6 Million" (the "May 4, 2004 Press Release"). The May 4, 2004 Press Release stated:

> Connetics . . . today reported net income for the first quarter ended March 31, 2004 of $1.9 million, or $0.05 per share on a fully diluted basis. This compares with a net loss for the 2003 first quarter of $5.4 million, or $0.17 per share.
>
> Total revenues for the first quarter of 2004 increased 63% to $25.0 million, compared with total revenues of $15.3 million for the first quarter of 2003. Product revenues for the quarter were $23.6 million, including $19.8 million in sales of OLUX(R) and Luxiq(R), an increase of 39% over sales of $14.3 million for those two products in the first quarter of 2003. In addition, the Company booked $3.6 million in sales of Soriatane(R) during the first quarter of 2004.

183.    The May 4, 2004 Press Release also announced Connetics' expected product revenues and earnings growth for 2004:

> Product revenues are now expected to be $126 million to $134 million, with sales of OLUX and Luxiq totaling $87 million to $91 million. This compares with prior guidance for product revenues of $114 million to $122 million, including $82 million to $86 million for OLUX and Luxiq. Total revenues (which include royalties and contract payments) are expected to be $128 million to $137 million . . .

184.    The May 4, 2004 Press Release also attached unaudited financial statements for the quarter, which reported the following:

> (i)      Product Revenues of $23,566,000;
>
> (ii)     Revenues of $24,982,000;
>
> (iii)    Net Earnings of $1,873,000;
>
> (iv)    Basic Net Income per share of $0.06; and
>
> (v)     Diluted Net income per share of $ 0.05.

185.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

### 3.    The May 4, 2004 Conference Call

186.    On May 4, 2004 Connetics held a conference call with investors that was participated in by, among others, Wiggans, Higgins, Vontz and Krochmal (the "May 4, 2004 Conference Call"). On that call, Defendant Wiggans stated:

> . . . In the first quarter, we recorded record revenues, as the press release stated. Product revenues were up 63 percent over last year, with OLUX and Luxiq revenues up 39 percent. Our earnings per share was a 20 cent improvement – the last year's loss of 17 cents versus a profit of 3 cents this quarter, excluding the gain of 2 cents that John will talk about as a result of our change in manufacturing and product development activities and accounting. So a swing of 20 cents there period-over-period.

187.    On the May 4, 2004 Conference Call, Defendant Higgins stated:

> What I would like to do is just give the highlight review of the first-quarter financial results. To start with, the revenue performance combined for OLUX and Luxiq we're pleased to report $19.8 million in combined sales. To break out OLUX, presented $14.4 million in quarterly sales. That is a 46 percent increase over the first quarter of 2003. Luxiq posted $5.4 million, a 24 percent increase over first quarter 2003. Soriatane again reported a $3.6 million. We're pleased with that. As Tom alluded to, the transaction closed earlier than anticipated. Also there was a very smooth transition to taking over that product line.

188.    On the May 4, 2004 Conference Call, Defendant Vontz stated:

Let me add a little more color on our first-quarter performance, specifically with OLUX and Luxiq. Then I will have some follow-on remarks about UCB and Soriatane as well.

As we look to the first quarter of '04, essentially this quarter at the total [prescriptions] written for topical steroids. If we look at first quarter '04 versus a year-ago performance, prescriptions for OLUX and Luxiq were ahead by about 9 percent over the same period.

As we look to our first-quarter performance, our Q1 prescriptions were inline with our expectations, that being essentially flat to Q4. As many of you know, historically we have guided everyone to a lower expectation for Q1 based on the high volume of meetings that take place during that time. As expected, not only was this year filled with meetings, many of them were earlier than in past years, falling into the first quarter, actually resulting in about 16 percent fewer selling days for us compared to the same period in '03.

As we ended Q1, we had a lot of Rx momentum. Going into the end of the first quarter as the meetings began to wind down, we actually hit three all-time high watermarks for our product SKUS. In fact, the OLUX 100-gram equivalents crossed the new threshold of 33,000 prescriptions per month. We expect that that momentum will continue into the second quarter, and that is based on support from the strong data that was presented at the AAD from our Center for Skin Biology.

189.    On the May 4, 2004 Conference Call, Defendant Higgins also stated:

For revenue, we are pleased to raise guidance for all three of our products. Luxiq and OLUX combined, we are now forecasting revenue of $87 million to $91 million, an increase of $5 million over our existing guidance, driven principally by our new relationship with UCB. Soriatane, we're raising guidance to $35 million to $37 million, an increase of approximately $6 million to $7 million over our existing guidance, reflecting the smooth transition and integration of the brand into our Company. Actiza, an exceeded guidance of 4 to 6 million in the fourth quarter is unchanged. Total product sales for the year then rolls up to $126 million to $134 million.

190.    On the May 4, 2004 Conference Call, Defendant Wiggans also stated:

[O]ur revised guidance at this point reflects our increased visibility and confidence in our ability to continue to grow revenue through the remainder of the year. We will also be focusing on our Velac NDA filing. We are beginning to turn our attention in a significant way to the launch preparation for Actiza and Extina, and we will also be beginning clinical trials for the next generation of foam steroid products, as well as the completion of the formulation work for next year's clinical candidates in our 4-to-1 model.

191.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

### 4.    **The 1Q 2004 10-Q**

192.    On or about May 10, 2004, Connetics filed with the SEC Connetics' Form 10-Q for the quarter ending March 31, 2004 (the "1Q04 10-Q"). The 1Q04 10-Q was signed and certified by Defendants Wiggans and Higgins. Wiggans and Higgins each certified that "the information contained in the report presents, in all material respects, the financial condition and results of operations of the Company." Also, pursuant to Section 302 of Sarbanes-Oxley, Defendants Wiggans and Higgins each certified that based on his knowledge, "this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

193.    Connetics also represented in the 1Q04 10-Q that Defendants Wiggans and Higgins each confirmed that Connetics' ". . . disclosure controls and procedure were effective in timely alerting them to material information required to be included in our periodic SEC Reports." Wiggans and Higgins also confirmed there had ". . . been no change in [Connetics'] internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting." The certifications signed by Defendants Wiggans and Higgins and attached to the 1Q04 10-Q as exhibits stated that these Defendants were responsible for "establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" for Connetics and stated that they had:

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]
>
> disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

194.    The 1Q04 10-Q stated "we have prepared the accompanying unaudited condensed consolidated financial statements . . . in accordance with accounting principles generally accepted in the United States."

195.    The 1Q04 10-Q reported the following results for the fiscal period ended March 31, 2004:

    (i)     Product Revenues of $23,566,000;

    (ii)    Revenues of $24,982,000;

    (iii)   Income from operations of $2,592,000;

    (iv)    Net Income of $1,873,000;

    (v)     Basic Net Income per share of $0.06; and

    (vi)    Diluted Net income per share of $ 0.05.

196.    The 1Q04 10-Q also stated "We recognize revenue from product sales when there is persuasive evidence that an arrangement exists, when title has passed, the price is fixed or determinable, and we are reasonably assured of collecting the resulting receivable.  We recognize product revenues net of estimated allowances for discounts, returns, rebates, and chargebacks."

197.    The 1Q04 10-Q stated:

> Our product revenues were $23.6 million for the three months ended March 31, 2004 compared to $14.3 million for the three months ended March 31, 2003.  Total net product sales increased 65% in the first three months of 2004 as compared to the same period in the prior year.  The introduction of Soriatane to our product portfolio in March 2004 accounted for 26% of the increase in product sales.  Increased sales volumes accounted for a 17% increase in the net product sales in the first quarter of 2004 compared to the same period in 2003.  Higher sales prices for our OLUX and Luxiq product lines accounted for the remaining 22% of the increase in net product sales in the three months ended March 31, 2004 compared to the same period in 2003.

198.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

**5.    The July 1, 2004 Article In The Dermatology Times**

199.    On July 1, 2004, the *Dermatology Times* issued a report that included information provided by the Company and Defendant Krochmal:

> . . . [T]rial results revealed patients treated with the Velac gel had significantly lower lesion counts, and significantly less acne by investigator assessment, than either clindamycin or tretinoin gel alone.

> "The combination is powerful," says dermatologist Lincoln Krochmal, M.D., executive vice president of research and product development for Connetics Corp.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -60-
Case No. C 07-02940 SI

"Together, they do more as a single product than each active by itself . . . what you have to show in any combination product is that the combined product is superior, and clearly that's what you find here."

. . . The manufacturer of Velac recently announced results of two phase 3 trials, and says that a new drug application (NDA) will be submitted to the U.S. Food and Drug Administration (FDA) in the third quarter of 2004.

200.    These statements were materially false and misleading for the reasons set forth above in Section V.B.

### 6.    The July 28, 2004 Press Release

201.    On July 28, 2004, Connetics issued a press release entitled "Connetics Reports Second Quarter EPS of $0.19, Total Revenues Increase 92% to $38.3 Million; Company Raises 2004 Revenue and Earnings Guidance and Introduces Third Quarter Financial Guidance" (the "July 28, 2004 Press Release").  The July 28, 2004 Press Release "…reported net income for the second quarter ended June 30, 2004 of $7.5 million or $0.19 per diluted share."

202.    The July 28, 2004 Press Release also quoted Defendant Wiggans as stating:

. . . This quarter's impressive results showcase our achievements in every aspect of our operations and speak to the potential for further growth and expansion of a valuable specialty pharmaceutical franchise . . . .  We are confident in our ability to achieve continued revenue growth with our current brands and look forward to launching up to three new products from our pipeline within the next 12 months.  Based on our commercial activities with Soriatane and the new distribution agreement we have entered into we are raising our financial guidance for the balance of the year.  Looking ahead, we are diligently preparing to initiate two clinical trials while preparing our commercial operations for the introduction of Actiza, Extina and Velac…

203.    The July 28, 2004 Press Release also stated:

Connetics projects it will make a $3.5 million milestone payment to Yamanouchi Europe B.V. in the third quarter concurrent with the projected submission of the Velac NDA.  Connetics licensed the Velac program from Yamanouchi in 2002.  Earnings per share on a diluted basis for 2004 are projected to be $0.48 to $0.52, including the $0.10 per share charge in the third quarter for the Yamanouchi payment.

For the third quarter of 2004, the Company projects product revenue of $37.5 million to $39.5 million.  Third quarter combined SG&A and R&D expenses are projected to be in the range of $23.5 million to $25.0 million.  EPS on a diluted basis is projected to be $0.06 to $0.08, including the $0.10 per share charge for the $3.5 million milestone payment to Yamanouchi.

204.    These statements were materially false and misleading for the reasons set forth above in Section V.B. (statements regarding Velac), and Section V.C. (statements regarding reported financial performance).

### 7.    The July 28, 2004 Conference Call

205.    On July 28, 2004, Connetics held a conference call with investors that was participated in by, among others, Defendants Wiggans, Higgins and Vontz (the "July 28, 2004 Conference Call").    On the call, Defendant Higgins stated, "We are quite pleased with our operating and financial performance . . . .    We finished the quarter [with] 76 million in cash.    This reflects strong earnings and cash collections in the second quarter as well as slightly higher accounts payable balances over the first quarter."

206.    In response to a question posed on the conference call, Defendant Higgins stated ". . . We are enjoying tremendous revenue momentum; I think credit [goes] to a lot of the elements and components of our business."

207.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

208.    On the July 28, 2004 Conference Call, Defendant Vontz stated ". . . We are working diligently to finalize the NDA submission and are on track to meet that goal of filing that NDA this quarter . . . .    We are very pleased with our revenue momentum-the increased cash flows with the business . . . .    Our product revenue guidance is $37.5m to $39.5m on all of our products."

209.    These statements were materially false and misleading for the reasons set forth above in Section V.B.

### 8.    The 2Q 2004 10-Q

210.    On or about August 5, 2004, Connetics filed with the SEC Connetics' Form 10Q for the quarter ending June 30, 2004 (the "2Q04 10-Q").    The 2Q04 10-Q was signed and certified by Defendants Wiggans and Higgins.    Wiggans and Higgins each certified that "the information contained in the report presents, in all material respects, the financial condition and results of operations of the Company."    Also, pursuant to Section 302 of Sarbanes-Oxley,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -62-
Case No. C 07-02940 SI

Defendants Wiggans and Higgins each certified that based on his knowledge, "this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

211.    Connetics also represented in the 2Q04 10-Q that Defendants Wiggans and Higgins each confirmed that Connetics' ". . . disclosure controls and procedure were effective in timely alerting them to material information required to be included in our periodic SEC Reports."  Wiggans and Higgins also confirmed there had ". . . been no change in [Connetics'] internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."  The certifications signed by Defendants Wiggans and Higgins and attached to the 2Q04 10-Q as exhibits stated that these Defendants were responsible for "establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" for Connetics and stated that they had:

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

> disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

212.    The 2Q04 10-Q stated "we have prepared the accompanying unaudited condensed consolidated financial statements . . . in accordance with accounting principles generally accepted in the United States."

