1  SHIRLI FABBRI WEISS (Bar No. 079225)
   shirli.weiss@dlapiper.com
2  ALYSSON RUSSELL SNOW (Bar No. 225185)
   alysson.snow@dlapiper.com
3  **DLA PIPER US LLP**
   401 B Street, Suite 1700
4  San Diego, CA  92101-4297
   Tel:  619.699.3650
5  Fax:  619.699.2701

6

7  Attorneys for Defendant
   ALEXANDER YAROSHINSKY

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11 | | CASE NO.  3:07-cv-02940-SI
   IN RE CONNETICS CORPORATION
12 SECURITIES LITIGATION | | CLASS ACTION

13 |_____| | **DECLARATION OF ALYSSON SNOW IN SUPPORT OF ALEXANDER**
14 This Document Relates To: | | **YAROSHINSKY'S MOTIONS TO DISMISS AND STRIKE PLAINTIFF'S**
15 | | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
        ALL ACTIONS.
16

17 | | Date:          October 19, 2007
      Courtroom:   10
18 | | Time:          9:00 a.m.
      Judge:        Honorable Susan Illston
19

20

21

22

23

24

25

26

27

28

I, Alysson Snow, declare:

1.    I am an attorney duly licensed to practice law in the State of California and in this judicial district.  I am an associate at the firm of DLA Piper US LLP, counsel of record for Defendant ALEXANDER YAROSHINSKY ("Dr. Yaroshinsky") in connection with the above-captioned matter.  I have personal knowledge of all matters stated herein, and, if called, would so testify.

2.    Attached hereto as Exhibit A is a true and correct copy of the SEC Release Nos. 33-7881, 34-43154, IC-24599 (Aug. 15, 2000), 65 FR 51716 (Aug. 24, 2000) (File No. S7-31-99) ("Regulation Fair Disclosure").

3.    Attached hereto as Exhibit B is a true and correct copy of the May 12, 2005 Connetics' Form 8-K.

4.    Attached hereto as Exhibit C is a true and correct copy of the April 26, 2005 Connetics' Form 8-K.

5.    Attached hereto as Exhibit D is a true and correct copy of the Securities Exchange Commission's Amended Complaint, filed on June 22, 2006 in the United States District Court in the Southern District of New York, Case No. 06CV2401

I declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration was executed in San Diego, California on August 13, 2007.

__/s/ Alysson Snow_____
ALYSSON SNOW

**EXHIBIT A**



U.S. Securities and Exchange Commission

## Final Rule:
## Selective Disclosure and Insider Trading

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 240, 243, and 249**

**Release Nos. 33-7881, 34-43154, IC-24599, File No. S7-31-99**

**RIN 3235-AH82**

**Selective Disclosure and Insider Trading**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission is adopting new rules to address three issues: the selective disclosure by issuers of material nonpublic information; when insider trading liability arises in connection with a trader's "use" or "knowing possession" of material nonpublic information; and when the breach of a family or other non-business relationship may give rise to liability under the misappropriation theory of insider trading. The rules are designed to promote the full and fair disclosure of information by issuers, and to clarify and enhance existing prohibitions against insider trading.

**EFFECTIVE DATE:** The new rules and amendments will take effect October 23, 2000.

**FOR FURTHER INFORMATION CONTACT:** Richard A. Levine, Sharon Zamore, or Jacob Lesser, Office of the General Counsel at (202) 942-0890; Amy Starr, Office of Chief Counsel, Division of Corporation Finance at (202) 942-2900.

**SUPPLEMENTARY INFORMATION:** The Securities and Exchange Commission today is adopting new rules: Regulation FD,[1] Rule 10b5-1,[2] and Rule 10b5-2.[3] Additionally, the Commission is adopting amendments to Form 8-K.[4]

### I. Executive Summary

We are adopting new rules and amendments to address the selective disclosure of material nonpublic information by issuers and to clarify two issues under the law of insider trading. In response to the comments we received on the proposal, we have made several modifications, as discussed

below, in the final rules.

Regulation FD (Fair Disclosure) is a new issuer disclosure rule that addresses selective disclosure. The regulation provides that when an issuer, or person acting on its behalf, discloses material nonpublic information to certain enumerated persons (in general, securities market professionals and holders of the issuer's securities who may well trade on the basis of the information), it must make public disclosure of that information. The timing of the required public disclosure depends on whether the selective disclosure was intentional or non-intentional; for an intentional selective disclosure, the issuer must make public disclosure simultaneously; for a non-intentional disclosure, the issuer must make public disclosure promptly. Under the regulation, the required public disclosure may be made by filing or furnishing a Form 8-K, or by another method or combination of methods that is reasonably designed to effect broad, non-exclusionary distribution of the information to the public.

Rule 10b5-1 addresses the issue of when insider trading liability arises in connection with a trader's "use" or "knowing possession" of material nonpublic information. This rule provides that a person trades "on the basis of" material nonpublic information when the person purchases or sells securities while aware of the information. However, the rule also sets forth several affirmative defenses, which we have modified in response to comments, to permit persons to trade in certain circumstances where it is clear that the information was not a factor in the decision to trade.

Rule 10b5-2 addresses the issue of when a breach of a family or other non-business relationship may give rise to liability under the misappropriation theory of insider trading. The rule sets forth three non-exclusive bases for determining that a duty of trust or confidence was owed by a person receiving information, and will provide greater certainty and clarity on this unsettled issue.

## II. Selective Disclosure: Regulation FD

A. Background

As discussed in the Proposing Release,[5] we have become increasingly concerned about the selective disclosure of material information by issuers. As reflected in recent publicized reports, many issuers are disclosing important nonpublic information, such as advance warnings of earnings results, to securities analysts or selected institutional investors or both, before making full disclosure of the same information to the general public. Where this has happened, those who were privy to the information beforehand were able to make a profit or avoid a loss at the expense of those kept in the dark.

We believe that the practice of selective disclosure leads to a loss of investor confidence in the integrity of our capital markets. Investors who see a security's price change dramatically and only later are given access to the information responsible for that move rightly question whether they are on a level playing field with market insiders.

Issuer selective disclosure bears a close resemblance in this regard to

ordinary "tipping" and insider trading. In both cases, a privileged few gain an informational edge -- and the ability to use that edge to profit -- from their superior access to corporate insiders, rather than from their skill, acumen, or diligence. Likewise, selective disclosure has an adverse impact on market integrity that is similar to the adverse impact from illegal insider trading: investors lose confidence in the fairness of the markets when they know that other participants may exploit "unerodable informational advantages" derived not from hard work or insights, but from their access to corporate insiders.[6] The economic effects of the two practices are essentially the same. Yet, as a result of judicial interpretations, tipping and insider trading can be severely punished under the antifraud provisions of the federal securities laws, whereas the status of issuer selective disclosure has been considerably less clear.[7]

Regulation FD is also designed to address another threat to the integrity of our markets: the potential for corporate management to treat material information as a commodity to be used to gain or maintain favor with particular analysts or investors. As noted in the Proposing Release, in the absence of a prohibition on selective disclosure, analysts may feel pressured to report favorably about a company or otherwise slant their analysis in order to have continued access to selectively disclosed information. We are concerned, in this regard, with reports that analysts who publish negative views of an issuer are sometimes excluded by that issuer from calls and meetings to which other analysts are invited.[8]

Finally, as we also observed in the Proposing Release, technological developments have made it much easier for issuers to disseminate information broadly. Whereas issuers once may have had to rely on analysts to serve as information intermediaries, issuers now can use a variety of methods to communicate directly with the market. In addition to press releases, these methods include, among others, Internet webcasting and teleconferencing. Accordingly, technological limitations no longer provide an excuse for abiding the threats to market integrity that selective disclosure represents.

To address the problem of selective disclosure, we proposed Regulation FD. It targets the practice by establishing new requirements for full and fair disclosure by public companies.

1. Breadth of Comment on the Proposal

The Proposing Release prompted an outpouring of public comment -- nearly 6,000 comment letters.[9] The vast majority of these commenters consisted of individual investors, who urged -- almost uniformly -- that we adopt Regulation FD. Individual investors expressed frustration with the practice of selective disclosure, believing that it places them at a severe disadvantage in the market. Several cited personal experiences in which they believed they had been disadvantaged by the practice.[10] Many felt that selective disclosure was indistinguishable from insider trading in its effect on the market and investors, and expressed surprise that existing law did not already prohibit this practice.

Other comments suggested that today's self-directed, online investors do not expect to rely exclusively on research and analysis performed by

professionals, as was more common in the past. With advances in
information technology, most notably the Internet, information can be
communicated to shareholders directly and in real time, without the
intervention of an intermediary. This online revolution has created a greater
demand, expectation, and need for direct delivery of market information.
As many individual commenters noted, under this paradigm, analysts still
provide value for investors by using their education, judgment, and
expertise to analyze information. On the other hand, investors are rightly
concerned with the use of information gatekeepers who merely repeat
information that has been selectively disclosed to them.

Noting that analysts predominantly issue "buy" recommendations on
covered issuers, investors also made the point that current selective
disclosure practices may create conflicts of interest; analysts have an
incentive not to make negative statements about an issuer if they fear
losing their access to selectively disclosed information. Thus, these
commenters suggested that a rule against selective disclosure could lead to
more objective and accurate analysis and recommendations from securities
analysts.

We also received numerous comments from securities industry participants,
issuers, lawyers, media representatives, and professional and trade
associations. Almost all of these commenters agreed that selective
disclosure of material nonpublic information was inappropriate and
supported our goals of promoting broader and fairer disclosure by issuers.
Some of these commenters believed the proposal was a generally
appropriate way to address the problem of selective disclosure. Many
others, however, expressed concerns about the approach of Regulation FD
and suggested alternate methods for achieving our goals or recommended
various changes to the proposal.

2. Need for Regulation

One fundamental issue raised by these commenters was whether
Regulation FD is necessary. Some commenters stated that there is limited
anecdotal evidence of selective disclosure. Others suggested that it appears
that issuer disclosure practices are generally improving, so that we should
refrain from rulemaking at this time, and instead permit practices to evolve
and encourage voluntary adherence to "best practices" of disclosure. We do
not agree with these views.

It is, of course, difficult to quantify precisely the amount of selective
disclosure -- just as it is difficult to quantify precisely the amount of
ordinary insider trading. Incidents of selective disclosure, like insider
trading, by definition are not conducted openly and in public view.
Nevertheless, we have noted numerous media reports in the past two years
alleging selective, exclusionary disclosure practices.[11] More generally,
surveys of practices of issuer personnel indicate significant
acknowledgement of the use of selective disclosure of material
information.[12] Based on these public reports, as well as our staff's
experience, it is clear to us that the problem of selective disclosure is not
limited, as some commenters have suggested, to just a few isolated
incidents.

Some commenters cited a February 2000 NIRI survey suggesting an

improvement in issuer disclosure practices, in that most issuers responding to the survey now are opening certain of their conference calls to individual investors.[13] To the extent this demonstrates voluntary improvement in response to our efforts to focus attention on the problem,[14] we believe this is a positive development. However, these voluntary steps, while laudable, have been far from fully effective. We note, for example, that all of the public reports of selective disclosure cited above occurred after the Commission had begun to focus public attention on issuer selective disclosure. Some occurred even after we proposed Regulation FD. This suggests that the problematic practices targeted by Regulation FD are continuing to occur. Finally, the overwhelming support from investors for Regulation FD demonstrates a strong perception among the investing public that selective disclosure is a significant problem, and shows a corresponding need to prohibit this practice in order to bolster investor confidence in the fairness of the disclosure process.

Some commenters contended that rulemaking on this topic was an inappropriately broad response to the issue.[15] They suggested instead that we use existing tools (namely, the law of insider trading) to bring individual enforcement actions in those cases that appear to involve significant selective disclosures. While we have considered this approach -- and of course we remain free to bring such cases where a selective disclosure does violate insider trading laws -- we do not agree that this is the appropriate response to the legal uncertainties posed by current insider trading law. In other contexts, we have been criticized for attempting to "make new law" in an uncertain area by means of enforcement action and urged instead to seek to change the law through notice-and-comment rulemaking. We believe that this rulemaking is the more careful and considered response to the problem presented by selective disclosure.[16]

### 3. Effect of Regulation FD on Issuer Communications

One frequently expressed concern was that Regulation FD would not lead to broader dissemination of information, but would in fact have a "chilling effect" on the disclosure of information by issuers.[17] In the view of these commenters, issuers would find it so difficult to determine when a disclosure of information would be "material" (and therefore subject to the regulation) that, rather than face potential liability and other consequences of violating Regulation FD, they would cease informal communications with the outside world altogether.[18] Some of these commenters therefore recommended that the Commission not adopt any mandatory rule prohibiting selective disclosure, like Regulation FD, but instead pursue voluntary means of addressing the problem, such as interpretive guidance, or the promotion of a "blue ribbon" panel to develop best practices for issuer disclosure. Other commenters recommended various ways that Regulation FD could be made narrower or more well-defined, in order to ameliorate some of the concerns about chilling. Other commenters, however, took issue with the supposition that issuer disclosures would be chilled. As some commenters stated, the marketplace simply would not allow issuers to cease communications with analysts and security holders.[19]

We have considered these views carefully. As discussed in the Proposing Release, we are mindful of the concerns about chilling issuer disclosure; we agree that the market is best served by more, not less, disclosure of

information by issuers. Because any potential "chill" is most likely to arise -- if at all -- from the fear of legal liability, we included in proposed Regulation FD significant safeguards against inappropriate liability. Most notably, we stated that the regulation would not provide a basis for private liability, and provided that in Commission enforcement actions under Regulation FD we would need to prove knowing or reckless conduct.

4. Revisions to Narrow the Scope of Regulation FD

Nevertheless, to provide even greater protection against the possibility of inappropriate liability, and to guard further against the likelihood of any chilling effect resulting from the regulation, we have modified Regulation FD in several respects.

First, we have narrowed the scope of the regulation so that it does not apply to all communications with persons outside the issuer. The regulation will apply only to communications to securities market professionals and to any holder of the issuer's securities under circumstances in which it is reasonably foreseeable that the security holder will trade on the basis of the information.

Second, we have narrowed the types of issuer personnel covered by the regulation to senior officials and those persons who regularly communicate with securities market professionals or with security holders. The effect of these first two changes is that Regulation FD will not apply to a variety of legitimate, ordinary-course business communications or to disclosures to the media.

Third, to remove any doubt that private liability will not result from a Regulation FD violation, we have revised Regulation FD to make absolutely clear that it does not establish a duty for purposes of Rule 10b-5 under the Securities Exchange Act of 1934 ("Exchange Act"). The regulation now includes an express provision in the text stating that a failure to make a disclosure required solely by Regulation FD will not result in a violation of Rule 10b-5.

Fourth, we have made clear that where the regulation speaks of "knowing or reckless" conduct, liability will arise only when an issuer's personnel knows or is reckless in not knowing that the information selectively disclosed is both material and nonpublic. This will provide additional assurance that issuers will not be second-guessed on close materiality judgments. Neither will we, nor could we, bring enforcement actions under Regulation FD for mistaken materiality determinations that were not reckless.

Fifth, we have expressly provided that a violation of Regulation FD will not lead to an issuer's loss of eligibility to use short-form registration for a securities offering or affect security holders' ability to resell under Rule 144 under the Securities Act of 1933 ("Securities Act"). This change eliminates additional consequences of a Regulation FD violation that issuers and other commenters considered too onerous.

We have made two other significant changes to the scope of Regulation FD, which, while not specifically addressed to concerns about chilling disclosure,

narrow its scope. In response to concerns about the interplay of Regulation FD with the Securities Act disclosure regime, we have expressly excluded from the scope of the regulation communications made in connection with most securities offerings registered under the Securities Act. We believe that the Securities Act already accomplishes most of the policy goals of Regulation FD for purposes of registered offerings, and we will consider this topic in the context of a broader Securities Act rulemaking. Also, we have eliminated foreign governments and foreign private issuers from the coverage of the regulation.

With these changes, we believe Regulation FD strikes an appropriate balance. It establishes a clear rule prohibiting unfair selective disclosure and encourages broad public disclosure. Yet it should not impede ordinary-course business communications or expose issuers to liability for non-intentional selective disclosure unless the issuer fails to make public disclosure after it learns of it. Regulation FD, therefore, should promote full and fair disclosure of information by issuers and enhance the fairness and efficiency of our markets.

B. Discussion of Regulation FD

Rule 100 of Regulation FD sets forth the basic rule regarding selective disclosure. Under this rule, whenever:

> (1) an issuer, or person acting on its behalf,

> (2) discloses material nonpublic information,

> (3) to certain enumerated persons (in general, securities market professionals or holders of the issuer's securities who may well trade on the basis of the information),

> (4) the issuer must make public disclosure of that same information:

>> (a) simultaneously (for intentional disclosures), or

>> (b) promptly (for non-intentional disclosures).

As a whole, the regulation requires that when an issuer makes an intentional disclosure of material nonpublic information to a person covered by the regulation, it must do so in a manner that provides general public disclosure, rather than through a selective disclosure. For a selective disclosure that is non-intentional, the issuer must publicly disclose the information promptly after it knows (or is reckless in not knowing) that the information selectively disclosed was both material and nonpublic.

We have modified several of the key terms in the regulation that serve to define its precise scope and effect. We discuss the key provisions of the regulation below.

1. Scope of Communications and Issuer Personnel Covered by the Regulation

As proposed, Regulation FD would have applied to any disclosure of

material nonpublic information made by an issuer, or person acting on its behalf, to "any person or persons outside the issuer." A number of commenters stated that, as proposed, Regulation FD was too broad in its coverage of disclosures to "any person or persons outside the issuer," and in its definition of "person acting on behalf of an issuer." We are persuaded that these comments have merit, and thus we have modified the scope of the regulation in several respects.

a. Disclosures to Enumerated Persons

Commenters stated that if Regulation FD applied to disclosures made to "any person" outside the issuer, it would inappropriately interfere with ordinary-course business communications with parties such as customers, suppliers, strategic partners, and government regulators.[20] In addition, several media organizations and rating agencies commented that the regulation should not apply to disclosures made to the press, or to rating agencies for purposes of securities ratings.[21] Overall, commenters suggested various ways to narrow the scope of the regulation, including providing specific exclusions for various types of recipients of information,[22] or expressly limiting the regulation's coverage to persons such as securities analysts, market professionals, institutional investors, or others who regularly make or would reasonably be expected to make investment decisions involving the issuer's securities.[23]

In response to these comments, we have narrowed the coverage of the final regulation. The regulation is designed to address the core problem of selective disclosure made to those who would reasonably be expected to trade securities on the basis of the information or provide others with advice about securities trading. Accordingly, Rule 100(a) of Regulation FD, as adopted, makes clear that the general rule against selective disclosure applies only to disclosures made to the categories of persons enumerated in Rule 100(b)(1).

Rule 100(b)(1) enumerates four categories of persons to whom selective disclosure may not be made absent a specified exclusion. The first three are securities market professionals -- (1) broker-dealers and their associated persons, (2) investment advisers, certain institutional investment managers[24] and their associated persons, and (3) investment companies, hedge funds,[25] and affiliated persons.[26] These categories will include sell-side analysts, many buy-side analysts, large institutional investment managers, and other market professionals who may be likely to trade on the basis of selectively disclosed information. The fourth category of person included in Rule 100(b)(1) is any holder of the issuer's securities, under circumstances in which it is reasonably foreseeable that such person would purchase or sell securities on the basis of the information. Thus, as a whole, Rule 100(b)(1) will cover the types of persons most likely to be the recipients of improper selective disclosure, but should not cover persons who are engaged in ordinary-course business communications with the issuer, or interfere with disclosures to the media or communications to government agencies.[27]

Rule 100(b)(2) sets out four exclusions from coverage. The first, as proposed, is for communications made to a person who owes the issuer a duty of trust or confidence -- i.e., a "temporary insider" -- such as an

attorney, investment banker, or accountant. The second exclusion is for communications made to any person who expressly agrees to maintain the information in confidence.[28] Any misuse of the information for trading by the persons in these two exclusions would thus be covered under either the "temporary insider" or the misappropriation theory of insider trading. This approach recognizes that issuers and their officials may properly share material nonpublic information with outsiders, for legitimate business purposes, when the outsiders are subject to duties of confidentiality.[29]

The third exclusion from coverage in Rule 100(b)(2) is for disclosures to an entity whose primary business is the issuance of credit ratings, provided the information is disclosed solely for the purpose of developing a credit rating and the entity's ratings are publicly available. As discussed by commenters,[30] ratings organizations often obtain nonpublic information in the course of their ratings work. We are not aware, however, of any incidents of selective disclosure involving ratings organizations. Ratings organizations, like the media, have a mission of public disclosure; the objective and result of the ratings process is a widely available publication of the rating when it is completed. And under this provision, for the exclusion to apply, the ratings organization must make its credit ratings publicly available. For these reasons, we believe it is appropriate to provide this exclusion from the coverage of Regulation FD.

