1   SUSAN S. MUCK (CSB NO. 126930)
    DEAN S. KRISTY (CSB NO. 157646)
2   CHRISTOPHER J. STESKAL (CSB NO. 212297)
    EMILY ST. JOHN COHEN (CSB NO. 239674)
3   GAURAV MATHUR (CSB NO. 242630)
    FENWICK & WEST LLP
4   555 California Street, 12th Floor
    San Francisco, CA  94104
5   Telephone:     (415) 875-2300
    Facsimile:     (415) 281-1350
6   smuck@fenwick.com
    dkristy@fenwick.com
7   csteskal@fenwick.com
    ecohen@fenwick.com
8   gmathur@fenwick.com

9   Attorneys for Defendants Connetics Corp.,
    John L. Higgins, Lincoln Krochmal,
10  C. Gregory Vontz, and Thomas G. Wiggans

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14

15                                    Case No.  C 07-02940 SI

16

17                                    REPLY MEMORANDUM IN SUPPORT OF
                                      REQUEST FOR JUDICIAL NOTICE BY
18                                    DEFENDANTS CONNETICS CORP., JOHN
                                      L. HIGGINS, LINCOLN KROCHMAL, C.
19                                    GREGORY VONTZ, AND THOMAS G.
    IN RE CONNETICS CORP.            WIGGANS
20  SECURITIES LITIGATION
                                      Date:      October 19, 2007
21                                    Time:      9:00 a.m.
                                      Dept:      Courtroom 10, 19th Floor
22                                    Judge:     Honorable Susan Illston

23

24

25

26

27

28

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ............................................................................................. 1

II.     THE COURT SHOULD TAKE JUDICIAL NOTICE OF FDA RECORDS ................... 3

III.    THE COURT SHOULD TAKE JUDICIAL NOTICE OF SUMMARY EXHIBITS ........ 7

IV.     THE COURT SHOULD CONSIDER JUDICIALLY NOTICEABLE FACTS IN
        RULING ON THE MOTION TO DISMISS ............................................................... 8

        A.      Exhibit 1– Transcript of Connetics' April 26, 2005 Call ........................ 8

        B.      Exhibit 2 – Transgenic Mouse Models Article ..................................... 10

        C.      Exhibits 7, 8, 13-16 and 19 – SEC Filings ........................................... 11

V.      THE COURT SHOULD TAKE JUDICIAL NOTICE OF EXHIBIT 42 ........................ 13

VI.     CONCLUSION ................................................................................................ 14

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Branch v. Tunnell*,
  14 F.3d 449 (9th Cir. 1994)................................................................................. 13

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997).............................................................................. 13

*DeMarco v. DepoTech Corp.*,
  149 F. Supp. 2d 1212 (S.D. Cal. 2001) ...................................................... 7, 11, 12

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002)............................................................................ 3, 8

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989)...................................................................... 13, 14

*In re Applied Micro Circuits Corp. Sec. Litig.*,
  2002 U.S. Dist. LEXIS 22403 (S.D. Cal. Oct. 3, 2002) .................................... 3, 10

*In Re Boston Scientific Corp. Sec. Litig.*,
  490 F. Supp. 2d 142 (D. Mass 2007) ..................................................................... 14

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) ............................................................... 14

*In re CV Therapeutics Sec. Litig.*,
  2004 WL 1753251 (N.D. Cal. Aug. 5, 2004).......................................................... 2

*In re Guidant Corp. Sec. Litig.*,
  2006 WL 2538374 (S.D. Ind. Nov. 8, 2004) ........................................................... 4

*In re Harmonic, Inc. Sec. Litig.*,
  163 F. Supp. 2d 1079 (N.D. Cal. 2001) .............................................................. 6, 9

*In re Invision Tech., Inc. Sec. Lit.*,
  2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ..................................................... 11, 12

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999)............................................................................ 2, 7

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ............................................................... 12

*In re Vertex Pharms., Inc. Sec. Litig*,
  357 F. Supp. 2d 343, 352 (D. Mass. 2005) ............................................... 1, 3, 5, 6

*In re Wellbutrin SR/Zyban Antitrust Litig.*,
  281 F. Supp. 2d 751 (E.D. Pa. 2003) ..................................................................... 3

*Interstate Natural Gas Co. v. Southern California Gas Co.*,
  209 F.2d 380 (9th Cir. 1953)................................................................................. 3

*Metro Pub., Ltd. v. San Jose Mercury News*,
  987 F.2d 637 (9th Cir. 1993)................................................................................. 3

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES
**(continued)**

Page(s)

*Osher v. JNI Corp.*,
  308 F. Supp. 2d 1168 (S.D. Cal. 2004),
  *aff'd in relevant part,* 183 Fed. Appx. 604
  (9th Cir. 2006) ................................................................................................................ 6, 9

*Reiger v. Altris Software, Inc.*,
  1999 WL 540893 (S.D. Cal. Apr. 30, 1999) ........................................................ 6, 9

*Tellabs v. Makor Issues & Rights, Ltd.*,
  127 S. Ct. 2499 (2007) ............................................................................................. passim

