BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
DAVID R. STICKNEY   (Bar No. 188574)
NIKI L. MENDOZA   (Bar No. 214646)
MATTHEW P. SIBEN   (Bar No. 223279)
TAKEO A. KELLAR   (Bar No. 234470)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:      (858) 793-0070
Fax:     (858) 793-0323
davids@blbglaw.com
nikim@blbglaw.com
matthews@blbglaw.com
takeok@blbglaw.com
      -and-
CHAD JOHNSON
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:      (212) 554-1400
Fax:     (212) 554-1444
chad@blbglaw.com

Attorneys for Lead Plaintiff Teachers' Retirement
System of Oklahoma and Lead Counsel to the Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| In re CONNETICS SECURITIES LITIGATION | Case No. C 07-02940 SI |
|---|---|
| | **LEAD PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITIES** |

Pursuant to Local Civil Rule 7.3(d), Lead Plaintiff Teachers' Retirement System of Oklahoma ("Lead Plaintiff") respectfully submits for the Court's consideration in ruling upon defendants' motions for dismissal the following authorities: (i) *In re Openwave Systems Sec. Litig.*, 2007 U.S. Dist. LEXIS 80558 (S.D.N.Y. Oct. 31, 2007), attached hereto as Exhibit A; (ii) Memorandum and Order, *In re Scottish Re Group Sec. Litig.*, 06 Civ. 5853 (SAS), attached hereto as Exhibit B; and (iii) *In re Enron Corp. Secs.*, 2005 U.S. Dist. LEXIS 41240 (S.D. Tex. Dec. 22, 2005), attached hereto as Exhibit C.  Each of these authorities was either published after the hearing on defendants' motions to dismiss or responds further to new points raised during the oral argument on October 19, 2007.

*Openwave* further supports the arguments in Lead Plaintiff's Opposition to the Connetics' Motion to Dismiss [Dkt. 45] at 39 (stating that pursuant to the Private Securities Litigation Reform Act of 1995, the court-appointed Lead Plaintiff has standing to assert § 20A claims on behalf of members of the proposed class even if Lead Plaintiff did not itself purchase contemporaneously with each of the defendants' insider sales).  In this regard, the *Openwave* court held:

> [T]he Complaint alleges that members of the putative class traded Openwave stock contemporaneously with the defendants named in the Section 20A cause of action,* and has specified the dates of the defendants' trades.  Such averments are sufficient to state a cause of action under Section 20A.**
>
> *     As the Second Circuit has held, the lead plaintiff need not have standing to sue on all possible causes of action.  *See Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 & n.13 (2d Cir. 2004).
>
> **     *Neubronner v. Milken*, 6 F.3d 666 (9th Cir. 1993), upon which defendants rely, is distinguishable from the case at bar.  In that case … the plaintiff "suggest[ed] he should be permitted to allege generally that contemporaneous trading occurred, and then amend his complaint following discovery of any particular instances of contemporaneous trading."  *Id*. at 670.  The Ninth Circuit rejected this suggestion, "[i]n light of the obvious need to protect parties from having to defend suits against plaintiffs who may be merely guessing that contemporaneous trading occurred."  *Id*.  In the instant case, there is no risk of a fishing expedition, as plaintiff has alleged with specificity the dates of defendants' trades and the action is brought on behalf of a class under circumstances that make ***it likely that members of the class bought the securities sold by these defendants***.

*Openwave,* 2007 U.S. Dist. LEXIS 80558 at *49 & fn. 11 and 12 (emphasis added).

*In re Scottish Re Group Sec. Litig.* further supports the arguments in Lead Plaintiff's Opposition to the Connetics' Motion to Dismiss [Dkt. 45] at 19-26 (applying the scienter standard as articulated in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (U.S. 2007)).    Specifically, under Ninth Circuit precedent, scienter is adequately pleaded where confidential witnesses establish that company's "top executives actually directed the improper revenue recognition."    *In re Daou Sys.*, 411 F.3d 1006, 1023 (9th Cir. 2005); compare to Complaint ¶¶112-119.    The holding of *Scottish Re* further supports Lead Plaintiff's argument that defendants cannot direct employees to engage in transactions that falsify the Company's financial statements, but then claim ignorance to the effects of those transactions:

> In short, all of the reasons supporting an inference that the financial statements were false, as discussed above, were known to the Scottish Re Defendants ***at the time they made the statements***.  It is simply not a plausible opposing inference that the Company's officers – sophisticated executives actively engaged in the planning of these transactions – were ignorant of the transactions' consequences . . . .

*Scottish Re*, at 49 (emphasis in original).

For the first time during oral argument on October 19, 2007, counsel for Connetics Corporation and defendants Wiggins, Vontz, Higgins and Krochmal argued that Lead Plaintiff could not rely upon a complaint filed by the United States Securities Exchange Commission ("SEC") because the SEC's complaint was not subject to the pleading strictures of the Private Securities Litigation Reform Act of 1995.  *See* Tr. at 21: 14-25 (the SEC was not "trying to plead the Reform Act Standard and they didn't . . . so [plaintiffs] can't just bootstrap their way past it").  This issue was squarely ruled upon by Judge Harmon of the Southern District of Texas in *Enron*.  In *Enron*, defendant Royal Bank of Canada argued that plaintiffs' complaint improperly relied upon factual findings made by the Enron bankruptcy examiner, which were insufficient to state a claim under the PSLRA or to satisfy plaintiffs' Rule 11 obligations.  Defendant argued:

> These bankruptcy examinations were not conducted to determine if there was securities fraud involving Enron and thus they lack the requisite particularity to state securities law violations.  Moreover, charge RBC Defendants, the complaint is not based on Plaintiff's independent, personal investigation of the facts that form the basis of the suit, but "piggybacks on contested hearsay allegations by a third party," circumventing Rule 11.

1  *Enron,* 2005 U.S. Dist. LEXIS 41240 at *22, fn. 11.  Judge Harmon correctly denied the motion

2  for dismissal (*id.* at *74), even though the bankruptcy "Examiner's findings and conclusions . . .

3  were made in a different context for a different purpose."  *Id*. at *24, fn. 12.

4  Dated: November 8, 2007              Respectfully submitted,

5                                       BERNSTEIN LITOWITZ BERGER
                                          & GROSSMANN LLP
6

7
                                           */s/ David R. Stickney*
8                                         DAVID R. STICKNEY

9                                    DAVID R. STICKNEY
                                     NIKI L. MENDOZA
10                                   MATHEW P. SIBEN
                                     TAKEO A. KELLAR
11                                   12481 High Bluff Drive, Suite 300
                                     San Diego, CA 92130
12                                   Tel:    (858) 793-0070
                                     Fax:    (858) 793-0323
13
                                     Attorneys for Lead Plaintiff Teachers' Retirement
14                                   System of Oklahoma and Lead Counsel to the Class

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

LEXSEE 2007 U.S. DIST. LEXIS 80558

**IN RE OPENWAVE SYSTEMS SECURITIES LITIGATION, This document relates to all actions.**

**07 Civ. 1309 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 80558*

**October 31, 2007, Decided
October 31, 2007, Filed**

**COUNSEL:** [*1] Appearances: For Lead Plaintiff: Chad Johnson, Laura Gundersheim, Bernstein Litowitz Berger & Grossmann LLP, New York, New York.

For Defendant, Openwave Systems Inc.: Marshall R. King, Gibson, Dunn & Crutcher LLP, New York, New York.

Paul J. Collins, Gibbson, Dunn & Crutcher, LLP, Palo Alto, California.

For Defendants, Harold L. Covert, Jr., Kenneth D. Denman, Roger L. Evans, Bo C. Hedfors, Gerald Held, Masood Jabbar, Bernard Puckett, Alain Rossmann, and Andrew Verhalen: Garrett J. Waltzer, Skadden, Arps, Slate, Meagher & Flom, LLP, Palo Alto, California.

For Defendants, Alan J. Black, Kevin J. Kennedy, Donald J. Listwin, Joshua A. Pace, David Peterschmidt, Allen E. Snyder, and Simon Wilkinson: Richard A. Spehr, Henninger S. Bullock, Mayer, Brown, Rowe & Maw, LLP, New York, New York.

For Defendants, Merrill Lynch, Pierce, Fenner & Smith Inc., Lehman Brothers Inc., J.P. Morgan Securities Inc., and Thomas Weisel Partners LLC: A. Robert Pietrzak, Andrew W. Stern, Nicholas P. Crowell, Catherine B. Winter, Sidley Austin, LLP, New York, New York.

For Defendant KPMG: Mary Gail Gearns, Bingham McCutchen, LLP, New York, New York.

Dale [*2] E. Barnes, Jr., Bingham McCutchen, LLP, San Francisco, California.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION & ORDER*

    DENISE COTE, District Judge:

    Plaintiff brings this action on behalf of a putative class of all persons or entities who purchased or acquired common stock in Openwave Systems, Inc. ("Openwave"), the self-proclaimed "leading provider of open software products and services for the communications industry," during a class period that spanned from September 30, 2002 through October 26, 2006. Plaintiff alleges that Openwave's stock price dropped dramatically as a result of the defendants' seven-year-long stock options backdating scheme, which forced Openwave to restate its previously-filed financial statements for fiscal year 2000 through the third quarter of 2006 by more than $ 182 million.

    Plaintiff brings claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") against Openwave, certain of its officers and directors, the underwriters of its December 2005 stock offering, and its auditor. Defendants have moved to dismiss all claims. Defendants' motion to dismiss the Securities Act claims is [*3] granted; the motion to dismiss the Exchange Act claims is granted in part.

2007 U.S. Dist. LEXIS 80558, *3

BACKGROUND

The following facts are taken from the First Corrected Consolidated Amended Class Action Complaint (the "Complaint") filed on August 3, 2007 and the documents to which it refers, unless otherwise noted.

I. The Parties

A. The Lead Plaintiff

On May 29, 2007, the Arkansas Teacher Retirement System, a public pension benefit fund that holds assets of approximately $ 10 billion for the benefit of current and retired Arkansas public school teachers, was appointed lead plaintiff in this action. Plaintiff claims to have purchased shares of Openwave common stock during the class period, and to have suffered financial loss as a result of the federal securities laws violations alleged in this suit. [1]

> 1    The Fresno County Retirement Association ("FCERA"), a public pension fund that claims to have purchased shares of Openwave common stock during the class period, joins in this action as a named plaintiff.

B. The Defendants

1. The Company

Openwave, a corporation organized under the laws of the State of Delaware with its principal place of business in California, develops software products and services for the telecommunications [*4] industry. Throughout the class period, Openwave was listed and publicly traded on the NASDAQ exchange under the symbol "OPWV."

2. The Individual Defendants

Under the Securities Act, plaintiff has brought claims against two Openwave officers: David C. Peterschmidt, who served as President, CEO, and a director from November 2004 through March 2007, and Harold L. Covert, Jr., who is currently CFO and Executive Vice President of Openwave, and served as a director and chairman of the audit committee of the company from April 2003 to September 2005. Plaintiff has also brought Securities Act claims against five directors of the company: M. Bernard Puckett, Kenneth D. Denman, Bo C. Hedfors, Gerald Held, and Masood Jabbar.

Collectively, these defendants will be referred to as the "Individual Securities Act Defendants."

Under the Exchange Act, plaintiff has brought claims against Peterschmidt and Covert, as well as eight additional officers. They are: Donald J. Listwin, President, CEO, and a director of Openwave from September 2000 to April 2003; Alan J. Black, formerly Senior Vice President of Finance and Administration, CFO, and Treasurer; Joshua A. Pace, formerly Vice President of Finance and [*5] Chief Accounting Officer; Allen E. Snyder, Chief Operations Officer until November 30, 2006; Steve Peters, formerly Senior Vice President, Legal Officer, Vice President, and General Counsel of Openwave, and currently its Executive Vice President and Chief Administrative Officer; Alain Rossmann, Chairman and CEO until June 2001; Simon Wilkinson, Vice President of Sales and Client Business from July 2004 through January 2005, and currently Senior Vice President and General Manager; and David J. Kennedy, Chief Operating Officer from August 2001 through September 2003, an advisor from October 2003 to June 2005, and a director from October 2002 to June 2005. In addition to the directors listed above, plaintiff has brought Exchange Act claims against former directors Roger L. Evans and Andrew W. Verhalen. Collectively, these defendants will be referred to as the "Individual Exchange Act Defendants." [2]

> 2    The Complaint and plaintiff's brief make reference to a "Defendant Solomon," but no such defendant is identified in the Complaint or named in any cause of action.

3. The Underwriter Defendants

Defendants Merrill, Lynch, Pierce, Fenner & Smith Incorporated, Lehman Brothers Inc., J.P. Morgan [*6] Securities Inc., and Thomas Weisel Partners LLC (the "Underwriter Defendants") provided underwriting services for Openwave's December 2005 common stock offering. Plaintiff alleges that, as "part of their duties as underwriters," these defendants were paid for their underwriting services and provided equity research coverage of Openwave.

4. The Auditor Defendant

Finally, plaintiff brings a claim under the Securities Act against defendant KPMG LLP ("KPMG" or the "Auditor Defendant") which served as Openwave's

auditor. Plaintiff alleges that, for each of the fiscal years covered by the class period, KPMG issued "an unqualified audit opinion on the Company's consolidated financial statements."

## II. The Backdating Scheme

Between 2000 and 2006, Openwave granted stock options to its officers, directors and employees pursuant to at least three different stock option plans, the stated purpose of which was to "attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees and Consultants of the Company and its Subsidiaries and to promote the success of the Company's business." Under two of Openwave's stock option plans, [*7] the board of directors or a designated committee was responsible for determining the exercise price of each option grant; under the third plan, the board alone was responsible for setting the exercise price. Each of these plans was subject to limitations; the most important of these limitations for the purposes of the instant litigation was that the stock options must not have an exercise price less than the fair market value of a share of Openwave common stock on the date of the grant. Openwave repeatedly represented to its shareholders and the public that it was issuing stock options in compliance with the terms of the stock option plans.

Each stock option gave the recipient the right to buy one share of Openwave stock from the company at a set price, called the "exercise price" or "strike price," on a future date after the option vested. By granting a stock option with an exercise price lower than the market price on the date of the grant, a company effectively grants an employee an instant opportunity for profit. This backdating, plaintiff alleges, removed the officers' incentive to promote Openwave's success and, contrary to the company's SEC filings concerning options grants, [*8] did nothing to "align the financial interests of the executive officers with the performance of the Company business objectives, and reward executives for their ongoing contributions to the organization."

Backdating also has accounting consequences for the grantor company. Openwave repeatedly represented in its financial statements that the company had elected to follow various generally accepted accounting principles. Those principles include Accounting Principles Board Opinion No. 25 ("APB No. 25"), which governed accounting for stock-based compensation through June

2005. APB No. 25 required companies to record the "intrinsic value" -- generally the market value -- of an option at the time it is granted. If an option had been issued at market price on the date of its issuance, the grantee need not have reported the grant as income, and the grantor company need not have reported it as employee compensation. But if an option had been backdated, APB 25 required the company to record as compensation the amount by which the market price exceeded the exercise price for the duration of the grant's vesting period, which was generally ten years in Openwave's case. Plaintiff alleges that Openwave [*9] failed to do so, thereby materially underreporting the company's compensation expenses and inflating its earnings per share in each year of the vesting period. [3]

> 3   Additionally, plaintiff alleges that the decline in the company's use of backdated options after the passage of the Sarbanes-Oxley Act, which became effective on August 29, 2002, is powerful evidence that the backdating practice was intentional and intentionally deceptive. Before Sarbanes-Oxley, option grantees reported the grants to the SEC on financial forms that were due forty-five days after the company's fiscal year end. Following enactment of Sarbanes-Oxley, a company's ability to backdate option grants was greatly diminished because grantees were required to report the grant to the SEC within two days of receiving it. Plaintiff observes that there was a precipitous decline in Openwave's alleged backdating activity after the Sarbanes-Oxley effective date, and alleges that, "[h]ad Defendants not been intentionally backdating options, but instead, simply committing 'administrative and recordkeeping errors,' they would likely have continued to backdate options at the same or similar rate throughout fiscal years 2003 through [*10] 2006."

## III. The Secondary Offering

During the class period, Openwave conducted a secondary offering of its stock. In December 2005, the company filed a set of offering documents with the SEC. Those documents included financial data for fiscal years 2002 through 2005, and incorporated by reference Openwave's Form 10-K for the year ending June 30, 2005 as well as a letter from defendant KPMG addressed to the Openwave board of directors consenting to

Openwave's use of KPMG's September 12, 2005 audit report in the offering documents and to Openwave's referring to KPMG as "Experts" in the offering documents. The Underwriter Defendants served as the managers of this offering.

IV. The Scheme Becomes Public

On March 18, 2006, *The Wall Street Journal* published an article concerning the manipulation of stock options by public companies. The article discussed the possibility that the companies had backdated the stock options to dates with lower strike prices, or "spring loading" the options by granting them on strike dates ahead of the release of positive corporate news. The publication of this article spurred investigations by the Securities and Exchange Commission ("SEC"), executive resignations, [*11] and financial restatements by public companies implicated in stock-manipulation schemes. On May 22, 2006, Openwave issued a press release announcing that the SEC had initiated an informal inquiry into the company's historical practice of granting stock options. The press release advised that "the SEC letter states that the formal inquiry should not be construed as an indication by the SEC or its staff that any violation of law has occurred, or as an adverse reflection upon any person, entity, or security."

On July 5, 2006, Openwave notified the SEC through a public filing that it had received subpoenas from the United States Attorneys for the Northern District of California and for the Southern District of New York requesting documents concerning the company's granting of stock options. On October 4, Openwave announced that it had convened a special committee of the company's board of directors to investigate any possible stock options backdating, and that the special committee had discovered irregularities in the issuance of certain stock option grants made between fiscal years 2000 and 2005. Openwave suggested that it would likely be forced to restate its financial results for those [*12] fiscal years and that, accordingly, "financial statements previously issued by the Company should no longer be relied upon." On October 26, Openwave issued another press release confirming that "the measurement dates for financial accounting purposes for certain stock option grants differ from recorded grant dates for certain awards."

Openwave announced the completion of the special committee's internal investigation on December 1, 2006, and filed its 2006 Form 10-K with the SEC restating the company's financial results since 1999. A press release attached to the Form 10-K notified the public that the special committee had "identified certain circumstances in which the grant date used by the Company as the 'measurement date' for accounting purposes preceded the appropriate measurement date." As a consequence, "Openwave re-measured certain stock option grants which resulted in additional non-cash charges for stock-based compensation and associated payroll tax expense for fiscal years 2000 through 2005, totaling approximately $ 182 million." This figure represented

(a) additional non-cash stock-based compensation expense and the associated payroll tax expense relating to employee stock [*13] and option grants prior to fiscal year 2006, (b) adjustments of income tax assets and liabilities, and (c) adjustments of accumulated deficit, deferred revenue, and accrued liabilities.

The Form 10-K reported, however, that the special committee "did not find evidence that lead [sic] it to conclude there was fraud in the granting of options."

The price of Openwave stock fluctuated widely during the class period, reaching a high of $ 23.19 per share on February 9, 2006, and a low of $ 6.09 per share on July 20. Plaintiff describes the high price as "artificially inflated" due to Openwave's reporting outstanding financial results in early 2006, and ascribes the low price to the public revelations of the option backdating scheme. Indeed, plaintiff asserts that particular drops in Openwave's stock price are traceable to particular disclosures about the company's backdating scheme. For example, plaintiff asserts that the May 22, 2006 press release announcing an SEC informal inquiry into Openwave's option granting practice spurred a sixty-nine-cent decrease in the stock's price that day.

Plaintiff asserts that the entirety of the artificial inflation to Openwave's stock price from the fraud [*14] was "removed" by July 20, 2006. Further, plaintiff alleges that while the stock price was artificially inflated, the Exchange Act Individual Defendants "engaged in a massive insider trading bailout, selling more than $ 54.8 million worth of Openwave stock in violation of the securities laws."

V. Theories of Liability

Under the Securities Act, plaintiff alleges that the Securities Act Individual Defendants, the underwriters, and KPMG are among those "statutorily responsible for untrue statements in the Offering Documents pursuant to which Openwave issued common stock to the public in December 2005." Plaintiff contends that these defendants "failed to fulfill their duty" to the investors to "conduct, prior to the Offering, a reasonable investigation of the Company to ensure that the statements contained in the Offering Documents contained no material misstatements or omissions of material fact." Plaintiff brings claims against Openwave, the Securities Act Individual Defendants, the Underwriter Defendants, and KPMG under *Sections 11, 12(a)(2)*, and *15* of the Securities Act. Plaintiff avers that these claims are "exclusively strict liability and negligence claims" and "expressly disclaim[s] [*15] any claim of fraud or intentional misconduct . . . in these non-fraud claims."

The gravamen of the Complaint against Openwave and the Exchange Act Individual Defendants is that, by effecting the backdating scheme and concealing it from shareholders and the public, they (1) violated generally accepted accounting principles (GAAP); (2) issued options with terms that violated the requirements of the company's stock option plans, rendering fraudulent all company representations to the contrary; (3) misled investors by representing that the grant of stock options to company employees was intended to enhance company performance; and (4) misrepresented the value of officer, director, and employee compensation in various company filings. Accordingly, under the Exchange Act, plaintiff asserts that Openwave and the Exchange Act Individual Defendants violated *Sections 10(b), 20(a)*, and *20A*, as well as the rules and regulations promulgated thereunder, including SEC *Rule 10b-5*.

Plaintiff filed a complaint against Openwave, Alan Black, David C. Peterschmidt, Harold L. Covert, and Donald Listwin on February 21, 2007. A Consolidated and Amended Class Action Complaint against all the defendants named [*16] in the instant action was filed on June 29, and the First Corrected Consolidated and Amended Class Action Complaint -- the one at issue here -- was filed on August 3.

Defendants now move to dismiss for a variety of reasons. Openwave, the Securities Act Individual Defendants, the Underwriter Defendants, and KPMG move to dismiss plaintiff's Securities Act claims as barred

by the Act's one-year statute of limitations. Openwave and the Exchange Act Individual Defendants move to dismiss plaintiff's Exchange Act claims principally for failure to plead scienter and loss causation.

DISCUSSION

I. Securities Act Claims

Plaintiff brings claims under the Securities Act against Openwave, the Securities Act Individual Defendants, the Underwriter Defendants, and KPMG. *Section 11* of the Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." *15 U.S.C. § 77k(a)*. The purpose of the section [*17] was "to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983)*. *Section 12(a)(2)* of the Securities Act allows a purchaser of a security to bring a private action against a seller that "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." *15 U.S.C. § 77l(a)(2)*. *Section 15* extends Securities Act liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under *[section 11]* or *[section 12]* of this title." *15 U.S.C. § 77o*.

Openwave, the Securities Act Individual Defendants, the Underwriter Defendants, and KPMG all move to dismiss plaintiff's claims under the Securities Act as time-barred by the Securities Act's one-year statute of limitations. Claims brought under *Sections 11* and *12* of the Securities Act are subject to a one-year statute of limitations. *See 15 U.S.C. § 77m*. [*18] The limitations period begins to run when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992)*.

A duty to inquire arises "when the circumstances would suggest to an investor of ordinary intelligence the probability" that she has a cause of action. *Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003)* (citation omitted). The circumstances giving rise to the duty to inquire are referred to as "storm warnings." *Id.* (citation omitted). "Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate." *Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 169 (2d Cir. 2005).* In some cases, despite the presence of storm warnings, investors are not placed on inquiry notice "because the warning signs are accompanied by reliable words of comfort from management." *LC Capital Partners LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003).* While such statements must be considered, their existence will prevent or dissipate [*19] the duty to inquire "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." *Id.* "Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence." *Id.*

Because plaintiff's duty to investigate was triggered no later than June 8, 2006, its Securities Act claims, which were first pleaded in the Consolidated and Amended Class Action Complaint filed on June 29, 2007, are untimely. For purposes of a motion to dismiss, the Second Circuit has

> deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.

*Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)* (citation omitted).

In the Complaint, plaintiff [*20] pleaded that it was aware of a March 18, 2006 Wall Street Journal article "questioning whether several public companies had been manipulating stock option grants to enrich executives by

backdating those grants to lower prices or granting options to executives ahead of the release of positive corporate news." On May 16, 2006, the Center for Financial Research and Analysis issued a report specifically identifying Openwave as a company "at high risk for having backdated stock options granted its senior executives." The initial complaint filed in this action identified this report as the trigger of a significant drop in Openwave's stock price between May 16 and May 17. [4] On May 22, Openwave issued a press release announcing that the SEC had opened an informal inquiry into the company's stock option grants. On June 8, Openwave filed a Form 8-K with the SEC announcing that three shareholders had filed separate derivative lawsuits in California state and federal courts on May 26 and May 30. According to the Form 8-K, these lawsuits accused Openwave officers and directors of breaching their fiduciary duties by authorizing, or failing to halt, the backdating of certain stock options, and also [*21] claimed that the Company had issued false and misleading financial statements between 2002 and 2005.

> 4   Because Plaintiff cited this report both in its original complaint and in its Memorandum of Law in support of its motions to be appointed lead counsel and to consolidate all related actions -- but, conspicuously, not in the First Corrected Consolidated and Amended Class Action Complaint -- the document is properly considered on this motion to dismiss as a document "that the plaintiff[] either possessed or knew about and upon which [it] relied in bringing the suit." *Rothman, 220 F.3d at 88* (citation omitted).

These news reports, public filings, and press releases, all appropriately considered on this motion to dismiss, indicate that plaintiff's duty to inquire into Openwave's alleged backdating was triggered, at the latest, by June 8, 2006, and that the one-year statute of limitations on its Securities Act claims ended on June 8, 2007. Since the evidence is overwhelming that plaintiff was on inquiry notice of Openwave's alleged backdating, the statute of limitations question may be resolved on a motion to dismiss. *See LC Capital, 318 F.3d at 155-56.* While the *Wall Street Journal's* March [*22] 18, 2006 general discussion of backdating was insufficient to trigger any duty to investigate, the subsequent disclosures discussed above were sufficiently "company-specific" to "trigger a duty to investigate." *Lentell, 396 F.3d at 169.* That is, the disclosures "relate[] directly to the

misrepresentations and omissions the Plaintiffs later allege in their actions against the defendants." *Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003)* (citation omitted).

