1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re CONNETICS CORPORATION

SECURITIES LITIGATION

_____/

No. C 07-02940 SI

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS AND
DEFENDANTS' MOTION TO STRIKE**

On October 19, 2007, the Court heard oral argument on motions to dismiss filed by nominal and individual defendants and a motion to strike filed by defendants Alexander Yaroshinsky and Victor Zak. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS defendants' motion to dismiss and GRANTS defendants' motion to strike.

**BACKGROUND[1]**

This is a securities class action against Connetics Corporation and certain of its officers under Sections 10(b), 20(a), 20A and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"). The case is brought on behalf all purchasers of the publicly-traded securities of Connetics between January 27, 2004, and July 9, 2006 ("the class period").

Connetics is a pharmaceutical company specializing in prescription dermatological products. Plaintiffs allege that during the class period, Connetics was developing a new acne medication called Velac Gel ("Velac") that would allow Connetics to participate in the lucrative market of prescription acne medications. In the period leading up to what defendants hoped would be the approval of Velac by the Food and Drug Administration ("FDA"), defendants provided investors with frequent updates

_____

[1] The following background facts are taken from the allegations of plaintiffs' complaint, which for purposes of this motion, must be taken as true.

United States District Court
For the Northern District of California

about Velac's progress, its likelihood of approval by the FDA, and projected revenues that would be realized once Velac hit the market. However, defendants failed to inform investors about the results of a pre-clinical test performed on transgenic mice; these results demonstrated that Velac resulted in an "alarmingly high rate of carcinogenicity." Complaint at ¶ 4. Defendants learned the results of this study in June 2004. On June 28, 2004, they convened a panel of experts to discuss the study; the panel concluded that they did not know of any drug that exhibited "a 'positive dermal' similar to Velac that had ever been approved by the FDA." *Id.* According to the complaint, defendants concealed the results of this study from investors and analysts for almost a full year, continuing to tout Velac's safety and continuing to suggest that they expected the FDA to approve the drug.

On April 13, 2005, some defendants participated in a conference call with the FDA during which the FDA allegedly informed the company that the results of the transgenic mouse study was a "serious issue" for Velac. *Id.* at ¶ 69. Two weeks later, after the close of the market on April 26, 2005, defendants revealed to the public the fact that the study had yielded "positive" results (meaning a finding of carcinogenicity) and that the FDA was "interpreting some of the results of the [study] differently than the Company did." *Id.* at ¶ 74. Following this disclosure, Connetics' stock dropped 19% on heavy trading volume. Then, on Friday, June 10, 2005, Connetics received a formal "non-approvable" letter from the FDA, stating that Velac was unsafe. After disclosing this information prior to the opening of the market on Monday, June 13, 2005, Connetics' stock dropped 27% on heavy trading volume. The complaint also alleges that shortly after the conference call with the FDA, defendants Alexander Yaroshinsky (a Connetics researcher) and Victor Zak (Yaroshinsky's former neighbor) used this information to profit from insider trading. The SEC filed a complaint against these two defendants in June 2006.

In addition to the misleading statements made to investors regarding Velac, plaintiffs also allege that defendants engaged in "channel stuffing" by shipping unneeded products to its customers in order to inflate its sales and revenue in the short term. This channel stuffing, which was caused in part by a push by certain defendants to increase demand forecasts of Connetics' products, resulted in the filing of false financial statements. Connetics announced on May 3, 2006, that it would likely have to restate its financial statements; following this announcement, Connetics' stock dropped by 12% on heavy

1   trading volume.  On July 10, 2006, Connetics announced that it would have to reduce inventory at its

2   distributors by shipping less product, after which its stock dropped 34% on heavy trading volume.  On

3   July 25, 2006, Connetics restated its fiscal year 2005 Form 10-K, admitting accounting errors related

4   to product rebates and chargebacks.

5       The lead plaintiff in this action is the Teachers' Retirement System of Oklahoma.  The individual

6   defendants are Thomas Wiggans, the CEO and a director throughout the class period, as well as

7   president from July 1994 to February 2005; Gregory Vontz, the COO who was promoted to president

8   in February 2005; John Higgins, the executive vice president throughout the class period; Lincoln

9   Krochmal, executive vice president of research and product development starting in October 2003; and

10  Yaroshinsky and Zak.  Now before the Court is a motion to dismiss filed by Connetics and the officer

11  defendants, as well as a motion to dismiss and motion to strike filed by defendants Yaroshinsky and Zak.

12

13                                    **LEGAL STANDARD**

14  **1.      Rule 12(b)(6)**

15      Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it

16  fails to state a claim upon which relief can be granted.  The question presented by a motion to dismiss

17  is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer

18  evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other*

19  *grounds by Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012 (1984).

20      In answering this question, the Court must assume that the plaintiff's allegations are true and

21  must draw all reasonable inferences in the plaintiff's favor.  *See Usher v. City of Los Angeles*, 828 F.2d

22  556, 561 (9th Cir. 1987).  Even if the face of the pleadings suggests that the chance of recovery is

23  remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings.  *See*

24  *United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

25      If the Court dismisses the complaint, it must then decide whether to grant leave to amend.  The

26  Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request

27  to amend the pleading was made, unless it determines that the pleading could not possibly be cured by

28  the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal

quotation marks omitted).

