**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

    PLAINTIFF,

  v.

ALEXANDER J. YAROSHINSKY,

and

VICTOR E. ZAK

    DEFENDANTS.

and

SOFIA K. YAROSHINSKY, a/k/a SOPHIE YAROSHINSKY

and

TAMARA STAROSTINA

    RELIEF DEFENDANTS.

Case No. 06CV2401 (CM)

RECEIVED
JUN 29 2007
U.S.D.C. S.D. N.Y.
CASHIERS

---

## SECOND AMENDED COMPLAINT

For its complaint against Defendants Alexander J. Yaroshinsky and Victor E. Zak, and Relief Defendants Sofia K. Yaroshinsky, a/k/a Sophie Yaroshinsky, (hereinafter, "S. Yaroshinsky") and Tamara Starostina (hereinafter "Starostina"), Plaintiff the United States Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.     This is an insider trading case involving transactions in the securities of Connetics Corp. ("Connetics" or the "Company") by Alexander J. Yaroshinsky ("Yaroshinsky"), the former Vice President of Biostatistics and Clinical Operations for Connetics, and Victor E. Zak ("Zak"). The Defendants' trading was conducted in advance of a June 13, 2005 public announcement (the "Announcement") by Connetics stating that it had received a "not approvable" letter from the Food and Drug Administration ("FDA") concerning Velac Gel, a developmental stage acne medication that the Company was projecting would contribute significantly to its near-term and long-term financial performance. After the announcement, Connetics' common stock fell 27% from the previous day's close on volume of more than 30 times its 30-day moving average.

2.     On April 13, 2005, two months before the Announcement, Yaroshinsky, in his capacity as Connetics' Vice President of Biostatistics and Clinical Operations, participated on a telephone call with members of the FDA staff responsible for reviewing Velac Gel ("FDA staff"), during which he learned of the comments and conclusions by the FDA's Executive Carcinogenicity Assessment Committee ("ECAC") with respect to the results of a carcinogenicity study of Velac Gel. ECAC serves as the primary consulting body for the FDA on carcinogenicity issues. Its responsibilities include evaluating carcinogenicity study results, data generated from dose selection studies, and proposed carcinogenicity protocols.

3.     Yaroshinsky subsequently positioned himself to benefit from a decline in the price of Connetics' securities. From April 26 through June 10, 2005, Yaroshinsky purchased 51 put contracts and sold 15,100 shares of Connetics common stock in an account that he held jointly with his wife, S.Yaroshinsky, and purchased 2,025 Connetics put contracts in a nominee account he controlled held in the name of his mother-in-law, Tamara Starostina (hereinafter "Starostina").

4.     Yaroshinsky communicated the information he learned on the April 13 telephone call with the FDA staff to Zak. Thereafter, from April 13 through June 10,

2006, Zak, who also positioned himself to benefit from a decline in the price of Connetics' securities, purchased 430 Connetics put contracts and sold short 75,000 Connetics shares. In addition, Zak sold a previously-acquired long position of 5,000 Connetics shares.

5. As a result of their unlawful conduct, the Defendants benefited financially by more than $1.58 million. Specifically, Yaroshinsky benefited financially by more than $680,000, and Zak benefited financially by more than $900,000.

6. By virtue of their conduct, Yaroshinsky and Zak violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, and, unless enjoined, will continue to engage in transactions, acts, practices, and courses of business similar to those alleged in this Complaint.

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)] seeking permanently to enjoin Yaroshinsky and Zak from engaging in the wrongful conduct alleged in this Complaint and seeking as to Yaroshinsky a temporary restraining order, an asset freeze, and other relief. The Commission also seeks final judgments ordering Yaroshinsky and Zak to pay disgorgement, civil money penalties and other relief pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §78u(d) and 78u-1].

8. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 77u(e) and 78aa]. Yaroshinsky and Zak, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9. Venue lies in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]. Certain of the transactions, acts, practices, and courses of business, including certain securities transactions, constituting the violations alleged herein occurred within the City of New York.

## DEFENDANTS

10. Defendant Alexander J. Yaroshinsky, age 53, upon information and belief, is a resident of San Andreas, California. During the relevant period, Yaroshinsky was Connetics' Vice President of Biostatistics and Clinical Operations.

