# EXHIBIT 1

# CONNETICS CORPORATION

**Moderator: Pat O'Brien**
**April 26, 2005**
**3:30 pm CT**

Operator:    Good afternoon.  My name is (Paige) and I will be your conference facilitator. At this time I would like to welcome everyone to the Connetics First Quarter Earnings conference call.  All lines have been placed on mute to prevent any background noise.

After the speakers' remarks there will be a question and answer period.  If you would like to ask a question during this time, simply press star then the number 1 on your telephone keypad.  If you would like to withdraw your question, press star then the number 2 on your telephone keypad.  Thank you.

I will now turn the call over to Pat O'Brien, Director of Investor Relations. Please go ahead, sir.

Pat O'Brien:    Thank you and good afternoon, everyone.  With me for today's conference call is Tom Wiggans, Chief Executive Officer, Greg Vontz, President and Chief Operating Officer, John Higgins, Chief Financial Officer.

I will begin the call by addressing our forward-looking statements.  Following this, I will turn the call over to Tom Wiggans.

As a reminder, the statements made in this call represent our judgment as of April 26, 2005.

Our remarks and responses to questions during this conference call may constitute forward-looking statements, including plans, expectations and projections, all of which involve certain assumptions, risks and uncertainties that are beyond our control. And could cause our actual results to differ materially from these statements.

Those risks and uncertainties include among others, that sales growth and future product revenues may be lower or expenses may be higher than our projections in any quarter.

And that our clinical and regulatory expectations for our product candidates, including approval timeframes we expect, may not be met. And that the company may not be able to sustain profitability.

We encourage you to take the time to review our recent filings with the Securities and Exchange Commission and the first quarter earnings release issued earlier today, which present these matters in more detail.

Connetics does not undertake any obligation to update any forward-looking statements made during this call.

At this point, I'd like to turn the call over to Tom Wiggans.

Tom Wiggans:    Thanks, Pat. And thanks, everybody for joining us today. I will give a general state of the business before I turn it over to John and Greg. And give

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 3

you an overview of another successful quarter, good corporate performance and continued momentum across the - all aspects of our business.

In the first quarter, we had a solid quarter for our core brands — OLUX, Luxiq, Soriatane and Evoclin. Greg will be going into prescription trends for those. But it was a good quarter for us.

We continue to have good gains, good progress in our managed care area and our prescription growth. Also the Evoclin launch continues to go very well. We updated people on that at the analyst day and we'll give you some more information. But that is a very good launch for us.

Also in the first quarter - it's a very busy quarter for us in terms of our meetings and our attendance at many dermatology meetings, most notably the American Academy of Dermatology Meeting this year.

Once again I believe Connetics had a terrific visibility, terrific performance at the AAD, a great branding opportunity, good customer service opportunities and again, leading the way with many presentations and publications on our current and future products at that meeting.

In the first quarter we also moved to a new facility. Some of you have been out here to visit us. And I hope others can come to visit us in the facility.

Not only did we get a terrific real estate deal on the new facility, but importantly the company is back together now under one roof, resulting in I believe, a number of operational efficiencies, benefits, communication and continued excitement and momentum here at the company. So I hope as many of you as possible can come visit us.

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 4

We completed $200 million financing. Has nothing to do with moving into a new building. Did have a lot to do with the terrific financing environment, as well as Connetics being able to put more money in our war chest.

We have no identified uses for this money at the current time. However, as our size and our scope continues to expand, we feel it's important to have a war chest to take advantage of opportunities should they arise in the future.

We signed a commercial partnership with Ventiv, under which a new 50-person sales force will promote our products outside of the dermatology market. That is the successor to the UCB deal.

The UCB deal was a good one for us. But it was a corporate goal for us as many of you know, when UCB bought Celltech and terminated the relationship - for us to find an effective way to leverage our brands into non-dermatology markets. And we believe the Ventiv partnership is a great way to do that.

We had our analyst day on April 14. We were able to provide a terrific overview on our commercial opportunities and our pipeline.

And hopefully we were able to make the point that we believe we have the strongest pipeline in the dermatology sector -- not only a number of new clinical products that Greg will be updating you on, formulating candidates, but also our delivery platforms, not just our initial VersaFoam product but now our VersaFoam-Emollient Foam in our new products.

And those are being extremely well received in the clinical setting. And we believe will be extremely well received in the marketplace.

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 5

Regarding Velac, we are - we continue to be in active discussions with FDA on their review of our NDA. As we've moved through the review process, we've been pleased with the review.

And up to this point we've been in active communication with the agency. And have continued to be in active communication with the agency over the last several weeks, answering their questions as they finalize their review of the various sections.

As part of this review, we've recently received communications that indicated FDA were interpreting results of one of our preclinical studies in a different fashion than we did in our submission.

I realize over the past several weeks there's been speculation regarding the approvability of a new retinoid or approvability of a combo product. The question that they have asked is unrelated to either one of these subjects.

We conducted one of our preclinical studies in a transgenic mouse model. And in that study there was a positive response to our product. At the time, we carefully analyzed the results with a panel of leading experts in this model and leading toxicologists.

The outcome of that was that the experts advised us that this mouse model is known to have limitations. And they concluded that the positive response was a result of one of these limitations of the model.

Their advice is supported in fact, by other products which have had a positive finding in this model, resulting in a clinical hold only to be released later based upon submission of additional data.

And in fact, benzoyl peroxide, a commonly used OTC acne product and an ingredient in several prescription acne products, has Rx labeling that notes a positive result in this model.

Because up to this point FDA had not raised this issue with us, we were surprised to receive this information. However, we are in discussions with them on their question. And we expect to submit additional information well before the PDUFA date which further supports our original conclusion included in the NDA.

I would point out that as a rule, we do not feel it is appropriate frankly, to provide regular updates on our discussions with FDA.

And we do not intend to provide further updates on this until we have more definitive information because obviously this is limited information for you as well as for us. However, we felt it was important to take the opportunity to give you an update on this recent information.

While I realize that this question might raise more questions rather than answers for you just as it did us, I can tell you that we are very committed to working with FDA to get them the information so this issue can be resolved and enable us to launch Velac on schedule.

So with that overview, I'm going to turn it over to John to review the financials.

John Higgins:    Tom, thank you. I'm going to review the first quarter results first and then walk through guidance for second quarter and full year.

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 7

First quarter results - we're pleased with our financial performance. Total revenues came in at 42.4 million. When we look at the breakout by product, Luxiq produced 5.7 million in revenue, OLUX - 15.8 million, Soriatane - 17.6 million and Evoclin - our first full quarter of sales - 3.1 million.

Greg will get into the prescription trend. We're very pleased with the prescription performance of these products and the revenue performance.

We are seeing with the maturity of our business, the revenues are impacted only slightly by our recently entered distribution service agreement, increased managed care contracting, as well as the mix of product size by product line.

That is, we have multiple sizes and the mix of sales between, for instance 50 and 100 grams continually changes.

In terms of royalty and contract revenue, we saw approximately $180,000 this quarter -- in line with our expectations.

Gross margins came in just over 91% -- slightly higher than forecast, principally due to the mix of Soriatane sales - the mix between U.S. and international. We do pay a royalty to Roche on international Soriatane sales.

Expenses came in slightly lower than expected for both SG&A and R&D. SG&A came in at 27.6 million and R&D at 5.8 million.

Net income for the quarter - we're pleased. We generated just over 1 million in net income, which produced earnings per share of 3 cents.

And with the net proceeds from our financing, we finished the quarter with cash - restricted cash of approximately $238 million.

Now I'd like to move to guidance. We've given of course, guidance on the full year as it relates to our recently announced partnership with Ventiv. Let me give some details on the second quarter and some further comments on our full-year guidance.

For the second quarter, we're forecasting revenues of $45 million to $47 million combined for total revenues on expenses of $34 million to $36 million.

The expense forecast is expected to be higher than the first quarter. And higher than we originally expected at the start of this year due - principally due to the Ventiv copromotion agreement, which was not expected at the start of this year.

We will incur launch and copromotion costs related to the Ventiv partnership. Of course, we will continue to spend heavily on what we believe is still the launch period of Evoclin. And of course we're budgeting for the Velac prelaunch activities — a very important program for us.

In addition, we do expect the R&D costs to be higher as well in the second quarter over the first quarter due to the increased clinical activity. We're still developing Desilux in phase III studies. And now have two phase III trials ongoing for Primolux as well.

With this revenue and expense guidance, we forecast earnings per share on a fully diluted basis to be in the range of 6 cents to 8 cents for the second quarter.

When we look at the full-year guidance, we did raise revenue and expense guidance when we announced the Ventiv copromotion deal a couple of weeks ago.

The revenue guidance for 2005 is 195 million to 206 million — increased originally from 190 million to 200 million.

On the expense side, we're forecasting expense in the range of 121 million to 128 million — again an increase from our original guidance in light of the Ventiv copromotion expense structure. The original guidance was $116 million to $123 million.

We forecast the Ventiv deal would generate additional revenues for us but will be earnings neutral in 2005, yet earnings positive in 2006. Therefore our earnings per share guidance is unchanged for '05 at 88 cents to 92 cents.

Just a little more color on the business as now we move into the second quarter and have better visibility on the second half of 2005. We're very pleased with the way the business is advancing.

On the revenue side we do forecast in the second half of '05, growth of all of our existing four brands, notably with increased revenue really kicking in in the third and fourth quarter given our partnership with Ventiv promoting to the non-dermatology audience.

We are of course, forecasting the launch of Velac in the third quarter at this time with this guidance.

And I do want to comment that we've enjoyed strong fourth quarter revenues the last several years. It seems to be a very significant quarter for dermatology products and certainly we have included that in our assumptions.

On the expense side, we do forecast second half expenses will be lower than the first half. A couple of significant factors - the first half costs.

As we've discussed in the past, there are multiple major medical meetings we sponsor, sales and home office training that are first half of the year events. In addition, we are incurring significant launch activities for both Evoclin and Velac in the first half.

We do incur a higher administrative cost in the first half. And also, we believe at this time that the copromotion expenses for the non-derm channel may be higher as well in the first half.

So again, we do forecast lower SG&A in the second half. Also the R&D cost we expect to be lower as well as the clinical trial work will begin to wrap up.

On the amortization side, specific to our recent debt deal, we expect amortization to up slightly on an annual basis as we amortize our debt transactions over a ten-year life.

With just under $7 million in total expenses, the annual amortization cost for the next ten years will be about $670,000. That is an increase.

Just a final comment. Of course, this 2005 guidance assumes that Velac launches in the third quarter. If there is a delay in that timeline there will be an impact on our financial forecast and we will update guidance accordingly.

Greg, I'll turn it over.

Greg Vontz:    John, thanks.  Let me start my comments off with some highlights from our first quarter.

As you know, first quarter is typically a very challenging quarter for us just in terms of all the activities, meetings that go on and time with dermatologists at their office.  And this quarter was no exception to that.

In spite of those environmental circumstances, we had a strong showing in the first quarter.

If we look at the Rx performance in Q1 of 2005 versus the same period in 2004 for Luxiq, we have a 12% increase in prescriptions, achieving $66,000 and change in Q1 '05 for Luxiq.

Also a 12% growth in Rxs for OLUX, moving up to almost 112,000 prescriptions for the first quarter of 2005.

And excitingly for Soriatane, in a same period comparison, a 4% growth rate for Soriatane, achieving close to 31,000 prescriptions in the first quarter of 2005.

And undoubtedly the real bright spot in this quarter was the enthusiastic reception by physicians and patients to Evoclin, which closed out the first quarter with 29,000 prescriptions.  So a very strong showing by Evoclin.

A couple of other points of note for the quarter.  While we always struggle a little bit in January and February again because of the meetings, March comes back strong.  This was the case again for our Rx trends.

In March, OLUX reached an all-time high for the 100 gram trade size, exceeding 34,000 prescriptions in the month.  And Luxiq was just shy of an all-time high for itself.

In keeping with the trend of all-time highs, in March we also achieved for the first time a new record high for Soriatane since it has been introduced into the market, with specific momentum in the 10 gram size, which we believe is indicative of growing interest in low-dose utilization as well as in combination with biologics.

While it's difficult to equate the increase in Soriatane in the first quarter with the potential change in the prescribing environment for the biologics, we did notice a decline in Enbrel in the treatment of psoriasis in January and February.

So all in all, given the time out on the market for our customers and the many meetings and activities, we had a strong first quarter, especially buttressed by the fact that the markets - the overall steroid markets were down for mid and high-potency products about 3%.

As we look forward to the second quarter, historically it is a strong quarter for us and we certainly look to continue that momentum and historical trend. Additionally, our expanded sales force is really starting to hit their stride now. And we look for exciting activities from them in the second quarter.

And as Tom mentioned and was - as introduced in our analyst day recently, our Ventiv promotional activities to more than 8000 physicians outside of dermatology now is well underway.

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 13

We are having encouraging reports from our managers that are spending time in the field with these new customers and our new representatives. So all in all, a lot of momentum going into the second quarter.

Now let me shift my comments from our commercial activities to progress on the product development front.

Our clinical operations team and our product development organization continue to drive very aggressively in pushing our development programs ahead. And this quarter was no different.

We were pleased to announce at our analyst day the unblinding of our phase II results for Desilux. I'll remind you that Desilux is our low-potency topical steroid in our emollient foam vehicle.

The results that we saw in that trial were certainly encouraging, showing a 53% response rate of clear or almost clear for Desilux, a 12% response rate for the placebo emollient foam. But again, we're always tempered in our enthusiasm for these data as these are merely a small, phase II sizing study.

Additionally, many thanks to our clinical operations team for their incredible work. I'm pleased to announce that they have now concluded enrollment in our Desilux phase III program, enrolling more than 550 patients in the complete phase III trial, which now puts us well on our way and on track to file an NDA for Desilux before year end.

In terms of our other phase III development program with Primolux, I'll remind you that is formerly our OLUX-EF program. We have made good progress on that program as well. We now are actively enrolling in two phase III programs -- one in atopic dermatitis, the other in psoriasis.

The early enrollment trends are positive. And I think as Tom mentioned, we continue to be encouraged by the reception of this vehicle by clinicians in the clinical research phase. Here again we believe we are on track with an ambitious timeline for an NDA filing at year's end.

And finally, with regards to an update on our clinical programs, calcipotriene in VersaFoam-EF is moving along well.

We have been in discussions with the agency and would appear to be on track for a Q3 '05 clinical start for this program. And we look forward to updating you on future calls as this exciting program gets underway.

So with that, that concludes my comments. Let me now turn it back over to Tom.

Tom Wiggans:    Great, John. Thank you very much. We will now open it up for some questions. Operator?

Operator:    At this time I would like to remind everyone, if you would like to ask a question, press star then the number 1 on your telephone keypad. We'll pause for just a moment to compile the Q&A roster.

We are still compiling the Q&A roster. Your first question comes from Elliot Wilbur with CIBC World Markets.

Elliot Wilbur:    Good afternoon, guys. And thanks for taking the question. I understand the commentary about the slowing rate of growth in the steroid market in the first quarter.

And, you know, obviously it's somewhat seasonal due to all the meetings and the like. But this is the first time we've actually seen Luxiq, OLUX sales down sequentially.

And I guess, you know, outside of the market conditions, what's also changed is that you have a lot more sales force muscle behind the product. So it would just seem that that should have offset, you know, the slight deterioration in growth.

And I'm wondering if there's anything else there that could have impacted reported sales such as returns or a new distribution services agreement with another wholesaler? Or something that might have caused you to, you know, pare down ex-factory sales?

Man:        Elliot, thanks. As Greg pointed out, first quarter over fourth quarter they were down.

We certainly don't want to use it as an excuse but we can't overemphasize that the first quarter is generally – it's not a tough quarter for us. It's a fun quarter because there are a lot of meetings.

And we're out there, we're kicking off the year. But we're spending a lot of money because we're in meetings. And physicians aren't writing a lot of prescriptions because they're in meetings.

If you look at year-over-year, we actually were pretty happy with the growth in Luxiq and OLUX. I agree with you, it is challenging to continue to grow these products five and six years old.

However, we expect them to grow from our own expanded sales force. And we expect Ventiv to have an impact. When we look at the UCB data, they did have an impact with these products in non-derm markets.

So that's a bit of a long answer to your question, Elliot. But I think we are okay with the first quarter over fourth quarter decline this year, we're happy with the year-over-year growth and we look forward to growing the products the rest of the year.

Elliot Wilbur:     Okay. Then I had one follow-up question for John on the SG&A line. Looking at your guidance for the second quarter - and I guess I'm going to make the assumption that we'll probably see SG&A go up modestly at least.

Then if I think about your full-year guidance, it kind of puts you at a low 20-something run rate. And I guess that's sort of below the rate that you were at in the fourth quarter of '04, which didn't reflect the full sales force cost yet.

So, you know, I understand that you've got a lot more visibility on some of the discretionary spend items than we do. But I'm just trying to get a little bit more comfortable that we can kind of get back down to that low 20s rate.

John Higgins:     Yes, Elliot. Good question. And your analysis generally is accurate. First and second quarter SG&A are going to be the high quarters for the year. Q3 and Q4 will come down. We haven't given specific items but the general level that you're describing makes sense.

I think what's significant is that we did have a sales force expansion. It was - actually I think they were recruited in September and on the street the first week of October. So that was a full quarter impact.

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 17

Not only have we invested significantly in Evoclin launch activities but also to really arm, so to speak, the expanded sales force with the training and the samples that they need, we have invested significantly in all of our brands from a promotional perspective.

That coupled with higher copromotion expenses, as well as the unanticipated Ventiv costs in the second quarter were really the driving factors why first half SG&A will certainly be higher than the second half SG&A.

Elliot Wilbur:    All right. Thank you. Those are my only questions.

Operator:    Your next question comes from Deb Knobelman with Piper Jaffray.

Deb Knobelman:    Hey guys. A couple of questions. My first question, as much as you can answer this, on Velac - just give us a little more feel on how long it will take to do the additional trials on Velac.

And if the FDA does decide to push out your PDUFA date, when you might expect to hear back from them on that.

Man:    Well Deb, let me ask - answer that two ways. First, (we did) - this information is recent. We're giving it to you in pretty real time so we don't have a lot of color on it.

However, it is our plan to submit additional information to them well before the PDUFA date. So if I suggested at this time there was additional trials to do, that's not the case.

So we will be submitting additional information to them. And we expect to do that in the next several weeks.

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 18

Deb Knobelman:    Okay.  So you don't need to do any additional even preclinical trials?

Man:    We do not have 100% clarity on if there's any additional things we have to do.
We what we do know at this time and in response to their question, we have the
information and we're preparing to submit that.

Deb Knobelman:    Okay.  Great.  And then just – second part, kind of following up on what Elliot
was asking, I guess if you do assume that Velac launches in the third quarter,
you still would anticipate that Q3 would be down sequentially from Q2 in
terms of SG&A spend?

Man:    Yes.

Deb Knobelman:    Okay.  Is that because the bulk of sort of the sampling and everything else
comes in the second quarter?

Man:    No.  Sampling of course, will kick up at the time of launch.  And – but there's
– part of it is across all four of our product lines, investment across all the
sampling activity.  I think proportionately the sampling costs will be lower in
the third quarter.

But also significantly, before the launch of Velac and any revenue of course
from that brand, we're investing now and preparing for that.  So we're
incurring expenses across all these existing brands plus for the brands that are
not launched.

Deb Knobelman:    Right.  Okay.  And then just one more question on R&D spend.  I have here in
my notes that you guys have guided to 28 million to 30 million in R&D spend
for '05 in total.

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 19

|  |  |
|---|---|
|  | Is it going to be lower than that now or is that - what is the current run rate on that, I guess? |
| Man: | That - we have not given express guidance since the beginning of the year. The run rate will likely come in slightly below that original guidance. |
| Deb Knobelman: | Okay.  Okay great.  Thanks, guys. |
| Man: | Thank you. |
| Operator: | Your next question comes from David Buck with Buckingham Research Group. |
| David Buck: | Yes.  Thanks for taking the question.  The first one's for Tom on Velac.  You mentioned the preclinical positive finding in the rat study. |
|  | Can you just give a little bit more clarity on what that was?  And, you know, give us - just in follow up, give us some comfort that this is the type of situation that wouldn't require another preclinical trial at least. |
|  | And then I have a follow up. |
| Tom Wiggans: | David, first of all that was a mouse, not a rat.  But it's probably a technicality. |
|  | You know, I'm just not - I'm not prepared to go into a lot of depth right now.  We just got this information.  I think we understand the information that we're looking for and we're going to be submitting some additional information. |

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 20

And right now beyond that, I don't think we're prepared to comment. We - I realize the information may be incomplete but we've told you pretty much what we know.

David Buck:    Okay. And one John on just the SG&A side. Can you give us a little bit more color on just the size of the SG&A spending for the Ventiv Health agreement?

The guidance for this quarter obviously is, you know, is a lot lower than the current consensus. So just give us some sense of where the Ventiv spending comes in. Thanks.

John Higgins:    Yeah. Sure. Absolutely. The increase in expense guidance for the year in '05 -- of course it's a partial year -- is 5 million for Ventiv. And we increased the revenue range from 5 million to 6 million.

So you can assume that all of that is relating to Ventiv with some of the expenses being frontloaded in the second quarter as we train, deploy the field force and supply them with samples. So that is clearly a big driver.

Consistent with our original plan and we discussed this on our first - fourth quarter call in January, the first half of the year, again significant expenditures, not only in product sampling but also the launch activities around Evoclin and Velac.

Also I'll comment that the first quarter expenses for SG&A, in fact came in slightly lower than our forecast. And largely due to timing of various factors throughout the first and second quarter.

David Buck:    Okay. And if I could sneak in one more, just on the inventories that you have in the trade, did you experience any trade inventory (destocking)? I know that

you've talked about fee-for-service agreements. And particularly on the steroid franchise it looks like obviously you trailed script growth.

But, you know, can you give us some sense of what happened on the trade inventory side?