213.    The 2Q04 10-Q reported the following results for the three month period ended June 30, 2004:

(i)     Product Revenues of $37,999,000;

(ii)    Revenues of $38,253,000;

(iii)   Income from operations of $8,712,000;

(iv)    Net Income of $7,457,000;

1          (v)      Basic Net Income per share of $0.21; and

2          (vi)     Diluted Net Income per share of $ 0.19.

3      214.    The 2Q04 10-Q also stated "We recognize revenue from product sales when there

4  is persuasive evidence that an arrangement exists, when title has passed, the price is fixed or

5  determinable, and we are reasonably assured of collecting the resulting receivable.  We recognize

6  product revenues net of estimated allowances for discounts, returns, rebates, and chargebacks."

7      215.    The 2Q04 10-Q stated:

8          Our product revenues were $38.0 million for the three months ended
           June 30, 2004 and $61.6 million for the six months ended June 30, 2004,
9          compared to $15.5 million and $29.8 million, respectively, for the three
           and six months ended June 30, 2003.  Total product revenues increased by
10         145% in the three months ended June 30, 2004 and by 106% in the six
           months ended June 30, 2004, as compared to the same periods in the prior
11         year.  The increase in product revenues in the three months ended June 30,
           2004 represents 111% attributable to the introduction of Soriatane to our
12         product portfolio, 17% attributable to increases in sales volumes, and 17%
           attributable to higher sales prices for our OLUX and Luxiq product lines.
13         The increase in product revenue in the six months ended June 30, 2004
           represents 70% attributable to the introduction of Soriatane to our product
14         portfolio, 17% attributable to increases in sales volumes, and 19% to
           higher sales prices for our OLUX and Luxiq product lines.
15
       216.    These statements were materially false and misleading for the reasons set forth
16
   above in Section V.C.
17
           **9.      The October 25, 2004 Press Release**
18
       217.    On October 25, 2004, Connetics issued a press release entitled "Connetics Reports
19
   Third Quarter Earnings per Share of $0.10; Company Introduces 2004 Fourth Quarter Financial
20
   Guidance (the "October 25, 2004 Press Release").  The October 25, 2004 Press Release stated:
21
           Connetics reported net income for the third quarter ended September 30,
22         2004 of $3.7 million, or $0.10 per diluted share, which includes a $3.5
           million milestone payment due to Yamanouchi Europe B.V. in conjunction
23         with the submission of the Velac(R) New Drug Application (NDA).  This
           compares with net income of $1.6 million, or $0.05 per diluted share, for the
24         third quarter of 2003.  Total revenues for the third quarter of 2004 were $37.3
           million, compared with total revenues of $19.7 million for the third quarter of
25         2003.  Product revenues for the 2004 third quarter more than doubled to
           $37.0 million, compared with $17.7 million for the comparable period last
26         year, reflecting growth in revenues of OLUX(R) and Luxiq(R), and the
           addition of Soriatane(R), which the Company acquired from Roche in March
27         2004.  The Company had cash, cash equivalents and short-term investments
           on September 30, 2004 of $78.0 million.
28

218.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

219.    The October 25, 2004 Press Release quoted Defendant Wiggans as stating:

> I am delighted to report on our progress, particularly our recent regulatory milestones including the FDA approval of Evoclin(TM) and the filing of the NDA for our Velac product . . . . The Company continues to execute well on all fronts, and we are anticipating a strong finish to 2004.

220.    These statements were materially false and misleading for the reasons set forth above in Section V.B.

## 10.    The October 25, 2004 Conference Call

221.    On October 25, 2004, Connetics held a conference call with investors that was participated in by, among others, Defendants Wiggans and Vontz (the "October 25, 2004 Conference Call"). On the October 25, 2004 Conference Call, Defendant Wiggans stated "Let me start out by saying the state of the business, we believe, has never been healthier."

222.    On the call, Defendant Wiggans also stated:

> It was another solid quarter for us financially. We earned 10 cents, which included the one time charge for the Velac payment versus our first profitable quarter of five cents last year. So far, the business this year has generated $32.6 million in cash flow versus a nine-month year-to-date total at this time last year of a negative $12.7 million in cash flow. So a lot of our expectations, the way we've built this business to become a very important and significant cash flow generator I believe is beginning to materialize as of the third quarter and year to date this year.

223.    On the call, Defendant Higgins stated:

> Now I'd like to give guidance for the fourth quarter. We've reflected various numbers in our press release, but specifically I'd like to comment on our product revenue guidance for the fourth quarter we forecast to be $43 to $446 million for our brand . . . . We're very pleased now as we head into the fourth quarter to look at total product revenues for the year of $142 to $145 million.

224.    On the October 25, 2004 Conference Call, Defendant Vontz stated that ". . . an important accomplishment in the third quarter for our regulatory team, who completed our largest NDA filing to date with the Velac filing, a tremendous amount of work by our team, very excited that we achieved our goal, and now can await a PDUFA date of June 25th, 2005."

225.    On the call, Defendant Vontz also stated:

> Where we will have comparative information, and advantages, though, frankly, is with Velac. The world is changing, as you're probably well aware, with endpoints. The new hurdle that has been imposed in the last 18 months is—for a full acne claim is demonstration of both inflammatory and non-inflammatory resolution of lesions, and that we have in spades with Velac.

226.    These statements were materially false and misleading for the reasons set forth above in Section V.B. (statements regarding Velac), Section V.C. (statements regarding reported financial performance).

## 11.    The 3Q 2004 10-Q

227.    On or about November 8, 2004, Connetics filed with the SEC Connetics' Form 10-Q for the quarter ending September 30, 2004 (the "3Q04 10-Q"). The 3Q04 10-Q was signed and certified by Defendants Wiggans and Higgins. Wiggans and Higgins each certified that "the information contained in the report presents, in all material respects, the financial condition and results of operations of the Company." Also, pursuant to Section 302 of Sarbanes-Oxley, Defendants Wiggans and Higgins each certified that based on his knowledge, "this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

228.    Connetics also represented in the 3Q04 10-Q that Defendants Wiggans and Higgins each confirmed that Connetics' ". . . disclosure controls and procedure were effective in timely alerting them to material information required to be included in our periodic SEC Reports." Wiggans and Higgins also confirmed there had ". . . been no change in [Connetics'] internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting." The certifications signed by Defendants Wiggans and Higgins and attached to the 3Q04 10-Q as exhibits stated that these Defendants were responsible for "establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" for Connetics and stated that they had:

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

229.    The 3Q04 10-Q stated "we have prepared the accompanying unaudited condensed consolidated financial statements . . . in accordance with accounting principles generally accepted in the United States."

230.    The 3Q04 10-Q reported the following results for the three month period ended September 30, 2004:

   (i)      Product Revenues of $36,999,000;

   (ii)     Revenues of $37,344,000;

   (iii)    Income from operations of $4,212,000;

   (iv)     Net Income of $73,695,000;

   (v)      Basic Net Income per share of $0.10; and

   (vi)     Diluted Net Income per share of $0.10.

231.    The 3Q04 10-Q also stated ". . . We recognize revenue from product sales when there is persuasive evidence that an arrangement exists, when title has passed, the price is fixed or determinable, and we are reasonably assured of collecting the resulting receivable.  We recognize product revenues net of estimated allowances for discounts, returns, rebates, and chargebacks."

232.    In addition, the 3Q04 10-Q stated:

Our product revenues were $37.0 million for the three months ended September 30, 2004 and $98.6 for the nine months ended September 30, 2004, compared to $17.7 million and $47.5 million, respectively, for the three and nine months ended September 30, 2003.  In general, increases in our product revenues reflect the introduction of Soriatane into our product line in March 2004.  Specifically, total product revenues increased by 110% in the three months ended September 30, 2004 and by 108% in the nine months ended September 30, 2004, as compared to the same periods in the prior year.  Of the 110% increase in product revenues in the three months ended September 30, 2004, 84% is attributable to the introduction of Soriatane to our product portfolio, 12% to increases in sales volumes, and 14% attributable to higher sales prices for our OLUX and LUXIO product lines.  Of the 108% increase in product revenue in the nine months ended September 30, 2004, 75% is attributable to the introduction of Soriatane to our product portfolio, 15% is attributable to increases in sales volumes, and 18% is attributable to higher sales prices for our OLUX and Luxiq product

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              -67-
Case No. C 07-02940 SI

1

2

3

> lines.  During the three months ended September 30, 2004, we recorded an increase in revenue of $544,000 related to the reduction of certain revenue reserves recorded on the initial sales of Soriatane through June 30, 2004.  We reduced the reserves to reflect the timing and expected terms of new and anticipated managed care products."

4

233.    These statements were materially false and misleading for the reasons set forth

5

above in Section V.C.

6

234.    The 3Q04 10-Q also stated "In August 2004, we submitted a New Drug

7

Application (NDA) for Velac® (1% clindamycin and 0.025% tretinoin) Gel with the Food and

8

Drug Administration (FDA) and, in October 2004, we received notification that the FDA

9

accepted the NDA for filing as of August 23, 2004."

10

235.    These statements were materially false and misleading for the reasons set forth

11

above in Section V.B.

12

**12.    The November 22, 2004 Press Release**

13

236.    On November 22, 2004, Connetics issued a press release entitled "Connetics

14

Affirms Velac Patent Position" (the "November 22, 2004 Press Release").  The November 22,

15

2004 Press Release stated in part:

16

17

> The U.S. Food and Drug Administration has accepted for filing Connetics' New Drug Application for Velac as of August 23, 2004, with a user fee goal date of June 25, 2005.

18

237.    These statements were materially false and misleading for the reasons set forth

19

above in Section V.B.

20

**13.    The January 25, 2005 Press Release**

21

238.    On January 25, 2005, Connetics issued a press release entitled "Connetics Reports

22

Fourth Quarter EPS of $0.17 and Product Revenues up 128% to $43.5 Million; Concludes First

23

Year of Profitability with $0.52 EPS (the "January 25, 2005 Press Release"). The press release

24

stated in part:

25

> Connetics . . . reported record net income for the 2004 fourth quarter of $6.4 million, or $0.17 per diluted share, compared with $1.5 million, or $0.05 per diluted share, for the comparable quarter last year...SG&A expenses increased to $71.9 million for 2004, compared with $40.9 million for 2003, primarily due to payments made to UCB for promotional activities related to OLUX and Luxiq, increased promotional activities for all products and increased headcount.  R&D expenses for 2004 were $21.0 million, down from $29.6 million during 2003 primarily due to the completion of pivotal

26

27

28

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              -68-
Case No. C 07-02940 SI

trials with Extina, Evoclin and Velac . . . .  Connetics expects 2005 total revenues to be between $190 million and $200 million, representing an increase of 32% to 39% compared with 2004.  Combined SG&A and R&D expenses are projected to be between $116 million and $123 million. Diluted EPS for 2005 is projected to grow by approximately 70% and to be in the range of $0.88 to $0.92, based on an estimated 42.3 million shares outstanding and an estimated effective tax rate of 10%.  Assuming FDA approval of Velac during 2005, the Company anticipates making a milestone payment of $5 million to Yamanouchi.  This payment will be capitalized and amortized over the life of the patent, which expires in 2014.

239.   The January 25, 2005 Press Release quoted Defendant Wiggans as stating:

Strong product revenue growth during 2004 contributed to our first full year of profitability and the fifth consecutive year of growth in our core brands OLUX and Luxiq . . . .  Our first product in the acne market, Evoclin, was approved and launched during the fourth quarter.  While early in the launch phase, the prescription data has been strong and the feedback from physicians has been encouraging, which we believe bodes well for a dynamic and expanding presence for Connetics in the acne market . . . .  With four marketed brands, a substantially expanded commercial team and a robust product pipeline, we believe Connetics is poised for another exciting and highly productive year.

240.   These statements were materially false and misleading for the reasons set forth above in Section V.B (statements regarding Velac), Section V.C. (statements regarding reported financial performance).

### 14.    The January 25, 2005 Conference Call

241.   On January 25, 2005, Connetics held a conference call with investors that was participated in by, among others, Defendants Wiggans, Higgins and Vontz (the "January 25, 2005 Conference Call").  On the January 25, 2005 Conference Call, Defendant Wiggans stated: ". . . 2004 was a substantial growth and expansion year for the Company.  Not only did we post significant revenue growth and turn profitable, the expanded revenue, income, and cash flow, especially from Soriatane, allowed us to substantially expand our business and increase our commercial presence in the dermatology market."

242.   On the call, Defendant Wiggans also stated:

. . . But as we prepare not only to expand the launch of Evoclin, but prepare for a Velac launch, our plan [ecompases] that there will be a competitive product for Velac. But we have excellent data on Velac. We now have an expanded and very talented sales force.  And we are confident that we will be successful in this market with our acne franchise, and in particular, with Velac . . . . I recall back as other companies kind of move towards profitability, there's always that profit watch—are they going to be to 1 or 2 cents profitable? We swung from a loss in 2003 to a profit of 52 cents in 2004—so considerable leverage, and obviously, a

dramatic improvement in cash flow. We see it again in '05 as we forecast approximately a 35 percent increase in revenues and approximately a 70 percent increase in earnings. And we expect this to continue, if not accelerate, as we go into 2006. Our ability to deliver innovative product development and substantial sales growth through a relatively modestly expanding organization remains a key part of our business model. And we continue to deliver on this . . . . In summary we believe our business plan continues to be one of the most attractive in the specialty pharmaceuticals sector. Our expanded sales force and increasing commercial presence; our ongoing product development model, delivering innovative new products and innovative new technologies for dermatologists and their patients—we believe will continue to generate substantial revenue, income, and value growth for our shareholders . . .