The fourth exclusion from coverage is for communications made in connection with most offerings of securities registered under the Securities Act. We discuss this exclusion in greater detail in Part II.B.6 below.

b. Disclosures by a Person Acting on an Issuer's Behalf

As proposed, Regulation FD defined any "person acting on behalf of an issuer" as "any officer, director, employee, or agent of an issuer, who discloses material nonpublic information while acting within the scope of his or her authority." A number of commenters stated that this definition was too broad and should be limited to "senior officials," to designated or authorized spokespersons, or in some other manner.[31] One commenter said that the definition should be broader to prevent evasion.[32] One commenter stated that if the scope of Regulation FD were limited to disclosures to analysts and institutional investors, then the definition of "person acting on behalf of an issuer" would be appropriate.[33]

We have modified slightly the definition of "person acting on behalf of an issuer" to make it more precise. We define the term to mean: (1) any senior official of the issuer;[34] or (2) any other officer, employee, or agent of an issuer who regularly communicates with any of the persons described in Rule 100(b)(1)(i), (ii), or (iii), or with the issuer's security holders.[35] By revising the definition in this manner, we provide that the regulation will cover senior management, investor relations professionals, and others who regularly interact with securities market professionals or security holders.[36] Of course, neither an issuer nor such a covered person could avoid the reach of the regulation merely by having a non-covered person make a selective disclosure. Thus, to the extent that another employee had been directed to make a selective disclosure by a member of senior management, that member of senior management would be responsible for having made the selective disclosure. See Section 20(b) of the Exchange

Act. In addition, as was proposed, the definition expressly states that a person who communicates material nonpublic information in breach of a duty to the issuer would not be considered to be acting on behalf of the issuer. Thus, an issuer is not responsible under Regulation FD when one of its employees improperly trades or tips.[37]

## 2. Disclosures of Material Nonpublic Information

The final regulation, like the proposal, applies to disclosures of "material nonpublic" information about the issuer or its securities. The regulation does not define the terms "material" and "nonpublic," but relies on existing definitions of these terms established in the case law. Information is material if "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision.[38] To fulfill the materiality requirement, there must be a substantial likelihood that a fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[39] Information is nonpublic if it has not been disseminated in a manner making it available to investors generally.[40]

The use of the materiality standard in Regulation FD was the subject of many comments. Some commenters supported the use of the existing definition of materiality, noting that attempts to define materiality for purposes of Regulation FD could have implications beyond this regulation.[41] Other commenters, however, including securities industry representatives, securities lawyers, and some issuers or issuer groups, stated that using a general materiality standard in the regulation would cause difficulties for issuer compliance.[42] These commenters claimed that materiality was too unclear and complex a standard for issuer personnel to use in making "real time" judgments about disclosures,[43] and that this vagueness would lead to litigation and a chilling effect on corporate disclosure practices.[44] These commenters offered a variety of recommendations to address this issue.

Some commenters suggested that the regulation include a bright-line standard or other limitation on what was material for purposes of Regulation FD, or identify in the regulation an exclusive list of types of information covered.[45] While we acknowledged in the Proposing Release that materiality judgments can be difficult, we do not believe an appropriate answer to this difficulty is to set forth a bright-line test, or an exclusive list of "material" items for purposes of Regulation FD. The problem addressed by this regulation is the selective disclosure of corporate information of various types; the general materiality standard has always been understood to encompass the necessary flexibility to fit the circumstances of each case. As the Supreme Court stated in responding to a very similar argument: "A bright-line rule indeed is easier to follow than a standard that requires the exercise of judgment in the light of all the circumstances. But ease of application alone is not an excuse for ignoring the purposes of the securities acts and Congress' policy decisions. Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be over- or underinclusive."[46]

Other suggestions from commenters included providing more interpretive guidance about types of information or events that are more likely to be

considered material. While it is not possible to create an exhaustive list, the following items are some types of information or events that should be reviewed carefully to determine whether they are material: (1) earnings information; (2) mergers, acquisitions, tender offers, joint ventures, or changes in assets; (3) new products or discoveries, or developments regarding customers or suppliers (e.g., the acquisition or loss of a contract); (4) changes in control or in management; (5) change in auditors or auditor notification that the issuer may no longer rely on an auditor's audit report; (6) events regarding the issuer's securities -- e.g., defaults on senior securities, calls of securities for redemption, repurchase plans, stock splits or changes in dividends, changes to the rights of security holders, public or private sales of additional securities; and (7) bankruptcies or receiverships.[47]

By including this list, we do not mean to imply that each of these items is per se material. The information and events on this list still require determinations as to their materiality (although some determinations will be reached more easily than others). For example, some new products or contracts may clearly be material to an issuer; yet that does not mean that all product developments or contracts will be material. This demonstrates, in our view, why no "bright-line" standard or list of items can adequately address the range of situations that may arise. Furthermore, we do not and cannot create an exclusive list of events and information that have a higher probability of being considered material.

One common situation that raises special concerns about selective disclosure has been the practice of securities analysts seeking "guidance" from issuers regarding earnings forecasts. When an issuer official engages in a private discussion with an analyst who is seeking guidance about earnings estimates, he or she takes on a high degree of risk under Regulation FD. If the issuer official communicates selectively to the analyst nonpublic information that the company's anticipated earnings will be higher than, lower than, or even the same as what analysts have been forecasting, the issuer likely will have violated Regulation FD. This is true whether the information about earnings is communicated expressly or through indirect "guidance," the meaning of which is apparent though implied. Similarly, an issuer cannot render material information immaterial simply by breaking it into ostensibly non-material pieces.

At the same time, an issuer is not prohibited from disclosing a non-material piece of information to an analyst, even if, unbeknownst to the issuer, that piece helps the analyst complete a "mosaic" of information that, taken together, is material. Similarly, since materiality is an objective test keyed to the reasonable investor, Regulation FD will not be implicated where an issuer discloses immaterial information whose significance is discerned by the analyst. Analysts can provide a valuable service in sifting through and extracting information that would not be significant to the ordinary investor to reach material conclusions. We do not intend, by Regulation FD, to discourage this sort of activity. The focus of Regulation FD is on whether the issuer discloses material nonpublic information, not on whether an analyst, through some combination of persistence, knowledge, and insight, regards as material information whose significance is not apparent to the reasonable investor.

Finally, some commenters stated that greater protection would be afforded

to issuers if we made clear that the regulation's requirement for "intentional" (knowing or reckless) conduct also extended to the judgment of whether the information disclosed was material.[48] We agree that this clarification is appropriate. As adopted, Rule 101(a) states that a person acts "intentionally" only if the person knows, or is reckless in not knowing, that the information he or she is communicating is both material and nonpublic.[49] As commenters suggested, this aspect of the regulation provides additional protection that issuers need not fear being second-guessed by the Commission in enforcement actions for mistaken judgments about materiality in close cases.

3.  Intentional and Non-intentional Selective Disclosures: Timing of Required Public Disclosures

A key provision of Regulation FD is that the timing of required public disclosure differs depending on whether the issuer has made an "intentional" selective disclosure or a selective disclosure that was not intentional. For an "intentional" selective disclosure, the issuer is required to publicly disclose the same information simultaneously.[50]

a.  Standard of "Intentional" Selective Disclosure

Under the regulation, a selective disclosure is "intentional" when the issuer or person acting on behalf of the issuer making the disclosure either knows, or is reckless in not knowing, prior to making the disclosure, that the information he or she is communicating is both material and nonpublic.[51] A number of commenters thought that the distinction between intentional and non-intentional disclosures was appropriate.[52] Others, however, stated that the "intentional" standard should not include reckless conduct, because of the risk that this standard, in hindsight, could be interpreted as close to a negligence standard.[53] Some commenters suggested that there be a safe harbor for good-faith efforts to comply with Regulation FD or for good-faith determinations that information was not material.[54]

After considering these comments, we have determined to adopt the "intentional"/non-intentional distinction essentially as proposed. By creating this distinction, Regulation FD already provides greater flexibility as to the timing of required disclosure in the event of erroneous judgments than do other issuer disclosure provisions under the federal securities laws; it essentially incorporates the knowing or reckless mental state required for fraud into this disclosure provision. Since recklessness suffices to meet the mental state requirement even for purposes of the antifraud provisions,[55] we believe it is appropriate to retain recklessness in Regulation FD's definition of "intentional" as well. Further, in view of the definition of recklessness that is prevalent in the federal courts,[56] it is unlikely that issuers engaged in good-faith efforts to comply with the regulation will be considered to have acted recklessly.

As requested by several commenters, moreover, we emphasize that the definition of "intentional" in Rule 101(a) requires that the individual making the disclosure must know (or be reckless in not knowing) that he or she would be communicating information that was both material and nonpublic. Thus, in the case of a selective disclosure attributable to a mistaken determination of materiality, liability will arise only if no reasonable person

under the circumstances would have made the same determination.[57] As a result, the circumstances in which a selective disclosure is made may be important. We recognize, for example, that a materiality judgment that might be reckless in the context of a prepared written statement would not necessarily be reckless in the context of an impromptu answer to an unanticipated question.

### b. "Prompt" Public Disclosure After Non-intentional Selective Disclosures

Under Rule 100(a)(2), when an issuer makes a covered non-intentional disclosure of material nonpublic information, it is required to make public disclosure promptly. As proposed, Rule 101(d) defined "promptly" to mean "as soon as reasonably practicable" (but no later than 24 hours) after a senior official of the issuer learns of the disclosure and knows (or is reckless in not knowing) that the information disclosed was both material and non-public. "Senior official" was defined in the proposal as any executive officer of the issuer, any director of the issuer, any investor relations officer or public relations officer, or any employee possessing equivalent functions.

Commenters expressed varying views on the definition of "promptly" provided in the rule. Some said that the time period provided for disclosure was appropriate;[58] others said it was too short;[59] and still others said that it was too specific, and should require disclosure only as soon as reasonably possible or practicable.[60] We believe that it is preferable for issuers and the investing public that there be a clear delineation of when "prompt" disclosure is required. We also believe that the 24-hour requirement strikes the appropriate balance between achieving broad, non-exclusionary disclosure and permitting issuers time to determine how to respond after learning of the non-intentional selective disclosure. However, recognizing that sometimes non-intentional selective disclosures will arise close to or over a weekend or holiday, we have slightly modified the final rule to state that the outer boundary for prompt disclosure is the later of 24 hours or the commencement of the next day's trading on the New York Stock Exchange, after a senior official learns of the disclosure and knows (or is reckless in not knowing) that the information disclosed was material and nonpublic. Thus, if a non-intentional selective disclosure of material, nonpublic information is discovered after the close of trading on Friday, for example, the outer boundary for making public disclosure is the beginning of trading on the New York Stock Exchange on Monday.

Commenters also expressed differing views on the definition of "senior official" contained in the regulation. We are adopting this definition as proposed.[61] However, in response to comments, we have provided greater clarity as to when the duty to make "prompt" disclosure begins. The requirement to make prompt disclosure is triggered when a senior official of the issuer learns that there has been a non-intentional disclosure of information by the issuer or a person acting on behalf of the issuer that the senior official knows, or is reckless in not knowing, is both material and non-public.[62] Similar to the language contained in the definition of "intentional," discussed above, this language is designed to make clear that the requirements of the regulation are only triggered when a responsible issuer official (1) learns that certain information has been disclosed, (2) knows (or is reckless in not knowing) that the information disclosed is material, and (3) knows (or is reckless in not knowing) that the information disclosed is nonpublic.

#### 4. "Public Disclosure" Required by Regulation FD

Rule 101(e) defines the type of "public disclosure" that will satisfy the requirements of Regulation FD. As proposed, Rule 101(e) gave issuers considerable flexibility in determining how to make required public disclosure. The proposal stated that issuers could meet Regulation FD's "public disclosure" requirement by filing a Form 8-K, by distributing a press release through a widely disseminated news or wire service, or by any other non-exclusionary method of disclosure that is reasonably designed to provide broad public access -- such as announcement at a conference of which the public had notice and to which the public was granted access, either by personal attendance, or telephonic or electronic access. This definition was designed to permit issuers to make use of current technologies, such as webcasting of conference calls, that provide broad public access to issuer disclosure events.

Commenters generally favored the flexible approach provided by Rule 101 (e). The American Society of Corporate Secretaries and the Financial Executives Institute, among others, agreed that the definition should not stipulate particular means of technology used for public disclosure. Individual investors supported the idea that issuers should open their conference calls to the public through means such as webcasting over the Internet. Some commenters, however, raised the concern that conference calls or webcasts should not be permitted to supplant the use of press releases as means of disclosing material information.[63] Others suggested that we provide that an issuer's posting of information on its website should also be considered sufficient Regulation FD disclosure.[64]

After considering the range of comments on this issue, we have determined to adopt a slightly modified definition of "public disclosure" that would provide even greater flexibility to issuers in determining the most appropriate means of disclosure. As adopted, Rule 101(e) states that issuers can make public disclosure for purposes of Regulation FD by filing or furnishing a Form 8-K, or by disseminating information "through another method (or combination of methods) of disclosure that is reasonably designed to provide broad, non-exclusionary distribution of the information to the public."

##### a. Form 8-K Disclosure

Commenters generally opposed the proposed new Item 10 of Form 8-K based, in large part, on a concern that people would construe a separate Item 10 filing as an admission that the disclosed information is material.[65] In light of the timing requirements for making materiality judgments under Regulation FD, commenters wanted to be able to err on the side of filing information that may or may not be material, without precluding a later conclusion that the information was not material. Commenters recommended amending Item 5 of Form 8-K to include required Regulation FD disclosures.[66] Some commenters also suggested that Regulation FD submissions on Form 8-K should not be treated as "filed" for purposes of the Exchange Act.

In light of these comments, we provide that either filing or furnishing information on Form 8-K solely to satisfy Regulation FD will not, by itself,

be deemed an admission as to the materiality of the information. In addition, while we retain a separate Item, we also are modifying Item 5 of Form 8-K to address commenters' concerns. As revised, issuers may choose either to "file" a report under Item 5 of Form 8-K or to "furnish" a report under Item 9 of Form 8-K that will not be deemed "filed." If an issuer chooses to file the information on Form 8-K,[67] the information will be subject to liability under Section 18 of the Exchange Act. The information also will be subject to automatic incorporation by reference into the issuer's Securities Act registration statements, which are subject to liability under Sections 11 and 12(a)(2) of the Securities Act. If an issuer chooses instead to furnish the information,[68] it will not be subject to liability under Section 11 of the Securities Act or Section 18 of the Exchange Act for the disclosure, unless it takes steps to include that disclosure in a filed report, proxy statement, or registration statement. All disclosures on Form 8-K, whether filed or furnished, will remain subject to the antifraud provisions of the federal securities laws.

b. Alternative Methods of Public Disclosure

We are recognizing alternative methods of public disclosure to give issuers the flexibility to choose another method (or a combination of methods) of disclosure that will achieve the goal of effecting broad, non-exclusionary distribution of information to the public.[69]

As a general matter, acceptable methods of public disclosure for purposes of Regulation FD will include press releases distributed through a widely circulated news or wire service, or announcements made through press conferences or conference calls that interested members of the public may attend or listen to either in person, by telephonic transmission, or by other electronic transmission (including use of the Internet). The public must be given adequate notice of the conference or call and the means for accessing it. The regulation does not require use of a particular method, or establish a "one size fits all" standard for disclosure; rather, it leaves the decision to the issuer to choose methods that are reasonably calculated to make effective, broad, and non-exclusionary public disclosure, given the particular circumstances of that issuer. Indeed, we have modified the language of the regulation to note that the issuer may use a method "or combination of methods" of disclosure, in recognition of the fact that it may not always be possible or desirable for an issuer to rely on a single method of disclosure as reasonably designed to effect broad public disclosure.

We believe that issuers could use the following model, which employs a combination of methods of disclosure, for making a planned disclosure of material information, such as a scheduled earnings release:

- First, issue a press release, distributed through regular channels, containing the information;[70]

- Second, provide adequate notice, by a press release and/or website posting, of a scheduled conference call to discuss the announced results, giving investors both the time and date of the conference call, and instructions on how to access the call; and

- Third, hold the conference call in an open manner, permitting

investors to listen in either by telephonic means or through Internet webcasting.[71]

By following these steps, an issuer can use the press release to provide the initial broad distribution of the information, and then discuss its release with analysts in the subsequent conference call, without fear that if it should disclose additional material details related to the original disclosure it will be engaging in a selective disclosure of material information. We note that several issuer commenters indicated that many companies already follow this or a similar model for making planned disclosures.[72]

In the Proposing Release, we stated that an issuer's posting of new information on its own website would not by itself be considered a sufficient method of public disclosure. As technology evolves and as more investors have access to and use the Internet, however, we believe that some issuers, whose websites are widely followed by the investment community, could use such a method. Moreover, while the posting of information on an issuer's website may not now, by itself, be a sufficient means of public disclosure, we agree with commenters that issuer websites can be an important component of an effective disclosure process. Thus, in some circumstances an issuer may be able to demonstrate that disclosure made on its website could be part of a combination of methods, "reasonably designed to provide broad, non-exclusionary distribution" of information to the public.[73]

We emphasize, however, that while Rule 101(e) gives an issuer considerable flexibility in choosing appropriate methods of public disclosure, it also places a responsibility on the issuer to choose methods that are, in fact, "reasonably designed" to effect a broad and non-exclusionary distribution of information to the public. In determining whether an issuer's method of making a particular disclosure was reasonable, we will consider all the relevant facts and circumstances, recognizing that methods of disclosure that may be effective for some issuers may not be effective for others. If, for example, an issuer knows that its press releases are routinely not carried by major business wire services, it may not be sufficient for that issuer to make public disclosure solely by submitting its press release to one of these wire services; the issuer in these circumstances should use other or additional methods of dissemination, such as distribution of the information to local media, furnishing or filing a Form 8-K with the Commission, posting the information on its website, or using a service that distributes the press release to a variety of media outlets and/or retains the press release.

We also caution issuers that a deviation from their usual practices for making public disclosure may affect our judgment as to whether the method they have chosen in a particular case was reasonable. For example, if an issuer typically discloses its quarterly earnings results in regularly disseminated press releases, we might view skeptically an issuer's claim that a last minute webcast of quarterly results, made at the same time as an otherwise selective disclosure of that information, provided effective broad, non-exclusionary public disclosure of the information.[74] In short, an issuer's methods of making disclosure in a particular case should be judged with respect to what is "reasonably designed" to effect broad, non-exclusionary distribution in light of all the relevant facts and circumstances.

## 5. Issuers Subject to Regulation FD

Regulation FD will apply to all issuers with securities registered under Section 12 of the Exchange Act, and all issuers required to file reports under Section 15(d) of the Exchange Act, including closed-end investment companies, but not including other investment companies, foreign governments, or foreign private issuers.

As written, proposed Regulation FD would have applied to foreign sovereign debt issuers required to file reports under the Exchange Act. Today's Regulation FD excludes these issuers from coverage. Proposed Regulation FD also would have applied to foreign private issuers. However, the Commission has determined to exempt foreign private issuers at this time as it has in the past exempted them from certain U.S. reporting requirements such as Forms 10-Q and 8-K. Today's global markets pose new regulatory issues. In recognition of this fact, the Commission will be undertaking a comprehensive review of the reporting requirements of foreign private issuers.[75] In the interim, we remind foreign private issuers of their obligations to make timely disclosure of material information pursuant to applicable SRO rules and policies,[76] and our expectation that the markets will enforce these obligations. Also, while Regulation FD will not apply, foreign issuers in their disclosure practices remain subject to liability for conduct that violates, and meets the jurisdictional requirements of, the antifraud provisions of the federal securities laws.[77]

## 6. Securities Act Issues

### a. The Operation of Regulation FD During Securities Offerings

As proposed, Regulation FD would have applied to disclosures made by a reporting company in connection with an offering under the Securities Act. Commenters expressed a number of concerns they perceived in the interplay of the disclosure requirements of Regulation FD and those of the Securities Act.[78]

With respect to public offerings, commenters worried that a public disclosure mandated by Regulation FD could violate Section 5 of the Securities Act. Section 5 places limitations on the type of disclosures that may be made at various intervals during a registered offering.[79] Commenters were concerned that public disclosures mandated by Regulation FD would exceed those limitations. Commenters similarly raised concerns about proposed Regulation FD's interrelationship with unregistered offerings of securities. Here, the principal concern was that public disclosure mandated by Regulation FD could conflict with the conditions of the exemption from registration on which the issuer was relying.

### i. Registered Offerings Exemption

In light of the comments we have received and our own further consideration, we have determined that our concerns about selective disclosure in connection with registered offerings under the Securities Act should not be addressed by overlaying Regulation FD onto the system of regulation provided by that Act. The mandated disclosure regime and the

civil liability provisions of the Securities Act reduce substantially any meaningful opportunity for an issuer to make selective disclosure of material information in connection with a registered offering. We are satisfied that the Securities Act already accomplishes at least some of the policy imperative of Regulation FD within the context of a registered offering. Thus, with limited exceptions, Regulation FD as adopted does not apply to disclosures made in connection with a securities offering registered under the Securities Act.[80]

In reaching this conclusion, we also note that our Division of Corporation Finance is currently involved in a systematic review of the Securities Act disclosure system as it relates to communications during the offering process. To the extent selective disclosure concerns arise in connection with registered offerings of securities, we believe it would be more appropriate to consider that impact in the context of a broader Securities Act rulemaking.

In creating the exclusion for registered offerings, we have defined for purposes of Regulation FD when those offerings are considered to begin and end.[81] Communications that take place outside the periods clearly specified would not be considered a part of the registered securities offering to which the exemption from Regulation FD applies. Communications that are not made in connection with a registered offering also are not exempt.[82]

ii. Unregistered Offerings

Unregistered offerings are not subject to the full public disclosure and liability protections that the Securities Act applies to registered offerings. An issuer engaged in an unregistered securities offering does not have the same discipline imposed under the Securities Act to merge material information into its public disclosure. While we have carefully considered the concerns expressed by commenters, we believe that Regulation FD should not provide an exception for communications made in connection with an unregistered offering. We believe that reporting companies making unregistered offerings should either publicly disclose the material information they disclose nonpublicly or protect against misuse of that information by having those who receive it agree to maintain it in confidence.