## STATUTES

15 U.S.C. § 78u-4(b)(1) .................................................................................................. 2

15 U.S.C. § 78u-4(b)(1)(B) .......................................................................................... 12

15 U.S.C. § 78u-5(c)(2) ................................................................................................. 8

15 U.S.C. § 78u-5(e) ...................................................................................................... 7

## RULES

Fed. R. Evid. 201 ........................................................................................................... 1

Fed. R. Evid. 803(8) ....................................................................................................... 2

Fed. R. Evid. 1006 ..................................................................................................... 1, 7

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## I.    INTRODUCTION

Plaintiff admits that the Court may take judicial notice of all but six of the 41 exhibits submitted by Connetics in support of its motion to dismiss.  The remaining six exhibits – four public records from the FDA (Exhibits 30 to 33) and two summary exhibits (Exhibits 39 and 40) – are also subject to judicial notice.  The FDA records fall squarely within the ambit of Rule 201 of the Federal Rules of Evidence.  The contents of these documents are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201.  The two summary exhibits may also be considered.  They are accurate summaries of other voluminous and judicially noticeable facts.  There is no legitimate reason to ignore them.  *See* Fed. R. Evid. 1006 (allowing summaries of voluminous documents).

Plaintiff ignores the governing legal standard and instead argues that the Court should not consider the FDA public records because, according to plaintiff, they are not "central" to its claim.  RJN Opp. at 9.  However, the law does not impose a "centrality" test.  In any event, the FDA public records go to the heart of plaintiff's claims because they show that the FDA approved dermal products with benzoyl peroxide even though that substance "induced skin tumors in transgenic Tg.AC mice."  Steskal Decl. Ex. 30.  Connetics was aware of, and relied on, the FDA's past decisions relating to such products when it projected that Velac could be approved by the FDA.  *Id.* Ex. 1, at 6.  The FDA public records refute any inference that defendants intended to mislead investors about Velac's prospects for approval.  *See In re Vertex Pharms., Inc. Sec. Litig.*, 357 F. Supp. 2d 343, 352 (D. Mass. 2005) (taking judicial notice of FDA public records and holding that undisclosed preclinical animal test did not foreclose prospects of FDA approval because other products had been approved that showed toxicity in same preclinical test).

Plaintiff expends most of its opposition arguing that although the Court may take judicial notice of many of the exhibits, it should then disregard those exhibits whenever plaintiff asserts in conclusory fashion that the facts are "hotly contested."  RJN Opp. at 4.  Not surprisingly, plaintiff's nonsensical argument is contrary to the law.  *Tellabs* makes clear that a court ***must*** consider ***all the facts alleged*** including, "in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs v. Makor Issues &*

Fenwick & West LLP
Attorneys At Law
San Francisco

-1-

*Rights, Ltd.,* 127 S. Ct. 2499, 2509 (2007).  In addition, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court ***must take into account plausible opposing inferences***," that is, "plausible nonculpable explanations for defendants' conduct."  *Id.* at 2509-10 (emphasis added).  When undertaking this "inherently comparative" inquiry, a court must weigh competing inferences and determine whether plaintiff has met its burden of pleading a "cogent and compelling" inference of scienter, which is an inference that is "more than merely plausible or reasonable."  *Id.* at 2504-05, 2510.

Plaintiff's argument would foreclose the very analysis that is compelled by the Reform Act and *Tellabs*.  Whereas the Reform Act and *Tellabs* require a court to consider judicially noticeable facts and draw inferences from those facts that are favorable to the defendants, plaintiff argues that this Court should disregard such facts whenever defendant disagrees with (*i.e.*, "disputes") those inferences.  RJN Opp. at 4.  If accepted, the Court would be left with nothing to consider but the "facts" plaintiff selectively highlights and the inferences that plaintiff urges.  That is precisely the legal standard that the Reform Act and *Tellabs* rejected.  Moreover, the Reform Act is clear that a plaintiff cannot allege a securities fraud claim merely by stating in conclusory fashion, as plaintiff does here, that a statement or fact is "false" or "hotly contested."  *Id*.  Rather, a plaintiff must plead facts with particularity demonstrating the reasons why the statement or fact is false.  15 U.S.C. § 78u-4(b)(1); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 984 (9th Cir. 1999) ("[W]e read the statutory command that a plaintiff plead all the 'facts' with 'particularity' to mean that a plaintiff must provide a list of all relevant circumstances in great detail").

Plaintiff is also wrong when it contends that the Court cannot consider the documents at issue for the truth.  RJN Opp. at 1.  This proposition is directly contradicted by the very authority relied on by plaintiff in its opposition.  *See In re CV Therapeutics, Inc. Sec. Litig.,* 2004 WL 1753251, *12 (N.D. Cal. Aug. 5, 2004) ("Finally, plaintiffs argue that the Court cannot consider any documents for the 'truth of their contents.'  The Court does not restrict its taking of judicial notice in this way.") (citations omitted); *see also* Fed. R. Evid. 803(8) (public records are not hearsay and may be considered for truth).  In any event, even if the Court does not consider

-2-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the documents at issue for the truth, the Court must consider the documents when determining

whether plaintiff has pleaded a "cogent and compelling" inference of scienter.  That means that if

the contents of a judicially noticeable document or a document cited in the complaint refutes an

inference of scienter, the Court must consider that document and dismiss plaintiff's complaint.