Plaintiff contends that it was under no duty to inquire prior to the October 4, 2006 announcement that a special committee of the board had discovered irregularities in the issuance of stock option grants between 2002 and 2005, which would likely result in a restatement of the company's finances. Plaintiff argues that inquiry notice was not triggered by earlier disclosures because those disclosures "made no mention of the potential need for a restatement nor did [they] indicate that the Company's past financial statements might be affected in some material way." This argument is unavailing. Disclosures made well before October 2006 concerned the defendants' alleged misrepresentations and omissions, as well as the allegedly [*23] false and misleading nature of the company's financial statements. Indeed, because plaintiff's Securities Act claims are not fraud-related, but rather concern strict liability and negligence for misrepresentations or misstatements by the defendants, the disclosures gave plaintiff more than adequate prompting to inquire into Openwave's alleged wrongdoing. Likewise, the three lawsuits adverted to in Openwave's Form 8-K concerned the same security, backdating scheme, and alleged malfeasance by Openwave directors and officers that form the core of plaintiff's claims pleaded in the instant Complaint. [5] These similarities confirm that investors were on inquiry notice of the alleged backdating scheme. [6]

[5]    In this respect, plaintiff's reliance on *In re Ames Dep't Stores, Inc. Note Litig., 991 F.2d 968 (2d Cir. 1993)*, is misplaced, because that decision turned on the fact that the stockholders and subordinated noteholders held different interests in the Ames Department Stores, and therefore were concerned with different types of information. The information that put the *Ames* shareholders on notice of previously-filed false financial statements did not put its noteholders on notice that the company [*24] would not "meet its obligations on the debt instruments when due." *Id. at 980*. Regardless of whether, as plaintiff claims, the earlier-filed lawsuits alleged Openwave officers' breach of fiduciary duty to the company, they put plaintiff on inquiry notice of the alleged backdating scheme.

[6]    In opposing the motion to dismiss, plaintiff relies on a number of documents that are inappropriate for consideration on a motion to dismiss because they were not referred to or incorporated by reference in the Complaint, nor are they legally mandated disclosure documents or documents "upon which [plaintiff] relied in bringing the suit." *Rothman, 220 F.3d at 88* (citation omitted). Accordingly, defendants' responsive filings in the earlier Openwave derivative lawsuits and the analysts' reports concerning assurances made by Openwave between May 22 and July 6, 2006, will not be considered on this motion to dismiss. In any event, consideration of these documents would not change the outcome of this motion.

Similarly unpersuasive is plaintiff's argument that defendants provided "words of comfort" to the public, dispelling the need to investigate any wrongdoing. Plaintiff contends that Openwave management's [*25] conduct during the relevant time period "was deceptively designed to assure the market that Openwave's financial condition would not be impacted by the backdating investigation." Specifically, plaintiff deems "particularly reassuring" Openwave's September 13, 2006 announcement that the stock option investigation "is still ongoing and no determination has been made as to whether it will result in any impact on the Company's financial statements." An "investor of ordinary intelligence" would not "reasonably rely" on such a statement to allay his or her concerns about potential wrongdoing at Openwave. *LC Capital, 318 F.3d at 155*. Far from providing reassurance, the statement underscores that Openwave's investigation of the backdating scheme, based on allegations that had been public for over three months, was still proceeding. Management's aspirational statements concerning potential financial restatements cannot have served to dissipate plaintiff's duty to inquire.

Finally, plaintiff claims that, regardless of when it was placed on inquiry notice, the statute of limitations on its Securities Act claims did not begin to run until, "in the exercise of reasonable diligence, [plaintiff] should [*26] have discovered the facts underlying the alleged fraud." *Rothman, 220 F.3d at 97*. Plaintiff concedes that, while its investigation into Openwave yielded some information about the company's backdating prior to October 4, 2006,

no information was available from either the Company's own SEC filings and press releases or Company witnesses to indicate that it was probable that the Company had been improperly accounting for its compensation expenses thereby rendering the Company's past financial statements materially false and misleading.

Regardless of how plaintiff now parses the different species of information it did or did not acquire through its investigation, it is plain that plaintiff was alerted to Openwave's alleged backdating scheme, which constitutes the "facts underlying" the core of the Securities Act claims. Plaintiff need not have been aware of the precise accounting consequences of that scheme to have been put on inquiry notice, because the scheme that was alleged, and of which plaintiff was aware, was adequate to place plaintiff on inquiry notice as to its potential consequences.

In order to state a controlling-person claim under *Section 15* of the Securities Act, a plaintiff [*27] must first assert a primary violation by the controlled person. *See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996).* For the reasons just discussed, plaintiff has failed to state any claims upon which relief may be granted under *Sections 11* and *12* of the Securities Act. Any claim for relief under *Section 15* is therefore precluded. Accordingly, defendants' motions to dismiss the Securities Act claims are granted. [7]

> [7]    Plaintiff has specifically disavowed any argument that the Complaint relates back to the first-filed complaint.

II. Exchange Act Claims

Plaintiff brings claims under Exchange Act *Sections 10(b), 20(a),* and *20A,* as well as SEC *Rule 10b-5,* naming different permutations of the Exchange Act Individual Defendants with respect to each section. Plaintiff brings a Section 10(b) claim against Openwave, Peterschmidt, Covert, Listwin, Black, Pace, Rossmann, Kennedy, Puckett, Denman, Hedfors, Held, Jabbar, Evans, and Verhalen; a Section 20(a) claim against Peterschmidt, Covert, Listwin, Black, and Pace; and a Section 20A claim against Peterschmidt, Listwin, Pace, Snyder, Peters, Rossmann, Wilkinson, Kennedy, and Puckett.

Openwave and the Exchange Act Individual [*28] Defendants move to dismiss plaintiff's Exchange Act claims principally on the ground that plaintiff failed adequately to plead scienter and loss causation. In addition, Individual Defendants Rossmann and Verhalen move to dismiss plaintiff's Section 10(b) claims against them because, they contend, plaintiff has not alleged any wrongful conduct on these defendants' part during the putative class period. Finally, defendants move to dismiss the claims under *Sections 20(a)* and *20A* for failure to state a claim upon which relief can be granted.

When considering a motion to dismiss under *Rule 12(b)(6),* a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)* (citation omitted). Under *Federal Rule of Civil Procedure 9(b),* "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b).* The Rule requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements [*29] were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006).* "Malice, intent, knowledge, and other condition of mind of a person may be averred generally," *Fed. R. Civ. P. 9(b),* but the Private Securities Litigation Reform Act ("PSLRA") requires that the allegations in a complaint support a strong inference of scienter:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4 (b)(2)* (emphasis added).

As the Supreme Court recently clarified, "'in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.'" *ATSI Commc'n,*

*Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510, 168 L. Ed. 2d 179 (2007))*. "For an inference of scienter to [*30] be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs, 127 S. Ct. at 2510*).

A. *Section 10(b)* and *Rule 10b-5*

1. Scienter

*Section 10(b)* of the Exchange Act is designed to protect investors by serving as a "catchall provision" which creates a cause of action for manipulative practices by defendants acting in bad faith. *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)*. *Rule 10b-5*, the parallel regulation, describes what constitutes a manipulative or deceptive device. *17 C.F.R. § 240.10b-5*. To state a cause of action under *Section 10(b)* and *Rule 10b-5* a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003)* (citation omitted). Section 10(b) claims sound in fraud, and must satisfy the pleading requirements of *Rule 9(b)* and the PSLRA. *See In re Scholastic Corp., 252 F.3d 63, 69-70 (2d Cir. 2001)*.

The Second Circuit has identified [*31] four types of allegations that may be sufficient to allege scienter. They are allegations that the defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000)* (citation omitted).

Plaintiff pleads scienter based on two theories. First, plaintiff seeks to demonstrate a strong inference of scienter by arguing that options backdating is "by its very nature intentional." In support of this theory, plaintiff offers a variety of species of evidence to demonstrate such intent, including confidential witness statements, statistical analysis of Openwave's stock option grants, the size and duration of the backdating scheme, violations of Generally Accepted Accounting Principals (GAAP),

defendants' receipt of backdated options, the resignation of several Openwave executives, and defendants' false certifications under the Sarbanes-Oxley Act. Second, plaintiff seeks to demonstrate scienter by pleading that defendants [*32] had motive and opportunity to commit the alleged fraud.

Plaintiff has adequately pleaded scienter with respect to defendants Black, Listwin, Pace, and Kennedy by alleging with specificity that they received backdated options. As the Second Circuit has opined, allegations that a defendant "benefitted in a concrete and personal way from the purported fraud," *id.,* may be sufficient to plead scienter. These defendants received options, the exercise or strike prices of which did not match the actual date on which defendants received them. The options, most of which were allegedly backdated two days, garnered the defendants immediate returns of up to twenty percent of the exercise price. Such benefits are "concrete and personal" because they represent a species of compensation different from the one ordinarily accumulated by corporate officers and directors: In distinction to standard stock options, the returns on the backdated options are immediate and risk-free. That the options may have been backdated to dates "nowhere near the monthly lows for Openwave stock," as defendants contend, is irrelevant. This fact simply indicates that backdating did not achieve as much benefit to the grantee [*33] as it could have, not that backdating did not occur. In any event, this argument does not arise from the face of the Complaint, and depends on the weighing of evidence of intent which, even after *Tellabs,* is reserved for trial.

Contrary to defendants' assertion, such evidence is no less probative of scienter after the Supreme Court's decision in *Tellabs.* In that case, the Supreme Court observed that allegations of defendants' motive in securities fraud cases may not be considered in isolation; rather, "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Tellabs, 127 S. Ct. at 2511*. In particular, a court must consider "plausible nonculpable explanations for the defendant's conduct." *Id. at 2510*. Defendants have not pointed to any "competing inferences rationally drawn from the facts alleged," *id. at 2504*, that could explain their receipt of options bearing dates other than the ones on which they received them.

Moreover, it is irrelevant that the options were

received before the class period. The accounting for the backdated options affected every financial statement until those options vested. Moreover, each of [*34] these defendants continued to work for Openwave through the class period, and the inference of scienter extends from their pre-class-period receipt of the options into the class period during which the fraud is alleged to have continued. Plaintiff has pleaded that during the class period, each of these defendants signed statements that materially misrepresented certain aspects of Openwave's practices and/or financial condition as a result of the backdating scheme. Plaintiff has thus adequately pleaded that these defendants participated in the fraudulent scheme alleged, in violation of *Section 10(b)* of the Securities Act and SEC *Rule 10b-5*.

Plaintiff has also adequately plead scienter as to defendants Puckett, Denman, and Hedfors, who were part of the compensation committee of Openwave's board of directors during some portion of the class period. According to the Complaint, the compensation committee granted the stock options through unanimous written consent. The Openwave plans under which the stock options were granted required that the options not have an exercise price less than the fair market value of a share of Openwave common stock on the date of the grant. Accordingly, the [*35] members of the compensation committee were charged with a specific "duty to monitor" the exercise dates of the options granted. *Novak, 216 F.3d at 311*. Their failure to do so, as demonstrated by the facts alleged in the Complaint, gives rise to an inference of scienter. The Complaint also alleges that these defendants signed documents misrepresenting Openwave's finances during the class period. These misstatements, coupled with adequately pleaded scienter, suffice to state a claim under Exchange Act *Section 10(b)* and *Rule 10b-5*. [8]

> 8    Defendants have offered no argument, other than the ones generically asserted on behalf of all defendants, as to why plaintiff has failed to state a cause of action against Openwave. Because defendant has offered no particularized argument concerning Openwave's Section 10(b) liability, *vel non,* and because claims against certain of its officers and directors have been adequately pleaded, the claims against Openwave can proceed.

Plaintiff has not, however, adequately pleaded

scienter with respect to Peterschmidt. According to the Complaint, Peterschmidt was Openwave's president, CEO, and a director from November 2004 through March 2007. The backdating scheme [*36] is alleged to have taken place between 1999 and 2005, with the majority of the backdating alleged to have occurred between 2000 and 2002. The only specific allegations of scienter ostensibly made against Peterschmidt concern the office of the CEO, and not Peterschmidt himself. For example, the Complaint recites an allegation made by Confidential Witness # 4 that "the Compensation Committee granted authority to the Company's CEO (Defendants Listwin and Peterschmidt) to independently make awards of 50,000 options or less." Likewise, the Complaint quotes Openwave's 2006 Form 10-K, which concluded:

> there were deficiencies in the process by which certain options were granted by the Stock Option Committee ("SOC"), a one-person committee with authority delegated from the Compensation Committee, consisting of the Company's CEO. For certain grants, the SOC or an executive on his behalf, communicated to the Stock Administration group that the SOC had decided to grant stock options more than one day after the Record Date.

The Complaint avers that, "[b]ased on the Company's reporting of officers, it is clear that this individual was either Defendant Listwin and/or Defendant Peterschmidt." Thus, [*37] the two allegations of scienter that ostensibly implicate Peterschmidt personally apply with equal force to Listwin. A fifty/fifty chance that these averments concern Peterschmidt, and not Listwin, is not enough to infer Peterschmidt's scienter.

Plaintiff also pleaded scienter with respect to Peterschmidt by alleging (1) the scope and duration of the backdating scheme; (2) Peterschmidt's resignation three months after the completion of the special committee's investigation and the issuance of the restatement; and (3) Peterschmidt's sale of stock "at inflated prices due to the backdating scheme." These three allegations, considered individually or taken together, fail to raise an inference of scienter. First, while the backdating scheme was alleged to have infiltrated deep into Openwave's management and to have lasted from 1999 until the restatement in 2006, the majority of the backdating scheme is alleged to have taken place well before Peterschmidt joined the company

in late 2004. These general allegations about the scope of the backdating scheme are therefore not sufficiently particular to Peterschmidt to infer scienter. Second, the Complaint does not include a single fact linking [*38] Peterschmidt's resignation to the alleged fraud or his knowledge thereof. Putting the word "resigned" in quotation marks does not serve as a substitute for particularized allegations concerning the circumstances of Peterschmidt's departure. Third, conclusory allegations concerning Peterschmidt's sale of Openwave stock do not serve to infer scienter. According to the Complaint, Peterschmidt sold 106,250 of his Openwave shares between November 2005 and May 2006. This appears to represent a small percentage of the shares he owned, and the shares were sold well below the class-period high price of $ 23.19 per share on February 9, 2006. Plaintiff has not offered any basis from which to infer that Peterschmidt's stock sales were related to any knowledge of wrongdoing at Openwave. Indeed, as plaintiff alleges, it was after Openwave's likely involvement in backdating became *public* that Peterschmidt sold 50,000 shares of the company's stock. Finally, plaintiff has failed to plead any motive or opportunity to commit the alleged fraud that is particular to Peterschmidt, and not simply incident to his role as president, CEO, or director.

Plaintiff has also failed adequately to plead scienter against [*39] defendants Covert, Jabbar, Evans, and Held. Plaintiff merely alleges that Covert has served as Openwave's CFO and executive vice-president since October 2005, and before that as a director and chairman of the audit committee from April 2003 to September 2005, and that he signed various financial statements. These allegations are insufficient to infer scienter. In particular, because the role and responsibilities of the audit committee -- other than signing financial statements -- are nowhere described in the Complaint, it is impossible to discern whether Covert had any duty to monitor the dating of option grants, or whether he had access to meetings or documents that might have alerted him to the alleged backdating. *See In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2003 U.S. Dist. LEXIS 21363, 2003 WL 23174761, at **4-5 (S.D.N.Y. Dec. 3, 2003).* The only allegations made against defendant Jabbar are that he was a member of Openwave's audit committee; he signed the 2004 Form 10-K disclosure; and he signed the 2005 Form 10-K. For the reasons just stated concerning Covert, plaintiff has not adequately pleaded scienter as to Jabbar. The only allegations made against defendant Evans are that he was

a member [*40] of Openwave's audit committee, and that he signed Openwave's Forms 10-K for fiscal years 1999 through 2002. This is insufficient to plead scienter as to him. Similarly, regarding defendant Held, plaintiff has alleged only that he was a director of Openwave and that he signed the 2005 Form 10-K. These allegations are insufficient to allege scienter.

### 2. Loss Causation

In order to state a Section 10(b) claim, plaintiff must also allege loss causation. *See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)* (citation omitted). Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc., 544 U.S. at 342* (citation omitted). To plead loss causation, "a plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell, 396 F.3d at 173* (citation omitted). "[I]f the loss was caused by an intervening event, like a general fall in the price of [] stocks, the chain of causation will not have been established. But such is a matter [*41] of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).*

Plaintiff has adequately pleaded loss causation for its Section 10(b) claim. The Complaint alleges a series of Openwave announcements publicizing investigations into the backdating scheme and, eventually, the resultant restatement of the company's finances, and avers that these disclosures led to temporally proximate drops in the price of Openwave stock. For example, the Complaint alleges that the drop in price from $ 15.37 on Friday, May 19, 2006 to $ 14.68 on May 22 was a result of the May 22 announcement that the SEC was investigating Openwave's stock option grant practices, and that the drop in price from $ 11.47 on July 5, 2006 to $ 7.77 on July 6 resulted from Openwave's Form 8-K filing on July 5, which divulged that the company had received subpoenas from two United States Attorneys concerning its options grants.

Defendants contend that these allegations are insufficient to plead loss causation for a variety of reasons, each of which is unavailing. First, defendants claim that the May 22 and July 5 curative [*42]

disclosures are insufficiently tethered to the alleged price declines to raise plaintiff's right to relief "above a speculative level." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).* With respect to the May 22 trading data, defendants contend both that there was no material stock price movement because there was only a seventeen-cent drop from the stock's closing price on May 19 to its intra-day high on May 22, and that any price movement between May 19 and May 22 was "consistent with routine price fluctuations" in the month of May. Plaintiff and defendants essentially cavil about whether to measure the price drop between May 19 and May 22 by reference to the May 22 intra-day high price or the closing price. This is not an issue to be resolved on the basis of the pleadings alone. For the purposes of a motion to dismiss, plaintiff has adequately alleged that there was a marked decline in Openwave stock price on the date of a curative disclosure about the company's alleged backdating scheme. Likewise, whether the decline was attributable to some other cause, as defendants allege, is a matter for proof at trial. *See Emergent Capital, 343 F.3d at 197.*

With regard to the [*43] July 5 announcement, defendants contend that the contents of that disclosure had already been revealed because Openwave had announced the SEC's informal inquiry into the company's stock options granting process on May 22. They therefore contend that no downward movement in the stock price is attributable to this announcement. But the determination whether these two events -- an informal SEC inquiry and two United States Attorneys' subpoenas -- are different phenomena that may exert different influences on the market price of a company's stock is one for the jury to make. Similarly, a jury must determine whether a July 6 announcement that Openwave posted disappointing earnings for the prior quarter caused the stock price to drop, as defendants allege. *Id.*

Second, defendants make much of plaintiff's observation that the price of Openwave's stock reached its nadir on July 20, 2006, and that the substantial price decline culminating on that date "removed the artificial inflation from Openwave's stock price, causing real economic loss to investors who had purchased the securities during the Class Period." Defendants attempt to portray this allegation as a "conce[ssion] that disclosures made [*44] after July 20, 2006, are irrelevant to [plaintiff's] claimed loss because, under their own theory, by July 20, all relevant information was disclosed to the

market and reflected in the Company's (no longer "inflated") stock price." Plaintiff has conceded no such thing. Rather, plaintiff merely observed that disclosures concerning Openwave's involvement in a backdating scheme had burst the bubble on the company's stock price and sent it to a class-period low. Such an observation does not preclude any averment that the Openwave stock thereafter rebounded and that disclosures subsequent to July 20 also affected the stock price. In any event, on the basis of its averments about the May 22 and July 5 curative disclosures, and their effects on the market price of Openwave stock, plaintiff has adequately pleaded loss causation for its Section 10(b) claim.

### 3. Failure to State a Claim

Finally, plaintiff has failed to state a claim against the fourth member of the compensation committee, defendant Alain Rossmann, because it has failed to allege that he made any misrepresentation during the class period. A defendant is only liable for statements made during the class period. *Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007).* [*45] Plaintiff has similarly failed to identify any misrepresentation or misstatement attributable to defendant Andrew Verhalen, whose relationship with Openwave ended in June 2002, before the commencement of the class period. Plaintiff's effort to argue that Rossmann and Verhalen had some nebulous "duty to correct" misstatements they made during their tenure at Openwave is unavailaing, as plaintiff identifies neither the source of that duty nor the precise avenue for the correction that allegedly ought to have been made. [9] Moreover, as *Lattanzio* makes clear, a duty to correct arises "when [the defendant] learned that its prior statement . . . was untrue." *Id. at 154.* Plaintiff claims that Rossmann and Verhalen knew the financial statements to be untrue at the time they signed them. Because these statements were made before the class period, plaintiff cannot hold Rossmann and Verhalen liable on the theory that they are in "endless breach" of some duty to correct. *Id.* As the Second Circuit has recognized, if it were to adopt such a theory, "all knowing misstatements made before the class period, which remain uncorrected, would be actionable within the class period on an omission theory." [*46] *Id.* (quoting *In re The Warnaco Group, Inc. Sec. Litig., 388 F. Supp. 2d 307, 315 (S.D.N.Y. 2005)).* Accordingly, Rossmann and Verhalen's motion to dismiss plaintiff's Section 10(b) claims against them is granted.

9    Both cases cited by plaintiff, *Lattanzio and Overton v. Todman & Co., 478 F.3d 479 (2d Cir. 2007)*, deal only with an accountant's duty to correct financial statements later found to be erroneous, false, or misleading.

## B. *Section 20(a)*

Plaintiff asserts control person claims under *Section 20(a)* of the Exchange Act, contending that defendants Peterschmidt, Covert, Listwin, Black, and Pace "directly or indirectly, control[led] any person liable under any provision of this chapter or of any rule or regulation thereunder." *15 U.S.C. § 78t(a)*. On this motion to dismiss, defendants have argued only that plaintiff failed adequately to plead the violations underlying the Section 20(a) claims, and that the Section 20(a) claims are therefore unsustainable. But as discussed above, plaintiff's Section 10(b) claims were adequately pleaded as to several defendants. Because defendants have not identified any other reason why the Section 20(a) claims should be dismissed, those claims will go [*47] forward as to all defendants named in this cause of action.

## C. *Section 20A*

Plaintiff brings a cause of action under *Section 20A* of the Exchange Act against defendants Peterschmidt, Listwin, Pace, Snyder, Peters, Rossmann, Wilkinson, Kennedy, and Puckett. Defendants have moved to dismiss this cause of action for plaintiff's failure to plead an underlying violation of the Exchange Act and for failure to allege contemporaneous stock trading. *Section 20A* provides that

> [a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

*15 U.S.C. § 78t-1(a)*. A plaintiff bringing a claim under this section must therefore plead: (1) "a predicate violation of the [Exchange] Act or its rules and regulations," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994)*; [*48] (2) that the defendant traded the security at issue "contemporaneously" with the plaintiff; and (3) that the defendant was "in possession of material, nonpublic information" at the time of the trade.

There is some dispute as to whether causes of action under *Section 20A* are subject to the pleading requirements of *Federal Rule of Civil Procedure 8*, or the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)* and the PSLRA. *Compare In re Qwest Commc'n Int'l, Inc. Sec. Litig., 396 F. Supp. 2d 1178, 1201 (D. Colo. 2004)* (taking the former view), *with In re Musicmaker.com Sec. Litig., No. 00 Civ. 2018, 2001 U.S. Dist. LEXIS 25118, 2001 WL 34062431, at *27 (C.D. Cal. June 4, 2001)* (taking the latter view). This question need not be resolved in the instant case, however, because the outcome is unaffected by the applicable pleading standard. [10] As to defendants Puckett, Listwin, Pace, and Kennedy, the Section 20A claims have been adequately pleaded. The Complaint has identified with particularity the fraudulent statements attributed to each of them and explained why they are fraudulent. *Lerner, 459 F.3d at 290*. Moreover, as discussed above, plaintiff has adequately pleaded scienter with respect to each [*49] of these defendants, in satisfaction of the requirements of both the PSLRA and *Rule 9(b)*. In addition, the Complaint alleges that members of the putative class traded Openwave stock contemporaneously with the defendants named in the Section 20A cause of action, [11] and has specified the dates of the defendants' trades. Such averments are sufficient to state a cause of action under *Section 20A*. [12]

10    The Second Circuit has not yet confronted this issue, but it would appear that under Second Circuit law the heightened pleading requirements of the PSLRA and *Rule 9(b)* would apply to claims brought under *Section 20A*. By its terms, the PSLRA's pleading requirements apply to allegations of scienter and material misstatements and omissions; likewise, *Rule 9(b)* concerns "averments of fraud or mistake." Claims of insider trading inherently raise the specter of scienter and fraud, because they are predicated on allegations that the trading party was in possession of "material, nonpublic information" at the time of his/her trade, and that s/he breached a duty either to abstain or disclose the insider information in

consummating the insider trade. Indeed, the Second Circuit recognizes two different [*50] theories under which insider trading might be regarded as fraud or deception. *See United States v. Falcone, 257 F.3d 226, 228-33 (2d Cir. 2001).*

Even if *Section 20A* were to be read as a strict liability statute, the allegations underlying plaintiff's cause of action would require at least that the requirements of *Rule 9(b)* apply. In *Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004),* the Second Circuit considered the pleading requirement applicable to claims under *Sections 11* and *12(a)(2)* of the Securities Act, which by their terms impose liability for misrepresentations of material fact in registration statements or securities prospectuses, respectively. To state a claim under either section, a plaintiff need not plead scienter, mistake, or fraud. But the Second Circuit determined that the wording of *Federal Rule of Civil Procedure 9(b)* "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Id. at 171.* Therefore, the court held that "the heightened pleading standard of *Rule 9(b)* applies to *Section 11* and *Section 12(a)(2)* claims insofar as the claims are premised [*51] on allegations of fraud." *Id.* Thus under *Rombach,* in determining which pleading standard applies to a securities cause of action, a court must look not to the statutory elements of the cause of action, but rather to the underlying conduct alleged. Here, the Section 20A claim is premised on allegations of fraud, insofar as these claims hinge on the defendants' knowledge of non-public information concerning a backdating scheme that eventuated in false and misleading financial statements. Accordingly, plaintiff's pleadings on the Section 20A claim must be evaluated under *Rule 9(b).*

11    As the Second Circuit has held, the lead plaintiff need not have standing to sue on all possible causes of action. *See Hevesi v. Citigroup Inc., 366 F.3d 70, 82 & n.13 (2d Cir. 2004).*

12    *Neubronner v. Milken, 6 F.3d 666 (9th Cir. 1993),* upon which defendants rely, is distinguishable from the case at bar. In that case, which addressed the adequacy of a Section 10(b) insider trading claim, the plaintiff "suggest[ed] he

should be permitted to allege generally that contemporaneous trading occurred, and then amend his complaint following discovery of any particular instances of contemporaneous trading." *Id. at 670.* [*52] The Ninth Circuit rejected this suggestion, "[i]n light of the obvious need to protect parties from having to defend suits against plaintiffs who may be merely guessing that contemporaneous trading occurred." *Id.* In the instant case, there is no risk of a fishing expedition, as plaintiff has alleged with specificity the dates of defendants' trades and the action is brought on behalf of a class under circumstances that make it likely that members of the class bought the securities sold by these defendants. It is alleged that Openwave securities were traded in an open and efficient market.