### 2.    Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for any person to use interstate commerce:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under section 10(b) and Rule 10b-5, the plaintiff must allege (1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5) that proximately caused the alleged loss.  *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).  Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice.  Federal Rule of Civil Procedure also requires that "the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).

### 3.    Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act of 1995 (the "Reform Act" or the "PSLRA") was enacted as an amendment to the Exchange Act.  *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 n.2 (9th Cir. 1999).  Under the Reform Act:

> In any private action arising under his chapter under which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

15 U.S.C. § 78u-4(b)(2).

The required state of mind is "at a minimum, deliberate recklessness." *In re Silicon Graphics*, 183 F.3 at 983. Scienter may be pled and proven by reference to circumstantial evidence. *See In re Peoplesoft Sec. Litig.*, No. C 99-0472, slip op. at 5 (May 26, 2000). However, when pleading on information and belief, a plaintiff must plead with "particularity" by "provid[ing] all facts forming the basis for [plaintiff's] belief in great detail." *In re Silicon Graphics*, 183 F.3d at 983; *see also* 15 U.S.C. § 78u-4(b)(1). Therefore, the Reform Act has strengthened the pleading requirements of Federal Rule of Civil Procedure 9(b).

**3.     Rule 9(b)**

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Federal securities fraud claims, like common law fraud claims, are subject to the special pleading requirements of Rule 9(b). *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Rule 9(b) requires particularity in pleading the circumstances constituting fraud. The Ninth Circuit has interpreted this requirement to mean that allegations of fraud must be specific enough to give defendants notice of "the particular misconduct which is alleged to constitute the fraud." *See id.* In the securities context, a plaintiff may aver scienter generally, but must state the "time, place, and content" of the alleged misrepresentations, and "an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994) (en banc) (remanded to *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591 (9th Cir. 1995)).

**4.     Request for judicial notice**

Generally, when considering a motion to dismiss, a district court must consider only the facts stated in the plaintiffs' complaint, or in documents attached to the complaint as exhibits or incorporated into the complaint by reference. Under certain circumstances, the court may also consider matters that are appropriate subjects of judicial notice under Fed. R. Evid. 201. *Kramer v. Time Warner*, 937 F.2d

767, 773 (2d Cir. 1991). While the general rule is that "[m]atters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss," in a securities action a court may also consider documents that the defendant has attached to its motion to dismiss either as exhibits or accompanied by a request for judicial notice, *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997).

**DISCUSSION**

**1.    Standing**

As a threshold matter, defendants assert that the lead plaintiff, the Teachers' Retirement System of Oklahoma, lacks standing to bring a claim related to defendants' drug Velac. Defendants appear to base their argument on the injury prong of Article III standing, contending that the lead plaintiff did not own stock in Connetics on a day when defendants disclosed negative information.

Constitutional standing requires that a plaintiff show (1) an injury in fact that is (2) fairly traceable to the defendant's actions and (3) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In a class action, lead plaintiffs must show that they personally have been injured, "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). As to whether a lead plaintiff must have suffered every injury alleged by the class, there is an apparent split in the Northern District. Some courts have held that a lead plaintiff in a securities case lacks standing with regard to actions that occurred during specific time periods when the lead plaintiff was not itself injured, even if other members of the class may have been. *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1022 (N.D. Cal. 2006) (explaining that when a named plaintiff does have standing to pursue a claim, "'courts have strictly limited the class period to the period for which that named representative has standing'" (quoting *In re Bank of Boston*, 762 F. Supp. 1525, 1531 (D. Mass. 1991)); *see also In re General Motors Sec. Litig.*, 694 F. Supp. 1119, 1126-27 (D. Del. 1988). Other courts have held that once a lead plaintiff demonstrates individual standing on the basis of its own injury in fact, that is the end of the inquiry and the lead plaintiff has standing to assert other related injuries suffered by members of the class. *In re VeriSign, Inc.*, 2005 WL 88969, *4 (N.D. Cal. Jan. 13,

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

2005) ("Once the class representatives individually satisfy standing, that is it: standing exists."); *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 606 (N.D. Cal. 1991); *see also Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82, 83 n.13 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action. Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."); Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 2.5 (4th ed. 2002) (stating that "[o]nce threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense," and that "[t]he presence of individual standing is sufficient to confer the right to assert issues that are common to the class, speaking from the perspective of any standing requirements"). Instead, the *VeriSign* court held that once the lead plaintiff is found to have individual standing, any remaining questions about the lead plaintiff's ability to bring the case are to be dealt with under Federal Rule of Civil Procedure 23. *In re VeriSign*, 2005 WL 88969 at *4-5.

Here, the lead plaintiff has conceded that it was not a Connetics shareholder on June 13, 2005, the day Connetics revealed that it had received a "non-approvable" letter from the FDA. At the close of the markets on June 13, 2005, Connetics' stock dropped 27% on heavy trading volume. Complaint at ¶¶ 85, 333. Following this drop in stock price, the lead plaintiff acquired new shares in Connetics. Based on these undisputed allegations, it is clear to the Court that the lead plaintiff itself has no claim with regard to losses suffered during the June 13, 2005, drop in the share price. A shareholder who sells stocks before a disclosure of truthful information will not have suffered any loss based on a misrepresentation related to that information. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