11. Defendant Victor E. Zak, 52, is a resident of Newton, Massachusetts and works in information technology. Zak and Yaroshinsky were neighbors in Massachusetts in 1992.

## RELIEF DEFENDANTS

12. Relief Defendant Sofia K. Yaroshinsky (a/k/a Sophie Yaroshinsky,), age 38, is the wife of Defendant Alexander J. Yaroshinsky and upon information and belief resides with him in San Andreas, California.

13. Relief Defendant Tamara Starostina, age 68, is the mother of S. Yaroshinsky and the mother-in-law of Defendant Alexander J. Yaroshinsky. Upon information and belief, Tamara Starostina is a resident of San Andreas, California.

## RELATED ENTITY

14. At all relevant times, Connetics was a Palo Alto, California-based marketer and developer of dermatological products. At all relevant times, Connetics common stock was traded on the Nasdaq National Market System. At all relevant times,

Connetics options were traded on the American Stock Exchange, as well as other exchanges.

## FACTUAL ALLEGATIONS

15.     During the relevant period, Yaroshinsky's duties and responsibilities as Connetics' Vice President of Biostatistics and Clinical Operations included designing drug development studies, conducting the studies, analyzing the results and ultimately generating reports to the FDA for use in drug applications. In order to carry out his duties, Yaroshinsky was entrusted with, and had ready access to, non-public information concerning the approval process of Connetics' developmental stage drugs.

16.     As an employee of publicly traded Connetics, Yaroshinsky owed Connetics a fiduciary duty of trust and confidence. In addition, at all times during his employment with Connetics, Yaroshinsky was subject to Connetics' written code of professional conduct for employees, which explicitly prohibited employees from buying or selling Connetics securities while having knowledge of material non-public information and from disclosing such information to others. The code of conduct specifically defined material information to include "negative views about a new or existing product" and "expected government actions" which included FDA actions on pending drug approvals.

17.     Throughout 2004, Connetics touted Velac Gel as potentially its biggest selling product. By the end of 2004, Connetics had reported that it spent in excess of $15 million in licensing fees, milestone payments, and development costs related to Velac Gel. In 2004, and early 2005, Connetics was projecting publicly that it expected Velac Gel to launch during the fourth quarter of 2005, and the Company and analysts who

- 5 -

followed Connetics projected publicly that a launch of Velac Gel would contribute significantly to Connetics' 2005 and 2006 revenues.

18. Before Velac Gel could be sold in the U.S., however, Connetics was required to obtain approval from the FDA. As part of the approval process, the FDA required Connetics to perform a carcinogenicity study on Velac Gel to ascertain the incidence of the formation of skin tumors on mice. Consistent with his responsibilities at Connetics, Yaroshinsky played a role in the development and testing of Velac Gel.

19. From January 2004 through June 2004, Connetics performed the carcinogenicity study on mice. The carcinogenicity study results indicated that out of 160 mice treated with Velac Gel in varying formulations and dosages, 89 mice developed tumors.

20. On June 28, 2004, Connetics convened a panel of toxicology experts to provide feedback on the carcinogenicity study results. At the meeting, the panel convened by Connetics reported that it was unaware of any drug exhibiting a "positive dermal," similar to Velac Gel, that had been approved by the FDA. Yaroshinsky was present at this discussion.

21. On August 24, 2004, Connetics submitted the Velac Gel drug application to the FDA. The application included the results of the carcinogenicity study.

22. On April 13, 2005, at 2:15 p.m. EST, the FDA staff held a conference call with Connetics' staff to discuss the FDA staff's preliminary analysis of the carcinogenicity study results. During the call, the FDA staff told Connetics that ECAC had concluded that the Velac Gel vehicle was positive and may be a "tumor promoter or a carcinogen." The FDA staff further told Connetics that "this is a serious issue for a

topical product for the treatment of acne... ." Yaroshinsky was present during this conference call with the FDA staff.