John Higgins:     Sure. Essentially no change in inventory levels. And regarding perhaps the value for Rx, I think what is significant just to play off of Tom's comment earlier, the reality of maturing brands and now OLUX and Luxiq are in their fifth and sixth - entering their seventh year.

The reality is not only are the DSAs, the Distribution Service Agreements, new in terms of a cost of our distribution process, but also as we have more mature brands, there is a bigger bite for the managed care contracting. There's a bigger bit, so to speak, out of revenues for Rx for Medicaid.

And also, I believe another analyst inquired about return. It's not really significant to note separately but obviously with more mature brands, returns are going up as we would forecast. That increases the reserve against those sales modestly.

So it's very much in line with our forecast and expectations, consistent with maturing product line and the reality of these several components.

David Buck:     Okay. Thank you.

Operator:     Your next question comes from Angela Larson with C.E. Unterberg and Towbin.

| | |
|---|---|
| Angela Larson: | Thank you for taking the question. I want to go back to the SG&A spend. I think what we're struggling with is does this imply that you're training your sales force for the Velac launch before you got actual approval? |
| Man: | Angela, no. I don't think you can make that interpretation from the SG&A spend. But certainly a portion of the SG&A spend in Q2 relates to supporting Evoclin and the rapidly growing base of business for that product, as well as preparing for Velac introduction. |
| Man: | Yeah. I think the hesitation, Angela - we were all kind of looking ourselves, shaking our head. So that's not the case.<br><br>But clearly there are prelaunch activities. But as far as bringing everybody in for a launch meeting, that's not scheduled yet. |
| Angela Larson: | So when we try to, you know, put our arms around what is different in third quarter versus second and first quarter, it's prelaunch activities but not the actual sales force training. |
| Man: | The actual - Angela, a lot of - as you might imagine, there's a lot of prep work that goes into a launch meeting. That's why those expenses were recognized in advance. The actual training itself is a fairly modest expense in the whole process. |
| Angela Larson: | Okay. |
| Man: | That's right. Yeah. And also the Ventiv - of course in the first half of the year, the UCB contract costs were fairly high. Ventiv, of course, it's a brand new relationship. |

CONNETICS CORPORATION
Moderator: Pat O'Brien
04-26-05/3:30 pm CT
Confirmation #5419652
Page 23

The startup costs will be frontloaded to a certain extent. And that revenue, we won't begin to realize really until they're out in the market meaningfully for several months. So I think that's significant.

Essentially right now, Evoclin and our past products, OLUX notably and Luxiq - we really started to invest in the launch of those brands post launch. With Velac we are preparing the market for launch and incurring Velac's launch costs as well.

So all of that is hitting. It's just a variety of factors that are hitting, to a certain extent frontloaded in the first half of 2005.

Man:          Yeah. And...

Man:          Those are the variable expenses.

Man:          Yeah. And Angela, I will add again, for those of you who were at the analyst day, I think you saw the UCB Rx impact, which was dramatic in terms of the impact they had with our brands outside of derm, as was their lack of impact once the merger was announced.

We recognize that the Ventiv startup has costs associated with it in the second quarter. And frankly, we thought it was an investment worth making.

And we're excited about their contributions for the rest of the year, knowing that the second quarter is - we're taking a little bit of a hair cut on EPS on the second quarter as a result of that.

| | |
|---|---|
| Angela Larson: | Okay. And one quick question on the Velac outcome. The positive result in the transgenic mouse — what kind of clinical risk does that raise? Right now we're kind of left with no information. |
| Man: | Well obviously we have looked at this carefully as we submitted the NDA and had a lot of expert opinions. I mean our view is it has absolutely no relevance to clinical. |
| | But it doesn't mean that we don't have some additional information that we can supply the FDA on additional preclinical work that we've done. And data that we have. |
| Man: | Angela, let me also add a couple of quick comments. With regard to clinical outcomes, we saw nothing whatsoever in our clinical trials. |
| | Additionally, I will make mention that there are currently products in the market that have a benzoyl peroxide component that in their labeling they mention a TgAC study positive finding. But yet they are approved products on the market. |
| Angela Larson: | Okay. Thank you. |
| Operator: | Your next question comes from Mark Taylor with Roth Capital Partners. |
| Mark Taylor: | Good afternoon. Thanks for taking the question. Just two real quick. On the Soriatane revenue achieved in the first quarter, could you break down the international? |

And then secondly on Velac, regarding CMC's side of the equation, have - has that pretty much been taken care of to your satisfaction so far? Perhaps maybe a plant inspection by FDA upcoming?

Man:                Mark, I'll answer the Soriatane question. We do not break out in detail international and U.S.

Specifically for Soriatane, I will say at the time that we announced that business being added to our Soriatane line, that it was approximately 1 million a month. And that's the general trend we've seen the last several months.

Mark Taylor:         Okay.

Man:                Mark, with regards to your question on the CMC front with Velac, we've been in a very positive and active dialog with the agency on the CMC front. And have a sense that they are soon to conclude that part of the review.

And would not be surprised at some point in the future for them to have a visit.

Mark Taylor:         Thank you very much.

Operator:           Ladies and gentlemen, we have reached the end of the allotted time for questions and answers. Mr. O'Brien, are there any closing remarks?

Tom Wiggans:        I think Mr. O'Brien will turn it over to me. Once again, thanks to everybody. Had a good turnout today. Appreciate the questions.

It was a good first quarter and we look forward to keeping you informed of our progress through the rest of the year. Thank you very much.

Operator:        This concludes today's Connetics First Quarter Earnings conference call.  You may now disconnect.


END

# EXHIBIT 2

# CONNETICS CORPORATION

## Moderator: Patrick O'Brien
## January 25, 2005
## 3:30 pm CT

Operator:           Good afternoon.  My name is (Aileen) and I will be your conference facilitator.

At this time I would like to welcome everyone to the fourth quarter earnings call for Connetics Corporation.

All lines have been placed on mute to prevent any background noise.  After the speaker's remarks there will be a question and answer period.  If you would like to ask a question during this time simply press star then the number 1 on your telephone keypad.  If you would like to withdraw your question press star then the number 2 on your telephone keypad.

Thank you.

I would now like to introduce our moderator, Mr. Patrick O'Brien.  Sir you may begin.

Patrick O'Brien:   Thank you and good afternoon everyone.  With me for today's conference call is Tom Wiggans, President and Chief Executive Officer, Greg Vontz, Chief Operating Officer and Executive Vice President, and John Higgins, Chief Financial Officer and Executive Vice President.

I will begin the call by addressing our forward-looking statements.  Following this I will turn the call over to Tom Wiggans.  As a reminder the statements made in this call represent our judgment as of

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252
Pa

January 25, 2005.

Our remarks and responses to questions during this conference call may constitute forward-looking statements including plans, expectations and projections all of which involve certain assumptions, risks, and uncertainties that are beyond our control and could cause our actual results to differ materially from these statements. Those risk and uncertainties include among others that the company may not be able to sustain profitability and that sales growth and future product revenues may be lower or expenses may be higher than our projections in any quarter.

We encourage you to take the time to review our recent filings with the Securities and Exchange Commission and the fourth quarter earnings release issued earlier today which presents these matters in more detail.

Connetics does not undertake any obligation to update any forward-looking statements made during this call.

At this point I'd like to turn the call over to Tom Wiggans.

Tom Wiggans:    (Pat) thank you and thanks everybody for joining us today.

Two thousand four was a substantial growth and expansion year for the company. Not only did we post significant revenue growth and turn profitable the expanded revenue, income and cash flow especially from Soriatane allowed us to substantially expand our business and increase our commercial presence in the dermatology market.

If I could focus now on the fourth quarter, as we moved through the fourth quarter I was very pleased with the momentum that we saw particularly in two areas.

First, our increases in our existing product prescriptions for Luxíq, Olux, and Soriatane was very encouraging. Gregory is going to review these in more detail but in December we had all time high for both Luxíq and Olux on our 100 gram skew which is the largest selling skew and we had the best month for Soriatane since we took over promoting the product in April. These trends are continuing

as we move into the new year.

Additionally, our managed care efforts across the board but particularly for Soriatane we believe are also beginning to make an impact.

Secondly, while it is obviously still early for Evoclin the initial impact of our sales and marketing efforts are very encouraging and in fact exceeding our expectations which we believe bodes well for our entry into the acne market. We recognize this market is very competitive. We know we need to devote considerable resources as well as expertise and bring competitive products to this market.

But as we prepare not only to expand the launch of Evoclin but prepare for our Velac launch our planning case is that there will be a competitive product for Velac but we have excellent data on Velac, we have now an expanded and very talented sales force, and we are competent that we will be successful in this market with our acne franchise and in particular with Velac.

As we move into 2005 our sales, product development and technology development aspects of our business have never been stronger.

In the sales area the trends as I mentioned above in all products are quite encouraging right now and our sales force - our expanded sales force appears to be making an impact already. I believe this speaks directly to the quality of the sales representatives we were able to hire as well as the continued promotional responsiveness of our products.

In the product development area our product pipeline is the strongest it's ever been. Our 4-2-1 product development model continues to gain efficiency and this year we will have four clinical programs and project that we will file two NDAs.

Third, in the technology area our technology platform continues to expand. For example Connetics Australia and our Center for Skin Biology here in Palo Alto are making an increasingly significant impact on our ability to formulate and assess new products and delivery technologies.

We believe that the commercial launch and royalties from the formulations of Lamisil and/or

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252P
Pag

Rogaine that we've licensed to Novartis and Pfizer sales could begin this year. And certainly if th occurs although royalties will probably be modest this year we would forecast substantial ramp up in those royalties next year.

And thirdly, our new VersaFoam Emollient Foam platform is a very exciting and good example of where we think we can take the business. The VersaFoam-EF is the basis for most of the next generation of our new products. The intellectual property around this VersaFoam formulation - the patents were allowed in '04 and present us with a very broad intellectual property position covering this delivery technology.

Even more exciting is the reaction of dermatologists and their patients that we've now taken these products into our Phase 3 clinical trials. At our investigator meetings and the early feedback from the clinical trial sites this formulation is as exciting to the dermatologists and the patients as we thought it would be.

As John will talk to you about our steroid franchise this year will approach that $100 million revenue goal that we set forth several years ago. We believe based upon the opportunity for the VersaFoam-EF, the new categories and the new markets that that can take us into just in our steroid franchise, this new Emollient Foam delivery technology has the potential to double our steroid franchise.

So we're very excited about the technology platforms such as the VersaFoam-EF and I have no doubt that Connetics Australia and our product development team are going to continue to come up with outstanding new technology platforms as well as formulate a continuous stream of products into those delivery systems.

Let me conclude with an outlook as we begin (2 '05) and kind of look through to 2005 and into 2006.

In the first quarter clearly our expanded sales force, the major initiatives that we have each year to kick off the year, and a full blown Evoclin launch, it's going to be a very busy quarter for us. However as we have in the past we believe that this investment early in the year gets 2005 off to a great start and with considerable momentum.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252801
Page 5

Those of you who have followed the story of the company over the past several years I hope continue to appreciate the operational and financial leverage and financial and operational potential of this business. We saw it in 2004 as we swung from a loss in 2003 to considerable profit in 2004. I recall back as other companies kind of moved towards profitability there's always that profit watch, are they going to be 1 or 2 cents profitable? We swung from a loss in 2003 to a profit of 52 cents in 2004. So considerable leverage and obviously a dramatic improvement in cash flow. We see it again in '05 as we forecast approximately a 35% increase in revenues and approximately a 70% increase in earning and we expect this to continue if not accelerate as we go into 2006.

Our ability to deliver innovative product development and substantial sales growth through a relatively modestly expanding organization remains a key part of our business model and we continue to deliver on this. Our goal a couple of years ago was to have a sales per sales rep goal of $2 million - $2 million per sales rep and as we looked last year towards the end of 2004 prior to our expanded sales force we were on track to exceed that goal. We now feel with our expanded sales force of 124 we can do 2-1/2 to 3 million per sales rep over the next couple years.

In summary we believe our business plan continues to be one of the most attractive and especially pharmaceutical sector. Our expanded sales force and increasing commercial presence, our ongoing product development model delivering innovative new products and innovative new technologies for dermatologists and their patients we believe will continue to generate substantial revenue, income, and value growth for our shareholders.

With that I'll turn it over to John.

John Higgins:    Thanks Tom - going to give a review of the fourth quarter and full year financial highlights for 2004 and then walk through the guidance we've provided in a little more detail in our press release for 2005.

Fourth quarter results, we're very pleased with the revenue mix. Olux, you know, the product line came in at 16.3 million, Luxíq 6.2 million, Soriatane contributed 17.8 million in the fourth quarter and Evoclin 2.9 million.

For the full year very pleased with again the contributions of all of our products. Olux on a full year basis 61.9 million, Luxíq 23.6 million, Soriatane rolled up at 53.3 million and Evoclin, again we just launched in the last couple of weeks of December, we reported 2.9 million as I indicated.

Gross margins, we finished fourth quarter with a 90% mix on gross margin.

In the fourth quarter as we alluded to on our third quarter conference call in October we anticipated signing the Distribution Service Agreements. We did that. We signed two agreements with two of our larger wholesalers. The accounting for this - the cost will hit our sales line. It will be booked as a discount to gross sales. The impact in the fourth quarter was very small.

Expenses, as we look at the fourth quarter expenses for SG&A came in at 22.8 million. As we look at the quarter it was a very important quarter. We (unintelligible) for the expansion of our sales force. We saw almost a full quarter of the sales force expansion cost, of course the Evoclin launch activities. We did book promotion fees for UCB, our co-promotion partner for our steroid products. In addition we also recognized about a $600,000 write-off for Soriatane which relates to Soriatane samples as well as marketing material that were for the samples as well.

In the Research and Development area we spent 5.7 million in the fourth quarter. This is a higher quarterly run rate than in earlier part of 2004. As we've discussed the last several months we have increasing and clinical activities that we expect to continue into 2005. In addition in this line we also had about a $500,000 write-off for Extina due to the non-approval letter we received from the FDA for that product in November.

Tax for the quarter was 459,000 or 7% on a pretax basis. Of our pretax profit that is - that 7% is the average for the full year.

We're pleased fourth quarter came in with earnings of 17 cents per share and on a full year basis we have posted a profit of 52 cents per share.

We finished the year with $76 million in cash. This includes the cash payment for the Velac

milestone. The cash actually was paid in the fourth quarter. In addition it includes a couple of million dollars in build-out cost for a new facility as well as receivables increasing with the launch of Evoclin.

Before I talk about '05 guidance just a quick review. We're pleased with our financial performance throughout the year. We started 2004 with revenue guidance - the mid point of 92 million and earnings expectation of 23 cents. We (unintelligible) early in the year and had raised revenues and earnings - our expectations a time early this year was 120 million in revenues and 34 cents in earnings. And obviously now we're pleased to report total rollup of revenues just over 144 million and 52 cents in earnings per share.

Now I'm going to move to guidance. I want to talk first about the full year for 2005.

We are guiding total revenues of 190 to $200 million. Our steroid line, Luxíq and Olux, we see that franchise growing at close to 10% making up nearly 50% of our revenue base. Soriatane we're forecasting approximately 20% year over year growth making up approximately 1/3 of our revenue and our acne product, Evoclin, which we just launched and Velac we expect to be launched mid year, making up the balance or roughly 20% of our sales. That amount for our acne franchise in 2005 we expect to be split roughly 50/50 between both Evoclin and Velac.

Royalty and contract revenue we forecast to be flat 2005 over 2004. We expect the royalty line to pick up in 2006 with the increase in royalties from both Novartis and Pfizer anticipated at that time.

Margin for the full year we're forecasting at 90% and when we break down expenses total operating expenses including both SG&A and R&D we expect to come in the range of 116 to 123 million.

SG&A as we look specifically at that area we're looking at 88 to 93 million in SG&A. Specifically we're capturing a full year of the expanded sales force, two product launches, although we launched officially Evoclin in December we're still investing significantly in the launch of that brand plus we'll have the launch of Velac. For the full year we'll five marketed brands with all the incumbent promotion materials and sampling. We have increased visibility in the dermatology community and higher expenses associated with our new facility.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #32528^
Pag

In Research and Development we'll see growth year over year. Expenses are projected to be 28 to 30 million due principally to three Phase 3 programs that will be ongoing throughout the year. We anticipate filing two NDAs this year and also we have expanded formulation work ongoing with our pipeline.

With the expected approval of Velac in the middle of this year we will pay Yamanouchi a final milestone payment of $5 million. We forecast this will be a third quarter payment. We have looked at the accounting. We expect to capitalize this payment and amortize it over the life of the patent which is approximately ten years.

Total depreciation and amortization, the non-cash charge to the business, we expect to be 16 to $16-1/2 million on a full year basis. We're forecasting a tax rate of 10%, generating earnings per share of 88 to 92 cents on an if-converted basis. We have an outstanding convertible note. We're anticipating at that level of profitability we'll present on an if-converted basis. We're assuming 42 million shares and you would add back interest and loan cost of $2.3 million.

Now just to comment specifically to the first quarter here.

We're looking at revenue of 42 to $44 million. This is for the existing four products we're marketing right now, again, with gross margins averaging out at 90%.

Expenses we're looking at total operating expenses of 33-1/2 to $35-1/2 million. This is an increase over our fourth quarter expenses and this is consistent with the past three years. We have seen the first quarter has generated significant investment in the commercial side of our business in the last several years. This year is no exception notably now since we're launching Evoclin.

SG&A we're looking at 27 to $28 million in expenses. Again, this captures a full quarter of the expanded sales force, significant investment in the Evoclin product launch, four marketed brand, this is (unintelligible) major - several major medical conferences, pre-launch activity for Velac and in again higher expenses associated with the move to our new facility.

In the R&D area again as we invest in our trial activities we're seeing increased costs there as well. Forecasting roughly 6-1/2 to $7-1/2 million in expenses for Research and Development and we're looking at two Phase 3 programs ongoing throughout the quarter notably with the initiation of the Olux EF trial in the next several weeks. In addition we'll have expanded formulation work.

With the tax rate we're targeting of 10% we forecast earnings per share on a diluted basis of 1 to 2 cents for the first quarter.

Just my final comments, I want to put some perspective on the growth and progress we've made here in '04 as it relates to now our guidance for '05 and how that sets us up for 2006.

As Tom alluded to we are beginning to really enjoy leverage on our financial model, 2005 we're very excited about it. It is another year of exciting growth for us. In 2006 we see revenue driven by continued growth of Evoclin. We forecast enjoying a full year of Velac sales in addition to potential new product launches at the end of 2006. And this is matched with expenses that we believe will begin - the increases will begin to flatten year over year. The last couple of years we've seen tremendous investment in our commercial organization. We believe we're getting leverage off that.

As we look in '05 over '04 revenues grew in the mid 30% range. We forecast the revenue growth '06 over '05 to be consistent with that growth range at the top - on the top line. Expenses coming down. The last couple of years we've seen expense growth in the high 20 to 30% range year over year, '06 over '05 we expect expense growth to be in the 15 to 20% range. The tax rate will go up. As we move through our net operating losses we're forecasting tax in 2006 of a 20 to 25% range and we forecast that earnings growth in '06 over '05 will be equal or greater to the earnings growth we are guiding to '05 over '04.

With that I'll turn it over to Greg.

Greg Vontz:    John thanks.

I'll kick off the - my comments first talking about our performance with our products in '04 and then I'll give a view ahead to '05 both on the commercial and product development sides of the business.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252P
Page

In 2004 we had a strong year for our steroid franchise as was previously mentioned. With Olux we enjoyed a 30% increase in revenues in '04 over '03. That was fueled by a 14% increase in Rx growth year over year. As the product reached its fourth year we hit our all time high for prescriptions in '04 generating 324,000 prescriptions in 2004 and Olux finished the year as the number one, most frequently prescribed and highest retail dollar generating super-high potency topical steroid. So Olux continues to be a strong product for us and as it moves into its fifth year looks to have continued growth and momentum.

With Olux we also enjoyed robust growth despite the fact this product is in its fifth year. Total revenues year over year increased by 21% supported by an 8% growth in Rxs.

In terms of the mid potency category Luxíq finished up in the dermatology segment as the number three most frequently prescribed mid potency topical steroid and number one in retail sales.

Now moving on to Soriatane we enjoyed a 9% increase in retail sales over Roche's ownership of the product in 2003. On an Rx basis we were slightly down but importantly I think we generated a lot of momentum going into the fourth quarter and as we have started into the new year as we look at our weekly data we are now hitting all time highs for the product. So we are encouraged that we have generated some momentum.

And we wrapped up our 2004 with a very exciting launch of Evoclin. Certainly our marketing and sales teams did a super job with this introduction. In the first two weeks of December including the holidays we were pleased to have generated 2000 prescriptions. That was generated by 650 writers so a very rapid adoption given the holiday timeframe. And as we are seeing the weekly prescription data coming in in January we're seeing very, very strong growth trends for Evoclin. To put that in perspective it appears right now that we are on pace with Evoclin to exceed the prescription adoption rate for Olux and Olux was roughly twice as fast as Luxíq so we're certainly very encouraged by these trends.

With that let me turn my comments now towards the year ahead and 2005 and how we see the commercial business unfolding, what our views are on the products, and then I'll conclude talking

about our product development activities.

We really came off a lot of momentum in the fourth quarter with the expansion of our sales force. We've really seen an uplift in our prescription trends and are very excited about the momentum we bring into the first quarter.

As John also mentioned the first quarter is very, very busy for us. It's a time of a lot of conferences. It's our national sales meeting. We're coming up to the AAD in a few short weeks here in February as well as really focusing on the launch of Evoclin so a very, very busy, busy time for us. But as we look ahead to the business we continue to see solid growth for our steroids. John had mentioned previously that we're looking for growth in the 10% range and as Tom had previously mentioned at the JP Morgan conference one of our corporate goals is to replace UCB going forward. So we continue to be encouraged by the potential for our steroids.