243.    On the January 25, 2005 Conference Call, Defendant Higgins stated:

Soriatane, we're forecasting approximately 20 percent year-over-year growth, making up approximately one-third of our revenue. And our acne products – Evoclin, which we just launched, and Velac, we expect to be launched midyear, making up the balance or roughly 20 percent of our sales. That amount for our acne franchise in 2005 we expect to be split roughly 50-50 between both Evoclin and Velac . . . . With the expected approval of Velac in the middle of this year, we will pay Yamanouchi a final milestone payment of $5 million. We forecast this will be a third quarter payment. We have looked at the accounting. We expect to capitalize this payment and amortize it over the life of the patient, which is approximately 10 years . . . . In 2006, we see revenue driven by continued growth of Evoclin. We forecast enjoying a full year of Velac sales – in addition, potential new product launches at the end of 2006. And this is matched with expenses that we believe will begin – the increases to flatten year over year. The last couple of years, we've seen tremendous investment in our commercial organization. We believe we're getting leverage off that. As we look in '05 over '04, revenues grew in the mid-30 percent range. We forecast revenue growth '06 over '05 to be consistent with that growth range on the top line.

244.    On the January 25, 2005 Conference Call, Defendant Vontz stated:

On the Velac front, as Tom mentioned, preparations are completely underway for getting ready to launch this product. And as part of our launch strategy, we have worked out kind of a pulsed release of clinical data. We're very excited at the upcoming AAD meeting in New Orleans that of the 11 abstracts that we have submitted and have been accepted, 5 of those are unique to Velac. And those abstracts highlight some brand new data that will play a critical role in supporting the label for this product. So stay tuned when the data comes out – very, very exciting news for this product.

We additional [sic] have another tranche of data for Velac scheduled to be out at the summer AAD time to coincide with the launch of the product. So a lot of attention and energies by our marketing team and sales operations group being focused on preparations for Velac.

245.    On the call, Defendant Vontz also stated:

. . . we're very confident in the data set that we've got. We believe it's one of the strongest data sets for an acne products submitted to the FDA. And we're obviously very excited to launch it.

* * *

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -70-
Case No. C 07-02940 SI

1
2

I have a lot of confidence in the strength of our data. I've got a lot of confidence in the strength of our sales force. And although we have anticipated in our A scenario, if you will, a competitor in the market, we continue to believe we'll be very successful with our products.

3
4

246.    On the call, Defendant Higgins stated:

5
6

**Analyst:**      . . . could you break out from launched products of the 190 to 200 million? So, meaning, of that number, what's made up of the combination of Velac, Rogaine, and Lamisil in that number? Just really trying to get some aggregate organic growth rate for the year.

7
8
9

**Higgins**:      . . . So our guidance—when we give total revenue guidance of 190 to 200 million, that is principally all product revenue. As I indicated, we are looking at our acne product comprising approximately 20 percent of that revenue guidance, split fairly equally between Evoclin for a full year and Velac for a partial year.

10
11
12

247.    These statements were materially false and misleading for the reasons set forth above in Section V.B (statements regarding Velac), Section V.C. (statements regarding reported financial performance).

13
14

### 15.    The 2004 10-K

15
16

248.    On March 16, 2005, Connetics filed with the SEC its annual report on Form 10-K for the year ended December 31, 2004 (the "2004 10-K"). The 2004 10-K was signed by Defendants Wiggans and Higgins. The 2004 10-K was signed and certified by Defendants Wiggans and Higgins. Wiggans and Higgins each certified that "the information contained in the report presents, in all material respects, the financial condition and results of operations of the Company." Also, pursuant to Section 302 of Sarbanes-Oxley, Defendants Wiggans and Higgins each certified that based on his knowledge, "this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

17
18
19
20
21
22
23

249.    Connetics also represented in the 2004 10-K that Defendants Wiggans and Higgins each confirmed that Connetics' ". . . disclosure controls and procedure were effective in timely alerting them to material information required to be included in our periodic SEC Reports." Wiggans and Higgins also confirmed there had ". . . been no change in [Connetics'] internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting." The certifications signed by Defendants

24
25
26
27
28

Wiggans and Higgins and attached to the 2004 10-K as exhibits stated that these Defendants were responsible for "establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" for Connetics and stated that they had:

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

> disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

250. The 2004 10-K stated that Connetics' financial statements were "prepared in accordance with U.S. generally accepted accounting principles, or GAAP."

251. The 2004 10-K reported the following results for the fiscal year ended December 31, 2004:

> (i)     Product Revenues of $142,059,000;

> (ii)    Revenues of $144,355,000;

> (iii)   Income from operations of $21,983,000;

> (iv)    Net Income of $19,015,000;

> (v)     Basic Net Income per share of $0.54; and

> (vi)    Diluted Net income per share $ 0.51.

252. The 2004 10-K also stated:

> We recognize product revenue net of allowances for estimated discounts, returns, rebates and chargebacks. We allow a discount for prompt payment. We estimate these allowances based primarily on our past experience. We also consider the volume and price mix of products in the retail channel, trends in distributor inventory, economic trends that might impact patient demand for our products (including competitive environment), and other factors.

> We accept from customers the return of pharmaceuticals that are within six months before their expiration date. As a practice, we avoid shipping product that has less than ten months dating. We authorize returns for damaged products and exchanges for expired products in accordance with our returned goods policy and procedures. We monitor inventories in the distributor channel to help us assess the rate of return.

> We establish and monitor reserves for rebates payable by us to managed care organizations and state Medicaid programs. Generally, we pay managed care

organizations and state Medicaid programs a rebate on the prescriptions filled that are covered by the respective programs with us.   We determine the reserve…

253.   The 2004 10-K also stated:

Our product revenues increased to $142.1 million in 2004 from $66.6 million in 2003.   The increase in product revenues reflects the introduction of two new products in 2004, Soriatane in March and Evoclin in December, and, to a lesser extent, increases in sales volume and sales prices for existing products. Of the 113% increase in revenues, 84% is attributable to the introduction of the new products, 17% to increases in the prices of existing products, and 12% to increased sales volumes on existing products.   Net product revenues increased to $66.6 million in 2003 from $47.6 million in 2002.   Increased sales volumes for OLUX and Luxiq in 2003 accounted for 64% of this increase and increases in pricing accounted for the remaining 36% of this increase.

254.   These statements were materially false and misleading for the reasons set forth above in Section V.C.

255.   The 2004 10-K also stated:

We concluded clinical trials in 2004 and subsequently submitted an NDA with the FDA for our product candidate Velac, a combination of 1% clindamycin, and 0.025% tretinoin in a gel formulation, for the potential treatment of acne vulgaris.   The FDA accepted the Velac NDA for filing in October 2004 with a filing date of August 23, 2004.

In December 2002, we intitiated the Phase III program for Velac, a first-in-class combination of 1% clindamycin and 0.025% tretinoin, for the treatment of acne.   The Velac clinical program consists of two pivotal trials designed to demonstrate superiority to the individual drug products, and two smaller supplemental clinical studies required by the FDA.   We completed enrollment of both pivotal trials in late 2003, enrolling over 2,200 patients. In March 2004, we announced the positive outcome of the Phase III clinical trials of Velac.   The data from each trial demonstrated a consistently robust and statistically superior treatment effect for Velac compared with clindamycin gel, tretinoin gel and placebo gel on both of the primary endpoints.   An analysis of the combined data from the clinical trials demonstrated similar results to the individual trials.   The data from these trials also demonstrated that Velac was safe and well tolerated, with the most commonly observed adverse effects being application site reactions such as burning, dryness, redness and peeling.   Following this positive clinical outcome, we submitted an NDA with the FDA for Velac in August 2004. The NDA was accepted for filing by the FDA in October 2004 with a filing date of August 23, 2004 and a user fee goal date of June 25, 2005.   If approved by the FDA, we believe Velac will compete with topical retinoids as well as topical antibiotics, representing approximately $988 million in U.S. prescriptions during the 12 months ended December 2004. Prescriptions for the entire U.S. acne market during that same period were approximately $1.2 billion not including oral antibiotics.

256.    These statements were materially false and misleading for the reasons set forth above in Section V.B.

### 16.    The April 26, 2005 Press Release

257.    On April 26, 2005, Connetics issued a press release entitled "Connetics Announces First Quarter Results with Product Sales up 79%" (the "April 26, 2005 Press Release").    The April 26, 2005 Press Release contained numerous false and misleading statements and omissions as set forth above.    In addition to the statements set forth above, the April 26, 2005 Press Release stated:

> Over the past several weeks Connetics has been responding to the Food and Drug Administration's ("FDA") questions regarding the Company's New Drug Application ("NDA") for its product candidate Velac.    As part of this dialogue, the Company recently received communications from the FDA indicating that the agency was interpreting some of the results of a pre-clinical study for Velac® Gel differently than the Company did in the NDA submission.    The preclinical study in question involved a transgenic mouse model.    In the study, there was a positive response to the product.    The Company carefully analyzed the results with a panel of leading toxicologists and experts in this model.    The experts advised the Company that the transgenic mouse model is known to have limitations, and the experts concluded that the positive response was the result of a limitation of the model.    The advice of these experts is supported by other products which had a positive finding but were ultimately approved based on additional work in other animal models.    The Company is continuing its discussions with the FDA and expects to submit additional information which further supports the Company's original conclusion.

258.    The April 26, 2005 Press Release also stated:

> For the second quarter of 2005, Connetics projects total revenue of $45 million to $47 million.    Second quarter combined SG&A and R&D expenses are projected to be in the range of $34 million to $36 million.    Earnings per diluted share for the second quarter of 2005 are projected to be $0.06 to $0.08.

> Reiterating 2005 financial guidance as updated on April 14, 2005, the Company anticipates total revenues to be in the range of $195 million to $206 million and combined SG&A and R&D expenses to be in the range of $121 million to $128 million.    Earnings per diluted share for 2005 are expected to be $0.88 to $0.92. 2005 guidance assumes the launch of Velac in the third quarter.

259.    The April 26, 2005 Press Release quoted Defendant Wiggans as stating:

> I am very pleased to report on a busy first quarter that included sales from our newly launched Evoclin product and the successful completion of a $200 million convertible financing . . . .    We expect further revenue gains from our expanded sales force and new contract sales agreement with Ventiv for three of our products.    Additionally, we have a number of near-

term regulatory and clinical milestones as outlined during our Analyst and Investor Day event held on April 14, 2005.

260.    Although partially disclosing certain issues related to Velac, these statements were materially false and misleading for the reasons set forth above in Section V.B and Section V.C.

## 17.    The April 26, 2005 Conference Call

261.    On April 26, 2005, Connetics had a conference call with investors that was participated in by, among others, Defendants Wiggans, Higgins and Vontz (the "April 26, 2005 Conference Call"). Defendants made numerous false and misleading statements on the April 26, 2005 Conference Call, as set forth above. In addition to the statements set forth above, on the April 26, 2005 Conference Call Defendant Wiggans stated:

> In the first quarter, we had a solid quarter for our core brands, OLUX, Luxiq, Soriatane and Evoclin. Greg will be going into prescription trends for those. This was a good quarter for us. We continue to add good gains, good progress on our managed care area and our prescription growth. And also, the Evoclin launch continues to go very well. We updated people on that at the Analyst Day and we'll give you some more information, but that is a very good launch for us . . .

> Regarding Velac, we are – we continue to be in active discussions with FDA on their review of our NDA. As we've moved through the review process, we've been pleased with the review. And up to this point, we've been in active communication with the agency and have continued to be in active communication with the agency over the last several weeks, answering their questions as they finalize their review of the various sections.

> As part of this review, we recently received communications that indicated FDA were interpreting results of one of our pre-clinical studies in a different fashion than we did in our submission. I realize over the past several weeks there's been speculation regarding the approvability of a new retinoid, or approvability of a combo product. The question that they have asked is unrelated to either one of these subjects.

> We conducted one of our pre-clinical studies in a transgenic mouse model. And in that study, there was a positive response to our product. At the time, we carefully analyzed the results with a panel of leading experts in this model and leading toxicologists.

> The outcome of that was that the experts advised us that this mouse model is known to have limitations and they concluded that the positive response was a result of one of these limitations of the model.

> . . . But, because up to this point FDA had not raised this issue with us, we were surprised to received this information; however, we are in discussions with them on their question and we expect to submit additional information well before the PDUFA date, which further support our original conclusion included in the NDA.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                              -75-
Case No. C 07-02940 SI

While I realize that this question might raise more questions, rather than answers for you, just as it did us, I can tell you that we are very committed to working with the FDA to get them the information so this issue can be resolved and enable us to launch Velac on schedule.