If a reporting issuer releases material information nonpublicly during an unregistered offering with no such understanding about confidentiality, we believe that disclosure under Regulation FD is appropriate. We believe this even if, as a result of such disclosure, the availability of the Securities Act registration exemption may be in question. Public companies undertaking unregistered offerings will need to consider the impact their selective disclosure could have on any exemption they use. Before an exempt offering begins, issuer's counsel should advise the client of the potential complications that selective disclosure of material nonpublic information could raise.

Issuers who undertake private unregistered offerings generally disclose the information to the investors on a confidential basis. Under Regulation FD, public companies will still have the ability to avoid premature public

disclosure in those cases. A public company need not make public disclosure if anyone who receives the material, nonpublic information agrees to maintain that information in confidence.

### b. Eligibility for Short-Form Registration and Rule 144

Commenters observed that a failure to file a Form 8-K under Regulation FD when no alternative qualifying public disclosure is made, would result in the loss of availability of short-form Securities Act registration on Forms S-2 and S-3.[83] They pointed out that because the proposal did not contain any means to alter that ineligibility, the issuer would be disqualified from using Form S-2 or S-3 for at least a year from the date of the non-compliance with Regulation FD. Commenters also noted that a failure to file a required Form 8-K would render Rule 144 temporarily unavailable for resale of restricted and control securities, and Form S-8 temporarily unavailable for employee benefit plan offerings.[84] They pointed out that the loss of Rule 144 would primarily penalize shareholders reselling or attempting to resell securities. They also noted that the loss of Form S-8 could have a detrimental effect on employees.

The reporting status requirements in Forms S-2, S-3 and S-8 and Rule 144, the commenters argued, were not intended to be linked to a system for dissemination of discrete information outside of the traditional periodic reporting obligations of companies. The commenters were concerned that these consequences for the issuer and investors may be unduly harsh and not in line with the purposes of Regulation FD.

We find merit in these concerns and are modifying this aspect of the regulation. The purpose of Regulation FD is to discourage selective disclosure of material nonpublic information by imposing a requirement to make the information available to the markets generally when it has been made available to a select few. We agree that the purpose is not well served by negatively affecting a company's ability to access the capital markets. Nor is it well served by penalizing the shareholders or employees of the company. As discussed below, we have other adequate enforcement remedies that will provide a proportionate response for a violation and will have the desired effect on compliance. To implement our approach, Rule 103 of the regulation as adopted states that an issuer's failure to comply with the regulation will not affect whether the issuer is considered current or, where applicable, timely in its Exchange Act reports for purposes of Form S-8, short-form registration on Form S-2 or S-3 and Rule 144.

### 7. Liability Issues

We recognize that the prospect of private liability for violations of Regulation FD could contribute to a "chilling effect" on issuer communications. Issuers might refrain from some informal communications with outsiders if they feared that engaging in such communications, even when appropriate, would lead to their being charged in private lawsuits with violations of Regulation FD. Accordingly, we emphasized in the Proposing Release that Regulation FD is an issuer disclosure rule that is designed to create duties only under Sections 13(a) and 15(d) of the Exchange Act and Section 30 of the Investment Company Act. It is not an antifraud rule, and it is not designed to create new duties under the antifraud provisions of the

federal securities laws or in private rights of action.[85]

Most commenters who addressed this point believed that our decision not to create private liability for Regulation FD violations was appropriate. Several suggested, however, that the language in the Proposing Release offered insufficient protection from private lawsuits. In response to these comments, we have added to Regulation FD a new Rule 102, which expressly provides that no failure to make a public disclosure required solely by Regulation FD shall be deemed to be a violation of Rule 10b-5.[86] This provision makes clear that Regulation FD does not create a new duty for purposes of Rule 10b-5 liability. Accordingly, private plaintiffs cannot rely on an issuer's violation of Regulation FD as a basis for a private action alleging Rule 10b-5 violations.

Rule 102 is designed to exclude Rule 10b-5 liability for cases that would be based "solely" on a failure to make a public disclosure required by Regulation FD. As such, it does not affect any existing grounds for liability under Rule 10b-5. Thus, for example, liability for "tipping" and insider trading under Rule 10b-5 may still exist if a selective disclosure is made in circumstances that meet the Dirks "personal benefit" test.[87] In addition, an issuer's failure to make a public disclosure still may give rise to liability under a "duty to correct" or "duty to update" theory in certain circumstances.[88] And an issuer's contacts with analysts may lead to liability under the "entanglement" or "adoption" theories.[89] In addition, if an issuer's report or public disclosure made under Regulation FD contained false or misleading information, or omitted material information, Rule 102 would not provide protection from Rule 10b-5 liability.

Finally, if an issuer failed to comply with Regulation FD, it would be subject to an SEC enforcement action alleging violations of Section 13(a) or 15(d) of the Exchange Act (or, in the case of a closed-end investment company, Section 30 of the Investment Company Act) and Regulation FD. We could bring an administrative action seeking a cease-and-desist order, or a civil action seeking an injunction and/or civil money penalties.[90] In appropriate cases, we could also bring an enforcement action against an individual at the issuer responsible for the violation, either as "a cause of" the violation in a cease-and-desist proceeding,[91] or as an aider and abetter of the violation in an injunctive action.[92]

### III. Insider Trading Rules

As discussed in the Proposing Release, the prohibitions against insider trading in our securities laws play an essential role in maintaining the fairness, health, and integrity of our markets. We have long recognized that the fundamental unfairness of insider trading harms not only individual investors but also the very foundations of our markets, by undermining investor confidence in the integrity of the markets. Congress, by enacting two separate laws providing enhanced penalties for insider trading, has expressed its strong support for our insider trading enforcement program.[93] And the Supreme Court in United States v. O'Hagan has recently endorsed a key component of insider trading law, the "misappropriation" theory, as consistent with the "animating purpose" of the federal securities laws: "to insure honest securities markets and thereby promote investor confidence."[94]

As discussed more fully in the Proposing Release, insider trading law has developed on a case-by-case basis under the antifraud provisions of the federal securities laws, primarily Section 10(b) of the Exchange Act and Rule 10b-5. As a result, from time to time there have been issues on which various courts disagreed. Rules 10b5-1 and 10b5-2 resolve two such issues.

A. Rule 10b5-1: Trading "On the Basis Of" Material Nonpublic Information

1. Background

As discussed in the Proposing Release, one unsettled issue in insider trading law has been what, if any, causal connection must be shown between the trader's possession of inside information and his or her trading. In enforcement cases, we have argued that a trader may be liable for trading while in "knowing possession" of the information. The contrary view is that a trader is not liable unless it is shown that he or she "used" the information for trading. Until recent years, there has been little case law discussing this issue. Although the Supreme Court has variously described an insider's violations as trading "on"[95] or "on the basis of"[96] material nonpublic information, it has not addressed the use/possession issue. Three recent courts of appeals cases addressed the issue but reached different results.[97]

As discussed more fully in the Proposing Release, in our view, the goals of insider trading prohibitions -- protecting investors and the integrity of securities markets -- are best accomplished by a standard closer to the "knowing possession" standard than to the "use" standard.[98] At the same time, we recognize that an absolute standard based on knowing possession, or awareness, could be overbroad in some respects. The new rule attempts to balance these considerations by means of a general rule based on "awareness" of the material nonpublic information, with several carefully enumerated affirmative defenses. This approach will better enable insiders and issuers to conduct themselves in accordance with the law.

While many of the commenters on Rule 10b5-1 supported our goals of providing greater clarity in the area of insider trading law, some suggested alternative approaches to achieving these goals. In that regard, a common comment was that the rule should not rely on exclusive affirmative defenses. Commenters suggested that we should either redesignate the affirmative defenses as non-exclusive safe harbors or add a catch-all defense to allow a defendant to show that he or she did not use the information.[99]

We believe the approach we proposed is appropriate. In our view, adding a catch-all defense or redesignating the affirmative defenses as non-exclusive safe harbors would effectively negate the clarity and certainty that the rule attempts to provide. Because we believe that an awareness standard better serves the goals of insider trading law, the rule as adopted employs an awareness standard with carefully enumerated affirmative defenses. As discussed below, however, we have somewhat modified these defenses in response to comments that they were too narrow or rigid, and that additional ones were necessary.

Some commenters stated that an awareness standard might eliminate the element of scienter from insider trading cases, contrary to the requirements of Section 10(b) of the Exchange Act,[100] and that we therefore lack the authority to promulgate the rule.[101] These comments misconstrue the intent and effect of the rule. As discussed in the Proposing Release and expressly stated in the Preliminary Note, Rule 10b5-1 is designed to address only the use/possession issue in insider trading cases under Rule 10b-5. The rule does not modify or address any other aspect of insider trading law, which has been established by case law. Scienter remains a necessary element for liability under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Rule 10b5-1 does not change this.

2. Provisions of Rule 10b5-1

We are adopting, as proposed, the general rule set forth in Rule 10b5-1(a), and the definition of "on the basis of" material nonpublic information in Rule 10b5-1(b). A trade is on the basis of material nonpublic information if the trader was aware of the material, nonpublic information when the person made the purchase or sale.

Some commenters stated that a use standard would be preferable,[102] or suggested that the rule instead state that awareness of the information should give rise to a presumption of use.[103] As noted above, we believe that awareness, rather than use, most effectively serves the fundamental goal of insider trading law -- protecting investor confidence in market integrity. The awareness standard reflects the common sense notion that a trader who is aware of inside information when making a trading decision inevitably makes use of the information.[104] Additionally, a clear awareness standard will provide greater clarity and certainty than a presumption or "strong inference" approach.[105] Accordingly, we have determined to adopt the awareness standard as proposed.

The proposed affirmative defenses generated a substantial number of comments. Some commenters suggested that the affirmative defenses in the Proposing Release were too restrictive,[106] or that additional defenses were needed to protect various common trading mechanisms, such as issuer repurchase programs and employee benefit plans.[107] Some of these commenters noted that the requirement that a trader specify prices, amounts, and dates of purchases or sales pursuant to binding contracts, instructions, or written plans left some common, legitimate trading mechanisms outside the protection of the proposed affirmative defenses. Additionally, some commenters questioned the Proposing Release's exclusion of a price limit from the definition of a specified "price."[108] In consideration of these comments, we are revising the affirmative defense that allows purchases and sales pursuant to contracts, instructions, and plans. The revised language responds to commenters' concerns by providing appropriate flexibility to persons who wish to structure securities trading plans and strategies when they are not aware of material nonpublic information, and do not exercise any influence over the transaction once they do become aware of such information.

As adopted, paragraph (c)(1)(i) sets forth an affirmative defense from the general rule, which applies both to individuals and entities that trade. To satisfy this provision, a person must establish several factors.

- First, the person must demonstrate that before becoming aware of the information, he or she had entered into a binding contract to purchase or sell the security, provided instructions to another person to execute the trade for the instructing person's account, or adopted a written plan for trading securities.[109]

- Second, the person must demonstrate that, with respect to the purchase or sale, the contract, instructions, or plan either: (1) expressly specified the amount, price, and date; (2) provided a written formula or algorithm, or computer program, for determining amounts, prices, and dates; or (3) did not permit the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales; provided, in addition, that any other person who did exercise such influence was not aware of the material nonpublic information when doing so.[110]

- Third, the person must demonstrate that the purchase or sale that occurred was pursuant to the prior contract, instruction, or plan. A purchase or sale is not pursuant to a contract, instruction, or plan if, among other things, the person who entered into the contract, instruction, or plan altered or deviated from the contract, instruction, or plan or entered into or altered a corresponding or hedging transaction or position with respect to those securities.[111]

Under paragraph (c)(1)(ii), which we adopt as proposed, the exclusion provided in paragraph (c)(1)(i) will be available only if the contract, instruction, or plan was entered into in good faith and not as part of a scheme to evade the prohibitions of this section.

Paragraph (c)(1)(iii) defines several key terms in the exclusion. We are adopting, substantially as proposed, the definition of "amount",[112] which means either a specified number of shares or a specified dollar value of securities. We have revised the definition of "price" and added a definition of "date." As adopted, "price" means market price on a particular date or a limit price or a particular dollar price.[113] "Date" means either the specific day of the year on which a market order is to be executed, or a day or days of the year on which a limit order is in force.[114]

Taken as a whole, the revised defense is designed to cover situations in which a person can demonstrate that the material nonpublic information was not a factor in the trading decision. We believe this provision will provide appropriate flexibility to those who would like to plan securities transactions in advance at a time when they are not aware of material nonpublic information, and then carry out those pre-planned transactions at a later time, even if they later become aware of material nonpublic information.[115]

For example, an issuer operating a repurchase program will not need to specify with precision the amounts, prices, and dates on which it will repurchase its securities. Rather, an issuer could adopt a written plan, when it is not aware of material nonpublic information, that uses a written formula to derive amounts, prices, and dates. Or the plan could simply delegate all the discretion to determine amounts, prices, and dates to another person who is not aware of the information -- provided that the

plan did not permit the issuer to (and in fact the issuer did not) exercise any subsequent influence over the purchases or sales.[116]

Similarly, an employee wishing to adopt a plan for exercising stock options and selling the underlying shares could, while not aware of material nonpublic information, adopt a written plan that contained a formula for determining the specified percentage of the employee's vested options to be exercised and/or sold at or above a specific price. The formula could provide, for example, that the employee will exercise options and sell the shares one month before each date on which her son's college tuition is due, and link the amount of the trade to the cost of the tuition.

An employee also could acquire company stock through payroll deductions under an employee stock purchase plan or a Section 401(k) plan. The employee could provide oral instructions as to his or her plan participation,[117] or proceed by means of a written plan.[118] The transaction price could be computed as a percentage of market price, and the transaction amount could be based on a percentage of salary to be deducted under the plan.[119] The date of a plan transaction could be determined pursuant to a formula set forth in the plan.[120] Alternatively, the date of a plan transaction could be controlled by the plan's administrator or investment manager, assuming that he or she is not aware of the material, nonpublic information at the time of executing the transaction, and the employee does not exercise influence over the timing of the transaction.[121]

One commenter noted that the proposed Rule 10b5-1 defenses were not co-extensive with exemptions from liability and reporting under Section 16 of the Exchange Act.[122] The Section 16 exemptive rules do not provide any exemption from liability under Section 10(b) and Rule 10b-5. The adoption of Rule 10b5-1 does not change this principle. However, we have drafted the Rule 10b5-1 defenses so that their conditions should not conflict with the conditions of the Section 16 exemptive rules.[123]

The proposal included an additional affirmative defense available only to trading parties that are entities. In response to comments, the rule as adopted clarifies that this defense is available to entities as an alternative to the other enumerated defenses described above.

Under this provision, an entity will not be liable if it demonstrates that the individual making the investment decision on behalf of the entity was not aware of the information, and that the entity had implemented reasonable policies and procedures to prevent insider trading.[124] The American Bar Association commented that the use in this rule of the term "reasonable policies and procedures . . . to ensure" against insider trading differed from the standard provided in Section 15(f) of the Exchange Act, which requires a registered broker or dealer to establish, maintain, and enforce written policies and procedures "reasonably designed" to prevent insider trading. As we noted in the Proposing Release, we derived this provision from the defense against liability codified in Exchange Act Rule 14e-3, regarding insider trading in a tender offer situation. Rule 14e-3, which pre-dates Exchange Act Section 15(f), also used the "to ensure" language. We are not aware, however, nor did commenters suggest, that use of that language has created any problems of compliance with Rule 14e-3. We believe, in any event, that the standards should be interpreted as essentially the

same.[125]

B. Rule 10b5-2: Duties of Trust or Confidence in Misappropriation Insider Trading Cases

1. Background

As discussed more fully in the Proposing Release, an unsettled issue in insider trading law has been under what circumstances certain non-business relationships, such as family and personal relationships, may provide the duty of trust or confidence required under the misappropriation theory.[126] Case law has produced the following anomalous result. A family member who receives a "tip" (within the meaning of Dirks) and then trades violates Rule 10b-5. A family member who trades in breach of an express promise of confidentiality also violates Rule 10b-5. A family member who trades in breach of a reasonable expectation of confidentiality, however, does not necessarily violate

Rule 10b-5.

As discussed more fully in the Proposing Release, we think that this anomalous result harms investor confidence in the integrity and fairness of the nation's securities markets. The family member's trading has the same impact on the market and investor confidence in the third example as it does in the first two examples. In all three examples, the trader's informational advantage stems from "contrivance, not luck," and the informational disadvantage to other investors "cannot be overcome with research or skill."[127] Additionally, the need to distinguish among the three types of cases may require an unduly intrusive examination of the details of particular family relationships. Accordingly, we believe there is good reason for the broader approach we adopt today for determining when family or personal relationships create "duties of trust or confidence" under the misappropriation theory.

Some of the commenters who submitted comment letters on Rule 10b5-2 supported the proposal.[128] Some offered suggestions or alternative approaches.[129] Others expressed concern that the rule would erode standards of personal and family privacy.[130] As discussed in the Proposing Release, the rule is not designed to interfere with particular family or personal relationships; rather, its goal is to protect investors and the fairness and integrity of the nation's securities markets against improper trading on the basis of inside information. Moreover, we do not believe that the rule will require a more intrusive examination of family relationships than would be required under existing case law without the rule. Current case law, such as United States v. Chestman,[131] and United States v. Reed,[132] already establishes a regime under which questions of liability turn on the nature of the details of the relationships between family members, such as their prior history and patterns of sharing confidences.[133] By providing more of a bright-line test for certain enumerated close family relationships, we believe the rule will mitigate, to some degree, the need to examine the details of particular relationships in the course of investigating suspected insider trading.

2. Provisions of Rule 10b5-2

We are adopting Rule 10b5-2 substantially as proposed. The rule sets forth a non-exclusive list of three situations in which a person has a duty of trust or confidence for purposes of the "misappropriation" theory of the Exchange Act and Rule 10b-5 thereunder.[134]

First, as proposed, we provide that a duty of trust or confidence exists whenever a person agrees to maintain information in confidence.[135]

Second, we provide that a duty of trust or confidence exists when two people have a history, pattern, or practice of sharing confidences such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality.[136] This is a "facts and circumstances" test based on the expectation of the parties in light of the overall relationship. Some commenters were concerned that, as proposed, this provision examined the reasonable expectation of confidentiality of the person communicating the material nonpublic information rather than examining the expectations of the recipient of the information and/or both parties to the communication.[137] We believe that mutuality was implicit in the proposed rule because an inquiry into the reasonableness of the recipient's expectation necessarily involves considering the relationship as a whole, including the other party's expectations. Nevertheless, we have revised the provision to make this mutuality explicit.

Two commenters suggested that this part of the rule be limited to a history, pattern, or practice of sharing business confidences.[138] Although we have determined not to adopt such a limitation, we note that evidence about the type of confidences shared in the past might be relevant to determining the reasonableness of the expectation of confidence.

Third, we are adopting as proposed a bright-line rule that states that a duty of trust or confidence exists when a person receives or obtains material nonpublic information from certain enumerated close family members: spouses, parents, children, and siblings. An affirmative defense permits the person receiving or obtaining the information to demonstrate that under the facts and circumstances of that family relationship, no duty of trust or confidence existed. Some commenters noted that the enumerated relationships do not include domestic partners, step-parents, or step-children. We have determined not to include these relationships in this paragraph, although paragraphs (b)(1) and (b)(2) could reach them. Our experience in this area indicates that most instances of insider trading between or among family members involve spouses, parents and children, or siblings; therefore, we have enumerated these relationships and not others.

## IV. Paperwork Reduction Act

Certain provisions of Regulation FD contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995.[139] We published notice soliciting comments on the collection of information requirements in the Proposing Release, and submitted these requirements to the Office of Management and Budget ("OMB") for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The titles for the collections are (1) Form 8-K, and (2) Reg FD-Other Disclosure Materials.

We received two comments concerning our estimate that an issuer would make five disclosures under Regulation FD per year. The Bond Market Association stated that we provided no basis for our estimate.[140] The Securities Industry Association indicated that the basis for the estimate is unclear and suggested that the estimate is too low.[141] In the Proposing Release, we stated that we believe that issuers will make one disclosure per quarter plus, on average, one additional disclosure per year under Regulation FD. While we recognize that some issuers may make more than five annual FD disclosures, we also believe that a substantial number of issuers will make fewer than five FD disclosures annually.[142] As discussed in the Proposing Release, in many cases, information disclosed under Regulation FD would be information that an issuer ultimately was going to disclose to the public. Under Regulation FD, that issuer likely will not make any more public disclosure than it otherwise would, but it may make the disclosure sooner and now would be required to file or disseminate that information in a manner reasonably designed to provide broad, non-exclusionary distribution of the information to the public. We therefore believe that our estimate that issuers will make five disclosures per year under Regulation FD is appropriate.

The Bond Market Association also stated that the time required to accomplish disclosure will be longer than our estimate of five hours, but did not quantify how much longer.[143] As discussed in the Proposing Release, we estimated the average number of hours an entity spends completing Form 8-K by contacting a number of law firms and other persons regularly involved in completing the form. We therefore believe that our estimate is appropriate. We additionally believe it is reasonable to estimate that other forms of disclosure, such as a press release, will require no more (and probably less) than the preparation time of Form 8-K.

OMB approved the regulation's information collection requirements. Form 8-K (OMB Control No. 3235-0060) was adopted pursuant to Sections 13, 15, and 23 of the Exchange Act, and Regulation FD-Other Disclosure Materials (OMB Control No. 3235-0536) was adopted pursuant to Sections 13, 15, 23, and 36 of the Exchange Act. We are not collecting information pursuant to Regulation FD on Form 6-K (OMB Control No 3235-0116), as initially proposed, because, as discussed in this Release, we have modified Regulation FD to exclude foreign private issuers from coverage. We have adopted Regulation FD with some additional modifications to the regulation as proposed. None of these modifications (other than the exclusion of foreign private issuers from coverage), however, has an impact on our burden hour estimate.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Compliance with the disclosure requirements is mandatory. There is no mandatory retention period for the information disclosed, and responses to the disclosure requirements will not be kept confidential.