*See Tellabs,* 127 S. Ct. at 2509-10 (requiring court to examine judicially noticeable documents

and documents incorporated by reference and to engage in comparative analysis that credits

inferences favorable to defendants); *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)

(holding that court "must consider . . . inferences unfavorable to the plaintiffs" and dismissing

complaint where allegations negated a strong inference of scienter); *In re Applied Micro Circuits

Corp. Sec. Litig.,* 2002 U.S. Dist. LEXIS 22403, *12 (S.D. Cal. Oct. 3, 2002) (holding that court

must consider entire contents of SEC filings selectively quoted in complaint for purpose of

drawing inferences relating to plaintiff's allegations).

## II.      THE COURT SHOULD TAKE JUDICIAL NOTICE OF FDA RECORDS

Plaintiff objects to Exhibits 30 to 33, public records available from the FDA's website.

However, plaintiff fails to articulate any reason why the Court should not take judicial notice of

these records under Rule 201.  Exhibits 30 to 33 are neither subject to reasonable dispute nor can

their accuracy be questioned.  The law is clear that courts routinely take notice of records and

reports of administrative bodies, such as the FDA.  *See Metro Pub., Ltd. v. San Jose Mercury

News*, 987 F.2d 637, 641 n.3 (9th Cir. 1993) (taking judicial notice of trademark registrations);

*Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 384-85 (9th Cir. 1953)

(taking judicial notice of contract and rates filed with federal agency); *In re Wellbutrin SR/Zyban

Antitrust Litig.*, 281 F. Supp. 2d 751, 755 n.2 (E.D. Pa. 2003) (taking judicial notice of FDA

report posted on FDA website).

Plaintiff wrongly contends that the court cannot take judicial notice of Exhibits 30 through

33 because they are not "central" to plaintiff's claim or "referenced" in the complaint.  RJN Opp.

at 9.  That is not the standard.  Rather, a court can take judicial notice of FDA public records in a

securities fraud case because such records are available to and relied upon by the investing public

and provide context for plaintiff's allegations.  *See Vertex Pharms.,* 357 F. Supp. 2d at 352 n.4

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-3-

1   (taking judicial notice of FDA public records); *In re Guidant Corp. Sec. Litig.*, 2006

2   WL 2538374, *9 n.20 (S.D. Ind. Nov. 8, 2004) (same).  Notably, plaintiff does not dispute that

3   the Court can take judicial notice of similar documents under the same legal doctrine, including

4   the FDA's Manual of Policies and Procedures (Exhibits 28 and 29) and various analyst reports

5   (Exhibits 35 through 37).  Given the lack of any objection to such documents, it is clear that

6   plaintiff's objections here are not based on principle, but on a thinly cloaked desire to distract the

7   Court from considering public records that are devastating to plaintiff's allegations of fraud.

8          In any event, plaintiff is wrong when it argues that FDA records are not "central" to its

9   claim.  The gravamen of plaintiff's claim is that defendants made optimistic statements about

10  Velac's prospect for approval when, according to plaintiff, they knew all along that approval

11  could not be obtained.  The FDA records establish that defendants reasonably believed that Velac

12  could be approved despite the results of the Tg.AC mouse study.  For example, Exhibits 30 is the

13  FDA approval label for BenzaClin (which includes benzoyl peroxide):

14  **BenzaClin™ Topical Gel**                                    **Rx Only**

15  (clindamycin - benzoyl peroxide gel)

16  **Topical Gel:  clindamycin  (1%) as clindamycin phosphate, benzoyl peroxide (5%)**
    **For Dermatological Use Only - Not for Ophthalmic Use**

17  **\*Reconstitute Before Dispensing\***

18                                          …
    **Carcinogenesis, Mutagenesis, Impairment of Fertility:** Benzoyl peroxide has been

19  shown to be a tumor promoter and progression agent in a number of animal studies.  The
    clinical significance of this is unknown.

20
    Benzoyl peroxide in acetone at doses of 5 and 10 mg administered twice per week induced

21  skin tumors in transgenic Tg.AC mice in a study using 20 weeks of topical treatment.