Plaintiff, however, has failed to state a claim as to defendant Peterschmidt. As noted above, in order to state a claim under *Section 20A,* a plaintiff must allege, *inter alia,* that the defendant was "in possession of material, nonpublic information" at the time of the trade. *15 U.S.C. § 78t-1(a).* For the reasons discussed above, plaintiff has failed to allege that Peterschmidt was privy to any material, nonpublic information concerning the backdating scheme at Openwave, or was otherwise aware of the false and misleading nature of the financial statements he signed. Accordingly, the Section 20A claim [*53] must be dismissed as to him. [13]

13    *Section 20A* applies to any person who has violated "any provision of this chapter," which the Second Circuit interpreted to mean the Exchange Act. *See Jackson Nat'l Life Ins. Co., 32 F.3d at 703.* Because there is no limitation inscribed in this clause, it appears that the Section 20(a) violation adequately pleaded as to Peterschmidt would qualify as the required predicate for this element of a Section 20A claim against him.

Likewise, plaintiff's Section 20A claim as to defendants Rossmann, Snyder, Peters, and Wilkinson must be dismissed for failure adequately to allege an underlying violation of the Exchange Act. For reasons discussed above, plaintiff failed adequately to plead Exchange Act violations as to defendant Rossmann. Plaintiff failed entirely to allege any underlying Exchange Act violations as to defendants Snyder, Peters, and Wilkinson. The Section 20A claims against them are

therefore dismissed, as well.

CONCLUSION

Defendants' motion to dismiss is granted with respect to all Securities Act claims; granted with respect to the Exchange Act *Section 10(b)* and SEC *Rule 10b-5* claims as to defendants Peterschmidt, Covert, Held, Jabbar, Rossmann, [*54] Evans, and Verhalen; and granted with respect to the Exchange Act Section 20A claims as to defendants Peterschmidt, Rossmann, Snyder, Peters, and Wilkinson. The motion to dismiss is denied with respect to the Exchange Act *Section 10(b)* and SEC *Rule 10b-5* claims as to defendants Openwave, Puckett, Denman, Hedfors, Listwin, Black, Pace, and Kennedy; denied with respect to the Exchange Act Section 20(a) claims; and denied with respect to the Exchange Act Section 20A claims as to defendants Puckett, Listwin, Pace, and Kennedy.

SO ORDERED:

Dated: New York, New York

October 31, 2007

DENISE COTE

United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                :

IN RE SCOTTISH RE GROUP      :   **OPINION AND ORDER**
SECURITIES LITIGATION      :

                :   **06 Civ. 5853 (SAS)**

-----------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

This putative class action is brought on behalf of a class of

shareholders of Scottish Re Group Ltd. ("Scottish Re" or the "Company") against

(1) Scottish Re and certain of Scottish Re's officers and directors, (2) Ernst &

Young LLP ("E&Y"), the Company's outside auditor, and (3) underwriters and

forward purchasers involved in two of the Company's offerings. The

Consolidated Class Action Complaint (the "Complaint") alleges that defendants

violated federal securities laws in connection with Scottish Re's accounting for

deferred tax assets in its financial statements and its certifications of the adequacy

of the Company's internal controls.[1] All defendants now move to dismiss the

Complaint. For the reasons discussed below, defendants' motions are granted in

part and denied in part.

---

[1] The same conduct formed the basis of a shareholder derivative action dismissed by this Court in May 2007. *See Winn v. Schafer*, No. 06 Civ. 10170, 2007 WL 1346656 (S.D.N.Y. May 7, 2007).

## I. BACKGROUND

### A. Facts[2]

During the period from February 17, 2005 through July 31, 2006 (the "Class Period"), Scottish Re was a holding company engaged in the international reinsurance business and incorporated in the Cayman Islands, with its principal offices located in Bermuda.[3] Scottish Re was co-founded in 1994 by Sam Wyly, Charles J. Wyly, Jr. and Michael C. French.[4] The Company has been trading on the New York Stock Exchange (both under its prior name, Scottish Annuity & Life Holdings, Ltd., and its current name) since its initial public offering on November 30, 1998 (the "IPO").[5]

The "Officer Defendants" are Scott Willkomm, Elizabeth Murphy, Dean E. Miller, and French. Willkomm served as Chief Executive Officer ("CEO") of Scottish Re from January 1, 2005 until his resignation on July 31, 2006.[6] Murphy served as Chief Financial Officer ("CFO") of Scottish Re from

---

[2]     The facts summarized in this section are drawn from the Complaint and are presumed to be true for the purpose of these motions.

[3]     *See* Complaint ("Compl.") ¶¶ 1, 4, 51.

[4]     *See id.* ¶ 52.

[5]     *See id.* ¶¶ 53-54, 57.

[6]     *See id.* ¶ 16.

-2-

April 2002 until August 10, 2005 and Executive Vice President of Finance from

August 11, 2005 until her resignation on March 31, 2006.[7] Miller served as

Executive Vice President and CFO from August 10, 2005 through the end of the

Class Period.[8] French served as Chairman of the Board of Directors of Scottish Re

from March 2000 to May 3, 2006, and as a director from the time the Company

was founded through the end of the Class Period.[9] He also served as CEO of the

Company from May 1998 to December 31, 2004.[10] Scottish Re and the Officer

Defendants are referred to collectively as the "Scottish Re Defendants."

The "Director Defendants" are Michael Austin, William Caulfeild-

Browne, Robert Chmely, Lord Norman Lamont, Hazel O'Leary, and Glenn

Schafer.[11] Each of the Director Defendants was a director of Scottish Re during

the Class Period and signed the registration statements pursuant to which Scottish

Re Preferred Shares and Ordinary Shares were offered and sold to the public

---

[7]   *See id.* ¶ 17.

[8]   *See id.* ¶ 18.

[9]   *See id.* ¶ 19.

[10]   *See id.*

[11]   *See id.* ¶¶ 23-28.

-3-

during the Class Period.[12]

## 1. The ING Acquisition and the Ballantyne Re Securitization Transaction

As a life reinsurance company operating within the United States, insurance regulations require Scottish Re to maintain certain minimum levels of reserves.[13] As of January 1, 2000, those reserves requirements were increased (known as "Regulation XXX" and "Regulation AXXX" reserves).[14] On December 31, 2004, Scottish Re acquired the in-force life reinsurance business of ING (the "ING Acquisition").[15] As a result of the ING Acquisition, by the start of the Class Period, Scottish Re purported to be the third largest life reinsurer in the United States.[16] The ING Acquisition also greatly increased Scottish Re's Regulation XXX and Regulation AXXX reserve requirements.[17]

In order to meet the reserve requirements, the Company entered into an agreement with ING pursuant to which ING would maintain, for a fee,

---

[12]   *See id.*

[13]   *See id.* ¶ 64.

[14]   *See id.* ¶¶ 65-66.

[15]   *See id.* ¶¶ 59, 67.

[16]   *See id.*

[17]   *See id.* ¶ 68.

collateral for the XXX and AXXX reserves (the "ING Collateral Agreement").[18]
The ING Collateral Agreement was merely a temporary solution for funding the
ING-related reserves until Scottish Re could make satisfactory alternative
collateral arrangements.[19] Scottish Re's plan was to fund the XXX and AXXX
reserves through the use of securitizations.[20] Securitization involves the transfer
of assets with reasonably predictable cash flows to a separate special purpose
entity, which then sells debt securities backed by the cash flows from those assets
on the capital markets.[21] Once an asset is securitized, it is no longer capable of
generating net income on that company's books because the cash flows from that
asset are committed to the debt holders of the separate entity.[22]

On February 17, 2005, the first day of the Class Period, Willkomm
stated during the Company's investor conference call for the first quarter of 2005

---

[18]     *See id.* ¶ 69.

[19]     *See id.*

[20]     *See id.* ¶¶ 70-80.

[21]     *See id.* ¶ 72.

[22]     *See* International Monetary Fund, *Coordinated Portfolio Investment
Survey Guide* 159, available at
http://www.imf.org/external/pubs/ft/cpis/2002/pdf/cpis_index.pdf (2d ed. 2002).

-5-

that Scottish Re planned to securitize the ING-related reserves in the near future.[23]
That intention was reiterated during conference calls for the second and third
quarters of 2005.[24]

In order to securitize the ING-related reserves, Scottish Re completed
several separate financings. In December 2005, Scottish Re completed a $450
million XXX securitization through an orphaned special purpose entity, Orkney
Re II, plc, incorporated in Ireland.[25] In May 2006, Scottish Re completed a $2.1
billion securitization of all ING Acquisition assets that had Regulation XXX and
AXXX reserve requirements through a special purpose entity called Ballantyne Re
plc, also incorporated in Ireland (the "Ballantyne Re transaction").[26] As a result,
those assets were no longer capable of generating net income for Scottish Re.

## 2. Scottish Re's Financial Statements

The Financial Accounting Standards Board ("FASB") is a non-profit
entity responsible for developing generally accepted accounting principles

---

[23]    *See* Compl. ¶ 76.

[24]    *See id.* ¶ 77.

[25]    *See id.* ¶¶ 79-80.

[26]    *See id.*

-6-

("GAAP").[27] FASB Statements of Financial Accounting Standards No. 109,

"Accounting for Income Taxes" ("SFAS 109") governs the maintenance of

deferred taxes on a company's balance sheet.[28] Deferred tax assets arise when a

company will be able to benefit in future years by offsetting past tax losses against

future taxable income.[29] In accordance with SFAS 109, however, deferred tax

assets may be maintained on a company's balance sheet only when it is expected

that they will be realized, *i.e.*, that these losses will be used to reduce taxes

payable in future years.[30] The SFAS 109 Summary states that "'[a] valuation

allowance [*i.e.*, a reduction in the booked value of the deferred tax asset] is

---

[27]     GAAP are a detailed framework of accounting principles that govern the preparation of financial statements in the United States. These are distinct from generally accepted auditing standards ("GAAS"), which are a collection of ten general statements that address proper accounting practices. GAAS are maintained by the American Institute of Certified Public Accountants. *See* Generally Accepted Auditing Standards, American Institute of Certified Public Accountants, *available at* http://www.aicpa.org/download/members/div/auditstd/AU-00150.PDF.

[28]     *See id.* ¶ 85. Relevant provisions of SFAS 109 are attached as Exhibit ("Ex.") B to the Declaration of Evan M. Rosen, counsel for Scottish Re Defendants and Director Defendants ("Rosen Decl.").

[29]     *See* Compl. ¶ 87. "A deferred tax asset is recognized for temporary differences ['between the tax basis of an asset or liability and its reported amount in financial statements'] that will result in deductible amounts in future years and for carryforwards." SFAS 109 Summary.

[30]     *See* Compl. ¶ 87.

recognized if, based on the weight of available evidence, it is *more likely than not* that some portion or all of the deferred tax asset will not be realized.'"[31] Cumulative losses in recent years or "'unsettled circumstances'" that if not resolved would adversely affect operations or profits in the future make it "'difficult'" to conclude that a tax valuation allowance or charge is *not* needed.[32]

In the Form 10-K for the year ended December 31, 2004, Scottish Re reported: "[W]e believe that it is more likely than not that all gross deferred tax assets will reduce taxes payable in future years except for a valuation allowance of $22.1 million established in 2004."[33]  In the Company's Form 10-K for the year ended December 21, 2005, it reported: "[W]e believe that it is more likely than not that all gross deferred tax assets will reduce taxes payable in future years except for a valuation allowance of $18.5 million."[34]  The Company reported that the valuation allowances resulted from the deferred acquisition costs of the ING Acquisition.[35]

---

[31]     *Id.* (quoting SFAS 109 Summary (emphasis in original)). *Accord id.* ¶ 88 (quoting SFAS 109 ¶ 17e).

[32]     *Id.* ¶ 89 (quoting SFAS 109 ¶ 23).

[33]     *Id.* ¶ 93.

[34]     *Id.*

[35]     *See id.*

-8-

During the Class Period, Scottish Re stated repeatedly that it maintained its deferred tax assets based on management's estimates of the future profitability of its taxable entities, which in turn were based on current forecasts and forecasts for the period for which losses may be carried forward.[36]  However, in August 2006, the Company stated that because there was no history of taxable income, it must rely heavily on tax planning strategies for support of the gross deferred tax assets.[37]

Scottish Re never disclosed to investors the potential impact of the Company's securitization plans on the deferred tax assets.[38]  These securitization plans had materialized in December 2005 and May 2006 and had resulted in the transfer of income-producing assets from Scottish Re to separate and distinct entities.  Nonetheless, the Scottish Re Defendants repeatedly issued financial statements and signed certifications asserting that the Company was in compliance with SFAS 109.[39]

### 3.    Internal Controls

---

[36]    *See id.* ¶¶ 94, 96.

[37]    *See id.* ¶¶ 95, 96.

[38]    *See id.* ¶ 98.

[39]    *See id.* ¶ 86.

Throughout the Class Period, Scottish Re suffered from serious internal control deficiencies.[40] Nevertheless, Willkomm, Murphy and Miller repeatedly issued sworn Sarbanes-Oxley certifications attesting to the adequacy of the Company's internal controls.[41] The Company's Forms 10-Q for the first, second, and third quarters of 2005 also stated that the Company possessed adequate internal controls.[42]

On May 4, 2006, in connection with the announcement of the Company's results for the first quarter of 2006, Scottish Re disclosed that its net income was adversely impacted by approximately $15 million as the result of mortality and morbidity claims, late claims reported by several ceding companies, and the belated addition of reserves for such claims in the future.[43] On May 5, 2006, during the investor conference call for the first quarter of 2006, Willkomm stated that the Company had undertaken a review of the potential for similar issues to arise and had established additional reserves, acknowledging that "[w]here we

---

[40]     *See id.* ¶¶ 111-128.

[41]     *See id.* ¶ 128.

[42]     *See id.* ¶ 154 (first quarter 2005); ¶ 163 (second quarter 2005); ¶ 165 (third quarter 2005).

[43]     *See id.* ¶ 112.

-10-

erred was in not doing this sometime ago."[44]  Following that announcement, Bear

Stearns issued an analyst report that stated that the Company's first quarter results

had "shaken our confidence that management had the operational and financial

controls in place necessary to drive profitable business growth on a consistent

basis."[45]

Several confidential witnesses ("CWs"), former employees of

Scottish Re, have asserted that the Company had poor internal controls throughout

the Class Period.  These failings included a lack of a reliable method to track

premiums and claims, an inability to timely process thousands of claims associated

with the Company's acquisitions, and poor IT systems, all of which are likely to

severely impair the smooth functioning of an insurance company.[46]

According to several CWs,[47] Scottish Re did not have an adequate

---

[44]     *Id.* ¶ 113.

[45]     *Id.* ¶ 115.

[46]     *See id.* ¶¶ 120-127.

[47]     These CWs include a former Charlotte, North Carolina Vice President
responsible for the processing and adjudication of claims at Scottish Re who
worked at the Company for five years through Spring 2005, *see id.* ¶ 121, a former
Charlotte, North Carolina Assistant Vice President responsible for marketing who
worked at the Company for over four years through Spring 2006, *see id.* ¶ 123,
and a former Charlotte, North Carolina senior finance executive who worked at
the Company for over six years through Spring 2006, *see id.* ¶ 124.

-11-

system in place to track and process claims, which in turn made it difficult to estimate claims reserves on its financial statements.[48] The Company's employees were neither trained in nor knowledgeable about reinsurance.[49] These flaws were exacerbated by the Company's rapid growth, including one of the Company's earlier acquisitions and the subsequent ING Acquisition, which caused an overflow of claims and overwhelmed Scottish Re's already inadequate systems.[50]

Another CW, a former Charlotte, North Carolina Senior Vice President responsible for information technology and data, claims Seth Vance, the CEO of Scottish Re's North American segment, directed that certain 2005 year-end expenses be recorded as 2006 expenses in order to artificially inflate Scottish Re's reported year-end financial results and earnings for 2005.[51] The former employee complained to Vance in writing about those adjustments, but was told by Willkomm that she was just being "paranoid" and that she did not "have proof of anything."[52]

---

[48] *See id.* ¶ 111.

[49] *See id.*

[50] *See id.* ¶¶ 122-124.

[51] *See id.* ¶ 125.

[52] *Id.*

## 4.    E&Y

E&Y served as the Company's outside auditor from its IPO through the end of the Class Period.[53]  During the Class Period, E&Y issued clean, unqualified audit opinions on Scottish Re's financial statements for the years ended December 31, 2004 and December 31, 2005.[54]  At the same time, E&Y issued separate opinions supporting the Company's internal controls for the same two periods.[55]  E&Y also consented to incorporation by reference of both opinions for the year ended December 31, 2004 in the registration statement for the offerings of Scottish Re Preferred Shares and Ordinary Shares that took place during the Class Period.[56]  In addition, E&Y served as auditor for Ballantyne Re[57] and worked on the Company's two major securitizations prior to the Ballantyne Re transaction.[58]

Plaintiffs allege that E&Y did not staff its audits of Scottish Re with

---

[53]    *See id.* ¶ 29.

[54]    *See id.* ¶¶ 29, 130.

[55]    *See id.* ¶ 130.

[56]    *See id.* ¶ 131.

[57]    *See id.* ¶ 340.

[58]    *See id.* ¶ 342.

-13-

adequately trained auditors, and that it failed to exercise due professional care in the performance of its audits and the preparation of its reports.[59]  Plaintiffs also allege that E&Y failed to obtain a sufficient understanding of the Company's lack of internal controls despite the "common knowledge" within the Company that the Company's IT systems used to track premiums and claims were poor, that the Company's claims processing personnel were poorly trained, and that the administrative management was weak.[60]  Moreover, plaintiffs allege that E&Y failed to verify the recoverability of the Company's growing deferred tax assets.[61]  Thus, according to plaintiffs, due to an absentee E&Y partner and very junior auditors assigned to handle the Scottish Re audit, the GAAP violations and internal control weaknesses went undetected or unidentified by E&Y throughout the Class Period.[62]

### 5. The Offerings

The Underwriters include Lehman Brothers Inc., Bear Stearns & Co. Inc., Banc of America Securities LLC, Keefe Bruyette & Woods, Inc.,

---

[59]  *See id.* ¶ 135.

[60]  *Id.* ¶ 139.

[61]  *See id.* ¶ 140.

[62]  *See id* ¶ 135.

-14-

Oppenheimer & Co. Inc., Advest, Inc., RBC Dain Rauscher Inc., Stifel, Nicolaus & Company, Incorporated, Goldman, Sachs & Co., Wachovia Capital Markets, LLC, A.G. Edwards & Sons, Inc., and Fox-Pitt, Kelton Incorporated.[63] The Forward Purchasers include Bear Stearns International Limited and Lehman Brothers OTC Derivatives.[64] Unless otherwise distinguished, Underwriters and Forward Purchasers will be referred to collectively as "Underwriter Defendants."

On or about July 6, 2005, Scottish Re sold approximately five million Preferred Shares to the public (the "July 2005 Offering"), which raised net proceeds of approximately $120 million.[65] The July 2005 Offering was made pursuant to a registration statement and prospectus signed by French, Willkomm, Murphy and each of the Director Defendants and filed with the SEC.[66] Those filings expressly incorporated Scottish Re's Form 10-K for the year ended December 31, 2004 and Form 10-Q for the quarter ended March 31, 2005.[67]

On or about December 23, 2005, Scottish Re sold approximately 7.66

---

[63]     *See id.* ¶¶ 30-41.

[64]     *See id.* ¶¶ 42-43.

[65]     *See id.* ¶ 143.

[66]     *See id.* ¶ 144.

[67]     *See id.* ¶ 145. *See also id.* ¶¶ 146-156 (describing the contents of the incorporated filings).

million Ordinary Shares to the public at $24.00 per share (the "December 2005

Offering," and together with the July 2005 Offering, the "Offerings"), which

raised net proceeds of approximately $174 million.[68]  The December 2005

Offering was made pursuant to a registration statement and prospectus signed by

Willkomm, Murphy and each of the Director Defendants and filed with the SEC.[69]

Those filings expressly incorporated Scottish Re's 2004 Form 10-K and Forms 10-

Q for the quarters ended March 31, 2005, June 30, 2005, and September 30,

2005.[70]  In addition, the Forward Purchasers borrowed and sold approximately

3.15 million Ordinary Shares in the December 2005 Offering in exchange for the

Company's agreement to issue Ordinary Shares to the Forward Purchasers on

settlement dates nine and twelve months after the Offering.[71]

## 6.    The Unexpected Tax Valuation

On July 31, 2006, the Company announced that it would suffer a net

operating loss of approximately $130 million for the second quarter ended June

30, 2006, due principally to an unexpected $112 million tax valuation allowance

---

[68]    *See id.* ¶ 157.

[69]    *See id.* ¶ 159.

[70]    *See id.* ¶ 160. *See also id.* ¶¶ 146-156, 162-168 (describing the contents of the incorporated filings).

[71]    *See id.* ¶¶ 42-43, 158.

-16-

on deferred tax assets.[72]  Industry analysts reported that the valuation allowance

effectively wiped out all of Scottish Re's earnings for the 2005 fiscal year.[73]

At the same time, the Company also announced the resignation of

Scottish Re's CEO, Scott Willkomm and the CEO of Scottish Re's North

American segment, Seth Vance.[74]  The Company further disclosed that it had

engaged two investment banks to assist with evaluating strategic alternatives,

including the possible sale of the Company.[75]

Immediately following these announcements, the price of Scottish Re

stock declined by seventy-five percent on high trading volume.[76]  Rating agencies

also immediately downgraded the credit rating of Scottish Re from A- to B++,

which jeopardized the Company's ability to conduct its business.[77]  After the

unexpected announcement, an A.M. Best analyst stated:  "There was never any

guidance that there would be any question about the recoverability of the deferred

---

[72]     *See id.* ¶ 302.

[73]     *See id.* ¶ 108.

[74]     *See id.* ¶ 107.

[75]     *See id.* ¶ 106.

[76]     *See id.* ¶ 100.

[77]     *See id.* ¶¶ 102-105.

-17-

tax asset. The rating agencies had no prior knowledge of a possible impairment
and neither did Wall Street."[78]

## B. Procedural History

Shortly after the July 31, 2006 announcements, beginning in August
2006, a series of putative securities class actions were filed against Scottish Re
and certain individual defendants. In October 2006, this Court consolidated the
cases and appointed Lead Plaintiff and Lead Counsel. Lead Plaintiff, the State
Teachers Retirement System of Ohio, together with Plaintiff Richard Allen Baehr
as trustee of the Richard Allen Baehr Living Trust, subsequently filed a
consolidated class action complaint alleging securities law violations by Scottish
Re and various other defendants, including current and former officers and
directors of the Company arising out of misrepresentations concerning the
Company's deferred tax assets and internal controls. On March 7, 2007, the
Scottish Re Defendants and Director Defendants moved to dismiss the Complaint.
On March 14, 2007, E&Y and the Underwriter Defendants separately filed
motions to dismiss. On April 30, 2007, plaintiffs submitted an omnibus
opposition. On May 30, 2007, Scottish Re Defendants and Director Defendants
submitted their reply, followed on June 6, 2007 by E&Y's and Underwriter

---

[78] *Id.* ¶ 102.

-18-

Defendants' respective replies.  On July 9, 2007 and July 13, 2007, with the

Court's permission, Scottish Re and plaintiffs submitted supplemental letter briefs

regarding *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court's

intervening decision on the standard for pleading scienter.[79]

---

[79]     *See* — U.S. —, 127 S. Ct. 2499 (2007).

## II.   LEGAL STANDARD

### A.   Motion to Dismiss

When deciding a defendant's motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[80] and "draw all inferences in the light most favorable to the non-moving party[]."[81]  Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[82]

In deciding a motion to dismiss, the court is not limited to the face of the complaint.  The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[83]

---

[80]   *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007). *Accord In re NYSE Specialists Sec. Litig.*, — F.3d —, No. 06-1038-cv, 2007 WL 2701341, at *5 (2d Cir. Sept. 18, 2007).

[81]   *In re NYSE Specialists*, 2007 WL 2701341, at *5.

[82]   *Id.* at *5 (quotation omitted).

[83]   *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

-20-

### 1. In General

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[84] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[85] Although the complaint need not provide "detailed factual allegations,"[86] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*."[87] The standard is no longer that a complaint can be dismissed only if there us "no set of facts" that plaintiff could prove "which would entitle him to relief."[88] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[89]

---

[84] *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[85] *See Bell Atlantic*, 127 S. Ct. at 1970.

[86] *Id.* at 1964. *See also ATSI*, 493 F.3d at 98 n.2 (applying the standard of plausibility outside *Twombly's* anti-trust context).

[87] *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

[88] *Bell Atlantic*, 127 S. Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957)). *Accord id.* ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

[89] *ATSI*, 493 F.3d at 98 (quoting *Bell Atlantic*, 127 S. Ct. at 1965).