However, plaintiffs also argue that they did own stock in Connetics at the time of other disclosures and drops in the stock price, such as the April 27, 2005 drop of 19% on heavy trading volume, *see* Complaint at ¶ 80, the drop in price around May 4, 2006, *see id.* at ¶ 122, the drop in price on May 22, 2006, *see id.* at ¶ 125, and the 34% drop on heavy trading volume on July 10, 2006, *see id.* at ¶ 129, and thus did suffer an injury in fact caused by defendants' actions. *See also id.* at ¶ 333. There is no question that the lead plaintiff has suffered actual injuries related to defendants' alleged actions,

7

United States District Court

For the Northern District of California

1  and therefore has individual standing to sue defendants.  As a result, this Court is squarely presented

2  with a situation in which the lead plaintiff has individual standing as to some claimed injuries of the

3  class but not as to all claimed injuries of the class.  The Court agrees with *VeriSign* and *Alfus*, and finds

4  that the better rule is that a lead plaintiff with some injuries in fact has established standing for purposes

5  of Article III; once the general standing requirement is satisfied, any additional questions related to

6  particular injuries are relevant only in the context of class certification under Federal Rule of Civil

7  Procedure 23.  *See In re VeriSign*, 2005 WL 88969 at *4-5; *see also Hevesi*, 366 F.3d at 82, 83 n.13.

8  Accordingly, lead plaintiff Teachers' Retirement System of Oklahoma has established Article III

9  standing sufficient to invoke the court's jurisdiction, all that is required at this stage of the litigation.

11  **2.      Motion to strike**

12       Before reaching defendants' motions to dismiss, the Court also finds it necessary to address the

13  motion by defendants Yaroshinsky and Zak asking the Court to strike portions of plaintiffs' complaint.

14  Defendants contend that paragraphs 9, 25-26, 68-69, 86-94, 97-98, 148-49, 167, and 371 of the

15  complaint were taken from a complaint filed by the SEC against the two defendants, as well as a press

16  release that accompanied the complaint.  Defendants argue that the paragraphs in question should be

17  stricken because they are inadmissible evidence and because lifting allegations from an SEC complaint

18  does not constitute the reasonable investigation required by Federal Rule of Civil Procedure 11.

19  Plaintiffs concede that the allegations were based on information from the SEC complaint, but argue that

20  this is a reliable source among many other sources relied upon in formulating the complaint.  Plaintiffs

21  also argue that a complaint need not contain admissible evidence.

22       "Filing a complaint in federal court is no trifling undertaking.  An attorney's signature on a

23  complaint is tantamount to a warranty that the complaint is well grounded in fact . . . ."  *Christian v.*

24  *Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002).  This rule is found in Federal Rule of Civil Procedure

25  11(b), which states that by presenting a pleading to the Court, an attorney "is certifying that to the best

26  of the person's knowledge, information, and belief, formed after an inquiry reasonable under the

27  circumstances . . . the allegations and other factual contentions have evidentiary support or, if

28  specifically so identified, are likely to have evidentiary support after reasonable opportunity for further

**United States District Court**
For the Northern District of California

1    investigation or discovery." Fed. R. Civ. P. 11(b)(3). That is, an "attorney has a duty prior to filing a

2    complaint [] to conduct a reasonable factual investigation." *Christian*, 286 F.3d at 1127; *see also*

3    *Certain Underwriters at Lloyd's London v. Rauw*, 2007 WL 2729117 *5 (N.D. Cal. Sept. 18, 2007).

4    At the pleading stage, however, plaintiffs are only required to plead facts, not produce admissible

5    evidence. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). Upon

6    a motion made by a party or "upon the court's own initiative at any time, the court may order stricken

7    from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous

8    matter." Fed. R. Civ. P. 12(f).

9        Plaintiffs are undoubtedly correct that pleadings need not contain admissible evidence. *In re*

10    *McKesson*, 126 F. Supp. 2d at 1272. The Court therefore agrees with plaintiffs that there is no basis to

11    strike on evidentiary grounds.

12        When drafting a complaint, an attorney may rely in part on other sources, such as a newspaper

13    article, *see id.*, as part of his or her investigation into the facts, but plaintiffs cite no authority that stands

14    for the proposition that an attorney may rely *entirely* on another complaint as the *sole* basis for his or

15    her allegations. In support of their argument that they may incorporate the allegations of the SEC

16    complaint into their own complaint, plaintiffs rely primarily on the cases of *In re Cylink Securities*

17    *Litigation*, 178 F. Supp. 2d 1077 (N.D. Cal. 2001), *De La Fuente v. DCI Telecommunications, Inc.*, 259

18    F. Supp. 2d 250 (S.D. N.Y. 2003), and  *In re McKesson*, 126 F. Supp. 2d 1248. The Court is not

19    persuaded that these cases support plaintiffs' attempt to skirt the requirements of Rule 11(b)(3). *Cylink*

20    is inapposite because the question there was only whether a complaint filed by the SEC may come into

21    the mix of the materials considered by the court on a motion to dismiss; the court there was not

22    presented with allegations in a complaint that relied entirely on an SEC complaint. *See* 178 F. Supp.