23.     On the same day, at 3:13 p.m. EST, shortly after the teleconference with the FDA staff ended, Yaroshinsky, using a telephone at Connetics, called his friend and former neighbor Zak, at Zak's office, and told Zak of the FDA staff's comments and conclusions. After this call, Zak, who prior to April 13, 2005, maintained a bullish 5,000 share long position in Connetics securities, began executing bearish transactions in Connetics securities. Specifically, at 3:30 p.m. EST, Zak accessed his online brokerage account using his office computer, and sold short 5,000 shares of Connetics. Seventeen minutes later, Zak shorted an additional 2,000 shares and then eight minutes after this sale, Zak sold 3,000 shares from his previously held long position in Connetics securities.

24.     Between April 14 and June 10, 2005, Zak sold short a further 68,000 shares of Connetics common stock, sold 2,000 more Connetics shares of his previously held long position, and purchased 430 Connetics put contracts. A put contract is a type of option in which the value of the purchaser's investment increases in value as the price of the underlying security declines.

25.     Zak's short-selling of Connetics shares and buying of Connetics put options resulted in margin calls from his brokerage firm requiring additional funds to continue trading.

26.     On April 14, 2005, the day after the call with the FDA staff, Connetics imposed a two-tier ban on trading in the Company's securities. The first was to expire on April 28, 2005, and covered all employees who were present on the FDA call the prior day, which included Yaroshinsky. Connetics also imposed a trading prohibition that

- 7 -

extended to May 10, 2005 for employees who participated in preparing additional submissions to the FDA concerning the carcinogenicity study, which also included Yaroshinsky.

27. On the same day the trading ban was imposed, Yaroshinsky arranged for a nominee brokerage account to be opened in the name of his mother-in-law, Relief Defendant Starostina (hereinafter the "Starostina Account"). Yaroshinsky controlled the Starostina Account.

28. On April 21, while the trading ban was in place, Yaroshinsky purchased 5 put contracts in the Starostina Account.

29. On April 26, while the trading ban was in place, Yaroshinsky closed a short position consisting of 10 put contracts that he had written in February 2005 in a brokerage account that he held jointly with his wife, Relief Defendant, S. Yaroshinsky ("Joint Account"). The effect of this transaction was to avoid losses that would predictably occur when the news of the non-approval of Velac Gel became public.

30. On April 26, 2005, after the close of the market, Connetics made its first public statement regarding the FDA staff's April 13 comments. The press release stated that the FDA is "interpreting some of the results of a pre-clinical study [the carcinogenicity study] for Velac Gel differently than the Company…there was a positive response to the product." The release, however, stopped short of disclosing the full extent of the FDA's concerns and the incidence of tumors in the mice tested. Most notably, missing from the release was ECAC's conclusion that the "vehicle was positive in this assay and may be a tumor promoter or a carcinogen." Even the partial disclosure, however, affected Connetics' share price. On April 27, 2005, the price of Connetics

shares opened down $4.63 at $22.94 per share, and closed down $5.27 per share at $22.30 per share on volume of 6,961,700 shares, more than 11 times its moving 30-day average.

31. On April 27, 2005, while the trading ban was in place, Yaroshinsky liquidated 15,100 shares of his 16,913 share long position in Connetics securities in the Joint Account. Yaroshinsky had accumulated these shares in the Joint Account over the course of several years. In addition, on the same day, Yaroshinsky purchased 41 Connetics put contracts in the Joint Account.

32. On May 12, 2005, Yaroshinsky funded the Starostina Account with $363,000 from his own brokerage account. Approximately one month later, on June 6, 2005, Yaroshinsky deposited $150,000 from his checking account into the Starostina Account.

33. From May 12 through June 10, 2005, Yaroshinsky purchased 2,020 Connetics put contracts in the Starostina Account.

34. After the close of the market on Friday, June 10, 2005, Connetics received from the FDA a formal "not approvable" letter for Velac Gel. The FDA's letter stated that the drug was "unsafe for use." On Monday, June 13, 2005, before the opening of the market, Connetics issued a press release and Current Report on Form 8-K disclosing to the public that the FDA had not approved Velac Gel. The press release stated that the "only issue raised" in the FDA letter was the result of the carcinogenicity study. The release further stated that "as a result of today's announcement Connetics now projects 2005 total revenues to be $182 million to $188 million, down from previous guidance of $195 million to $206 million." In the same press release, Connetics adjusted down its

2005 earnings per share forecast, which the Company had previously projected would be between $0.88 and $0.92 per share. Connetics changed this projection to between $0.66 and $0.70 per share. Shortly after this announcement, analysts adjusted down their financial projections for Connetics in a similar fashion.