In specific as we look to the future Luxíq is now a maturing brand and with the introduction of Velac in the second half of the year we will no longer be actively promoting Luxíq. But it will be promoted in the PCP space as we see there is continued growth potential for the product there.

Olux has continued growth potential - robust growth potential we believe in '05. We have some pretty exciting new data that will be coming out on the product with regards to use concomitantly with Dovonex. We think that will continue to fuel growth as well as our expanded sales organization and so with the whole sales organization supporting Olux in 2005 we look for robust growth of the product.

In terms of Soriatane for '05 we continue to believe that a generic competitor is unlikely to appear in '05. That is our planning strategy in case at this point and we look to fuel growth of the product in '05 really based on two fronts.

We've made a lot of progress first and foremost on the managed care side of the business. Our managed care group has been very active and very quickly has taken us from a previous level of no contracts with Roche to a point where we now have more than 100 million lives under contract and we expect that number to exceed 200 million by the end of the first quarter.

Importantly, 2/3 of these lives are on second tier and probably most significant is we're projecting now by end of the first quarter that we will have between 60 and 65 million lives under step care therapy requiring patients first to undergo three months of treatment with Soriatane before they would be eligible for a biologic.  So on the basis of those two elements and the expanded sales force support of Soriatane we're optimistic for a strong year in '05 with Soriatane.

As we also kicked off the early part of this year with a lot of focus on Evoclin it will continue to be number one in terms of the promotional position for our sales organization.  Evoclin is an exciting brand.  We have some very interesting new data that's going to come out at the February AAD.

One of the pieces of data that's already getting some traction with Evoclin is the now proven ability of the product to be compatible with Benzyl Peroxide.  We're hearing a lot of good feedback from physicians about how patients are adopting the vehicle, how it's working for them, and how they're applying it concomitantly with BPO.  So stay tuned on Evoclin.  We look for more good things to come and I know our sales force is going to do a super job there.

On the Velac front as Tom mentioned preparations are completely underway for getting ready to launch this product and as part of our launch strategy we have worked out a - a kind of a pulse release of clinical data.  We're very excited at the upcoming AAD meeting in New Orleans that of the 11 abstracts that we have submitted and have been accepted 5 of those are unique to Velac.  And those abstracts highlight some brand new data that will play a critical role in supporting the label for this product.  So stay tuned when that data comes out - very, very exciting news for this product.

We additionally have another tranche of data for Velac scheduled to be out at the summer AAD timed to coincide with the launch of the product so a lot of attention and energies by our marketing team and sales operations group being focused on preparations for Velac.

Just to conclude, our forward-looking thoughts in '05 on the product mix, we previously had talked a little bit about where we are with Extina.  We're going to be meeting with the FDA in the very near future to discuss requirements and what the process might look like for product approval.  Once we have more clarity on the requirements and our decision we'll update you on our plans for Extina.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252801
Page 13

Let me just conclude my remarks before I turn it back over to Tom with a quick discussion of what 2005 looks like for us on the product development front.

It will be our busiest year in the history of the company in terms of product development. We're going to be developing three products specifically in '05, that is Olux, Desilux, and Calcipotriene. All of those will be in our VersaFoam-EF emollient vehicle. To complete that development work it's going to require us to conduct four Phase 3 clinical programs. In addition to that we'll be completing a major Phase 4 study for Soriatane. We'll be filing two NDAs and anticipate the approval of Velac. So a very, very busy year for our development organization.

In specific with regards to our Desilux program, our clinical operations group has done a superb job. We are more than halfway completed with our enrollment into the Phase 3 program. We would expect to file an NDA for this program before the end of the year and to look for a second half of '06 approval of Desilux which will be our first entry into the low potency topical steroid market.

Also in regards to our Olux program we had a very positive meeting with the FDA late last year. We now have two Phase 3 programs ready to get underway eminently. Those are in both a topic dermatitis and psoriasis which will bring us an even broader label we intend than that with Olux in our ethanolic foam. And so I think as we see the potential for these products they truly are significantly larger than those with our hydroethanolic products today.

And then lastly as we mentioned previously we are on track to start our Calcipotriene VersaFoam-EF program in the third quarter and we'll give you more color on that as the year progresses.

Let me just conclude by talking about the state of play for our formulation candidates.

As you know last year late in the year we announced our clinical candidates. We'll plan to do that again this year but for now let me just say we have made some very, very exciting progress on some of the formulation candidates specifically on the acne front. These are breakthroughs that previously weren't thought possible so we're optimistic at this point we're going to have some very unique products for - to put into the clinical development pipeline in '06.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252?
Pag?

So with that let me now turn it over to Tom for concluding remarks.

Tom Wiggans:     Greg, John, thank you very much.  Thank you all for your time on the phone and for your support of the company and for those employees that are no doubt on the call thank you for your support. We've got a terrific employee base and as Greg alluded to our national sales meeting is eminently on the horizon as is our annual kick-off meeting.  It's an opportunity for us to get all employees together, focus them on the 2005 corporate goals, and keep the momentum and the excitement of the company going.

As we alluded to - or not so subtlely alluded to the financial and the sales momentum in the company now we believe is considerable as is the commitment and the passion and the excitement of our employees.  So it is certainly our objective to keep that momentum going as we kick off 2005.

Just a couple of calendaring items for your attention.  Our Analyst Day this year will be April the 14th.  We'll be moving it up a little bit.  Our Analyst Day will be April 14th in New York.  It's scheduled for a 10:30 start at the Mandarin Hotel, details to follow.

A couple of upcoming conferences, John will be at the Piper conference this week in New York presenting on Thursday.  Greg will be at the Merrill Lynch conference on February the 8th and I will be at the (Leerink) conference in New York on March the 1st.

Again, thank you for your attention today and with that we'll open it up for questions.

Operator:     At this time I would like to remind everyone if you would like to ask a question please press star then the number 1 on your telephone keypad.  We will pause for just a moment to compile the Q&A roster.

Your first question comes from Ken Trbovich with RBC Capital Markets.

Ken Trbovich:     Good afternoon gentlemen.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252801
Page 15

Was curious if you could help me out. On the quarter it seemed that Soriatane sales were a bit higher than we would have expected. Did you have international sales like you did during the earlier quarter this year?

John Higgins:    Yes Ken we - and actually I want to just touch back on the numbers I cited. The Soriatane numbers for the fourth quarter and full year are slightly larger than what I previously reported on the call for the fourth quarter. They came in at 18 million as we indicated in the press release, the full year 53.6 million.

The mix absolutely does include the sales to our international distributor and our experience and obviously we've looked at Roche's history is fairly consistent with their history the last several years. Obviously we can't predict the timing entirely but it does account for sales to that channel in the fourth quarter.

Trbovich:    Okay and I guess the reason I'm sort of curious is it seemed like you had that sort of catch up order in the second quarter. And this one I'm just not certain whether or not we've got a situation where we're not going to see another order for several quarters or do they have a pattern of ordering twice a year?

John Higgins:    Right well we've only had the product for less than a year so it's hard for us to forecast exactly what to expect. Looking at the history with Roche it seemed to be a very steady ordering pattern. On top of that I will add and we talked at some length around the second quarter call there was about a good six to eight week transitional period where orders were not processed to us as channel as we were acquiring the (unintelligible). There was some question whether we would take over the relationship and whether they could - whether we could meet their supply requirement so that's why the second quarter was perhaps higher than expected.

As far as going forward obviously we're very pleased with the level of orderings here in the fourth quarter. Our general guidance that we've given for '05 would reflect what we expect including that channel in '05.

Ken Trbovich:    Okay and in terms of that 20% step up how much of a price increase does that include? So how

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #32528
Page

much is volume versus price and the reason I'm asking I'd like to go back to Greg and ask him to repeat something if I can after you answer that one.

John Higgins:    Very briefly Ken I'll say although we've given some direction in terms of the '05 mix we do not comment on the mix between price and volume.  Clearly we expect all of these brands to grow on a volume base in 2005.

Ken Trbovich:    Okay and if Greg could just step back to the comment about the step care therapy.  It went through rather quickly on the call and I would appreciate it if you could go back and explain what proportion of the patients are actually under step care therapy and when that process began?  I'm looking at the scrip data on a monthly basis and December's numbers were actually down from the year prior.  So I'm just trying to get a sense as to whether or not this is actually a trend which has just begun or one that started perhaps in the fourth quarter and it's building now.

Greg Vontz:    Ken let me share with you a little more detail on this.

Most of our contracting came into play late in the fourth quarter.  As we wrapped up the year we probably finished up with a little over 30 million lives under step care.  That momentum though with our contracting continues pretty briskly right now and we would expect as I said to wrap up the first quarter somewhere in the neighborhood of 60 to 65 million lives and that will probably be the peak under step care therapy...

Ken Trbovich:    Okay.

Greg Vontz:    ...for us.

Ken Trbovich:    So it really is a building trend?

Greg Vontz:    Yes we certainly believe so.

Ken Trbovich:    Okay thank you.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252801
Page 17

Operator:          Your next question comes from Deb Knobelman with Piper Jaffray.

Deb Knobelman:  Hi guys.

Two questions, my first question is on your SG&A guidance for '05, you know, I noticed the guidance for the first quarter which includes obviously mostly a product launch, et cetera, is pretty high. I'm just wondering if the Q3 number should also come up accordingly because - have you anticipate launch Velac at that time it will sort of be lumpy or if we're going to see a progression over the course of the year?

John Higgins:     Yes we aren't giving detailed quarterly guidance. I think generally your analysis makes sense. Clearly there's a - perhaps an increase in the period expense around the third quarter as we expect to launch that brand. That is such a substantial product.

Specifically we are already incurring pre-launch expenses - excuse me. That is hitting now. It will hit in Q2. So it would smooth that out a bit.

Specific to the first quarter expenses they are large as it relates to prior years, also as I indicated the growth over the last quarter but really speak to the fairly significant increase in our commercial operations as we move into 2005.

Deb Knobelman:  Okay great and then the second question, I mean, I'm sure you get this question all the time but just so we all hear what is your current understanding of the status of any potential competitors to Velac and any timing on that? And what is in your internal plan for such a competitor?

Tom Wiggans:     Believe it or not it's the first time we've got that question.

Deb Knobelman:  Oh, oh.

Tom Wiggans:     No I'm kidding. We do get it all the time.

Well as I alluded to in my comments Deb we know a lot about our product and that's all we know

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #325280
Page

anything about frankly and we're very confident in the data set that we've got.  We believe it's one of the strongest data sets for an acne product submitted to the FDA and we're obviously very excited to launch it.

While we have no specifics on competitors I think from a prudent standpoint it is our assumption - based upon what we've heard in the market it's our assumption that there will be a potential competitor to Velac and that's the way we've modeled our commercial activities and our sales forecast.

I have a lot of confidence in the strength of our data.  I've got a lot of confidence in the strength of our sales force and although we have anticipated in our A scenario if you will a competitor in the market we continue to believe we'll be very successful with our product.

Deb Knobelman:   Okay so your '05 guidance does include a competitor launching in 2005?

Tom Wiggans:     That is correct.

Deb Knobelman:   Terrific.

Tom Wiggans:     That is our base case assumption.

Deb Knobelman:   Okay.  Thanks so much guys.

Operator:        Your next question comes from Elliot Wilbur with CIBC World Markets.

Elliot Wilbur:    Good afternoon.

Just a quick clarification question for John on the EPS guidance for '05.  The 88 to 92 cents does include the $5 million payment to Yamanouchi, is that correct?

John Higgins:    It does but just a very, very small proportion.  The 5 million will be a cash payment we expect to go out the door so to speak in the third quarter.  Originally we had anticipated that like our last

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252801
Page 19

milestone payment this would be charged as a period expense, an in-process research and development payment, that would be charged to our operating expense. But given the fact that it is a milestone based upon the approval and therein the expected eminent launch of the product it actually will be capitalized and be amortized as an expense over the life of the patent. The patent expires in the year 2014 so we'll just have a couple of hundred thousand dollars that will actually hit our amortization line in the second half of 2005.

Elliot Wilbur:    Okay and then taking a look at the total revenue guidance. You guys have brought up kind of the low end of the range that you initially outlined at your analyst meeting last year and just sort of going through those numbers and kind of comparing that to our own expectations and the expectations that seem to be out there on the street. I guess it, you know, and based on your product guidance it looks like you're maybe a little bit, you know, quite a bit more bullish on the acne side of the business than seems to be reflected in the street numbers and, you know, given there's roughly a 10% price increase on Luxíq and Olux late in the year seems like your guidance is - there is somewhat conservative. So I'm just trying to maybe get a little bit better color sort of on, you know, that observation.

Tom Wiggans:    Well I'm not quite sure how to answer that Elliot, I mean, we try to give our - we try to give the best clarity we can on our forecast. Yes we brought up the bottom end of the range primarily at this time due to the trends we're seeing in the market and the impact of our expanded sales force. So as John said it continues to be our goal, although clearly Olux and Luxíq are maturing in their lifecycles, it continues to be our goal to increase volume growth across every product in our product line. It's going to vary obviously considerably among the products but even Luxíq and Olux we are anticipating volume growth this year. But I guess specifically it is a function more than anything else of the expanded sales force.

Elliot Wilbur:    Okay and then just one last question. Is there anything at this point that we can say further about US patent number 275 license to Medicis that supposedly your, you know, like product may infringe upon or just I guess there's maybe not much to say at this point.

Tom Wiggans:    No I don't think there is. I think our press release said it all. We were notified. We're confident of our patent position.

Elliot Wilbur:    Okay. Thank you.

Operator:    Your next question comes from Michael Tong with Wachovia Securities.

Michael Tong:    Hi. Thanks for taking the question.

Just a couple quick ones. I notice accounts receivables went up to 25 million versus 13 million in Q3, was wondering John if you can give us some color on that. And secondly, if I look at your EPS guidance during the analyst day excluding the Velac payment was about 90 cents to a dollar and now we're seeing 88 to 92 cents. I was wondering between then and now what has changed to cause that change in terms of your EPS guidance? And finally, was there a pipeline fill in Q4 for Evoclin that's not reflected in product sales?

John Higgins:    Right okay. Just to break it down the - in terms of accounts receivable at year-end they were a bit higher than obviously the prior quarter.

I think the two principal factors there are one, the launch of Evoclin. Again, the sales of that product principally did not hit until the second or third week of December and - which is significant and I think you'll see an AR bump with the launch of any production within the quarter it is launched.

Secondly, we as I indicated entered a couple of Distribution Service Agreements. They're with two of our larger wholesalers and it was about a five to six week process where although it was a collaborative dialog in terms of looking at inventory level and making sales to those channels several orders were placed in December.

Specific to our guidance I think what we're very excited about first in terms of revenue and earnings is our outlook for 2005. It is we think consistent if not better than what we were expecting six months ago.

As far as the earnings number that you cited you're right. Initially we did anticipate that Velac would hit the 10 to 12 cent charge in '05. In fact we are able to frankly reinvest that money in our

business without taking any impact - without having any impact on our earnings. That will not be spread over the ten-year life of the patent. We're able to invest not only more in our sales force but in our marketing activity and this is significant. We are clearly managing some very significant dermatology products. We think Evoclin will be a big success and are quite excited about the launch activities for Velac.

So we are redistributing our expenses although we've not given detail in the past. We have redistributed our expenses and are very pleased with the business we're funding as well as the profits this business will generate in 2005.

| | |
|---|---|
| Tom Wiggans: | Right. Michael could you restate your question on the fourth quarter Evoclin number? |
| Michael Tong: | Yes was there Evoclin shipment that was - that weren't recognized in the 2.9 million in sales? |
| Higgins: | No, no. No we - the commercial team and clearly having launched several products very sophisticated in terms of our stocking analysis. We want to make sure there's appropriate level of stocking at the retail pharmacy level, did some careful calculations, and no essentially what we have booked is what was shipped. |
| Greg Vontz: | (Mike) let me just add one other comment there. We're already very encouraged I think by the number of reorders that are being placed already for Evoclin so hopefully this will soon become too small a base and we'll see a lot of growth to support demand in the channel. |
| Michael Tong: | Okay great. Thank you. |
| Operator: | Your next question comes from David Buck with Buckingham Research Group. |
| David Buck: | Yes good afternoon and thanks for taking the questions. |
| | A couple of questions for either Tom or Greg. First on the signing of the inventory or Distribution Services Agreements which I guess is the (unintelligible) term these days, can you give us a sense of where your trade inventories are going to be targeted going forward and where they are versus that |

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252
Pag

target?  And I've got a couple of follow-ups.

Tom Wiggans:     Well with regard to the inventories I think other than as John explained while we were negotiating these, you know, there were some orders that were held and then were shipped after the agreements were placed.  Our inventory levels during this transition period were not appreciably different I think once we signed these.  The good news is that we got probably better visibility than we've ever had on the inventory levels and that's obviously very useful to us but in the past - versus our historical inventory levels they are fundamentally unchanged to these two wholesalers as a result of the DSAs.

David Buck:     Okay and where would you be targeting - is it one month, a half a month, one and a half months?

Tom Wiggans:     No we target actually around two months, in some cases maybe a little bit more than that.  I think if you look at the volume of our products and the distribution throughout the different distribution centers or the wholesalers and into the retail level, you know, we've concluded that we need a little higher inventory level to support the retail channel on, you know, these products that are, you know this is not - there's not a Lipitor velocity drug through the distribution channel.  Having said that, our inventory levels have stayed relatively constant over the last few quarters if not year or so and when we got the additional visibility on the channel we were pretty pleased with what we saw.

Greg Vontz:     Tom let me just add a comment there for you.

David historically we work very hard certainly in the area prior to having the DSAs in place to make sure that the wholesalers did not speculate on us and did not get ahead of us on our Rxs.

The one thing we did see is when we were really pushing that down quite a bit as our inventories got down to the four week mark we begin to see a pretty high frequency of stock outs.  I think as Tom said there's now a pretty fair volume in the channel with our products so we're pretty happy with where levels are at in terms of making sure that we have products there when patients show up at the pharmacy.

David Buck:     Okay and one for Greg.  As we look at 2005 any changes that you're seeing for the managed care side in terms of co-payment level, formulary acceptance, et cetera?

And just a clarification and follow-up to one of - I guess Elliot Wilbur's question. The price increases that you had in the fourth quarter was there anything else besides the 9% I believe for Olux and Luxíq in October?

Greg Vontz:    David generally we don't - really don't comment on our price increases but your assumptions are correct.

With regard to the managed care environment I can speak to all of our products. If you have a specific product question I can give you more detail there.

Right now that I think the trends in general independent of products are for managed care systems to increasingly move cost to their patients. So I think what you're going to see over time is more and more of the co-pay especially at level - tier two and tier three seeing those increase. But for the time being they don't seem to be moving too quickly. About 2/3 of our products are currently contracted at the second tier and we would anticipate that to continue for the rest of our contracting activities.

We have about 160 million lives under contract total right now and will - once at the conclusion of our activities at the end of Q1 we'll probably have close to 200 million lives at that point. And we would estimate about 2/3 of that will be at the second tier.

David Buck:    Okay and if I look at Olux, Luxíq, and Evoclin, what's the average co-payment for those?

Greg Vontz:    Those are on tier two so it depends on each individual plan but probably a range of anywhere from 10 to $30 depending on the plan.

David Buck:    Okay great. Thank you.

Operator:    Your next question comes from Dave Windley with Jeffries & Company.

Dave Windley:    Good afternoon gentlemen.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252?
Page

Is it possible to provide any additional color on where you stand in your discussions and negotiati
on a replacement partner for UCB?

Tom Wiggans: It is a priority for us. As Greg alluded to it is a corporate goal this year. We reviewed those at the JP Morgan conference and specifically called it out. UCB will be our partner through March 31 so all I can say is stay tuned.

Dave Windley: Okay. Do your guidance numbers for 2005 assume a particular point in time at which you will have a partner in place?

Tom Wiggans: Our guidance for 2005 right now is based upon our current information and as we - if and when we sign up a partner we'll give you an update on that.

Dave Windley: Okay. John on the expense guidance is D&A buried in one of the two expense lines that you're guiding?

John Higgins: I'm sorry. Can you repeat the question again?

Dave Windley: Sure. Is D&A in - lumped in with SG&A in your guidance?

John Higgins: No. That is separate and again for the full year and 2005 we're forecasting 16 to 16-1/2 million for depreciation and amortization.

Dave Windley: Okay.

John Higgins: And just to come back as well to the revenue guidance question I believe you were asking of us. As it relates to the co-promotion partner clearly that is a corporate goal - presumably we're successful there. We'll announce the deal - the structure. The guidance we've given does not assume revenue from a co-promotion partner.

Dave Windley: So yes. It would assume that you get some tailwind scrip volume from the activities through March but that the royalty payments to a partner would cease at March?

John Higgins:      That's right, I mean, the UCB contract - they are still actively promoting for us. We will have a promotion fee in the first quarter payable to UCB but their promotion activity will discontinue at the end of March.

Dave Windley:      Okay and the last question dovetailing a little bit on Mr. Tong's earlier question on the AR. Would you - well generally speaking is there anything on - any movement that you would expect on the balance sheet that would skew cash flow results for 2005 above or below, you know, say what would be a normal level vis-à-vis net income?

John Higgins:      No. No it's a clean and a fairly transparent business. We've identified the Velac milestone which will be a cash payment we forecast in third quarter. We have - as we anticipate moving, our lease expires in a couple of months, we'll move. We've invested several million in a build-out as well as had to pledge security deposits but aside from that no it's a fairly low - it's capital business for us.

Dave Windley:      Right and so you would expect to exit 2005 at about the same DSO level as you exit 2004?

John Higgins:      That's correct. The last couple of quarters the DSO levels in fact have been below average. As we've grown the business we've got a very clean collection cycle. Historically we've been in the 20 to 25 day range but certainly very, very healthy DSO level.

Dave Windley:      Okay. Thank you.

Operator:          Your next question comes from Megan Murphy with Lazard.

Megan Murphy:     Hi, good evening.