262.     On the April 26, 2005 Conference Call, Defendant Higgins stated:

For the second quarter, we're forecasting revenues of $45 to $47 million combined for total revenues.  On expense of $34 to $36 million . . .

With this revenue and expense guidance, we forecast EPS on a fully diluted basis to be in the range of $0.06 to $0.08 for the second quarter . . .

We are, of course, forecasting the launch of Velac in the third quarter at this time with this guidance.  And I do want to comment that we've enjoyed strong fourth quarter revenues the last several years.  It seems to be a very significant quarter for dermatology products, and certainly we have included that in our assumptions.

263.     Although partially disclosing certain issues related to Velac, these statements were materially false and misleading for the reasons set forth above in Section V.B and Section V.C.

264.     On the call, Defendant Vontz stated:

we had a strong showing in the first quarter.  If we look at the Rx performance in Q1 of 2005 versus the same period in 2004 for Luxiq, we had a 12% increase in prescriptions, achieving 66,000 and change in Q1 '05 for Luxiq.  Also, there was 12% growth in our efforts for OLUX, moving up to almost 112,000 prescriptions for the first quarter of 2005.

And excitably for Soriatane, in the same period comparison, a 4% growth rate for Soriatane, achieving close to 31,000 prescriptions in the first quarter of 2005.  And undoubtedly, the real bright spot in this quarter was the enthusiastic reception by physicians and patients to Evoclin, which closed out the first quarter with 29,000 prescriptions.  So, a very strong showing by Evoclin.

265.     These statements were materially false and misleading for the reasons set forth above in Section V.C.

### 18.     The 1Q 2005 10-Q

266.     On or about May 10, 2005, Connetics filed with the SEC Connetics' Form 10-Q for the quarter ending March 31, 2005 (the "1Q05 10-Q").  The 1Q05 10-Q was signed and certified by Defendants Wiggans and Higgins.  Wiggans and Higgins each certified that "the information contained in the report presents, in all material respects, the financial condition and results of operations of the Company."  Also, pursuant to Section 302 of Sarbanes-Oxley,

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              -76-
Case No. C 07-02940 SI

Defendants Wiggans and Higgins each certified that based on his knowledge, "this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

267.    Connetics also represented in the 1Q05 10-Q that Defendants Wiggans and Higgins each confirmed that Connetics' ". . . disclosure controls and procedure were effective in timely alerting them to material information required to be included in our periodic SEC Reports."  Wiggans and Higgins also confirmed there had ". . . been no change in [Connetics'] internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."  The certifications signed by Defendants Wiggans and Higgins and attached to the 1Q05 10-Q as exhibits stated that these Defendants were responsible for "establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" for Connetics and stated that they had:

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

> disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

268.    The 1Q05 10-Q stated "we have prepared the accompanying unaudited condensed consolidated financial statements . . . in accordance with accounting principles generally accepted in the United States."

269.    The 1Q05 10-Q reported the following results for the three month period ended March 31, 2005:

(i)     Product Revenues of $42,190,000;

(ii)    Revenues of $42,371,000;

(iii)   Income from operations of $1,499,000;

(iv)    Net Income of $1,041,000;

(v)     Basic Net Income per share of $0.03; and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          -77-
Case No. C 07-02940 SI

(vi)    Diluted Net Income per share of $ 0.03.

270.    The 1Q05 10-Q also stated ". . . We recognize revenue from product sales when there is persuasive evidence that an arrangement exists, when title has passed, the price is fixed or determinable, and we are reasonably assured of collecting the resulting receivable.   We recognize product revenues net of estimated allowances for discounts, returns, rebates, and chargebacks."

271.    The 1Q05 10-Q stated:

> Our product revenues were $42.2 million for the three months ended March 31, 2005, compared to $ 23.6 million for the three months ended March 31, 2004.  Total product revenues increased $18.6 million or 79% in the first three months of 2005 as compared to the same period in 2004.  The introduction of two new products, Soriatane in March 2004 and Evoclin in December 2004, accounted for 91% of the increase in product revenues.  For our other marketed products, primarily OLUX and Luxiq, increased sales volumes accounted for 6% of the increase in total product revenues and higher sales prices accounted for the remaining 3%.  During the three months ended March 31, 2005, we recorded an increase in revenue of $445,000 related to the reduction of certain revenue reserves recorded on sales of Soriatane through December 31, 2004.  We reduced the reserves to reflect our actual experience of chargebacks since acquisition of the Soriatane product rights.

272.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

273.    The 1Q05 10-Q stated: "As of March 31, 2005, inventory included $636,000 in raw materials for Velac, a product not yet approved by the Food and Drug Administration, or FDA, for commercial use, but with a planned launch in the second half of 2005."

274.    The 1Q05 10-Q also stated: "In addition to the increased amounts identified above, the other significant change in working capital during the first quarter of 2005 was an increase of $2.5 million in inventory to support increased product sales and the planned launch of Velac in the second half of 2005."

275.    These statements were materially false and misleading for the reasons set forth above in Section V.B.

**19.    The June 13, 2005 Press Release**

276.    On June 13, 2005, Connetics issued a press release entitled "Connetics Receives FDA Non-Approvable Letter For Velac" (the "June 13, 2005 Press Release").  The June 13, 2005

Press Release made numerous false and misleading statements and omissions, as set forth above.

In addition to the statements set forth above, the June 13, 2005 Press Release stated:

> . . . the U.S. Food and Drug Administration (FDA) issued a non-approvable letter dated June 10, 2005 for Velac® (a combination of 1% clindamycin and 0.025% tretinoin) Gel, an investigational new drug formulation for treating acne. The only issue raised in the non-approvable letter was a positive carcinogenicity signal that was detected in a TgAC mouse dermal carcinogenicity study.

277. The June 13, 2005 Press Release quoted Defendant Wiggans as saying:

> We are disappointed in the FDA's decision. As discussed during our first quarter earnings call on April 26, we were particularly disappointed that the FDA did not notify us of this as a potential issue until two months prior to the PDUFA date . . . We remain committed to bringing Velac to market, and will be working with FDA representatives to determine what is required to do so. Despite this setback, Connetics will continue to expand its leading position in the dermatology field with four brands on the market and a robust and diverse pipeline.

278. The June 13, 2005 Press Release also stated:

> As a result of today's announcement, Connetics now projects 2005 total revenues to be $182 million to $188 million, down from previous guidance of $195 million to $206 million. Combined SG&A and R&D expenses for 2005 are projected to be between $121.5 million and $125.0 million. Diluted EPS for 2005 is projected to be in the range of $0.66 to $0.70, versus previous guidance of $0.88 to $0.92. The revised revenue and earnings guidance represents growth of approximately 28% over 2004 revenues and 33% over 2004 earnings.

279. Although partially disclosing certain issues related to Velac, these statements were materially false and misleading for the reasons set forth above in Section V.B and Section V.C.

**20.    The June 13, 2005 Conference Call**

280. On June 13, 2005, Connetics hosted a conference call with investors that was participated in by, among others, Defendants Wiggans, Higgins and Vontz (the "June 13, 2005 Conference Call"). On the June 13, 2005 Conference Call, Defendant Wiggans stated:

> Moreover, as we discussed in our first-quarter earnings call on April 26[th], we were particularly disappointed that the FDA did not notify us of this as a potential issue until two months prior to the PDUFA date. We would like to have thought had we had this discussion earlier we may have been able to resolve it prior to the PDUFA date . . .
>
> As you saw in our releases [this] morning, we have revised our '05 financial guidance as follows – we project total revenues to be between $182 and $188 million, down from the previous guidance of $195 to $206 million. We

project earnings per share this year of $0.66 to $0.70 per share, down from our previous guidance of $0.88 to $0.92 a share. And I would point out that the new guidance still reflects growth of approximately 28% in revenues and 33% in earnings versus 2004.

281.    Although partially disclosing certain issues related to Velac, these statements were materially false and misleading for the reasons set forth above in Section V.B and Section V.C.

### 21.    The August 2, 2005 Conference Call

282.    On August 2, 2005, Connetics hosted a conference call with investors that was participated in by, among others, Defendants Wiggans, Higgins and Vontz (the "August 2, 2005 Conference Call"). On the August 2, 2005 Conference Call, Defendant Wiggans stated:

> . . . The second quarter was an extremely busy one for us. And the fundamentals, I can report, the fundamentals of the Company remain strong. During the quarter we achieved all-time prescription highs for OLUX and Soriatane, and Luxiq fell just sort of its all-time high, and Evoclin, of course, continues to perform extremely well for us. This performance is very rewarding, particularly given the maturity of the OLUX and Luxiq brands, and the increasing competition in our markets. It's – it's a tribute to the quality and the commitment of our sales force regarding their ability to continue to grow our products in an increasingly competitive market.

283.    On the August 2, 2005 Conference Call, Defendant Higgins stated:

> On the revenue side, we recorded $18.3 million in sales for Soriatane, we're very pleased with this. It is the highest level of net sales since we acquired the brand at the beginning of 2004. Evoclin, we reported $7 million, which includes sales to an international distributor of about $900,000. We're very pleased with this new channel. It was unexpected. We sold just about $50,000 to the same group in the first quarter. And we're pleased with this new channel. And we're pleased with their – their demand in ordering. Luxiq came in at $5.8 million, and OLUX net sales for the second quarter are $14 million. The total rollup when we look at combined product revenues, we have sales of $45.2 million, we're very pleased with this. It is a record high for the Company, and consistent with our prescription performance, suggests nice growth for the business.
>
> I – I do want to give some additional commentary around the returns, specifically relating to OLUX in the second quarter. We did see unusually high returns for OLUX and particularly for the 100-gram unit size. We have two units, and the OLUX 100-gram size in particular. Given the returns that were – were reported during the quarter, as well as an estimate for future potential liability, we have booked a $2.3 million provision this period, then return activity we experienced was unexpected, and it relates to the actual returned, and information that we received in the second quarter. We did do a very thorough review of OLUX, as well as all of our products and we concluded that the returns are due to the distribution ordering practice of

investment purchasing, or forwarding buying of product in anticipation of price increases, namely by our two largest wholesalers back in 2004.

As most of you know, at the end of 2004 we did enter distribution service agreements, or DSA's, as they're called, with both of these wholesalers. The DSA's, among other things, they do prohibit investment purchasing and they also make available to us considerably more information about the inventory levels and channel distribution by the wholesalers. I do want to clarify the product that has been returned, or is expected to be returned was purchased prior to Connetics entering these agreements. We do believe the high second quarter return provision relating to investment purchasing is a one-time event. We also believe we've taken the appropriate reserves, we have more information available to us now under these agreements and will be monitoring the shelf life of existing product as it moves through the distribution channel going forward.

284.     On the August 2, 2005 Conference Call, Defendant Higgins had the following exchange with an analyst:

**Analyst:**     . . . And what were inventory levels for all products at the end of the quarter? How does that compare to last quarter? And then, specifically, on Soriatane and Evoclin, obviously those numbers came in pretty strong. Was there any stocking there, or does that truly reflect that prescription demand for those products?

**Higgins:**     . . . we're spending more time matching shipments to demand, that's one of our objectives, I think with regard to your previous question, the levels of inventory at the end of this quarter, versus last quarter [are] fundamentally unchanged.

285.     On the August 2, 2005 Conference Call, Defendants Higgins and Vontz had the following exchange with an analyst:

**Analyst:**     . . . My first question is on Luxiq, you said the inventory shifts, there were no inventory shifts on that product, but with a price increase and some prescription growth, can you kind of walk us through why the product was basically flat in terms of revenues?

**Higgins:**     Yes . . . the sales roughly flattish, actually on the dollar, on a net basis up over a bit over first quarter as, obviously, prescriptions were, as well. We did have a price increase at the end of the first quarter in March. As we've discussed in the past, we don't get into the exact detail, but with our DSA's the wholesaler agreements, we are giving up a bit of share there. We're entering more managed care contracts with the exposure for government charge back, et cetera. We don't keep the full extent of our price increase. So we're up a couple of percent on reported net basis, prescriptions were up a couple of percent. In terms of getting that leverage on the price increase, we don't keep all of that, certainly over the next couple of quarters, we'll – we'll benefit more – more form those price increases.

**Vontz:**     …let me just add a little more color, as John said we were up quarter-over-quarter for Luxiq, 2% plus percent on the product, but it really is the fourth product in the promotional cycle, so it is not getting the level of attention which is appropriate given the maturity of this product, and, frankly, the much more competitive and busy generic mid-potency category.