## V. Cost-Benefit Analysis

A. Regulation FD: Selective Disclosure

Regulation FD requires that when an issuer intentionally discloses material nonpublic information to securities market professionals or holders of the issuer's securities who are reasonably likely to trade on the basis of the information, it must simultaneously make public disclosure. When the issuer's selective disclosure of material nonpublic information is not intentional, the issuer must make public disclosure promptly.

1. Benefits

Regulation FD will provide several important benefits to investors and the securities markets as a whole. First, current practices of selective disclosure damage investor confidence in the fairness and integrity of the markets. When selective disclosure leads to trading by the recipients of the disclosure or trading by those whom these recipients advise, the practice bears a close resemblance to ordinary "tipping" and insider trading. The economic effects of the two practices are essentially the same; in both cases, a few persons gain an informational edge -- and use that edge to profit at the expense of the uninformed -- from superior access to corporate insiders, not through skill or diligence.[144] Thus, investors in many instances equate the practice of selective disclosure with insider trading.[145]

The Chicago Board Options Exchange also commented that selective disclosure is extremely detrimental to the markets, in that the unusual trading and increased volatility that result from selective disclosure can cause market makers substantial losses and potentially lead to wider and less liquid options markets.[146] This argument can be extended to the primary markets for the securities as well. Economic theory and empirical studies have shown that stock market transaction costs increase when certain traders may be aware of material, undisclosed information.[147] A reduction in these costs should make investors more willing to commit their capital.

The inevitable effect of selective disclosure, as indicated by numerous comment letters we received, is that individual investors lose confidence in the integrity of the markets because they perceive that certain market participants have an unfair advantage.[148] Although one commenter questioned this investor confidence argument,[149] we agree with the common sense view -- expressed by both the Supreme Court and the Congress -- that investors will lose confidence in a market that they believe is unfairly rigged against them.[150] Similarly, economic studies have provided support for the view that insider trading reduces liquidity, increases volatility, and may increase the cost of capital.[151]

Given the similarity of selective disclosure practices to ordinary tipping and insider trading, we believe that a regulation addressing selective disclosure of material information will promote benefits similar to insider trading regulation. Regulation FD will foster fairer disclosure of information to all investors, and increase investor confidence in market integrity. By enhancing investor confidence in the markets, therefore, the regulation will encourage continued widespread investor participation in our markets, enhancing market efficiency and liquidity, and more effective capital raising.

Second, the regulation likely also will provide benefits to those seeking

unbiased analysis. This regulation will place all analysts on equal footing with respect to competition for access to material information. Thus, it will allow analysts to express their honest opinions without fear of being denied access to valuable corporate information being provided to their competitors. Analysts will continue to be able to use and benefit from superior diligence or acumen, without facing the prospect that other analysts will have a competitive edge solely because they say more favorable things about issuers.[152]

2. Costs

The regulation will impose some costs on issuers. First, issuers will incur some additional costs in making the public disclosures of material nonpublic information required by the regulation. Regulation FD gives issuers two options for making public disclosure. The issuer can: (1) file or furnish a Form 8-K;[153] or (2) disseminate the information through another method or combination of methods of disclosure that is reasonably designed to provide broad, non-exclusionary distribution of the information to the public (press release, teleconference, or web-conference).

Because the regulation does not require issuers to disclose material information (just to make any disclosure on a non-selective basis), we cannot predict with certainty how many issuers will actually make disclosures under this regulation. For purposes of the Paperwork Reduction Act, however, we base our estimate of the paperwork burden of the regulation on our belief that issuers will make on average five[154] public disclosures under Regulation FD per year.[155] Since there are approximately 13,000 issuers affected by this regulation, we estimate that the total number of disclosures under Regulation FD per year will be 65,000.

If an issuer files a Form 8-K, we estimate that the issuer would incur, on average, five burden hours per filing. This estimate is based on current burden hour estimates under the Paperwork Reduction Act for filing a Form 8-K and the staff's experience with such filings. For the purposes of the Paperwork Reduction Act, we estimate that in preparing Form 8-Ks approximately 25% of the burden hours are expended by the company's internal professional staff, and the remaining 75% by outside counsel. Assuming a cost of $85/hour for in-house professional staff and $175/hour[156] for outside counsel, the total cost would be $762.50 per filing. These assumptions reflect the greater reliance on outside lawyers in preparing documents to be filed with the Commission.

We have no direct data on which to base estimates of the costs of the other disclosure options. However, we anticipate that other methods of disclosure, such as press releases, may require less preparation time than a Form 8-K and will be prepared primarily, if not exclusively, by the company's internal staff.[157] Moreover, if the costs of another method of disclosure are less than the costs of filing the Form 8-K, we presume issuers will choose another method of public disclosure. Issuers may, however, choose to use methods of dissemination with higher out-of-pocket costs, presumably because they believe these methods provide additional benefits to the issuer or investor for which they are willing to pay. Given that we estimate that there will be 65,000 disclosures under Regulation FD per year at an approximate cost ranging from $537.50 to $762.50 per

disclosure, we estimate that the total paperwork burden of preparing the information for disclosure per year will be approximately $34,937,500 to $49,562,500.[158]

We received several comments concerning the costs of the disclosure options provided by Regulation FD. Two commenters suggested that the benefits of the regulation outweigh the costs of making disclosure.[159] One commenter suggested that the direct costs to issuers of complying with the regulation will exceed the $33 million that we estimated in the Proposing Release.[160] This commenter suggested that there is no basis for our estimate that issuers will make on average five disclosures per year, and that our estimate that it will take five hours to make disclosure under the regulation is too low, due to legal involvement with each corporate communication. This commenter additionally stated that the cost estimates for in-house and outside legal advice do not reflect the current or future marketplace and that the estimates do not consider all of the people involved in the disclosure process or the costs of a decision not to make disclosure.[161] Another commenter stated that our estimate of, on average, five disclosures per issuer per year is too low. This commenter also said that it could not quantify the costs of Regulation FD.[162]

Our estimate of five disclosures per issuer is based on several factors. First, we believe that for a large group of issuers, five disclosures reflects the need to make one FD disclosure per quarter, and allows for one additional miscellaneous FD disclosure. At the same time, however, we recognize that there will be a wide variation among disclosure practices at different issuers. Some issuers may average more annual FD disclosures. A substantial number of other issuers, however, depending on their industry, shareholder composition, or level of analyst coverage,[163] may make fewer if any FD disclosures annually. Thus, we believe the estimate adequately allows for a wide variety of situations. We, therefore, believe that five is a reasonable estimate of the average number of disclosures each issuer will make annually under Regulation FD. We also believe it is reasonable to assume that the costs of making disclosure via some other method, such as a press release, will not be greater than the costs of filing a Form 8-K.

While it is possible that issuers may incur some cost in connection with the implementation of corporate policy relating to disclosure, as well as decisions not to make disclosure under the regulation, we believe that any additional costs would not be substantial. Many issuers already consult with in-house and/or outside counsel regarding their disclosure obligations under the federal securities laws. Moreover, as we have narrowed the definition of "persons acting on behalf of the issuer" to cover only those who regularly interact with securities market professionals and security holders, the issuer personnel whose disclosures will be covered by the regulation are those who are most likely to be well-versed in disclosure issues and practiced in making judgments on these issues. Further, to the extent that issuers already have policies in place to cover the types of disclosures those personnel can make, we expect the additional costs associated with compliance to be small. Thus, after careful consideration of the comments, we have determined that our estimates of the costs of making disclosure are appropriate.

One commenter asserted that our cost-benefit analysis does not consider

indirect costs on capital formation.[164] These costs, according to this commenter, include less liquidity, missed market opportunities, and the introduction of market inefficiencies. One such market inefficiency, according to the commenter, might result from confidentiality agreements becoming a regular practice, thereby excluding some institutions that cannot or will not agree to the restrictions in such agreements. This commenter also suggested a cost resulting from issuers' involving their attorneys in each corporate communication. This commenter did not quantify these purported costs.

We believe that this comment does not adequately take into account the flexibility provided in Regulation FD for issuer compliance. The regulation gives issuers a variety of ways to comply, and we assume that an issuer will be able to determine the least costly methods of compliance for its particular circumstances. Moreover, as discussed in the Release, we have significantly narrowed the scope of the regulation in ways that should reduce both direct and indirect compliance costs; for example, we have narrowed the types of communications covered, and excluded communications made in connection with most registered securities offerings. Further, as discussed above, we believe that the regulation will encourage continued widespread investor participation in our markets, which will enhance market efficiency and liquidity, and foster more effective capital raising. Thus, we have carefully considered whether the regulation will increase the costs of capital formation, and we believe it may, in fact, reduce such costs.[165]

The regulation may also lead to some increased costs for issuers resulting from new or enhanced systems and procedures for disclosure practices. As indicated by some commenters,[166] we believe that many, if not most, issuers already have internal procedures for communicating with the public; for many issuers, therefore, new procedures to prevent selective disclosures will not be needed. There might be a cost to these issuers, however, for enhancing and strengthening existing procedures to safeguard against selective disclosures that are not intentional to ensure prompt public release when such disclosures do occur.

Some commenters suggested that disclosure methods utilizing Internet technology impose minimal costs.[167] In particular, one commenter noted that there are several services that make the audio signal from conference calls available over the Internet at no cost.[168] Another commenter disagreed, and stated that some of the methods of making disclosure, such as webcasts, are costly.[169] This commenter suggested that additional costs might include those associated with new technologies, but provided no quantitative data associated with any such costs.[170] As stated above, we believe that making disclosure by a method other than a Form 8-K will likely be less costly than making disclosure by filing a Form 8-K. We believe that issuers will use new technology to the extent that it is cost-effective to do so; in any event, no issuer will be required to expend more on disclosures utilizing new technology than it would cost to make disclosure by filing a Form 8-K.

One potential cost of the regulation that we have identified is the risk that the regulation might "chill" corporate disclosures to analysts, investors, and the media. We recognized the concern that issuers may speak less often

out of fear of liability based on a post hoc assessment that disclosed information was material, and that if such a chilling effect resulted from Regulation FD, there would be a cost to overall market efficiency and capital formation.

A number of commenters also raised the concern about a chilling effect as a significant potential cost of Regulation FD, and several of these suggested that we were underestimating this effect.[171] A common theme among these commenters was that the regulation would result in the flow of less information to the marketplace, rather than more, and that the cost of this effect would be greater surprise and volatility.[172] However, these commenters were unable to quantify these costs. Moreover, other commenters, including issuers who would be subject to the regulation, did not necessarily agree that their communications would be significantly chilled.[173]

In response to the concerns about a diminished flow of information, as discussed elsewhere in this Release, we have made several significant modifications that we believe reduce the likelihood of a chilling effect. These modifications include narrowing the scope of the regulation so that it does not apply to all communications with persons outside the issuer, narrowing the types of issuer personnel covered by the regulation to senior officials and those who would normally be expected to communicate with securities market professionals or security holders, and clarifying that where the regulation requires "knowing or reckless" conduct, liability will attach only when an issuer's personnel know or are reckless in not knowing that the information selectively disclosed is both material and nonpublic. Additionally, as discussed below, we have added an express provision in the regulation's text designed to remove any doubt that private liability will not result from a Regulation FD violation.

In addition, there are numerous practices that issuers may employ to continue to communicate freely with analysts and investors, while becoming more careful in how they disclose information. Moreover, the regulation only covers the selective disclosure of material nonpublic information; the level of non-material information available to the market need not decrease. We believe issuers will have strong reasons to continue releasing information given the market demand for information and a company's desire to promote its products and services. One economic study has found that more public disclosure is associated with factors that have been shown to reduce the cost of capital.[174] Finally, commenters expressed concern that the regulation would increase the risk of private liability. Regulation FD is designed to create duties only under Sections 13(a) and 15(d) of the Exchange Act and Section 30 of the Investment Company Act, and does not create new duties under Section 10(b) of the Exchange Act. As discussed, we have added an express provision to the regulation stating that a failure to make a disclosure required solely by Regulation FD will not result in a violation of Rule 10b-5.

B. Rule 10b5-1: Trading "On The Basis Of" Material Nonpublic Information

Rule 10b5-1 would define when a sale or purchase of a security occurred "on the basis of" material nonpublic information. Under the rule, a person trades "on the basis of" material nonpublic information if the person making

the purchase or sale was aware of the material nonpublic information at the time of the purchase or sale. However, the rule provides exclusions for certain situations in which a trade resulted from a pre-existing plan, contract, or instruction that was made in good faith.

1. Benefits

We anticipate two significant benefits arising from Rule 10b5-1. First, the rule should increase investor confidence in the integrity and fairness of the market because it clarifies and strengthens existing insider trading law. Second, the rule will benefit corporate insiders by providing greater clarity and certainty on how they can plan and structure securities transactions. The rule provides specific guidance on how a person can plan future transactions at a time when he or she is not aware of material nonpublic information without fear of incurring liability. We believe that this guidance will make it easier for corporate insiders to conduct themselves in accordance with the laws against insider trading.

2. Costs

The rule does not require any particular documentation or recordkeeping by insiders, although it would, in some cases, require a person to document a particular plan, contract, or instruction for trading if he or she wished to demonstrate an exclusion from the rule. Some commenters suggested that the proposed affirmative defenses did not allow for trade commonly used mechanisms for trading securities, such as issuer repurchase plans. If the rule prohibited, for example, issuers from repurchasing their securities, a cost might result. As discussed elsewhere in this Release, however, we have modified the rule to provide appropriate flexibility to persons who wish to structure securities trading plans and strategies when they are not aware of material nonpublic information. Any entity that sought to rely on the affirmative defense in paragraph (c)(2) for institutional traders would be required to comply with the specific provisions of that paragraph, including implementing reasonable policies and procedures to prevent insider trading. We believe that most entities to whom this affirmative defense would be relevant -- i.e., broker-dealers and investment advisers -- already have procedures in place, because of existing statutory requirements.[175] Thus, as adopted, we do not believe that any costs that may be imposed by Rule 10b5-1 will be significant.[176]

C. Rule 10b5-2: Duties of Trust or Confidence in Misappropriation Insider Trading Cases

1. Benefits

Rule 10b5-2 enumerates three non-exclusive bases for determining when a person receiving information is subject to a "duty of trust or confidence" for purposes of the misappropriation theory of insider trading. Two principal benefits are likely to result from this rule. First, the rule will provide greater clarity and certainty to the law on the question of when a family relationship will create a duty of trust or confidence. Second, the rule will address an anomaly in current law under which a family member receiving material nonpublic information may exploit it without violating the prohibition against insider trading. By addressing this potential gap in the

law, the rule will enhance investor confidence in the integrity of the market.

2. Costs

We do not attribute any costs to Rule 10b5-2 and no commenter suggested otherwise.

## VI. Consideration of Impact on the Economy, Burden on Competition, and Promotion of Efficiency, Competition, and Capital Formation

Sections 2(b) of the Securities Act, 3(f) of the Exchange Act, and 2(c) of the Investment Company Act require the Commission, when engaging in rulemaking that requires it to consider or determine whether an action is necessary or appropriate in the public interest, also to consider whether the action will promote efficiency, competition, and capital formation. As discussed above, we believe that Regulation FD and Rules 10b5-1 and 10b5-2 will bolster investor confidence in the integrity of the markets and the fairness of the disclosure process. By enhancing investor confidence and participation in the markets, these rules should increase liquidity and help to reduce the costs of capital. Accordingly, the proposals should promote capital formation and market efficiency.[177]

Section 23(a) of the Exchange Act requires the Commission, when adopting rules under the Exchange Act, to consider the impact on competition of any rule it adopts. Several commenters suggested that Regulation FD might have some effects on competition. One commenter suggested that the regulation would have a negative effect on competition because analysts operating independently of, and in competition with, each other can more effectively pursue an independent line of inquiry and ferret out negative information that management would rather not disclose. According to this commenter, "[l]eveling the playing field for analysts, as among themselves and vis-a-vis the general public, will undermine the great advantages of the current system."[178] We disagree. We believe, to the contrary, that the regulation will encourage competition because it places all analysts on equal competitive footing with respect to access to material information. Analysts will continue to be able to use and benefit from superior diligence or acumen, without facing the prospect that other analysts will have a competitive edge simply because they have been favored with selective disclosure. Additionally, analysts will be able to express their honest opinions without fear of being denied access to material corporate information.

Some commenters also suggested that it would be anti-competitive and unfair to exempt ratings agencies and/or the news media from the regulation's coverage.[179] According to these commenters, reporters are competitors of analysts. We believe that there is a significant difference between analysts and news reporters, and therefore disagree with this comment. Reporters gather information for the purpose of reporting the news and informing the public; generally, their reports are widely disseminated. Similarly, ratings agencies make their ratings reports public when completed. Analysts, by contrast, gather and report information to be used for securities trading; their reports are typically available to a limited, usually paying, audience.

As discussed more fully above, we have decided to exclude foreign private issuers from the Regulation FD disclosure requirements in light of the fact that the Commission will be undertaking a comprehensive review of the reporting requirements of foreign private issuers. To the extent any anti-competitive effect may arise from exempting foreign private issuers from the regulation, we believe any such burden would be necessary and appropriate for the protection of investors. Overall, we do not believe that the regulation and rules will have any anti-competitive effects.

## VII. Final Regulatory Flexibility Analysis

This Final Regulatory Flexibility Analysis ("FRFA") has been prepared in accordance with the Regulatory Flexibility Act ("RFA"). It relates to Regulation FD, Rule 10b5-1, and Rule 10b5-2 under the Exchange Act, as amended. The regulation and rules address the selective disclosure of material nonpublic information and clarify two unsettled issues under current insider trading law.

### A. Need for the Regulation and Rules

The new regulation and rules address three separate issues. Regulation FD addresses the problem of issuers making selective disclosure of material nonpublic information to analysts or particular investors before making disclosure to the investing public. Rules 10b5-1 and 10b5-2 address two unsettled issues in insider trading case law: (1) when insider trading liability arises in connection with a person's "use" or "knowing possession" of material nonpublic information; and (2) when a family or other non-business relationship can give rise to liability under the misappropriation theory of insider trading. By addressing these issues, we believe the new regulation and rules will enhance investor confidence in the fairness and integrity of the securities markets.

Regulation FD requires that when an issuer intentionally discloses material nonpublic information it do so through public disclosure, not selective disclosure. When an issuer has made a non-intentional selective disclosure, Regulation FD requires the issuer to make prompt public disclosure thereafter. The regulation provides for several alternative methods by which an issuer can make the required public disclosure. We believe that this new regulation will provide for fairer and more effective disclosure of important information by issuers to the investing public.

Rule 10b5-1 provides a general rule that liability arises when a person trades while "aware" of material nonpublic information. Rule 10b5-1 also provides affirmative defenses from the general rule to allow persons to structure securities trading plans and strategies when they are not aware of material nonpublic information, and follow through with the trades pursuant to those plans and strategies even after they become aware of material nonpublic information. We believe Rule 10b5-1 clarifies an important issue in insider trading law, and will enhance investor confidence in market integrity.

Rule 10b5-2 defines the scope of "duties of trust and confidence" for purposes of the misappropriation theory in a manner that more appropriately serves the purposes of insider trading law. Rule 10b5-2 will have no direct effect on small entities.

### B. Significant Issues Raised by Public Comment

In the Proposing Release, we solicited comments on the Initial Regulatory Flexibility Analysis ("IRFA"). In particular, we requested comments regarding: (i) the number of small entity issuers that may be affected by the proposed regulation and rules; (ii) the existence or nature of the potential impact of the proposed regulation and/or rules on small entity issuers discussed in the analysis; and (iii) how to quantify the impact of the proposed regulation and rules. Commentators were asked to describe the nature of any impact and provide empirical data supporting the extent of the impact.

We did not receive any comments addressing the IRFA for proposed Regulation FD and Rules 10b5-1 and 10b5-2. We did receive several comments addressing the potential impact of proposed Regulation FD on small entity issuers and whether Regulation FD should treat them the same as other issuers.

One issue affecting small entities on which we received significant comment was the method of "public disclosure" required by Regulation FD. One commenter said that Regulation FD's public disclosure requirement should recognize the particular circumstances of the issuer; in this commenter's view, because smaller issuers often have more difficulty obtaining coverage, Regulation FD's public disclosure requirement could be qualified to require those efforts reasonable under the circumstances of the issuer and the market for its securities. This commenter noted that it would help address this issue if Regulation FD's public disclosure requirement could be satisfied by a website posting.[180] Another commenter said that Regulation FD's provision for public disclosure through a press release is not appropriate because this method does little, if anything, to provide investors with information regarding smaller companies.[181]

In response to these comments and others, we have modified the definition of "public disclosure" in the final regulation. The final regulation provides greater flexibility to an issuer to determine what is an appropriate means of making public disclosure in light of its particular circumstances. The final regulation permits issuers, including small entity issuers, to choose a method (or a combination of methods) of public disclosure reasonably designed to provide broad, non-exclusionary distribution of information to the public.

With respect to the regulation's application to disclosures of "material" nonpublic information, two commenters noted that what might be material to a small company might not be material to a large company.[182] As noted elsewhere in the Release, the general materiality standard has always been understood to encompass the necessary flexibility to fit the circumstances of each case. Thus, we believe the use of a materiality standard in Regulation FD appropriately takes into account the differences between small and large issuers.