22

23  This FDA public record demonstrates that dermal products that include benzoyl peroxide have

24  been approved by the FDA despite adverse Tg.AC test results:  "Benzoyl peroxide . . . induced

25  skin tumors in transgenic Tg.AC mice."  Far from foreclosing the possibility of FDA approval for

26  BenzaClin, the adverse Tg.AC test results were simply included as part of the BenzaClin label.

27         Other courts have taken judicial notice of similar records and held that they are highly

28  relevant in evaluating whether a plaintiff has met its burden of pleading a strong inference of

Fenwick & West LLP
Attorneys At Law
San Francisco

-4-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

scienter. For example, in *Vertex Pharms.,* the plaintiff alleged that defendants misrepresented the prospects for a drug's approval and made false and misleading statements regarding the results of Phase I and II clinical studies because the defendants failed to disclose that preclinical animal tests showed that the drug was "dangerously toxic." The court dismissed plaintiff's complaint:

> [T]he allegation that the defendants were aware that preclinical testing demonstrated a toxicity problem with VX-745 by March of 1999 is not in itself sufficient to demonstrate scienter. The fact that a drug has a certain toxicity level does not necessarily doom the drug's commercial prospects. As defendants point out, many drugs currently on the market are toxic depending on dosage levels and concentrations. Defendants note that other drugs (such as Lipitor and Zocor) have been found in animal studies to have toxic effects on the CNS in certain dosages, yet have been approved by the FDA. *See Def.'s Exh.* I, J. Thus, defendants' knowledge of some toxicity in VX-745 in 1999, without more, is insufficient to indicate "a mental state embracing intent to deceive, manipulate, or defraud.

357 F. Supp. 2d at 352 (case citation omitted). The same analysis applies here. The fact that Velac showed a positive response in the Tg.AC model did not "doom the drug's commercial prospects." *Id.* As shown by the FDA public records relating to BenzaClin, other dermal products have shown a positive result in that model but were nonetheless approved by the FDA. As such, the FDA documents are exactly the type of judicially noticeable records that the Court is required to consider under *Tellabs* because they refute an inference of scienter.

Plaintiff is also wrong when it argues that the Court should not consider the contents of Exhibits 30 through 33 because the documents are not "referenced" in its complaint. RJN Opp. at 9. As shown, that fact has no legal significance because a court is required to consider judicially noticeable documents, even if not referenced in the complaint. *Tellabs*, 127 S. Ct. at 2509. In any event, the complaint quotes at length from documents that demonstrate that (1) defendants were aware that the FDA had approved dermal products with benzoyl peroxide even though that compound "induced skin tumors in transgenic Tg.AC mice" and (2) defendants relied on those FDA decisions when they determined that Velac could be approved. For example, the complaint specifically calls out, quotes from, and relies on Connetics' April 26, 2005 conference call regarding the Tg.AC mouse study. *See* AC ¶¶ 261-265. During that conference call, Connetics specifically referred to drugs such as BenzaClin that also have had positive Tg.AC test results to explain why they believed Velac could be approved. Ex. 1 at 6, 24; s*ee infra* at 9.

Plaintiff attempts to avoid the import of the April 26, 2005 conference call by literally deleting from the quotations in its complaint the portions that refer to the FDA approval of dermal products with benzoyl peroxide.  *Compare* AC ¶ 261 (" . . . ") *with* Ex. 1, at 6 ("benzoyl peroxide, a commonly used OTC acne product and an ingredient in several prescription acne products, has Rx labeling that notes a positive result in this model") .  However, despite plaintiff's self-serving attempt to edit the statement, the law is clear that when a plaintiff selectively quotes from a document, the court must consider the entire document.  *See Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1186 (S.D. Cal. 2004), *aff'd in relevant part,* 183 Fed. Appx. 604 (9th Cir. 2006) (court must consider full document, not just portions plaintiff "selectively quote"); *Reiger v. Altris Software, Inc.*, 1999 WL 540893, *2 (S.D. Cal. Apr. 30, 1999) ("the court may consider the full text of those documents, even when the complaint quotes only selected portions."); *In re Harmonic, Inc. Sec. Litig.*, 163 F. Supp. 2d 1079, 1084 (N.D. Cal. 2001) (defendants may "attach to a 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim.").

Plaintiff also attempts to distract the Court from the import of the FDA public records by arguing that the facts relating to the approval of benzoyl peroxide are "highly disputed."  RJN Opp. at 10.  However, plaintiff never explains what exactly it disputes about those facts, nor does it make any allegations in its complaint demonstrating with the requisite particularity that defendants misrepresented those facts.  For instance, plaintiff does not allege – nor could it – that dermal products with benzoyl peroxide were not approved by the FDA despite the fact that benzoyl peroxide "induced skin tumors in transgenic Tg.AC mice."  Plaintiff also does not allege – nor could it – that defendants were unaware of the FDA's decision to approve those products and did not rely on that decision when they projected that Velac could be approved.  At bottom, plaintiff's quarrel is not with the judicially noticeable facts, but with the inferences that defendants draw from those facts:  namely, that defendants reasonably concluded that Velac might be approved.  Under *Tellabs*, the Court must consider those inferences, and dismiss the complaint where (as here) it eviscerates any "cogent and compelling" inference of scienter.  *See Vertex Pharms.*, 357 F. Supp. 2d at 352.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

### III.    THE COURT SHOULD TAKE JUDICIAL NOTICE OF SUMMARY EXHIBITS

2

Plaintiff also objects to Exhibits 39 and 40.  These are summaries of what plaintiff

3

acknowledges are judicially noticeable facts.  Such summaries are offered merely as a

4

convenience to the Court, and the Court may properly consider them.  *See, e.g., DeMarco v.*

5

*DepoTech Corp.*, 149 F. Supp. 2d 1212, 1218 (S.D. Cal. 2001) (taking judicial notice of chart

6

summarizing company's risk disclosures); *see also* Fed. R. Evid. 1006.