-21-

## 2.    Securities Fraud

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."[90]  Those heightened pleading requirements are imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").[91]

### a.    Rule 9(b)

A complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud . . . be stated with particularity."[92]  "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[93]  To comply with the requirements of Rule 9(b), a plaintiff must:  "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

---

[90]    *Id.* at 99.

[91]    15 U.S.C. § 78u-4(b).

[92]    Fed. R. Civ. P. 9(b). *Accord ATSI*, 493 F.3d at 99.

[93]    *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

-22-

fraudulent."[94] "Allegations that are conclusory or unsupported by factual assertions are insufficient."[95]

### b.    PSLRA

"Private securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal."[96] The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."[97] The PSLRA specifies that the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[98] The Supreme Court recently clarified the strong inference of scienter requirement in *Tellabs*. There, the Court held that in order to determine whether scienter is adequately plead, courts must look at the complaint as a whole

---

[94]    *Rombach*, 355 F.3d at 170 (quotation omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[95]    *ATSI*, 493 F.3d at 99.

[96]    *Id.* (citing 15 U.S.C. § 78u-4(b)(3)(A)).

[97]    *Tellabs*, 127 S. Ct. at 2504 (quotation omitted) (citing 15 U.S.C. § 78u-4(b)(1), (2)).

[98]    *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

and "must take into account plausible opposing inferences."[99]  "[A]n inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[100]  The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences.'"[101]  The inquiry on a motion to dismiss is as follows:  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[102]

"If the plaintiff alleges a false statement or omission, the PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is

---

[99]  *Id.* at 2509.  These plausible opposing inferences, however, may be based only on the complaint and other public documents on which Courts ordinarily rely in deciding a motion to dismiss, "while constantly assuming the plaintiff's allegations to be true." *Id.* at 2509, 2511-12.

[100]  *Id.* at 2504-05.

[101]  *Id.* at 2510 (citation omitted).

[102]  *Id.* at 2511.  *Accord id.* at 2510 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

formed.'"[103]

## B. Exchange Act Violations

### 1. Section 10(b) and Rule 10b-5

In order to state a claim under Rule 10b-5 for misrepresentations, the "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."[104] With respect to the first element, the complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[105]

"Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."[106] In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[107]

---

[103]  *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).

[104]  *Id.* at 105 (affirming the dismissal of plaintiffs' misrepresentations claims) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

[105]  *Rombach*, 355 F.3d at 172 (quotation omitted).

[106]  *Novak*, 216 F.3d at 308 (citation omitted).

[107]  *Id.* at 309 (citation omitted).

-25-

Mere "allegations that defendants should have anticipated future events and made

certain disclosures earlier than they actually did do not suffice to make out a claim

of securities fraud."[108]

Scienter can be pled by "alleging facts (1) showing that the

defendants had both motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious misbehavior or

recklessness."[109] "Sufficient motive allegations entail concrete benefits that could

be realized by one or more of the false statements and wrongful nondisclosures

---

[108]    *Id.* (citation omitted). *Accord Rothman v. Gregor*, 220 F.3d 81, 90
(2d Cir. 2000) ("The fact that management's optimism about a prosperous future
turned out to be unwarranted is not circumstantial evidence of conscious
fraudulent behavior or recklessness: People in charge of an enterprise are not
required to take a gloomy, fearful or defeatist view of the future; subject to what
current data indicates, they can be expected to be confident about their
stewardship and the prospects of the business that they manage." (quotations
omitted)).

[109]    *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d
154, 168-69 (2d Cir. 2000)). The Supreme Court in *Tellabs* noted that it had
"previously reserved the question whether reckless behavior is sufficient for civil
liability under § 10(b) and Rule 10b-5," but that "[e]very Court of Appeals that
has considered the issue has held that a plaintiff may meet the scienter requirement
by showing that the defendant acted intentionally or recklessly, though the
Circuits differ on the degree of recklessness required." 127 S. Ct. at 2507 n.3.
The Court again declined to address the issue. *Id.* ("The question whether and
when recklessness satisfies the scienter requirement is not presented in this
case."). Thus, Second Circuit law, which permits scienter to be shown by
recklessness, continues to bind this Court.

-26-

alleged."[110] Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[111]

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[112] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[113]

Finally, in order to state a claim for securities fraud, a plaintiff must plead "both transaction causation (also known as reliance) and loss causation."[114]

---

[110]   *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (quotations omitted).

[111]   *Id.* (describing "[i]nsufficient motives" as including "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation").

[112]   *Id.* at 142.

[113]   *Id.* (quotation omitted).

[114]   *ATSI*, 493 F.3d at 106.

-27-

Transaction causation requires a plaintiff to demonstrate that "'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"[115] Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[116] "To that end, the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."[117]

"'The standard for pleading auditor scienter is demanding.'"[118] "For an accountant to be found to have acted recklessly during an audit, its alleged misconduct must 'approximate an actual intent to aid in the fraud being perpetrated by the audited company.'"[119] "This standard requires more than a failure to follow GAAP."[120] Rather, plaintiffs must allege sufficient facts to show

---

[115] *Id.* (quoting *Lentell*, 396 F.3d at 172).

[116] *Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell*, 396 F.3d at 172). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir. 2003).

[117] *ATSI*, 493 F.3d at 107 (citing *Lentell*, 396 F.3d at 173).

[118] *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007) (quoting *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, Nos. MDL 1744, 04 Civ. 8144, 2006 WL 2057194, at *30 (S.D.N.Y. July 20, 2006)).

[119] *Id.* (quoting *Rothman*, 220 F.3d at 98 (citation omitted)).

[120] *Id.* (quotation omitted).

-28-

that "[t]he accounting practices were so deficient that the audit amounted to no

audit at all, or an egregious refusal to see the obvious, or to investigate the

doubtful, or that the accounting judgments which were made were such that no

reasonable accountant would have made the same decisions if confronted with the

same facts."[121] "Allegations of 'red flags,' when coupled with allegations of

GAAP and GAAS violations, are sufficient to support a strong inference of

scienter."[122]

### 2. Control Person Liability: Section 20(a)

In order to plead a prima facie case of control person liability under

section 20(a), a plaintiff must allege "(1) a primary violation by the controlled

person, (2) control of the primary violator by the defendant, and (3) that the

defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud."[123] A plaintiff must plead "actual control, not merely control

---

[121] *Id.* (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).

[122] *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (citing *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001)).

[123] *ATSI*, 493 F.3d at 108. Section 20(a) provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally

-29-

person status."[124]

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."[125] Thus, "'[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard'" and "'[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required.'"[126]

## C. Securities Act Violations

### 1. Section 11 and Section 12(a)(2) Liability

"'[Section] 11 provides a cause of action for any person acquiring a security issued pursuant to a materially false registration statement unless the

---

with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

[124]    *In re Refco*, 503 F. Supp. 2d at 637 (quotation omitted).

[125]    *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

[126]    *In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006) (quoting *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2003)).

-30-

purchaser knew about the false statement at the time of acquisition.'"[127]  "Section

12(a)(2) of the Securities Act imposes liability on any person who offers or sells

securities by means of a prospectus containing material misstatements."[128]  A

---

[127]     *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003)).  *Accord Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case.").  Section 11(a) provides in part,

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue –
> (1) every person who signed the registration statement;
> (2) every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted . . . .

15 U.S.C. § 77k(a).

[128]     *Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005).  Section 12(a)(2) provides, in pertinent part,

> Any person who . . .
> (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care

-31-

misstatement under Section 11 or Section 12(a)(2) is established when "material facts have been omitted or presented in such a way as to obscure or distort their significance."[129]

Although fraud "is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)," those claims "may be – and often are – predicated on fraud."[130] In such circumstances, Rule 9(b), which applies to "'all averments of fraud,'" will be applied.[131] The wording of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."[132] Thus, although fraud is not an element of a claim under Section 11 or Section 12(a)(2), where the claims are predicated on allegations of fraud, they will be subject to

---

could not have known, of such untruth or omission, shall be liable
. . . to the person purchasing such security from him . . . [for] the
consideration paid for such security with interest thereon, less the
amount of any income received thereon, upon the tender of such
security, or for damages if he no longer owns the security.

15 U.S.C. § 77 *l* (a)(2).

[129]    *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759,
761 (2d Cir. 1991) (quotation omitted).

[130]    *Rombach*, 355 F.3d at 171.

[131]    *Id.* (quoting Fed. R. Civ. P. 9(b)).

[132]    *Id.*

-32-

Rule 9(b).[133]

### 2. Control Person Liability: Section 15

In order to state a claim for control person liability under section 15

of the Securities Act, a plaintiff must allege "(a) a primary violation by a

controlled person, and (b) control by the defendant of the primary violator."[134]

Unlike section 20(a), the plaintiff is not required to allege culpable participation

by the controlling person in order to state a claim under section 15.[135]

---

[133]   *See id.* ("[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b).").

[134]   *In re Refco*, 503 F. Supp. 2d at 637. Section 15 provides,

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

[135]   *See In re Refco*, 503 F. Supp. 2d at 637.

-33-

## D.    Leave to Replead

Whether to permit a plaintiff to amend his pleadings is a matter committed to the Court's "sound discretion."[136]  Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."[137]  Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."[138]  "[A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated."[139]  In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."[140]

## III.    DISCUSSION

### A.    Section 10(b) and Rule 10b-5

---

[136]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[137]    Fed. R. Civ. P. 15(a).

[138]    *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

[139]    *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003) (quotation omitted).

[140]    *Olsen v. Pratt & Whitney Aircraft Div. of United Techs. Corp.*, 136 F.3d 273, 276 (2d Cir. 1998) (citing *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)).

Plaintiffs assert that the Scottish Re Defendants and E&Y

fraudulently misstated the Company's financial statements and E&Y's audits of

those statements because "the Company's history of income tax losses and long-

planned securitization transactions required Scottish Re to establish a tax

valuation allowance under GAAP by no later than the start of the Class Period."[141]

Plaintiffs further allege that the Scottish Re Defendants' certifications and E&Y's

audits regarding internal controls were fraudulent.  As discussed below, the

Complaint states a claim for securities fraud sufficient to survive a motion to

dismiss as to the Scottish Re Defendants and E&Y on both grounds.

### 1.    **Scottish Re Defendants**

#### a.    **Falsity**

##### i.    **Financial Statements**

The Complaint alleges that Scottish Re should have taken a valuation

allowance for its deferred tax assets at the beginning of the Class Period, when the

Company first announced its plans to securitize the ING Acquisition assets.

Plaintiffs allege that once the securitization took place, Scottish Re would be

unable to rely on any future income from that block of business as a means to

---

[141]     Plaintiffs' Memorandum of Law in Opposition to Defendants'
Motions to Dismiss the Consolidated Class Action Complaint ("Pl. Mem.") at 22.

realize tax benefits from its deferred tax assets. Coupled with the Company's history of income tax losses, which continued to grow, plaintiffs allege that planning a securitization on the order of the Ballantyne Re transaction left Scottish Re with insufficient future income to support the level of deferred tax assets the Company was maintaining on its books. In short, the Complaint alleges that the prospect of the Ballantyne Re transaction made it more likely than not under SFAS 109 that the Company would be unable to realize its deferred tax assets in the future and that a valuation allowance was thus required as soon as those plans were announced. By failing to record the valuation allowance earlier, plaintiffs allege that the value of the Company was overstated and that shareholders were harmed as a result when the true facts were made known and the stock declined seventy-five percent in one day of trading.

Plaintiffs' claim is supported by several alleged facts and reasonable inferences drawn from those facts. For example, the timing of the events at the center of the Complaint, namely that the announcements of the Ballantyne Re transaction's closing and the large surprise valuation allowance occurred in the same quarter of 2006, supports an inference that the two events were causally related.

Similarly, several of Miller's statements from the August 4, 2006

-36-

conference call also support an inference that the Ballantyne Re transaction was at least in part linked to the need for the valuation allowance. On that call, Miller stated that the Ballantyne Re transaction "put profitable business into a securitized vehicle that limited some flexibility on what you could do with that block of business."[142] He also stated that the Ballantyne Re transaction "eliminated a large cushion that greatly reduced flexibility in our tax planning strategies and increase[d] pressure on our remaining strategies."[143]

Further, plaintiffs rely on Scottish Re's Form 10-Q for the quarter ended September 30, 2006, in which the Company stated that it "can no longer recognize tax benefits for certain legal entities."[144] Plaintiffs assert that this statement directly links the valuation allowance to the Ballantyne Re transaction. Plaintiffs also cite Scottish Re's statements during the August 4, 2006 conference call and in its Form 10-Q for the quarter ended June 30, 2006 that the Company is unable to use projections of future taxable income due to the lack of history of taxable income and that as a result, the Company "must rely heavily on tax

---

[142]    Compl. ¶ 92.

[143]    *Id.* ¶ 95.

[144]    *Id.* ¶ 92.

-37-

planning strategies [] for support of the gross deferred tax asset."[145] Plaintiffs

assert that these statements demonstrate the materially misleading nature of the

Company's prior statement that it evaluated its deferred tax assets properly under

SFAS 109 based "upon management's estimates of the future profitability of [its]

taxable entities" was materially misleading.[146]

The allegations in the Complaint, taken as a whole and drawing all

reasonable inferences in plaintiffs' favor, are adequate to plead that the

Company's financial statements were materially misstated at this stage. A

reasonable inference may be drawn from the facts and statements outlined above

that the Ballantyne Re transaction contributed in large part, if not in full, to

requiring the $112 million valuation allowance. Likewise, given that SFAS 109

requires a prospective inquiry, it is reasonable to infer that the Scottish Re

Defendants' plans to complete that securitization made it more likely than not that

they would not be able to realize the benefits from their deferred tax assets in full.

SFAS 109 states that a valuation allowance should be taken "if, based

on the weight of available evidence, it is more likely than not (a likelihood of more

than 50 percent) that some portion or all of the deferred tax assets will not be

---

[145]    *Id.* ¶¶ 95 (conference call), 96 (Form 10-Q).

[146]    *Id.* ¶ 96.

-38-

realized" and that "[a]ll available evidence, both positive and negative, should be considered."[147] Plaintiffs have pled enough facts that existed at the time the deferred tax assets were reported to demonstrate that there were sufficient negative factors weighing against the Company's ability to realize its deferred tax assets. Moreover, as discussed above, SFAS 109 provides that cumulative losses in recent years or "'unsettled circumstances'" that if not resolved would adversely affect operations or profits in the future make it "'difficult'" to conclude that a tax valuation allowance or charge is *not* needed.[148] At the very least, the Complaint alleges facts sufficient to give rise to such "'unsettled circumstances.'"[149]

The Complaint alleges that the Company was planning a major $2.1 billion transaction that would prevent it from using any income generated by those substantial assets in the future to offset the deferred tax assets the Company was keeping (and growing) on its books. How the Company could treat the plan as if it had *no effect* on a balance sheet item that is specifically targeted at the Company's

---

[147]    SFAS ¶¶ 8(d), 17(e), 20.

[148]    Compl. ¶ 89 (quoting SFAS 109 ¶ 23).

[149]    The Scottish Re Defendants' arguments as to why the Ballantyne Re transaction did not require the Company to take the valuation allowance and the like are inappropriate at this stage of the litigation. Opposing inferences may only be based on the allegations of the Complaint, which must be taken as true, and other documents properly before the court on a motion to dismiss.

-39-

future income is puzzling. Even more puzzling is how the Company's treatment
and its failure to report any effects could continue in light of the Company's
history of income tax losses. Although the Company's plans to securitize the ING
Acquisition assets were publicly disclosed, the investing public was unaware of
the consequences those plans would have on the deferred tax assets.

It is also troubling that at the same time the Company was silent as to
the effects the securitization would have on the deferred tax assets, the Company
reported relatively small valuation allowances for other stated reasons. This may
have further misled investors to believe that the Company was properly reporting
and evaluating its deferred tax assets and taking valuation allowances when
needed. The absence of a valuation allowance in light of the securitization plans
could plausibly have suggested to investors that the securitization would have no
negative effect. The seventy-five percent drop in the share price that accompanied
the eventual (and perhaps inevitable) valuation allowance shows that no effect was
self-evident to the public and that the shareholders were relying on management to
truthfully report the Company's financials.

The Complaint adequately alleges that by failing to report the
valuation allowance when the securitization plans were announced, the Company
made a false and misleading statement. The Complaint states a claim that the

-40-

Scottish Re Defendants, who had been planning the securitization and reporting deferred tax assets and valuation allowances throughout the Class Period, should have recorded the valuation allowance much earlier than they did, which renders the financial statements false when made.[150]

## ii. Sarbanes-Oxley Certifications

The Sarbanes-Oxley Act of 2002 requires certain officers and the accountants of a public company to execute certifications that are filed with the company's Forms 10-K and 10-Q.[151] These certifications must discuss the company's internal control systems and must explain the effectiveness of those internal controls.[152]

The Complaint alleges that Wilkomm and Murphy violated section

---

[150]    Other cases that have dismissed securities fraud claims based on failure to take an earlier valuation allowance on deferred tax assets are distinguishable. *See Frank v. Dana Corp.*, No. 3:05CV7393, 2007 WL 2417372 (N.D. Ohio Aug. 21, 2007) (dismissing the complaint for failure to allege facts supporting a claim that the defendants "knew or recklessly disregarded facts from which they should have known of the fraud or accounting errors"); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129 (W.D. Wash. 2006) (dismissing for failure to allege that the financial statements were false when made as opposed to a change in circumstances followed by the prompt reporting of a valuation allowance and where there were no allegations of "'systematic' over-reporting").

[151]    *See* Pub. L. No. 107-204, 116 Stat. 745 (2002).

[152]    *See* 15 U.S.C. § 7241(a)(4).

-41-

10b and Rule 10b-5 by providing false Sarbanes-Oxley certifications in
connection with the Company's Forms 10-K for 2004 and 2005 and Forms 10-Q
for the first, second and third quarters of 2005 and the first quarter of 2006.[153]
These certifications stated that to the best of their knowledge, each Form "does not
contain any untrue statement of a material fact or omit to state a material fact
necessary to make the statements made, in light of the circumstances under which
such statements were made, not misleading."[154]  Thus, for these certifications to be
materially false, it is insufficient for the financial statements themselves to have
been false – defendants must also have had knowledge of that falsity.[155]  Plaintiffs
thus must allege that these certifications were false in that defendants knew the
stated value of the deferred tax assets was a material false statement.  The
certifications also state that Wilkomm and Murphy had implemented internal
controls over the company's financial reporting sufficient "to provide reasonable
assurance regarding the reliability of financial reporting and the preparation of
financial statements for external purposes in accordance with generally accepted

---

[153]     *See* Compl. ¶¶ 263, 273, 279, 285, 291, 300, 328.

[154]     *Id.* ¶ 300.

[155]     *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091
(1991) (discussing circumstances in which liability can attach to opinion
statements).

-42-

accounting principles."[156]  Further, they explain that the forms disclose "all

significant deficiencies and material weaknesses in the design or operation" of

those internal controls that are "reasonably likely to adversely affect" the financial

statements.[157]

　　　　　As discussed above, plaintiffs have alleged sufficient facts to support

the inference that defendants knew of the incorrect valuation at the time they

began planning the securitization transactions.  Because plaintiffs' allegation that

the certifications at issue represent false statements is plausible, the motion to

dismiss the Sarbanes-Oxley claim is denied.

　　　　　Plaintiffs claim that the financial statements were materially

misleading in that the Company's internal controls were structurally inadequate.

The allegations state that the internal controls were lacking, and, as a result, the

Company was able to improperly report expenses.  Moreover, plaintiffs allege that

the Company had "serious weaknesses in processing and tracking insurance

claims."[158]  Defendants have moved to dismiss on the ground that plaintiffs have

failed to provide factual allegations that illustrate problems with the Company's

---

[156]　Compl. ¶ 300.

[157]　*Id.*

[158]　*Id.* ¶ 7.

-43-

internal controls. Defendants observe that while the Company restated its financial statements for the first two quarters of fiscal year 2006,[159] it has not conceded any failure in its internal controls.

Plaintiffs allege several facts in support of their claim. *First*, they allege that the Company's restatement of its financials during the period in question is indicative of a failure in internal controls.[160] *Second*, they plead that four CWs claim that the Company lacked adequate internal controls. The first CW, described as a Vice President who worked on adjudication of claims at the Company for five years (ending in the Spring 2005), claims that the internal data-gathering system was inadequate and observes that the Company was unable to maintain accurate financial information.[161] The second CW, described as an Assistant Vice President who worked in marketing for four years (through Spring 2006), states that management was aware of the Company's inability to grow its financial reporting systems at the same pace as the growth of its business.[162] The third CW, described as a "senior finance executive" who worked at the Company

---

[159] *See id.* ¶¶ 117, 120 (discussing Company's establishment of claims reserves and premium adjustments for first and second quarter 2006).

[160] *See id.*

[161] *See id.* ¶¶ 121-122.

[162] *See id.* ¶ 123.

for six years (through Spring 2006), notes that the Company lacked the administrative infrastructure and skilled employees required to handle its growth, and that it was common knowledge at the Company that its internal systems were inadequate to track its premiums and claims.[163] The fourth CW, a Senior Vice President responsible for information technology during the Class Period, proffers testimony that the Company deliberately manipulated its financial statements to improve the appearance of short-term results.[164] That CW alleges that when she complained of certain irregularities, Willkomm told her that she was "paranoid" and did not "have proof of anything."[165] The CW resigned rather than face demotion.[166]

Plaintiffs are not necessarily required to reveal the identity of their witnesses at the pleading stage.[167] "[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants'

---

[163]   *See id.* ¶ 124.

[164]   *See id.* ¶¶ 125-126.

[165]   *Id.* ¶ 125.

[166]   *See id.*

[167]   *See Novak*, 216 F.3d at 313 ("[O]ur reading of the PSLRA rejects any notion that confidential sources must be named as a general matter . . . .").

-45-

statements were false."[168]  However, if the other facts are not independently

sufficient, the confidential witnesses must be described "with sufficient

particularity to support the probability that a person in the position occupied by

the source would possess the information alleged."[169]  Thus, sufficiency and

particularity are intertwined; the greater the basis for a belief, *i.e.*, the more clearly

sufficient plaintiffs' sources are, the less particularity is required in their

identification.  The threshold requirement is that the allegations must satisfy the

court that plaintiff's claim is not "unwarranted."

    In the instant case, I need not determine whether additional facts must

be pled because the allegations of the CWs provide an adequate basis for believing

defendants' statements were false.  Here, the CWs' identities are sufficiently

particular as to suggest that they possess the information alleged.  The CWs, all of

whom claim knowledge of a systemic failure in the Company's ability to manage

its financial information, occupied positions that would have allowed for relevant

hands-on experience in various parts of the Company.  Because the CWs'

allegations are sufficiently particular as to support their plausibility, they state a

claim without regard to plaintiffs' other allegations.

---

[168] *Id.* at 314.

[169] *Id.*

## b.    Scienter

Although plaintiffs have adequately pled falsity, "allegations of

GAAP violations or accounting irregularities, standing alone, are insufficient to

state a securities fraud claim.  Only where such allegations are coupled with

evidence of corresponding fraudulent intent might they be sufficient."[170]  This

Complaint, taken as a whole, adequately pleads an inference of scienter as to each

of the Scottish Re Defendants that is cogent and at least as compelling as any

plausible opposing inference of nonfraudulent intent.

Scienter may be pled "by identifying circumstances indicating

conscious behavior by the defendant, though the strength of the circumstantial

allegations must be correspondingly greater" than with motive allegations.[171]

---

[170]    *Novak*, 216 F.3d at 309 (quotations omitted).  *Accord In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973, at \*8 (S.D.N.Y. June 23, 2004) ("To satisfy Rule 9(b) and the PSLRA, the Plaintiffs must plead particular facts supporting their theory that the Defendants' failure to take the accounting charges earlier was due to something nefarious, rather than simply imperfect economic forecasting.  The complaint lacks the requisite particularity.").

[171]    *Kalnit*, 264 F.3d at 142.  Plaintiffs' motive theory of scienter is insufficient because they have not pled any "concrete and personal benefit" to the Scottish Re Defendants.  *Id.* at 139.  For example, plaintiffs' argument that an inference of fraud may be drawn based on the Scottish Re Defendants' desire to raise funds in securities offerings fails.  *See Rombach*, 355 F.3d at 177 (holding that the complaint's allegations of several corporate acquisitions and a secondary public offering worth nearly \$100 million, which were purportedly part of an effort to "artificially inflate and maintain the market price of [Family Golf]

Here, plaintiffs' allegations, taken as true, adequately plead that the Scottish Re

Defendants' conduct, *i.e.*, not taking an earlier valuation allowance, was "highly

unreasonable" and "an extreme departure from the standards of ordinary care to

the extent that the danger was either known to the defendant or so obvious that the

defendant must have been aware of it."[172]

　　　　　The Scottish Re Defendants knew that SFAS 109 governed the

application of deferred tax assets and valuation allowances. Indeed, they applied

and quoted the standard in the Company's financial statements both before and

throughout the Class Period. Moreover, they knew that the Company was

---

common stock" and to "complete a previously arranged corporate acquisition of
Eagle Quest and to retire debt," without allegations that defendants engaged in
these transactions "to secure personal gain" were insufficient to allege scienter
because "these steps are part of the officers' and directors' financial
responsibilities to the Company" (quotation omitted)). Likewise, defendants'
motive to protect the Company from financial jeopardy is also insufficient, as such
a goal is shared by all corporate officers. *See, e.g., id.* ("Action taken to 'maintain
the appearance of corporate profitability, or of the success of an investment . . .
does not entail concrete benefits' sufficient to demonstrate motive." (quoting *Chill
v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996))); *San Leandro Emergency
Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 814 (2d Cir.
1996) ("We do not agree that a company's desire to maintain a high bond or credit
rating qualifies as a sufficient motive for fraud in these circumstances, because
'[i]f scienter could be pleaded on that basis alone, virtually every company in the
United States that experiences a downturn in stock price could be forced to defend
securities fraud actions.'" (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54
(2d Cir. 1995))).

[172]　　*Kalnit*, 264 F.3d at 42 (quotation omitted).

-48-

planning to enter into a large transaction to securitize the ING Acquisition assets.
They also knew that such a securitization, once complete, would preclude the
Company from using any income generated by the securitized assets in the future.
Thus, they knew that a large block of future income would no longer be available
to offset the Company's deferred tax assets.