23    2d 1080, 1083 ("[T]hese allegations, especially *when combined with* the other transactions detailed

24    in the SEC complaint, provide strong circumstantial evidence . . . ." (emphasis added)). The court also

25    did not consider whether the plaintiffs had violated Rule 11. In *De La Fuente*, the court considered Rule

26    11 but specifically noted that the plaintiff had stated "that every allegation in the complaint was verified

27    by plaintiff's counsel through independent investigation." 259 F. Supp. 2d at 260. Finally, *McKesson*

28    actually supports defendants' arguments. There, the court held that "[t]o the extent that a newspaper

article *corroborates plaintiff's own investigation* and provides detailed factual allegations, it can – *at least in combination with plaintiff's investigative efforts* – be a reasonable source of information and belief allegations." *In re McKesson*, 126 F. Supp. 2d at 1272 (emphasis added). Here, as to the particular paragraphs that defendants ask the Court to strike, there apparently were no "investigative efforts" to combine with plaintiffs' reliance on the SEC complaint. Although plaintiffs contend that the SEC complaint is one of many bases for plaintiffs' complaint, they do not contend that they conducted independent investigation into the facts alleged in the SEC complaint or had any additional bases for the specific allegations pertaining to Yaroshinsky and Zak. Instead, the SEC complaint appears to be *the only basis* for the allegations against defendants Yaroshinsky and Zak and certain other allegations.

Under Rule 11(b), an attorney has a "nondelegable responsibility" to "personally . . . validate the truth and legal reasonableness of the papers filed," *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989), and "to conduct a reasonable factual investigation," *Christian*, 286 F.3d at 1127. Given that this responsibility cannot be delegated to another member of the attorney's firm, *see Pavelic*, 493 U.S. at 125-27, it would make little sense that an attorney "somehow can rely on the analysis of attorneys in *different actions* and who are presumably from different law firms," *Geinko v. Padda*, 2002 WL 276236 *6 (N.D. Ill. Feb. 27, 2002). Here, plaintiffs make no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on in formulating their specific claims against defendants Yaroshinsky and Zak. Nor does the complaint itself indicate that any other sources were used as to these specific claims. Accordingly, the Court agrees with defendants that under Rule 11(b), plaintiffs did not personally investigate their claims against defendants Yaroshinsky and Zak.

After reviewing the paragraphs in question, the Court GRANTS the motion to strike each paragraph cited by defendants with the exception of paragraph 9, which merely alleges the existence of the SEC complaint but does not rely on it for factual support. *See* Complaint at ¶ 9. In addition, the Court strikes paragraphs 56 and 57 because the complaint states that the information in paragraph 56 was "alleged in the SEC complaint" and because it appears that the information in these paragraphs was taken directly from the SEC complaint with no additional investigation. *Compare* Complaint at ¶ 56-57

*with* SEC Complaint at ¶ 17-18.  Plaintiffs may amend their complaint after conducting an independent, reasonable investigation as required by Rule 11(b), and should also amend any other paragraphs in the complaint that may not have been brought to the Court's attention but for which plaintiffs failed to conduct the necessary inquiries.  The Court also GRANTS the motion to dismiss filed by defendants Yaroshinsky and Zak, as the complaint cannot possibly make sufficient allegations against these defendants in the absence of the stricken paragraphs.

**3.    Motion to dismiss Section 10(b) claims**

    **A.    False or misleading statements related to the drug Velac**

Plaintiffs' complaint contains allegations of numerous fraudulent statements pertaining to Velac made by defendants in press releases, conference calls, SEC filings, and more.  Because the volume of allegedly actionable statements is so large, the Court will not examine each statement individually but will instead group them into three areas for purposes of defendants' motion to dismiss: (1) forward-looking statements about the likelihood of FDA approval of Velac and Velac's potential as a drug; (2) statements about the safety of Velac; and (3) statements disclosing the transgenic mouse study and conversation with the FDA regarding this study.  *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 928 (9th Cir. 1996) (grouping challenged statements).

          **(1)    Statements about FDA approval made between January 27, 2004, and April 13, 2005**

The first group of allegedly false or misleading statements consists of those that tout the future potential of Velac and discuss the likelihood of FDA approval of the drug.  Defendants argue that this group of forward-looking statements is protected by the safe harbor provision of the PSLRA and that these statements reflect corporate optimism and are mere puffery.  Alternatively, defendants also argue that plaintiffs have failed to plead that defendants had actual knowledge of the falsity of these statements when made.  Plaintiffs argue that safe harbor does not apply because these statements were false when made.

Forward-looking statements, which include "a statement of the plans and objectives of

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

management," a statement "of future economic performance," and a statement "containing a projection of revenues," 15 U.S.C. § 78u-5(i)(1), enjoy special protection under the PSLRA. "A forward-looking statement qualifies for the PSLRA 'safe harbor' and is not actionable if either of the following two conditions is true: (A) the statement is accompanied by 'meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement'; or (B) plaintiffs fail to establish that the statement was 'made with actual knowledge ... that the statement was false or misleading.'" *In re iPass, Inc. Sec. Litig.*, 2006 WL 496046 *5 (N.D. Cal. Feb. 28, 2006).

As an initial matter, the Court disposes of any challenged statements relating to Velac made prior to mid-June 2004. Plaintiffs do not allege that defendants were aware of the results of the transgenic mouse study until sometime in mid-June 2004. Complaint at ¶¶ 52, 56. Plaintiffs also allege that defendants did not meet with their panel of experts to discuss the study results until June 28, 2004. *Id.* at ¶ 57.[2] Accordingly, any statements about Velac made by defendants prior to June 2004, *see, e.g.*, Complaint at ¶ 47-51, are not currently actionable because they no facts are alleged to demonstrate that they were false when made. *See In re Syntex*, 95 F.3d at 929 ("Defendants' forward looking statement . . . may have proved to be wrong, but Plaintiffs have not pled facts indicating that the statement about the consent decree was false *when made*.").