35. By the close of the market on Monday, June 13, 2005, Connetics' share price had fallen 27% from Friday's close of $20.77 to $15.13 on volume of 15,448,594 shares traded, 30 times its 30-day moving average. This closing price was a significant departure from the range in which shares of Connetics traded during the previous two months, during which it had traded between a high of $29.48 and a low of $19.07.

36. During the following five weeks, Yaroshinsky closed out over 2,000 of his options contracts. As a result of these transactions, as well as his long sales preceding the June 13 announcement, Yaroshinsky benefited financially by more than $680,000, from trades in the Joint Account and the Starostina Account.

37. On or about March 24, 2006, Defendant Yaroshinsky and Relief Defendant S. Yaroshinsky used $682,537.03 of the proceeds in the Starostina Account derived from the fraudulent trading in Connetics shares to purchase real estate in San Andreas, California.

38. After the June 13 announcement, but before the end of 2005, Zak closed out of his Connetics options positions, and covered his short sales of Connetics shares. As a result of these transactions, as well as his long sales preceding the June 13 announcement, Zak befitted financially by more than $900,000.

## CLAIMS FOR RELIEF

### COUNT ONE

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]

39. Paragraphs 1 through 38 are re-alleged and incorporated herein by reference.

40. In the course of his employment at Connetics, Defendant Yaroshinsky learned material, non-public information concerning the status of Velac Gel. He further knew, should have known, or was reckless in not knowing, that the information concerning the FDA's view of the carcinogenicity study was material and nonpublic. Yaroshinsky further recklessly violated the fiduciary duty of trust and confidence that he owed to Connetics to maintain such information in confidence until it was publicly disseminated.

41. In violation of his fiduciary duty to Connetics, Defendant Yaroshinsky used such material, non-public information, for his own financial benefit, to trade in the securities of Connetics prior to the Company's June 13, 2005 announcement that the FDA had not approved Velac Gel.

42. In violation of his fiduciary duty of trust and confidence to Connetics, Defendant Yaroshinsky communicated the material, non-public information concerning the FDA staff's comments and conclusions concerning the Velac Gel carcinogenicity study to Zak, for his direct or indirect personal benefit, who could have reasonably been expected to use this information to his advantage prior to the Company's June 13, 2005 announcement that the FDA had not approved Velac Gel.

43. Zak conducted the securities transactions in his accounts as described above while in possession of information that he knew, should have known, or was reckless in not knowing, that was material, nonpublic information that Yaroshinsky had

conveyed to him in breach of Yaroshinsky's fiduciary duty of trust and confidence to Connetics.

44. By the conduct described above, Yaroshinsky and Zak directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT TWO

### Against Relief Defendants

45. Plaintiff realleges and incorporates herein paragraphs 1 through 44 above.

46. By virtue of the foregoing, Relief Defendants were unjustly enriched through the monies derived as proceeds of the fraud and shares of Connetics stock that they received from the Defendant Yaroshinsky and for which they did not give adequate consideration. These monies and shares derived directly or indirectly from the illegal conduct of the Defendants.

47. Relief Defendants have control over assets or proceeds directly or indirectly related to the violations of the federal securities laws by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the Securities and Exchange Commission, respectfully requests that this Court:

(a) enter judgments permanently restraining and enjoining Yaroshinsky and Zak, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder; ordering

Yaroshinsky and Zak to pay an amount equal to all moneys obtained through the illegal activities described above plus prejudgment interest thereon, and to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1]; and

(b) grant such other relief as this Court deems just and proper.

By: *[signature]*
Alan M. Lieberman (AL-6517)
Telephone: (202) 551-4474
Fax: (202) 772-9245
liebermana@sec.gov
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-4030

Dated: June 28, 2007