                   A question, maybe some color, on the clinical trials that we'll be looking at for this year. Can we get a sense of what's an NDA program, what's a 505 B2 program, and then maybe what kind of arms we're talking about in each of the trials specifically relative to placebo and non-inferiority, et cetera?

Greg Vontz:        Yes Megan happy to respond to that. Just to give you some approximations on these trials. These

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #32528
Page

are all 505 B2s planned for the time being certainly for Olux and VersaFoam and Desilux. These versus placebo in this instance - in these trials. Enrollment is targeted roughly in the 5 to 600 patient range for all of the Phase 3 trials this year.

Megan Murphy:    Great. Thanks very much.

Greg Vontz:    Uh-huh.

Operator:    Your next question comes from Mike Hearle with Lee Munder.

Mike Hearle:    It's really just to clarify - I guess the clarifications on the '05 sales guidance and forecast but could you break out contribution from launched products of the 190 to 200 million? So meaning of that number, what's made up of the combination of Velac, Rogaine, and Lamisil in that number? Just really trying to get to an aggregate organic growth rate for the year.

John Higgins:    Right. I'll comment on the royalty and contract line first.

We forecast that being relatively flat over 2004. We do have two dynamite partnerships with Novartis and Pfizer but we don't expect those royalty lines to materially grow until 2006. So our guidance when we give total revenue guidance, 190 to 200 million, that is principally all product revenue. As I indicated we're looking at our acne product comprising approximately 20% of that revenue guidance split fairly equally between Evoclin for a full year and Velac for a partial year.

Mike Hearle:    Great, thanks.

Operator:    Your next question comes from Donald Ellis with Thomas Weisel Partners.

Donald Ellis:    Thank you. Most of my questions have been answered by this time - just a couple left.

Regarding Olux and Luxíq with roughly a 9% price increase in the fourth quarter of '04 and a 10% growth estimate for next year is it correct if we assume that your assumptions are for 1% unit growth for '05?

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252801
Page 27

Tom Wiggans:     Well, you know, let me answer that. Maybe a little more than that (Don), I mean, our price increases because of our managed care contracts there's not a straight flow through on that 9% so our yield is a little bit less than that.

Donald Ellis:     Okay. Then regards to Soriatane I think you guys stated that your expectations for 20% growth '05 versus '04. Are we assuming that you're expecting the prescriptions to grow to make up most of that or is that mostly going to be price?

Tom Wiggans:     Well, you know, as Greg said we don't prospectively comment on price increases. All we will say is that as I said on our third quarter call our expectation is we should see volume growth in Soriatane and we expect to see, for those of our sales force that are listening, we expect to see unit growth in Soriatane in 2005.

ald Ellis:     Okay. Last question is about Soriatane. You guys made a comment on this call that you're not expecting generic competition for Soriatane in calendar '05. Can you let us know what gives you that level of confidence?

Greg Vontz:     (John) as we've talked before with a number of folks we did an extensive amount of research in the diligence process for the acquisition of this product and that process gave us a lot of clarity on where respective manufacturers stood with their abilities to not only produce but to generate a bioequivalent form of the product.

One of the unique aspects of Soriatane is it goes through an intermediate processing step between the creation of the API and the capsule filling and that is unique and very critical to the bioavailability of the product. So we are of the mindset that that bioavailability issue has not been cracked as of yet in the timeframe where an ANDA would impact us in '05.

Tom Wiggans:     So that, I mean, just to follow-on to that while yes if we don't have perfect information again our planning scenario is through '05 we won't see any generics. And if we - if that occurs Soriatane will have been and will continue to be an excellent financial and strategic acquisition for us.

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252P
Page

Donald Ellis:    Great. That's helpful. Thank you very much.

Operator:    Your next question comes from Elliot Wilbur with CIBC World Market.

Elliot Wilbur:    Yes thanks for taking the call. On Calcipotriene I guess it just seems to me like maybe there was an acceleration in that program based on your comments from last conference call and I want to make sure that it's - that's correct, that I did catch that and if so why?

Greg Vontz:    Elliot it's a very, very exciting product. As you know the Dovonex - the active ingredients of (unintelligible) in the Dovonex product line right now have sales roughly in the $125 million range. The other thing driving this is frankly the patent landscape. The pivotal patents will expire in late '07 so this is timed to coincide to introduce a product shortly thereafter.

Elliot Wilbur:    Okay so it's on track essentially with what you said last time.

Greg Vontz:    Correct.

Elliot Wilbur:    That's fair. Okay then one just additional follow-up question for John with respect to the EPS guidance. Does that include any impact from SFAS123 and then if you could just - I don't know if you - you probably don't have the full year number yet but if you have it handy just sort of year to date what the impact was?

John Higgins:    Right. Elliot you're referring to the requirement to expense stock options. No it does not. As we indicated toward the end of our press release the guidance does not reflect the impact of stock option expensing. We expect we will begin to expense options as required in the third quarter and later on in the year we'll give more details how that impact - or how that will impact our company.

Tom Wiggans:    Hello? Hello? Operator? Is anybody there?

Operator:    Your next question comes from David Buck.

David Buck:    Yes just a couple of follow-ups. First, the follow-up on the stock option question. In your current

CONNETICS CORPORATION
Moderator: Patrick Wiggans
01-25-04/3:30 pm CT
Confirmation #3252801
Page 29

option scheme and (unintelligible) can you just review John what the number would be in terms of EPS hits on a full year basis and obviously it's a half year but just remind us of that?

John Higgins:    Right.

David Buck:    And also if you have the cash flow from operations number and free cash flow for the fourth quarter that would be terrific.

John Higgins:    Yes the nine month number which is from our 10-Q is just below $5 million total for 2004.  When we file our 10-K of course we'll have the full year number but that is the nine-month value of our options for the first nine months of this year.

Your second question - I'm sorry, it related to…?

.d Buck:    Just if you have the data - the free cash flow or cash flow from operations numbers for the fourth quarter and year?

John Higgins:    David I'll follow-up with you.  I don't have that…

David Buck:    Okay.  That's fine.

John Higgins:    …handy with me right now here.

David Buck:    Okay.  That's it for me.  Thanks.

Operator:    Ladies and gentlemen we have reached the end of the allotted time for questions and answers.

Tom Wiggans:    Thank you all very much.

Operator:    This concludes today's fourth quarter financial results.

END

# EXHIBIT 3

# CONNETICS CORP

3400 W BAYSHORE RD
PALO ALTO, CA 94303
415. 843.2800

# 10–K/A

**FORM 10–K/A**
**Filed on 03/29/2002 – Period: 12/31/2001**
File Number 000–27406



Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Form 10–K/A

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE

### SECURITIES EXCHANGE ACT OF 1934

For the Fiscal Year Ended December 31, 2001

Commission file number: 0–27406

# Connetics Corporation

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| Delaware | 94–3173928 |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| 3290 West Bayshore Road Palo Alto, California | 94303 |
| *(Address of principal executive offices)* | *(zip code)* |

Registrant's telephone number, including area code: (650) 843–2800

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:

Common Stock, $0.001 par value per share
Preferred Share Purchase Rights

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K.    ☐

The aggregate market value of the voting stock held by non–affiliates of the registrant was approximately $225,516,073 as of March 22, 2002, based upon the closing sale price on the Nasdaq National Market reported for that date. The calculation excludes shares of common stock held by each officer and director and by each person who owns 5% or more of the outstanding common stock in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

There were 30,566,234 shares of registrant's common stock issued and outstanding as of March 22, 2002.

### DOCUMENTS INCORPORATED BY REFERENCE

The information required by Part III of this Report, to the extent that it is not set forth in this Report, is incorporated by reference to the registrant's definitive proxy statement for the Annual Meeting of Stockholders to be held on May 16, 2002.

Table of Contents

## FORWARD–LOOKING INFORMATION

*Our disclosure and analysis in this Report, in other reports that we file with the Securities and Exchange Commission, in our press releases and in public statements of our officers contain forward–looking statements within the meaning of Section 27A of the Securities Act, and Section 21E of the Securities Exchange Act. Forward–looking statements give our current expectations or forecasts of future events. You can identify these statements by the fact that they do not relate strictly to historical or current events. They use words such as "anticipate," "estimate," "expect," "will," "may," "intend," "plan," "believe" and similar expressions in connection with discussion of future operating or financial performance. These include statements relating to future actions, prospective products or product approvals, future performance or results of current and anticipated products, sales efforts, expenses, the outcome of contingencies such as legal proceedings, and financial results.*

*Forward–looking statements may turn out to be wrong. They can be affected by inaccurate assumptions or by known or unknown risks and uncertainties. Many factors mentioned in this Report — for example, governmental regulation and competition in our industry — will be important in determining future results. No forward–looking statement can be guaranteed, and actual results may vary materially from those anticipated in any forward–looking statement.*

*Although we believe that our plans, intentions and expectations reflected in these forward–looking statements are reasonable, we may not achieve these plans, intentions or expectations. Forward–looking statements in this Report include, but are not limited to, those relating to the commercialization of our currently marketed products, the progress of our product development programs, developments with respect to clinical trials and the regulatory approval process, developments related to acquisitions and clinical development of drug candidates, and developments relating to the growth of our sales and marketing capabilities. Actual results, performance or achievements could differ materially from those contemplated, expressed or implied by the forward–looking statements contained in this Report. Important factors that could cause actual results to differ materially from our forward–looking statements are set forth in this Report. These factors are not intended to represent a complete list of the general or specific factors that may affect us. It should be recognized that other factors, including general economic factors and business strategies, and other factors not currently known to us, may be significant, presently or in the future, and the factors set forth in this Report may affect us to a greater extent than indicated. All forward–looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements set forth in this Report. Except as required by law, we do not undertake any obligation to update any forward–looking statement, whether as a result of new information, future events or otherwise.*

## PART I

**Item 1.**   *Business*

**The Company**

*References in this Report to "Connetics," "the Company," "we," "our" and "us" refer to Connetics Corporation, a Delaware corporation, and its consolidated subsidiaries. Our principal executive offices are located at 3290 West Bayshore Road, Palo Alto, CA 94303. Our telephone number is (650) 843–2800. Connetics®, Luxíq®, and OLUX® are registered trademarks, and Liquipatch™ and the seven interlocking "C's" design are trademarks, of Connetics. All other trademarks or service marks appearing in this Report are the property of their respective companies. We disclaim any proprietary interest in the marks and names of others.*

Connetics is a specialty pharmaceutical company focusing exclusively on the treatment of dermatological conditions. We currently market two pharmaceutical products, Luxíq® Foam (betamethasone valerate), 0.12%, and OLUX® Foam (clobetasol propionate), 0.05%. Our commercial business is focused on the dermatology marketplace, which is characterized by a large patient population that is served by relatively small number of treating physicians. Our two dermatology products have clinically proven therapeutic

1

Table of Contents

group of patients with a particular disease to obtain evidence of the agent's effectiveness against the targeted disease, to further explore risk and side effect issues, and to confirm preliminary data regarding optimal dosage ranges. Phase I and Phase II trials can sometimes be combined, with the FDA's concurrence, into a Phase I/II trial. Phase III trials involve more patients, and often more locations and clinical investigators than the earlier trials. At least one such trial is required for FDA approval to market a drug. Phase II and Phase III trials can sometimes be combined, with the FDA's concurrence, into a Phase II/III trial, which is an accelerated clinical trial intended to provide sufficient data for approval.

The rate of completion of our clinical trials depends upon, among other factors, the rate at which patients enroll in the study. Patient enrollment is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical sites and the eligibility criteria for the study. Delays in planned patient enrollment may result in increased costs and delays, which could have a material adverse effect on our business. In addition, side effects or adverse events that are reported during clinical trials can delay, impede, or prevent marketing approval.

Section 505(b)(2) of the Food, Drug and Cosmetic Act makes it possible for a company to possibly accelerate the FDA approval process. A so-called 505(b)(2) application permits a sponsor of a drug to satisfy the requirements for a full New Drug Application, or NDA, by relying on published studies or the FDA's findings of safety and effectiveness based on studies in a previously-approved NDA sponsored by another person, together with the studies generated on its own drug products. The FDA evaluates 505(b)(2) applications using the same standards of approval for an NDA, but the number of clinical trials required to support a 505(b)(2) application, and the amount of information in the application itself, may be substantially less than that required to support an NDA application. We used the 505(b)(2) application process for both Luxiq and OLUX, but the 505(b)(2) process may not be available for our other product candidates, and as a result the FDA process may be longer for those product candidates than it was for Luxiq and OLUX.

After we complete the clinical trials of a new drug product, we must file an NDA with the FDA. We must receive FDA clearance before we can commercialize the product, and the FDA may not grant approval on a timely basis or at all. The FDA can take between one and two years to review an NDA, and can take longer if significant questions arise during the review process. While various legislative and regulatory initiatives have focused on the need to reduce FDA review and approval times, the ultimate impact of such initiatives on our products cannot be certain. In addition, if there are changes in FDA policy while we are in product development, we may encounter delays or rejections that we did not anticipate when we submitted the new drug application or biologics license application for that product. We may not obtain regulatory approval for any products that we develop, even after committing such time and expenditures to the process. Even if regulatory approval of a product is granted, it may entail limitations on the indicated uses for which the product may be marketed.

Our products will also be subject to foreign regulatory requirements governing human clinical trials, manufacturing and marketing approval for pharmaceutical products. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement are similar, but not identical, to FDA requirements, and they vary widely from country to country.

*Manufacturing.* The FDA regulates and inspects equipment, facilities, and processes used in the manufacturing of pharmaceutical products before providing approval to market a product. If after receiving clearance from the FDA, we make a material change in manufacturing equipment, location, or process, we may have to undergo additional regulatory review. We must apply to the FDA to change the manufacturer we use to produce any of our products. We and our contract manufacturers must adhere to current Good Manufacturing Practice and product-specific regulations enforced by the FDA through its facilities inspection program. The FDA also conducts regular, periodic visits to re-inspect equipment, facilities, and processes after the initial approval. If, as a result of these inspections, the FDA determines that our (or our contract manufacturers') equipment, facilities, or processes do not comply with applicable FDA regulations and conditions of product approval, the FDA may seek sanctions and/or remedies against us, including suspension of our manufacturing operations.

10

Table of Contents

of our products on reasonable or acceptable terms. Any loss of a manufacturer or any difficulties that could arise in the manufacturing process could significantly affect our inventories and supply of products available for sale. If we are unable to supply sufficient amounts of our products on a timely basis, our market share could decrease and, correspondingly, our profitability could decrease.

*If our contract manufacturers fail to comply with cGMP regulations, we may be unable to meet demand for our products and may lose potential revenue.*

All of our contractors must comply with the applicable FDA cGMP regulations, which include quality control and quality assurance requirements as well as the corresponding maintenance of records and documentation. If Miza is not able to comply with the applicable cGMP regulations and other FDA regulatory requirements, our sales of marketed products could be reduced and we could suffer delays in the progress of clinical trials for products under development. We do not have control over our third–party manufacturers' compliance with these regulations and standards. The cGMP validation of a new facility and the approval of that manufacturer for a new drug product may take a year or more before manufacture can begin at the facility. Delays in obtaining FDA validation of a replacement manufacturing facility could cause an interruption in the supply of our products. Our business interruption insurance, which covers the loss of income for up to $8.0 million, may not completely mitigate the harm to our business from the interruption of the manufacturing of products caused by certain events, as the loss of a manufacturer could still have a negative effect on our sales, margins and market share, as well as our overall business and financial results.

*If our supply of finished products is interrupted, our ability to maintain our inventory levels could suffer.*

We try to maintain inventory levels that are no greater than necessary to meet our current projections. Any interruption in the supply of finished products could hinder our ability to timely distribute finished products. If we are unable to obtain adequate product supplies to satisfy our customers' orders, we may lose those orders and our customers may cancel other orders and stock and sell competing products. This in turn could cause a loss of our market share and negatively affect our revenues.

Supply interruptions may occur and our inventory may not always be adequate. Numerous factors could cause interruptions in the supply of our finished products including shortages in raw material required by our manufacturers, changes in our sources for manufacturing, our failure to timely locate and obtain replacement manufacturers as needed and conditions effecting the cost and availability of raw materials.

*We cannot sell our current products and product candidates if we do not obtain and maintain governmental approvals.*

Pharmaceutical companies are subject to heavy regulation by a number of national, state and local agencies. Of particular importance is the FDA in the United States. It has jurisdiction over all of our business and administers requirements covering testing, manufacture, safety, effectiveness, labeling, storage, record keeping, approval, advertising and promotion of our products. Failure to comply with applicable regulatory requirements could, among other things, result in fines; suspensions of regulatory approvals of products; product recalls; delays in product distribution, marketing and sale; and civil or criminal sanctions.

The process of obtaining and maintaining regulatory approvals for pharmaceutical products, and obtaining and maintaining regulatory approvals to market these products for new indications, is lengthy, expensive and uncertain. The manufacturing and marketing of drugs, including our products, are subject to continuing FDA and foreign regulatory review, and later discovery of previously unknown problems with a product, manufacturing process or facility may result in restrictions, including withdrawal of the product from the market. The FDA is permitted to revisit and change its prior determinations and it may change its position with regard to the safety or effectiveness of our products. Even if the FDA approves our products, the FDA is authorized to impose post–marketing requirements such as:

• testing and surveillance to monitor the product and its continued compliance with regulatory requirements,

17

Table of Contents

- submitting products for inspection and, if any inspection reveals that the product is not in compliance, the prohibition of the sale of all products from the same lot,

- suspending manufacturing,

- recalling products, and

- withdrawing marketing clearance.

Even before any formal regulatory action, we could voluntarily decide to cease distribution and sale or recall any of our products if concerns about the safety or effectiveness develop.

To market our products in countries outside of the United States, we and our partners must obtain similar approvals from foreign regulatory bodies. The foreign regulatory approval process includes all of the risks associated with obtaining FDA approval, and approval by the FDA does not ensure approval by the regulatory authorities of any other country.

In its regulation of advertising, the FDA from time to time issues correspondence to pharmaceutical companies alleging that some advertising or promotional practices are false, misleading or deceptive. The FDA has the power to impose a wide array of sanctions on companies for such advertising practices, and the receipt of correspondence from the FDA alleging these practices can result in the following:

- incurring substantial expenses, including fines, penalties, legal fees and costs to comply with the FDA's requirements,

- changes in the methods of marketing and selling products,

- taking FDA-mandated corrective action, which may include placing advertisements or sending letters to physicians rescinding previous advertisements or promotion, and

- disruption in the distribution of products and loss of sales until compliance with the FDA's position is obtained.

In recent years, various legislative proposals have been offered in Congress and in some state legislatures that include major changes in the health care system. These proposals have included price or patient reimbursement constraints on medicines and restrictions on access to certain products. We cannot predict the outcome of such initiatives, and it is difficult to predict the future impact of the broad and expanding legislative and regulatory requirements affecting us.

***We may spend a significant amount of money to obtain FDA and other regulatory approvals, which may never be granted.***

Successful product development in our industry is highly uncertain, and the process of obtaining FDA and other regulatory approvals is lengthy and expensive. Very few research and development projects produce a commercial product. Product candidates that appear promising in the early phases of development may fail to reach the market for a number of reasons, including that the product candidate did not demonstrate acceptable clinical trial results even though it demonstrated positive preclinical trial results, or that the product candidate was not effective in treating a specified condition or illness, or that the FDA did not approve our product candidate for its intended use.

To obtain approval, we must show in preclinical and clinical trials that our products are safe and effective, and the marketing and manufacturing of pharmaceutical products are subject to rigorous testing procedures. The FDA approval processes require substantial time and effort, the FDA continues to modify product development guidelines, and the FDA may not grant approval on a timely basis or at all. Clinical trial data can be the subject of differing interpretation, and the FDA has substantial discretion in the approval process. The FDA may not interpret our clinical data the way we do. The FDA may also require additional clinical data to support approval. The FDA can take between one and two years to review new drug applications, or longer if significant questions arise during the review process. We may not be able to obtain FDA approval to conduct clinical trials or to manufacture and market any of the products we develop, acquire or license. Moreover, the

18

Table of Contents

*SFAS 142.* In July 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangible Assets" (SFAS 142), which addresses the financial accounting and reporting for acquired goodwill and other intangible assets. Under SFAS 142, we are no longer required to amortize goodwill and intangible assets with indefinite lives, but will be required to periodically review these for impairment. Intangible assets determined to have definitive lives will continue to be amortized over their useful lives. SFAS 142 is effective for years ending after December 15, 2001. We adopted SFAS 142 effective January 1, 2002, and reclassified amounts to goodwill that were previously allocated to assembled workforce. Upon adoption, we ceased the amortization of goodwill currently representing expense of $0.7 million per year. Although we have not completed the transactional impairment test, we currently do not expect the results of such test to have a material effect on our financial position or results of operations.

*SFAS 144.* In October 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long–Lived Assets" (SFAS 144), which establishes a single accounting model for the impairment or disposal of long–lived assets, including discontinued operations. SFAS 144 supersedes SFAS 121, "Accounting for the Impairment of Long–Lived Assets and for Long–Lived Assets to be Disposed Of." SFAS 144 requires that long–lived assets to be disposed of by sale be measured at the lower of carrying amount or fair value less cost to sell, whether reported in continuing operations or in discontinued operations. SFAS 144 excludes from the definition of long–lived assets goodwill and other intangibles that are not amortized in accordance with SFAS 142. SFAS 144 also expands the reporting of discontinued operations to include components of an entity that have been or will be disposed of rather than limiting such discontinuance to a segment of a business. SFAS 144 is effective for years ending after December 15, 2001. We adopted SFAS 144 effective January 1, 2002, and it did not have a significant impact on our financial position or results of operations.

## Factors That May Affect Forward–Looking Statements

A wide range of factors could materially affect our future developments and performance, including the following:

- We have experienced operating losses every year since our incorporation and expect to incur additional losses for at least the next few years. Losses are expected to fluctuate from period to period based on timing of product revenues, clinical material purchases, possible acquisitions of new products and technologies, scale–up activities and clinical activities. Therefore, the time for us to reach profitability is uncertain and we may never be able to generate revenue from our products now under development or achieve profitability on a sustained basis.