286.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

## 22.    The 2Q 2005 10-Q

287.    On or about August 8, 2005, Connetics filed with the SEC Connetics' Form 10-Q for the quarter ending June 30, 2005 (the "2Q05 10-Q").  The 2Q05 10-Q was signed and certified by Defendants Wiggans and Higgins.  Wiggans and Higgins each certified that "the information contained in the report presents, in all material respects, the financial condition and results of operations of the Company."   Also, pursuant to Section 302 of Sarbanes Oxley, Defendants Wiggans and Higgins each certified that based on his knowledge, "this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

288.    Connetics also represented in the 2Q05 10-Q that Defendants Wiggans and Higgins each confirmed that Connetics' ". . . disclosure controls and procedure were effective in timely alerting them to material information required to be included in our periodic SEC Reports."   Wiggans and Higgins also confirmed there had ". . . been no change in [Connetics'] internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."   The certifications signed by Defendants Wiggans and Higgins and attached to the 2Q05 10-Q as exhibits stated that these Defendants were responsible for "establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" for Connetics and stated that they had:

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and] disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

289.    The 2Q05 10-Q stated, "we have prepared the accompanying unaudited condensed consolidated financial statements . . . in accordance with accounting principles generally accepted in the United States."

290.    The 2Q05 10-Q reported the following results for the three month period ended June 30, 2005:

       (i)    Product Revenues of $45,239,000;

       (ii)    Revenues of $45,369,000;

       (iii)    Income from operations of $2,674,000;

       (iv)    Net Income of $2,502,000;

       (v)    Basic Net Income per share of $0.07; and

       (vi)    Diluted Net Income per share of $ 0.07.

291.    The 2Q05 10-Q also stated ". . . We recognize revenue from product sales when there is persuasive evidence that an arrangement exists, when title has passed, the price is fixed or determinable, and we are reasonably assured of collecting the resulting receivable.  We recognize product revenues net of estimated allowances for discounts, returns, rebates, and chargebacks."

292.    The 2Q05-10Q stated:

> We recorded product revenues of $45.2 million for the three months ended June 30, 2005, compared to $38.0 million for the three months ended June 30, 2004, for an increase of $7.2 million or 19%.  The increase in product revenues is primarily attributable to the introduction of two new products, Soriatane in March 2004 and Evoclin in December 2004, which accounted for $1.2 million and $7.0 million of the incremental revenue, respectively.  During the three months ended June 30, 2005, we experienced unexpected product returns related to expired and expiring products at our wholesaler customers of OLUX that were significantly above historic levels. Based on our analysis, we recorded a charge to product revenues of $2.3 million in the three months ended June 30, 2005 for the expired and estimated expiring products at our customers, associated with product sales recorded in prior periods.  Our analysis considered information contained in the reporting provided to us by our wholesaler customers under the distribution service agreements that became available to us in the second quarter of 2005.  This additional reserve was recorded as a decrease in product revenues in the second quarter, which partially offset the increased sales from the new products.

> For the six months ended June 30, 2005, our product revenues were $87.4 million compared to $61.6 million for the six months end June 30, 2004, for an increase of $25.8 million or 42%.  The increase in product revenues is

attributable to Soriatane and Evoclin, which accounted for $15.1 million and $10.1 million of the increase, partially offset by the additional returns reserve recorded in the second quarter as described above.

293.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

## 23.    The November 1, 2005 Press Release

294.    On November 1, 2005, Connetics issued a press release entitled "Connetics Reports Third Quarter Revenues of $55.3 Million and Diluted EPS of $0.39" (the "November 1, 2005 Press Release"). The November 1, 2005 Press Release stated:

Total revenues for the third quarter of 2005 were $55.3 million, an increase of 48% over total revenues of $37.3 million in the third quarter of 2004. Total product revenues for the quarter increased 49% to $55.2 million, up from $37.0 million in the third quarter of 2004, reflecting contribution from sales of Evoclin™, which was launched in December 2004, and continued growth in sales of Soriatane®, OLUX® and Luxíq®. Third quarter product sales included: Soriatane $23.1 million, Evoclin $7.7 million, OLUX $17.3 million and Luxíq $7.0 million.

295.    The November 1, 2005 Press Release also stated:

For the nine months ended September 30, 2005, total revenues were $143.1 million, an increase of 42% compared with total revenues of $100.6 million for the first nine months of 2004.

SG&A expenses for the first nine months of 2005 were $76.1 million compared with $49.1 million for the first nine months of 2004. R&D expenses for the first nine months of 2005 were $22.8 million, up from $15.3 million in the first nine months of 2004.

Net income was $18.9 million, or $0.50 per diluted share, compared with net income of $13.0 million, or $0.35 per diluted share, for the comparable period last year.

For the fourth quarter of 2005 Connetics projects total revenues of $47 million to $49 million, and combined SG&A and R&D expenses in the range of $29 million to $30 million. Earnings per share on a diluted "If Converted" basis for the fourth quarter of 2005 are projected to be $0.24 to $0.26.

The Company's full year total revenues are expected to be $190 million to $192 million, compared with prior guidance of $185 million to $190 million. Combined SG&A and R&D expenses are now projected to be in the range of $128 million to $129 million, compared with prior guidance of $125 million to $127 million. Earnings per share on a diluted "If Converted" basis for 2005 are expected to be $0.74 to $0.76, compared with prior guidance of $0.66 to $0.70.

296.    The November 1, 2005 Press Release quoted Defendant Wiggans as stating:

The third quarter marked another solid period of commercial growth while we continued to make progress advancing our product pipeline . . . our product

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -84-
Case No. C 07-02940 SI

portfolio continues to enjoy revenue growth. We are investing significantly in our pipeline to drive our future growth, and we have several global licenses that we expect will begin generating new royalty and contract revenues for the Company in the coming year. In the final months of 2005, we continue to build a broad platform that will allow Connetics to become the leading medical dermatology company in the U.S.

297. These statements were materially false and misleading for the reasons set forth above in Section V.C.

### 24. The 3Q 2005 10-Q

298. On or about November 9, 2005, Connetics filed with the SEC Connetics' Form 10-Q for the quarter ending September 30, 2005 (the "3Q05 10-Q"). The 3Q05 10-Q was signed and certified by Defendants Wiggans and Higgins. Wiggans and Higgins each certified that "the information contained in the report presents, in all material respects, the financial condition and results of operations of the Company." Also, pursuant to Section 302 of Sarbanes-Oxley, Defendants Wiggans and Higgins each certified that based on his knowledge, "this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

299. Connetics also represented in the 3Q05 10-Q that Defendants Wiggans and Higgins each confirmed that Connetics' ". . . disclosure controls and procedure were effective in timely alerting them to material information required to be included in our periodic SEC Reports." Wiggans and Higgins also confirmed there had ". . . been no change in [Connetics'] internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting." The certifications signed by Defendants Wiggans and Higgins and attached to the 3Q05 10-Q as exhibits stated that these Defendants were responsible for "establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" for Connetics and stated that they had:

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -85-
Case No. C 07-02940 SI

1    disclosed in this report any change in the registrant's internal control over
2    financial reporting that occurred during the registrant's most recent fiscal
     quarter that has materially affected, or is reasonably likely to materially
3    affect, the registrant's internal control over financial reporting;

4    300.    The 3Q05 10-Q stated "we have prepared the accompanying unaudited condensed

5    consolidated financial statements . . . in accordance with accounting principles generally accepted

6    in the United States."

7    301.    The 3Q05 10-Q reported the following results for the three month period ended

8    September 30, 2005:

9    (i)    Product Revenues of $55,183,000;

10   (ii)    Revenues of $55,341,000;

11   (iii)    Income from operations of $15,675,000;

12   (iv)    Net Income of $15,365,000;

13   (v)    Basic Net Income per share of $0.44; and

14   (vi)    Diluted Net Income per share of $ 0.39.

15   302.    The 3Q05 10-Q also stated ". . . We recognize revenue from product sales when

16   there is persuasive evidence that an arrangement exists, when title has passed, the price is fixed

17   or determinable, and we are reasonably assured of collecting the resulting receivable.   We

18   recognize product revenues net of estimated allowances for discounts, returns, rebates, and

19   chargebacks."

20   303.    The 3Q05 10-Q stated:

21   We recorded product revenues of $55.2 million for the three months ended
     September 30, 2005, compared to $37.0 million for the three months ended
22   September 30, 2004, for an increase of $18.2 million or 49%.  The increase
     in product revenues is primarily attributable to the introduction of two new
23   products, Soriatane in March 2004, which accounted for $8.4 million of the
     incremental revenue, and Evoclin in December 2004, which accounted for
24   $7.7 million of the incremental revenue.  The year to year increase in product
     revenues for Soriatane is primarily related to a $ 7.0 million reduction of
25   estimated reserves for returns and government rebates recorded from the time
     of acquisition through June 30, 2005.  We began selling Soriatane in March
26   2004 after we acquired the U.S. product rights from Roche, and we recorded
     revenue reserves for estimated returns and government rebate information not
27   previously available to us.  As part of the process of evaluating our estimates
     for returns and rebates, we used the new information from Roche together
28   with our own returns and rebate experience, and as a result reversed $7.0
     million of reserves for Soriatane.  This reversal resulted in an increase in
     Soriatane product revenue for the three and nine months ended September

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -86-
Case No. C 07-02940 SI

30, 2005 of the same amount and increased our diluted earnings per share by $0.16 for the three months ended September 30, 2005. The remaining increase in product revenue is primarily related to price increases in August 2004 and March 2005.

For the nine months ended September 30, 2005, our product revenues were $142.6 million compared to $98.6 million for the nine months ended September 30, 2004, for an increase of $44.0 million or 45%. The increase in product revenues is attributable to Soriatane and Evoclin, which accounted for $23.5 million and $17.8 million of the increase, respectively. The $7.0 million related to the reduction of the estimated reserves for Soriatane returns and government rebates discussed above, are also included in the Soriatane increase reflected for the nine months ended September 30, 2005. This adjustment increased our diluted earnings per share by $0.16 for the nine months ended September 30, 2005. Those increases are partially offset by the additional returns for OLUX recorded in the second quarter totaling $2.3 million which decreased our diluted earnings per share by $.05 for the nine months ended September 30, 2005.

304.    These statements were materially false and misleading for the reasons set forth above in Section V.C.

## 25.    The December 19, 2005 Conference Call

305.    On December 19, 2005 Connetics hosted a conference call with investors that was participated in by, among others, Defendants Wiggans, Higgins and Vontz (the "December 19, 2005 Conference Call"). On the December 19, 2005 Conference Call, Defendant Higgins said:

For 2006, as we indicated in the press release, we're forecasting revenues of $215 to $218 million in total revenues. This represents a 17% growth over 2005 revenues. All four current products are expected to enjoy revenue growth with Evoclin, just in its second year, growing the most . . .

When we look at EPS, EPS is projected to be $0.86 to $0.88 on a diluted if-converted basis. This does exclude the impact of FAS 123, or the expenses associated with stock-based compensation. We estimate that FAS 123 will have an impact to net income in '06 of approximately $6 to $7 million, or $0.09 to $0.11 dilution to earnings per share . . .

Just a comment about our profitability. We're pleased with our outlook for '06. When we look at the 2006 profitability, it represents approximately 45% growth over 2005, excluding the one-time tax benefit. And earlier, we had indicated we expected our 2006 tax rate to be in the mid-20% range. That had been our plan in case. We had given some general guidance. And assuming a 25% tax rate, our '06 earnings per share would have actually been $1.05 per share.

306.    On the December 19, 2005 Conference Call, Defendant Wiggans had the following exchange with an analyst:

**Analyst:**    Okay. And, then, maybe just following up on that, could you just kind of give us a sense, then, sort of where you expect to be at year end in terms of wholesaler inventory levels on the range of products in the portfolio?

| | |
|---|---|
| **Wiggans** | Well, we've always – I mean, we track, now, shipments to demand. We have for some period of time. And so we, again, we don't see any fundamental changes in our inventory levels. We haven't adjusted any of the others. Soriatane is really the bulk of the change. We've previously said 8 to 12 weeks is our range. Soriatane was at the high end of that. We expect to get it to the low end of that. |

307.    On the December 19, 2005 Conference Call, Defendant Wiggans also had the following exchange with another analyst:

| | |
|---|---|
| **Analyst**: | . . . I was hoping to clarify the comment with regard to the inventory levels. You just said you expected [Soriatane] inventory to go from 12 weeks to 8 weeks, but the revenue adjustment seems to be greater than that. Could you comment on how much of this inventory adjustment is actually from adjustments from the international distributor, for which it's extremely difficult, obviously, to gauge pull through? |
| **Wiggans**: | Well, actually it's difficult for us to get visibility on that as well. They pretty much order when they need it. They've had a very consistent pattern of ordering. So, by and large, as we said, the majority of the Soriatane is on our wholesaler inventories. |
| **Analyst**: | Right. But are you seeing those international orders in the current quarter? Or is that also a part of the contribution to the shortfall? |
| **Wiggans**: | They come in—they come in when they do. We have seen—we have seen orders in the fourth quarter. So I think, at the current time, generally, in line with the track for the last couple of quarters. |
| **Analyst**: | And I guess the question, then, is – if there's some uncertainty as to whether or not the generic is even going to emerge in early '07, why make the adjustment all in one quarter as opposed to working down inventories in a more rational process? |
| **Wiggans**: | . . . This is something that we've certainly spent a lot of time here on, and it's certainly been an issue surrounding the business. We don't know whether generic is going to launch. We're certainly going to do everything we can to prevent that, but we felt it was an opportunity to really make some prudent business moves and get this issue behind us so that everybody can really look at these numbers and say, okay, I understand what's probably the worst – what is probably the worst-case scenario, and I can evaluate the business on – along those parameters. So that's why we did it. |

308.    These statements were materially false and misleading for the reasons set forth above in Section V.C. In addition, numerous former employees contacted by Lead Plaintiff indicated that throughout the Class Period, Connetics regularly placed four months of inventory into the channel, not the 12 weeks to 8 weeks falsely stated by Defendants in this conference call.