### C. Small Entities Subject to the Regulation and Rules

Regulation FD will affect issuers and closed-end investment companies that are small entities.[183] We estimate there are between approximately 1,000

to 2,000 issuers subject to the reporting requirements of the Exchange Act that satisfy the definition of small entity.[184] We also estimate that there are approximately 62 closed-end investment companies that may be considered small entities subject to Regulation FD.[185]

Rule 10b5-1 will apply to any small entities that engage in securities trading while aware of inside information and therefore are subject to existing insider trading prohibitions of Rule 10b-5. This could include issuers, broker-dealers,[186] investment advisers,[187] and investment companies. We estimate that there are approximately 913 broker-dealers that may be considered small entities.[188] We estimate that there are approximately 1,500 investment advisers that may be considered small entities.[189] We estimate that there are approximately 241 investment companies that may be considered small entities.[190] The Commission cannot estimate with certainty how many small entities engage in securities trading while aware of inside information and no comments were received on this point.

D. Projected Reporting, Recordkeeping, and Other Compliance Requirements

1. Regulation FD

When an issuer, large or small, discloses material nonpublic information, Regulation FD requires it to file or furnish a Form 8-K, or to otherwise make public disclosure of information through another method (or combination of methods) of disclosure that is reasonably designed to provide broad, non-exclusionary distribution of the information to the public.

The regulation's "public disclosure" requirement would give small entity issuers flexibility in how to disseminate information (such as via telephonic or Internet conference calls). This flexible performance element enables small entity issuers the freedom to select the method (or combination of methods) of public disclosure that best suits their business operations while achieving broad dissemination of the information. Accordingly, we do not think the requirement will have a disproportionate affect on small entity issuers. In addition, by allowing an issuer to use a method "or combination of methods" of disclosure, Regulation FD recognizes that it may not always be possible for an issuer to rely on a single method of disclosure as reasonably designed to effect broad non-exclusionary public disclosure.

2. Rule 10b5-1

Rule 10b5-1 does not directly impose any recordkeeping or compliance requirements on small entities. To the extent that an entity engaged in securities trading wished to rely on an affirmative defense, it might document the existence of a pre-existing plan to trade. More generally, any entity, large or small, that sought to rely on the affirmative defense in paragraph (c)(2) for institutional traders would be required to comply with the specific provisions of that paragraph, including implementing reasonable policies and procedures to prevent insider trading. We believe that most entities to whom this affirmative defense would be relevant -- i.e., broker-dealers and investment advisers -- already have procedures in place, because of existing statutory requirements.[191]

### 3. Rule 10b5-2

Rule 10b5-2 affects individuals and not entities. Accordingly, we believe that Rule 10b5-2 would not have a significant economic impact on a substantial number of small entities.

### E. Agency Action to Minimize Effect on Small Entities

As required by Sections 603 and 604 of the RFA, the Commission has considered the following alternatives to minimize the economic impact of Regulation FD and Rule 10b5-1 on small entities: (a) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (b) the clarification, consolidation, or simplification of compliance and reporting requirements under the regulation and the rule for small entities; (c) the use of performance rather than design standards; and (d) an exemption from coverage of the regulation or rule, or any part thereof, for small entities.

With respect to Regulation FD, we continue to believe that different compliance or reporting requirements or timetables for small entities would interfere with achieving the primary goal of protecting investors. For the same reason, we believe that exempting small entities from coverage of Regulation FD, in whole or part, is not appropriate. In addition, we have concluded that it is not feasible to further clarify, consolidate, or simplify the regulation for small entities. We have, however, used performance elements in Regulation FD in two ways. Regulation FD does not require that an issuer satisfy its obligations in accordance with any specific design, but rather allows each issuer, including small entities, flexibility to select the method (or combination of methods) of compliance that is most efficient and appropriate for its business operations. First, each issuer can select what method(s) to use to avoid selective disclosure (e.g., by designating which authorized official(s) will speak with analysts). Second, each issuer can choose what method(s) to use for "public disclosure" (e.g., filing or furnishing a Form 8-K, issuing a press release, holding a conference call transmitted telephonically or over the Internet, etc.). We do not believe different performance standards for small entities would be consistent with the purpose of Regulation FD.

We have made a number of changes to proposed Regulation FD that we believe decrease its impact on all issuers, including small entity issuers.

First, we have narrowed the scope of communications covered by Regulation FD so it does not apply to all communications to persons outside the issuer. As revised, the regulation applies only to communications made to securities market professionals and to holders of the issuer's securities under circumstances in which it is reasonably foreseeable that the security holder will trade on the basis of the information.

Second, we have narrowed the definition of "person acting on behalf of the issuer" to senior officials and those persons who normally would be expected to communicate with securities market professionals or with holders of the issuer's securities.

Third, to remove any doubt that private liability will not result from a

Regulation FD violation, we have added an express provision in the regulation text that a failure to make a disclosure required solely by Regulation FD will not result in a violation of Rule 10b-5.

Fourth, to clarify that a reasonable, but mistaken, determination that information was not material will not be second-guessed, the regulation text has been revised to provide that the materiality determination is subject to a recklessness standard.

Fifth, Regulation FD has been revised so that a failure to comply with its provisions will not disqualify an issuer from use of short-form registration for securities offerings or affect security holders' ability to resell under Securities Act Rule 144.

Sixth, Regulation FD has been revised to exclude communications made in connection with most securities offerings registered under the Securities Act.

With respect to Rule 10b5-1, we continue to believe that different compliance requirements for small entities would interfere with achieving the primary goal of protecting investors. For the same reason, we believe that exempting small entities from coverage of Rule 10b5-1, in whole or part, is not appropriate. In addition, we have concluded that it is not feasible to further clarify, consolidate, or simplify the rule for small entities. First, the aspects of Rule 10b5-1 that indirectly involve compliance requirements are for affirmative defenses to the general rule and therefore not required to comply with Rule 10b5-1. Second, we have used performance elements for the affirmative defense based on an institutional investor implementing proper informational barriers set forth in paragraph (c)(2) of Rule 10b5-1. If an entity decides to assert this affirmative defense, Rule 10b5-1 does not require that it satisfy its obligations under the affirmative defense in accordance with any specific design, but rather allows it flexibility to select which measure(s) it wants to put in place to satisfy the elements of the affirmative defense. We do not believe different performance standards for small entities would be consistent with the purpose of the rule.

We have made changes to Rule 10b5-1 that we believe will decrease its impact on small entities. First, a person may use limit orders in a pre-existing contract, plan, or instruction created while the person was not aware of any inside information. Second, Rule 10b5-1 as adopted provides that the price, amount, and date of a transaction do not have to be specified where the purchase or sale that occurred was the result of the pre-existing contract, plan, or instruction.

## VIII. Statutory Bases and Text of Amendments

We are adopting Regulation FD, the amendments to Form 8-K, Rule 10b5-1, and Rule 10b5-2 under the authority set forth in Sections 10, 19(a), and 28 of the Securities Act, Sections 3, 9, 10, 13, 15, 23, and 36 of the Exchange Act, and Section 30 of the Investment Company Act.

### List of subjects

17 CFR Part 240

Fraud, Reporting and recordkeeping requirements, Securities.

17 CFR Parts 243 and 249

Securities, Reporting and recordkeeping requirements.

**Text of Amendments**

For the reasons set out in the preamble, Title 17, Chapter II of the Code of Federal Regulations is amended as follows:

**PART 240 -- GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934**

1. The authority citation for Part 240 continues to read, in part, as follows:

Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78f, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78o, 78p, 78q, 78s, 78u-5, 78w, 78x, 78ll(d), 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, and 80b-11, unless otherwise noted.

\* \* \* \* \*

2. Section 240.10b5-1 is added after Section 240.10b-5 to read as follows:

§ 240.10b5-1 Trading "on the basis of" material nonpublic information in insider trading cases.

Preliminary Note to § 240.10b5-1: This provision defines when a purchase or sale constitutes trading "on the basis of" material nonpublic information in insider trading cases brought under Section 10(b) of the Act and Rule 10b-5 thereunder. The law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5, and Rule 10b5-1 does not modify the scope of insider trading law in any other respect.

(a) General. The "manipulative and deceptive devices" prohibited by Section 10(b) of the Act (15 U.S.C. 78j) and § 240.10b-5 thereunder include, among other things, the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information.

(b) Definition of "on the basis of." Subject to the affirmative defenses in paragraph (c) of this section, a purchase or sale of a security of an issuer is "on the basis of" material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale.

(c) Affirmative defenses.

(1)(i) Subject to paragraph (c)(1)(ii) of this section, a person's purchase or sale is not "on the basis of" material nonpublic information if the person making the purchase or sale demonstrates that:

(A) before becoming aware of the information, the person had:

(1) entered into a binding contract to purchase or sell the security,

(2) instructed another person to purchase or sell the security for the instructing person's account, or

(3) adopted a written plan for trading securities;

(B) the contract, instruction, or plan described in paragraph (c)(1)(i)(A) of this Section:

(1) specified the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold;

(2) included a written formula or algorithm, or computer program, for determining the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold; or

(3) did not permit the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the contract, instruction, or plan, did exercise such influence must not have been aware of the material nonpublic information when doing so; and

(C) the purchase or sale that occurred was pursuant to the contract, instruction, or plan. A purchase or sale is not "pursuant to a contract, instruction, or plan" if, among other things, the person who entered into the contract, instruction, or plan altered or deviated from the contract, instruction, or plan to purchase or sell securities (whether by changing the amount, price, or timing of the purchase or sale), or entered into or altered a corresponding or hedging transaction or position with respect to those securities.

(ii) Paragraph (c)(1)(i) of this section is applicable only when the contract, instruction, or plan to purchase or sell securities was given or entered into in good faith and not as part of a plan or scheme to evade the prohibitions of this section.

(iii) This paragraph (c)(1)(iii) defines certain terms as used in paragraph (c) of this Section.

(A) Amount. "Amount" means either a specified number of shares or other securities or a specified dollar value of securities.

(B) Price. "Price" means the market price on a particular date or a limit

price, or a particular dollar price.

(C) Date. "Date" means, in the case of a market order, the specific day of the year on which the order is to be executed (or as soon thereafter as is practicable under ordinary principles of best execution). "Date" means, in the case of a limit order, a day of the year on which the limit order is in force.

(2) A person other than a natural person also may demonstrate that a purchase or sale of securities is not "on the basis of" material nonpublic information if the person demonstrates that:

(i) The individual making the investment decision on behalf of the person to purchase or sell the securities was not aware of the information; and

(ii) The person had implemented reasonable policies and procedures, taking into consideration the nature of the person's business, to ensure that individuals making investment decisions would not violate the laws prohibiting trading on the basis of material nonpublic information. These policies and procedures may include those that restrict any purchase, sale, and causing any purchase or sale of any security as to which the person has material nonpublic information, or those that prevent such individuals from becoming aware of such information.

3. Section 240.10b5-2 is added to read as follows:

§ 240.10b5-2 Duties of trust or confidence in misappropriation insider trading cases.

Preliminary Note to § 240.10b5-2: This section provides a non-exclusive definition of circumstances in which a person has a duty of trust or confidence for purposes of the "misappropriation" theory of insider trading under Section 10(b) of the Act and Rule 10b-5. The law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5, and Rule 10b5-2 does not modify the scope of insider trading law in any other respect.

(a) Scope of Rule. This section shall apply to any violation of Section 10(b) of the Act (15 U.S.C. 78j(b)) and § 240.10b-5 thereunder that is based on the purchase or sale of securities on the basis of, or the communication of, material nonpublic information misappropriated in breach of a duty of trust or confidence.

(b) Enumerated "duties of trust or confidence." For purposes of this section, a "duty of trust or confidence" exists in the following circumstances, among others:

(1) Whenever a person agrees to maintain information in confidence;

(2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its

confidentiality; or

(3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; <u>provided</u>, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

4. Part 243 is added to read as follows:

**PART 243 -- REGULATION FD**

Sec.

243.100 General rule regarding selective disclosure.

243.101 Definitions.

243.102 No effect on antifraud liability.

243.103 No effect on Exchange Act reporting status.

Authority: 15 U.S.C. 78c, 78i, 78j, 78m, 78o, 78w, 78mm, and 80a-29, unless otherwise noted.

§ 243.100 General rule regarding selective disclosure.

(a) Whenever an issuer, or any person acting on its behalf, discloses any material nonpublic information regarding that issuer or its securities to any person described in paragraph (b)(1) of this section, the issuer shall make public disclosure of that information as provided in § 243.101(e):

(1) Simultaneously, in the case of an intentional disclosure; and

(2) Promptly, in the case of a non-intentional disclosure.

(b)(1) Except as provided in paragraph (b)(2) of this section, paragraph (a) of this section shall apply to a disclosure made to any person outside the issuer:

(i) Who is a broker or dealer, or a person associated with a broker or dealer, as those terms are defined in Section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a));

(ii) Who is an investment adviser, as that term is defined in Section 202(a)(11) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-2(a)(11)); an institutional investment manager, as that term is defined in Section 13(f)(5) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(f)(5)), that filed

a report on Form 13F (17 CFR 249.325) with the Commission for the most recent quarter ended prior to the date of the disclosure; or a person associated with either of the foregoing. For purposes of this paragraph, a "person associated with an investment adviser or institutional investment manager" has the meaning set forth in Section 202(a)(17) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-2(a)(17)), assuming for these purposes that an institutional investment manager is an investment adviser;

(iii) Who is an investment company, as defined in Section 3 of the Investment Company Act of 1940 (15 U.S.C. 80a-3), or who would be an investment company but for Section 3(c)(1) (15 U.S.C. 80a-3(c)(1)) or Section 3(c)(7) (15 U.S.C. 80a-3(c)(7)) thereof, or an affiliated person of either of the foregoing. For purposes of this paragraph, "affiliated person" means only those persons described in Section 2(a)(3)(C), (D), (E), and (F) of the Investment Company Act of 1940 (15 U.S.C. 80a-2(a)(3)(C), (D), (E), and (F)), assuming for these purposes that a person who would be an investment company but for Section 3(c)(1) (15 U.S.C. 80a-3(c)(1)) or Section 3(c)(7) (15 U.S.C. 80a-3(c)(7)) of the Investment Company Act of 1940 is an investment company; or

(iv) Who is a holder of the issuer's securities, under circumstances in which it is reasonably foreseeable that the person will purchase or sell the issuer's securities on the basis of the information.

(2) Paragraph (a) of this section shall not apply to a disclosure made:

(i) To a person who owes a duty of trust or confidence to the issuer (such as an attorney, investment banker, or accountant);

(ii) To a person who expressly agrees to maintain the disclosed information in confidence;

(iii) To an entity whose primary business is the issuance of credit ratings, provided the information is disclosed solely for the purpose of developing a credit rating and the entity's ratings are publicly available; or

(iv) In connection with a securities offering registered under the Securities Act, other than an offering of the type described in any of Rule 415(a)(1)(i) - (vi)

(§ 230.415(a)(1)(i) - (vi) of this chapter).

§ 243.101 Definitions.

This section defines certain terms as used in Regulation FD (§§ 243.100 - 243.103).

(a) Intentional. A selective disclosure of material nonpublic information is "intentional" when the person making the disclosure either knows, or is reckless in not knowing, that the information he or she is communicating is both material and nonpublic.

(b) <u>Issuer</u>. An "issuer" subject to this regulation is one that has a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), including any closed-end investment company (as defined in Section 5(a)(2) of the Investment Company Act of 1940) (15 U.S.C. 80a-5(a)(2)), but not including any other investment company or any foreign government or foreign private issuer, as those terms are defined in Rule 405 under the Securities Act

(§ 230.405 of this chapter).

(c) <u>Person acting on behalf of an issuer</u>. "Person acting on behalf of an issuer" means any senior official of the issuer (or, in the case of a closed-end investment company, a senior official of the issuer's investment adviser), or any other officer, employee, or agent of an issuer who regularly communicates with any person described in § 243.100(b)(1)(i), (ii), or (iii), or with holders of the issuer's securities. An officer, director, employee, or agent of an issuer who discloses material nonpublic information in breach of a duty of trust or confidence to the issuer shall not be considered to be acting on behalf of the issuer.

(d) <u>Promptly</u>. "Promptly" means as soon as reasonably practicable (but in no event after the later of 24 hours or the commencement of the next day's trading on the New York Stock Exchange) after a senior official of the issuer (or, in the case of a closed-end investment company, a senior official of the issuer's investment adviser) learns that there has been a non-intentional disclosure by the issuer or person acting on behalf of the issuer of information that the senior official knows, or is reckless in not knowing, is both material and nonpublic.

(e) <u>Public disclosure</u>.

(1) Except as provided in paragraph (e)(2) of this section, an issuer shall make the "public disclosure" of information required by § 243.100(a) by furnishing to or filing with the Commission a Form 8-K (17 CFR 249.308) disclosing that information.

(2) An issuer shall be exempt from the requirement to furnish or file a Form 8-K if it instead disseminates the information through another method (or combination of methods) of disclosure that is reasonably designed to provide broad, non-exclusionary distribution of the information to the public.

(f) <u>Senior official</u>. "Senior official" means any director, executive officer (as defined in § 240.3b-7 of this chapter), investor relations or public relations officer, or other person with similar functions.

(g) <u>Securities offering</u>. For purposes of § 243.100(b)(2)(iv):

(1) <u>Underwritten offerings</u>. A securities offering that is underwritten commences when the issuer reaches an understanding with the broker-dealer that is to act as managing underwriter and continues until the later of the end of the period during which a dealer must deliver a prospectus or

the sale of the securities (unless the offering is sooner terminated);

(2) Non-underwritten offerings. A securities offering that is not underwritten:

(i) If covered by Rule 415(a)(1)(x) (§ 230.415(a)(1)(x) of this chapter), commences when the issuer makes its first bona fide offer in a takedown of securities and continues until the later of the end of the period during which each dealer must deliver a prospectus or the sale of the securities in that takedown (unless the takedown is sooner terminated);

(ii) If a business combination as defined in Rule 165(f)(1) (§ 230.165(f)(1) of this chapter), commences when the first public announcement of the transaction is made and continues until the completion of the vote or the expiration of the tender offer, as applicable (unless the transaction is sooner terminated);

(iii) If an offering other than those specified in paragraphs (a) and (b) of this section, commences when the issuer files a registration statement and continues until the later of the end of the period during which each dealer must deliver a prospectus or the sale of the securities (unless the offering is sooner terminated).

§ 243.102 No effect on antifraud liability.

No failure to make a public disclosure required solely by § 243.100 shall be deemed to be a violation of Rule 10b-5 (17 CFR 240.10b-5) under the Securities Exchange Act.

§ 243.103 No effect on Exchange Act reporting status.

A failure to make a public disclosure required solely by § 243.100 shall not affect whether:

(a) For purposes of Forms S-2 (17 CFR 239.12), S-3 (17 CFR 239.13) and S-8 (17 CFR 239.16b) under the Securities Act, an issuer is deemed to have filed all the material required to be filed pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)) or, where applicable, has made those filings in a timely manner; or

(b) There is adequate current public information about the issuer for purposes of § 230.144(c) of this chapter (Rule 144(c)).

**PART 249 -- FORMS, SECURITIES EXCHANGE ACT OF 1934**

5. The authority citation for Part 249 is amended by adding the following citations:

Authority: 15 U.S.C. 78a, et seq., unless otherwise noted;

Section 249.308 is also issued under 15 U.S.C. 80a-29.

* * * * *

6. Section 249.308 is amended by revising the phrase "Rule 13a-11 or Rule 15d-11 (§ 240.13a-11 or § 240.15d-11 of this chapter)" to read "Rule 13a-11 or Rule 15d-11 (§ 240.13a-11 or § 240.15d-11 of this chapter) and for reports of nonpublic information required to be disclosed by Regulation FD (§§ 243.100 and 243.101 of this chapter)".

7. Form 8-K (referenced in § 249.308) is amended:

a. in General Instruction A, by revising the phrase "Rule 13a-11 or Rule 15d-11" to read "Rule 13a-11 or Rule 15d-11, and for reports of nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 and 243.101)".

b. by adding one sentence to the end of paragraph 1 of General Instruction B;

c. in General Instruction B, by adding a new paragraph 2;

d. in General Instruction B.4., by revising the phrase "other events of material importance pursuant to Item 5," to read "other events of material importance pursuant to Item 5 and of information pursuant to Item 9,";

e. in General Instruction B. by adding a new paragraph 5;

f. in Item 5 of Information to be Included in the Report by adding a new sentence at the end of the paragraph;

g. by adding a new Item 9 under "Information to be Included in the Report", to read as follows:

Note: The text of Form 8-K does not, and these amendments will not, appear in the Code of Federal Regulations.

Form 8-K

* * * * *

GENERAL INSTRUCTIONS

* * * * *

B. Events to be Reported and Time for Filing of Reports

1. * * * A registrant either furnishing a report on this form under Item 9 or electing to file a report on this form under Item 5 solely to satisfy its obligations under Regulation FD (17 CFR 243.100 and 243.101) must furnish such report or make such filing in accordance with the requirements of Rule 100(a) of Regulation FD (17 CFR 243.100(a)).

2. The information in a report furnished pursuant to Item 9 shall not be deemed to be "filed" for the purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities of that section, except if the registrant specifically states that the information is to be considered "filed" under the

Exchange Act or incorporates it by reference into a filing under the Securities Act or the Exchange Act.

\* \* \* \* \*

5. A registrant's report under Item 5 or Item 9 will not be deemed an admission as to the materiality of any information in the report that is required to be disclosed solely by Regulation FD.

\* \* \* \* \*

INFORMATION TO BE INCLUDED IN THE REPORT

\* \* \* \* \*

Item 5. Other Events and Regulation FD Disclosure.