7

Exhibit 39 is a table summarizing defendants' stock sales and holdings of Connetics stock

8

during the period of July 1, 2001 to July 9, 2006.  It is based on judicially noticeable documents,

9

principally Forms 4 filed by the individual Connetics defendants.  *See* Exs. 24-26.  Plaintiff does

10

not contest the accuracy of Exhibit 39, but rather takes issue with its relevance, arguing that it is

11

improper to include underwater options in calculating the defendants' holdings.  However,

12

plaintiff cites absolutely no authority whatsoever for this novel proposition.  Rather, the law is

13

clear than when evaluating a defendant's stock sales, a court must compare those sales to the

14

defendant's total stock holdings, which includes exercisable stock options.  *Silicon Graphics,* 183

15

F.3d at 986-87.  There is no basis in the case law to exclude so-called underwater stock options

16

from that analysis.  Moreover, plaintiff's proposed rule makes no sense.  A defendant would have

17

the same motivation to increase the share price (so that the options were no longer underwater)

18

regardless.  In any event, plaintiff never alleges what defendant's total holdings would be if so-

19

called underwater stock options were excluded.  Exhibit 39 is properly considered because it is

20

based on documents that plaintiff admits are judicially noticeable, and there is no dispute that it is

21

an accurate summary of these voluminous documents.

22

Exhibit 40 is a table summarizing some of the meaningful cautionary language related to

23

Velac gel.  It is based on judicially noticeable documents, namely public filings and statements.

24

*See* Exs. 1, 3-8, 10-12, 17-18.  Plaintiff's objection to this exhibit ignores that, with respect to

25

forward-looking statements, the Reform Act explicitly provides that courts **must** examine the

26

contents of public statements and the relevant cautionary language that applies to those

27

statements.  15 U.S.C. § 78u-5(e) .  Moreover, with respect to oral statements during analyst calls,

28

courts **must** examine the cautionary statements that are contained in written documents and SEC

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-7-

1  filings referenced during the analyst calls.  15 U.S.C. § 78u-5(c)(2).  Exhibit 40 properly excerpts

2  the relevant cautionary language so that the Court can readily evaluate plaintiff's allegation that

3  defendants intentionally deceived investors about Velac's prospects for FDA approval.  As shown

4  in Exhibit 40, defendants never promised that Velac would be approved, but rather repeatedly

5  warned that FDA approval was uncertain and may be denied.

6  **IV.    THE COURT SHOULD CONSIDER JUDICIALLY NOTICEABLE FACTS IN**

7  **RULING ON THE MOTION TO DISMISS**

8      The remainder of plaintiff's opposition is spent arguing not over whether the Court may

9  take judicial notice of the exhibits – it concedes that it can – but over "defendants'

10 characterizations" of the documents and alleged "improper use of such documents."  RJN Opp. at

11 1.  As shown above, however, this argument is a red herring.  The law requires the Court to

12 review the documents and then consider inferences that can be drawn from those documents that

13 refute plaintiff's allegation of scienter.  *See Tellabs,* 127 S. Ct. at 2509-11.  Plaintiff cannot

14 foreclose that analysis merely by arguing that it "opposes defendants' characterization" of the

15 document, or asserting that defendants are somehow misusing the documents by arguing that they

16 eviscerate scienter.  RJN Opp. at 1.  Even before *Tellabs*, the Ninth Circuit rejected the argument

17 that a court had to accept a plaintiff's characterization of the facts and could not consider a

18 defendant's characterization when ruling on a motion to dismiss.  *See Gompper,* 298 F.3d at 897.

19 Now, after *Tellabs*, the law is clear that a court must consider and weigh a defendant's

20 characterization of factual allegations and judicially noticeable documents when deciding whether

21 a plaintiff has pleaded a "cogent and compelling" inference of scienter.  *See Tellabs*, 127 S. Ct. at

22 2509-11.

23     For these reasons, the Court must take judicial notice of Exhibits 1, 2, 7, 8, 13-16 and 19

24 and draw inferences from those documents that negate scienter under *Tellabs*.

25 **A.    Exhibit 1– Transcript of Connetics' April 26, 2005 Call**

26     Exhibit 1 is a transcript of Connetics' April 26, 2005 conference call.  Plaintiff relies on

27 this transcript in the complaint and admits that the Court may take judicial notice of it.  AC ¶¶ 78-

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

79, 261-65; *see also* RJN Opp. at 4.[1]  In that transcript, Connetics reports several facts that

explain its actions and negate any inference that defendants knew at the time that the FDA would

deny approval for Velac, including:

- "We conducted one of our preclinical studies in a transgenic mouse model.  And in that study there was a positive response to our product.  At the time, ***we carefully analyzed the results with a panel of leading experts in this model and leading toxicologists.  The outcome of that was that the experts advised us that this mouse model is known to have limitations.  And they concluded that the positive response was a result of one of these limitations of the model.***"  Steskal Decl. Ex. 1 at 5 (emphasis added).