In short, all of the reasons supporting an inference that the financial
statements were false, as discussed above, were known to the Scottish Re
Defendants *at the time they made the statements*. It is simply not a plausible
opposing inference that the Company's officers – sophisticated executives actively
engaged in the planning of these transactions – were ignorant of the transactions'
consequences on the Company's deferred tax assets. The Complaint adequately
alleges that the Scottish Re defendants knew, or were at the very least reckless in
not knowing, that the financial statements were false when made. The "unsettled
circumstances" that were created by the securitization plans were staring them in
the face. Moreover, the fact that there was a large, $112 million "surprise"
valuation that allegedly wiped out a year's worth of the Company's earnings[173]

---

[173]    *See* Compl. ¶ 108.

also provides some circumstantial evidence of scienter.[174]

        This is not a case where plaintiffs are pleading fraud based on

changed circumstances that were unforeseen by defendants at the time they made

their statements.[175] Rather, plaintiffs have cited contemporaneous circumstances

(none of which changed), of which the Scottish Re Defendants' were aware, and

which made their failure to take an earlier valuation allowance tantamount to

conscious misbehavior sufficient to support a strong and cogent inference of

---

[174]     Even though a GAAP violation itself is insufficient to establish
scienter, that is not to say that it can never weigh in favor of scienter. "[T]o the
contrary, when the number, size, timing, nature, frequency, and context of the
misapplication or restatement are taken into account, the balance of the inferences
to be drawn from such allegations may shift significantly in favor of scienter (or,
conversely, in favor of a nonculpable state of mind)." *In re MicroStrategy, Inc.
Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000). *Accord PR Diamonds, Inc.
v. Chandler*, 364 F.3d 671, 685-86 (6th Cir. 2004); *In re Seitel, Inc. Sec. Litig.*,
447 F. Supp. 2d 693, 704-05 (S.D. Tex. 2006); *In re Friedman's, Inc. Sec. Litig.*,
385 F. Supp. 2d 1345, 1361-62 (N.D. Ga. 2005).

[175]     *Cf. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.
1994) (dismissing complaint where plaintiff claimed that defendant's statement
that it believed its loan loss reserve was adequate was false when made because
"misguided optimism is not a cause of action, and does not support an inference of
fraud" and because the allegations did "not say . . . that the company's disclosures
were inconsistent with current data. The pleading strongly suggests that the
defendants should have been more alert and more skeptical, but nothing alleged
indicates that management was promoting a fraud.").

-50-

scienter.[176] Taking the allegations of the Complaint as true, I conclude that a reasonable person would deem the inference of scienter at least as strong as any opposing inference.[177]

Defendants have moved to dismiss the charges that relate to false statements regarding internal controls on the ground that plaintiffs have failed to plead adequate evidence of scienter. As discussed above, plaintiffs must plead allegations that "constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness"[178] sufficient to make the inference at least as plausible as any other inference.[179]

The Complaint alleges that defendants' "intent to deceive or reckless disregard for the truth is demonstrated by substantial circumstantial evidence supporting a strong inference of scienter."[180] This circumstantial evidence

---

[176]    Moreover, the additional "highly unusual and suspicious facts" lend further support to the inference of scienter in this case. For example, the resignations of Willkomm and Vance, although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud.

[177]    See *Tellabs*, 127 S. Ct. at 2511.

[178]    *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).

[179]    See *Tellabs*, 127 S. Ct. at 2511.

[180]    Compl. ¶ 315.

-51-

includes testimony from CWs that the Company's reporting systems were in such

poor condition that it could not properly track unprocessed claims and that the

individual in charge of maintaining financial reporting systems in the United

States was dismissed in connection with these failures.[181]  These allegations, taken

as true for purposes of this motion, sufficiently support the inference that

defendants were reckless in their failure to discover and disclose these

weaknesses.  As a result, this charge cannot be dismissed at this stage in the

proceeding.

### c.  Loss Causation[182]

Defendants also move for dismissal of the internal controls claim on

the ground that plaintiffs have failed to allege a causal connection between the

Company's failure to establish adequate internal controls and plaintiffs' losses.

The Second Circuit has explained that loss causation can be described "in terms of

the tort-law concept of proximate cause" – that is, the damages must be a

foreseeable consequence of the misrepresentation.[183]  This does not mean that the

---

[181]    *See id.* ¶ 329.

[182]    Defendants do not challenge transaction causation in this case, nor do
they challenge loss causation as to the misstatements regarding the deferred tax
assets.

[183]    *Lentell*, 396 F.3d at 172.

misrepresentation itself must "cause" the drop in value of the security, but rather

that "the risk that caused the loss was within the zone of risk concealed by the

misrepresentations and omissions alleged."[184] Therefore, in order to plead loss

causation, the facts alleged must demonstrate that the misrepresentation was the

true "cause" of the loss suffered.[185] It is insufficient as a matter of law to allege

simply that the price of the securities was inflated at some time because of the

misrepresentations.[186] Plaintiffs must also allege some relationship between the

misrepresentations and the actual loss suffered.[187]

On August 4, 2006, Miller announced that the Company had made

three adjustments to its financial statements for the second quarter of 2006 in

addition to the tax deferred asset valuation allowance. These were adjustments to

premiums that were "under-accrued in prior years" amounting to approximately

\$13 million, a change in the way reinsurance was expensed that approximated \$8

---

[184]    *Id.* at 172-73 (citing *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 238 (2d Cir. 2000) (Winter, J., dissenting)).

[185]    *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).

[186]    *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).

[187]    *See id.* at 343.

-53-

million, and a change in premium accruals that amounted to $8 million.[188]

Plaintiffs allege that defendants concealed material weaknesses in the Company's

internal controls, and that because of those weaknesses, the Company failed to

detect these problems earlier. In support of this proposition, plaintiffs point out

that the Company admitted it had a "need to improve the quality" of financial

information available[189] and that upon disclosure of these problems, analysts

remarked that the failures in the Company's internal control system likely

prevented the Company from earlier discovery of these problems.[190] Had the

Company revealed these internal control weaknesses, investors could have arrived

at a valuation of the securities that more accurately reflected the risk of the

Company suffering from financial problems not reflected on its balance sheets.

Instead, trusting that the Company possessed adequate internal controls, it is

plausible that investors believed such financial problems would be discovered

---

[188]     Compl. ¶ 117.

[189]     *Id.*

[190]     *Id.* ¶¶ 115-116. Defendants correctly observe that analyst speculation
regarding internal control failures is generally insufficient to survive a motion to
dismiss. However, where that speculation is supported by other factual
allegations, it can be used to support the plausibility of the allegations. In this
case, plaintiffs' claim is also supported by allegations based on information
provided by the CWs, statements made by defendants, and inferences drawn from
adjustments to the Company's financial statements.

-54-

without undue delay.

Plaintiffs allege that "[t]he price of Scottish Re securities declined in May and July 2006, as the Scottish Re Defendants' disclosures revealed previously undisclosed internal control deficiencies at the Company."[191] They also allege that "when the true facts were subsequently disclosed, the price of [Scottish Re] securities declined precipitously and Plaintiffs . . . were harmed and damaged as a direct and proximate result of their purchases of Scottish Re securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed."[192] These allegations, accepted as true, adequately describe a causal relationship between concealment of the failings of the Company's internal controls and the loss suffered by plaintiffs.

## 2. E&Y

Plaintiffs have raised two discrete grounds for their section 10(b) and Rule 10b-5 claims against E&Y. *First*, plaintiffs allege that E&Y falsely stated that its audits of the Company were performed in accordance with GAAS. *Second*, plaintiffs allege that E&Y vouched for the accuracy of the Company's financial statements notwithstanding the fact that E&Y knew or should have

---

[191]   *Id.* ¶ 128.

[192]   *Id.* ¶ 361.

-55-

known that these financial statements were false.[193]

### a. E&Y's Statements Regarding Its Audit of the Company

In connection with the Company's Forms 10-K for fiscal years 2004

and 2005, E&Y provided reports stating that its audits of the Company had been

conducted "in accordance with the standards of the Public Company Accounting

Oversight Board,"[194] including GAAS.[195] This statement forms the core of

plaintiffs' first claim against E&Y.

Accounting standards require that an audit be "performed by a person

or persons having adequate technical training and proficiency as an auditor" and

require that "[d]ue professional care [be] exercised in the performance of the audit

and the preparation of the report."[196] Plaintiffs allege that E&Y's reports were

false or misleading in that E&Y's audit was not conducted in accordance with

---

[193]     Plaintiffs are thus not alleging aiding and abetting liability. *See*
*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S.
164 (1994) (holding that section 10(b) does not create a cause of action for aiding
and abetting liability); *In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987,
992 (8th Cir. 2006) (concluding that *Central Bank* applies to all Rule 10(b)-5
claims), *cert. granted sub. nom Stoneridge Inv. Partners, LLC v.
Scientific-Atlanta, Inc.*, 75 U.S.L.W. 3034 (U.S. Mar 26, 2007) (No. 06-43).

[194]     Compl. ¶¶ 265, 293.

[195]     *Id.* ¶ 132.

[196]     *Id.* ¶ 134.

those standards.

To support these allegations, plaintiffs introduce testimony from a CW who was a "senior finance executive" at the Company for six years.[197] The CW states that E&Y's audits were performed by unqualified auditors during the relevant time period.[198] Plaintiffs also indicate that E&Y's failure to detect the Company's improper accounting of the deferred tax assets and the Company's internal control failings, notwithstanding that the deferred tax assets were "heavily scrutinized by E&Y . . . in each period in which" the Company issued financial statements, evinces their failure to perform a comprehensive audit.[199]

As discussed above, where the testimony of a confidential witness is necessary to bolster the plausibility of a plaintiff's claim, the witness must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."[200] In this case, there is little question that a senior executive at the Company would be familiar with the interaction between the Company and its auditors.

---

[197]    *Id.* ¶ 135.

[198]    *See id.*

[199]    *Id.* ¶ 136.

[200]    *Novak,* 216 F.3d at 314.

-57-

Even considering the allegations of the CW together with E&Y's

failure to detect the alleged errors in the valuation of the deferred tax assets,

plaintiffs have failed to allege sufficient facts to show that E&Y's statement was

false. Plaintiffs allege that the auditors sent by E&Y were "very junior people . . .

who were unable to perform effectively."[201] But plaintiffs do not allege that

E&Y's auditors were not certified public accountants, nor have they alleged facts

that make plausible the suggestion that they were improperly trained or that they

performed inadequately. Because the allegations in the Complaint regarding

E&Y's ineffective performance are conclusory and implausible, defendants'

motion to dismiss this claim against E&Y is granted with leave to replead.

> **b.     E&Y's Approval of the Company's Financial
> Statements**

E&Y also certified the Company's financial statements in connection

with the Preferred Shares Offering[202] and provided a letter in connection with the

Company's Form 10-K for 2005 stating that in E&Y's opinion, the Company's

internal controls were adequate, and that E&Y believed its audit provided a

---

[201]    Compl. ¶ 135.

[202]    *See id.* ¶ 178.

-58-

reasonable basis for that opinion.[203]  Plaintiffs allege that this opinion and
certification were inaccurate.[204]

### i.    Falsity

The Supreme Court has clarified that an opinion can be actionable if
the speaker deliberately misrepresented its opinion.[205]  An opinion can also be
actionable if it is made in reckless disregard for its truth.[206]  In this case, plaintiffs
have alleged that E&Y knew or recklessly failed to discover that the Company's
financial statements were inaccurate and that its internal controls were
inadequate.[207]

As discussed above, plaintiffs' factual allegations, accepted as true,
suggest that the Company recklessly or intentionally misled investors as to the

---

[203]    *See id.* ¶ 294.

[204]    *See id.* ¶ 178.

[205]    *See Virginia Bankshares*, 501 U.S. at 1092.

[206]    *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir.
1978) ("'A representation certified as true . . . when knowledge there is none [sic],
a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the
conclusion that there was no genuine belief in its truth, are all sufficient upon
which to base liability.'") (quoting *State St. Co. v. Ernst*, 278 N.Y. 104, 112
(1938)).

[207]    *See* Compl. ¶¶ 139, 140, 171.

state of its internal controls and the value of its deferred tax assets.[208] Given E&Y's alleged familiarity with the state of the Company's finances and failure to provide experienced auditors, as well as its alleged involvement in the Company's securitization transactions and familiarity with Ballantyne Re, I conclude that these allegations, if true, suggest that E&Y's opinion was false.

### ii. Scienter

As discussed above, there is a high standard for pleading auditor scienter. Plaintiffs must allege that "'[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful . . . .'"[209]

For purposes of this motion, I accept that the Company assigned an unrealistic value to the deferred tax assets and possessed inadequate internal controls. Plaintiffs allege that E&Y was familiar with the Company's past securitization transactions and had conducted a detailed analysis of the deferred tax assets' value.[210] Plaintiffs further allege that there were clear indications of a

---

[208]    *See supra* Part III.A.1.

[209]    *In re Refco*, 503 F. Supp. 2d at 658 (quoting *Price Waterhouse*, 797 F. Supp. at 1240) (alteration in original).

[210]    *See* Compl. ¶ 342.

-60-

lack of proper internal controls that E&Y should have discovered.[211]

Notwithstanding these allegations, scienter has not been adequately

pled. At best, plaintiffs have alleged that a reasonable auditor would have

discovered the problems with the Company's valuation of the deferred tax assets

and internal controls. However, such allegations would support a claim of

negligence, but would not "'approximate an actual intent to aid in the fraud being

perpetrated . . . .'"[212] Defendants' motion to dismiss is therefore granted as to this

claim against E&Y with leave to replead.

**B.      Section 11 and Section 12(a)(2) Claims**

The Complaint alleges claims against the Scottish Re Defendants,

Officer Defendants and Underwriter Defendants under section 11 and against

Scottish Re and the Underwriter Defendants under section 12(a)(2).  For the same

reasons the Complaint adequately pleads falsity under 10(b) and 10b-5, the

Complaint adequately alleges material misstatements under section 11 and section

12(a)(2).[213]  However, certain defendants have raised specific defenses, which I

---

[211]      *See id.* ¶ 344.

[212]      *Rothman*, 220 F.3d at 98 (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120-21 (2d Cir. 1982)).

[213]      *See supra* Part III.A.1.a.i.  Because the Complaint states a claim even under the heightened pleading standards of Rule 9(b), I need not decide whether

now address.

### 1. Section 12(a)(2) "Seller" Restriction

The Complaint charges that the Company and the Underwriter Defendants violated section 12(a)(2) in the issuance or sale of shares in accordance with the Preferred Shares Prospectus and Ordinary Shares Prospectus.[214] A claim under section 12(a)(2) can be brought against "[a]ny person who . . . offers or sells a security."[215]

The Complaint is not entirely clear as to the extent of plaintiffs' claim under section 12(a)(2). Plaintiffs allege that "Defendants issued or sold" both Preferred Shares and Ordinary Shares,[216] and that plaintiffs purchased securities in the Offerings.[217] However, the putative class consists of "all . . . persons and entities . . . who purchased or acquired [Scottish Re securities] during the" Class Period, with various exceptions.[218] The Class Period is defined as February 17,

---

the Complaint sounds in fraud for purposes of determining whether Rule 8(a) or Rule 9(b) governs the pleading of the section 11 and section 12(a)(2) claims.

[214]   *See* Compl. ¶¶ 195-204 (preferred); *id.* ¶¶ 237-246 (ordinary).

[215]   15 U.S.C. § 77*l* (1).

[216]   Compl. ¶ 198 (preferred); ¶ 240 (ordinary).

[217]   *See id.* ¶ 202 (preferred); ¶ 244 (ordinary).

[218]   *Id.* ¶ 1.

2005 through July 31, 2006. Thus, the putative class includes not only those purchasers who acquired their securities in the Offerings (July 6, 2005 and December 23, 2005), but also persons who acquired their securities on the open market. Nevertheless, accepting the allegations of the Complaint as true for purposes of this motion, I will proceed on the assumption that the plaintiffs purchased securities in the Offerings.

The Company asserts that because the Offerings were effected in "firm commitment" underwritings, the Company cannot qualify as a statutory "seller" under section 12. In a firm commitment underwriting, the issuer sells all the offered shares directly to its underwriters, which then sell those shares to investors. Thus, the Company had no direct interaction with investors.

The Second Circuit has explained that "the term seller includes a person 'who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'"[219] Thus, it applies not only to the seller who is in privity with the investor-plaintiff, but also with other persons, not in privity, who "solicited the sales in question for

---

[219]    *Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608, 616 (2d Cir. 1994) (quoting *Pinter v. Dahl,* 486 U.S. 622, 647 (1988)).

-63-

financial gain."[220]

The Company's motion to dismiss thus raises two issues of fact: (1)
whether the Company solicited sales of its securities; and (2) if so, whether it was
motivated by financial gain.  Plaintiffs allege that the Company conducted a public
offering of its securities through the Underwriter Defendants and imply that the
Company benefitted financially from the sale of those securities.[221]  These
allegations, presumed true, are sufficient to state a claim that the Company was a
statutory seller under section 12.[222]

The Underwriter Defendants also assert that the section 12 claims
against them must be dismissed as plaintiffs have failed to allege that the
Underwriter Defendants "sold" or "solicited" a sale.  However, as discussed

---

[220]    *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124,
1126 (2d Cir. 1989).  *Accord Commercial Union Assurance Co.*, 17 F.3d at 616
("Privity between the buyer and seller is no longer required in a § 12(2) action.");
*Pinter*, 486 U.S. at 647 (discussing the scope of liability under similar provision of
the Securities Act).  *Wilson* distinguished persons soliciting the sale of securities
for their personal financial gain from persons, such as attorneys, that perform
merely ministerial tasks associated with an offering.  Persons in the latter group
are not "sellers" under section 12.  *See Wilson*, 872 F.2d at 1126-27.

[221]    *See* Compl. ¶ 336.

[222]    *See Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y.
1999) (citing *Degulis v. LXR Biotechnology, Inc.*, No. 95 Civ. 4204, 1997 WL
20832, at *6 (S.D.N.Y. Jan. 21, 1997); *In re Chaus Sec. Litig.*, No. 88 Civ. 8641,
1990 WL 188921, at *12 (S.D.N.Y. Nov. 20, 1990)).

-64-

above, the Complaint adequately alleges that defendants, including the

Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs

acquired securities in the Offerings. A reasonable inference is that plaintiffs

acquired their securities from the Underwriter Defendants. The Complaint thus

states a claim under section 12(a)(2).[223]

### 2. Forward Purchaser Liability Under Section 11

The Forward Purchasers move to dismiss on the ground that they are

not alleged to have functioned as underwriters with respect to the securities.

Section 11 provides a cause of action against "every underwriter with respect to

[the offered] security."[224] That section defines "underwriter" as "any person who

has purchased from an issuer with a view to, or offers or sells for an issuer in

connection with, the distribution of any security, or participates or has a direct or

---

[223]    *See WorldCom*, 219 F.R.D. at 283 (noting that plaintiff has standing
to pursue a section 12 claim against "any underwriter from whom it bought Notes
or who successfully solicited the purchase"); *Feiner v. SS&C Techs., Inc.*, 47 F.
Supp. 2d 250, 254 (D. Conn. 1999) ("Purchasers who did not acquire their shares
directly from [the underwriters], however, lack § 12(a)(2) standing."); *cf. In re
American Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 430, 438-
39 (S.D.N.Y. 2000) (holding underwriters to be sellers where the putative class
consisted of investors who acquired shares in the initial public offering).

[224]    15 U.S.C. § 77k.

indirect participation in any such undertaking."[225] "An 'underwriter' is commonly understood to be a person who 'buys securities directly or indirectly from the issuer and resells them to the public, or [] performs some act (or acts) that facilitates the issuer's distribution. He participates in the transmission process between the issuer and the public.'"[226] Thus, "courts have determined whether a defendant was an underwriter by analyzing its role in the underwriting process."[227]

Plaintiffs allege that the Forward Purchasers "borrowed and sold an aggregate of approximately 3,150,000 Ordinary Shares . . . in exchange for the agreement by the Company to issue Ordinary Shares to the Forward Purchasers on settlement dates nine and twelve months after the offering."[228] Like a traditional underwriter, the Forward Purchasers sold shares to the public and sought to profit from the difference between the market price of the securities and the price at which they could purchase the securities from the issuer. The alleged role of the Forward Purchasers was that of underwriters – they formed a key step in the transmission of securities from the Company to the public. Plaintiffs thus state a

---

[225]     *Id.* § 77b(a)(11).

[226]     *WorldCom*, 308 F. Supp. 2d at 343 (quoting *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977)).

[227]     *Id.* at 344.

[228]     Compl. ¶ 42.

claim under section 11 against the Forward Purchasers.

## C.    Control Person Liability

The Complaint alleges control person liability (under section 20(a)

and/or section 15) against Willkomm, Murphy, Miller and French.  Willkomm,

Murphy and Miller challenge these claims only on the basis that the Complaint

fails to allege a primary violation.  For the reasons stated above, this challenge

fails.

French, however, asserts that in addition to the failure to plead a

primary violation, the control person claims against him fail because his control

has not been adequately alleged.  This argument fails.  In order to plead control

under Rule 8, the complaint must allege "that the defendant possessed 'the power

to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise.'"[229]

Moreover, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry,

and generally should not be resolved on a motion to dismiss."[230]

---

[229]    *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)
(quoting 17 C.F.R. § 240.12b-2).

[230]    *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y.
2006) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 143
(S.D.N.Y. 1999)).

Here, the Complaint alleges that French held a "senior executive position[],"[231] was "direct[ly] involve[d] in [the Company's] day-to-day operations, including its financial reporting and accounting functions,"[232] and "signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period."[233] It further alleges that French, along with the other alleged control persons "influence[d] and control[led], directly or indirectly, the decision making of Scottish Re, including the content of its financial statements and public statements."[234] These allegations are more than sufficient to give French fair notice of the claim that he was a control person and the grounds on which that claim rests, which is all that is required at this stage.[235]

---

[231]    Compl. ¶ 366.

[232]    *Id.*

[233]    *Id.* ¶ 19.

[234]    *Id.* ¶ 367.

[235]    *See In re Converium Holding*, 2006 WL 3804619, at *14 (citing *In re WorldCom*, 294 F. Supp. 2d at 415-16). *See also Catton v. Defense Tech. Sys., Inc.*, 457 F. Supp. 2d 374, 385 (S.D.N.Y. 2006) (allegations of control were sufficient to give defendants fair notice of the claim that they acted as control persons where the plaintiffs alleged, *inter alia*, that "[b]y virtue of their high level and controlling positions within the Company, participation in and/or awareness of the Company's actual performance, these defendants had the requisite power to directly or indirectly control or influence specific corporate policy").

-68-

Thus, because the Complaint adequately pleads a primary violation under both the Exchange Act and the Securities Act, as discussed above, the Complaint also states a claim for control person liability as to each of the alleged control persons.[236]

---

[236] *See ATSI*, 493 F.3d at 108 ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability."); *Rombach*, 355 F.3d at 178 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, these secondary [control person liability claims] must also be dismissed.").

## IV. CONCLUSION

For the reasons discussed above, defendants' motions to dismiss are granted in part and denied in part. The Clerk of the Court is directed to close these motions [Nos. 47, 70 and 72 on the Docket Sheet]. In an order dated January 25, 2007 [No. 43 on the Docket Sheet], the Court granted defendants' motion for an extension of time relating to these motions. Accordingly, the Clerk of the Court is directed to close that motion as well [No. 41 on the Docket Sheet]. If plaintiffs choose to file an amended complaint, they must do so by November 29, 2007. A conference is scheduled for November 30, 2007, at 3:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
             November 1, 2007

## - Appearances -

### For Lead Plaintiff and the Class:

Max W. Berger, Esq.
Salvatore J. Graziano, Esq.
John C. Browne, Esq.
Eric T. Kanefsky, Esq.
Bernstein Litowitz Berger &
Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

John R. Climaco, Esq.
David M. Cuppage, Esq.
Scott D. Simpkins, Esq.
Climaco, Lefkowitz, Peca, Wilcox &
Garofoli Co.
55 Public Square, Suite 1950
Cleveland, OH 44113
(216) 621-8484

### For Plaintiff Richard Baehr Trust:

Marvin L. Frank, Esq.
Murray, Frank & Sailer, LLP
275 Madison Avenue
New York, NY 10016
(212) 682-1818

David Kahn, Esq.
Mark E. King, Esq.
David B. Kahn & Associates, Ltd.
One Northfield Plaza, Suite 100
Northfield, IL 60093
(847) 501-5083

### For Defendants Scottish Re Group Limited, Elizabeth Murphy, Dean E. Miller, Michael C. French, Michael Austin, William Caulfeild-Browne, Robert Chmely, Lord Norman Lamont, Hazel O'Leary and Glenn Schafer:

Evan M. Rosen, Esq.
Lyle Roberts, Esq.
George Anhang, Esq.
LeBoeuf, Lamb, Greene & MacRae LLP
1875 Connecticut Ave., N.W.
Washington, D.C. 20009
(202) 986-8000

**For Defendant Scott Willkomm:**

Dennis E. Glazer, Esq.
Elliot Moskowitz, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

**For Defendant Ernst & Young LLP:**

William R. Maguire, Esq.
Marc A. Weinstein, Esq.
Sarah L. Cave, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000

**For Defendants Lehman Brothers Inc., Bear Stearns & Co. Inc., Banc of America Securities LLC, Keefe Bruyette & Woods, Inc., Oppenheimer & Co. Inc., Advest, Inc., RBC Dain Rauscher Inc., Stifel, Nicolaus & Company, Incorporated, Goldman, Sachs & Co., Wachovia Capital Markets, LLC, A.G. Edwards & Sons, Inc., Fox-Pitt, Kelton Incorporated, Lehman Brothers OTC Derivatives, and Bear Stearns International Limited:**

James E. Brandt. Esq.
Jeff G. Hammel, Esq.
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200

# EXHIBIT C

LEXSEE 2005 U.S. DIST. LEXIS 41240

**In Re Enron Corporation Securities, Derivative & "ERISA" Litigation; MARK NEWBY, ET AL., Plaintiffs VS. ENRON CORPORATION, ET AL., Defendants; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs, VS. KENNETH L. LAY, et al., Defendants. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Individually and on behalf of all others similarly situated, Plaintiffs, VS. ROYAL BANK OF CANADA, ROYAL BANK DS HOLDING INC., ROYAL BANK HOLDING INC., RBC DOMINION SECURITIES INC., RBC DOMINION SECURITIES LTD., RBC HOLDINGS (USA) INC., AND RBC DOMINION SECURITIES CORP., Defendants.**

**MDL-1446, CIVIL ACTION NO. H-01-3624, CONSOLIDATED CASES, CIVIL ACTION NO. H-04-0087**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2005 U.S. Dist. LEXIS 41240*

**December 22, 2005, Decided**
**December 22, 2005, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Newby v. Enron Corp. (In re Enron Corp. Secs., Derivative & "ERISA" Litig), 2006 U.S. Dist. LEXIS 35246 (S.D. Tex., Apr. 12, 2006)*

**PRIOR HISTORY:** *Newby v. Enron Corp. (In re Enron Corp. Secs), 229 F.R.D. 126, 2005 U.S. Dist. LEXIS 19719 (S.D. Tex., 2005)*

**COUNSEL:** [*1] For The Regents of the University of California, Individually and on behalf of all others similarly situated, Plaintiff: Roger B Greenberg, Schwartz Junell et al, Houston, TX; William S Lerach, Lerach Coughlin et al, San Diego, CA.