The remaining forward-looking statements about Velac were made after defendants became aware of the results of the transgenic mouse test (in June 2004) but before defendants were informed that the FDA might have serious concerns about the transgenic test (on April 13, 2005), and thus are potentially actionable. Typical of these statements is the announcement in the July 28, 2004 press release that Connetics was "'preparing our commercial operations for the introduction' of Velac, and stated that the Company intended to launch Velac within the next twelve months." Complaint at ¶ 60.[3]

---

[2] The Court realizes that these paragraphs have been stricken, but will rely on them here for purposes of clarifying plaintiffs' allegations.

[3] An additional statement made during this period that does not neatly fit into any category is the statement made by Lincoln Krochmal in a news article published on July 1, 2004. Krochmal was quoted as saying that "Velac's clinical trial results 'revealed patients treated with the Velac gel had significantly lower lesion counts, significantly less acne by investigator assessment, than either

United States District Court
For the Northern District of California

1    Also typical are the forward-looking statements made by defendants during the January 25, 2005

2    conference call, for instance the statement that "we are confident that we will be successful in this

3    market with our acne franchise, and in particular, with Velac." *Id.* at ¶ 242. *See also id.* at ¶¶ 243-245.

4          Defendants argue that the first prong of the safe harbor provision of the PSLRA applies to these

5    statements because they are forward-looking and were accompanied by meaningful cautionary language.

6    *See* 15 U.S.C. § 78u-5(c).  First, plaintiffs are correct that the safe harbor provision does not apply to

7    any forward-looking statements "included in a financial statement prepared in accordance with generally

8    accepted accounting principles."  *Id.* at § 78u-5(b)(2)(A).  Thus, to the extent that any of the challenged

9    statements were made in Forms 8-K or 10-K filed with the SEC, safe harbor does not apply.  *See Baker*

10   *v. MBNA Corp.*, 2007 WL 2009673 *5 (D. Del. July 6, 2007).  Second, safe harbor predicated on the

11   presence of cautionary statements requires "meaningful cautionary statements identifying important

12   factors that could cause actual results to differ materially from those in the forward-looking statement."

13   15 U.S.C. § 78u-5(c)(1)(A)(i).  The Court finds that although some of the statements made by

14   defendants in their press releases and conference calls were accompanied by some cautionary

15   statements, the statements were not meaningful and did not identify specific important factors that could

16   affect the prediction.[4]

17          As to the second prong of the safe harbor provision, the Court agrees with defendants that

18   plaintiffs have failed to state "with particularity facts giving rise to a strong inference that the defendant

19   acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Here, the required state of mind for

20   safe harbor in the absence of meaningful cautionary statements is "actual knowledge . . . that the

21   statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i); *see also In re iPass*, 2006 WL

22

23   clindamycin or tretinoin gel alone.'" Complaint at ¶ 59.  This statement is not forward-looking, but
     rather concerns present or historical facts.  *See In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL

24   21500525 *6 (S.D. Cal. May 1, 2003) ("[T]he challenged statements in this case are observed facts
     about the trial results and data as opposed to predictions or assumptions about future events.").

25   However, because plaintiffs have identified nothing about this statement that is untrue and because the
     statement concerns only Velac's effectiveness, rather than its safety, the Court holds that this statement

26   is not actionable on the current allegations.

27          [4] Moreover, many of the cautionary statements highlighted by defendants are found in forms
     filed with the SEC, rather than in the actual press release or conference call in which plaintiffs allege

28   the challenged statements were made.  Accordingly, these cautionary statements could not have
     "accompanied" the challenged statements. 15 U.S.C. § 78u-5(c)(1)(A)(i).

United States District Court
For the Northern District of California

496046 at *5. Plaintiffs have not created a strong inference that defendants had actual knowledge of falsity at the time their predictions about Velac were made because during this period defendants had not heard anything from the FDA indicating that the FDA had concerns about the results of the transgenic mouse test. Although defendants may have heard the concerns expressed by their panel of experts in June 2004, defendants were aware of another drug that had been approved by the FDA despite a positive transgenic test.[5] Thus, statements predicting that the FDA would approve Velac, *see*, *e.g.*, Complaint at ¶¶ 60, 242-45, were not made in the face of actual knowledge that Velac could never be approved; rather, they may have been made in the optimistic belief that the transgenic testing problem was a surmountable barrier to FDA approval. *See In re Syntex*, 95 F.3d at 930 ("Syntex was forecasting a future event. Any alleged deficiencies in the testing procedures do not indicate that Syntex's prediction of an FDA approval date was false when made. Instead, the company could have known of problems in the testing procedures, planned to remedy those deficiencies, and still thought it would achieve FDA approval by the estimated date."); *In re CBT Group PLC Sec. Litig.*, 1999 WL 1249287 *3 (N.D. Cal. July 21, 1999) ("Moreover, even if a company knows that a problem exists, it could still honestly and in good faith report that the company will continue to perform as expected. Management simply may have been confident that they could overcome the problems or merely underestimated the severity of such problems."); *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D. N.Y. 2004) (discussing "nonactionable expressions of corporate optimism"). Accordingly, the Court holds that the forward-looking statements regarding the likelihood of Velac's future success, made between June 2004 and April 13, 2005, are subject to the safe harbor provision of the PSLRA and therefore are not actionable on the allegations of this complaint. The Court GRANTS defendants' motion to dismiss as to this category of statements.