- There are risks related to the management of the marketing and sales of our products. Our success depends in part on our ability to effectively manage the distribution of our products and to market and sell our products successfully. If Luxíq and OLUX do not sustain market acceptance, our financial condition and results of operations will be adversely affected. Future revenues from sales are uncertain as we are subject to patent risks and competition from new products.

- We do not have manufacturing capabilities, and we receive all of our products (including clinical trial material) from contract manufacturing companies. We currently have no manufacturing facilities nor do we intend to develop such capabilities in the near future. If any of our contract manufacturers were to fail to provide product to us on a timely basis, we might have to delay clinical trials or commercial sales, which would have a material adverse effect on our results of operations.

- We are subject to uncertainties associated with product development and market acceptance. We have several product candidates in clinical or preclinical development. Products under development may not be safe and effective or approved by the FDA, or we may not be able to produce them in commercial quantities at reasonable costs, and the products may not gain satisfactory market acceptance.

- Our future capital uses and requirements depend on numerous factors, including costs associated with the research, development, clinical testing and obtaining regulatory approvals of products in our pipeline; enforcing patent claims and intellectual property rights; acquisition of new products and

33

Table of Contents

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CONNETICS CORPORATION
a Delaware corporation

| By: | /s/ JOHN L. HIGGINS |
|---|---|

John L. Higgins
*Chief Financial Officer*
*Executive Vice President, Finance*
*and Corporate Development*

Date: March 29, 2002

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| **Principal Executive Officer:** | | |
| /s/ THOMAS G. WIGGANS | President, Chief Executive Officer and Director | March 29, 2002 |
| Thomas G. Wiggans | | |
| **Principal Financial and Accounting Officer:** | | |
| /s/ JOHN L. HIGGINS | Chief Financial Officer; Executive Vice President, Finance and Corporate Development | March 29, 2002 |
| John L. Higgins | | |
| **Directors:** | | |
| /s/ ALEXANDER E. BARKAS | Director | March 29, 2002 |
| Alexander E. Barkas | | |
| /s/ EUGENE A. BAUER | Director | March 29, 2002 |
| Eugene A. Bauer | | |
| /s/ JOHN C. KANE | Director | March 29, 2002 |
| John C. Kane | | |
| /s/ THOMAS D. KILEY | Director | March 29, 2002 |
| Thomas D. Kiley | | |
| /s/ GLENN A. OCLASSEN | Director | March 29, 2002 |
| Glenn A. Oclassen | | |
| /s/ LEON E. PANETTA | Director | March 29, 2002 |
| Leon E. Panetta | | |
| /s/ G. KIRK RAAB | Chairman of the Board, Director | March 29, 2002 |
| G. Kirk Raab | | |

EXHIBIT 4

# CONNETICS CORP

3400 W BAYSHORE RD
PALO ALTO, CA 94303
415. 843.2800

# 10–K/A

**FORM 10–K/A**
**Filed on 12/02/2003 – Period: 12/31/2002**
File Number 000–27406



Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## Form 10–K/A

**(Amendment No. 2)**
**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2002**

**Commission file number: 0–27406**

# CONNETICS CORPORATION

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **94–3173928** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3290 West Bayshore Road** | **94303** |
| **Palo Alto, California** | *(zip code)* |
| *(Address of principal executive offices)* | |

Registrant's telephone number, including area code: **(650) 843–2800**

Securities registered pursuant to Section 12(b) of the Act: **None**

Securities registered pursuant to Section 12(g) of the Act:

**Common Stock, $0.001 par value per share**
**Preferred Share Purchase Rights**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. YES ☒  NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b–2). YES ☒  NO ☐

The aggregate market value of the voting stock held by non–affiliates of the registrant was approximately $250,191,000 as of June 28, 2002, based upon the shares outstanding and the closing sale price on the Nasdaq National Market reported for that date. The calculation excludes shares of common stock held by each officer and director and by each person known by the registrant to beneficially own 5% or more of the outstanding common stock in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

There were 31,398,567 shares of registrant's common stock issued and outstanding as of March 3, 2003.

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III of this Report, to the extent that it is not set forth in this Report, is incorporated by reference to the registrant's definitive proxy statement for the Annual Meeting of Stockholders to be held on May 14, 2003.

Table of Contents

effects associated with increasing doses. Phase II trials generally involve administration of a product to a larger group of patients with a particular disease to obtain evidence of the agent's effectiveness against the targeted disease, to further explore risk and side effect issues, and to confirm preliminary data regarding optimal dosage ranges. Phase III trials involve more patients, and often more locations and clinical investigators than the earlier trials. At least one such trial is required for FDA approval to market a drug.

The rate of completion of our clinical trials depends upon, among other factors, the rate at which patients enroll in the study. Patient enrollment is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical sites and the eligibility criteria for the study. Delays in planned patient enrollment may result in increased costs and delays, which could have a material adverse effect on our business. In addition, side effects or adverse events that are reported during clinical trials can delay, impede, or prevent marketing approval.

The Food, Drug and Cosmetic Act includes provisions for accelerating the FDA approval process under certain circumstances. For example, we used the so–called 505(b)(2) application process for both OLUX and Luxíq, which permitted us to satisfy the requirements for a full NDA by relying on published studies or the FDA's findings of safety and effectiveness based on studies in a previously–approved NDA sponsored by another applicant, together with the studies generated on our products. While the FDA evaluation used the same standards of approval as an NDA, the number of clinical trials required to support a 505(b)(2) application, and the amount of information in the application itself, may be substantially less than that required to support an NDA application. The 505(b)(2) process will not be available for all of our other product candidates, and as a result the FDA process may be longer for those product candidates than it was for OLUX and Luxíq.

After we complete the clinical trials of a new drug product, we must file an NDA with the FDA. We must receive FDA clearance before we can commercialize the product, and the FDA may not grant approval on a timely basis or at all. The FDA can take between one and two years to review an NDA, and can take longer if significant questions arise during the review process. In addition, if there are changes in FDA policy while we are in product development, we may encounter delays or rejections that we did not anticipate when we submitted the new drug application for that product. We may not obtain regulatory approval for any products that we develop, even after committing such time and expenditures to the process. Even if regulatory approval of a product is granted, it may entail limitations on the indicated uses for which the product may be marketed.

Our products will also be subject to foreign regulatory requirements governing human clinical trials, manufacturing and marketing approval for pharmaceutical products. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement are similar, but not identical, to FDA requirements, and they vary widely from country to country.

*Manufacturing.* The FDA regulates and inspects equipment, facilities, and processes used in the manufacturing of pharmaceutical products before providing approval to market a product. If after receiving clearance from the FDA, we make a material change in manufacturing equipment, location, or process, we may have to undergo additional regulatory review. We must apply to the FDA to change the manufacturer we use to produce any of our products. We and our contract manufacturers must adhere to cGMP and product–specific regulations enforced by the FDA through its facilities inspection program. The FDA also conducts regular, periodic visits to re–inspect equipment, facilities, and processes after the initial approval. If, as a result of these inspections, the FDA determines that our (or our contract manufacturers') equipment, facilities, or processes do not comply with applicable FDA regulations and conditions of product approval, the FDA may seek sanctions and/or remedies against us, including suspension of our manufacturing operations.

*Post–Approval Regulation.* The FDA continues to review marketed products even after granting regulatory clearances, and if previously unknown problems are discovered or if we fail to comply with the applicable regulatory requirements, the FDA may restrict the marketing of a product or impose the withdrawal of the product from the market, recalls, seizures, injunctions or criminal sanctions. In its regulation of advertising, the FDA from time to time issues correspondence to pharmaceutical companies alleging that

11

Table of Contents

*We cannot sell our current products and product candidates if we do not obtain and maintain governmental approvals.*

Pharmaceutical companies are subject to heavy regulation by a number of national, state and local agencies. Of particular importance is the FDA in the United States. It has jurisdiction over all of our business and administers requirements covering testing, manufacture, safety, effectiveness, labeling, storage, record keeping, approval, advertising and promotion of our products. Failure to comply with applicable regulatory requirements could, among other things, result in fines; suspensions of regulatory approvals of products; product recalls; delays in product distribution, marketing and sale; and civil or criminal sanctions.

The process of obtaining and maintaining regulatory approvals for pharmaceutical products, and obtaining and maintaining regulatory approvals to market these products for new indications, is lengthy, expensive and uncertain. The manufacturing and marketing of drugs, including our products, are subject to continuing FDA and foreign regulatory review, and later discovery of previously unknown problems with a product, manufacturing process or facility may result in restrictions, including withdrawal of the product from the market. The FDA is permitted to revisit and change its prior determinations and it may change its position with regard to the safety or effectiveness of our products. Even if the FDA approves our products, the FDA is authorized to impose post–marketing requirements such as:

- testing and surveillance to monitor the product and its continued compliance with regulatory requirements,

- submitting products for inspection and, if any inspection reveals that the product is not in compliance, the prohibition of the sale of all products from the same lot,

- suspending manufacturing,

- recalling products, and

- withdrawing marketing approval.

Even before any formal regulatory action, we could voluntarily decide to cease distribution and sale or recall any of our products if concerns about the safety or effectiveness develop.

To market our products in countries outside of the United States, we and our partners must obtain similar approvals from foreign regulatory bodies. The foreign regulatory approval process includes all of the risks associated with obtaining FDA approval, and approval by the FDA does not ensure approval by the regulatory authorities of any other country.

In its regulation of advertising, the FDA from time to time issues correspondence to pharmaceutical companies alleging that some advertising or promotional practices are false, misleading or deceptive. The FDA has the power to impose a wide array of sanctions on companies for such advertising practices, and the receipt of correspondence from the FDA alleging these practices can result in the following:

- incurring substantial expenses, including fines, penalties, legal fees and costs to comply with the FDA's requirements,

- changes in the methods of marketing and selling products,

- taking FDA–mandated corrective action, which may include placing advertisements or sending letters to physicians rescinding previous advertisements or promotion, and

- disruption in the distribution of products and loss of sales until compliance with the FDA's position is obtained.

In recent years, various legislative proposals have been offered in Congress and in some state legislatures that include major changes in the health care system. These proposals have included price or patient reimbursement constraints on medicines and restrictions on access to certain products. We cannot predict the outcome of such initiatives, and it is difficult to predict the future impact of the broad and expanding legislative and regulatory requirements affecting us.

19

Table of Contents

*We may spend a significant amount of money to obtain FDA and other regulatory approvals, which may never be granted. Failure to obtain such regulatory approvals could adversely affect our prospects for future revenue growth.*

Successful product development in our industry is highly uncertain, and the process of obtaining FDA and other regulatory approvals is lengthy and expensive. Very few research and development projects produce a commercial product. Product candidates that appear promising in the early phases of development may fail to reach the market for a number of reasons, including that the product candidate did not demonstrate acceptable clinical trial results even though it demonstrated positive preclinical trial results, or that the product candidate was not effective in treating a specified condition or illness, or that the FDA did not approve our product candidate for its intended use.

To obtain approval, we must show in preclinical and clinical trials that our products are safe and effective. The FDA approval processes require substantial time and effort, the FDA continues to modify product development guidelines, and the FDA may not grant approval on a timely basis or at all. Clinical trial data can be the subject of differing interpretation, and the FDA has substantial discretion in the approval process. The FDA may not interpret our clinical data the way we do. The FDA may also require additional clinical data to support approval. The FDA can take between one and two years to review new drug applications, or longer if significant questions arise during the review process. We may not be able to obtain FDA approval to conduct clinical trials or to manufacture and market any of the products we develop, acquire or license. Moreover, the costs to obtain approvals could be considerable and the failure to obtain or delays in obtaining an approval could have a significant negative effect on our business.

*If OLUX and Luxíq do not sustain market acceptance, our revenues will not be predictable and may not cover our operating expenses.*

Our future revenues will depend upon dermatologist and patient acceptance of OLUX and Luxíq. Factors that could affect acceptance of OLUX and Luxíq include:

- satisfaction with existing alternative therapies,

- the effectiveness of our sales and marketing efforts,

- the cost of the product as compared with alternative therapies, and

- undesirable and unforeseeable side effects.

We cannot predict the potential long–term patient acceptance of, or the effects of competition and managed health care on, sales of either product.

*We rely on third parties to conduct clinical trials for our products, and those third parties may not perform satisfactorily. Failure of those third parties to perform satisfactorily may significantly delay commercialization of our products, increase expenditures and negatively affect our prospects for future revenue growth.*

We do not have the ability to independently conduct clinical studies, and we rely on third parties to perform this function. If these third parties do not perform satisfactorily, we may not be able to locate acceptable replacements or enter into favorable agreements with them, if at all. If we are unable to rely on clinical data collected by others, we could be required to repeat, extend the duration of, or increase the size of, clinical trials, which could significantly delay commercialization and require significantly greater expenditures.

*If we are unable to develop new products, our expenses may continue to exceed our revenue indefinitely, without any return on the investment.*

We currently have a variety of new products in various stages of research and development and are working on possible improvements, extensions and reformulations of some existing products. These research and development activities, as well as the clinical testing and regulatory approval process, which must be completed before commercial quantities of these developments can be sold, will require significant commitments of personnel and financial resources. Delays in the research, development, testing or approval processes will cause a corresponding delay in revenue generation from those products.

20

Table of Contents

We re–evaluate our research and development efforts regularly to assess whether our efforts to develop a particular product or technology are progressing at a rate that justifies our continued expenditures. On the basis of these re–evaluations, we have abandoned in the past, and may abandon in the future, our efforts on a particular product or technology. Products we are researching or developing may never be successfully released to the market and, regardless of whether they are ever released to the market, the expense of such processes will have already been incurred.

*If we do not successfully integrate new products into our business, we may not be able to sustain revenue growth and we may not be able to compete effectively.*

When we acquire or develop new products and product lines, we must be able to integrate those products and product lines into our systems for marketing, sales and distribution. If these products or product lines are not integrated successfully, the potential for growth is limited. The new products we acquire or develop could have channels of distribution, competition, price limitations or marketing acceptance different from our current products. As a result, we do not know whether we will be able to compete effectively and obtain market acceptance in any new product categories. A new product may require us to significantly increase our sales force and incur additional marketing, distribution and other operational expenses. These additional expenses could negatively affect our gross margins and operating results. In addition, many of these expenses could be incurred prior to the actual distribution of new products. Because of this timing, if the new products are not accepted by the market, or if they are not competitive with similar products distributed by others, the ultimate success of the acquisition or development could be substantially diminished.

*We rely on the services of a single company to distribute our products to our customers. A delay or interruption in the distribution of our products could negatively impact our business.*

All of our product distribution activities are handled by SPS. SPS stores and distributes our products from a warehouse in Tennessee. Any delay or interruption in the process or in payment could result in a delay delivering product to our customers, which could have a material effect on our business.

*Our sales depend on payment and reimbursement from third party payors, and if they reduce or refuse payment or reimbursement, the use and sales of our products will suffer, we may not increase our market share, and our revenues and profitability will suffer.*

Our products' commercial success is dependent, in part, on whether third–party reimbursement is available for the use of our products by hospitals, clinics, doctors and patients. Third–party payors include state and federal governments, under programs such as Medicare and Medicaid, managed care organizations, private insurance plans and health maintenance organizations. Over 70% of the U.S. population now participates in some version of managed care. Because of the size of the patient population covered by managed care organizations, it is important to our business that we market our products to them and to the pharmacy benefit managers that serve many of these organizations. Payment or reimbursement of only a portion of the cost of our prescription products could make our products less attractive, from a net–cost perspective, to patients, suppliers and prescribing physicians. Managed care organizations and other third–party payors try to negotiate the pricing of medical services and products to control their costs. Managed care organizations and pharmacy benefit managers typically develop formularies to reduce their cost for medications. Formularies can be based on the prices and therapeutic benefits of the available products. Due to their lower costs, generics are often favored. The breadth of the products covered by formularies varies considerably from one managed care organization to another, and many formularies include alternative and competitive products for treatment of particular medical conditions. Exclusion of a product from a formulary can lead to its sharply reduced usage in the managed care organization patient population. If our products are not included within an adequate number of formularies or adequate reimbursement levels are not provided, or if those policies increasingly favor generic products, our market share and gross margins could be negatively affected, as could our overall business and financial condition.

To the extent that our products are purchased by patients through a managed care group with which we have a

21

**Table of Contents**

The decrease in license revenue in 2001 from 2000 was in part due to our decision in May 2001 to reduce our investment in the development of relaxin. Through the end of 2002, we had not entered into any new licensing opportunities or other strategic alternatives for relaxin. Effective April 1, 2000 we assigned to InterMune our remaining rights and obligations under a license with Genentech for Actimmune and the corresponding supply agreement. In exchange, InterMune paid us approximately $5.2 million in 2000. InterMune paid an additional $942,000 by the end of March 2001, which was offset by related product rebates and chargebacks of $171,000. In August 2002, we entered into an agreement with InterMune to terminate our exclusive option for certain rights in the dermatology field in exchange for an up–front, non–refundable payment of $350,000. We recognized the full amount of this revenue in 2002.

We anticipate that product revenue will increase in 2003 due to continued sales growth of OLUX and Luxíq. We also anticipate that license and contract revenue will decrease, as several revenue streams from 2002 will not recur in 2003, while royalty revenue is expected to remain about the same in 2003. Beyond 2003, we expect license revenue to fluctuate significantly depending on whether we enter into additional collaborations, when and whether we or our partners achieve milestones under existing agreements, and the timing of any new business opportunities that we may identify.

*Cost of Product Revenues*

Our cost of product revenues includes the third party costs of manufacturing OLUX, Luxíq, Ridaura (until April 2001), and Actimmune (until April 2000), royalty payments based on a percentage of our product revenues and product freight and distribution costs from SPS, the third party that handles all of our product distribution activities. We recorded cost of product revenues of $4.2 million in 2002 compared to $3.1 million in 2001 and $3.9 million in 2000. The increase in total cost of product revenues in 2002 was the result of an increase in sales volumes. On a percentage basis, cost of product revenues decreased to 8.8% in 2002 from 10.1% in 2001. When we acquired Connetics Australia, we began to eliminate all intercompany transactions in consolidation, which included our royalty expense and Connetics Australia's related royalty income. The decrease in cost of product revenues from 2001 to 2002 on a percentage basis was primarily due to the elimination of intercompany royalties of $1.7 million, partially offset by an average increase in the cost per unit of our products of approximately 6%. The decrease in cost of product revenues from 2000 to 2001 was primarily due to the elimination of intercompany royalties of $1.6 million, as well as a change in product mix as a result of discontinuing sales of Ridaura, which had higher manufacturing costs than our other products. We sold the rights to Ridaura to Prometheus in April 2001. We anticipate a slight increase in the cost of product revenues in 2003, on a per unit basis as we shift the production of our products to domestic suppliers.

*Research and Development*

Research and development expenses include costs of personnel to support our research and development activities, costs of preclinical studies, costs of conducting our clinical trials, such as clinical investigator fees, monitoring costs, data management and drug supply costs, external research programs, and an allocation of facilities costs, salaries and benefits, and overhead costs such as rent, supplies and utilities. Research and development expenses increased in 2002 to $25.8 million, compared to $19.2 million in 2001 and $21.9 million in 2000.

In 2002, our research and development expenses primarily consisted of:

- $7.4 million on preclinical and clinical research in the development of new dermatology products,

- $5.1 million on quality assurance and quality control in the enhancement of existing dermatology products,

- $3.9 million on the optimization of manufacturing and process development for existing dermatology products,

- $2.7 million on manufacturing, process development and optimization of dermatology products under development,

29

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Connetics Corporation
a Delaware corporation

By: /s/ JOHN L. HIGGINS
_____

John L. Higgins
*Chief Financial Officer*
*Executive Vice President, Finance*
*and Corporate Development*

Date: December 2, 2003

# EXHIBIT 5

# CONNETICS CORP

3400 W BAYSHORE RD
PALO ALTO, CA 94303
415. 843.2800

# 10–K

**FORM 10–K**
**Filed on 03/15/2004 – Period: 12/31/2003**
File Number 000–27406



Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Fiscal Year Ended December 31, 2003**

**Commission File Number 0-27406**

# CONNETICS CORPORATION

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **94-3173928** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3290 West Bayshore Road** | |
| **Palo Alto, California** | **94303** |
| *(Address of principal executive offices)* | *(zip code)* |

Registrant's telephone number, including area code: **(650) 843-2800**
Securities registered pursuant to Section 12(b) of the Act: **None**
Securities registered pursuant to Section 12(g) of the Act:

**Common Stock, $0.001 par value per share**
**Preferred Share Purchase Rights**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. YES ☒  NO☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). YES ☒  NO ☐

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $371,000,000 as of June 30, 2003, based upon the shares outstanding and the closing sale price on the Nasdaq National Market reported for that date. The calculation excludes shares of common stock held by each officer and director and by each person known by the registrant to beneficially own 5% or more of the outstanding common stock as of that date, in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

There were 35,202,167 shares of registrant's common stock issued and outstanding as of March 9, 2004.

### DOCUMENTS INCORPORATED BY REFERENCE

The information required by Part III of this Report, to the extent that it is not set forth in this Report, is incorporated by reference to the registrant's definitive proxy statement for the Annual Meeting of Stockholders to be held on May 7, 2004.