309.    On the December 19, 2005 Conference Call, Defendants Wiggans and Vontz had the following exchange with an analyst:

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -88-
Case No. C 07-02940 SI

| | |
|---|---|
| **Analyst:** | A few questions.  First you're forecasting some pretty decent growth in 2007.  And you said you have a conservative scenario in there for generic Soriatane.  Could you give us a sense for what you're thinking there?  Is it typical substitution rates, like 80, 90% or less than that similar to what we've seen with, I guess, with Accutane? |
| **Wiggans:** | Well we've taken a – we've modeled this a couple of different ways, and I think the comment you just made, by and large, we've looked at the Accutane model, and, frankly, there were three generics in that market.  But I think, if anything, the group has done a good job of modeling a very aggressive erosion scenario and a very prudent down case.  So, that's kind of the way we looked at it. |
| **Analyst:** | Okay.  Then, I guess you commented that you expected pretty decent unit growth in Evoclin, but recently those scripts have flattened a little bit.  Can you tell us when you expect to see a reacceleration in those scripts?  And is there something, I guess, going on in the acne market as far as competition that's causing them to stall a little bit? |
| **Vontz** | . . . it's a good question.  One of the things that we know about this marketplace is it's very different than the steroids.  It has a different seasonal cycle.  And we see this over a period of multiple years, having looked at this.  Typically, August is the largest month of the year.  Typically, it translates to about 11% of total sales for the product.  September is historically a big drop off in the overall market. |
| | We are assuming, while we don't know the specifics, a lot of that is due to very aggressive sampling, and a lot of new prescriptions being written in August that accounts for that lag.  So while we've seen Evoclin's prescriptions slowing, we've continued to gain share.  Just in the last month, we've now crossed 6% of the total clindamycin market.  So we are not surprised by this cycle.  It's typical to see the overall acne market moving down slightly in the fourth quarter.  We expect to see continued share gains through the rest of the year, and certainly strong share gains into next year.  So we really believe this is nothing more than seasonal effects for the acne market. |

310.   These statements were materially false and misleading for the reasons set forth above in Section V.C.

### 26.   The January 31, 2006 Press Release

311.   On January 31, 2006, Connetics issued a press release entitled "Connetics Reports Fourth Quarter Revenues of $41.3 Million and EPS of $0.40" (the "January 31, 2006 Press Release").  The January 31, 2006 Press Release stated:

> Connetics . . . today reported net income for the quarter ended December 31, 2005 of $15.1 million, or $0.40 earnings per share on a diluted "If-Converted" basis.  This compares with net income of $6.0 million, or $0.16 earnings per share on a diluted basis, for the comparable quarter in 2004.  The results in the 2005 fourth quarter include a positive impact of $0.25 per diluted share from recording a tax asset of $9.9 million, as previously announced.

---

Total revenues for the fourth quarter of 2005 were $41.3 million, compared with total revenues of $43.8 million in the fourth quarter of 2004. Fourth quarter 2005 product revenues included OLUX(R) sales of $14.7 million, Soriatane(R) sales of $13.6 million, Evoclin(TM) sales of $6.9 million and Luxiq(R) sales of $5.6 million.

312.   The January 31, 2006 Press Release also stated:

Net income for 2005 was $34.1 million, or $0.89 per diluted "If-Converted" share, compared with net income of $19.0 million, or $0.51 per diluted share, in 2004. Full year 2005 results include a positive impact of $0.24 per diluted share from recording a tax asset of $9.9 million during the fourth quarter.

Total revenues for 2005 rose 28% to $184.4 million, and product revenues increased 29% to $183.4 million, reflecting growth in OLUX and Luxíq, and a full year revenue contribution of Soriatane and Evoclin. SG&A expenses increased to $97.4 million for 2005, compared with $73.2 million for 2004, primarily due to costs associated with a larger sales force, promotional activities for Evoclin and increased headcount. Due to increased formulation and clinical development activities, R&D expenses for 2005 increased to $31.9 million, compared with R&D expenses of $21.5 million in 2004.

313.   The January 31, 2006 Press Release quoted Defendant Wiggans as stating:

Evoclin reached record market share levels during the quarter, and our other brands remain solid performers in increasingly competitive markets and against new entrants . . . . We are delighted that two of our partners, Pfizer and Novartis, recently received approvals to market products that incorporate Connetics' patented topical delivery technologies. With the breadth of our commercial portfolio, the expected introduction of Desilux in the fourth quarter of this year, and our expanded sales presence, we believe Connetics is positioned for continued growth in 2006.

314.   These statements were materially false and misleading for the reasons set forth above in Section V.C.

### 27.   The 2005 10-K

315.   On March 13, 2006, Connetics filed its annual report on Form 10-K for the year ended December 31, 2005 (the "2005 10-K"), wherein the Company reaffirmed its previously announced financial results and reported net income of $33,958,000 for 2005. The Company's 2005 10-K was signed by Defendants Wiggans and Higgins. The 2005 10-K was signed and certified by Defendants Wiggans and Higgins. Wiggans and Higgins each certified that "the information contained in the report presents, in all material respects, the financial condition and results of operations of the Company." Also, pursuant to Section 302 of Sarbanes-Oxley, Defendants Wiggans and Higgins each certified that based on his knowledge, "this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of

the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

316.    Connetics also represented in the 2005 10-K that Defendants Wiggans and Higgins each concluded that Connetics' ". . . disclosure controls and procedure were effective in timely alerting them to material information required to be included in our periodic SEC Reports." Wiggans and Higgins also concluded there had ". . . been no change in [Connetics'] internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

317.    The 2005 10-K also stated ". . . We recognize revenue from product sales when there is persuasive evidence that an arrangement exists, when title has passed, the price is fixed or determinable, and we are reasonably assured of collecting the resulting receivable. We recognize product revenues net of estimated allowances for discounts, returns, rebates, and chargebacks."

318.    The 2005 10-K stated that Connetics' financial statements were "prepared in accordance with U.S. generally accepted accounting principles, or GAAP."

319.    The 2005 10-K reported the following results for the fiscal year ended December 31, 2005:

> (i)    Product Revenues of $183,312,000;
>
> (ii)    Revenues of $184,264,000;
>
> (iii)    Income from operations of $23,897,000;
>
> (iv)    Net Income of $33,958,000;
>
> (v)    Basic Net income per share of $0.97; and
>
> (vi)    Diluted Net Income per share of $ 0.89.

320.    The 2005 10-K also stated:

> Our product revenues increased to $183.3 million in 2005 from $142.1 million in 2004. The increase in product revenues is primarily attributable to a full year's sales in 2005 of both Soriatane and Evoclin Foam, which accounted for $19.01 million and $21.8 million of the increase, respectively. The $0.4 million increase in combined OLUX Foam and Luxiq Foam revenues is a result of price increases offset by the $2.3 million charge in the second quarter for product returns discussed below. During the fourth quarter of 2005, we made two changes to our Evoclin Foam reserves based on having one full year of commercialization history of the product. We reduced Medicaid reserves for Evoclin Foam by $1.0 million, which

increased diluted earnings per share for the year by $0.03, and increased returns reserves for Evoclin Foam by $0.5 million; these changes resulted in a net increase to revenues of $0.5 million, a $0.01 increase in diluted earnings per share for the year ended December 31, 2005.

The year to year increase in product revenues for Soriatane includes a $7.0 million benefit from the reduction of estimated reserves for returns of $3.6 million and government rebates of $3.4 million recorded from the time of acquisition through June 30, 2005. We began selling Soriatane in March 2004 after we acquired the U.S. product rights from Roche, and we recorded revenue reserves for estimated returns and government rebates based on information available to us at the time. In September and October 2005, Roche provided us with additional returns and government rebate information not previously available to us. As part of the process of evaluating our estimates for returns and rebates, we used the new information from Roche together with our own returns and rebate experience, and as a result reversed $7.0 million of reserves for Soriatane in the third quarter. This adjustment increased our diluted earnings per share by $0.17 for the year ended December 31, 2005.

In the second quarter of 2005, our wholesaler customers returned an unexpectedly high amount of expiring and expired OLUX Foam. These return levels were significantly above historical levels. Based on our analysis, we recorded a charge to product revenues of $2.3 million in the second quarter for expired and estimated expiring products at our customers associated with product sales recorded in prior periods.

321.   These statements were materially false and misleading for the reasons set forth above in Section V.C.

### 28.   **The May 3, 2006 Press Release**

322.   On May 3, 2006, after the market closed, Connetics issued a press release entitled "Results of Operations and Financial Condition" (the "May 3, 2006 Press Release"). The May 3, 2006 Press Release made numerous materially false and misleading statements, as set forth above. In addition to the statements set forth above, the May 3, 2006 Press Release stated:

On May 3, 2006, the Company concluded that its financial statements for the year ended December 31, 2005, and potentially additional periods, should no longer be relied upon. The Company has determined that its rebate reserves as of the end of 2005 were understated. Rebates are contractual discounts offered to government programs and private health plans which are eligible for rebates at the time prescriptions are dispensed, subject to various conditions. The Company records quarterly reserve provisions for rebates by estimating rebate liability for product sold, based on factors such as timing and terms of plans under contract, time to process rebates, product pricing, sales volumes, units held by distributors, and prescription trends. Upon review, the Company has concluded that the rebate rates and method used to calculate the rebate liability did not fully capture the impact of these factors in its historical provision. Accordingly, the Company plans to restate its financial statements for the year ended December 31, 2005, and potentially additional periods.

323.  The May 3, 2006 Press Release also stated:

> On a preliminary basis, net income for the first quarter ended March 31, 2006 was $0.8 million, or $0.02 earnings per share on a diluted basis, including stock-based compensation expense of $1.6 million, or $0.05 per diluted share, reflecting the adoption of SFAS 123R, accounting for stock-based compensation, as of January 1, 2006.  On a non-GAAP basis excluding stock-based compensation, net income for the first quarter of 2006 was $2.4 million, or $0.07 per diluted share . . .

> For the second quarter of 2006, Connetics projects total revenues of $50.5 million to $52.5 million.  Second quarter operating expenses, including depreciation, are projected to be in the range of $37 million to $38 million. Connetics projects earnings per share on a diluted basis for the second quarter of 2006 of $0.07 to $0.09, including an estimated $1.6 million or approximately $0.04 per diluted share impact from expensing stock-based compensation.  Non-GAAP diluted EPS for the second quarter of 2006 excluding expense for stock-based compensation is projected to be in the range of $0.11 to $0.13.

> Based on information currently available to the Company, Connetics is lowering 2006 revenue guidance.  Total revenues are now expected to be $211 million to $217 million, compared with prior guidance of $221 million to $225 million, reflecting increased competition in the psoriasis market. Total operating expenses for 2006, including depreciation, are unchanged and projected to be between $146 million and $148 million.

324.  The May 3, 2006 Press Release quoted Defendant Wiggans as stating:

> We had a busy and productive first quarter hitting all-time prescription highs with Evoclin, submitting a New Drug Application (NDA) for Primolux and licensing a new product technology for development . . . . In addition, we completed our acquisition of a pediatric sales force, which is now trained and in the field promoting Evoclin and Luxiq.  While we have experienced increased pressure from recent competitive product launches, we remain focused on commercial success with our four marketed brands.  We also are committed to product development, and our current product pipeline is larger than at any time in the Company's history.  We currently have more than 10 products in development, with three having the potential to be approved and launched during the coming 18 months.  Clearly a short-term priority is to file our restated financial results, but the revised accounting does not affect our underlying business model or growth prospects."

325.  Although partially disclosing certain issues related to Connetics' financial statements, these statements were materially false and misleading for the reasons set forth above in Section V.C.

### 29.    The May 3, 2006 Conference Call

326.  On May 3, 2006 Connetics hosted a conference call with investors that was participated in by, among others, Defendants Wiggans, Higgins and Vontz (the "May 3, 2006 Conference Call").  On the May 3, 2006 Conference Call, Defendant Wiggans stated:

---

For the first quarter, we recorded product revenues of $47.7 million and earnings per share, excluding stock option expensing, of $0.07. As we discussed in our press release, we've determined that we should begin accounting for rebates to managed care plans and our government programs differently. Since we began selling our first product, Luxiq, in 1999 we've taken quarterly reserves to account for rebate obligation. However, as Connetics' business has grown and our contracts have grown, so has our reserve liability.