\* \* \* The registrant may, at its option, file a report under this item disclosing the nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100-243.103).

\* \* \* \* \*

Item 9. Regulation FD Disclosure.

Unless filed under Item 5, report under this item only information the registrant elects to disclose through Form 8-K pursuant to Regulation FD (17 CFR 243.100-243.103).

\* \* \* \* \*

By the Commission.

Jonathan G. Katz
Secretary

Dated: August 15, 2000

**Footnotes**

[1] 17 CFR 243.100-243.103.

[2] 17 CFR 240.10b5-1.

[3] 17 CFR 240.10b5-2.

[4] 17 CFR 249.308.

[5] The new rules and amendments were proposed in Exchange Act Release No. 42259 (Dec. 20, 1999) [64 FR 72590].

[6] United States v. O'Hagan, 521 U.S. 642, 658 (1997) (citing Victor Brudney, Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws, 93 Harv. L. Rev. 322, 356 (1979)). See also H.R. Rep. No. 100-910 (1988) ("The investing public has a legitimate expectation that the prices of actively traded securities reflect publicly available information about the issuer of such securities. . . . [T]he small investor will be - and has been - reluctant to invest in the market if he feels it is rigged against him.")

[7] See Proposing Release, part II.A. As discussed in the Proposing Release, in light of the "personal benefit" test set forth in the Supreme Court's decision in Dirks v. SEC, 463 U.S. 646 (1983), many have viewed issuer selective disclosures to analysts as protected from insider trading liability, see, e.g., Paul P. Brountas Jr., Note: Rule 10b-5 and Voluntary Corporate Disclosures to Securities Analysts, 92 Colum. L. Rev. 1517, 1529 (1992). We have brought a settled enforcement action alleging a tipping violation by a corporate officer who was alleged to have acted with the motive to protect and enhance his reputation. SEC v. Phillip J. Stevens, Litigation Release No. 12813 (Mar. 19, 1991).

[8] See e.g., Jeffrey M. Laderman, Who Can You Trust? Wall Street's Spin Game, Stock Analysts Often Have a Hidden Agenda, Bus. Wk., Oct. 5, 1998 and Amitabh Dugar, Siva Nathan, Analysts' Research Reports: Caveat Emptor, 5 J. Investing 13 (1996).

[9] The public comments we received, and a summary of public comments prepared by our staff, can be reviewed in our Public Reference Room at 450 Fifth Street, N.W., Washington, D.C. 20549, in File No. S7-31-99. Public comments submitted by electronic mail are on our website, www.sec.gov.

[10] See, e.g., Letters of Gary Aguirre, David Cambridge, Malcolm Kirby, and Doug Wilmsmeyer.

[11] See, e.g., EDS Call By Merrill Spurs Warning: Call of the Day, Bloomberg News, June 9, 2000, available in Bloomberg, Hush List; Altera Steers Analysts' Revenue Forecasts: Call of the Day, Bloomberg News, June 6, 2000, available in Bloomberg, Hush List; Goldman Falls After Warning on 2nd-Quarter Profit, Bloomberg News, May 26, 2000, available in Bloomberg, Hush List; Pepsi Bottling Gives Select Group Early Look at Data, Bloomberg News, May 15, 2000, available in Bloomberg, Hush List; Investors Back SEC Rule to Ban Selective Disclosure, Bloomberg News, Apr. 27, 2000, available in Bloomberg Equity CN; Richard McCaffery, Papa John's Investors: The Last to Know, Motley Fool, Dec. 9, 1999 (http://www.fool.com/news/1999/pzza991209.html); Juniper Networks Doesn't Invite All Investors to Product Call, Bloomberg News, Dec. 7, 1999, available in Bloomberg, Hush List; Access Denied: Some Investors Lose When Kept Out, Bloomberg News, Dec. 6, 1999, available in Bloomberg, Hush List; Fred Barbash, Companies, Analysts a Little Too Cozy, Wash. Post, Oct. 31, 1999, at H1; SEC's Levitt Seeks to Open Company Conference Calls, Bloomberg News, Oct. 18, 1999, available in Bloomberg, Hush List; Susan Pulliam, Abercrombie & Fitch Ignites Controversy Over Possible Leak of Sluggish Sales Data, Wall St. J., Oct. 14, 1999, at C1; SEC May Propose Rule to Curb Selective Disclosure, Bloomberg News, Oct. 7, 1999, available in Bloomberg, Hush List; Idaho Conference of Moguls,

Investors Boosts Stocks, Bloomberg News, July 8, 1999, available in Bloomberg, Hush List; ConAgra Excludes Investors From 3rd-Qtr Earnings Call, Bloomberg News, Mar. 25, 1999, available in Bloomberg, Hush List; Susan Pulliam and Gary McWilliams, Compaq is Criticized for How it Disclosed PC Troubles, Wall St. J., Mar. 2, 1999, at C1; Miriam Hill, Should Companies Play Favorites?, Philadelphia Inquirer, Feb. 2, 1999, at C1; Big Investors Get First Word With Market-Moving News, Bloomberg News, Dec. 14, 1998, available in Bloomberg, Hush List. We do not mean to suggest that all these reports necessarily involve selective disclosure of material nonpublic information.

[12] National Investor Relations Institute, A Study of Corporate Disclosure Practices, Second Measurement, 18 (May 1998); Stephen Barr, "Back to the Future: What the SEC Should Really Do About Earnings Management," CFO Magazine (Sept. 1999).

[13] NIRI Executive Alert, Most Corporate Conference Calls Are Now Open to Individual Investors and the Media, Feb. 29, 2000.

[14] See, e.g., Remarks of Chairman Arthur Levitt to the "SEC Speaks" Conference, "A Question of Integrity: Promoting Investor Confidence by Fighting Insider Trading" (Feb. 27, 1998); Remarks of Commissioner Isaac C. Hunt, Jr., "Navigating the Sea of Communications" (Feb. 26, 1999); Remarks of Commissioner Laura S. Unger, "Corporate Communications Without Violations: How Much Should Issuers Tell Their Analysts and When" (Apr. 23, 1999). Copies of these speeches are available on the SEC's website at www.sec.gov.

[15] See, e.g., Letters of the Securities Industry Association, The Bond Market Association, and the American Bar Association.

[16] We note, in addition, that if we were successful in enforcement actions charging selective disclosures as a form of fraudulent insider trading, the in terrorem effect of that success (and the consequent chilling effect on issuers) would certainly be far greater than the impact of the more measured approach we adopt today.

[17] See, e.g., Letters of the Securities Industry Association, Sullivan and Cromwell, the Association for Investment Management and Research, Merrill Lynch, and the New York City Bar Association.

[18] See, e.g., Letters of the Securities Industry Association, the Association for Investment Management and Research, and Merrill Lynch.

[19] See, e.g., Letters of the United Kingdom Listing Authority, Chris Kallaher, and Joseph L. Toenjes.

[20] See, e.g., Letters of the American Bar Association, the American Corporate Counsel Association, the DC Bar, the American Society of Corporate Secretaries, and the Securities Industry Association.

[21] Letters of Dow Jones, Moody's, and Standard and Poors.

[22] See, e.g., Letters of Dow Jones (suggesting exclusion for "bona fide news organizations"); Standard and Poors (suggesting exclusion for disclosure to rating agencies when information provided in connection with rating process); and the Securities Industry Association (suggesting exclusion for disclosure to government recipients).

[23] See, e.g., Letters of the American Corporate Counsel Association, the American Society of Corporate Secretaries, the DC Bar, and Sullivan and Cromwell.

[24] Rule 100(b)(1)(ii) includes an "institutional investment manager" as defined in Section 13(f)(5) of the Exchange Act (15 U.S.C. 78m(f)(5)) that filed a Form 13F for the most recent quarter of the year. Generally, institutional investment managers are required to report on Form 13F if they exercise investment discretion with respect to accounts holding publicly traded equity securities having an aggregate market value of at least $100 million. See Exchange Act Rule 13f-1, 17 C.F.R. 240.13f-1.

[25] Rule 100(b)(1)(iii) includes hedge funds by covering persons who would be categorized as investment companies but for the exclusions from the definition of investment company set forth in Sections 3(c)(1) or 3(c)(7) of the Investment Company Act (15 U.S.C. 80a-3(c)(1) or 80a-3(c)(7)).

[26] With one exception, we are using the definitions of these terms provided in the federal securities laws. With respect to investment companies and hedge funds, the definition of "affiliated person" that we provide for purposes of Regulation FD is somewhat narrower than the definition of that term provided in Section 2(a)(3) of the Investment Company Act (15 U.S.C. 80a-2(a)(3)). The Regulation FD definition does not include the persons included in Section 2(a)(3)(A) and (B) -- i.e., persons who own or control 5% of the voting securities of an investment company, or companies in which the investment company owns or controls 5% of the voting securities. We believe that these persons should not be included among those to whom selective disclosure is prohibited, because they are not ordinarily persons who will exercise influence or control over an investment company's investment decisions, or be used as conduits for transmission of selectively disclosed information.

[27] While it is conceivable that a representative of a customer, supplier, strategic partner, news organization, or government agency could be a security holder of the issuer, it ordinarily would not be foreseeable for the issuer engaged in an ordinary-course business-related communication with that person to expect the person to buy or sell the issuer's securities on the basis of the communication. Indeed, if such a person were to trade on the basis of material nonpublic information obtained in his or her representative capacity, the person likely would be liable under the misappropriation theory of insider trading.

[28] This agreement to maintain confidentiality must be express. However, this is not a requirement for a written agreement; an express oral agreement will suffice. In addition, it will not be necessary for the issuer to obtain a confidentiality agreement before making the disclosure. An agreement obtained after the disclosure is made, but before the recipient of the information discloses or trades on the basis of it, will be sufficient. In

this manner, an issuer who has mistakenly made a selective disclosure of material information may try to avoid any harm resulting from the selective disclosure by obtaining from the recipient of that disclosure an agreement not to disclose or trade on the basis of the information.

[29] These first two exclusions recognize that an issuer may have a confidentiality agreement with, or be owed a duty of trust or confidence by, an individual or group within a larger organization. In that situation, the issuer can share material nonpublic information with the individual or group that owes it the duty of confidentiality, even though there may be other persons in the organization who do not owe the issuer such a duty (and disclosure to whom would be covered by Regulation FD). For example, if an issuer shares information with an investment banker subject to a duty of trust or confidence or an express confidentiality agreement, the issuer will not be deemed to be sharing the information with other parts of the investment banker's firm (e.g., sell-side analysts or sales force personnel). Conversely, the fact that a duty of trust or confidence or a confidentiality agreement specifically covers disclosure to the investment banker does not permit disclosure to others within the investment banker's firm.

[30] Letters of The Bond Market Association, Moody's, and Standard and Poors.

[31] Letters of the American Bar Association, the American Corporate Counsel Association, and Cleary Gottlieb.

[32] Letter of PricewaterhouseCoopers.

[33] Letter of the Business Roundtable.

[34] "Senior official" is defined in Rule 101(f) as any director, executive officer, investor relations or public relations officer, or other person with similar functions. See Section II.B.3.b below. In the case of a closed-end investment company, Regulation FD also defines the term "person acting on behalf of an issuer" to include a senior official of the issuer's investment adviser.

[35] See Rule 101(c). For a closed-end investment company subject to Regulation FD, an "agent" of the issuer would include a director, officer, or employee of the investment company's investment adviser or other service provider who is acting as an agent of the issuer.

[36] By including those who "regularly" communicate with securities market professionals and security holders, the rule focuses on those whose job responsibilities include dealing with securities market professionals and security holders, acting in those capacities. It does not cover every employee who may occasionally communicate with an analyst or security holder. Thus, if an analyst sought to ferret out information about an issuer's business by quizzing a store manager on how business was going, the store manager's response ordinarily would not trigger any Regulation FD obligations. Similarly, an employee who routinely dealt with customers or suppliers would not come within this definition merely because one of these customers or suppliers also happened to be a security holder of the issuer.

[37] As noted in the Proposing Release, in such a case the employee's potential liability will depend on existing insider trading law and relevant doctrines of controlling person liability. See, e.g., Sections 20A and 21A of the Exchange Act, 15 U.S.C. 78t-1 and 78u-1.

[38] TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); see Basic v. Levinson, 485 U.S. 224, 231 (1988) (materiality with respect to contingent or speculative events will depend on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity); see also Securities Act Rule 405, 17 CFR 230.405; Exchange Act Rule 12b-2, 17 CFR 240.12b-2; Staff Accounting Bulletin No. 99 (Aug. 12, 1999) (64 FR 45150) (discussing materiality for purposes of financial statements).

[39] Id.

[40] See, e.g., Texas Gulf Sulphur, 401 F.2d 833, 854 (2d Cir. 1968), cert. denied, 394 U.S. 976 (1969); In re Investors Management Co., 44 S.E.C. 633, 643 (1971). For purposes of insider trading law, insiders must wait a "reasonable" time after disclosure before trading. What constitutes a reasonable time depends on the circumstances of the dissemination. Faberge, Inc., 45 S.E.C. 249, 255 (1973), citing Texas Gulf Sulphur, 401 F.2d at 854.

[41] See, e.g., Letters of the Financial Executives Institute and the North American Securities Administrators Association.

[42] See, e.g., Letters of the American Bar Association, the Association for Investment Management and Research, the Association of Publicly Traded Companies, Bank One, Cleary Gottlieb, Goldman Sachs, the Investment Company Institute, the New York City Bar Association, the Securities Industry Association, and Sullivan and Cromwell.

[43] See Letter of the American Bar Association.

[44] In the Proposing Release, we offered several suggestions for mitigating these concerns, including: (1) designating a limited number of persons who are authorized to make disclosures or field inquiries from investors, analysts, and the media; (2) keeping a record of communications with analysts; (3) declining to answer sensitive questions until issuer personnel could consult with counsel; or (4) seeking time-limited "embargo" agreements from analysts in appropriate circumstances. Several commenters believed that the first of these methods was a useful practice, which was already in place at many issuers, but did not believe the other suggestions would be practical. We did not intend to suggest that issuers were required to implement any of these practices, but only offered them as suggestions.

[45] See, e.g., Letters of the American Bar Association, the Association of Publicly Traded Companies, the Investment Company Institute, and the DC Bar.

[46] Basic Inc. v. Levinson, 485 U.S. 224, 236 (1988).

[47] Compare NASD Rule IM-4120-1. Some of these items are currently covered in Form 8-K reporting requirements.

[48] See, e.g., Letter of Charles Schwab.

[49] See also, Section II.B.3 below.

[50] Rule 100(a)(1).

[51] Rule 101(a).

[52] See, e.g., Letters of the American Corporate Counsel Association, Charles Schwab, and Dow Chemical.

[53] See, e.g., Letters of the American Society of Corporate Secretaries and Credit Suisse First Boston.

[54] See, e.g., Letters of the American Society of Corporate Secretaries, the American Corporate Counsel Association, and J.P. Morgan.

[55] See, e.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2d Cir.), cert. denied, 439 U.S. 1039 (1978); McLean v. Alexander, 599 F.2d 1190 (3d Cir. 1979); Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979); SEC v. Carriba Air, Inc., 681 F.2d 1318 (11th Cir. 1982).

[56] See Hollinger v. Titan Capital Corp., 914 F.2d 1564 (9th Cir. 1990), cert. denied, 499 U.S. 976 (1991); Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th Cir.), cert. denied, 434 U.S. 875 (1977).

[57] Of course, a pattern of "mistaken" judgments about materiality would make less credible the claim that any particular disclosure was not intentional.

[58] See Letters of the Chicago Board Options Exchange and Gretchen Sprigg Wisehart.

[59] See, e.g., Letters of Cleary Gottlieb, Credit Suisse First Boston, Emerson Electric, and Morgan Stanley Dean Witter.

[60] See, e.g., Letters of the American Bar Association, the American Corporate Counsel Association, the National Investor Relations Institute, and PR Newswire.

[61] Rule 101(f).

[62] Rule 101(d).

[63] See, e.g., Letters of Business Wire, the Society of American Business Editors and Writers, PR Newswire, and the National Federation of Press Women.

[64] See, e.g., Letters of the American Corporate Counsel Association, the American Society of Corporate Secretaries, the Business Roundtable, Intel, and Dow Chemical.

[65] See, e.g., Letters of the American Corporate Counsel Association, the American Society of Corporate Secretaries, Cleary Gottlieb, and the National Investors Relations Institute.

[66] Item 5 is used for optional reporting of any information not required to be reported by a company.

[67] A company must designate in the Form 8-K that it is filing under Item 5 in this case.

[68] A company must designate in the Form 8-K that it is furnishing information under Item 9 in this case.

[69] Rule 101(e)(2).

[70] We do not share the concerns of some commenters that Regulation FD will lead to press releases being supplanted as a regular means of corporate disclosure. In many cases, a widely-disseminated press release will provide the best way for an issuer to provide broad, non-exclusionary disclosure of information to the public. Moreover, we note that self-regulatory organization ("SRO") rules typically require companies to issue press releases to announce material developments. We believe that these rules are appropriate, and do not intend Regulation FD to alter or supplant the SRO requirements.

[71] Giving the public the opportunity to listen to the call does not also require that the issuer give all members of the public the opportunity to ask questions.

[72] See Letters of Intel, Charles Schwab, and the Business Roundtable.

[73] We believe that if an issuer is using a webcast or conference call as part of its method of effecting public distribution, it should consider providing a means of making the webcast or call available for some reasonable period of time. This will enable persons who missed the original webcast or call to access the disclosures made therein at a later time.

[74] This is not to say, however, that an issuer may not change its usual practices on an ongoing basis rather than in isolated instances.

[75] The Commission has asked the Division of Corporation Finance to undertake this review.

[76] See, e.g., NASDAQ Rules 4310(c)(16) and 4320(e)(14), and NYSE Listed Company Manual, § 2.

[77] See Schoenbaum v. Firstbrook, 405 F.2d 200, 208 (2d Cir.) rev'd on other grounds, 405 F.2d 215, 220 (2d Cir. 1968) (en banc). See also

discussion in Section II.B.7. infra.

[78] See, e.g., Letters of the American Bar Association, the New York City Bar Association, The Bond Market Association, Cleary Gottlieb, Credit Suisse First Boston, and the Securities Industry Association.

[79] For example, Section 5(c) prohibits offers prior to the filing of a registration statement and Section 5(b)(1) prohibits the use of written or broadcast communications that fall within the "prospectus" definition (except the preliminary Section 10 prospectus) until the final Section 10(a) prospectus has been delivered.

[80] See Rule 100(b)(2). Registered shelf offerings under Rule 415(a)(1)(i), (ii), (iii), (iv), (v), or (vi) are not excluded from the operation of Regulation FD. Those offerings, which include secondary offerings, dividend or interest reinvestment plans, employee benefit plans, the exercise of outstanding options, warrants or rights, the conversion of outstanding securities, pledges of securities as collateral and issuances of American depositary shares, are generally of an ongoing and continuous nature. Because of the nature of those offerings, issuers would be exempt from the operation of Regulation FD for extended periods of time if the exclusion for registered offerings covered them. Public companies that engage in these offerings should be accustomed to resolving any Section 5 issues relating to their public disclosure of material information during these offerings.

In light of the revisions we have made to Regulation FD to exclude disclosures in connection with a registered offering, we are not adopting proposed Rule 181. That proposed rule was designed to address concerns that Regulation FD-required disclosures during a registered offering could be nonconforming prospectuses that violate Section 5(b)(1) of the Securities Act. Because Regulation FD will not apply to disclosure in connection with registered offerings (other than those of a continuous nature), we believe that Rule 181 is no longer necessary.

[81] See Rule 101(g).

[82] For example, communications that a public company makes about its future financial performance in one of its regularly scheduled conference calls with analysts would not be considered to be made in connection with an offering simply because the issuer was in the midst of a registered offering at that time.

[83] See, e.g., Letters of the American Bar Association; the American Corporate Counsel Association; the American Society of Corporate Secretaries; the New York State Bar Association; the Securities Industry Association; and Sullivan & Cromwell.

Form S-3 requires that the issuer be current and timely in filing its reports under Sections 13, 14 and 15(d) for a period of at least 12 calendar months prior to filing the registration statement. Form S-2 requires the same except that the issuer must be current in its reporting for the last 36 calendar months.

[84] Rule 144 requires that for such a resale to be valid the issuer of the securities must have made all filings required under the Exchange Act during the preceding 12 months. Form S-8 requires that the issuer be current in its reporting for the last 12 calendar months (or for such shorter period that the issuer was required to file such reports and materials). Rule 144 and Form S-8 eligibility would have been lost from the time of the failure to comply with Regulation FD until the company disclosed the information under the terms of the regulation.

[85] In addition, because a violation of Regulation FD is not an antifraud violation, it would not lead to loss of the safe harbor for forward looking statements provided by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737. See Securities Act Section 27A (b), 15 U.S.C. 77z-2(b); and Exchange Act Section 21E(b), 15 U.S.C. 78u-5 (b).

[86] This provision is limited to Regulation FD disclosure requirements and should be distinguished from other reporting requirements under Section 13(a) or 15(d) which do create a duty to disclose for purposes of Rule 10b-5.

[87] See SEC v. Phillip J. Stevens, supra note 7.

[88] See generally Backman v. Polaroid Corp., 910 F.2d 10 (1st Cir. 1990) (en banc); In re Phillips Petroleum Sec. Litig., 881 F.2d 1236 (3d Cir. 1989).

[89] See, e.g., Elkind v. Ligget & Myers, Inc., 635 F.2d 156 (2d Cir. 1980); In the Matter of Presstek, Inc., Exchange Act Release No. 39472 (Dec. 22, 1997).