- "Their advice is supported in fact, by other products which have had a positive finding in this model, resulting in a clinical hold only to be released later based upon submission of additional data.  And in fact, ***benzoyl peroxide, a commonly used [over-the-counter] acne product and an ingredient in several prescription acne products has Rx labeling that notes a positive result in [a transgenic mouse] model***."  *Id.* at 5-6 (emphasis added).

- "***Because up to this point [the] FDA had not raised this issue with us, we were surprised to receive this information.***  However, we are in discussions with them on their questions.  And we expect to submit additional information well before the PDUFA date which further supports our original conclusion."  *Id.* at 6 (emphasis added).

- "I would point out that as a rule, ***we do not feel it is appropriate frankly, to provide regular updates on our discussions with [the] FDA.***"  *Id.*  (emphasis added).

Although plaintiff cites extensively from this conference call transcript in its complaint

(AC ¶¶ 261-64), plaintiff now argues that the Court should ignore much of the transcript because,

according to plaintiff, defendants' statements are "fabrications."  RJN Opp. at 4.  However,

plaintiff pleads no facts – much less facts with particularity as required by the Reform Act –

demonstrating that any of the statements are false or misleading.  For instance, plaintiff does not

allege that the expert panel did not conclude that the positive response in the mouse model "was a

result of one of [the] limitations of the model," *i.e.*, that it was a false positive.  AC ¶ 261.

Likewise, as shown, plaintiff does not allege that the FDA has not approved dermal products that

had a positive response in the Tg.AC mouse model.  In the absence of particularized allegations

---

[1] Although plaintiff asserts that the authenticity of the transcript is in question at this point, it cannot both rely on and quote this transcript in its complaint and at the same time dispute its authenticity.  *See Osher,* 308 F. Supp. 2d at 1186 (court must consider full document, not portion plaintiff "selectively quoted"); *Reiger,* 1999 WL 540893, at *2 ("the court may consider the full text of those documents, even when the complaint quotes only selected portions"); *In re Harmonic,* 163 F. Supp. 2d at 1086 (defendants may "attach to a 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   demonstrating falsity under the Reform Act, the Court must accept the statements as true and

2   draw inferences in defendants' favor.  Here, the facts demonstrate that defendants reasonably

3   believed that Velac could be approved by the FDA despite the positive response in the Tg.AC

4   mouse model.  *See Tellabs,* 127 S. Ct. at 2509-10 (holding that courts must engage in

5   comparative analysis that credits inferences favorable to defendants); *Applied Micro Circuits*

6   *Corp.,* 2002 U.S. Dist. LEXIS 22403, at *12 (where plaintiff "refer[s] to [] SEC filings in its

7   amended complaint, [] it cannot therefore selectively argue that Defendants' cannot rely on the

8   same material").

9           **B.      Exhibit 2 – Transgenic Mouse Models Article**

10          Exhibit 2 is an article titled "Transgenic Mouse Models:  Their Role in Carcinogen

11  Identification."  Plaintiff quotes this document and relies on it in the complaint to show that

12  mouse studies make "correct" calls 77 to 81 percent of the time (and, by inference, make

13  "incorrect" calls 19 to 23 percent of the time).  AC ¶ 56.  Plaintiff further agrees that the Court

14  may take judicial notice of the fact that transgenic mice are engineered so that tumors will

15  develop more quickly.  RJN Opp. at 5.  However, plaintiff takes issue in its opposition with the

16  following statements that are also included within the article:

17      •   "Overall, the transgenic models performed well, but important issues of validation and
            standardization need further attention to permit their regulatory acceptance and use in
18          human risk assessment."  Steskal Decl. Ex. 2 at 3.

19      •   "Although they have great promise, transgenic models also have actual or potential
            limitations for use in a carcinogen identification effort.  For example, many current
20          transgenic models (including those evaluated here) have mutations in only one
            pathway that may, or may not, be relevant to human cancer processes for a given
21          chemical.  In addition, the specific gene defect may influence tumor development and
            type, increasing the difficulty of modeling the human response."  *Id.* at 5.
22

23          But again, there is nothing in the complaint that disputes these facts.  AC ¶¶ 54, 56.

24  Indeed, plaintiff itself relies on the same article for its truth.  *Id.* ¶ 56.  Moreover, Exhibit 2

25  demonstrates that there are known limitations to the transgenic mouse model, and positive results

26  in Tg.AC mice may not be relevant to human cancer processes.  Exhibit 2 is particularly relevant

27  here because an expert panel told Connetics that Velac's positive response in the mouse model

28  "was a result of one of these limitations of the model."  AC ¶ 261.  Thus, the Exhibit fully

-10-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    corroborates the conclusions of the expert panel, namely, that the results of the mouse test were a

2    false positive.  The Court must take judicial notice of these facts in evaluating whether plaintiff

3    has alleged a "cogent and compelling" inference of scienter.  *See Tellabs*, 127 S. Ct. at 2509.