For Royal Bank of Canada, Defendant: Anne C Patin, Mark D Kotwik, Michael J McNamara, Seward and Kissel LLP, New York, NY; Barry Richard, Tallahassee, FL; Claude L Stuart, III, Phelps Dunbar LLP, Houston, TX; Glenn T Burhans, Jr, Greenberg Traurig PA, Tallahassee, FL; Laureen E Galeoto, Tallahassee, FL.

For Royal Bank Holding Inc, RBC Dominion Securities Inc, RBC Holdings (USA) Inc, Defendants: Claude L Stuart, III, Phelps Dunbar LLP, Houston, TX; Mark D

Kotwik, Michael J McNamara, Seward and Kissel LLP, New York, NY.

For Mark Newby, Plaintiff: Richard J Zook, Cunningham Darlow et al, Houston, TX; Roger B Greenberg, Schwartz Junell et al, Houston, TX.

For Enron Corporation, Defendant: Scott David Lassetter, John B Strasburger, Weil Gotshal & Manges, Houston, TX.

**JUDGES:** MELINDA HARMON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MELINDA HARMON

**OPINION**

**OPINION AND ORDER**

The above referenced putative class action alleging that the Royal Bank of [*2] Canada and six of its subsidiaries and affiliates "engaged in or participated in the implementation of manipulative or deceptive devices

Case 3:07-cv-02940-SI    Document 74-2    Filed 11/08/2007    Page 96 of 116

Page 2
2005 U.S. Dist. LEXIS 41240, *2

to inflate Enron's reported profits and financial condition and participated in a scheme to defraud or a course of business that operated as a fraud or a deceit on purchasers of Enron and Enron-related publicly traded securities between January 9, 1999 and November 27, 2001," in violation of *Sections 10(b)* and *20(a)* of the Securities Exchange Act of 1934 ("the 1934 Act"), *15 U.S.C. §§ 78j(b)* and *78t(a)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5.* Complaint, # 1 at 1.

Pending before the Court are Defendants Royal Bank of Canada, Royal Bank Holding, Inc., Royal Bank DS Holding Inc., RBC Dominion Securities Limited, RBC Holdings (USA) Inc., and RBC Dominion Securities Corporation's (collectively, "RBC Defendants'") [1] motion to dismiss the complaint (instrument # 16) pursuant to *Fed. Rules of Civil Procedure 8, 9(b), 11,* and *12(b)(6)* and the Private [*3] Securities Reform Act of 1995 ("PSLRA"), codified at *15 U.S.C. § 78u-4(b) (3) (A).*

> 1    The complaint, # 1 at 3-4, claims that Defendant Royal Bank Holding Inc., which is under the control of the Royal Bank of Canada,
>
> > conducts its business affairs through a series of wholly owned and controlled subsidiaries where the bank holding company directly or indirectly owns 100% of the stock of the subsidiaries and completely directs and controls their business operations through the selection and appointment of their officers and, where necessary, directors. These controlled subsidiaries are also the agents of the bank holding company and include subsidiaries rendering financial advice and services to public companies, including Enron. . . . The bank holding company . . . participated in the fraudulent scheme and course of business complained of, not only by way of the actions of the holding company itself, but also by way of the actions of numerous of its controlled subsidiaries and agents, some of which have been named as defendants in this action.

[*4] The Court refers the parties to, and hereby incorporates, its memoranda and orders in *Newby*, in particular the Memorandum and Order *Re* Secondary Actors' Motions to dismiss (# 1194, issued on 12/19/02), Memorandum and Order regarding Enron insiders' motions to dismiss (# 1299 entered on March 25, 2003), and Memorandum and Order relating to the Imperial County Employees Retirement System's ("ICERS'") motion to intervene (# 1999 entered on February 24, 2004), [2] as well as those addressing the same transactions at issue here, because the Court's prior rulings discuss in detail many of the facts alleged here and the relevant law and because the parties base some of their arguments on those decisions.

> 2    Published as *In re Enron Corp. Secs., Derivative & ERISA Litig., 235 F. Supp. 2d 549 (S.D. Tex. 2002).*

**Allegations in the Complaint**

The complaint identifies the following allegedly intrinsically fraudulent transactions structured, funded, and executed by RBC Defendants for Enron from 1995-1999, which Plaintiff [*5] the Regents of the University of California contends had to provide RBC with notice of Enron's methods of systematic deception in concealing its substantial off-balance-sheet debt: (1) Caribou, commenced in 1995, utilized swap agreements with Enron affiliates that were guaranteed by Enron and created significant off-balance sheet debt exposure for Enron; (2) State Street Bank and Trust ("State Street"), a $ 718.8 million, five-year, securitized lease entered into around January 1996 by State Street and CXC, Inc., a securitization company serviced by Citicorp and 100% guaranteed by Enron; (3) Sarlux, a 1996 transaction involving the financing of a Sardinian power plant by means of an SPE; (4) Brazos Office Holdings L.P. ("Brazos"), an SPE, that entered into a 1997 $ 276 million synthetic lease with Enron to lease Enron's headquarters building and certain equipment back to an Enron affiliate, with Enron guaranteeing $ 213 million of that amount; (5) Bob West Treasure LLC ("Bob West"), an SPE owned by Enron and an LJM2 entity, to which RBC provided bridge financing in December 1999 and which funded the prepayment of a $ 105 million prepaid gas forward sales contract that was 100% guaranteed [*6] by Enron; [3] and (6) E-Next FAS 140 transaction, structured in three phases to keep $ 582 million in

funding off Enron's balance sheet in the purchase of turbines and development of peaking power plants, but the third phase of which Enron never intended to occur, leaving Enron as a guarantor of the funds. [4]

> 3    While claims arising out of these first five transactions would be time-barred, as the Court has concluded in other orders such a pattern of disguised loan transactions may be used as evidence of the alleged scheme to defraud investors in Enron and Enron-related securities and to establish RBC Defendants' scienter.
> 4    The complaint states that Goldin determined that E-Next "was primarily a device to conceal loans to, or guarantees by, Enron." Report at 163.

Plaintiff alleges that some of these transactions were manipulative devices employed to misrepresent Enron's financial statements; others demonstrate the pattern, course of conduct, and participation by RBC in the scheme to defraud investors, in [*7] connection with Enron's purportedly misleading financial statements and Enron's intent to create them by means of deceptive structured transactions.

The complaint recites that Enron North America's ("ENA's") Court-Appointed Bankruptcy Examiner Harrison J. Goldin, in his report to the bankruptcy court regarding transactions with Enron-related special purpose entities ("SPEs") ("the Goldin Report" at 93 n.280), publicly issued on December 4, 2003, [5] reported that a factfinder could find that Caribou in 1995 (demonstrating that Enron was using prepay structure to obtain off-balance-sheet financing), State Street in 1996 (demonstrating that Enron was monetizing assets by removing them from its balance sheet), Sarlux and Brazos in 1997, Bob West in 1999, and JEDI and ECLN in 2000, constituted "red flags" putting RBC on notice that Enron had considerable exposure to off-balance-sheet debt. Thus although the ENA Examiner did not find direct evidence of RBC's knowledge until mid-September 2000, at which time he also found that the ratings agencies were confused about the extent of that exposure, Harrison did conclude that a fact-finder could infer that RBC Defendants' involvement in these [*8] earlier transactions triggered inquiry notice.

> 5    A copy of the Goldin Report, entitled "Report of Harrison J. Goldin, the Court-Appointed Examiner in the Enron North American Corp. Bankruptcy Proceeding, Respecting His

Investigation of the Role of Certain Entities in Transactions Pertaining to Special Purpose Vehicles," is attached to and incorporated by reference into the complaint.

The complaint further asserts that RBC, concerned that Enron considered RBC to be a "second tier" bank, strove to become one of Enron's ten "top tier" banks, rewarded with more lucrative future business transactions and thus more fees, interest, and credit facility payments from Enron. That ambition in part motivated RBC to participate in the fraudulent LJM2 transaction. Goldin found that in August 2000, to realize that ambition RBC hired twenty-five bankers [6] from Defendant NatWest's structured finance group. These bankers' prior experience working with Enron purportedly gave them personal knowledge about how Enron structured [*9] off-balance-sheet transactions to make investors, analysts and rating agencies believe that Enron had current cash flow from sales of assets when, in fact, it had only "paper profits" that had not been realized. Moreover, after these bankers were hired, RBC structured, funded and executed a number of key fraudulent transactions with Enron that constitute the heart of the current complaint, including the following: (1) the September 2000 Alberta Prepay, a commodity prepay that was actually a disguised loan to Enron; (2) Cerberus, [7] a short-term financing that was actually comprised of loans that allowed Enron to monetize gains in Enron Oil & Gas shares owned by Enron; (3) the November 2000 Hawaii 125-0 transaction, involving creation of SPEs to purchase nonperforming assets from Enron, structured as sales, but actually loans; (4) JEDI, for which in April 2000 RBC was the managing agent and in a $ 513.5 million loan to which RBC was a $ 32 million participant, and which loan RBC knew was guaranteed by Enron common stock and an Enron swap designed to repay the principal and interest; (5) a second, May 30, 2000 Bob West credit swap of bridge financing to shift the risk of [*10] an Enron or Bob West default to European Finance Reinsurance, while the transaction retained full recourse against Enron for the off-balance-sheet debt of Bob West; (6) Enron Credit Linked Notes ("ECLN") or Yosemite III, which RBC fraudulently funded with at least $ 50 million, making RBC appear to be an equity partner in Yosemite III, in August 2000, to hide Enron's debt from $ 475 million in prepay financing by Citigroup and Delta Energy.

> 6    Among these purportedly were Gary Mulgrew, who headed NatWest's structured finance group

and then Royal Bank's Global Structured Finance Group; Giles Darby, managing director of NatWest's structured finance group and Enron's "relationship manager"; and David Bermingham, a director of NatWest's structured finance group. The complaint states that all three have been indicted for their Enron-related actions and are fugitives.

7   At times inconsistently spelled "Cerebrus" in the pleadings.

As direct evidence of RBC's scienter, the complaint claims that in August 2000 Enron [*11] wanted off-balance sheet financing to allow Enron Canada to purchase an Alberta Power Purchase Arrangement. RBC proposed three different fraudulent transactions (described in the complaint at 12-15, PP 29-39) with SPEs, fraudulent gas swaps, prepays and off-balance-sheet accounting, the first two of which were rejected by Enron. In sum, the complaint asserts, "The [final, accepted] Alberta prepay materially distorted Enron's financial statements. Enron understated its debt and overstated its cash flow from operating activities by reporting its obligations as price risk management instead of debt."

The complaint further alleges that RBC knew by September 2000 that Enron's off-balance sheet debt might be $ 16 billion and quotes a comment by a RBC banker, "Being Enron's auditor would be a thankless task." Complaint at 10, P 22. RBC also learned that rating agencies were way off the mark because they did know about Caribou, Bob West, and the various disguised loans that RBC had structured, funded and executed for Enron: Standard & Poor's calculated Enron's debt exposure as only $ 3 billion, while Moody's calculated it as $ 6.8 billion. The complaint quotes one RBC banker's written communication [*12] to his supervisor, a vice president in risk management, after RBC's Management Group received a document relating to Enron around September 20, 2000:

The implications of that document for Enron are absolutely enormous. If Bob [Bob Hall, senior vice president of Risk Management group, and Piazza's supervisor ("Hall")] *read it he'd cut the [credit] limit [of Enron] in half [.] . . . If the existing off balance sheet obligations are generally stated as $ 6.2B . . . I*

*suggest that asset base of the company is spurious, and that there are other obligations hidden in these vehicles [.]* . . . The deal itself is a concoction that while it may "compensate a valued employee" also benefits Enron, and the equity base of the vehicles is likely inflated by partnership management fees (earned or expected) treated as equity [.] *. . . Its [sic] hard to believe this stuff, because it implies the "10 top tier banks" are aware of whats [sic] going on."*

Complaint at 10, P 23.

A September 22, 2000 e-mail from one RBC banker to another, also quoted in the complaint, reveals that RBC knew that Enron was being pressed by the rating agencies to reduce its [*13] debt and increase its cash flow, according to Plaintiff:

The rating agencies have been pressing Enron *vis-a-vis* low level of cash flow generation to total debt for the rating class. I think John [Aitken] is referring to the transparency of the financial statements (the integrity of the accounting principals [sic] behind the financial statements).

*Id.* at 11, P 24.

The complaint conclusorily alleges that in September 2000, RBC knew that Andrew Fastow controlled LJM2 and that NatWest was receiving enormous profits from "equity" trades with Enron and LJM1. Even though it was worried about Fastow's conflict of interest with LJM2, RBC lent LJM2 $ 10 million to obtain additional business from Enron. The pleading quotes the conclusion of ENA Examiner Goldin:

By early October, 2000, RBC knew that (i) there had been issues between Enron and its auditors for some time; (ii) Enron's auditors wanted to maintain the appearance that they were adhering to the appropriate accounting conventions; and (iii) Enron was a major global user of off-balance-sheet financing. There are also indications that RBC believed Enron's auditor's [sic] were not closely examining

[*14] Enron's activities and that the US $ 800 million JEDI *I* refinancing RBC was looking to become involved in would not involve true equity. RBC also thought Enron would be looking to RBC "to support them over their year end."

*Id.* at 11, P 26. Nevertheless RBC continued to work for tier one status with Enron. The complaint asserts that RBC's concern about Enron's liquidity, concentrating on the maximization of assets and minimization of debt on its balance sheet, led RBC to plan to reduce RBC's exposure by syndication or by underwriting more of its Enron transactions and by structuring, funding, and executing more deceptive transactions to keep Enron afloat (such as the November 7, 2000 approval by RBC's Risk Management group of RBC's participation in the Hawaii 125-0 transaction), while it simultaneously pocketed more and more fees from the troubled corporation. RBC also reduced Enron's credit limit from $ 750 million (Canadian) to $ 500 million (Canadian) after Enron filed its 2001 10-K.

The complaint characterizes the Cerberus transaction 8 as an "invitation to co-lead a monetization of Enron's shareholding in Enron Oil and Gas ["EOG"]," in reward for RBC's participation [*15] in the Alberta Prepay and for "progress" on LJM2. Enron wanted to "sell" the shares to generate cash to pay down other debt until the convertible bond, which the EOG shares were intended as the source to redeem, matured in June 2002. Detailed in the complaint at 15-17, PP 41-47, Cerberus gave Enron off-balance-sheet funding, secured on its EOG shares, to raise short term (18-20 months) funds without requiring Enron to lose control of the EOG shares; in essence it was, according to an RBC memorandum, "a 19 month secured loan' to Enron" instead of a sale of assets, as Goldin recognized. The complaint asserts that if the Cerberus transaction had been accounted for in the manner that Enron Bankruptcy Examiner Neal Batson argued was proper, the EOG shares would have remained as assets on Enron's balance sheet and "Enron's liability under the Original Cerberus Total Return Swap (equal to approximately $ 517.5 million) would have been recorded as debt. Cash flow from the operating activities for *the year 2000 would have been reduced by approximately $ 517.5 million and cash flow from financing activities increased correspondingly."* Complaint at 17, P 47.

8    The complex Cerberus transaction is described *inter alia* in the complaint in the words of an RBC banker at 16, P 43:

The EOG shares will be transferred to the ownership of an effectively bankruptcy remote vehicle Aeneas LLC [("Aeneas")] which will issue A' shares (legal controlling interest but little economic value) to Enron Asset Holdings (EAH"), and B' shares (non-voting but substantially all of the economic value). The B' shares are subscribed for by Psyche LLC ("Psyche") which will then sell the B' shares to Heracles Share Trust [("Heracles")]. Heracles will be a trust owned by the Delaware registered entity, Wilmington Trust and the equity certificate of the trust may be assigned to Gen Re if it is part of the structure. Heracles funds itself by way of a loan from [RBC] and will hold the B' interest on behalf of the lenders. *EAH will enter into a total return swap . . . with Heracles via which Enron receives dividends and any upside on the EOG shares and Enron pays LIBOR plus margin in return as well as any downside on EOG. LIBOR plus margin is sufficient for Heracles to service the underlying loan to Heracles. The obligations of EAH under the [total return swap] will be unconditionally guaranteed by Enron Corp.*

According to the ENA Examiner, "the total return swap effectively constituted a promise by EAH to pay Heracles the amounts that Heracles owed Royal Bank, to the extent the proceeds from the EOG shares actually received by Heracles were insufficient to cover the amounts owed on the loan," and thus "this arrangement was equivalent to a secured guarantee of the Heracles loan." Complaint at 16, P 43.

[*16] In the Hawaii 125-0 transaction in November 2000, two special purpose trusts (Hawaii I Trust and Hawaii II Trust) were created as one of a series of contrivances to conceal nonperforming assets from Enron's balance sheet by selling the assets to the trusts without Enron's *"losing control until a legitimate third party buyer can be found"*: RBC described it *"as a warehouse vehicle for Enron allowing Enron to better time asset sales to third parties and to aggregate assets, achieving a critical mass for later refinancing into a longer term off-balance sheet vehicle."* Complaint at 18, P 49. It utilized a total return swap, assuring lenders of payment, like an Enron guaranty, with Enron retaining risks and benefits. Enron's Bankruptcy Examiner stated,

> If the Hawaii Transaction were accounted for in the manner the Examiner has determined to be proper, the assets in the Hawaii transactions would have remained on Enron's balance sheet as assets and *Enron's liability under the Hawaii Total Return Swaps (equal to approximately $ 43.6 million as of the Petition Date) would have been recorded as debt and the approximately $ 273.7 million gain would not have been* [*17] *recognized.*

Complaint at 19, P 50. RBC participated in the financing of the Hawaii deceptive transaction, led by CIBC, which Enron's Bankruptcy Examiner, Neal Batson, determined was fraudulent in nature and which the Department of Justice and the SEC decided was a sham. Ex. 5 to # 21, Enron Bankruptcy Examiner's Final Report, Appendix. G, at 5; Exs. 6 (SEC) and 7 (DOJ) to # 21.

In August 2001 RBC, as a purported equity investor, entered into a FAS 140 transaction with Enron involving Enron Energy Services ("EES"), which reported as a sale of assets what actually was a loan to Enron with no risk since Enron assured timely and full repayment.

In December 1999 RBC provided bridge financing, guaranteed by Enron, to Bob West Treasure for a $ 105 million fraudulent gas prepay in a sale of gas to an Enron affiliate; ENA was to pay Bob West Treasure the funds required to repay RBC's loan to Bob West Treasure. The Goldin Report stated that a factfinder could determine that RBC knew under United States accounting standards that off-balance sheet financing should not include full

recourse against Enron and thus the Bob West Treasure loan did not qualify for off-balance sheet financing. [*18] The report further stated that RBC knew from its review of Enron's financial condition since at least 1996 and its involvement in Caribou, State Street, and Brazos Office Holdings, that these transactions had each created substantial off-balance sheet debt for Enron and that Enron's additional exposure from the Bob West Treasure loan would be concealed from the investing public. Moreover, the Bob West Treasure commodity swap was created to conceal the full guarantee of the RBC loan by Enron North American and Enron.

RBC was involved as managing agent in several loans to JEDI, secured by Enron common stock and utilizing a swap to create funds to repay the principal and interest, but not disclosed on Enron's financial statements, during 2000.

RBC also worked on LJM2 and in mid-November 2000 lent the partnership $ 10 million in order to position itself for additional lucrative transactions with Enron [9]; its LJM2 Transaction Request stated, "We also recognize that this deal is seen as *an entry ticket for more remunerative transactions which we are already seeing coming to us."* Complaint at 22, P 59. RBC was verbally assured that the loan would not run its full term and that [*19] RBC would be repaid within two years with a return for two years of 36.77%. *Id.*

> 9 RBC Defendants point out that Plaintiff does not allege that they or their employees were limited partners in LJM2 or that they were invited to invest in it. Moreover the Goldin Report at 93-94 stated that "it was not clear that [the RBC loan] increased the off-balance sheet exposure of Enron."

In August 2000, again with risk, RBC invested at minimum $ 50 million in the Enron Credit Linked Notes transactions of the Yosemite III transaction, which was designed to disguise debt from $ 475 million in prepays by Citigroup and its controlled offshore SPE, Delta Energy.

### RBC Defendants' Motion to Dismiss

Specifically the RBC Defendants argue for dismissal in their memorandum of law in support of their motion on the grounds that (1) the claims against them are time-barred, since Plaintiff the Regents of the University

of California, which also serves as Lead Plaintiff in *Newby*, had at least inquiry notice of the alleged [*20] Enron-related fraud by October 16, 2001, when Enron publicly announced one billion dollars in charges and a reduction of shareholders' equity by $ 1.2 billion, and when the *Newby* case, of which this suit is a part, was filed a few days later, but the Regents nevertheless failed to file this action until January 9, 2004 [10]; (2) the complaint does not comply with *Federal Rules of Civil Procedure 8(a)*, *9(b)*, and *11* and the PSLRA; [11] (3) The complaint does not differentiate among the seven RBC Defendants nor specify with particularity which wrongful acts were by which Defendant, but lumps them together, and this Court has already determined that such "group pleading" did not survive the PSLRA; (4) the complaint fails to allege that the RBC Defendants committed a primary violation of *§ 10(b)*, but at most states a claim of aiding and abetting that is not actionable after *Central Bank of Denver, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994)*, [12] and the complaint fails to plead facts giving rise to a strong inference of scienter; (5) Plaintiff [*21] fails to allege loss causation adequately under *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)* because Plaintiff's damage claim is premised exclusively on the allegation that the purchase price of the securities was artificially inflated by RBC Defendants' wrongdoing; and (6) Plaintiff's claim for control person liability under *§ 20(a)* fails because there is no properly pled, independent violation of *§ 10(b)* by the controlled person that is not barred by limitations and because there are no specific allegations of actual control by any of the RBC Defendants over a primary violator, but only conclusory allegations. They maintain that the complaint merely alleges that RBC Defendants engaged over a seven-year period in what were private structured finance transactions [13] with Enron, which were later misrepresented by Enron in its financial statements; they claim that any fraud was the result of Enron's accounting and reports, which were not created, prepared, drafted, reviewed or advised upon by RBC Defendants. They note that Plaintiff has not and cannot allege that they have made any public false or misleading statements that affected the market for [*22] Enron securities for liability under *§ 10(b)*; nor has Plaintiff alleged that the transactions RBC Defendants have engaged in with Enron were manipulative or deceptive, but only that these transactions were misrepresented by Enron in its financial statements, for which and in which RBC Defendants

insist they had no responsibility or involvement. In addition, RBC Defendants contend that the transactions at issue were private transactions between Enron, Enron-controlled affiliates, RBC Defendants, and other financial institutions, and did not involve public disclosure or shareholder solicitation, and thus the claims against them should be dismissed.

10    The initial limitations period for *§ 10(b)/Rule 10b-5* securities fraud claims was that established in *Lampf*, i.e., the shorter of one year after discovery of the facts constituting the violation or three years after the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 358, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991)*. It was amended for all "proceedings" filed on or after the date of its enactment by the Sarbanes-Oxley Act ("Sarbanes-Oxley"), Pub. L. 107-204, § 804(b), 116 Stat. 745 (July 30, 2002), codified at *28 U.S.C. § 1658*. Under Sarbanes-Oxley, the limitations period for all private actions under *§ 10(b)* and *Rule 10b-5* was lengthened to two-years-from-date-of-discovery-of-facts-constituting-the-violation or five-years-from-date-of-occurrence statute of limitations. Claims that were stale when Sarbanes-Oxley was enacted were not revived by it. # 1999 at 25-60. Since this Court issued that decision a number of appellate courts have reached the same conclusion. *See In re ADC Telecommunications, Inc. Sec. Litig., 409 F.3d 974, 977 (8th Cir. 2005)*; *Foss v. Bear, Stearns & Co., 394 F.3d 540, 541-42 (7th Cir. 2005)*; *Glaser v. Enzo Biochem, Inc., 126 Fed. Appx. 593, 598 (4th Cir. 2004)*; *Enterprise Mortg. Acceptance Co., LLC, Sec. Litig. v. Enterprise Mortg. Acceptance Co., 391 F.3d 401, 405-10 (2d Cir. 2004)*; *Chenault v. U.S. Postal Serv., 37 F.3d 535, 539 (9th Cir. 1994)*.

This Court previously concluded that *Newby*, filed on October 22, 2001, is not governed by the Sarbanes-Oxley Act, but by the *Lampf* one-year/three-year statute of limitations.