## (2)    Statements about Velac's safety made after June 2004

The second group of allegedly false or misleading statements consists of those regarding the

---

[5] The Court takes judicial notice, *see In re CV Therapeutics, Inc. Sec. Litig.*, 2004 WL 1753251 *4 (N.D. Cal. Aug. 5, 2004), of the fact that BenzaClin is labeled as having been shown to be a tumor promoter and having induced skin tumors in transgenic mice, *see* Defendants' Request for Judicial Notice ex. 30 at 6.

United States District Court
For the Northern District of California

1    safety of Velac made following June 2004, when defendants were allegedly aware of the results of the

2    transgenic mouse test.  Plaintiffs argue that when discussing Velac's safety, defendants had a duty to

3    disclose additional information about the transgenic test.  Defendants argue that they had no duty to

4    disclose the results of the transgenic mouse study, and also appear to argue that the safe harbor provision

5    applies to statements about Velac's safety.

6         "[I]n order for there to be liability under 10b-5 for omissions or nondisclosure, . . . a duty to

7    speak must exist."  *In re CV Therapeutics*, 2004 WL 1753251 at *8 (internal quotation marks omitted)

8    (quoting *In re MedImmune, Inc. Sec. Litig.*, 873 F. Supp. 2d 953, 966 (D. Md. 1995)); *see also SEC v.*

9    *Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996).  A legal duty exists where a defendant must "'state a material

10   fact necessary in order to make the statements made . . . not misleading.'"  *Tellabs*, 127 S.Ct. at 2507

11   (quoting 17 C.F.R. § 240.10b-5).  This duty "is a general one, and arises whenever a disclosed statement

12   would be 'misleading' in the absence of the 'disclos[ure] of [additional] material facts' needed to make

13   it not misleading."  *Fehn*, 97 F.3d at 1290 n.12 (alterations in original).

14        Defendants' statement regarding safety was made in a Form 10-K filed on March 16, 2005.

15   There, defendants asserted that the data from prior clinical trials "demonstrated that Velac was safe and

16   well tolerated, with the most commonly observed adverse effects being application site reactions such

17   as burning, dryness, redness and peeling.  Following this positive clinical outcome, we submitted an

18   NDA with the FDA for Velac on August 2004."  Complaint at ¶ 255; *see also id.* at ¶ 65.  Although

19   defendants made this statement at a time when they were allegedly aware of the results of the mouse

20   study showing that Velac may cause cancer, the statement made no mention of the mouse study or the

21   results.  Thus defendants' statement about Velac's safety may have been misleading because it was

22   made without the disclosure of additional facts that, at the very least, raised serious questions about the

23   drug's safety. Defendants' statement also may be misleading because it implies that the adverse effects

24   are limited to reactions at the same level of magnitude as "burning, dryness, redness and peeling."

25   Although these may well have been the most commonly observed adverse effects from the clinical trials

26   in question, a reasonable person certainly would feel misled as to Velac's adverse effects without a

27   disclosure about the disputed, though significant, possibility that Velac was a carcinogen.

28        At this juncture, however, the Court is unable to hold that plaintiffs have adequately pled that

these statements were misleading because this question turns on defendants' knowledge of the transgenic mouse study. As discussed above, paragraphs 56 and 57 of the complaint have been stricken. Accordingly, there is no basis in the complaint at this time for the Court to find that defendants' statement created a duty to disclose additional information about the safety of Velac within defendants' knowledge.

In addition, the Court finds it necessary to address here a challenged statement that does not fit neatly into any of the three categories but relates to safety concerns about Velac. During the January 25, 2005 conference call, defendant Gregory Vontz stated that "'we're very confident in the data set that we've got. We believe it's one of the strongest data sets for an acne products [sic] submitted to the FDA.'" Complaint at ¶ 245. Opinions such as these are actionable where there is no reasonable basis for the belief or where the "speaker is [] aware of [] undisclosed facts tending to seriously undermine the accuracy of the statement." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). At the time of this statement, defendants may have had actual knowledge of the results of the transgenic mouse study, and they also knew, as they themselves aver, that only one other drug with similar results had been approved by the FDA. For this reason, the Court is inclined to hold that plaintiffs have put forth sufficient allegations to show there was no reasonable basis for the belief that Velac was one of the strongest data sets for an acne product submitted to the FDA and that Vontz had actual knowledge of undisclosed facts tending to seriously undermine the accuracy of the statement. Without the information contained in paragraphs 56 and 57, however, the Court holds that plaintiffs have not adequately pled that this statement was actionable.

In sum, the Court holds that in the absence of the stricken paragraphs, plaintiffs have failed to plead with particularity the facts demonstrating that defendants' statements regarding safety were false or misleading. The Court GRANTS defendants' motion to dismiss as to this category of statements.

### (3)    Statements disclosing the test results and the FDA's concerns

The third group of allegedly false or misleading statements consists of those made on April 26, 2005, in both a press release and a conference call that revealed the fact that the transgenic mouse study resulted in a positive response and that the FDA's Executive Carcinogenicity Assessment Committee

("ECAC") had contacted defendants regarding the study. Plaintiffs argue that it was false or misleading for defendants to fail to disclose the full extent of ECAC's concerns, fail to inform investors that defendants had been aware of the study for nearly a year, and fail to state that defendants' own panel of experts had not been aware of any drug with a similar positive response that had been approved by the FDA. Complaint at ¶ 76. Defendants argue in response that they had no duty to disclose further details about the discussion with ECAC. Defendants also argue that because the FDA has approved a drug with a similar positive response in a transgenic mouse study, they were under no obligation to inform investors what their experts concluded.