Table of Contents

### Forward–Looking Statements

*Our disclosure and analysis in this Report, in other reports that we file with the Securities and Exchange Commission, in our press releases and in public statements of our officers contain forward–looking statements within the meaning of Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. Forward–looking statements give our current expectations or forecasts of future events. Forward–looking statements may turn out to be wrong. They can be affected by inaccurate assumptions or by known or unknown risks and uncertainties. Many factors mentioned in this Report — for example, governmental regulation and competition in our industry — will be important in determining future results. No forward–looking statement can be guaranteed, and actual results may vary materially from those anticipated in any forward–looking statement.*

*You can identify forward–looking statements by the fact that they do not relate strictly to historical or current events. They use words such as "anticipate," "estimate," "expect," "will," "may," "intend," "plan," "believe" and similar expressions in connection with discussion of future operating or financial performance. These include statements relating to future actions, prospective products or product approvals, future performance or results of current and anticipated products, sales efforts, expenses, the outcome of contingencies such as legal proceedings, and financial results.*

*Although we believe that our plans, intentions and expectations reflected in these forward–looking statements are reasonable, we may not achieve these plans, intentions or expectations. Forward–looking statements in this Report include, but are not limited to, those relating to the commercialization of our currently marketed products, the progress of our product development programs, developments with respect to clinical trials and the regulatory approval process, developments related to acquisitions, and developments relating to our sales and marketing capabilities. Actual results, performance or achievements could differ materially from those contemplated, expressed or implied by the forward–looking statements contained in this Report. In particular, this Report sets forth important factors that could cause actual results to differ materially from our forward–looking statements. These factors are not intended to represent a complete list of the general or specific factors that may affect us. It should be recognized that other factors, including general economic factors and business strategies, and other factors not currently known to us, may be significant, now or in the future, and the factors set forth in this Report may affect us to a greater extent than indicated. All forward–looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements set forth in this Report. Except as required by law, we do not undertake any obligation to update any forward–looking statement, whether as a result of new information, future events or otherwise.*

### PART I

### Item 1. Business

### THE COMPANY

*References in this Report to "Connetics," "the Company," "we," "our" and "us" refer to Connetics Corporation, a Delaware corporation, and its consolidated subsidiaries. Unless the context specifically requires otherwise, "we" includes Connetics Australia Pty Ltd. Connetics was incorporated in Delaware in February 1993, and our principal executive offices are located at 3290 West Bayshore Road, Palo Alto, California 94303. Our telephone number is (650) 843–2800. Connetics®, Luxíq®, OLUX® and Extina® are registered trademarks, and VersaFoam™, Actiza™, Liquipatch™, and the seven interlocking "C's" design are trademarks, of Connetics. Velac® is a registered trademark of Yamanouchi Europe B.V. Soriatane® is a registered trademark of Hoffmann–La Roche Inc., and was assigned to us effective March 4, 2004. All other trademarks or service marks appearing in this Report are the property*

1

**Table of Contents**
**OUR PRODUCTS**

**OLUX Foam**

OLUX is a foam formulation of clobetasol propionate, one of the most widely prescribed super high–potency topical steroids. OLUX has been proven to deliver rapid and effective results for scalp and non–scalp psoriasis. In fact, according to Physician Global Assessments, significantly more patients were completely clear or almost clear after two weeks of treatment. Topical steroids are used to treat a range of dermatoses, for which approximately 24 million steroid prescriptions are written annually. In 2003, OLUX and Luxíq comprised 7.3% of the branded prescriptions in these combined topical steroid markets, corresponding to 17% of the retail annual branded sales for 2003. While the topical steroid market is highly fragmented, we believe that OLUX is the number one branded super–high potency topical steroid prescribed by U.S. dermatologists.

We began selling OLUX in November 2000 for the short–term, topical treatment of inflammatory and pruritic manifestations of moderate to severe corticosteroid–responsive scalp dermatoses. In December 2002, the FDA approved our supplemental New Drug Application, or sNDA, to market OLUX for the treatment of mild to moderate non–scalp psoriasis.

A study conducted at Stanford University School of Medicine compared the safety and effectiveness, patient satisfaction, quality of life, and cost–effectiveness of two clobetasol regimens in the treatment of psoriasis. In a single–blind design, 29 patients were randomized to receive either clobetasol foam on the skin and scalp or a combination of clobetasol cream on the skin and lotion on the scalp for 14 days. Severity of disease and quality of life were evaluated using several tools, including the Psoriasis Area Severity Index, or PASI, and the Dermatology Life Quality Index. The trial showed that the increased improvement in clinical severity, decreased application time, and increased perception of relative efficacy, combined with similar cost of treatment, suggest that OLUX is a better choice than cream and lotion for some patients. This study supports our belief that improved patient compliance with the foam will yield better treatment results than the same active ingredient in other formulations.

Mipharm S.p.A., which holds a license to market OLUX in Italy, filed a Marketing Authorization Application, or MAA, in 2002 for OLUX with the Medicines and Healthcare Products Regulatory Agency, known as MHRA, in the United Kingdom. The MHRA granted marketing authorization for OLUX in June 2003. The approval grants the right to market and launch OLUX in the U.K. Following MHRA approval, updated MAAs were submitted to each of the EU Concerned Member States, using a process called the mutual recognition process, or MRP. The MRP was completed in December 2003 with all Concerned Member States granting approval for OLUX except France. National licenses are expected to be issued in the first half of 2004. We will receive milestone payments and royalties from Mipharm on future product sales in the Italian territory. We retain marketing and distribution rights for the rest of Europe and are seeking commercial partners outside the territory licensed to Mipharm. We have signed a letter of intent with a third party for rights to market OLUX in all of Europe excluding the U.K. and the territory licensed to Mipharm.

**Luxíq Foam**

Luxíq is a foam formulation of betamethasone valerate, a mid–potency topical steroid prescribed for the treatment of mild–to–moderate steroid–responsive scalp dermatoses such as psoriasis, eczema and seborrheic dermatitis. We have been selling Luxíq commercially in the United States since 1999. In a clinical trial, a majority of patients were judged to be almost clear or completely clear (90–100%) of scalp psoriasis at the end of treatment as judged by Investigator's Global Assessment of response. Luxíq also significantly reduced scaling, erythema, and plaque thickness, as compared with betamethasone valerate

4

Table of Contents

often more locations and clinical investigators than the earlier trials. At least one such trial is required for FDA approval to market a drug.

The rate of completion of our clinical trials depends upon, among other factors, the rate at which patients enroll in the study. Patient enrollment is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical sites and the eligibility criteria for the study. Delays in planned patient enrollment may result in increased costs and delays, which could have a material adverse effect on our business. In addition, side effects or adverse events that are reported during clinical trials can delay, impede, or prevent marketing approval.

The Food, Drug and Cosmetic Act includes provisions for accelerating the FDA approval process under certain circumstances. For example, we used the so–called 505(b)(2) application process for OLUX, Luxíq, Extina and Actiza, which permitted us in each case to satisfy the requirements for a full NDA by relying on published studies or the FDA's findings of safety and effectiveness based on studies in a previously–approved NDA sponsored by another applicant, together with the studies generated on our products. While the FDA evaluation used the same standards of approval as an NDA, the number of clinical trials required to support a 505(b)(2) application, and the amount of information in the application itself, may be substantially less than that required to support an NDA application. The 505(b)(2) process will not be available for all of our other product candidates, and as a result the FDA process may be longer for our future product candidates than it has been for our products to date.

After we complete the clinical trials of a new drug product, we must file an NDA with the FDA. We must receive FDA clearance before we can commercialize the product, and the FDA may not grant approval on a timely basis or at all. The FDA can take between one and two years to review an NDA, and can take longer if significant questions arise during the review process. In addition, if there are changes in FDA policy while we are in product development, we may encounter delays or rejections that we did not anticipate when we submitted the new drug application for that product. We may not obtain regulatory approval for any products that we develop, even after committing such time and expenditures to the process. Even if regulatory approval of a product is granted, it may entail limitations on the indicated uses for which the product may be marketed.

Our products will also be subject to foreign regulatory requirements governing human clinical trials, manufacturing and marketing approval for pharmaceutical products. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement are similar, but not identical, to FDA requirements, and they vary widely from country to country.

*Manufacturing.* The FDA regulates and inspects equipment, facilities, and processes used in the manufacturing of pharmaceutical products before providing approval to market a product. If after receiving clearance from the FDA, we make a material change in manufacturing equipment, location, or process, we may have to undergo additional regulatory review. We must apply to the FDA to change the manufacturer we use to produce any of our products. We and our contract manufacturers must adhere to cGMP and product–specific regulations enforced by the FDA through its facilities inspection program. The FDA also conducts regular, periodic visits to re–inspect equipment, facilities, and processes after the initial approval. If, as a result of these inspections, the FDA determines that our (or our contract manufacturers') equipment, facilities, or processes do not comply with applicable FDA regulations and conditions of product approval, the FDA may seek sanctions and/or remedies against us, including suspension of our manufacturing operations.

*Post–Approval Regulation.* The FDA continues to review marketed products even after granting regulatory clearances, and if previously unknown problems are discovered or if we fail to comply with the applicable regulatory requirements, the FDA may restrict the marketing of a product or impose the

14

Table of Contents

California and Australia locations, and lower amounts for each of our contract manufacturers, may not completely mitigate the harm to our business from the interruption of the manufacturing of products. The loss of a manufacturer could still have a negative effect on our sales, margins and market share, as well as our overall business and financial results.

*If our supply of finished products is interrupted, our ability to maintain our inventory levels could suffer and future revenues may be delayed.*

We try to maintain inventory levels that are no greater than necessary to meet our current projections. Any interruption in the supply of finished products could hinder our ability to timely distribute finished products. If we are unable to obtain adequate product supplies to satisfy our customers' orders, we may lose those orders and our customers may cancel other orders and stock and sell competing products. This in turn could cause a loss of our market share and negatively affect our revenues.

Supply interruptions may occur and our inventory may not always be adequate. Numerous factors could cause interruptions in the supply of our finished products including shortages in raw material required by our manufacturers, changes in our sources for manufacturing, our failure to timely locate and obtain replacement manufacturers as needed and conditions affecting the cost and availability of raw materials.

*We cannot sell our current products and product candidates if we do not obtain and maintain governmental approvals.*

Pharmaceutical companies are subject to heavy regulation by a number of national, state and local agencies. Of particular importance is the FDA in the United States. The FDA has jurisdiction over all of our business and administers requirements covering testing, manufacture, safety, effectiveness, labeling, storage, record keeping, approval, advertising and promotion of our products. If we fail to comply with applicable regulatory requirements, we could be subject to, among other things, fines, suspensions of regulatory approvals of products, product recalls, delays in product distribution, marketing and sale, and civil or criminal sanctions.

The process of obtaining and maintaining regulatory approvals for pharmaceutical products, and obtaining and maintaining regulatory approvals to market these products for new indications, is lengthy, expensive and uncertain. The manufacturing and marketing of drugs, including our products, are subject to continuing FDA and foreign regulatory review, and later discovery of previously unknown problems with a product, manufacturing process or facility may result in restrictions, including withdrawal of the product from the market. The FDA is permitted to revisit and change its prior determinations and it may change its position with regard to the safety or effectiveness of our products. Even if the FDA approves our products, the FDA is authorized to impose post-marketing requirements such as:

- testing and surveillance to monitor the product and its continued compliance with regulatory requirements,

- submitting products for inspection and, if any inspection reveals that the product is not in compliance, prohibiting the sale of all products from the same lot,

- suspending manufacturing,

- recalling products, and

- withdrawing marketing approval.

23

Table of Contents

Even before any formal regulatory action, we could voluntarily decide to cease distribution and sale or recall any of our products if concerns about safety or effectiveness develop.

To market our products in countries outside of the United States, we and our partners must obtain approvals from foreign regulatory bodies. The foreign regulatory approval process includes all of the risks associated with obtaining FDA approval, and approval by the FDA does not ensure approval by the regulatory authorities of any other country.

In its regulation of advertising, the FDA from time to time issues correspondence to pharmaceutical companies alleging that some advertising or promotional practices are false, misleading or deceptive. The FDA has the power to impose a wide array of sanctions on companies for such advertising practices, and if we were to receive correspondence from the FDA alleging these practices we might be required to:

- incur substantial expenses, including fines, penalties, legal fees and costs to comply with the FDA's requirements,

- change our methods of marketing and selling products,

- take FDA-mandated corrective action, which could include placing advertisements or sending letters to physicians rescinding previous advertisements or promotion, and

- disrupt the distribution of products and stop sales until we are in compliance with the FDA's position.

*We may spend a significant amount of money to obtain FDA and other regulatory approvals, which may never be granted. Failure to obtain such regulatory approvals could adversely affect our prospects for future revenue growth.*

Successful product development in our industry is highly uncertain, and the process of obtaining FDA and other regulatory approvals is lengthy and expensive. Very few research and development projects produce a commercial product. Product candidates that appear promising in the early phases of development may fail to reach the market for a number of reasons, including that the product candidate did not demonstrate acceptable clinical trial results even though it demonstrated positive preclinical trial results, or that the product candidate was not effective in treating a specified condition or illness.

To obtain approval, we must show in preclinical and clinical trials that our products are safe and effective. The FDA approval processes require substantial time and effort, the FDA continues to modify product development guidelines, and we may not be able to obtain FDA approval to conduct clinical trials or to manufacture and market any of the products we develop, acquire or license. Clinical trial data can be the subject of differing interpretation, and the FDA has substantial discretion in the approval process. The FDA may not interpret our clinical data the way we do. The FDA may also require additional clinical data to support approval. The FDA can take between one and two years to review new drug applications, or longer if significant questions arise during the review process. Moreover, the costs to obtain approvals could be considerable and the failure to obtain or delays in obtaining an approval could have a significant negative effect on our business.

24

Table of Contents

**SUBSEQUENT EVENTS**

On January 5, 2004, we reached an agreement with S.C. Johnson to terminate an existing license agreement pursuant to which we licensed to S.C. Johnson the rights to a concentrated aerosol spray that is marketed in the U.S. and internationally. On a consolidated basis, in 2003, we received $7.0 million in royalties in connection with this agreement, which included a one–time royalty payment of $2.9 million. In connection with the termination of the agreement, we will cease recognizing royalties after the first quarter of 2004, and S.C. Johnson will have a fully–paid up license to the technology.

On February 9, 2004, we announced that we had entered into a binding purchase agreement with Roche to acquire exclusive U.S. rights to Soriatane–brand acitretin, an approved oral medicine for the treatment of severe psoriasis in adults. The transaction closed on March 4, 2004. Under the terms of the purchase agreement, we paid Roche a total of $123 million in cash at the closing to acquire Soriatane. We also agreed to assume certain liabilities in connection with returns, rebates and chargebacks, and we are obligated to buy Roche's existing inventory within thirty days after the closing of the acquisition.

On February 6, 2004, in connection with the Soriatane acquisition, we entered into a $30 million credit facility provided by Goldman, Sachs Credit Partners L.P. We formally terminated the credit facility on February 25, 2004, without incurring any indebtedness under the facility.

On February 13, 2004, we completed a private placement of 3.0 million shares of our common stock to accredited institutional investors at a price of $20.25 per share, for net proceeds of approximately $57.1 million without giving effect to certain offering costs. We used a portion of the net proceeds to pay for the acquisition of exclusive U.S. rights to Soriatane, and we intend to use the balance for general corporate purposes, including working capital.

**CRITICAL ACCOUNTING POLICIES AND ESTIMATES**

The fundamental objective of financial reporting is to provide useful information that allows a reader to comprehend our business activities. To aid in that understanding, we have identified our "critical accounting policies and estimates" which are used in preparing the consolidated financial statements. These policies have the potential to have a more significant impact on our financial statements, either because of the significance of the financial statement item to which they relate, or because they require us to make estimates and judgments due to the uncertainty involved in measuring, at a specific point in time, events that are continuous in nature.

*Revenue Recognition – Reserves for Discounts, Returns, Rebates and Chargebacks.*

We recognize product revenue net of allowances for estimated discounts, returns, rebates and chargebacks. We allow a discount for prompt payment, and we estimate other allowances based primarily on our past experience. We also consider the volume and price mix of products in the retail channel, trends in distributor inventory, economic trends that might impact patient demand for our products (including competitive environment), current arrangements with managed care organizations, the economic value of the rebates being offered and other factors. In the past, actual discounts, returns, rebates and chargebacks have not generally exceeded our reserves. However, actual returns, rebates and chargebacks in the future period are inherently uncertain. Our revenue reserves are approximately 14% of our gross product revenues. If actual returns, rebates and chargebacks are significantly greater than the reserves we have established, the actual results would decrease our reported revenue; conversely, if actual returns, rebates and chargebacks are significantly less than our reserves, this would increase our reported revenue. If we changed our assumptions and estimates, our revenue reserves would change, which would impact the net revenue we report.

39

Table of Contents

We are obligated to accept from customers the return of pharmaceuticals that have reached their expiration date. As a practice, we avoid shipping product that has less than ten months dating. We monitor inventories in the distributor channel to help us assess the rate of return.

We establish and maintain reserves for amounts payable by us to managed care organizations and state Medicaid programs. Generally, we pay managed care organizations and state Medicaid programs a rebate on the prescriptions filled that are covered by the respective programs. We determine the reserve amount at the time of sale based on our best estimate of the expected prescription fill rate to managed care and state Medicaid patients, adjusted to reflect historical experience and known changes in the factors that impact such reserves.

*Revenue Recognition – Contract Revenue*

We record contract revenue for research and development as it is earned based on the performance requirements of the contract. We recognize royalty revenue in the quarter in which the royalty payment is either received from the licensee or may be reasonably estimated, which is typically one quarter following the related sale by the licensee. We recognize non–refundable contract fees for which no further performance obligations exist, and for which we have no continuing involvement, on the earlier of when the payments are received or when collection is assured. We recognize revenue from non–refundable upfront license fees ratably over the period in which we have continuing development obligations when, at the time the agreement is executed, there remains significant risk due to the incomplete state of the product's development. Revenue associated with substantial "at risk" performance milestones, as defined in the respective agreements, is recognized based upon the achievement of the milestones. We recognize revenue under R&D cost reimbursement contracts as the related costs are incurred.

*Goodwill, Purchased Intangibles and Other Long–Lived Assets – Impairment Assessments*

We make judgments about the recoverability of goodwill, purchased intangible assets and other long–lived assets whenever events or changes in circumstances indicate an other–than–temporary impairment in the remaining value of the assets recorded on our balance sheet. To judge the fair value of long–lived assets, we make various assumptions about the value of the business that the asset relates to and typically estimate future cash flows to be generated by the asset or, in the case of goodwill, the enterprise. This may include assumptions about future prospects for the asset and typically involves computation of the estimated future cash flows to be generated. Based on these judgments and assumptions, we determine whether we need to take an impairment charge to reduce the value of the asset stated on our balance sheet to reflect its actual fair value. Judgments and assumptions about future values and remaining useful lives are complex and often subjective. They can be affected by a variety of factors, including external factors such as changes in our business strategy and our internal forecasts. Although we believe the judgments and assumptions we have made in the past have been reasonable and appropriate, different judgments and assumptions could materially impact our reported financial results. More conservative assumptions of the anticipated future benefits from these assets would result in greater impairment charges, which would decrease net income and result in lower asset values on our balance sheet. Conversely, less conservative assumptions would result in smaller impairment charges and higher asset values. For more details about how we make these judgments, see *Note 2* in our *Notes to Consolidated Financial Statements*.

40

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Connetics Corporation
a Delaware corporation

By:        /s/ John L. Higgins
_____

John L. Higgins
*Chief Financial Officer*
*Executive Vice President, Finance*
*and Corporate Development*

Date: March 11, 2004

Each person whose signature appears below constitutes and appoints Katrina J. Church and John L. Higgins, jointly and severally, his or her attorneys–in–fact and agents, each with the power of substitution, for him or her and in his or her name, place or stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10–K, and to file the same, with exhibits and other documents in connection therewith, with the Securities and Exchange Commission, granting to each attorney–in–fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully as he or she might or could do in person, and ratifying and confirming all that the attorneys–in–fact and agents, or his or her substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| **Principal Executive Officer:** | | |
| /s/ Thomas G. Wiggans | President, Chief Executive Officer and Director | March 11, 2004 |
| _____ | | |
| Thomas G. Wiggans | | |
| **Principal Financial and Accounting Officer:** | | |
| /s/ John L. Higgins | Chief Financial Officer; Executive Vice President, Finance and Corporate Development | March 11, 2004 |
| _____ | | |
| John L. Higgins | | |

56

**Table of Contents**

| Directors: | Signature | Title | Date |
|---|---|---|---|
| | /s/ Alexander E. Barkas | Director | March 11, 2004 |
| | Alexander E. Barkas | | |
| | /s/ Eugene A. Bauer | Director | March 11, 2004 |
| | Eugene A. Bauer | | |
| | /s/ R. Andrew Eckert | Director | March 11, 2004 |
| | R. Andrew Eckert | | |
| | /s/ Denise M. Gilbert | Director | March 11, 2004 |
| | Denise M. Gilbert | | |
| | /s/ John C. Kane | Director | March 11, 2004 |
| | John C. Kane | | |
| | /s/ Thomas D. Kiley | Director | March 11, 2004 |
| | Thomas D. Kiley | | |
| | /s/ Leon E. Panetta | Director | March 11, 2004 |
| | Leon E. Panetta | | |
| | /s/ G. Kirk Raab | Chairman of the Board | March 11, 2004 |
| | G. Kirk Raab | | |

57

# EXHIBIT 6

# CONNETICS CORP

3400 W BAYSHORE RD
PALO ALTO, CA 94303
415. 843.2800

# 10–K

**FORM 10–K**
**Filed on 03/16/2005 -- Period: 12/31/2004**
File Number 000–27406



Table of Contents

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10–K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the Fiscal Year Ended December 31, 2004
Commission File Number 0–27406

# CONNETICS CORPORATION

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **94–3173928** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3160 Porter Drive** | **94304** |
| **Palo Alto, California** | *(zip code)* |
| *(Address of principal executive offices)* | |

Registrant's telephone number, including area code:
**(650) 843–2800**
**Securities registered pursuant to Section 12(b) of the Act:**
**None**
**Securities registered pursuant to Section 12(g) of the Act:**
**Common Stock, $0.001 par value per share**
**Preferred Share Purchase Rights**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K.    ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b–2 of the Act).    Yes ☑    No ☐

The aggregate market value of the common stock held by non–affiliates of the registrant was approximately $473,000,000 as of June 30, 2004 based upon the shares outstanding and the closing sale price on the Nasdaq National Market reported for that date. The calculation excludes shares of common stock held by each officer and director of the registrant and by each person known by the registrant to beneficially own more than 5% of the registrant's outstanding common stock as of that date, in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

There were 35,926,559 shares of registrant's common stock issued and outstanding as of February 28, 2005.