After a careful review of our reserve levels we have concluded that our product rebates are under-reserved for future liabilities. This is a historical adjustment to be allocated over the past several years and these adjustments will have no impact on revenues going forward . . .

Although as I mentioned before, in March we hit all-time highs for OLUX, the prescription trends for OLUX and Soriatane are below our forecast levels. Given this run rate, we now believe we will not be able to achieve our original forecasts. As a result, we are reducing our revenue guidance for the year from $221 to $225 million, to $211 to $217 million . . .

* * *

The rebate accounting issue has no effect whatsoever on future trends. ***And to the degree that we may do destocking over time, that was built into the original guidance***. So of the three points you made, Mark, the reason for the guidance change is the way we see the prescriptions. As you can – as you may recall last year, we had a pretty big second half forecast. And a lot of the calls – or a lot of the questions on the first quarter call were: Can you really grow the business that much in the second half of the year? Last year we were able to do that. Our assessment right now is we won't be able to do that in the second half of the year unless we bend the trend.

(Emphasis added.)

327. On the May 3, 2006 Conference Call, Defendant Vontz stated: "Any destocking activities over the coming quarters have been accounted for in our revised guidance given today."

328. On the May 3, 2006 Conference Call, Defendant Higgins stated:

As [Defendant Wiggans] alluded to, the total revenue guidance is now $211 to $217 million, approximately. This is approximately 4% lower than our original guidance. And the reduction when you look at it on a product basis is driven more by lower revenue expectations for OLUX and Soriatane. The guidance includes revenue from the anticipated fourth quarter launch of Desilux, as well as royalty and contract revenue. When we look at the full year gross margins, we believe for the full year we'll be slightly higher than our beginning of the year forecast at about 91%. Operating expenses, excluding stock-based comp. are unchanged at $146 to $148 million.

Finally, let me provide some comments about our rebate accounting. To start with, rebates are – background, rebates are contractual discounts offered to governmental entities, such as state Medicard programs and private health plans. The entities under contract are eligible for rebates at the time prescriptions are dispensed. Of course, there are various conditions. They have to, in certain cases, have national market share levels, et cetera. The Company has literally taken estimate reserves for rebates against quarterly sales. I'll add that the calculation is complex. It's based on a multiple of

factors, including the timing and the terms of the rebate contracts, the time to process the rebate, product pricing, look at quarterly sales volume, unit sales to distributors, as well as prescription trends.

Upon review, the Company concluded the rebate rates and the method used to calculate the rebate liability in prior periods did not fully capture the impact of all of these factors. And that our reserve for the future liability is low. We estimate that the cumulative impact of the change as of the end of 2005 is approximately $8 to $9 million.

329. On the May 3, 2006 Conference Call, Defendants Wiggans, Higgins and Vontz had the following exchange with an analyst:

**Analyst:** I just wanted to clarify, in understanding this issue what precipitated the recognition that you were under-reserved? Was there a threat of a whistle blower lawsuit with the regard to under-reserving or exactly what was it that drew this out now as opposed to let's say at the year-end process when the K was completed?

**Wiggans:** . . . We want to make it very clear that this issue arose in our examination of our reserves and in consultation with Ernst & Young. It was something we identified. We thought it might be a longer project. But I think as we got into it and understood the amounts and consulted with E&Y, the time to do it was now. And I think you can count on us, whenever we identify an issue like this we address it. Something that we wish hadn't arisen but it has and we will fix it and we'll get it behind us. ***And it arose during the first quarter***.

**Vontz:** Let me answer this. I don't want to oversimplify it Ken. But I think the short answer is, the business is a lot more complicated now than it was a couple of years ago. This is a function of growth, it's a function of contracting. As an example, when we bought Soriatane there were very few contracts. We have contracted much more aggressively. So the – all of these things, and again, I don't want to oversimplify this, and I'm not going to dodge the question. All these things are unrelated and they're a function of growing the business. The Soriatane reversal in the third quarter was really a reversal of a reserve that we had taken very conservatively and in conjunction with our auditors when we acquired the product. And when the actuals came in back from Roche we had over-reserved. So a series of accounting issues but they are unrelated.

**Higgins:** . . . just a little more color. The third quarter adjustment was a change in estimates related specifically to the acquisition accounting at the time we acquired Soriatane in early '04. Actually, we were looking at existing data at that time, we made various assumptions in terms of what the reserve rates should be for that product. And really late into '05, we had been seeking new or additional data from Roche. It was, I think, late in the third quarter that we finally got data sufficient to justify we were over-reserved. And that was the release of that particular item, again specifically relating to the acquisition accounting. The topic we're looking at here really is I'll say a historical or legacy issue that really goes back over time. We have four products, we launched Soriatane, we launched Evoclin, we've got increased rebate contracting. The process for us now is to carefully evaluate in which periods we need to increase the reserve. As [Defendant Wiggans] alluded to in his opening remarks, this

will be an adjustment to our '05 ending year and balance. **Of course, it won't impact our business going forward** . . .

(Emphasis added.)

330.    On the May 3, 2006 Conference Call, Defendant Wiggans had the following exchange with another analyst:

**Analyst:**    Okay. And then just in terms of the inventory levels, as you got more clarity, did you say – did you notice that inventories had risen over the course of the past quarter, or that they were just staying steady at a level higher than you had expected?

**Wiggans:**    . . . as we've said in the past, one thing we have – one thing I believe we've gotten better at over the last several quarters, or year or so, is really tracking shipments to prescription demand. That is something we've had a pretty good handle on, the actual amounts in the channel, less visibility. I think over the last quarter actually, the inventory levels in the channel based on the reports we're getting now, were very slightly lower. So they went down slightly, probably not a significant amount. But I think what we've been able to do for some time is track shipments versus demand. I don't think we had the degree of clarity on the amount in the channel that we do now, or think we do now.

**Analyst:**    So just you're raising the number based on increased clarity, not an actual --?

**Wiggans:**    Correct. That is correct . . .

331.    Defendants Wiggans, Higgins and Vontz also had the following exchange with an analyst:

**Analyst:**    And a follow-up on the rebate issue. I was a little confused as to why you wouldn't have seen this issue earlier than this reporting period?

**Higgins:**    . . . the rebate calculation is very complex and based on multiple factors. We are using the rate and method historically that we thought was providing sufficient reserve. And again, it was in the quarter close process, very recently, that we got a sense, looking at--wholesaler channel, the effective recent price increases, recent rebate contracting, again, just a number of factors. As well as looking into industry practices, that we concluded that we were under-reserved.

**Vontz:**    . . . one other to share with you is we also have to forecast not only what rebate is being paid to each contract situation but what portion of the business will flow through that on any given quarter. So, it gets to be a very complex forecasting methodology.

**Wiggans:**    Let me just add one last thing. And we said this at the outset. We have been doing it this way for six years. And I think it was a good thing for our finance group to all of a sudden say: "here's another area we ought to look at." But in terms of why we didn't notice it sooner, we've been doing it the same way for six years. It seemed like the right way to do it. Everything always checked out when we got the invoices and we paid the

amount.  And adjustments might need to be made from quarter to quarter, but were immaterial, so that's really the reason we didn't catch it before.

332.    Although partially disclosing certain issues related to Connetics' financial statements, these statements were materially false and misleading for the reasons set forth above in Section V.C.

## VIII.  **LOSS CAUSATION**

333.    Throughout the Class Period, as detailed above, the prices of the Company's securities were artificially inflated as a direct result of Defendants' misrepresentations and omissions regarding the Company.  When the truth about the Company was partially revealed to the market at various times including, but not limited to, April and June 2005, May 2006 and July 2006, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant damages to Lead Plaintiff and the other Class members.  As set forth in detail above, Connetics' securities consistently reacted to information in the market place, for instance:

(i)     On April 27, 2005, Connetics' common stock closed at $22.30, down $5.27 from its April 26, 2005 high of $28.24, a 19% decrease, on heavy trading volume.  Between April 20, 2005 and April 27, 2005, Connetics' bond prices dropped $22.26 from a price of $133.91 on April 20, 2005 to $111.65 on April 27, 2005, a decrease of approximately 17%.

(ii)    On Monday, June 13, 2005, Connetics' common stock closed at $15.13, down $5.72 from its Friday, June 10, 2005 high of $20.85, a 27% decrease, on heavy trading.  Between June 6, 2005 and June 13, 2005, Connetics' bond prices fell $14.53 from $110.61 to $96.08, a decrease of approximately 13%.

(ii)    On May 2, 2006, the price of Connetics' common stock closed at $15.27.  On May 4, 2006, it traded down $1.84 as low as $13.43 per share, a drop of approximately 12%, on heavy trading volume.  On May 3, 2006, Connetics' bonds traded at $92.94 down $2.57 from their trading price on May 2, 2006 of $95.51, a decrease of approximately 3%.

(iii)   On May 23, 2006, the price of Connetics' common stock traded as low as $12.51 per share, down $0.75 from its May 22, 2006 closing price of $13.26 per share, a decrease of approximately 6%.

(iv)    On July 10, 2006 the price of Connetics' common stock closed at $7.76 down $3.93 from its closing price on July 7, 2006 (the immediately preceding trading day) of $11.69 per share, a decrease of approximately 34% on heavy trading volume.  By July 24, 2006, Connetics' bond prices fell to $95.62, a decrease of approximately 30% from their Class Period high.

334.    The declines in the Company's securities prices following these revelations, and the resulting damages suffered by Lead Plaintiff and the other members of the Class are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's condition.  Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants named herein, or been aware of the truth behind these Defendants' material misstatements, they would not have purchased Connetics securities at artificially inflated prices.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

335.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.  In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## X.    PRESUMPTION OF RELIANCE

336.    The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available

sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

    (a)    Connetics stock was actively traded on the NASDAQ;

    (b)    The market price of Connetics' securities reacted promptly to the dissemination of public information regarding the Company;

    (c)    Securities analysts followed and published research reports regarding Connetics that were publicly available to investors;

    (d)    The average weekly trading volume for Connetics stock during the Class Period was approximately 10 percent of average total outstanding shares; and

    (e)    The Company's market capitalization was approximately $890 million during the Class Period.

337.    Throughout the Class Period, the Company was consistently followed by securities analysts as well as the business press. During this period, Connetics and certain Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors; assimilated into the ratings agencies' ratings for the convertible notes and into analysts and investors' analysis of the creditworthiness and the probability of default on the notes; and reflected in the market price of the notes.

338.    In addition, following the Private Placement, a secondary market developed for the Company's convertible notes. Because the notes were convertible under certain conditions to shares of the Company's common stock, the notes reacted to the same information and market disclosures that impacted the trading of Connetics' common stock. The secondary market for the notes broadened with the issuance of the Bond Registration Statement, after which the Registered Bonds became freely tradeable in the public markets. At all relevant times, major brokerage houses served as market makers and/or dealers in the Registered Bonds, and information regarding the prices at which the Registered Bonds were trading was publicly available through various pricing services.

339.    As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for Connetics securities was artificially inflated.

Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

340.    Lead Plaintiff and the other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Connetics securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

341.    Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by the Defendants, or been aware of the truth behind the Defendants' material misstatements, they would not have purchased Connetics securities at artificially inflated prices.

## XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE
**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against Defendants Connetics, Wiggans, Higgins, Vontz, Krochmal, Yaroshinsky and Zak**

342.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.  This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Lead Plaintiff and all other members of the Class, against Defendants Connetics, Wiggans, Higgins, Vontz, Krochmal, Yaroshinsky and Zak.

343.    As alleged herein, throughout the Class Period, the Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

344.    Connetics' and the Insider Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii)

1  cause Lead Plaintiff and the other members of the Class to purchase the Company's securities at

2  inflated prices.

3      345.  Connetics and the Insider Defendants were individually and collectively

4  responsible for making the statements and omissions alleged herein, by virtue of having prepared,

5  approved, signed, and/or disseminated documents which contained untrue statements of material

6  fact and/or omitted facts necessary to make the statements therein not misleading and/or making

7  direct statements to the investing public on the conference calls detailed herein.

8      346.  As described herein, Connetics and the Insider Defendants made the false

9  statements and omissions knowingly and intentionally, or in such an extremely reckless manner

10  as to constitute willful deceit and fraud upon Lead Plaintiff and other members of the Class who

11  purchased Connetics securities during the Class Period.  Throughout the Class Period, Connetics

12  and the Insider Defendants had a duty to disclose new information that came to their attention,

13  which rendered their prior statements to the market materially false and misleading.

14      347.  Connetics and the Insider Defendants' false statements and omissions were made

15  in connection with the purchase or sale of the Company's securities.

16      348.  In ignorance of the false and misleading nature of Connetics and the Insider

17  Defendants' statements and omissions, and relying directly or indirectly on those statements

18  and/or upon the integrity of the market price for Connetics securities, Lead Plaintiff and the other

19  members of the Class purchased Connetics' securities at artificially inflated prices during the

20  Class Period.  But for the fraud, they would not have purchased the securities at artificially

21  inflated prices.