[90] Regulation FD does not expressly require issuers to adopt policies and procedures to avoid violations, but we expect that most issuers will use appropriate disclosure policies as a safeguard against selective disclosure. We are aware that many, if not most, issuers already have policies and procedures regarding disclosure practices, the dissemination of material information, and the question of which issuer personnel are authorized to speak to analysts, the media, or investors. The existence of an appropriate policy, and the issuer's general adherence to it, may often be relevant to determining the issuer's intent with regard to a selective disclosure.

[91] Section 21C of the Exchange Act, 15 U.S.C. 78u-3. A failure to file or otherwise make required public disclosure under Regulation FD will be considered a violation for as long as the failure continues; in our enforcement actions, we likely will seek more severe sanctions for violations that continue for a longer period of time.

[92] Section 20(e) of the Exchange Act, 15 U.S.C. 78t(e).

[93] Insider Trading Sanctions Act of 1984, Pub. L. No. 98-376, 98 Stat. 1264; Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. L. No. 100-704, 102 Stat. 4677.

[94] United States v. O'Hagan, 521 U.S. 642, 658 (1997).

[95] See Dirks v. SEC, 463 U.S. 646, 654 (1983).

[96] See O'Hagan, 521 U.S. at 651-52.

[97] Compare United States v. Teicher, 987 F.2d 112, 120-21 (2d Cir.), cert. denied, 510 U.S. 976 (1993) (suggesting that "knowing possession" is sufficient) with SEC v. Adler, 137 F.3d 1325, 1337 (11th Cir. 1998) ("use" required, but proof of possession provides strong inference of use) and United States v. Smith, 155 F.3d 1051, 1069 & n.27 (9th Cir. 1998), cert. denied, 525 U.S. 1071 (1999) (requiring that "use" be proven in a criminal case).

[98] See Proposing Release at part III.A.1.

[99] See, e.g., Letters of the Securities Industry Association, the American Bar Association, Sullivan and Cromwell, and the DC Bar.

[100] Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976); Chiarella v. United States, 445 U.S. 222 (1980).

[101] See Letters of the American Bar Association and Sullivan and Cromwell.

[102] See, e.g., Letters of the American Bar Association, the New York City Bar Association, the Investment Company Institute, the DC Bar, and Sullivan and Cromwell.

[103] Letters of the American Society of Corporate Secretaries and Brobeck Phleger & Harrison.

[104] See Teicher, 987 F.2d at 120.

[105] Some commenters stated that "aware" was an unclear term that may be interpreted to mean something less than "knowing possession." We disagree. "Aware" is a commonly used and well-defined English word, meaning "having knowledge; conscious; cognizant." We believe that "awareness" has a much clearer meaning than "knowing possession," which has not been defined by case law.

[106] See, e.g., Letter of the Securities Industry Association.

[107] See Letters of LeBoeuf, Lamb, Greene, & MacRae (issuer repurchases); the American Society of Corporate Secretaries, Brobeck Phleger & Harrison (employee stock option plans); and L.B. Foster Company (employee stock purchase plans).

[108] See, e.g., Letter of the American Society of Corporate Secretaries.

[109] Rule 10b5-1(c)(1)(i)(A).

[110] Rule 10b5-1(c)(1)(i)(B). We have removed the proposed affirmative defense for purchases or sales that result from a written plan for trading

securities that is designed to track or correspond to a market index, market segment, or group of securities. We believe that the activity that was contemplated by that provision is permissible under the defense as adopted. Therefore, a separate defense is no longer necessary.

[111] Rule 10b5-1(c)(1)(i)(C). However, a person acting in good faith may modify a prior contract, instruction, or plan before becoming aware of material nonpublic information. In that case, a purchase or sale that complies with the modified contract, instruction, or plan will be considered pursuant to a new contract, instruction, or plan.

[112] Rule 10b5-1(c)(1)(iii)(A).

[113] Rule 10b5-1(c)(1)(iii)(B).

[114] Rule 10b5-1(c)(1)(iii)(C).

[115] Some commenters raised questions about the treatment of standardized options trading under the proposed rule. These commenters suggested that the exercise of a standardized option should be allowed, regardless of what information the trader was aware of at the time of exercise, because the relevant investment decision was made when the person purchased the standardized option. We do not agree that the decision to exercise a standardized option is not a separate investment decision. However, Rule 10b5-1, as adopted, does not affect the analysis of whether it is a separate investment decision. The rule could, however, affect options transactions in that it permits a person to pre-arrange, at a time when he or she is not aware of material nonpublic information, a plan for exercising options in the future.

[116] A person would not satisfy this provision of the rule by establishing a delegation of authority under which the person retained some ability to influence the decision about how, when, or whether to purchase or sell securities.

[117] Rule 10b5-1(c)(1)(i)(A)(2).

[118] Rule 10b5-1(c)(1)(i)(A)(3).

[119] Rule 10b5-1(c)(1)(i)(B)(2).

[120] Id.

[121] Rule 10b5-1(c)(1)(i)(B)(3).

[122] See Letter of L.B. Foster Company addressing Rule 16b-3(c), the exemption from Section 16(a) reporting and Section 16(b) short-swing profit liability for most transactions under tax-conditioned plans.

[123] For example, it will be possible to set up a trust so that the trust transactions will be eligible for both the Rule 16a-8(b)(3) exemption and the Rule 10b5-1(c)(1)(i)(B)(3) defense. The Rule 10b5-1(c)(1)(i)(B)(3)

defense also will be available for portfolio securities transactions in which a Section 16 insider is not deemed to have a pecuniary interest by virtue of Rule 16a-1(a)(2)(iii).

[124] Rule 10b5-1(c)(2).

[125] The Securities Industry Association commented that paragraph (c)(2) would not allow institutions to engage in "dynamic hedging" in circumstances where the institution's trading desk, while managing its proprietary position through a hedge, also was aware of material nonpublic information. We do not believe paragraph (c)(2) should provide a defense in those circumstances, if the same trader who is aware of the material information is making the trading decisions for the firm. However, paragraph (c)(1), which would allow a broker-dealer to manage risk by devising a formula for hedging at a time when it is not aware of material nonpublic information, could provide a defense for that activity. Alternatively, the broker-dealer could segregate its personnel and otherwise use information barriers so that the trader for the firm's proprietary account is not made aware of the material nonpublic information.

The Securities Industry Association also commented that the rule could unintentionally impede market liquidity when broker-dealers participate in shelf takedowns and other block transactions. The concern was that the rule would create uncertainty about whether a broker-dealer that held an order to execute a block transaction could continue to conduct regular market making in that same security. We believe that ordinary market making does not present insider trading concerns if a customer who places an order with a broker-dealer has an understanding that the broker-dealer may continue to engage in market making while working the order. Thus, a broker-dealer's ordinary market making would not be considered a "misappropriation" of the customer's information because it would not involve trading on the basis of the information in a manner inconsistent with the purpose for which it was given to the broker. If, however, a broker-dealer engaged in extraordinary trading for its own account when aware of unusually significant information regarding a customer order, it is possible, based on the facts and circumstances, that the broker-dealer would be held liable for insider trading or for front-running as defined by SRO rules.

[126] Proposing Release at part III.B.1.

[127] O'Hagan, 521 U.S. at 658-59.

[128] See, e.g., Letters of the American Society of Corporate Secretaries, the American Corporate Counsel Association, and the North American Securities Administrators' Association.

[129] See, e.g., Letter of the Association for Investment Management and Research.

[130] See, e.g., Letters of the American Bar Association and the New York City Bar Association.

[131] 947 F.2d 551 (2d Cir. 1991) (en banc), cert. denied, 503 U.S. 1004 (1992).

[132] 601 F. Supp. 685 (S.D.N.Y.), rev'd on other grounds, 773 F.2d 447 (2d Cir. 1985).

[133] Reed, for example, suggests that the types of confidences previously exchanged by family members (e.g., whether or not they were business confidences), may make a difference in determining whether or not a confidential relationship exists.

[134] As stated in the Proposing Release and in the Preliminary Note to the rule, the law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5. This rule does not address or modify the scope of insider trading law in any other respect.

[135] Rule 10b5-2(b)(1).

[136] Rule 10b5-2(b)(2).

[137] Letters of the American Bar Association and the DC Bar.

[138] Letters of the American Bar Association and the New York City Bar Association.

[139] 44 U.S.C. 3501 et seq.

[140] See Letter of The Bond Market Association.

[141] See Letter of the Securities Industry Association.

[142] Many issuers, for example, do not have analyst coverage, see Harrison Hong et al., Bad News Travels Slowly: Size, Analyst Coverage, and the Profitability of Momentum Strategies, 55 J. Finance 265 (2000), or do not have institutional shareholders.

[143] See Letter of The Bond Market Association.

[144] A recent academic paper finds evidence that analyst conference calls are associated with increased return volatility, trading volume, and trade size. The authors interpret these results as evidence that material information may be revealed in analyst conference calls and that larger investors likely are taking advantage of this information. Richard Frankel et al., An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium, 37 J. Acct. Res. 133 (1999). Two commenters questioned the reliability of the assumptions made in the study. We believe the assumptions are reasonable approximations, although not perfect. In any event, we view these results as corroborative evidence, not as the basis for our conclusions. See Letters of American Corporate Counsel Association and The Bond Market Association.

[145] See, e.g., Letters of Pieter Bergshoeff and Barbara Black.

[146] Letter of the Chicago Board Options Exchange.

[147] See I. Krinsky and J. Lee, Earnings Announcements and the Components of the Bid-Ask Spread, 51 J. of Fin. 1523 (1996); C.M. Lee, B. Mucklow and M.J. Ready, Spreads, Depth and the Impact of Earnings Information: An Intraday Analysis, 6 Rev. of Fin. Stud. 345 (1993); A.S. Kyle, Continuous Auctions and Insider Trading, 53 Econometrica 1315 (1985); L.R. Glosten and P. Milgrom, Bid, Ask and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders, 14 J. of Fin. Econ. 71 (1985).

[148] See, e.g., Letters of IBM, A.T. Bigelow, and Thomas Brandon.

[149] Letter of Joseph McLaughlin.

[150] See United States v. O'Hagan, and H.R. Rep. No. 100-910, supra, note 6.

[151] See M.J. Fishman and K.M. Hagerty, Insider Trading and the Efficiency of Stock Prices, 23 Rand J. of Econ. 106 (1992); M. Manove, The Harm From Insider Trading and Informed Speculation, 104 Q.J. of Econ. 823 (1989).

[152] The Securities Industry Association disputed the significance of this benefit. Given the widespread reports, cited above and in the Proposing Release, of analysts' concerns about continuing access to corporate insiders, we continue to believe this is a significant issue.

[153] 17 CFR 249.308.

[154] We anticipate that many issuers will make one disclosure each quarter under Regulation FD. We also assume that issuers will, on average, make one additional disclosure per year.

[155] In many cases, information disclosed under Regulation FD would be information that an issuer was ultimately going to disclose to the public. Under Regulation FD, that issuer is not going to make any more public disclosure than it otherwise would, but it may make the disclosure sooner and now would be required to file or disseminate that information in a manner reasonably designed to provide broad, non-exclusionary distribution of the information to the public.

[156] In the Proposing Release, we assumed a cost of $125 per hour for outside legal advice. We have revised that estimate and now assume that outside legal advice will cost $175 per hour.

[157] Accordingly, in the Proposing Release, we assumed that 25% of the burden would be borne by outside counsel and 75% by in-house professional staff. This balance reflects our belief that many issuers will make disclosures by some disclosure option other than by a Form 8-K that will require less time from outside lawyers. Using these assumptions, the total approximate cost of a Regulation FD disclosure would be $537.50.

[158] In the Proposing Release, we estimated the total paperwork burden to be approximately $33,250,000. In addition to the changes noted above in notes 156 and 157, the revised figure also reflects a reduction in paperwork burden due to the exclusion from coverage of foreign private issuers under Regulation FD.

[159] Letters of Stephen Jones and Gretchen Sprigg Wisehart.

[160] Letter of The Bond Market Association.

[161] Id.

[162] Letter of the Securities Industry Association.

[163] See Harrison Hong et al., supra note142.

[164] Letter of The Bond Market Association.

[165] See Fishman and Hagerty; Manove, supra note 151.

[166] See, e.g., Letters of Huntington Bancshares and Charles Schwab.

[167] See, e.g., Letters of Bradley Richardson and Scott Lawton.

[168] Letter of Net2000.

[169] Letter of the National Association of Real Estate Investment Trusts.

[170] Id.

[171] See, e.g., Letters of the Securities Industry Association, The Bond Market Association, and the American Bar Association.

[172] See, e.g., Letters of the Securities Industry Association and The Bond Market Association.

[173] See Letters of Charles Schwab and Net2000.

[174] R.J. Lundholm and M.H. Lang, Corporate Disclosure Policy and Analyst Behavior, 71 The Acct. Rev. 467 (1996).

[175] See Section 15(f) of the Exchange Act (15 U.S.C. 78o(f)) and Section 204A of the Investment Advisers Act (15 U.S.C. 80b-4a).

[176] In the Proposing Release, we asked whether we should require that contracts, instructions, or trading plans be approved by counsel. Commenters noted that such a requirement would impose costs. As adopted, the rule does not impose this requirement.

[177] We find that the exemption of issuers from the obligation to make public

disclosure by furnishing or filing Forms 8-K on the condition that they disseminate the information through another method that is reasonably designed to provide broad, non-exclusionary distribution is necessary or appropriate in the public interest and is consistent with the protection of investors.

[178] Letter of the Securities Industry Association.

[179] Letters of the Securities Industry Association and Joseph McLaughlin.

[180] Letter of the American Bar Association.

[181] Letter of VirtualFund.com.

[182] Letters of the American Society of Corporate Secretaries and the Securities Industry Association.

[183] Exchange Act Rule 0-10(a) defines an issuer, other than an investment company, to be a "small business" or "small organization" if it had total assets of $5 million or less on the last day of its most recent fiscal year. 17 CFR 240.0-10(a). Investment Company Act Rule 0-10(a) defines an investment company as a "small business" or "small organization" if it, "together with other investment companies in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year." 17 CFR 270.0-10(a).

[184] In the IRFA, we estimated the number of issuers, other than investment companies, that may be considered small entities as approximately 830. The FRFA number represents the increased number of issuers filing Exchange Act reports pursuant to the NASD's new requirements implemented under Rule 6530 during the last 18 months.

[185] The Commission bases its estimate on information from Lipper Directors' Analytical Data, Lipper Closed-End Fund Performance Analysis Service, and reports investment companies file with the Commission on Form N-SAR.

[186] Exchange Act Rule 0-10(c) defines a broker-dealer as a small entity if it had total capital (net worth plus subordinated liabilities) of less than $500,000 on the date in the prior fiscal year as of which its audited financial statements were prepared and it is not affiliated with any person (other than a natural person) that is not a small entity. 17 CFR 240.0-10 (c).

[187] Investment Advisers Act Rule 0-7 defines an investment adviser as a small entity if it: (i) manages less than $25 million in assets, (ii) has total assets of less than $5 million on the last day of its most recent fiscal year, and (iii) is not in a control relationship with another investment adviser that is not a small entity. 17 CFR 275.0-7.

[188] The Commission bases its estimate on information from FOCUS Reports.

[189] The Commission bases its estimate on information from the Commission's database of registration information.

[190] The Commission bases its estimate on information from Lipper Directors' Analytical Data and reports investment companies file with the Commission on Form N-SAR.

[191] See Section 15(f) of the Exchange Act (15 U.S.C. 78o(f)) and Section 204A of the Investment Advisers Act (15 U.S.C. 80b-4a).

*http://www.sec.gov/rules/final/33-7881.htm*

**EXHIBIT B**

8-K 1 f09128e8vk.htm FORM 8-K

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

**May 10, 2005**
Date of Report (Date of earliest event reported)

# CONNETICS CORPORATION
(Exact name of Registrant as specified in its charter)

| **Delaware** | **0-27406** | **94-3173928** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File No.) | (IRS Employer Identification No.) |

**3160 Porter Drive, Palo Alto, California 94304**
(Address of principal executive offices, including zip code)

**(650) 843-2800**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events.**

The following Executive Officer of Registrant has adopted a "plan" under Rule 10b5-1 of the Securities Exchange Act of 1934, as amended, for trading shares of Registrant's common stock, par value $0.001 per share, and/or exchangeable shares:

Thomas G. Wiggans

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**CONNETICS CORPORATION**

By: /s/ Sanjiv S. Dhawan
       Sanjiv S. Dhawan
       Vice President, Corporate Counsel

Date: May 12, 2005

**EXHIBIT C**

8-K 1 f08322e8vk.htm FORM 8-K

**Table of Contents**

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 8-K

---

**CURRENT REPORT**
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

**April 26, 2005**
Date of Report (Date of earliest event reported)

# CONNETICS CORPORATION
(Exact name of Registrant as specified in its charter)

| **Delaware** | **0-27406** | **94-3173928** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File No.) | (IRS Employer Identification No.) |

**3160 Porter Drive, Palo Alto, California 94304**
(Address of principal executive offices, including zip code)

**(650) 843-2800**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## TABLE OF CONTENTS

Item 2.02. Results of Operations and Financial Condition.
Item 8.01. Other Events.
Item 9.01. Financial Statements and Exhibits.
SIGNATURES
EXHIBIT INDEX
EXHIBIT 99.1

Table of Contents

**Item 2.02. Results of Operations and Financial Condition.**

On April 26, 2005 Connetics Corporation, issued a press release announcing earnings for the quarter ended March 31, 2005. A copy of the earnings release is furnished as Exhibit 99.1 to this report.

**Item 8.01. Other Events.**

Over the past several weeks Connetics has been responding to the Food and Drug Administration's, ("FDA") questions regarding the Company's New Drug Application ("NDA") for its product candidate Velac. As part of this dialogue, the Company recently received communications from the FDA indicating that the agency was interpreting some of the results of a pre-clinical study for Velac® Gel differently than the Company did in the NDA submission. The preclinical study in question involved a transgenic mouse model. In the study, there was a positive response to the product. The Company carefully analyzed the results with a panel of leading toxicologists and experts in this model. The experts advised the Company that the transgenic mouse model is known to have limitations, and the experts concluded that the positive response was the result of a limitation of the model. The advice of these experts is supported by other products which had a positive finding but were ultimately approved based on additional work in other animal models. The Company is continuing its discussions with the FDA and expects to submit additional information which further supports the Company's original conclusion.

**Item 9.01. Financial Statements and Exhibits.**

(c) Exhibits.

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release dated April 26, 2005. |

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CONNETICS CORPORATION

By:  /s/ John L. Higgins
     John L. Higgins
     Executive Vice President, Finance and
     Corporate Development, and Chief
     Financial Officer

Date: April 26, 2005

**Table of Contents**

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated April 26, 2005 |

EX-99.1 2 f08322exv99w1.htm EXHIBIT 99.1

Exhibit 99.1



## CONNETICS ANNOUNCES FIRST QUARTER RESULTS
## WITH PRODUCT SALES UP 79 PERCENT

**PALO ALTO, Calif. (April 26, 2005) – Connetics Corporation (Nasdaq: CNCT),** a specialty pharmaceutical company that develops and commercializes dermatology products, announced today net income for the first quarter ended March 31, 2005 of $1.0 million, or $0.03 per diluted share. This compares with net income of $1.9 million, or $0.05 per diluted share, for the first quarter of 2004.

Total revenues for the first quarter of 2005 were $42.4 million, compared with total revenues of $25.0 million for the comparable period in 2004. Total product sales for the first quarter of 2005 increased 79% to $42.2 million, compared with $23.6 million for the comparable period in 2004, reflecting growth in sales of OLUX® and Luxíq®, a full quarter of sales of Soriatane®, which was acquired in March 2004, and our first full quarter of sales of Evoclin™, which was introduced in December 2004.

First quarter 2005 sales of OLUX and Luxíq were $21.4 million, representing an increase of 8% over the same period in 2004. Soriatane sales were $17.6 million during the quarter and Evoclin sales were $3.1 million. Royalty and contract revenues for the first quarter of 2005 were $181,000 lower as compared with $1.4 million in the first quarter of 2004, primarily as a result of the final royalty payment from S.C. Johnson in the first quarter of 2004.

Selling, general and administrative expenses for the first quarter of 2005 increased to $27.6 million from $15.1 million in the same period last year, reflecting a more than doubling of the sales force, non-dermatology promotional activities provided by UCB Pharma, Inc. as well as marketing and promotional activities related to the launch of Evoclin. Research and development expenses were $5.8 million during the quarter, compared with $4.3 million during the same period last year, due to increased clinical activities related to the ongoing Desilux™ VersaFoam-EF™ trials and the initiation of trials for Primolux™ VersaFoam-EF.

The Company had cash and investments, including restricted cash, as of March 31, 2005 of $237.8 million, including $159.0 million in net proceeds from the private placement of convertible senior notes late in the first quarter.

"I am very pleased to report on a busy first quarter that included sales from our newly launched Evoclin product and the successful completion of a $200 million convertible financing," said Thomas G. Wiggans, Chief Executive Officer of Connetics. "We expect further revenue gains from our expanded sales force and new contract sales agreement with Ventiv for three of our products. Additionally, we have a number of near-term regulatory and clinical milestones as outlined during our Analyst and Investor Day event held on April 14, 2005."

Significant activities in the first quarter of 2005 and subsequent weeks included:

- Signing an agreement with Ventiv Commercial Services Group (VCS), a division of Ventiv Health, Inc., to deploy a sales force dedicated to provide sales support for OLUX, Luxíq and Evoclin to primary care physicians and pediatricians through 2006. Product promotional activities under the agreement commenced on April 18, 2005.