4        **C.      Exhibits 7, 8, 13-16 and 19 – SEC Filings**

5             Finally, plaintiff argues that the Court may not consider SEC filings that plaintiff itself

6    cites and relies on in its complaint.  However, here again plaintiff alleges disputes where there

7    are none and asks the Court to ignore judicially noticeable documents in evaluating scienter.

8             *Exhibit 8.*  Plaintiff does not assert that Exhibit 8 – a May 14, 2002 press release from

9    Connetics – contains any false or misleading statements.  AC ¶¶ 52-80; *see also* AC ¶ 41 (quoting

10   press release).  There is absolutely no allegation in the complaint that the statement that "clinical

11   studies in more than 700 patients in Europe … have shown Velac gel to be safe and effective as

12   leading topical treatments," was either false or misleading.  *See* Ex. 8; AC ¶¶ 52-80.  In fact,

13   those statements were made before the class period and thus could not form the basis of any

14   claim.  Moreover, the European clinical tests showing that Velac was safe for human use are

15   highly relevant in assessing whether plaintiff has alleged a "cogent and compelling" case that

16   defendants in fact knew that Velac could never be approved.  *See In re Invision Tech., Inc. Sec.*

17   *Lit.*, 2006 WL 538752, *2 (N.D. Cal. Jan. 24, 2006) (statements outside class period are not

18   actionable but considered only in context of demonstrating "truth of falsity of Class Period

19   statements"); *DeMarco*, 149 F. Supp. 2d at 1223 n.6 (statements before the class period "may

20   have evidentiary relevance to the issue of scienter").  In fact, these European clinical test results

21   are consistent with the results of the Phase III clinical trials in the United States which involved

22   testing on 2,200 patients.  AC ¶¶ 36, 44-48, 255; Steskal Decl. Ex. 6, at 6 & Ex. 7, at 10.  Thus,

23   the prior clinical studies in Europe, like the Phase III clinical trials in the United States, are

24   relevant to the scienter of defendants.  Those tests demonstrate that defendants had compelling

25   reasons to be optimistic that Velac could be approved by the FDA.

26            *Exhibit 7.*  Plaintiff likewise does not allege in its complaint that Exhibit 7—a July 25,

27   2006 Form 10-K/A SEC filing—contains any false or misleading statements.  In fact, plaintiff

28   repeatedly cites that filing for the truth.  AC ¶¶ 130-32.  Moreover, that Form 10-K/A was issued

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-11-

1    *after* the end of the class period and thus cannot form the basis of plaintiff's fraud claim.  AC ¶

2    27 (class period ends on July 9, 2006); *see also Invision Tech.*, 2006 WL 538752, at *2;

3    *DeMarco*, 149 F. Supp. 2d at 1223 n.6.  Given these express allegations in the complaint, plaintiff

4    cannot conceivably argue (as it now attempts to do in its brief) that the Form 10-K/A contains

5    "false" factual assertions.  In any event, there is no allegation in the complaint that disputes the

6    fact that "until December 2005 the reports received [from Connetics' distributors] contained

7    inaccuracies and inconsistencies that made them unreliable."  Ex. 7 at 31; AC ¶¶ 109-120.  In

8    fact, despite the fact that Connetics publicly disclosed that it received inventory reports from its

9    distributors, plaintiff never explains how Connetics could have engaged in fraudulent channel

10   stuffing if those reports did not show a backlog of inventory.

11       *Exhibits 13, 14, 16 and 19*.  Plaintiff fails to allege with any specificity that any statement

12   contained or relied on in Exhibits 13, 14 and 19 was either false or misleading.  AC ¶¶ 201-204,

13   217-220, 282-286.  Instead, plaintiff block quotes from these press releases and generically

14   alleges that these statements were "materially false and misleading" for unstated reasons

15   purportedly having something to do with plaintiff's allegations of channel stuffing.  *See, e.g.,* AC

16   ¶¶ 204, 220, 286.  This type of "puzzle pleading" is not sufficient to plead securities fraud under

17   the Reform Act.  15 U.S.C. § 78u-4(b)(1)(B); *see also In re Splash Tech. Holdings, Inc. Sec.*

18   *Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001) (this type of pleading "obfuscates rather than

19   clarifies" and fails to "divine precisely which statements (or portion of statements) are alleged to

20   be false or misleading, and the reason or reasons why each statement is false or misleading").

21   (quotation omitted)

22       In any case, the Court may take judicial notice of these press releases and consider them

23   for the purpose of evaluating whether plaintiff's inference of scienter is cogent and compelling

24   under *Tellabs*.  In fact, there is nothing in the complaint that disputes any of the following:

25   • Connetics submitted an NDA application for Velac to the FDA in August 2004, which
         was accepted in October 2004.  *See* Steskal Decl. Exs. 14-15.
26

27   • There is a user fee associated with an NDA application.  *See id.* Ex. 15.

28   • Connetics paid $3.5 million to Yamanouchi Europe BV in conjunction with its
         submission of the Velac NDA to the FDA.  *See id.* Exs. 14, 16.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-12-

1

2

- In Q4 2004, Connetics hired 66 sales professionals, more than doubling its sales force. *See id.* Ex. 16.