RBC Defendants contend that this action against them is "an integral part and an extension of the proceedings in the Newby Action." They point to the order consolidating it with *Newby*, the fact that it is subject to the pre-trial and

2005 U.S. Dist. LEXIS 41240, *22

scheduling orders and the Deposition Protocol Order in *Newby*, the fact that Plaintiff is Lead Plaintiff in *Newby* and calls itself "Lead Plaintiff" in this suit, the allegations that RBC Defendants participated in a "fraudulent scheme to misrepresent Enron's financial conditions [as] detailed in the Regents' First Amended Consolidated Complaint [at P 3] filed May 14, 2003" in *Newby*, and the fact that the causes of action against RBC Defendants are the same *Section 10(b)* and *Section 20(a)* claims that are asserted against other financial institution defendants in *Newby* that exhibited the same course of conduct in the same or similar transactions. # 17 at 9. RBC Defendants also highlight the fact that the Regents filed a Consolidated Complaint in *Newby* on April 8, 2002, adding financial institutions as defendants and alleging violations of federal securities laws. They argue Plaintiff could and should have sued, but chose not to sue, RBC Defendants by amending the complaint in *Newby*. They also point out that on December 2, 2003, the Regents filed a separate suit against Toronto-Dominion Bank and Royal Bank of Scotland, H-03-5528, as participants in the alleged *Newby Ponzi* scheme. Yet the Regents still did not sue RBC Defendants for the same cause of action for almost another two years.

Plaintiff responds that this action, H-04-0087, is governed by the Sarbanes-Oxley statute of limitations because the suit was filed after its July 30, 2002 enactment, alleges different claims against a new financial institution that Plaintiff has sued for the first time, and in essence is a new "proceeding" under Sarbanes-Oxley.

[*23]

11    RBC Defendants argue that rather than a short, plain statement of Plaintiff's claims, the complaint incorporates the lengthy Goldin report in the Enron bankruptcy proceeding before the Honorable Arthur Gonzalez. The Goldin Report in turn incorporates other long bankruptcy examiners' reports, including those of Enron Examiner Neal Batson. Not only is the complaint prolix, but it lacks the factual specificity necessary for a securities fraud claim. These bankruptcy examinations were not conducted to determine if there was securities fraud involving

Enron and thus they lack the requisite particularity to state securities law violations. Moreover, charge RBC Defendants, the complaint is not based on Plaintiff's independent, personal investigation of the facts that form the basis of the suit, but "piggybacks on contested hearsay allegations by a third party," circumventing *Rule 11*.

The Court observes that under the PSLRA, a plaintiff need not plead from personal knowledge, but may plead based on "information and belief" as long as the plaintiff "states with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*. *See also ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 351 (5th Cir. 2002)* (An allegation is "made on information and belief" when it is not based on personal knowledge). In *ABC Arbitrage, 291 F.3d at 351*, the Fifth Circuit adopted the standard of the Second Circuit as set forth in *Novak v. Kasaks, 216 F.3d 300, 312-14 (2d Cir. 2000)* (where complaint is based on information and belief, plaintiff "need only plead with particularity *sufficient* facts to support those beliefs"), *cert denied, 531 U.S. 1012, 121 S. Ct. 567, 148 L. Ed. 2d 486 (2000)*. In *Novak* the plaintiffs relied on confidential sources. The Second Circuit concluded that the sources need not be named and found the complaint was sufficient because it identified with particularity several documentary sources that supported their belief that serious inventory problems existed during the class period. It stated, "a complaint can meet the new pleading requirement imposed by paragraph (b) (1) by providing documentary evidence and/or sufficient general description of the personal sources of the plaintiffs' beliefs." *Id. at 314*. Here the sources (bankruptcy examiners' reports) are not confidential but were documents publicly filed in the bankruptcy court by independent examiners, required by statute to be disinterested, and the reports are attached as exhibits to pleadings in the file.

[*24]

12    RBC Defendants argue that Goldin's report found the evidence only supported an inference that RBC aided and abetted Enron's officers in breaching their fiduciary duty to shareholders, which is insufficient to state a *§ 10(b)* claim under

*Central Bank.* Defendants do concede that Goldin found that they were aware by mid-September 2000 of the extent of Enron's off-balance-sheet accounting and that the rating agencies were confused about the amount of Enron's debt exposure, but RBC Defendants insist that

Plaintiff has not shown a primary violation of the securities laws. Plaintiff again points out that the purpose of the Examiner's report was not to find violations of federal securities law and thus its use of "aiding and abetting" language is being taken out of context. The Court agrees and, as will be discussed, even if the purpose of the report had been to find securities fraud, in bringing suit Plaintiff is not restricted to or bound by the Examiner's findings and conclusions, which were made in a different context for a different purpose.

13    These included transactions, from 1995 on, known as Caribou, State Street, Sarlux, Brazos Holdings, Bob West Treasure, and E-Nest-1999, and Alberta, Cerberus, a refinancing of Bob West Treasure, and debt participations in Hawaii 125-0, JEDI, and LJM2.

RBC Defendants point out that Goldin concluded that there was an insufficient basis to find that RBC Defendants' participation in the transactions, except for the three that closed after September 2000 (i.e., the Alberta prepay, Cerberus and Hawaii), contributed to the alleged *Ponzi* scheme. Goldin found that in Hawaii, which was structured by another financial institution, RBC was a minor debt participant. RBC Defendants contend that there are no facts alleged demonstrating that RBC Defendants knew that Enron was improperly accounting for Alberta and Cerberus, in which RBC did participate in the structuring. They emphasize that Arthur Andersen was a highly regarded, independent accounting firm that was reviewing such transactions and imply they were justified in relying on its work product.

[*25] With regard to the statute of limitations, RBC Defendants concede that the Royal Bank of Canada and the RBC Dominion Securities Corporation (collectively the "Tolled RBC Defendants") entered into separate, one-year tolling agreements [14] with Plaintiff on

September 18, 2002, but emphasize that the other five ("Untolled RBC Defendants") did not. Thus RBC Defendants argue that claims against the Untolled RBC Defendants are barred if Plaintiff discovered or should have discovered in the exercise of reasonable diligence the alleged fraud before January 9, 2003 or if the alleged fraud occurred before January 9, 2001, while Plaintiff's claims against Tolled RBC Defendants are time-barred if they were discovered or should have been discovered in the exercise of reasonable diligence prior to January 9, 2002 or if the alleged fraud occurred prior to January 9, 2000. RBC Defendants insist that Plaintiff has admitted that it had at least inquiry notice of the facts forming the basis of the fraud claim before January 9, 2002 and thus the claims against all of them are time-barred. They point to the following "storm warnings": Enron's shocking revelation on October 16, 2001 of $ 1 billion in charges [*26] and a reduction of shareholders' equity by $ 1.2 billion; a few days later The Wall Street Journal's expose of Enron, the SEC investigation, and Fastow's resignation; the filing of the *Newby* complaint on October 22, 2001, followed by more than fifty other lawsuits before the Consolidated Complaint was filed in *Newby* on April 8, 2002; the downgrading by 11/28/01 of Enron's publicly traded debt to "junk" status by the rating agencies; Enron's filing for bankruptcy on December 2, 2001; and an article in the December 24, 2001 Fortune Magazine charging that Enron's fraud was a combination of arrogance, greed, deceit and financial chicanery. They further insist that Plaintiff's counsel's letter to Royal Bank of Canada's counsel on September 18, 2002, seeking a tolling agreement, mentioned in Plaintiff's own pleadings, showed that it had notice of potential claims against the Bank, which began to accrue no later than October 16, 2001, even though Plaintiff argues that it only received notice of its claims against RBC Defendants when the Goldin Report was released on December 4, 2003. [15]

14    Copies of the Tolling Agreements, tolling limitations from September 18, 2002 until September 18, 2003, are attached as Exs. 1 and 2 to the Declaration of Claude L. Stewart III (# 18).

[*27]

15    That letter, Ex. 3 to # 18, states,

While we believe that the Sarbanes Oxley legislation extends the statute of limitations to two years from the date of actual knowledge of a claim, there exists

the possibility that a defendant could argue that the statute of limitations expires in mid-October of this year. Thus in an abundance of caution, absent a tolling agreement signed by Royal Bank of Canada, we will have to name Royal Bank of Canada as a defendant on or before October 16, 2002.

RBC Defendants argue that even if Plaintiff was not on notice of the alleged fraud before January 9, 2002, the claims against the Untolled RBC Defendants are time-barred under both statutes of limitations because Plaintiff had actual notice of its claims against them not later than September 18, 2002, the date of the letter. Alternatively, the claims are barred by the three-year statute of repose under *Lampf*. Plaintiff's complaint identifies a number of transactions by the RBC Defendants that took place from 1995 on, with only one, E-Next, taking place after January 9, 2001. Regarding that transaction, [*28] the ENA Examiner found there was insufficient evidence to decide that Enron's accounting for the E-Next transaction was improper or that RBC aided and abetted a breach of fiduciary duty by an Enron officer. [16]

> [16]    Plaintiff objects to RBC Defendants' suggestion that the Goldin report absolved RBC Defendants of liability for the E-Next work. Noting again that the report was not done to determine whether there was securities fraud, Plaintiff points out that the ENA Examiner concluded, Goldin Report at 163, that "RBC knew Enron's exposure in E-Next would not be disclosed properly on Enron's Financial Statements."

**Plaintiff's Opposition**

Plaintiff argues that the extended statute of limitations of Sarbanes-Oxley applies to this action because unlike *Newby*, it was filed after enactment of the Act, and because at the time of that enactment Plaintiff's claims were not time-barred by the *Lampf* one-year statute of limitations/three-year statute of repose. The complaint is not an amended complaint, the claims [*29] against RBC are not "substantially the same" as those against the defendants originally sued in *Newby*, but

instead based on RBC Defendants' distinct conduct, Plaintiff does not rely on the *Newby* complaint even though this suit delineates RBC Defendants' purportedly illicit roles in the overall *Ponzi* scheme to defraud investors that was described in *Newby*, [17] and the Royal Bank of Canada has not previously been sued by Plaintiff for its role in the Enron fraud; thus the case is a "new proceeding" governed by Sarbanes-Oxley's two-year/five-year limitations periods.

> [17]    Because the *Newby* complaint "provides a context for measuring specific allegations" against the RBC Defendants and for judicial efficiency to avoid reiterating many relevant facts, Plaintiff now states that it incorporates the *Newby* complaint by reference for context only. # 21 at 32.

Plaintiff insists that it first learned of RBC's participation in Enron fraud on December 4, 2003, after Goldin's Report was released, and [*30] filed this suit one month later, less than one year *(Lampf)* and less than two years (Sarbanes-Oxley) after the discovery of facts constituting the securities law violation. Because it was not on notice of its claims until December 4, 2003, Plaintiff filed suit in less than one year of discovery of the facts and the claims are not time-barred under either statute of limitations.

Moreover, Plaintiff insists it has charged RBC with primary violations. In furtherance of Enron's alleged fraudulent scheme to defraud investors, as observed by Goldin, RBC played a substantial role in creating, structuring, and implementing the financial transactions discussed *supra*, which RBC knew would fundamentally distort Enron's reported financial status.

In response to the group pleading challenge, Lead Plaintiff points out that it has pled that RBC Defendants, under the control of the Royal Bank of Canada, not only represent themselves to the world as a unified entity, but operated as a single entity in furtherance of the alleged fraudulent scheme, making the requirement of pleading against individual participants inapplicable, and it has identified the sham transactions in which Defendants [*31] participated, if not which transactions were performed by which RBC Defendant. Complaint at PP 11-20. RBC Defendants also hold themselves out to the public as the Royal Bank of Canada. Plaintiff underlines the fact that Goldin also referred to the RBC entities together. Plaintiff points to this Court's March 31, 2004

order (# 2044 at 8-9, 13-15) relating to Credit Suisse First Boston and its subsidiaries, and urges the Court to follow its determinations there that the particularity rule for pleading fraud may be relaxed where factual information is peculiarly within the defendant's knowledge or control, that the complexity of the alleged scheme and the thousands of affiliates involved support eschewing hyper-technical application of the pleading-with-particularity requirement, and that the group pleading rule applied to individuals, i.e., officers and directors in securities fraud cases, not to entities of a financial organization. For the reasons indicated in # 2044, the Court finds that under the circumstances here, Plaintiff has adequately stated a claim against the RBC Defendants. [18]

> 18    The Court notes that the Fifth Circuit's discussion of its rejection of the group pleading doctrine under the PSLRA in Southland *Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 364-65 (5th Cir. 2004)*, talks about the doctrine in terms of individual corporate officers and directors.

[*32]    As for scienter, Plaintiff maintains that it has demonstrated RBC Defendants' intent to defraud by pleading facts showing that they knew from personal involvement that Enron was concealing the nature of transactions designed to disguise its exposure to debt in repeated transactions since 1995, as recognized in Goldin's Report at 93, and to manipulate its financial statements, and that Defendants were motivated to participate in order to become a "top tier" Enron bank to make huge fees. It points to specific findings in Goldin's Report that demonstrate the requisite scienter on the part of RBC to commit securities fraud: (1) RBC knew that Enron manipulated its financial results as evidenced by a message from one RBC banker to his supervisor in risk management, "I suggest the asset base of the company is spurious, and that there are other obligations hidden in these vehicles."-Report at 101, 158;. (2) Goldin concluded, "RBC believed Enron's auditor's [sic] were not closely examining Enron's activities" and he found direct evidence of RBC's knowledge of Enron's accounting practices-Report at 102, 96-97; (3) Goldin found "evidence indicating that RBC knew in mid-September, 2000 that [*33] Enron had substantial exposure to off-balance sheet-debt that was not disclosed in its financial statements and that the ratings agencies were confused about the amount of such

exposure."-Report at 93, n.280, and 100-01 ("RBC had information that Enron's off-balance-sheet obligations could be as much as US $ 16 billion" and that RBC knew that Standard & Poor's and Moody's calculated Enron's debt exposure as US $ 3billion and US $ 6.8 billion, respectively); and (4) Goldin found that RBC had "detailed knowledge about how Enron structured off-balance-sheet transactions to make it appear to investors, analysts and rating agencies that Enron had current cash flow from sales of assets, when, in fact, the profits were only on paper and had not been realized"-Report at 98.

In its brief in opposition, Plaintiff argues that to plead loss causation adequately, it need only plead that RBC's actions "touched upon" or somehow contributed to plaintiffs' damages. The complaint has alleged that RBC falsified Enron's financial results by illicit structured financings that caused Enron's publicly traded securities to be sold at inflated prices. It also asserts that although "plaintiffs' damages were [*34] caused by an assortment of conduct that violated *§ 10(b)* [,] Royal Bank of Canada played a significant role in that conduct, for Royal Bank of Canada was a primary participant in the fraudulent scheme that caused plaintiffs' damages." # 21 at 41. Plaintiff states, "By acting to falsify Enron's financial results, Royal Bank of Canada caused Enron's publicly traded securities to be sold at artificially high prices. This caused plaintiffs to be damaged." *Id.* at 44. According to Plaintiff, that *Ponzi* scheme placed Enron on the course of destruction years before Enron had become so highly leveraged that it had to collapse, with the "final straw" perhaps being Enron's November 2001 restatement. Thus RBC's participation in the scheme, combined with plaintiffs' reliance on the integrity of the market price for securities, satisfies the element of causation. That the information about RBC Defendants' particular role may not have been released until long after Enron's bankruptcy does not relieve them of responsibility.

Plaintiff maintains that it has adequately asserted a control person claim under *§ 20(a)* against Royal Bank of Canada, a bank holding company, for its control of [*35] its subsidiaries, divisions, and affiliates, the Royal Bank of Canada entities named as defendants, based on underlying primary violations by these entities.

**Court's Decision**

**Role of a Bankruptcy Examiner**

Because Goldin's report is such a central part of the complaint, the Court provides some general background information about the legal significance of a bankruptcy examiner's report. Under the Bankruptcy Code, as an alternative to appointing a trustee in a Chapter 11 reorganization case, a "disinterested" bankruptcy examiner may be appointed by the Bankruptcy Court to perform two tasks in return for reasonable compensation for the examiner's services and expenses: (1) to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of the plan," and any other tasks ordered by the Bankruptcy Court; and (2) then to file a report or statement regarding the investigation that includes "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, [*36] or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate." *See, e.g., In re Big Rivers Electric Corp. v. Schilling, 355 F.3d 415, 422, 429 (6th Cir. 2004)* (citing and quoting *11 U.S.C. § 1104(c)* and *§ 1106(a), (b)). Big Rivers* contains an extensive discussion of the role of the Chapter 11 examiner. The requirement that the examiner be, and remain, "disinterested" means that the examiner may "not have an interest materially adverse to the interest of the estate or of any class of creditors of equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the debtor or an investment banker specified in subparagraph (B) or (C), or for any other reason." *Id. at 431*, quoting *11 U.S.C. § 101(14)(E)*. The examiner also owes a fiduciary duty of complete loyalty to the creditors and shareholders. *Id. at 434*. Although "'the benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders, . . . [as a court fiduciary] he answers solely to the court.'" *Id. at 432,* [*37] *quoting In re Baldwin United Corp., 46 B.R. 314, 316 (S.D. Ohio 1985).*

The purpose of the examiner's investigation is to discover what assets may exist for the debtor's estate. [19] The *Air Line Pilots Assoc., Int'l v. American National Bank and Trust Co. of Chicago (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 432 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994)*. An examiner's investigative authority under *Fed. R. Bankr. P. 2004* is broader than the scope of civil discovery. "The investigation of an examiner in bankruptcy, unlike civil discovery under *Rule 26(c)*, is supposed to be a fishing expedition,' as exploratory and

groping as appears proper to the Examiner." Id., *citing In re Vantage Petroleum Corp., 34 B.R. 650, 651 (E.D.N.Y. 1983), citing Sachs v. Hadden, 173 F.2d 929, 931 (2d Cir. 1949).* Pursuant to court order, he may examine any entity with knowledge of the debtor's acts, property, liabilities, and financial affairs relating to the bankruptcy proceedings or who has had a relationship with the debtor, and his examinee does not enjoy the protections usually [*38] provided by the Federal Rules of Civil Procedure. In *Baldwin*, the bankruptcy judge analogized the function of the examiner to that of a "civil grand jury" seeking to uncover areas of and appropriate targets for recovery. *46 B.R. at 317*; *Ionosphere, 156 B.R. at 432.*

> [19] Nevertheless, because, as noted, the statute provides that the court-appointed bankruptcy examiner is to perform an investigation and to file a report that includes "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate," its content may be highly relevant to securities law violations. *11 U.S.C. § 1104(c)* and *§ 1106(a),(b).*

"Any record compiled by the examiner is not a judicial record, but simply a source of information designed for the purpose of identifying the assets of the estate for the eventual benefit of the debtor and its creditors. [*39] That some of the parties to the proceedings will assert substantive rights to the assets, once collected, does not make the identification of these assets an adjudicatory determination of substantive rights.'" *Ionosphere, 156 B.R. at 432.* The Examiner's findings are not binding on the Court or the parties. [20] *Baldwin, 46 B.R. at 316*; *Ionosphere, 156 B.R. at 432.* The Examiner is not an arm of the Court, and, indeed, is appointed by the Court to assist not it, but to assist other parties. *Ionosphere, 156 B.R. at 432, 433.* Until the Examiner files his report with the court or until and unless the documents he compiles are made judicial documents in some other way, there is no public right of access to them. *Id. at 433.* Under *11 U.S.C. § 107*, the Examiner's report, like other papers, once filed with the Bankruptcy Court become public records unless the bankruptcy judge orders the information sealed for commercial, confidential or defamatory reasons. Id. Any documents underlying the report, on which the report is based, if not filed, are not part of the court record and are not subject to public [*40] access. *Id.*

20   Generally *Federal Rule of Civil Procedure 10(c)* allows a party to incorporate "any written instrument which is an exhibit" to a pleading, thereby making the attached document an integral part of the pleading for all purposes. 5A Charles Alan Wright and Arthur Miller, Federal *Practice and Procedure* § 1327 at 434 (3d ed. West 2004). As has been noted, because the Examiner's report was prepared for a different purpose and its language chosen for a particular context, e.g., aiding and abetting allegations, the meanings of words cannot automatically be transferred, but must be evaluated in terms of the underlying factual allegations in determining whether Plaintiff has stated a claim for securities violations under the 1934 Act. *Id.* at 450 & n.19 ("The district court . . . can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the attached material as long as the justice seeking objectives of the federal rules are kept in mind."), *quoting Rickel & Associates Inc. v. Smith (In re Rickel & Assocs.), 272 B.R. 74, 91-92 (Bankr. D.C.N.Y. 2002)(Rule 10(c)* "does not mean that the plaintiff adopts as true every statement in the exhibit. Instead, an appended document will be read to evidence what it incontestably shows once one assumes that it is what the complaint says it is (or, in the absence of a descriptive allegation, that it is what it appears to be").). Because Plaintiff has submitted the entire portion of Goldin's report related to RBC Defendants, the Court can view any statement selectively quoted or referenced in the context from which it was drawn to protect against any misrepresentation or misinterpretation.

### [*41] *Rule 12(b)(6)* Motion to Dismiss

A motion to dismiss should be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* The court must take all well pleaded facts as true and construe them in favor of the plaintiff. *Calhoun v. Hargrove, 312 F.3d 730, 733 (5th Cir. 2002).* Therefore Defendants' disagreements with the factual allegations in the complaint are not relevant in this review.

### Statute of Limitations

In *In re Enron Corp.Securities, Derivative & "ERISA") Litig., 2004 U.S. Dist. LEXIS 8158, No. MDL 1446, Civ. A. H-01-3624, 2004 WL 405886, *12 (S.D. Tex. Feb. 25, 2004)*, this Court concluded that the Sarbanes-Oxley statute of limitations applies to actions filed on or after July 30, 2002 "based on underlying conduct that occurred before the enactment of the Sarbanes-Oxley Act as long as such claims were not time-barred by the *Lampf* statute of limitations and/or repose controlling before July 30, 2002. This Court agrees with Plaintiff that at this stage of the litigation it appears that the Sarbanes-Oxley's [*42] statute of limitations applies to the instant action, filed on January 9, 2004.

First, the Court finds the suit is a new "proceeding" filed after enactment of Sarbanes-Oxley, based on the alleged wrongdoing that is not the same conduct [21] charged against other previously sued financial institution defendants in MDL 1446, on four, substantial, Enron-related transactions by RBC Defendants, which are being sued for the first time by Plaintiff, and which claims were not time-barred at the time of Sarbanes-Oxley's enactment: September 2000 Alberta Prepay; November 2000 Cerberus; November 2000 Hawaii 125-0; and the 2001 E-Next. While Plaintiff could have included these claims in the *Newby* suit had it known of the facts on which they are based, because it claims it did not, because Defendants have not shown that Lead Plaintiff knew these facts or had inquiry notice before the release of the Goldin report, and because the suit targets distinct conduct by distinct Defendants in an action that can stand alone, there is no mandate that it had to be. To require otherwise would deny plaintiffs with viable causes of action that are not time-barred the right to bring them and/or [*43] to burden the courts by filing prematurely potential claims about which plaintiffs lack sufficient information.

21   Insisting this action is merely an extension of *Newby*, RBC Defendants object that Sarbanes-Oxley applies only to new proceedings, not to new claims or new parties, as this Court stated in its order (# 1999 at 55) allowing ICERS to intervene in *Newby*. This Court refused to allow Plaintiff to file a new, second suit or a new claim or add a new party to circumvent a time bar. *Id..* at 52 n.42

Relying on the ICERS intervention order (# 1999), RBC argues that this suit is an extension of *Newby* and should not be allowed to circumvent the *Lampf* time bar by waiting to file it after the enactment of the Sarbanes-Oxley Act. This Court notes that the situation regarding ICERS is factually distinguishable from that in the instant action. ICERS not only adopted the *Newby* complaint, but its claims were based on the **same alleged material misrepresentations and omissions by the same entities** [*44] as those of other plaintiffs in the class action, which were known by the Regents when it filed the first *Newby* complaint. *Enron, 2004 U.S. Dist. LEXIS 8158, 2004 WL 405886 at 13*. The claims against RBC Defendants are not for public misrepresentations and omissions. The factual allegations of specific wrongdoing against RBC Defendants, though falling under the same statute and relating to the same *Ponzi* scheme, are not identical to those asserted against other financial institution defendants in *Newby* and the claims are not time-barred. Moreover, Plaintiff asserts that it did not learn of RBC Defendants' alleged illicit conduct until December 2003, while Lead Plaintiff knew about the alleged misrepresentations and omissions on which ICERS' claim rested when it first filed *Newby*. Although RBC Defendants argue that this suit has been consolidated with *Newby* and is subject to the same scheduling and discovery orders, that "consolidation" is merely a pre-trial procedural mechanism to control multidistrict litigation and is not related to substantive allegations of any suit in MDL 1446. The fact that Plaintiff here calls itself "Lead Plaintiff," since it is the same entity that [*45] serves as Lead Plaintiff in *Newby*, *is* not a persuasive reason to view the instant suit as part of *Newby* because it does not appear to have followed the PSLRA's procedures to become a Lead Plaintiff in this individual class action.

The Court finds that the claims here were not time-barred under *Lampf* when Sarbanes-Oxley was enacted nor are they time barred under Sarbanes-Oxley, for the following reasons. Plaintiff has pled that it first discovered the facts regarding RBC's alleged role in the Enron matter on December 4, 2003 and filed this suit on January 9, 2004, clearly after the enactment of Sarbanes-Oxley and less than one year after the discovery of the facts leading to its claims. This Court has previously ruled that the issue of whether a plaintiff was aware of sufficient facts to put it on inquiry notice is frequently not proper for determination on a *Rule 12(b) (6)* motion. The Court has also found that the complexity

of the alleged schemes involving Enron took substantial time to unravel, especially with respect to alleged wrongdoing by persons and entities outside of the corporation. Plaintiff insists that its September 18, 2002 letter seeking a tolling agreement [*46] and stating that "there exists the possibility that a defendant could argue that the statute of limitations expires in mid-October of this year," was insufficient to constitute inquiry notice. The Court agrees. The pleading-with-particularity requirement under the PSLRA requires that inquiry notice must be demonstrated by showing that the triggering facts relate directly to the particular alleged fraud by the particular defendant. *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 171 (2d Cir. 2005)*, cert. *denied, 126 S. Ct. 421, 163 L. Ed. 2d 321 (2005), citing La Grasta v. First Union Sec., Inc., 358 F.3d 840, 846 (11th Cir. 2004)*; *Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003)* ("'The triggering financial data must be such that it relates directly to the misrepresentations and omission the Plaintiffs later allege in their action against the defendants.'"). RBC Defendants' cited storm warnings (such as Enron's fall 2001 announcement of reduction in shareholder's equity, its bankruptcy, or articles generally discussing Enron but not mentioning RBC Defendants) are too general to meet this requirement for Plaintiff's specific [*47] claims against RBC Defendants. [22] Moreover, as pointed out by Plaintiff, the Fifth Circuit has held that a statute of limitations bar is an affirmative defense, which defendants bear the burden of pleading and proving. *United States v. Ret. Servs. Group, 302 F.3d 425, 430 (5th Cir. 2002)* (citing *Fed. R. Civ. P. 8(c)*). Nor does the letter, as argued by RBC Defendants, demonstrate that Lead Plaintiff "originally intended to sue the RBC Defendants in the *Newby* proceeding." # 25 at 7. Thus dismissal on the pleadings under *Rule 12 (b) (6)* is not appropriate.