The Court is inclined to agree with plaintiffs that defendants had an obligation to disclose to investors the significant and material information regarding the FDA's statement that the possible carcinogenic effect of Velac was a "serious issue." *See In re CV Therapeutics*, 2004 WL 1753251 at * 6 ("[T]he concerns raised by the FDA . . . were much more significant than a bump on the road and shed serious doubt on the sufficiency of the trials. Accordingly, Defendants were obligated to disclose the FDA's concerns to render their statements not misleading." (quoting *Amylin Pharms.*, 2003 WL 21500525 at *8) (internal quotation marks omitted)). As discussed above, however, the Court strikes paragraphs 68 and 69, which contain all the pertinent allegations relating to the contents of the ECAC conference call on April 13, 2005. Without these paragraphs, plaintiffs cannot adequately plead that defendants made false or misleading statements related to ECAC's concerns. The Court also finds that plaintiffs cannot adequately plead that defendants made misleading statements as to the conclusions of their panel of experts, because the Court strikes paragraphs 56 and 57 of the complaint as well.

As to plaintiffs' allegation that defendants misled investors about how long they had been aware of the problem, paragraph 78 of the complaint does not adequately plead that defendant Wiggans made a false or misleading statement. Plaintiffs allege only that Wiggans stated during the April 26 conference call with investors that "this information is recent . . . *we're giving it to you pretty real time*." Complaint at ¶ 78 (emphasis in original). It is unclear to the Court how this statement could possibly be misleading, given that plaintiffs allege the conference call with ECAC occurred only two weeks earlier, a time period that could be characterized as "recent." There is no indication in plaintiffs' complaint that Wiggans was discussing the results of the transgenic mouse study, rather than Connetics'

17

1    conversation with ECAC.  The Court therefore GRANTS defendants' motion to dismiss all claims

2    regarding inadequate disclosure of the test results and conversation with ECAC, based on the current

3    allegations.

4

5           **B.        Financial statements and channel stuffing**

6            The complaint also alleges a violation of Section 10(b) based on the filing of false financial

7    statements and an accompanying effort to sell more product into the distribution channel than was

8    needed (i.e. "channel stuffing") during the class period.  Defendants move to dismiss these claims as

9    well, on grounds that the allegations fail to adequately plead that the defendants knew the statements

10   were false at the time they were issued and that the allegations of channel stuffing lack the necessary

11   specific facts.  Plaintiffs argue in response that defendants admitted the financial statements were

12   incorrect when they filed restatements, that the financial statements violated GAAP, and that the

13   allegations of channel stuffing are adequate based on the statements of confidential witnesses that some

14   defendants ordered employees to engage in channel stuffing.

15           "'[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without

16   more, does not establish scienter.'"  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385,

17   390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)).  "Rather,

18   to plead fraudulent intent based on GAAP violations, plaintiffs must allege facts showing that: (1)

19   specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that

20   rendered their accounting determinations fraudulent."  *Morgan v. AXT, Inc.*, 2005 WL 2347125 * 14

21   (N.D. Cal. Sept. 23, 2005) (citing *DSAM Global Value Fund*, 288 F.3d at 390-391).  The practice of

22   "channel stuffing" is "'the oversupply of distributors in one quarter to artificially inflate sales, which

23   will then drop in the next quarter as the distributors no longer make orders, while they deplete their

24   excess supply.'"  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal.

25   2001) (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir.1998)).  Recent authority

26   suggests that for an allegation of channel stuffing to be pled with sufficient particularity, it must "allege

27   'specific transactions, specific shipments, specific customers, specific times, or specific dollar

28   amounts.'"  *In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) (quoting

United States District Court
For the Northern District of California

*In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041 *6 (S.D. Cal. July 18, 2000)); *see also Greebel v. FTP Software, Inc.,* 194 F.3d 185, 204 (1st Cir. 1999) ("The allegations in the complaint do not include such basic details as the approximate amount by which revenues and earnings were overstated; the products involved in the contingent transactions; the dates of any of the transactions; or the identities of any of the customers or FTP employees involved in the transactions. We do not say that each of these particulars must appear in a complaint, but their complete absence in this case is indicative of the excessive generality of these allegations." (internal citations omitted)).

Here, defendants admit that their financial statements were misstated with regard to reserves. *See* Motion at 28. Therefore, only scienter, i.e. whether defendants acted with, "at a minimum, deliberate recklessness," *In re Silicon Graphics*, 183 F.3d at 983, is at issue with regard to the false financial statements. Plaintiffs attempt to show scienter by way of the restatements themselves and by the related practice of channel stuffing, which allegedly "caused Connetics' accruals for rebates, chargebacks and returns to be materially understated [and] in turn, materially overstated the Company's earnings and caused its publicly-filed financial statements to violate GAAP." Complaint at ¶ 119. Plaintiffs' opposition points to paragraphs 133 through 145 of their complaint in support of their contention that defendants knowingly issued false financial statements. These paragraphs only allege that defendants failed to comply with GAAP, not that defendants acted knowingly or with deliberate recklessness in doing so. *See* Complaint at ¶¶ 133-145. Defendants correctly argue that the restatements and acknowledgments of GAAP violations are not enough to show scienter. *DSAM Global Value Fund*, 288 F.3d at 390-391. It appears, then, that plaintiffs are left only with the related allegation of channel stuffing to support their claim of scienter in the filing of false statements.