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III of this Report, to the extent that it is not set forth in this Report, is incorporated by reference to the registrant's definitive proxy statement for the Annual Meeting of Stockholders to be held on April 22, 2005.

**Table of Contents**

### Forward–Looking Statements

*Our disclosure and analysis in this Report, in other reports that we file with the Securities and Exchange Commission, in our press releases and in public statements of our officers contain forward–looking statements within the meaning of Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. Forward–looking statements give our current expectations or forecasts of future events. Forward–looking statements may turn out to be wrong. They can be affected by inaccurate assumptions or by known or unknown risks and uncertainties. Many factors mentioned in this Report — for example, governmental regulation and competition in our industry — will be important in determining future results. No forward–looking statement can be guaranteed, and actual results may vary materially from those anticipated in any forward–looking statement.*

*You can identify forward–looking statements by the fact that they do not relate strictly to historical or current events. They use words such as "anticipate," "estimate," "expect," "will," "may," "intend," "plan," "believe" and similar expressions in connection with discussion of future operating or financial performance. These include statements relating to future actions, prospective products or product approvals, future performance or results of current and anticipated products, sales efforts, expenses, the outcome of contingencies such as legal proceedings, and financial results.*

*Although we believe that our plans, intentions and expectations reflected in these forward–looking statements are reasonable, we may not achieve these plans, intentions or expectations. Forward–looking statements in this Report include, but are not limited to, those relating to the commercialization of our currently marketed products, the progress of our product development programs, developments with respect to clinical trials and the regulatory approval process, and developments relating to our sales and marketing capabilities. Actual results, performance or achievements could differ materially from those contemplated, expressed or implied by the forward–looking statements contained in this Report. In particular, this Report sets forth important factors that could cause actual results to differ materially from our forward–looking statements. These and other factors, including general economic factors and business strategies, and other factors not currently known to us, may be significant, now or in the future, and the factors set forth in this Report may affect us to a greater extent than indicated. All forward–looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements set forth in this Report and in other documents that we file from time to time with the Securities and Exchange Commission including the Quarterly Reports on Form 10–Q to be filed in 2005. Except as required by law, we do not undertake any obligation to update any forward–looking statement, whether as a result of new information, future events or otherwise.*

Table of Contents

PART I

## Item 1.    Business
### THE COMPANY

*References in this Report to "Connetics," "the Company," "we," "our" and "us" refer to Connetics Corporation, a Delaware corporation, and its consolidated subsidiaries. Unless the context specifically requires otherwise, these terms include Connetics Australia Pty Ltd. and Connetics Holdings Pty. Ltd. Connetics was incorporated in Delaware in February 1993, and our principal executive offices are located at 3160 Porter Drive, Palo Alto, California 94304. Our telephone number is (650) 843–2800. Connetics®, Luxíq®, OLUX®, Extina®, Soriatane®, VersaFoam® and the seven interlocking "C's" design are registered trademarks, and Evoclin™, Liquipatch™, VersaFoam–EF™, and Desilux™ are trademarks, of Connetics. Velac® is a registered trademark of Yamanouchi Europe B.V. All other trademarks or service marks appearing in this Report are the property of their respective companies. We disclaim any proprietary interest in the marks and names of others.*

Connetics is a specialty pharmaceutical company that develops and commercializes products for the dermatology marketplace. This marketplace is characterized by a large patient population that is served by a relatively small, and therefore readily accessible, number of treating physicians. We currently market four pharmaceutical products, OLUX® (clobetasol propionate) Foam, 0.05%, Luxíq® (betamethasone valerate) Foam, 0.12%, Soriatane®–brand acitretin, and Evoclin™ (clindamycin) Foam, 1%. We promote the clinically proven therapeutic advantages of our products and provide quality customer service to physicians and other healthcare providers through our experienced sales and marketing professionals.

Dermatological diseases often persist for an extended period of time and are treated with a variety of clinically proven drugs that are delivered in a variety of formulations. Topical solutions have traditionally included lotions, creams, gels and ointments. These topical delivery systems often inadequately address a patient's needs for efficacy, ease of use and cosmetic elegance, and the failure to address those needs may decrease patient compliance. We believe that VersaFoam®, the proprietary foam delivery system used in OLUX, Luxíq and Evoclin, has significant advantages over conventional therapies for dermatological diseases. The foam formulation liquefies when applied to the skin, and enables the active therapeutic agent to penetrate rapidly. When the foam is applied, it dries quickly and does not leave any residue, stains or odor. We believe that the combination of the increased efficacy and the cosmetic elegance of the foam may actually improve patient compliance and satisfaction. In market research sponsored by Connetics, more than 80% of patients said that they preferred the foam to other topical delivery vehicles.

OLUX and Luxíq compete in the topical steroid market. According to NDC Healthcare, or NDC, for the 12 months ended December 2004, the value of the retail topical steroid market for mid–potency and high– and super–high potency steroids was $869 million. Luxíq competes in the mid–potency steroid market and OLUX competes in the high– and super–high potency steroid market. On March 4, 2004, we acquired from Hoffmann–La Roche, or Roche, the exclusive U.S. rights to Soriatane®, an approved oral therapy for the treatment of severe psoriasis in adults. According to NDC, the value of the entire retail market for psoriasis was $636 million in 2004. In October 2004, we received approval from the Food and Drug Administration, or FDA, for Evoclin for the treatment of acne vulgaris, and we launched Evoclin commercially in December 2004. Evoclin competes in the topical antibiotics market for the treatment of acne. For the 12 months ended December 2004, NDC reported that this market totaled $547 million.

We have one New Drug Application, or NDA, under review by the FDA, and one product candidate in Phase III clinical trials. In August 2004, we submitted an NDA for Velac® (1% clindamycin and 0.025% tretinoin) with the FDA. In October 2004, the FDA accepted the NDA for filing effective as of August 23, 2004 with a user fee goal date of June 25, 2005. In September 2004 we commenced a Phase III clinical trial for Desilux, a low–potency topical steroid for the treatment of atopic dermatitis, formulated with 0.05% desonide in our proprietary emollient foam delivery vehicle, VersaFoam–EF™. In July 2003, we submitted an NDA for Extina® Foam. Extina is an investigational new drug formulation of 2% ketoconazole formulated using our proprietary platform foam delivery vehicle for the treatment of

1

Table of Contents

seborrheic dermatitis. In November 2004, we received a non–approvable letter from the FDA for Extina. The FDA's position was based on the conclusion that, although Extina demonstrated non–inferiority to the comparator drug currently on the market, it did not demonstrate statistically significant superiority to placebo foam. We have continued discussions with the FDA about what, if any, steps we can take to secure approval for Extina, including resubmitting the NDA with additional information or appealing the FDA's decision.

We continue to develop and formulate new product candidates by leveraging the experience and expertise of our wholly owned subsidiary, Connetics Australia Pty Ltd., and the Connetics Center for Skin Biology, or CSB. The CSB, which is a segment of our product development group staffed by Connetics employees, explores ways to optimize drug penetration, distribution, and efficiency at the targeted treatment site on the skin, and assesses novel formulations and new delivery technologies. The CSB assists in the continued development of innovative topical dermatology products through rigorous scientific evaluation of products and product candidates. The CSB presents us with the opportunity to bring together dermatologists and pharmacologists from across the country to interact with our researchers to explore how topical drugs interact with and penetrate the skin. We believe this novel approach to drug development is a key part of our innovation and enables us to bring even more effective and novel treatments to our product platform and the dermatology market. We did not incur any additional costs to establish the CSB, which was created in 2001.

We own worldwide rights to a number of unique topical delivery systems, including several distinctive aerosol foams. We have leveraged our broad range of drug delivery technologies by entering into license agreements with several well–known pharmaceutical companies around the world. Those license agreements for marketed products bear royalties payable to us. In 2001, we entered into a global licensing agreement with Novartis Consumer Health SA for the use of our Liquipatch drug–delivery system in topical antifungal applications. In 2002 we entered into a license agreement with Pfizer, Inc. (formerly Pharmacia Corporation) pursuant to which we granted Pfizer exclusive global rights, excluding Japan, to our proprietary foam drug delivery technology for use with Pfizer's Rogaine® hair loss treatment. In September 2004, we entered into a license agreement granting Pierre Fabre Dermatologie exclusive commercial rights to OLUX for Europe, excluding Italy and the U.K., where the product is licensed to Mipharm S.p.A. The license agreement with Pierre Fabre also grants marketing rights for certain countries in South America and Africa. Pierre Fabre will market the product under different trade names. Under the terms of the license, we will receive an upfront license payment, milestone payments and royalties on product sales. Pierre Fabre will be responsible for costs associated with product manufacturing, sales, marketing, and distribution in its licensed territories. As part of the agreement, we also negotiated a right–of–first–refusal in the United States to an early–stage, innovative dermatology product currently under development by Pierre Fabre. Pierre Fabre anticipates an initial launch of OLUX in select European markets in mid–2005.

OUR STRATEGY

Our principal business objective is to be a leading specialty pharmaceutical company focused on providing innovative treatments in the field of dermatologic disease. To achieve this objective, we intend to continue to pursue our commercial strategy of maximizing product sales by leveraging novel delivery technologies, accelerating the processes of getting products to market, managing the risks of product development where possible, and identifying and targeting specific market opportunities where there are unmet needs. We have described our development paradigm as a "4:2:1 model." We strive in any given year to have four product candidates in product formulation, two product candidates in late–stage clinical trials, and one product or new indication launched commercially. We fuel our product pipeline by a combination of internally developing product candidates and in–licensing novel products that fit with our broader strategy. Key elements of our business and commercialization strategy include the following:

• *Maximizing Commercial Opportunities for OLUX, Luxíq, Soriatane and Evoclin.* We have a focused sales force dedicated to establishing our products as the standard of care for their respective indications. Our commercial strategy is to call on those medical professionals in dermatology who

2

Table of Contents

the drug may cause serious birth defects. Women who are pregnant or might become pregnant during therapy or within three years after stopping therapy should not take Soriatane. Less frequent but potentially serious adverse events that have been reported include liver toxicity, pancreatitis and increased intracranial pressure, as well as bone spurs, alteration in lipid levels, possible cardiovascular effects and eye problems.

**Evoclin Foam**

Evoclin is a foam formulation of 1% clindamycin for the treatment of acne vulgaris. Evoclin is Connetics' first commercial product that addresses the acne market. According to the National Institute of Arthritis, Musculoskeletal and Skin Disorders, in the U.S. an estimated 17 million people are affected by acne annually, and an estimated 5.6 million people visited a physician for treatment during the 12 months ended October 2004. Prescriptions for the entire topical U.S. acne market in 2004 were approximately $1.2 billion, making it the largest segment of the dermatology market. In the U.S., acne products containing clindamycin generated approximately $416 million in revenue in the 12 month period ended October 2004, making this active ingredient one of the most widely prescribed for acne. Evoclin will compete primarily in the topical antibiotic market, representing approximately $535 million in U.S. prescriptions in the 12 months ended October 2004. We received FDA approval to market Evoclin in October 2004 and began selling the product in December 2004 in 50g and 100g trade unit sizes. Net product revenues for Evoclin for the fourth quarter of 2004 were $2.9 million. Evoclin is indicated for topical application in the treatment of acne vulgaris. Evoclin is contraindicated in individuals with a history of hypersensitivity to preparations containing clindamycin or lincomycin, a history of regional enteritis or ulcerative colitis, or a history of antibiotic–associated colitis.

**PRODUCT CANDIDATES AND CLINICAL TRIALS**

Our product candidates require extensive clinical evaluation and clearance by the FDA before we can sell them commercially. Our 4:2:1 development model anticipates that we will conduct simultaneous studies on several products at a given time. However, we regularly re–evaluate our product development efforts. On the basis of these re–evaluations, we have in the past, and may in the future, abandon development efforts for particular products. In addition, any product or technology under development may not result in the successful introduction of a new product.

**Extina® Foam**

In April 2003, we announced summary results from our Phase III clinical trial with Extina, a foam formulation of a 2% concentration of the antifungal drug ketoconazole for the treatment of seborrheic dermatitis. Ketoconazole is used to treat a variety of fungal infections, including seborrheic dermatitis. Seborrheic dermatitis is a chronic, recurrent skin condition that affects 3–5% of the U.S. population. It usually involves the scalp, but also can affect the skin on other parts of the body, including the face and chest. The symptoms of seborrheic dermatitis include itching, redness and scaling. In 2003 an estimated 1.1 million patients sought physician treatment for seborrheic dermatitis. Extina is intended to compete primarily in the topical antifungal market, representing approximately $752 million in U.S. prescriptions in 2004.

The Extina clinical program consisted of a pivotal trial and two smaller supplemental clinical studies required by the FDA. In the pivotal trial, 619 patients were treated for four weeks in a double–blind, placebo– and active–controlled protocol. As designed, the trial results demonstrated that Extina was not inferior to Nizoral® (ketoconazole) 2% cream as measured by the primary endpoint of Investigator's Static Global Assessment, or ISGA. The trial was also designed to compare Extina to placebo foam per the ISGA. The result, although in favor of Extina, did not achieve statistical significance. On all other endpoints, statistical significance was achieved; therefore, we believe that the totality of the data demonstrated that Extina was clinically superior to placebo foam. In July 2003, we submitted an NDA to the FDA for Extina.

5

Table of Contents

In November 2004, the FDA issued a non–approvable letter for Extina. The FDA's position was based on the conclusion that, although Extina demonstrated non–inferiority to the comparator drug currently on the market, it did not demonstrate statistically significant superiority to placebo foam. We have continued discussions with the FDA about what, if any, steps we can take to secure approval for Extina, including resubmitting the NDA with additional information or appealing the FDA's decision.

**Velac®**

In December 2002, we initiated the Phase III program for Velac, a first–in–class combination of 1% clindamycin and 0.025% tretinoin, for the treatment of acne. The Velac clinical program consists of two pivotal trials designed to demonstrate superiority to the individual drug products, and two smaller supplemental clinical studies required by the FDA. We completed enrollment of both pivotal trials in late 2003, enrolling over 2,200 patients. In March 2004, we announced the positive outcome of the Phase III clinical trials of Velac. The data from each trial demonstrated a consistently robust and statistically superior treatment effect for Velac compared with clindamycin gel, tretinoin gel and placebo gel on both of the primary endpoints. An analysis of the combined data from the clinical trials demonstrated similar results to the individual trials. The data from these trials also demonstrated that Velac was safe and well tolerated, with the most commonly observed adverse effects being application site reactions such as burning, dryness, redness and peeling. Following this positive clinical outcome, we submitted an NDA with the FDA for Velac in August 2004. The NDA was accepted for filing by the FDA in October 2004 with a filing date of August 23, 2004 and a user fee goal date of June 25, 2005. If approved by the FDA, we believe Velac will compete with topical retinoids as well as topical antibiotics, representing approximately $988 million in U.S. prescriptions during the 12 months ended December 2004. Prescriptions for the entire U.S. acne market during that same period were approximately $1.2 billion not including oral antibiotics.

**Desilux™ Foam**

In September 2004, we commenced the Phase III clinical program for Desilux, a low–potency topical steroid, formulated with 0.05% desonide in our proprietary emollient foam delivery vehicle. The clinical program focuses on atopic dermatitis and is designed to include infants from three months of age and children up to 17 years old. Subject to a successful Phase III trial outcome, we plan to file an NDA for Desilux in the fourth quarter of 2005.

**OLUX–EF**

We anticipate initiating Phase III clinical trials for an emollient foam of OLUX, or OLUX–EF, by the end of the first quarter of 2005. OLUX–EF is a super–high potency steroid in our new proprietary ethanol–free emollient VersaFoam vehicle indicated for the treatment of steroid responsive dermatological diseases. Our clinical trials will be conducted in atopic dermatitis and psoriasis.

**Other Pipeline Formulations**

In addition to the product candidates described above, we are also developing the foam technology for other disease indications. As part of our 4:2:1 development model, we strive to have four product candidates in product formulation at any given time, so that we have some flexibility in determining which two to move into human clinical trials. Our most promising preclinical candidates include an emollient foam of Luxíq , a low potency steroid, as well as other formulation candidates in early stages of development. We are exploring various product formulations for Liquipatch as well, which is described in more detail below under *"Royalty–Bearing Products and Licensed Technology — Liquipatch."*

**ROYALTY–BEARING PRODUCTS AND LICENSED TECHNOLOGY**

*Foam Technology.* In 2002 we entered into a license agreement with Pfizer, Inc. (formerly Pharmacia Corporation) pursuant to which we granted Pfizer exclusive global rights, excluding Japan, to our proprietary foam drug delivery technology for use with Pfizer's Rogaine® hair loss treatment. The

Table of Contents

We expect that all of our prescription pharmaceutical products will require regulatory approval by governmental agencies before we can commercialize them. The nature and extent of the review process for our potential products will vary depending on the regulatory categorization of particular products. Federal, state, and international regulatory bodies govern or influence, among other things, the testing, manufacture, labeling, storage, record keeping, approval, advertising, and promotion of our products on a product–by–product basis. Failure to comply with applicable requirements can result in, among other things, warning letters, fines, injunctions, penalties, recall or seizure of products, total or partial suspension of production, denial or withdrawal of approval, and criminal prosecution. Accordingly, initial and ongoing regulation by governmental entities in the United States and other countries is a significant factor in the production and marketing of any pharmaceutical products that we have or may develop.

Product development and approval within this regulatory framework, and the subsequent compliance with appropriate federal and foreign statutes and regulations, takes a number of years and involves the expenditure of substantial resources.

*FDA Approval.* The general process for approval by the FDA is as follows:

- *Preclinical Testing.* Generally, a company must conduct preclinical studies before it can obtain FDA approval for a new therapeutic agent. The basic purpose of preclinical investigation is to gather enough evidence on the potential new agent through laboratory experimentation and animal testing, to determine if it is reasonably safe to begin preliminary trials in humans. The sponsor of these studies submits the results to the FDA as a part of an investigational new drug application, which the FDA must review before human clinical trials of an investigational drug can start. We have filed and will continue to be required to sponsor and file investigational new drug applications, and will be responsible for initiating and overseeing the clinical studies to demonstrate the safety and efficacy that are necessary to obtain FDA approval of our product candidates.

- *Clinical Trials.* Clinical trials are normally done in three distinct phases and generally take two to five years, but may take longer, to complete:
  - Phase I trials generally involve administration of a product to a small number of patients to determine safety, tolerance and the metabolic and pharmacologic actions of the agent in humans and the side effects associated with increasing doses.

  - Phase II trials generally involve administration of a product to a larger group of patients with a particular disease to obtain evidence of the agent's effectiveness against the targeted disease, to further explore risk and side effect issues, and to confirm preliminary data regarding optimal dosage ranges.

  - Phase III trials involve more patients, and often more locations and clinical investigators than the earlier trials. At least one such trial is required for FDA approval to market a branded, or non–generic, drug.

  The rate of completion of our clinical trials depends upon, among other factors, the rate at which patients enroll in the study. Patient enrollment is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical sites, the eligibility criteria for the study, and the sometimes seasonal nature of certain dermatological conditions. Delays in planned patient enrollment may result in increased costs and delays, which could have a material adverse effect on our business. In addition, side effects or adverse events that are reported during clinical trials can delay, impede, or prevent marketing approval.

- *Regulatory Submissions.* The Food, Drug and Cosmetic Act outlines the process by which a company can request approval to commercialize a new product. After we complete the clinical trials of a new drug product, we must file an NDA with the FDA. We used the so–called 505(b)(2) application process for OLUX, Luxíq, and Evoclin, which permitted us in each case to satisfy the requirements for a full NDA by relying on published studies or the FDA's findings of safety and effectiveness based on studies in a previously–approved NDA sponsored by another applicant,

13

Table of Contents

together with the studies generated on our products. Generally, although the FDA evaluation of safety and efficacy is the same, the number of clinical trials required to support a 505(b)(2) application, and the amount of information in the application itself, may be substantially less than that required to support a traditional NDA application. The 505(b)(2) process will not be available for all of our other product candidates, and as a result the FDA process may be longer for our future product candidates than it has been for our products to date.

We must receive FDA clearance before we can commercialize any product, and the FDA may not grant approval on a timely basis or at all. The FDA can take between one and two years to review an NDA, and can take longer if significant questions arise during the review process. In addition, if there are changes in FDA policy while we are in product development, we may encounter delays or rejections that we did not anticipate when we submitted the NDA for that product. We may not obtain regulatory approval for any products that we develop, even after committing such time and expenditures to the process. Even if regulatory approval of a product is granted, it may entail limitations on the indicated uses for which the product may be marketed.

Our products will also be subject to foreign regulatory requirements governing human clinical trials, manufacturing and marketing approval for pharmaceutical products. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement are similar, but not identical, to FDA requirements, and they vary widely from country to country.

*Manufacturing.* The FDA regulates and inspects equipment, facilities, and processes used in the manufacturing of pharmaceutical products before providing approval to market a product. If after receiving clearance from the FDA, we make a material change in manufacturing equipment, location, or process, we may have to undergo additional regulatory review. We must apply to the FDA to change the manufacturer we use to produce any of our products. We and our contract manufacturers must adhere to cGMP and product–specific regulations enforced by the FDA through its facilities inspection program. The FDA also conducts regular, periodic visits to re–inspect equipment, facilities, and processes after the initial approval. If, as a result of these inspections, the FDA determines that our (or our contract manufacturers') equipment, facilities, or processes do not comply with applicable FDA regulations and conditions of product approval, the FDA may seek sanctions and/or remedies against us, including suspension of our manufacturing operations.