22      349.  The market price for Connetics' securities declined materially upon the public

23  disclosure of the facts that had previously been misrepresented or omitted by Connetics and the

24  Insider Defendants, as described above.

25      350.  During the Class Period, Defendants were privy to non-public information

26  concerning the Company and had a duty to refrain from trading in Connetics securities while in

27  possession of this material, adverse, non-public information.

28

351.    Defendants did not refrain from such trading but rather profited by trading on the basis of the non-public information known to them.  By trading in Connetics securities while in possession of this material, adverse, non-public information, as is detailed herein, Defendants violated Section 10(b) and rule 10b-5

352.    At the same time that these Defendants traded in Connetics securities, Lead Plaintiff and other plaintiffs who are members of the Class traded contemporaneously with defendants in ignorance of the material, adverse, non-public information known to Defendants.

353.    Lead Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Connetics' securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

354.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

355.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to Lead Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT TWO
### For Violations Of Section 20(a) Of The Exchange Act
### Against Defendants Wiggans, Higgins And Vontz

356.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein. This Claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Wiggans, Higgins and Vontz (collectively, the "Section 20(a) Defendants"), on behalf of Lead Plaintiff and all members of the Class who purchased Connetics' securities during the Class Period.

357.    As alleged herein, Connetics is liable to Lead Plaintiff and the members of the Class who purchased Connetics' securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

358. Throughout the Class Period, the Section 20(a) Defendants were controlling persons of Connetics within the meaning of Section 20(a) of the Exchange Act, and particularly and culpable participants in the Connetics' fraud, as detailed herein.

359. Each of these Defendants exercised control over Connetics during the Class Period by virtue of, among other things, their executive positions with the Company, the key roles each played in the Company's management, and their direct involvement in its day-to-day operations, including its financial reporting and accounting functions.

360. In addition to the allegations set forth above, the following allegations demonstrate the Section 20(a) Defendants' control over Connetics during the Class Period. Defendant Wiggans was a controlling person of Connetics throughout the Class Period as demonstrated by the facts alleged herein, including:

>(i)    Wiggans served as President of Connetics from July 1994 to February 2005, and as Chief Executive Officer and a director throughout the Class Period.

>(ii)   Beginning in January 2006 Wiggans served also as the Chairman of the Board of Directors.

>(iii)  Wiggans, along with Higgins, was ultimately responsible for ensuring that the internal disclosure and accounting procedures were effective and required no changes. Consistent with that responsibility, he signed each of Connetics' Form 10-Ks and 10-Qs throughout the Class Period and the Registration Statement. Pursuant to Sections 302 and 906 of Sarbanes Oxley, Wiggans certified the accuracy of Connetics' Form 10-Ks and 10-Qs and the effectiveness of Connetics' disclosure and internal control procedures.

>(iv)   Throughout the Class Period, Wiggans also led each of Connetics' conference calls with analysts and investors, where he responded to questions relating to all aspects of Connetics' business, strategic direction, and financial performance.

>(v)    Wiggans was a member of Connetics' Management Executive Committee.

361. Defendant Higgins was a controlling person of Connetics throughout the Class Period as demonstrated by the facts alleged herein, including:

>(i)    Higgins served as the Executive Vice President, Finance and Corporate Development and Chief Financial Officer throughout the Class Period.

>(ii)   From January 2002 through the end of the Class Period, Higgins served as the Executive Vice President, Finance and Administration.

>(iii)  Higgins was ultimately responsible with Wiggans for ensuring that the internal disclosure and accounting procedures were effective and required

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                          -103-
Case No. C 07-02940 SI

no changes. Consistent with that responsibility, he signed each of Connetics' Form 10-Ks and 10-Qs throughout the Class Period and the Registration Statement. Pursuant to Sections 302 and 906 of Sarbanes Oxley, Higgins certified the accuracy of Connetics' Form 10-Ks and 10-Qs and the effectiveness of Connetics' disclosure and internal control procedures.

(iv)    Throughout the Class Period, Higgins also participated in each of Connetics' conference calls with analysts and investors, where he responded to questions relating to all aspects of Connetics' business, strategic direction, and financial performance.

(v)    Higgins was a member of Connetics' Management Executive Committee.

362.    Defendant Vontz was a controlling person of Connetics throughout the Class Period as demonstrated by the facts alleged herein, including:

(i)    Vontz served as President and Chief Operating Officer of Connetics throughout the Class Period.

(ii)    He was appointed President in February 2005 (succeeding Wiggans).

(iii)    Vontz participated in each of Connetics' conference calls with analysts and investors throughout the Class Period, where he responded to questions relating to all aspects of Connetics' business, strategic direction, and financial performance.

(iv)    Vontz was a member of Connetics' Management Executive Committee.

363.    Given their individual and collective responsibilities for managing Connetics throughout the Class Period, the Section 20(a) Defendants were regularly presented to the market as the individuals who were responsible for Connetics' day-to-day business and operations, as well as the Company's strategic direction. These Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for, product development. No one else at Connetics exercised that degree of responsibility for, or control over, the Company's activities and public statements.

364.    As a result of the false and misleading statements and omissions alleged herein, the market price of Connetics securities was artificially inflated during the Class Period. Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above. Lead Plaintiff and the members of the Class relied

1    upon either the integrity of the market or upon the statements and reports of the Defendants in

2    purchasing Connetics securities at artificially inflated prices.

3    365.    As a direct and proximate result of the wrongful conduct alleged herein, Lead

4    Plaintiff and other members of the Class suffered damages in connection with their purchases of

5    Connetics' securities.  Had Lead Plaintiff and the other members of the Class known of the

6    material adverse information not disclosed by Defendants, or been aware of the truth behind their

7    material misstatements, they would not have purchased the securities at artificially inflated prices.

8    366.    This claim was brought within two years after the discovery of this fraud and

9    within five years of the making of the statements alleged herein to be materially false and

10   misleading.

11   367.    By virtue of the foregoing, each of the Section 20(a) Defendants are liable to Lead

12   Plaintiff and the members of the Class, each of whom has been damaged as a result of Connetics'

13   underlying violations.

14
**COUNT THREE**
**For Violations Of Section 20A Of The Exchange Act**

15
**Against Defendants Wiggans, Higgins, Vontz, Yaroshinsky And Zak**

16   368.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if

17   fully set forth herein.

18   369.    This Claim is brought pursuant to Section 20A of the Exchange Act against

19   Defendants Wiggans, Higgins, Vontz, Yaroshinsky and Zak (collectively, the "Section 20A

20   Defendants") on behalf of all members of the Class damaged by the Section 20A Defendants'

21   insider trading during the Class Period.

22   370.    The Section 20A Defendants, were in possession of material non-public

23   information about Connetics.  As alleged above, the Section 20A Defendants took advantage of

24   the material non-public information regarding the likelihood the FDA would approve Velac and

25   concerning Connetics' improper accounting to make hundreds of thousands of dollars in insider

26   trading profits during the Class Period.  These transactions were made while the Section 20A

27   Defendants possessed material non-public information.

28

371.    The Section 20A Defendants' transactions in Connetics' securities were made contemporaneously with Lead Plaintiff's and Class members' purchases of Connetics' securities during the Class Period.  For instance, Lead Plaintiff purchased approximately 92,000 shares of Connetics common stock on April 18, 2005 and April 19, 2005.  Defendants Higgins sold 5,000 shares on April 19, 2005, and defendants Yaroshinsky and Zak traded on inside information throughout the period between April 14 and April 26, during which period Connetics had imposed a ban on trading in Connetics securities as set forth in the SEC Complaint ¶24 and herein.

372.    All members of the Class who purchased shares of Connetics' securities contemporaneously with sales by the Section 20A Defendants (i) have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of Section 10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Defendants false and misleading statements and concealment.  At the time of the purchases of the securities members of the Class, the fair and true market value of the securities was substantially less than the price paid by these Class members.

## XII.    **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Lead Plaintiff and the Class compensatory damages and/or rescission;

C.     Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

D.     Awarding Lead Plaintiff and the Class the fees and expenses incurred in this action, including expert witness fees and attorneys fees; and

E.     Awarding such other relief as this Court may deem just and proper.

**XIII.    JURY TRIAL DEMAND**

Lead Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: June 28, 2007                          Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP


                        */s/ David R. Stickney*
                        DAVID R. STICKNEY

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
DAVID R. STICKNEY
MATTHEW P. SIBEN
TAKEO A. KELLAR
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

Attorneys for Lead Plaintiff Teachers' Retirement
System of Oklahoma and Lead Counsel to the
Class

1

## **CERTIFICATE OF SERVICE**

2

    I, BRANDY ROBERTS, do hereby certify that on this 28th day of June, 2007, true and correct copies of the foregoing

3

4

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

5

6

7

was filed electronically.  Those attorneys who are registered with the Electronic Case Filing ("ECF") System may access this filing through the Court's system, and notice of this filing will be sent to the parties by operation of the Court's ECF System.  Attorneys not registered with the Court's ECF system will be duly and properly served via facsimile and/or Federal Express (as indicated on the attached Service List), in accordance with the Federal Rules of Civil Procedure and the Court's Local Rules.

8

9

10

                    /s/ *Brandy Roberts*
                    BRANDY ROBERTS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Master Service List

In re CONNETICS SECURITIES LITIGATION
Case No.: 07-02940

| COUNSEL FOR LEAD PLAINTIFF TEACHERS' RETIREMENT SYSTEM OF OKLAHOMA AND COUNSEL FOR THE CLASS | |
|---|---|
| David R. Stickney<br>Matthew P. Siben<br>Takeo A. Kellar<br>**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**<br>12481 High Bluff Drive<br>Suite 300<br>San Diego, CA 92130<br>Tel: 858-793-0070<br>Fax: 858-793-0323<br>davids@blbglaw.com<br>matthews@blbglaw.com<br>takeok@blbglaw.com | C. Chad Johnson<br>**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Tel: 212-554-1398<br>Fax: 212-554-1444<br>chad@blbglaw.com |
| **COUNSEL FOR CONSOLIDATED PLAINTIFF FISHBURY LIMITED** | |
| Jean-Marc Zimmerman<br>Eduard Korsinsky<br>Pamela Lynam Mahon<br>**ZIMMERMAN, LEVI & KORSINSKY LLP**<br>39 Broadway, Suite 1601<br>New York, NY 10006<br>Tel: 212-363-7500<br>Fax: 212-363-7171<br>ek@zlk.com<br>jmzimmerman@zlk.com<br>pmahon@zlk.com<br><br>*Via FedEx* | |
| **COUNSEL FOR CONSOLIDATED PLAINTIFF BRUCE GALLANT** | |
| Evan J. Smith<br>**BRODSKY & SMITH LLC**<br>240 Mineola Blvd.<br>Mineola, NY 11501<br>Tel: 516-741-4977<br><br>*Via FedEx* | |
| **COUNSEL FOR CONSOLIDATED PLAINTIFF MARCUS A. SEIGLE** | |
| Catherine A. Torell<br>**COHEN MILSTEIN HAUSFELD & TOLL P.L.L.C**<br>150 East 52nd Street<br>New York, NY 10022<br>Tel: 212-838-7797<br>Fax: 212-383-7745<br><br>*Via FedEx* | |

| **COUNSEL FOR DEFENDANTS CONNETICS CORPORATION, THOMAS G. WIGGANS, C. GREGORY VONTZ, JOHN HIGGINS, LINCOLN KROCHMAL, EUGENE A. BAUER, R. ANDREW ECKERT, CARL B. FELDBAUM, DENISE M. GILBERT, JOHN C. KANE, THOMAS D. KILEY, LEON E. PANETTA, AND G. KIRK RAAB.** | |
|---|---|
| Susan S. Muck<br>Dean S. Kristy<br>Christopher J. Steskal<br>Kalama M. Lui-Kwan<br>Emily St. John Cohen<br>**FENWICK & WEST**<br>275 Battery Street, Suite 1600<br>San Francisco, CA 94111<br>Tel: 415-875-2300<br>Fax: 415-281-1350<br>smuck@fenwick.com<br>dkristy@fenwick.com<br>csteskal@fenwick.com<br>klui-kwan@fenwick.com<br>ecohen@fenwick.com<br><br>*Via ECF* | Gregory A. Markel<br>**CADWALADER, WICKERSHAM & TAFT LLP**<br>1 World Financial Center<br>New York, NY 10281<br>Tel: 212-504-6112<br>Fax: 212-504-6666<br>gregory.markel@cwt.com<br><br><br><br><br><br><br><br><br><br>*Via FedEx* |
| **COUNSEL FOR DEFENDANT ALEXANDER J. YAROSHINSKY** | |
| James P. Duffy IV<br>**DLA PIPER US LLP**<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Tel: 212-335-4500<br>Fax: 212-504-6666<br>James.duffy@dlapiper.com<br><br>Alysson Russell Snow<br>**DLA PIPER US LLP**<br>401 B Street, Suite 1700<br>San Diego, CA 92101<br>Tel: 619-699-2858<br>Fax: 619-699-2701<br>Alysson.snow@dlapiper.com<br><br>*Via FedEx* | |