(more)

- Commencing the Phase III clinical program for Primolux VersaFoam-EF (formerly referred to as OLUX-EF), a super high-potency topical steroid, formulated with 0.05% clobetasol propionate in the Company's proprietary emulsion foam delivery vehicle. The clinical program will consist of two Phase III trials focusing on atopic dermatitis and psoriasis both of which are actively enrolling.

- Raising $200 million in an offering of convertible senior unsecured notes. Connetics used $35 million of the net proceeds from the offering to complete an open market purchase of the Company's common stock.

- Presenting 11 posters at the American Academy of Dermatology's 63rd annual meeting.

**Financial Guidance**
For the second quarter of 2005, Connetics projects total revenue of $45 million to $47 million. Second quarter combined SG&A and R&D expenses are projected to be in the range of $34 million to $36 million. Earnings per diluted share for the second quarter of 2005 are projected to be $0.06 to $0.08.

Reiterating 2005 financial guidance as updated on April 14, 2005, the Company anticipates total revenues to be in the range of $195 million to $206 million and combined SG&A and R&D expenses to be in the range of $121 million to $128 million. Earnings per diluted share for 2005 are expected to be $0.88 to $0.92. 2005 guidance assumes the launch of Velac in the third quarter.

In determining the Company's financial guidance, Connetics' management considered many factors and assumptions including, but not limited to, current and projected prescription information; sales trend data of the Company's products; the potential generic availability of, and competitive threats to, the Company's products; size, reach and call frequency of the Company's selling organization; status, timing and progression of the Company's development projects; current and projected spending levels to support sales, marketing, development, and administrative activities; and other risk factors discussed in Connetics' publicly filed documents. The above guidance does not take into account conversion of the Company's convertible senior notes, the effect of expensing stock options or the potential impact of other components of Connetics' growth strategy, including possible future acquisitions of products, businesses and/or technologies.

**Conference Call**
On the conference call, Connetics management will review key updates on areas including quarterly product performance, commercialization activities, the Ventiv co-promotion partnership, product pipeline, and financial highlights. In addition, management will provide an update on the regulatory status of Velac. Connetics will host a conference call to discuss first quarter financial results beginning at 4:30 p.m. Eastern Time/1:30 p.m. Pacific Time today. To participate in the live call by telephone, domestic callers should dial (888) 328-2575, and international callers should dial (706) 643-0459. To listen to the conference call live via the Internet, go to the investor relations section of www.connetics.com. A telephone replay will be available for 48 hours beginning today at 6:30 p.m. Eastern Time/3:30 p.m. Pacific Time. To access the replay from the U.S., please dial (800) 642-1687; and from outside the U.S. please dial (706) 645-9291. The Conference ID# is 5419652. The internet replay of the call will be available for 30 days at www.connetics.com.

**About Connetics**
Connetics Corporation is a specialty pharmaceutical company focused on the development and commercialization of innovative therapeutics for the dermatology market. Connetics has branded its proprietary foam drug delivery vehicle VersaFoam®. The Company's marketed products are OLUX® (clobetasol propionate) Foam, 0.05%, Luxiq® (betamethasone valerate) Foam, 0.12%, Soriatane® (acitretin) capsules and Evoclin™ (clindamycin) Foam, 1%. Connetics is developing Velac® (a combination of 1% clindamycin and 0.025% tretinoin) Gel, for treating acne, Desilux™ (desonide) VersaFoam-EF, 0.05% a low-potency topical steroid formulated to treat atopic dermatitis, and Primolux™ (clobetasol propionate) VersaFoam-EF, 0.05%, a super high-potency topical steroid formulated to treat atopic dermatitis and plaque psoriasis. Connetics' product formulations aim to improve the management of dermatological diseases and provide significant product differentiation. Connetics' proprietary formulations have earned wide acceptance by both physicians and patients due to their clinical

(more)

effectiveness, high quality and cosmetic elegance. For more information about Connetics and its products, please visit www.connetics.com.

**Forward Looking Statements**
Except for historical information, this press release includes "forward-looking statements" within the meaning of the Securities Litigation Reform Act. All statements included in this press release that address activities, events or developments that Connetics expects, believes or anticipates will or may occur in the future, including, particularly, statements about earnings estimates, future financial performance, and financial guidance, are forward-looking statements. Statements pertaining to revenue expectations, revenue growth, and sales and marketing success of, and regulatory and clinical milestones associated with, Connetics' products or product candidates are also forward-looking statements. These forward-looking statements are based on certain assumptions made by Connetics' management based on its experience and perception of historical trends, current conditions, expected future developments and other factors it believes are appropriate in the circumstances. Such statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond Connetics' control, and which could cause actual results or events to differ materially from those expressed in such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, risks and other factors that are discussed in documents filed by Connetics with the Securities and Exchange Commission from time to time, including Connetics' Annual Report on Form 10-K for the year ended December 31, 2004. Forward-looking statements represent the judgment of the Company's management as of the date of this release, and Connetics disclaims any intent or obligation to update any forward-looking statements.

**Contacts:**
Patrick O'Brien
Director, Investor Relations
(650) 739-2950
pobrien@connetics.com
Press Release Code: (CNCT-F)

Ina McGuinness or Bruce Voss
Lippert/Heilshorn & Associates
(310) 691-7100
imcguinness@lhai.com

Tables Follow

(more)

**CONNETICS CORPORATION**

**Condensed Consolidated Statements of Operations**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2004 |
| Revenues: | | |
| Product | $42,190 | $23,566 |
| Royalty and contract | 181 | 1,416 |
| Total revenues | 42,371 | 24,982 |
| | | |
| Operating costs and expenses: | | |
| Cost of product revenues | 3,766 | 1,568 |
| Research and development | 5,763 | 4,286 |
| Selling, general and administrative | 27,601 | 15,072 |
| Depreciation and amortization | 3,742 | 1,648 |
| Total operating costs and expenses | 40,872 | 22,574 |
| | | |
| Income from operations | 1,499 | 2,408 |
| | | |
| Interest and other income (expense), net | (353) | (292) |
| Provision for income taxes | (105) | (243) |
| | | |
| Net income | $ 1,041 | $ 1,873 |
| | | |
| Net income per share: | | |
| Basic | $ 0.03 | $ 0.06 |
| Diluted | $ 0.03 | $ 0.05 |
| | | |
| Shares used to calculate net income per share: | | |
| Basic | 35,699 | 33,587 |
| Diluted | 38,014 | 35,887 |

(more)

## CONNETICS CORPORATION

### Condensed Consolidated Balance Sheets
### (In thousands)
### (Unaudited)

|  | March 31, 2005 | December 31, 2004 |
|---|---|---|
| **Assets** | | |
| Assets: | | |
| Cash, cash equivalents and short-term investments | $233,705 | $ 72,383 |
| Restricted cash | 4,109 | 3,963 |
| Accounts receivable and other current assets | 26,847 | 25,099 |
| Other intangible assets, net | 118,988 | 122,388 |
| Property and equipment, net | 12,813 | 11,830 |
| Other long-term assets | 17,879 | 10,065 |
| Total assets | $414,341 | $ 245,728 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities and stockholders' equity: | | |
| Current liabilities | $ 28,438 | $ 27,388 |
| Other liabilities | 290,446 | 90,420 |
| Stockholders' equity | 95,457 | 127,920 |
| Total liabilities and stockholders' equity | $414,341 | $ 245,728 |

# # #

Connetics Corporation
3160 Porter Drive
Palo Alto, CA 94304

**EXHIBIT D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION,

                **PLAINTIFF,**

                **v.**

ALEXANDER J. YAROSHINSKY,

and

VICTOR E. ZAK

           **DEFENDANTS.**

---

Case No. 06CV2401 (RCC)

RECEIVED
JUN 2 2 2006
U.S.D.C.
CASHIER

## AMENDED COMPLAINT

For its complaint against Alexander J. Yaroshinsky and Victor E. Zak, Plaintiff the United States Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      This is an insider trading case involving transactions in the securities of Connetics Corp. ("Connetics" or the "Company") by Alexander J. Yaroshinsky ("Yaroshinsky"), the former Vice President of Biostatistics and Clinical Operations for Connetics, and Victor E. Zak ("Zak"). The Defendants' trading was conducted in advance of a June 13, 2005 public announcement (the "Announcement") by Connetics stating that it had received a "not approvable" letter from the Food and Drug Administration ("FDA") concerning Velac Gel, a developmental stage acne medication that the Company was projecting would contribute significantly to its near-term and long-term financial

performance. After the announcement, Connetics' common stock fell 27% from the previous day's close on volume of more than 30 times its 30-day moving average.

2.       On April 13, 2005, two months before the Announcement, Yaroshinsky, in his capacity as Connetics' Vice President of Biostatistics and Clinical Operations, participated on a telephone call with members of the FDA staff responsible for reviewing Velac Gel ("FDA staff"), during which he learned of the comments and conclusions by the FDA's Executive Carcinogenicity Assessment Committee ("ECAC") with respect to the results of a carcinogenicity study of Velac Gel. ECAC serves as the primary consulting body for the FDA on carcinogenicity issues. Its responsibilities include evaluating carcinogenicity study results, data generated from dose selection studies, and proposed carcinogenicity protocols.

3.       Yaroshinsky subsequently positioned himself to benefit from a decline in the price of Connetics' securities. From April 26 through June 10, 2005, Yaroshinsky purchased 51 put contracts and sold 15,100 shares of Connetics common stock in his own account and purchased 2,025 Connetics put contracts in a nominee account he controlled.

4.       Yaroshinsky communicated the information he learned on the April 13 telephone call with the FDA staff to Zak. Thereafter, from April 13 through June 10, 2006, Zak, who also positioned himself to benefit from a decline in the price of Connetics' securities, purchased 430 Connetics put contracts and sold short 75,000 Connetics shares. In addition, Zak sold a previously-acquired long position of 5,000 Connetics shares.

5.       As a result of their unlawful conduct, the Defendants benefited financially by more than $1.58 million. Specifically, Yaroshinsky benefited financially by more than $680,000, and Zak benefited financially by more than $900,000.

6.       By virtue of their conduct, Yaroshinsky and Zak violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, and, unless enjoined, will continue to engage in transactions, acts, practices, and courses of business similar to

- 2 -

those alleged in this Complaint.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)] seeking permanently to enjoin Yaroshinsky and Zak from engaging in the wrongful conduct alleged in this Complaint and seeking as to Yaroshinsky a temporary restraining order, an asset freeze, and other relief. The Commission also seeks final judgments ordering Yaroshinsky and Zak to pay disgorgement, civil money penalties and other relief pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §78u(d) and 78u-1].

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 77u(e) and 78aa]. Yaroshinsky and Zak, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9.      Venue lies in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]. Certain of the transactions, acts, practices, and courses of business, including certain securities transactions, constituting the violations alleged herein occurred within the City of New York.

## DEFENDANTS

10.     Defendant Alexander J. Yaroshinsky, age 52, is a resident of Mountain View, California. During the relevant period, Yaroshinsky was Connetics' Vice President of Biostatistics and Clinical Operations.

11.     Defendant Victor E. Zak, 51, is a resident of Newton, Massachusetts and works in information technology. Zak and Yaroshinsky were neighbors in Massachusetts in 1992.

- 3 -

**RELATED ENTITY**

12.     Connetics is a Palo Alto, California-based marketer and developer of dermatological products. Connetics common stock is traded on the Nasdaq National Market System. Connetics options are traded on the American Stock Exchange, as well as other exchanges.

**FACTUAL ALLEGATIONS**

13.     During the relevant period, Yaroshinsky's duties and responsibilities as Connetics' Vice President of Biostatistics and Clinical Operations included designing drug development studies, conducting the studies, analyzing the results and ultimately generating reports to the FDA for use in drug applications. In order to carry out his duties, Yaroshinsky was entrusted with, and had ready access to, non-public information concerning the approval process of Connetics' developmental stage drugs.

14.     As an employee of publicly traded Connetics, Yaroshinsky owed Connetics a fiduciary duty of trust and confidence. In addition, at all times during his employment with Connetics, Yaroshinsky was subject to Connetics' written code of professional conduct for employees, which explicitly prohibited employees from buying or selling Connetics securities while having knowledge of material non-public information and from disclosing such information to others. The code of conduct specifically defined material information to include "negative views about a new or existing product" and "expected government actions" which included FDA actions on pending drug approvals.

15.     Throughout 2004, Connetics touted Velac Gel as potentially its biggest selling product. By the end of 2004, Connetics had reported that it spent in excess of $15 million in licensing fees, milestone payments, and development costs related to Velac

- 4 -

Gel. In 2004, and early 2005, Connetics was projecting publicly that it expected Velac Gel to launch during the fourth quarter of 2005, and the Company and analysts who followed Connetics projected publicly that a launch of Velac Gel would contribute significantly to Connetics' 2005 and 2006 revenues.

16.     Before Velac Gel could be sold in the U.S., however, Connetics was required to obtain approval from the FDA. As part of the approval process, the FDA required Connetics to perform a carcinogenicity study on Velac Gel to ascertain the incidence of the formation of skin tumors on mice. Consistent with his responsibilities at Connetics, Yaroshinsky played a role in the development and testing of Velac Gel.

17.     From January 2004 through June 2004, Connetics performed the carcinogenicity study on mice. The carcinogenicity study results indicated that out of 160 mice treated with Velac Gel in varying formulations and dosages, 89 mice developed tumors.

18.     On June 28, 2004, Connetics convened a panel of toxicology experts to provide feedback on the carcinogenicity study results. At the meeting, the panel convened by Connetics reported that it was unaware of any drug exhibiting a "positive dermal," similar to Velac Gel, that had been approved by the FDA. Yaroshinsky was present at this discussion.

19.     On August 24, 2004, Connetics submitted the Velac Gel drug application to the FDA. The application included the results of the carcinogenicity study.

20.     On April 13, 2005, at 2:15 p.m. EST, the FDA staff held a conference call with Connetics' staff to discuss the FDA staff's preliminary analysis of the carcinogenicity study results. During the call, the FDA told Connetics that ECAC had

concluded that the Velac Gel vehicle was positive and may be a "tumor promoter or a carcinogen." The FDA staff further told Connetics that "this is a serious issue for a topical product for the treatment of acne... ." Yaroshinsky was present during this conference call with the FDA.

21.    On the same day, at 3:13 p.m. EST, shortly after the teleconference with the FDA ended, Yaroshinsky, using a telephone at Connetics, called his friend and former neighbor Zak, at Zak's office, and told Zak of the FDA staff's comments and conclusions. After this call, Zak, who prior to April 13, 2005, maintained a bullish 5,000 share long position in Connetics securities, began executing bearish transactions in Connetics securities. Specifically, at 3:30 p.m. EST, Zak accessed his online brokerage account using his office computer, and sold short 5,000 shares of Connetics. Seventeen minutes later, Zak shorted an additional 2,000 shares and then eight minutes after this sale, Zak sold 3,000 shares from his previously held long position in Connetics securities.

22.    Between April 14 and June 10, 2005, Zak sold short a further 68,000 shares of Connetics common stock, sold 2,000 more Connetics shares of his previously held long position, and purchased 430 Connetics put contracts. A put contract is a type of option in which the value of the purchaser's investment increases in value as the price of the underlying security declines.

23.    Zak's short-selling of Connetics shares and buying of Connetics put options resulted in margin calls from his brokerage firm requiring additional funds to continue trading.

24.    On April 14, 2005, the day after the call with the FDA staff , Connetics imposed a two- tier ban on trading in the Company's securities. The first was to expire

on April 28, 2005, and covered all employees who were present on the FDA call the prior day, which included Yaroshinsky. Connetics also imposed a trading prohibition that extended to May 10, 2005 for employees who participated in preparing additional submissions to the FDA concerning the carcinogenicity study, which also included Yaroshinsky.

     25.    On the same day the trading ban was imposed, Yaroshinsky arranged for a nominee brokerage account to be opened in the name of his mother-in-law. Yaroshinsky controlled this account.

     26.    On April 21, while the trading ban was in place, Yaroshinsky purchased 5 put contracts in the nominee account.

     27.    On April 26, while the trading ban was in place, Yaroshinsky closed a short position consisting of 10 put contracts that he had written in February 2005. The effect of this transaction was to avoid losses that would predictably occur when the news of the non-approval of Velac Gel became public.

     28.    On April 26, 2005, after the close of the market, Connetics made its first public statement regarding the FDA's April 13 comments. The press release stated that the FDA is "interpreting some of the results of a pre-clinical study [the carcinogenicity study] for Velac Gel differently than the Company…there was a positive response to the product." The release, however, stopped short of disclosing the full extent of the FDA's concerns and the incidence of tumors in the mice tested. Most notably, missing from the release was ECAC's conclusion that the "vehicle was positive in this assay and may be a tumor promoter or a carcinogen." Even the partial disclosure, however, affected Connetics' share price. On April 27, 2005, the price of Connetics shares opened down

$4.63 at $22.94 per share, and closed down $5.27 per share at $22.30 per share on volume of 6,961,700 shares, more than 11 times its moving 30-day average.

29.     On April 27, 2005, while the trading ban was in place, Yaroshinsky liquidated 15,100 shares of his 16,913 share long position in Connetics securities. Yaroshinsky had accumulated these shares over the course of several years. In addition, on the same day, Yaroshinsky purchased 41 Connetics put contracts in his account.

30.     On May 12, 2005, Yaroshinsky funded the nominee account with $363,000 from his own brokerage account. Approximately one month later, on June 6, 2005, Yaroshinsky deposited $150,000 from his checking account into the nominee account.

31.     From May 12 through June 10, 2005, Yaroshinsky purchased 2,020 Connetics put contracts in the nominee account.

32.     After the close of the market on Friday, June 10, 2005, Connetics received from the FDA a formal "not approvable" letter for Velac Gel. The FDA's letter stated that the drug was "unsafe for use." On Monday, June 13, 2005, before the opening of the market, Connetics issued a press release and Current Report on Form 8-K disclosing to the public that the FDA had not approved Velac Gel. The press release stated that the "only issue raised" in the FDA letter was the result of the carcinogenicity study. The release further stated that "as a result of today's announcement Connetics now projects 2005 total revenues to be $182 million to $188 million, down from previous guidance of $195 million to $206 million." In the same press release, Connetics adjusted down its 2005 earnings per share forecast, which the Company had previously projected would be between $0.88 and $0.92 per share. Connetics changed this projection to between $0.66

- 8 -

and $0.70 per share. Shortly after this announcement, analysts adjusted down their financial projections for Connetics in a similar fashion.

33.    By the close of the market on Monday, June 13, 2005, Connetics' share price had fallen 27% from Friday's close of $20.77 to $15.13 on volume of 15,448,594 shares traded, 30 times its 30-day moving average. This closing price was a significant departure from the range in which shares of Connetics traded during the previous two months, during which it had traded between a high of $29.48 and a low of $19.07.

34.    During the following five weeks, Yaroshinsky closed out over 2,000 of his options contracts. As a result of these transactions, as well as his long sales preceding the June 13 announcement, Yaroshinsky benefited financially by more than $680,000.

35.    After the June 13 announcement, but before the end of 2005, Zak closed out of his Connetics options positions, and covered his short sales of Connetics shares. As a result of these transactions, as well as his long sales preceding the June 13 announcement, Zak befitted financially by more than $900,000.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]

36.    Paragraphs 1 through 35 are re-alleged and incorporated herein by reference.

37.    In the course of his employment at Connetics, Defendant Yaroshinsky learned material, non-public information concerning the status of Velac Gel. He further knew, should have known, or was reckless in not knowing, that the information concerning the FDA's view of the carcinogenicity study was material and nonpublic. Yaroshinsky further recklessly violated the fiduciary duty of trust and confidence that he

owed to Connetics to maintain such information in confidence until it was publicly disseminated.

38.    In violation of his fiduciary duty to Connetics, Defendant Yaroshinsky used such material, non-public information, for his own financial benefit, to trade in the securities of Connetics prior to the Company's June 13, 2005 announcement that the FDA had not approved Velac Gel.

39.    In violation of his fiduciary duty of trust and confidence to Connetics, Defendant Yaroshinsky communicated the material, non-public information concerning the FDA's comments and conclusions concerning the Velac Gel carcinogenicity study to Zak, for his direct or indirect personal benefit, who could have reasonably been expected to use this information to his advantage prior to the Company's June 13, 2005 announcement that the FDA had not approved Velac Gel.

40.    Zak conducted the securities transactions in his accounts as described above while in possession of information that he knew, should have known, or was reckless in not knowing, that was material, nonpublic information that Yaroshinsky had conveyed to him in breach of Yaroshinsky's fiduciary duty of trust and confidence to Connetics.

41.    By the conduct described above, Yaroshinsky and Zak directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the Securities and Exchange Commission, respectfully requests that this Court:

(a) enter judgments permanently restraining and enjoining Yaroshinsky and Zak, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or

- 10 -

otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act

[15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder; ordering

Yaroshinsky and Zak to pay an amount equal to all moneys obtained through the illegal

activities described above plus prejudgment interest thereon, and to pay civil penalties

pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1]; and

    (b) grant such other relief as this Court deems just and proper.


By: _____
Alan M. Lieberman (AL-6517)
Telephone: (202) 551-4474
Fax: (202) 772-9245
liebermana@sec.gov
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-4030

Of Counsel:
Peter H. Bresnan, Deputy Director,
   Division of Enforcement
John Reed Stark, Chief,
   Office of Internet Enforcement
Thomas A. Sporkin, Deputy Chief
   Office of Internet Enforcement
Carolyn-Gail Gilheany
   Senior Counsel


Dated: June 20, 2006
Washington, D. C.


- 11 -