3

4

5

6

7

8

The Court may take judicial notice of these facts—and may draw inferences from them, including the reasonable inference that Connetics incurred substantial expenses in seeking FDA approval for Velac and preparing to launch Velac. Far from supporting an inference of fraud, these facts demonstrate that defendants actually believed that Velac could obtain FDA approval. *See Tellabs*, 127 S. Ct. at 2510; *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1118 (9th Cir. 1989) (scienter dispelled by efforts to prepare product for launch).

9

**V.      THE COURT SHOULD TAKE JUDICIAL NOTICE OF EXHIBIT 42**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Defendants also request judicial notice of Exhibit 42, which is attached to the Supplemental Declaration of Christopher Steskal. Exhibit 42 is a transcript of a January 25, 2005 conference call that was incorporated by reference in the complaint. AC ¶¶ 241-245. In its complaint, plaintiff engages in impermissible "puzzle pleading" by citing numerous statements and then alleging in conclusory fashion that the statements are "false or misleading." AC ¶ 146-332. In its opposition to the motion to dismiss, plaintiff reaches back to paragraph 242 of the complaint and quotes one such statement from the January 25, 2005 conference call. Opp. at 4, 11-12 (citing AC ¶¶ 242-245). However, plaintiff wrongly cites the statement out of context. Contrary to plaintiff's suggestion, defendants Wiggins and Higgans were not discussing whether Velac would be approved by the FDA during that call, but rather whether (if it were approved) it could compete against other products on the market. In particular, when an analyst asked about "potential competitors to Velac," defendant Wiggans stated that "we're very confidant in the data set we got." Supp. Steskal Dec. Ex. 42 at 17-18; *see also id.* at 3 ("[O]ur planning case is that there will be a competitive product for Velac but we have excellent data on Velac.").

24

25

26

27

28

To give context to the quoted statements, defendants request that the Court take judicial notice of Exhibit 42. *See Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997) (court may consider document referenced in complaint); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (same). When read in context, the statements during the January 25, 2005 conference call show that defendants actually believed Velac could be brought to market and that they were making

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  plans and investing resources to do just that.  *See Apple Computer*, 886 F.2d at 1118.  Moreover,

2  it is undisputed that the Phase III clinical trials and European clinical trials demonstrated the

3  efficacy of Velac and provided ample reason to be confident in Velac's ability to compete.  In any

4  event, the law is clear that generalized assertions of corporate optimism (*e.g.*, "excellent results")

5  are too vague and unspecific to be actionable under the securities laws.  *See In re Cornerstone*

6  *Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also In Re*

7  *Boston Scientific Corp. Sec. Litig.*, 490 F. Supp. 2d 142, 162 (D. Mass. 2007) ("Every company

8  praises its products and its objectives, and these statements are nothing more than corporate

9  puffery.").

10  **VI.    CONCLUSION**

11        For the reasons stated herein and in defendants' Request for Judicial Notice, the Court

12  should grant judicial notice of Exhibits 1 to 42 of the Declaration and Supplemental Declaration

13  of Christopher Steskal.

14  Dated: October 4, 2007                          Respectfully submitted,

15                                                  FENWICK & WEST LLP

16

17                                                  By:   /s/ Christopher J. Steskal

18                                                        Christopher J. Steskal

19                                                  Attorneys for Defendants Connetics Corp.,
                                                    John L. Higgins, Lincoln Krochmal,
20                                                  C. Gregory Vontz, and Thomas G. Wiggans

21

22

23

24

25

26

27

28  25251/00402/LIT/1273476.3

1

**PROOF OF SERVICE**

2

The undersigned declares as follows:

3

I am a citizen of the United States and employed in San Francisco County, State of

4

California.  I am over the age of eighteen years and not a party to the within-entitled action.  My

5

business address is Fenwick & West LLP, San Francisco California, 555 California Street,

6

12th Floor San Francisco, California 94104.  On the date set forth below, I served a copy of the

7

following document(s):

8

9

**REPLY MEMORANDUM IN SUPPORT OF REQUEST FOR JUDICIAL
NOTICE BY DEFENDANTS CONNETICS CORP., JOHN L. HIGGINS,
LINCOLN KROCHMAL, C. GREGORY VONTZ, AND THOMAS G. WIGGANS**

10

on the interested parties in the subject action by placing a true copy thereof as indicated below,

11

addressed as follows:

12

13

Victor E. Zak
24 Oakmont Road
Newton Center, MA 02459

14

15

16

☒ **BY OVERNIGHT COURIER:**  by placing the document(s) listed above in a sealed
envelope with a prepaid shipping label for express delivery and causing such envelope to
be transmitted to an overnight delivery service for delivery by the next business day in the
ordinary course of business.

17

I declare under penalty of perjury under the laws of the State of California and the United

18

States that the above is true and correct.

19

20

Date:  October 4, 2007                              _____/s/ Margaret E. Vertin_____

21

                                                                         Margaret E. Vertin

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PROOF OF SERVICE RE DEFENDANTS' REPLY MEMO ISO REQUEST FOR JUDICIAL NOTICE –
CASE NO. C 07-02940 SI