> 22    *See also Livid Holdings, Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 951 (2d Cir. 2005)* (Because "financial problems alone are generally insufficient to suggest fraud . . . the filing of the bankruptcy petition alone seems unlikely to satisfy the inquiry-plus-due diligence standard.").

Furthermore, on July 30, 2002, the enactment date of Sarbanes-Oxley, the three-year period [*48] of repose under *Lampf*, which would allow a plaintiff to reach conduct back to July 20, 1999, had not expired as to

claims arising out of the September 2000 Alberta Prepay, November 2000 Cerberus, November 2000 Hawaii 125-0 (each of which closed after September 2000), and the E-Next transactions. Thus Plaintiff was not "playing games" by delaying filing suit in order to circumvent the statute of limitations. Nor are claims arising out of those transactions barred by the five-year period of repose under Sarbanes-Oxley.

### Primary Violation of *§ 10(b)* and *Rule 10b-5*

RBC Defendants have argued that Plaintiff fails to allege any relationship between RBC Defendants' actions and Enron's securities and shareholders. They did not issue or underwrite Enron securities, made no statements to Enron investors, were not involved in the accounting treatment of the transactions in which they participated.

In # 1194 at 29-39 in *Newby*, this Court discussed at length that a primary violation of *§ 10(b)* and *Rule 10b-5* need not be in the form of a public misrepresentation or omission. *Rule 10b-5(a)* and *(c)* allow suit, based on conduct, against defendants who, acting with [*49] scienter, employed a material device, contrivance, scheme or artifice or participated in a course of business that operated as a fraud on sellers and purchasers of stock even if those defendants did not make a materially false or misleading statement or omission. *Affiliated Ute Citizens v. United States, 406 U.S. 128, 152-53, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). See also Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 11 n.7, 92 S. Ct. 165, 30 L. Ed. 2d 128 (1971)* ("It [is not] sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is usually associated with the sale or purchase of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception."); *SEC v. Zandford, 535 U.S. 813, 820-21, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002)*(broker's continuous series of unauthorized sales of securities and personal retention of the proceeds without his client's knowledge to further his fraudulent scheme "are properly viewed as a "'course of business' that operated as a fraud or deceit on a stockbroker's customer" in connection with the sale of securities); *Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 475-76, 97 S. Ct. 1292, 51 L. Ed. 2d 480* and n.15 [*50] (*Section 10(b)* covers deceptive "practices" and "conduct"). Here Plaintiff alleges that RBC Defendants actively participating in a material course of business, comprised of a number of key transactions employing

repeated fraudulent mechanisms, all part of a larger *Ponzi* scheme, that operated as a fraud or deceit relating to the sale or purchase of securities; with scienter RBC Defendants purportedly engaged in series of deceptive transactions (disguised loans), in and central to a scheme and course of business operating to manipulate Enron's financial statements and paint a falsely inflated picture of Enron's financial condition to the investing public. *Zandford, 535 U.S. at 821* ("It is enough that the scheme to defraud and the sale of securities coincide."). It also invested heavily in Enron-related entities. Goldin's Report at 138-40 summarizes,

> RBC argues that its status as one of Enron's "second tier" banks is evidence that it did not provide substantial assistance to Enron. While the ENA Examiner agrees that RBC was not one of Enron's ten top tier banks, the evidence indicates that RBC was trying to become a tier one bank . . ., that Enron began to [*51] treat RBC like a tier one bank, and that in August and September, 2000 RBC had the same information about Enron as did its top tier banks. Even before this time, RBC possessed the necessary information for it to know that Enron had substantial amounts of off-balance-sheet debt, that Enron had effectively guaranteed a substantial portion of this off-balance-sheet debt, that Enron was not disclosing its exposure to this off-balance-sheet debt in its published financial statements, and that the transactions RBC was arranging, structuring and/or funding were adding to Enron's undisclosed off-balance-sheet debt. . . . RBC . . . [engaged] in repeated transactions with Enron. . . . Many RBC transactions had common elements, such as the swaps that were effectively Enron Corp. guarantees in the December, 1999 Bob West Treasure loan, the April, 2000 JEDI loan, the May, 2000 Bob West Treasure credit wrap, the September, 2000 Alberta transaction, November, 2000 Hawaii transaction and the November, 2000 Cerberus transaction. . . . The evidence . . . suggests that RBC provided structures for the Alberta transaction and

helped structure the Cerberus transaction. . . . RBC argues that it was only [*52] a minor debt participant in most of the relevant transactions. RBC, however, was the only lender in the December, 1999 Bob West Treasure transaction, the arranger and participant in the May, 2000 Bob West Treasure transaction, the equity participant in the August, 2000 ECLN transaction, the arranger and participant in the September 2000 Alberta transaction, and the sole lead lender in the Cerberus transaction. . . . The evidence . . . indicates that the circle of swaps utilized in Alberta effectively constituted a loan and that RBC considered the transaction a loan. . . . The evidence indicates that RBC knew a great deal about the relevant accounting standards, Enron's accounting practices for off-balance-sheet financings, Enron's exposure to off-balance-sheet debt, which elements and details Enron's auditors were likely to focus on, and other relevant matters.

RBC Defendants urge the Court to find their role in structuring the transactions at issue was similar to that of Kirkland & Ellis, which the Court dismissed. The defendants are distinguishable: this Court has recognized an exception to liability based on substantial conduct in the representation of clients by law firms, [*53] which are shielded by the attorney-client privilege and a lawyer's duty to zealously represent his client, unless the attorney speaks out to third-parties with the intent that the third-parties would rely on the lawyer's statements.

### Control Person Claims Under § 20(a)

As for the control person claims, the Court finds that Plaintiff has adequately asserted a claim under § 20(a) against Royal Bank of Canada, a bank holding company, for its control of its subsidiaries, divisions, and affiliates named as defendants here, based on underlying primary violations by these entities. As this Court has recognized, the Fifth Circuit requires only that the plaintiff plead that the control person has the power to direct or cause the direction of the management and policies of the controlled person, not actual exercise of that power.

### Loss Causation under Dura Pharmaceuticals

Plaintiff's contention that it need only plead that RBC's actions "touch upon" or somehow contributed to plaintiffs' damages to satisfy the loss causation element for a claim under § 10(b) is no longer correct under the Supreme Court's ruling in *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).* [*54]

In *Dura Pharmaceuticals*, purchasers of stock in the pharmaceutical company that had submitted a new asthmatic spray device for approval from the Food and Drug Administration, alleged in a securities fraud class action suit that some of the company's' managers and directors misrepresented the company expected its drug sales to be profitable and that it expected FDA approval of the spray device shortly. On the final day of the purchase period the defendants disclosed that the earnings would be less than expected largely because of slow sales, and eight months later announced that the FDA would not approve the device. The complaint asserted only, "'In *reliance on the integrity of the market*, [*the plaintiffs*] . . . *paid artificially inflated prices for Dura securities' and the plaintiffs suffered damage[s]' thereby." 125 S. Ct. at 1630* (emphasis in the original).

Justice Stephen Breyer, writing for a unanimous Supreme Court, reversed a Ninth Circuit ruling that a plaintiff pleading securities fraud under § 10(b) and *Rule 10b-5* need only establish that the price of a security was artificially inflated on the date he purchased it to plead economic loss and [*55] loss causation under the 1934 Act. [23] The United States Supreme Court opined that in a fraud on the market case, where a plaintiff alleges that he suffered losses because he paid an artificially inflated price for a security, generally "as a matter of pure logic, at the moment that a transaction takes place, the plaintiff [who has purchased securities at an inflated price] has suffered no loss; the inflated purchase payment is offset by ownership of a share that at the instant possesses equivalent value." *125 S. Ct. at 1631.* In other words, at the time the purchase of a security occurs, the alleged inflated price, alone, logically cannot constitute "economic loss" because the plaintiff acquires a security of "equivalent value" and the "misrepresentation will not have led to any loss" if the plaintiff sells the shares "quickly before the truth begins to leak out." Id. Furthermore, the Supreme Court pointed out that an implied private action for securities fraud under the Securities Exchange Act is similar in many ways to common-law causes of action for deceit and fraudulent

misrepresentation, which require a plaintiff to show (1) that if he had known the truth he would [*56] not have acted as he did; (2) that he suffered actual, substantial damage; and (3) that the defendant's deception was the proximate cause of the plaintiff's injuries. [24]

23  The Eighth Circuit had also concluded that to plead loss causation a plaintiff need only allege that defendant's fraud had artificially inflated the price of the securities purchased by the plaintiff. *Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824, 831 (8th Cir. 2003)*.

24  In 1995 Congress codified the loss causation element in the PSLRA:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

*15 U.S.C. § 78u-4(b)(4)*.

Even when the purchaser later sells his shares at a lower price, the Supreme Court questioned any automatic assumption of a link between an inflated price and a subsequent economic loss [*57] after news of the deception is leaked:

> If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect not the earlier misrepresentation, but changed circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other related events which, taken separately or together, account for all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that is so, *i.e.,* the more likely that other factors caused the loss.

*Id. at 1631-32*. Thus the high court addressed a narrow issue: it held that in a fraud on the market case, a plaintiff must plead, and ultimately prove, more than simply that the defendant's misrepresentation caused the stock price to be inflated; an artificial high purchase, price "is not itself a relevant economic loss," but merely "touches upon" the subsequent loss of value and does not necessarily cause the plaintiff economic loss, [*58] especially in light of the "tangle of factors affecting price." *Id. at 1634, 1632*. [25]

25  Justice Breyer noted that the Ninth Circuit's standard would not serve the public policy goals of the federal securities laws, i.e., maintenance of public confidence in the market by making available private securities fraud actions; these statutes do not aim to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *125 S. Ct. at 1633*. The PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.*

Although the high court did clearly indicate more must be pled to establish loss causation than a simple allegation of inflated stock price, it avoided identifying what: "We need not, and do not, consider other proximate cause or loss related questions." *Id. at 1633-34*. [*59] It is notable that the Supreme Court did not affirmatively adopt Dura Pharmaceuticals' argument that a plaintiff must allege and ultimately prove that the defendant made a corrective disclosure of the fraud that was followed by a related price drop, nor did it specify what must be pled to establish that "the truth became known"; instead, the Supreme Court stated generally that a complaint must "provide defendants with notice of what the relevant economic loss might be or what the cause connections might be between that loss and the misrepresentation" (i.e., "some indication of the loss and the causal connection that the plaintiff has in mind," a subjective standard), the pleading of which "should not prove burdensome" for a plaintiff. [26] *Id. at 1634*. Thus besides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud a number of sources: e.g., from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the

company of changes in accounting treatment going forward, newspapers and journals, etc. See Alan Schulman and Nicki Mendoza, *Dura Pharm.* [*60] *, Inc. v. Broudo-The least of All Evils*, 1505 PLI/Corp. 272, 274 (Sept. 2005). Plaintiff's economic loss may occur as "relevant truth begins to leak out" or "after the truth makes its way into the market place," and the plaintiff need only give "some indication" of the causal link between that leaked truth and his economic loss. *125 S. Ct. at 1631, 1632, 1634.* Moreover, the plaintiff's loss need not be caused exclusively by the defendant's fraud. *Id.* at 276, *citing Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S. Ct. 2739, 2750, 159 L. Ed. 2d 718 (2004)* ("Proximate case is causation substantial enough and close enough to the harm to be recognized by the law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm."); *Caremark Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649 (7th Cir. 1997)* (Loss causation "does not require . . . that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant.").

> 26    In *Dura Pharmaceuticals* the Supreme Court found that although the complaint alleged that the plaintiffs paid artificially inflated prices for Dura Pharmaceutical's securities, it failed to allege that the share price of the stock at issue fell substantially after the truth was disclosed. *125 S. Ct. at 1634.* Instead the only allegation was that the purchase price was inflated and "the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation concerning Dura's spray device.'" *Id.*

[*61] The Supreme Court, "assuming, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss," appeared to suggest that *Federal Rule of Civil Procedure 8(a)(2)'s* standard ("a short plain statement of the claim showing that the pleader is entitled to relief") applies to the pleading of economic loss and proximate causation and that plaintiff must merely give fair notice of his claim and the grounds on which it is based, a "simple test." *Id. at 1634* ("We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-15, 122 S. Ct. 992, 152 L. Ed. 2d 1 . . . (2002).* But it should not

prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."). [27] Thus, as noted supra, under Dura *Pharmaceuticals*, one acceptable, but not the only, way to plead proximate cause and economic loss (the difference between the price the purchaser paid [*62] and the subsequent price to which the stock dropped) in fraud on the market cases is to allege that the price a plaintiff paid for a security "fell significantly after the truth [of the material misrepresentation or omission] becomes known" and that the disclosure of the misrepresentation or omission had a significant effect on the market price. In sum the high court found that the plaintiffs in *Dura Pharmaceuticals* failed to state a claim because they did not provide the defendants with fair notice of their claim and the grounds on which it rested, did not assert that Dura Pharmaceuticals' share price dropped substantially after the falsity of their alleged misrepresentations became known (suggesting "that plaintiffs considered the allegation of purchase price inflation alone sufficient"), did not identify their relevant economic loss, and did not describe the causal connection between their economic loss and the alleged misrepresentation. *Id. at 1634.*

> 27    Not all courts agree. *See, e.g., Joffee v. Lehman Brothers, Inc., 2005 U.S. Dist. LEXIS 12313, No. 04 Civ. 3507 RWS, 2005 WL 1492101, *14 (S.D.N.Y. June 23, 2005)*, in which Judge Sweet concluded that the heightened pleading standard under *Federal Rule of Civil Procedure 9(b)* for common law fraud applied to the pleading of loss causation for a *§ 10(b)*, *Rule 10b-5* claim.

[*63] While the Supreme Court rejected the Ninth Circuit's lenient test for economic loss and loss causation as inadequate pleading in fraud on the market cases, it did not address, and thus left intact, more stringent requirements that had been established by other Circuit Courts of Appeals, including the Second, Third, Seventh, and Eleventh. [28] *125 S. Ct. at 1630.* For example, in *Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005)*, cert. denied, *126 S. Ct. 421, 163 L. Ed. 2d 321 (2005)*, [29] the Second Circuit indicated that a plaintiff must allege that his loss was "foreseeable" and that it was caused by the "materialization of the concealed risk." *396 F.3d at 173.* In *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)*,

the Second Circuit described loss causation in terms of the tort-law concept of proximate cause, i.e., "that damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation." Stated another way, "a misstatement or omission is the proximate cause of an investor's loss if the risk caused by the loss was within the zone of risk *concealed* by the [*64] misrepresentations and omissions alleged by the disappointed investor"; thus to demonstrate loss causation the complaint must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise the loss in question was not foreseeable . . ." The complaint must also assert "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell, 396 F.3d at 172-73, 175*. [30] If the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant is sufficiently direct, the element of loss causation for pleading, which requires a fact-specific inquiry at trial stage, is satisfied. *Id. at 174*. The pleading burden will vary with the circumstances. A disparity between the purchase price and the "true investment quality" at the time of purchase, by itself, is not sufficient; if there is a market-wide drop in prices, the plaintiff must plead facts that show that the plaintiff's loss was caused by the alleged misstatements and not by any intervening factor. *Id. at 174*. [*65] If there was an intervening event, like a fall in the price of gasoline stock, the issue becomes "a matter of proof at trial and not to be decided on a *Rule 12(b) (6)* motion to dismiss." *Id.* Thus it appears *Lentell* provides different modes of pleading for different problems.

A district court in New York has commented, Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. [31] By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed-i.e, a corrective disclosure. [32]

*In re Initial Public Offering Securities Litig. v. Credit Suisse First Boston Corp., 399 F. Supp. 2d 298, No. MDL 1554(SAS), 21 MC 92 (SAS), 2005 WL 1529659, *6 (S.D.N.Y. 2005)*.

28    Other Circuit Courts of Appeals, like the Supreme Court have concluded that the plaintiff must allege and prove that he suffered an economic loss and that it was proximately caused by defendant's fraudulent conduct; it is insufficient merely to allege the difference between the purchase price and the true value of the security at the time of the purchase. *See, e.g., Semerenko v. Cendant Corp., 223 F.3d 165, 185 (3d Cir. 2000)* ("Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at an inflated price."), cert. denied, *531 U.S. 1149, 121 S. Ct. 1091, 148 L. Ed. 2d 965 (2001)*; *Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447-48 (11th Cir. 1997)* ("Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's subsequent decline in value."); *Bastian v. Petren Res. Corp., 892 F.2d 680, 685 (7th Cir. 1990)* (plaintiff must prove causation).

[*66]

29    The Court notes that *Lentell* issued on January 20, 2005, about three months before *Dura Pharmaceuticals*, and that the Supreme Court denied certiorari, but did not reverse it, after *Dura Pharmaceuticals.*

30    Thus if the complaint asserts that a broker initially rated a stock as "buy" and subsequently downgraded it to "neutral," that fact does not constitute a "corrective disclosure" because it does not disclose to the market the falsity of the earlier recommendation nor allege that the recommendation is the cause of the decline in stock value that plaintiff's claim is their loss. *223 F.3d at 175* & n.4.

31    As examples, the district court cites concealed incompetence that led to the corporation's collapse, and concealment of a company's intent to recapitalize that led the plaintiff to sell his stock because he was unaware that a recapitalization will greatly increase his stock's value. *Initial Public, 399 F. Supp. 2d at 307, 2005 WL 1529659, *6 n.55.*

2005 U.S. Dist. LEXIS 41240, *66

32   The complaint must plead disclosure of the intentional *falsity* of a statement, not merely that the statement was wrong, and tie that disclosure to the economic loss. Thus "plaintiffs' failure to allege a corrective disclosure of the falsity of defendants' opinions precludes any claim that such falsity caused their losses." *Initial Public, 399 F. Supp. 2d at 308, 2005 WL 1529659 at *6*.

[*67]  In the aftermath of *Dura Pharmaceuticals* two appellate courts have ruled on the pleading of loss causation and economic loss. In an unpublished opinion in a securities fraud class action suit alleging that senior Kmart officers and PricewaterhouseCoopers made misrepresentations about Kmart's financial condition before the corporation filed for bankruptcy and restated some interim financial reports, the Sixth Circuit affirmed the lower court's dismissal of the complaint for failure to plead loss causation for the same reasons as the Supreme Court, i.e., because in conclusory boilerplate language the complaint alleged only that plaintiffs paid artificially inflated prices for Kmart's securities and it "did not plead that the alleged fraud became, known to the market on any particular day, did not estimate the damages that the alleged fraud caused, and did not connect the alleged fraud with the ultimate disclosure and loss." *D.E. & J. Ltd. P'ship v. Conaway, 133 Fed. Appx. 994, 1000, 2005 WL 1386448, *5 (6th Cir. 2005)*. Nor did plaintiffs allege that the bankruptcy filing disclosed the fraud behind the prior misrepresentation; "of course, the filing of a bankruptcy petition [*68] by itself does not a security fraud allegation make." *133 Fed. Appx. at 100 [slip op.] at *6*. Thus the complaint did not give fair "notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation." *133 Fed. Appx. at 1000, [slip op.] at *6* ("Here, D.E. & J. has done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations [defendants' fraud] caused that drop.").

In *In re Daou Systems, Inc., 411 F.3d 1006 (9th Cir. 2005)*, the Ninth Circuit found the pleading of loss causation adequate where the complaint alleged a steep drop in the price of the company's stock after revelation of accounting figures that showed its true financial condition. Specifically the complaint stated that on August 13, 1998, Daou's stock was priced at $ 18.50 per share. Subsequently at the beginning of August 1998, and

not before, the defendants disclosed that "Daou's operating expenses and margins were deteriorating." *Id. at 1026*. On October 28, 1998 they announced that the Company had substantially missed its projected 3Q98 earnings and would report a loss [*69] of $ 0.17 per share, and "'that the Company's rapidly escalating work in progress account represented over $ 10 million in unbilled receivables-the *direct result of prematurely recognizing revenue.*'" According to the complaint, before August 13, 1998 the defendants did not reveal the actual figures to analysts in order to hide the deterioration of operating earnings and margins resulting from premature and improper recognition of revenue. *Id. at 1026*. The disclosure of this practice of premature recognition of revenue before it was earned allegedly resulted in a "dramatic negative effect on the market, causing Daou's stock to decline to $ 3.25 per share, a staggering 90% drop from the Class Period High of $ 34.375 *and a $ 17 per share drop from early August 1998.*'" *Id*. Plaintiffs' purported economic loss was not their purchase of their stock at inflated prices, but the decline in the value of their stock directly resulting from disclosure of Daou's true financial condition and its earlier misrepresentations. *Id. at 1027*. The Ninth Circuit, taking Plaintiffs' allegations as true, found they were adequate to provide Daou with the requisite indication [*70] that the drop in its stock price from its August 13 1998 high of $ 18.50, following its disclosures beginning in August 1998, was causally related to its practice of prematurely recognizing revenue before it was earned. *Id*. Plaintiffs' economic loss was not the inflated price they paid for their stock initially, but the decline in their stock value as a direct result of exposure of Daou's misrepresentations following Daou's disclosures of its true financial situation beginning in August 1998. *Id. at 1027*.

The Fifth Circuit has not addressed loss causation since *Dura Pharmaceuticals* was issued, nor had it examined the question in detail previously. [33] Therefore this Court applies the Second Circuit's standard under *Lentell*, and, pursuant to the Supreme Court's discussion in *Dura Pharmaceuticals*, does not impose heightened or onerous pleading requirements.

33   Before the Supreme Court decision, the Fifth Circuit used the same language as the Ninth Circuit in discussing pleading loss causation, but it is clear from the context that the language was defined differently and required a showing of

proximate cause: *Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981)* (the plaintiff must prove loss causation by demonstrating that "the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a *Rule 10b-5* case only if the misrepresentation **touches upon** the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied upon by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted. [emphasis added by the Court]"), *aff'd in part and rev'd in part on other grounds, 459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983).*

[*71] Plaintiff's suit was filed on January 9, 2004, more than fifteen months before the Supreme Court issued its ruling in *Dura Pharmaceuticals* on April 19, 2005. Dismissal based on a complaint's failure to comply with a Supreme Court's subsequent ruling, without allowing the plaintiff an opportunity to cure pleading deficiencies if it can, would be unjust. Although Plaintiff has employed the language rejected by the Supreme Court, from the allegations made in this complaint and in *Newby*, which it has adopted, it is obvious from facts already pled that Plaintiff can easily and adequately plead loss causation here. Although Plaintiff's proposed class purchased Enron securities at a highly inflated price because of Enron's alleged fraudulent financial statements, both complaints make clear that key corrective disclosures in the latter part of 2001 exposing material misstatements and omissions in earlier years of Enron's financial reports caused the sharp drop in price and the investors' damage. The relatively small time gap between the five transactions at issue and Jeff Skilling's August 2001 resignation, Enron's October 2001 corrective disclosures to the world, followed by [*72] SEC's investigation, is short, just over a year, thus tightening the causation link. The price of the stock plunged following Enron's revelation and its swift descent into bankruptcy. The putative class's economic loss was not the disparity in the inflated purchase price and the actual quality of the investment, but the significant decline in the price of the securities with the startling revelation in the fall of 2001 of Enron's previously concealed debt obligations, financial exposure, and vulnerability to bankruptcy, which it allegedly had deliberately hidden from investors.

Dismissal for failure to state a claim is not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), quoted in Cates v. Int'l Tel. and Tel. Corp., 756 F.2d 1161, 1180 (5th Cir. 1985); Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005)* (dismissal "is improper unless it is clear that the complaint could not be saved by any amendment"). Under *Federal Rule of Civil Procedure 15* [*73] , this Court has the discretion to allow amendment of a pleading in the absence of undue delay, bad faith or dilatory motive on the part of the movant, when an intervening court decision changes the law and where repleading will not be futile nor prejudice the defendant. While some courts have refused to grant leave to amend where there are heightened pleading requirements such as under the PSLRA because allowing such would undermine that standard, [34] the Supreme Court in *Dura Pharmaceuticals* reviewed the pleading of loss causation under *Rule 8*'s short plain statement sufficient to provide notice of the claim to the defendant.

> 34    *See, e.g., Brashears v. 1717 Capital Management, 2005 U.S. Dist. LEXIS 23471, No. Civ. A. 02-1534KAJ, 2005 WL 2585247, *2 & n.4 (D. Del. Oct. 13, 2005); In re Bristol-Myers Squibb Sec. Litig., 2005 U.S. Dist. LEXIS 18448, No. Civ. A. 00-1990 (SRC), 2005 WL 2007004, *10 (D.N.J. Aug. 17, 2005)* ("The Third Circuit has made clear, that in actions filed under the PSLRA, leave to amend should not be granted in a fashion that would frustrate the heightened pleading requirements of the statute."), *citing Cal. Public Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 2004 WL 3015578, *27 (3d Cir. 2004).*

[*74] Accordingly, for the reasons stated above, the Court

ORDERS that RBC Defendants' motion to dismiss is DENIED. The Court further

ORDERS Plaintiff to file within twenty days a concise supplemental statement pleading the basis for its allegations of loss causation.

**SIGNED** at Houston, Texas, this 22nd day of December, 2005.

2005 U.S. Dist. LEXIS 41240, *74

MELINDA HARMON                                    UNITED STATES DISTRICT JUDGE