Plaintiffs make particular allegations that defendants intentionally directed employees to increase forecasts of how much product would be sold in the future in order justify putting more product into the distribution channels than was necessary to meet demand. As argued by defendants, however, plaintiffs' complaint is completely lacking in any specific details about the channel stuffing that allegedly followed from these inflated forecasts. The complaint contains no details as to specific shipments, customers, times, or dollar amounts relating to the alleged channel stuffing. *See In re ICN Pharms.*, 299 F. Supp. 2d at 1062; *In re Ashworth*, 2000 WL 33176041 at *6; *Greebel*, 194 F.3d at 204. Accordingly, plaintiffs

1  have failed to plead the facts related to channel stuffing with particularity.  This in turn means that

2  plaintiffs are left only with very general allegations of scienter with regard to the filing of false financial

3  statements.

4

5      **C.      Scienter**

6      In addition to specifying what statements were misleading and why, 15 U.S.C. § 78u-4(b)(1),

7  "the PSLRA requires that the Complaint 'state with particularity facts giving rise to a strong inference

8  that the defendant acted with the required state of mind,' or scienter," *Nursing Home Pension Fund,*

9  *Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(2)).  This

10 inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter,

11 not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct.

12 at 2509.  Here, the required state of mind is at least "deliberate recklessness," meaning recklessness that

13 "reflects some degree of intentional or conscious misconduct." *Nursing Home Pension Fund*, 380 F.3d

14 at 1230 (internal quotation marks omitted).  As discussed above, plaintiffs have not pled that defendants

15 made false or misleading statements with regard to Velac.  As a result, the Court need not reach the

16 question of scienter with regard to that alleged violation of Section 10(b).  As to the remaining violation

17 of Section 10(b), relating to the filing of false financial statements, the Court finds that plaintiffs have

18 not pled with particularity sufficient facts giving rise to a strong inference that defendants acted with

19 deliberate recklessness.  Plaintiffs have not alleged channel stuffing, and plaintiffs' allegations of insider

20 trading are confined to inside information relating to Velac, not to the false financial statements.  *See*

21 Opposition at 26-27.  In addition, plaintiffs' list of other motives are simply bare allegations lacking

22 particular facts and do not suggest an inference of scienter that is at least as compelling as an inference

23 of nonfraudulent intent. *See id.* at 29.

24

25 **3.      Motion to dismiss Section 20(a) claims**

26     Defendants argue that plaintiffs' claim under Section 20(a) of the Exchange Act must be

27 dismissed because plaintiffs have not pleaded a viable claim under Section 10(b) and also because

28 plaintiffs have not pleaded facts showing that defendants Wiggans, Vontz, and Higgins were "control

20

persons."  Under Section 20(a) of the Exchange Act, "[e]very  person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  "Section 20(a) provides joint and several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding of good faith and lack of inducement."  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).  To state a claim under Section 20(a), "a plaintiff must prove: (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator."  *Id.* (internal quotation marks omitted).

Because the Court finds that plaintiffs have not pled a claim under Section 10(b), plaintiffs have not satisfied the first prong of a claim under Section 20(a), and the Court need not decide whether plaintiffs have satisfied the second prong.  The Court GRANTS defendants' motion to dismiss plaintiffs' Section 20(a) claims.

### 4.    Motion to dismiss Section 20A claims

Defendants also contend that plaintiffs' claim under Section 20A must be dismissed for failure to plead an independent violation of the Exchange Act, because the claim lacks particularized facts showing that defendants Wiggans, Vontz, and Higgins sold Connetics stock on the basis of material nonpublic information, and because plaintiffs have not demonstrated that they traded contemporaneously with the alleged insiders.  Plaintiffs respond that the complaint adequately pleads that defendants were aware of material nonpublic information at the times defendants sold Connetics stock.  Plaintiffs also equate the contemporaneous requirement with the requirements of standing and argue that they have met these requirements as to one defendant.

Section 20A of the Exchange Act creates a private right of action against "any person" who violates the Exchange Act by purchasing or selling securities "while in possession of material, nonpublic information."  15 U.S.C. § 78t-1(a).  The Act states that such person is liable to any investor who, "contemporaneously with the purchase or sale of securities" by the insider, purchased or sold securities

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  of the same class. *Id.*

2      Because the Court finds that plaintiffs have not pled a claim under Section 10(b), plaintiffs have

3  not satisfied the requirement that they show an independent violation of the Exchange Act. *Johnson v.*

4  *Aljian*, 490 F.3d 778, 781 (9th Cir. 2007) (claims under 20A require an independent violation of the

5  Exchange Act).   The Court therefore GRANTS defendants' motion to dismiss plaintiffs' Section 20A

6  claims.

7                                  **CONCLUSION**

8      For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants'

9  motion to dismiss with leave to amend and GRANTS the motion to strike filed by defendants

10  Yaroshinsky and Zak.  Plaintiffs shall have until February 22, 2008,  to amend their complaint, should

11  they wish to do so.

12

13      **IT IS SO ORDERED.**

14

15  Dated: January 29, 2008                                    _____

16                                                              SUSAN ILLSTON
                                                                United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28