*Post–Approval Regulation.* The FDA continues to review marketed products even after granting regulatory clearances, and if previously unknown problems are discovered or if we fail to comply with the applicable regulatory requirements, the FDA may restrict the marketing of a product or impose the withdrawal of the product from the market, recalls, seizures, injunctions or criminal sanctions. In its regulation of advertising, the FDA from time to time issues correspondence to pharmaceutical companies alleging that some advertising or promotional practices are false, misleading or deceptive. The FDA has the power to impose a wide array of sanctions on companies for such advertising practices.

*Pharmacy Boards.* We are required in most states to be licensed with the state pharmacy board as either a manufacturer, wholesaler, or wholesale distributor. Many of the states allow exemptions from licensure if our products are distributed through a licensed wholesale distributor. The regulations of each state are different, and the fact that we are licensed in one state does not authorize us to sell our products in other states. Accordingly, we undertake an annual review of our license status and that of SPS to ensure continued compliance with the state pharmacy board requirements.

*Fraud and Abuse Regulations.* We are subject to various federal and state laws pertaining to health care "fraud and abuse," including anti–kickback laws and false claims laws. The Office of Inspector General, or OIG, of the U.S. Department of Health and Human Services has provided guidance that outlines several considerations for pharmaceutical manufacturers to be aware of in the context of marketing and promotion of products reimbursable by the federal health care programs. Effective July 1, 2005, pursuant to a new California law, all pharmaceutical companies doing business in California will be required to certify that they are in compliance with the OIG guidance.

14

Table of Contents

not have full control over our third–party manufacturers' compliance with these regulations and standards. Our business interruption insurance, which covers the loss of income for up to $14.1 million at our California and Australia locations, and lower amounts for each of our contract manufacturers, may not completely mitigate the harm to our business from the interruption of the manufacturing of products. The loss of a manufacturer could still have a negative effect on our sales, margins and market share, as well as our overall business and financial results.

*If our supply of finished products is interrupted, our ability to maintain our inventory levels could suffer and future revenues may be delayed.*

We try to maintain inventory levels that are no greater than necessary to meet our current projections. Any interruption in the supply of finished products could hinder our ability to timely distribute finished products. If we are unable to obtain adequate product supplies to satisfy our customers' orders, we may lose those orders and our customers may cancel other orders and stock and sell competing products. This in turn could cause a loss of our market share and negatively affect our revenues.

Supply interruptions may occur and our inventory may not always be adequate. Numerous factors could cause interruptions in the supply of our finished products including shortages in raw material required by our manufacturers, changes in our sources for manufacturing, our failure to timely locate and obtain replacement manufacturers as needed and conditions affecting the cost and availability of raw materials.

*We cannot sell our current products and product candidates if we do not obtain and maintain governmental approvals.*

Pharmaceutical companies are subject to heavy regulation by a number of national, state and local agencies. Of particular importance is the FDA in the United States. The FDA has jurisdiction over all of our business and administers requirements covering testing, manufacture, safety, effectiveness, labeling, storage, record keeping, approval, advertising and promotion of our products. If we fail to comply with applicable regulatory requirements, we could be subject to, among other things, fines, suspensions of regulatory approvals of products, product recalls, delays in product distribution, marketing and sale, and civil or criminal sanctions.

The process of obtaining and maintaining regulatory approvals for pharmaceutical products, and obtaining and maintaining regulatory approvals to market these products for new indications, is lengthy, expensive and uncertain. The manufacturing and marketing of drugs, including our products, are subject to continuing FDA and foreign regulatory review, and later discovery of previously unknown problems with a product, manufacturing process or facility may result in restrictions, including recall or withdrawal of the product from the market. The FDA is permitted to revisit and change its prior determinations and it may change its position with regard to the safety or effectiveness of our products. Even if the FDA approves our products, the FDA is authorized to impose post–marketing requirements such as:

- testing and surveillance to monitor the product and its continued compliance with regulatory requirements,

- submitting products for inspection and, if any inspection reveals that the product is not in compliance, prohibiting the sale of all products from the same lot,

- suspending manufacturing,

- recalling products, and

- withdrawing marketing approval.

Even before any formal regulatory action, we could voluntarily decide to cease distribution and sale or recall any of our products if concerns about safety or effectiveness develop.

22

Table of Contents

To market our products in countries outside of the United States, we and our partners must obtain approvals from foreign regulatory bodies. The foreign regulatory approval process includes all of the risks associated with obtaining FDA approval, and approval by the FDA does not ensure approval by the regulatory authorities of any other country.

In its regulation of advertising, the FDA from time to time issues correspondence to pharmaceutical companies alleging that some advertising or promotional practices are false, misleading or deceptive. The FDA has the power to impose a wide array of sanctions on companies for such advertising practices, and if we were to receive correspondence from the FDA alleging these practices we might be required to:

- incur substantial expenses, including fines, penalties, legal fees and costs to comply with the FDA's requirements,

- change our methods of marketing and selling products,

- take FDA–mandated corrective action, which could include placing advertisements or sending letters to physicians rescinding previous advertisements or promotion, and

- disrupt the distribution of products and stop sales until we are in compliance with the FDA's position.

*We may spend a significant amount of money to obtain FDA and other regulatory approvals, which may never be granted. Failure to obtain such regulatory approvals could adversely affect our prospects for future revenue growth.*

Successful product development in our industry is highly uncertain, and the process of obtaining FDA and other regulatory approvals is lengthy and expensive. Very few research and development projects produce a commercial product. Product candidates that appear promising in the early phases of development may fail to reach the market for a number of reasons, including that the product candidate did not demonstrate acceptable clinical trial results even though it demonstrated positive preclinical trial results, or that the product candidate was not effective in treating a specified condition or illness.

The FDA approval processes require substantial time, effort and expense. The FDA continues to modify product development guidelines and we may not be able to obtain FDA approval to conduct clinical trials or to manufacture and market any of the products we develop, acquire or license. Clinical trial data can be the subject of differing interpretation, and the FDA has substantial discretion in the approval process. The FDA may not interpret our clinical data the way we do. The FDA may also require additional clinical data to support approval. The FDA can take between one and two years to review new drug applications, or longer if significant questions arise during the review process. Moreover, the costs to obtain approvals could be considerable and the failure to obtain, or delays in obtaining, an approval could have a significant negative effect on our business.

*Any factor adversely affecting the prescription volume related to our products could harm our business, financial condition and results of operations.*

We derive all of our prescription volume from OLUX, Luxíq, Soriatane and Evoclin. Accordingly, any factor adversely affecting our sales related to these products, individually or collectively, could harm our business, financial condition and results of operations. OLUX, Luxíq and Evoclin are all currently subject to generic competition in their respective markets, and each of them could be rendered obsolete or uneconomical by regulatory or competitive changes. A generic competitor for Soriatane could enter the market at any time which would have a significantly negative impact on its sales. Sales of all of our products could also be adversely affected by other factors, including:

- manufacturing or supply interruptions;

- the development of new competitive pharmaceuticals and technological advances to treat the conditions addressed by our core branded products;

23

Table of Contents

|  | Years Ended December 31, | | | | |
|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|  | (In thousands, except per share amounts) | | | | |
| **Diluted Earnings Per Share** | | | | | |
| Income (loss) per share before cumulative effect of change in accounting principle | $ 0.51 | $ (0.13) | $ (0.54) | $ (0.56) | $ 1.07 |
| Cumulative effect of change in accounting principle, net of tax | — | — | — | — | (0.17) |
| Net income (loss) per share | $ 0.51 | $ (0.13) | $ (0.54) | $ (0.56) | $ 0.90 |
| Shares used to calculate basic net earnings (loss) per share | 35,036 | 31,559 | 30,757 | 29,861 | 28,447 |
| Shares used to calculate diluted net earnings (loss) per share | 37,443 | 31,559 | 30,757 | 29,861 | 30,086 |
| Pro forma amounts assuming the accounting change was applied retroactively: | | | | | |
| Net income (loss) | $ 19,015 | $ (4,100) | $ (16,590) | $ (16,742) | $ 32,188 |
| Earnings per share: | | | | | |
| Basic | $ 0.54 | $ (0.13) | $ (0.54) | $ (0.56) | $ 1.13 |
| Diluted | $ 0.51 | $ (0.13) | $ (0.54) | $ (0.56) | $ 1.07 |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents, marketable securities and restricted cash | $ 76,346 | $ 114,966 | $ 53,788 | $ 48,476 | $ 180,184 |
| Working capital | 71,094 | 112,247 | 25,185 | 44,026 | 71,030 |
| Total assets | 245,728 | 145,897 | 59,553 | 72,327 | 85,713 |
| Convertible senior notes | 90,000 | 90,000 | — | | |
| Total stockholders' equity | 127,920 | 45,754 | 44,745 | 61,354 | 72,606 |

(1)   In the second quarter of 2003, we received a one-time royalty payment from S.C. Johnson in the amount of $2.9 million in connection with our aerosol spray technology.

(2)   In March 2004, we acquired exclusive U.S. rights to Soriatane, resulting in an intangible asset that is being amortized 10 years. Amortization charges for the Soriatane rights in 2004 were $10.6 million.

(3)   In May 2002, we entered into an agreement with Yamanouchi Europe, B.V. to license Velac. In connection with this agreement we paid Yamanouchi an initial $2.0 million licensing fee in the second quarter of 2002 and recorded another $2.0 million in the fourth quarter of 2002 when we initiated the Phase III trial for Velac. In the third quarter of 2004, we recorded an additional milestone payment of $3.5 million upon filing an NDA with the FDA.

(4)   In 2001, we recorded a net charge of $1.1 million representing costs accrued in connection with the reduction in workforce and the wind down of relaxin development contracts.

(5)   In the fourth quarter of 2000, we recorded a $43.0 million gain on the sale of securities.

(6)   In April 2001, we sold our rights to Ridaura including inventory to Prometheus Laboratories, Inc. for $9.0 million in cash plus a royalty on annual sales in excess of $4.0 million through March 2006. We recognized a gain of $8.0 million in connection with the sale of Ridaura.

(7)   Effective January 1, 2000, we changed our method of accounting for non-refundable license fees in accordance with Staff Accounting Bulletin 101, "Revenue Recognition in Financial Statements."

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion should be read in conjunction with the Consolidated Financial Statements and Notes to Consolidated Financial Statements filed with this Report.

**OVERVIEW**

*Business Overview*

We are a specialty pharmaceutical company that develops and commercializes innovative products for the dermatology market. Our products aim to improve the management of dermatological diseases and

34

Table of Contents

**CERTAIN EVENTS IN 2004**

During 2004, we filed NDA's with the FDA for our product candidates Extina, a foam formulation of a 2% concentration of the antifungal drug ketoconazole, for the treatment of seborrheic dermatitis, and Velac, a combination of 1% clindamycin and 0.025% tretinoin, for the treatment of acne. We also commenced Phase III clinical trials for our product candidate, Desilux, a low–potency topical steroid, formulated with 0.05% desonide in our proprietary emollient foam delivery vehicle.

In February 2004, we completed the sale of 3.0 million shares of our common stock in a private offering to certain accredited investors at a price of $20.25 per share for net proceeds of $56.9 million. We used the proceeds from this offering to acquire the exclusive U.S. rights to Roche's Soriatane, which we completed in March 2004. Including the purchase price of $123.0 million, assumed liabilities of $4.1 million and transaction costs of $529,000, we recorded an intangible asset of approximately $127.7 million related to the Soriatane acquisition, which we are amortizing over an estimated useful life of 10 years. In July 2004, we entered into a multi–year consent with Roche to sell Soriatane to a U.S.–based distributor that exports branded pharmaceutical products to select international markets. Product sold to this distributor is not permitted to be resold in the U.S. Under the terms of the agreement, we will pay a royalty to Roche on Soriatane sales made during the term of the agreement to this distributor.

In March 2004, we entered into an agreement with UCB Pharma, a subsidiary of UCB Group, pursuant to which we authorized UCB Pharma to promote OLUX and Luxíq to a segment of U.S. PCP's. In September 2004, in connection with UCB Pharma's acquisition of Celltech plc, UCB notified us that it intended to discontinue the co–promotion agreement, effective March 31, 2005. UCB will continue to promote OLUX and Luxíq until then. Through the end of the promotion period, UCB's focus will be on approximately 10% of PCP's who are active prescribers of dermatology products, including OLUX and Luxíq. The purpose of the co–promotion agreement is to ensure appropriate use of OLUX and Luxíq with the current PCP users and to build value for the OLUX and Luxíq brands. We estimate that before we entered into the agreement with UCB Pharma, PCP's wrote approximately 15% of prescriptions for OLUX and Luxíq, even though we have promoted primarily to dermatologists. We pay UCB a fee based on prescriptions written by targeted PCP's which is recorded as an expense in selling general and administrative expense. UCB bears the marketing costs for promoting the products (including product samples, marketing materials, etc.). We will not have any financial obligation to UCB on prescriptions generated by PCP's after March 31, 2005.

In August 2004, we submitted an NDA for Velac (1% clindamycin and 0.025% tretinoin) with the FDA and, in October 2004, we received notification that the FDA accepted the NDA for filing as of August 23, 2004. For the three months ended September 30, 2004, we recorded a $3.5 million fee due to the licensor upon the filing of the NDA. Because the product has not been approved and has no alternative future use, we recorded the fee as an in–process research and development and milestone expense. Under the terms of the license agreement we entered into in 2002 with Yamanouchi Europe B.V., we hold exclusive rights to develop and commercialize Velac in the U.S. and Canada and non–exclusive rights in Mexico.

In September 2004, we licensed to Pierre Fabre Dermatologie exclusive commercial rights to OLUX for Europe, excluding Italy and the U.K. where the product is licensed to Mipharm S.p.A. The license agreement with Pierre Fabre also grants marketing rights for certain countries in South America and Africa. Pierre Fabre will market the product under different trade names. Under the terms of the license, we received an upfront license payment of $250,000 and we will receive milestone payments and royalties on product sales. Pierre Fabre will be responsible for costs associated with product manufacturing, sales, marketing and distribution in its licensed territories. As part of the agreement, we also negotiated a right–of–first–refusal in the U.S. to an early–stage, innovative dermatology product currently under development by Pierre Fabre. Pierre Fabre anticipates an initial launch of OLUX in select European markets in mid–2005.

Table of Contents

In October 2004, we received approval from the FDA for Evoclin (clindamycin) Foam, 1% for the treatment of acne vulgaris. Evoclin is delivered in our proprietary VersaFoam vehicle. In anticipation of the commercial launch of Evoclin, we hired 66 sales professionals in November 2004 and we announced the commercial launch of the product in December 2004 with the availability of 50g and 100g trade unit sizes.

In November 2004, the FDA notified us that it would not approve Extina. The FDA's position was based on the conclusion that, although Extina demonstrated non–inferiority to the comparator drug currently on the market, it did not demonstrate statistically significant superiority to placebo foam. We have continued discussions with the FDA about what, if any, steps we can take to secure approval for Extina.

In November 2004 we announced that Medicis informed us that it has in–licensed rights to an issued patent that it asserts will be infringed by our product candidate Velac. Based on our prior review of the Medicis licensed patent, we believe that Velac will not infringe the patent assuming the patent is valid. While we are not aware of any legal filings related to this assertion by the patent holder or Medicis, we believe, based on information publicly available on the USPTO website, that the inventor named on the patent has filed a Reissue Patent Application with the USPTO. To our knowledge, the USPTO has not formally announced the filing of the reissue application in the Official Gazette as of the date of this Report.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Our consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States, or GAAP. These accounting principles require us to make certain estimates, judgments and assumptions. We believe that the estimates, judgments and assumptions upon which we rely are reasonable based upon information available to us at the time that they are made. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities as of the date of the financial statements, as well as the reported amounts of revenues and expenses during the periods presented. To the extent there are material differences between these estimates, judgments or assumptions and actual results, our financial statements will be affected.

Our senior management has reviewed these critical accounting policies and related disclosures with our Audit Committee. Our significant accounting policies are described in Note 2 to the Consolidated Financial Statements included in this Report. We believe the following critical accounting policies affect our more significant judgments, assumptions, and estimates used in the preparation of our condensed consolidated financial statements, and therefore are important in understanding our financial condition and results of operations.

*Revenue Recognition — Reserves for Discounts, Returns, Rebates and Chargebacks.*

We recognize product revenue net of allowances for estimated discounts, returns, rebates and chargebacks. We allow a discount for prompt payment. We estimate these allowances based primarily on our past experience. We also consider the volume and price mix of products in the retail channel, trends in distributor inventory, economic trends that might impact patient demand for our products (including competitive environment), and other factors. We accept from customers the return of pharmaceuticals that are within six months before their expiration date. As a practice, we avoid shipping product that has less than ten months dating. We authorize returns for damaged products and exchanges for expired products in accordance with our returned goods policy and procedures. We monitor inventories in the distributor channel to help us assess the rate of return.

We establish and monitor reserves for rebates payable by us to managed care organizations and state Medicaid programs. Generally, we pay managed care organizations and state Medicaid programs a rebate on the prescriptions filled that are covered by the respective programs with us. We determine the reserve

37

Table of Contents

amount at the time of the sale based on our best estimate of the expected prescription fill rate to managed care and state Medicaid patients, adjusted to reflect historical experience and known changes in the factors that impact such reserves.

In the past, actual discounts, returns, rebates and chargebacks have not generally exceeded our reserves. However, the rates and amount in future periods are inherently uncertain. Our revenue reserve rate was approximately 17% of our gross product revenues for 2004 compared to 14% in 2003, reflecting the higher reserve requirements for Soriatane. If future rates and amounts are significantly greater than the reserves we have established, the actual results would decrease our reported revenue; conversely, if actual returns, rebates and chargebacks are significantly less than our reserves, this would increase our reported revenue. If we changed our assumptions and estimates, our revenue reserves would change, which would impact the net revenue we report.

*Goodwill, Purchased Intangibles and Other Long–Lived Assets — Impairment Assessments*

We have in the past made acquisitions of products and businesses that include goodwill, license agreements, product rights, and other identifiable intangible assets. We assess goodwill for impairment in accordance with Statement of Financial Accounting Standards No. 142, *"Goodwill and other Intangible Assets,"* or SFAS 142, which requires that goodwill be tested for impairment at the "reporting unit level" ("reporting unit") at least annually and more frequently upon the occurrence of certain events, as defined by SFAS 142. Consistent with our determination that we have only one reporting segment, we have determined that there is only one reporting unit, specifically the sale of specialty pharmaceutical products for dermatological diseases. We test goodwill for impairment in the annual impairment test on October 1 using the two–step process required by SFAS 142. First, we review the carrying amount of the reporting unit compared to the "fair value" of the reporting unit based on quoted market prices of our common stock and on discounted cash flows based on analyses prepared by management. An excess carrying value compared to fair value would indicate that goodwill may be impaired. Second, if we determine that goodwill may be impaired, then we compare the "implied fair value" of the goodwill, as defined by SFAS 142, to its carrying amount to determine the impairment loss, if any. Based on these estimates, we determined that as of October 1, 2004 there was no impairment of goodwill. Since October 1, 2004, there have been no indications of impairment and the next annual impairment test will occur as of October 1, 2005.

In accordance with Statement of Financial Accounting Standards No. 144, *"Accounting for Impairment or Disposal of Long–Lived Assets,"* or SFAS 144, we evaluate purchased intangibles and other long–lived assets, other than goodwill, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable based on expected undiscounted cash flows attributable to that asset. The amount of any impairment is measured as the difference between the carrying value and the fair value of the impaired asset. We have not recorded any impairment charges for long–lived intangible assets for the three years ended December 31, 2004.

Assumptions and estimates about future values and remaining useful lives are complex and often subjective. They can be affected by a variety of factors, including external factors such as industry and economic trends, and internal factors such as changes in our business strategy and our internal forecasts. Although we believe the assumptions and estimates we have made in the past have been reasonable and appropriate, different assumptions and estimates could materially impact our reported financial results. Accordingly, future changes in market capitalization or estimates used in discounted cash flows analyses could result in significantly different fair values of the reporting unit, which may result in impairment of goodwill.

*Income Taxes*

We recognize deferred tax assets and liabilities for temporary differences between the financial reporting basis and the tax basis of our assets and liabilities. We record valuation allowances against our

38

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

> Connetics Corporation
> a Delaware corporation
> By: /s/ John L. Higgins
>
> John L. Higgins
> *Chief Financial Officer*
> *Executive Vice President, Finance*
> *and Corporate Development*

Date: March 15, 2005

Each person whose signature appears below constitutes and appoints Katrina J. Church and John L. Higgins, jointly and severally, his or her attorneys–in–fact and agents, each with the power of substitution, for him or her and in his or her name, place or stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10–K, and to file the same, with exhibits and other documents in connection therewith, with the Securities and Exchange Commission, granting to each attorney–in–fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully as he or she might or could do in person, and ratifying and confirming all that the attorneys–in–fact and agents, or his or her substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| **Principal Executive Officer:** | | |
| /s/ Thomas G. Wiggans | Chief Executive Officer | March 15, 2005 |
| Thomas G. Wiggans | and Director | |
| **Principal Financial and Principal Accounting Officer:** | | |
| /s/ John L. Higgins | Chief Financial Officer; | March 15, 2005 |
| John L. Higgins | Executive Vice President, Finance and Corporate Development | |
| **Directors:** | | |
| /s/ Alexander E. Barkas | Director | March 15, 2005 |
| Alexander E. Barkas | | |
| /s/ Eugene A. Bauer | Director | March 15, 2005 |
| Eugene A. Bauer | | |

53

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ R. Andrew Eckert<br>R. Andrew Eckert | Director | March 15, 2005 |
| /s/ Denise M. Gilbert<br>Denise M. Gilbert | Director | March 15, 2005 |
| /s/ John C. Kane<br>John C. Kane | Director | March 15, 2005 |
| /s/ Thomas D. Kiley<br>Thomas D. Kiley | Director | March 15, 2005 |
| /s/ Leon E. Panetta<br>Leon E. Panetta | Director | March 15, 2005 |
| /s/ G. Kirk Raab<br>G. Kirk Raab | Chairman of the Board | March 15, 2005 |

54