# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES - GENERAL</u>

Case No. CV 06-6863 DOC (RNBx)            Date: July 10, 2008

Title: MIDDLESEX RETIREMENT SYSTEM v. QUEST SOFTWARE, INC., VINCENT C. SMITH, M. BRINKLEY MORSE, MICHAEL J. LAMBERT, DOUGLAS F. GARN, DAVID M. DOYLE, JERRY MURDOCK, JR., AND KEVIN BROOKS

PRESENT:

<u>THE HONORABLE DAVID O. CARTER, JUDGE</u>

<u>Kristee Hopkins</u>            <u>Not Present</u>
Courtroom Clerk            Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT            NONE PRESENT

PROCEEDING (IN CHAMBERS): ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT; (2) ORDERING DISCOVERY

     Before the Court is Defendants Quest Software, Inc., Vincent C. Smith, Michael J. Lambert, Douglas F. Garn, David M. Doyle, Kevin Brooks and Jerry Murdock, Jr.'s ("Defendants") Motion to Dismiss Second Amended Complaint ("Defendants' Motion"). The Court finds the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local R. 7-15. After considering the moving, opposing, and replying papers, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' Motion.

I.      **BACKGROUND**[1]

---

[1] This is merely a brief summary. For an extensive recitation of the facts, *see Middlesex Retirement System v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. 2007).

MINUTES FORM 11 DOC            Initials of Deputy Clerk _kh_
CIVIL - GEN            Page 1 of 18

Defendant Quest Software, Inc. ("Quest") develops and sells database management and other software. Defendants Smith, Morse, Lambert, Garn, Doyle, Murdock and Brooks were Quest officers and directors.[2] Plaintiff Middlesex Retirement System ("Middlesex" or "Plaintiff"), a Massachusetts pension fund, alleges, and Quest concedes that it knowingly backdated stock options given to employees pursuant to what Quest calls its "bucket and best price" methodology. Middlesex claims that this policy caused Quest's financial statements to be materially misleading in that they failed to accurately reflect Quest's compensation expenses. Quest recently restated its financials to reflect additional compensation expenses of nearly $150 million.

Pursuant to the "bucket and best price" methodology, at the end of each month or each quarter, Quest would identify the date where its stock price was lowest during that period. Quest issued every option for that month (from high-level executives to entry-level employees) "as of" that date. Quest's Compensation Committee would then grant the options through Uniform Written Consents (UWCs), using the "as of" date. This resulted in immediate profits to recipients of the difference between the price on the "as of" date and the then current price of Quest's stock. The "bucket and best price" methodology allowed Quest to grant immediate compensation to employees without recognizing a compensation expense.

According to Plaintiff, this practice violated both Generally Accepted Accounting Principles ("GAAP") and Quest's own 1999 Stock Incentive Plan (the "1999 Plan"). Quest repeatedly asserted in public filings that its option granting procedure complied with GAAP and that it granted options at prices consistent with the 1999 Plan.

Plaintiff alleges that many of the individual defendants were directly responsible for these and other false SEC filings. Defendants Smith, Morse, Lambert, Murdock, and Brooks, signed SEC filings incorporating financial information that did not account for the compensation expense created by

---

[2] Defendant Vincent C. Smith ("Smith") has been the Chairman of Quest's Board of Directors since 1998, a director since 1995, and CEO since 1997. Defendant M. Brinkley Morse ("Morse") served as Quest's Senior Vice President, Corporate Development from 2005, as Vice President, Finance and Operations from 2001 to 2003, and as CFO from 2003 to 2005. Defendant Michael J. Lambert ("Lambert") served as Quest's Senior Vice President of Finance in 2004 and 2005 and as CFO from 2005. Defendant Douglas F. Garn ("Garn") served as Quest's Vice President, Worldwide Sales from 1998 to 2005, and as President from 2005 on. Defendant David M. Doyle ("Doyle") served as a Director from 1987 until 2004 and as President until 2003. Doyle was a member of Quest's Audit Committee form 1999 to 2001. Defendant Jerry Murdock, Jr. ("Murdock") has been an outside Director of Quest since April 1999. He was a member of Quest's Compensation and Audit committees. Defendant Kevin Brooks ("Brooks") served as Quest's Vice President and Corporate Controller from 2000 to 2006, when he was reassigned.

the options. Smith, Morse, and Brooks were responsible for the underlying financial reports that misstated the compensation expenses. Doyle and Murdock, as members of the Audit Committee certified those financials for proxy statements filed with the SEC. Additionally, as Chairman of the Audit Committee, Murdock signed reports to Quest's board stating that the Audit Committee had verified financial information later found misleading.

Many of these defendants also received the backdated options: Smith received at least 1,585,000, Morse received at least 850,000, Garn received at least 480,000, Doyle received at least 100,000, and Brooks received 40,000. And many of them sold the corresponding Quest stock during the relevant period, resulting in significant profits.

In a 2006 report, Goldman Sachs suggested that Quest's option grant dates were suspicious. Quest initially denied any backdating but set up a Special committee to investigate its option granting procedures. Defendant Morse refused to be interviewed in this investigation. The Special Committee found substantial backdating. Approximately four months later Morse resigned from his position at Quest. During the same period Brooks was reassigned from his position as Corporate Controller and Principal Accounting Officer.

Middlesex's Second Amended Complaint ("SAC") charges that Defendants Quest, Smith, Morse, Doyle, Murdock and Brooks committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 thereunder. It also charges that Defendants Smith, Morse, Lambert, Doyle, and Brooks are liable as control persons under § 20(a) of that Act. Finally, it charges that Defendants Smith, Brooks, Garn, Doyle and Murdock for insider trading under § 20A of that Act.

Quest and the Individual Defendants filed Motions to Dismiss the SAC for failure to state a claim under Federal Rule of Civil Procedure 12 (b)(6).

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief. *Bell Atlantic*, 127 S. Ct. at 1968 (abrogating *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957)).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the

plaintiff. *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006); *Balistreri*, 901 F.2d at 699. Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996)); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

Additionally, fraud claims must be pled with more particularity than other claims. Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Rule 9(b) ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Rule 9(b) therefore requires that allegations of fraud identify the parties to the misrepresentation such that each defendant is on notice of what specifically they are accused of. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).

Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress has imposed heightened pleading standards on securities fraud actions. 15 U.S.C. §§ 78u-4(b)(1), (2). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" *Id.* at 1084-85 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 973 (9th Cir. 1999)). To meet this heightened pleading requirement, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at 1085 (citing 15 U.S.C. §§ 78u-4(b)(1)).

The second requirement of the PSLRA is that the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. §§ 78u-4(b)(2)) (emphasis added). The Ninth Circuit has interpreted the scienter pleading requirement as meaning that plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. The *Silicon Graphics* Court further clarified that "recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977. The requisite recklessness must be an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Id.* at 984. A plaintiff cannot proceed on pleadings averring scienter based on mere "motive and opportunity" but instead must "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.* at 979.

Recently, in *Tellabs v. Makor Issues & Rights, Ltd.*, __U.S.__, 127 S. Ct. 2499 (2007), the Supreme Court elaborated on the PSLRA's "strong inference" standard for pleading scienter. Agreeing with the standard in the Ninth Circuit, the Court held that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . . . The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original).

Under the PSLRA "when determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). However, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' . . . . [T]he inference of scienter must be more than merely 'reasonable' or 'permissible'- it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 127 S. Ct. at 2510. Thus, a "complaint will survive. . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (emphasis added).

## III. DISCUSSION

### A. Section 10(b) Claim Against Quest, Smith, Morse, Doyle, and Brooks

The Securities and Exchange Act of 1934 prohibits "(1) the 'use or employ[ment] . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S. Ct. 1627, 1630-31 (2005) (citing 15 U.S.C. § 78j(b)). Securities and Exchange Commission Rule 10b-5 makes it unlawful for any person, in connection with the purchase or sale of any security, to "make any untrue statement of a material fact" or to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5 (2004). "The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura*, 544 U.S. at 341 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 744, 95 S. Ct. 1917 (1975); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S. Ct. 1375 (1976)). In addition, "Congress has imposed statutory requirements on that private action." *Id.* A cause of action for securities fraud arising under section 10(b) and Rule 10b-5 includes the following elements: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura*, 544 U.S. at 341 (citations omitted).

Defendants only challenge the scienter element. They argue that Plaintiff has not pled scienter with the particularity required under the PSLRA.

Scienter determinations should be not be made by scrutinizing "each allegation in isolation[,] but [by] assess[ing] all the allegations holistically." *Tellabs*, 127 S. Ct. at 2511; *see also In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999). A securities fraud complaint may rely on circumstantial evidence of scienter as long as that evidence meets the "strong inference" standard. *Id.* at 996. To qualify as strong, "an inference of scienter must be more than merely plausible or reasonable - it must be cogent and at least as compelling as any opposing inference of nonfraudelent intent." *Tellabs, Inc. v. Makor Issues & Rights, LTD.*, 127 S. Ct. 2499, 2504-05 (2007). "We must consider 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.'" *Nursing Home Pension Fund, Local 44 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2002)).

In backdating cases, Plaintiffs must establish that Defendants knew or were deliberately reckless in not knowing that: a) backdating was occurring; and b) this backdating made public statements misleading. *Middlesex Retirement System v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1188 (C.D. Cal. 2007).

This Court previously found that allegations in the First Amended Complaint gave rise to a strong inference that Quest "was engaging in substantial, prolonged, and intentional backdating of stock options," and that "Defendants either knew or were deliberately reckless in not knowing that the purported option grant dates were improper." *Id.* at 1183. Indeed, Defendants have acknowleged that they were aware that Quest was intentionally backdating its stock options. Defendants refer to the methodology as "bucket and best price," which is a nicer way of saying "intentional backdating."

The Court must now determine whether Defendants had the requisite scienter as to the misleading SEC filings. When viewed holistically, the facts alleged in the SAC give rise to a strong inference that Defendants knew, or were deliberately reckless in not knowing, that Quest's SEC filings were misleading. *Tellabs, Inc. v. Makor Issues & Rights, LTD.*, 127 S. Ct. 2499, 2511 (2007) (Determinations regarding the sufficiency of the scienter allegations in a complaint should be not be made by scrutinizing "each allegation in isolation[,] but [by] assess[ing] all the allegations holistically."). This inference is at least as compelling as the inference that Defendants were merely negligent.

### 1. Defendants' Knew of Quest's Intentional Backdating

Defendants' knowledge of intentional backdating of stock options supports a strong inference that Defendants knew their SEC filings were misleading. Defendants knew that they were backdating stock options and were certainly aware of the large profits they were reaping from those

options. Defendants were also aware that the financial statements they submitted to the SEC included figures, which were based in part, on those backdated stock options. Therefore, it is highly implausible that Defendants were not aware that their prolonged practice of backdating stock options would have a material and misleading effect on their public financial statements.

### 2. Defendants Repeatedly Certified that Quest's Financial Statements Conformed with GAAP

Financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. *17 C.F.R. § 210.4-01(a)(1)*. Significant GAAP violations, when described with particularity, may provide powerful indirect evidence of scienter. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

GAAP requires reporting of expenses associated with stock options to be in accordance with Accounting Principles Board Option No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). According to APB 25, if an option had an exercise price lower than the fair market value of the stock as of the measurement date, the company would have to recognize a compensation expense for the option. *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 955 (N.D. Cal. 2007). The measurement date is the first date on which it is known both (1) the number of options that an individual employee is entitled to receive, and (2) the option or purchase price. *Id.*

Plaintiff's SAC alleges several occasions where Defendants certified that its financial statements conformed with GAAP and APB 25. Quest's Form 10-Ks for 2002 through 2005 stated that "Quest records compensation expense for options to purchase the Company's common stock granted at below fair market value. The expense equals the difference between the fair market value of the Company's common stock on the grant date and the exercise price of the stock options and is recognized ratably over the vesting period." Pl.'s Second Am. Compl. ¶ 114. These Form 10-Ks were signed by the individual defendants. Moreover, a proxy statement filed with the SEC in 2003 represented that Quest's stock options granted in the last year were "granted at an exercise price equal to the fair market value of Quest Common Stock on the grant date." Pl.'s Second Am. Compl. ¶ 133. Defendants have conceded in their Restatement that Quest granted stock options at an exercise price lower than fair market value on the date of the grant and failed to record the appropriate compensation expense. Therefore, the representations made that Quest conformed with GAAP were false.

Defendants' repeated certifications that Quest was in compliance with GAAP were "red flags," which give rise to a strong inference that Defendants either knew or were deliberately reckless in not knowing that their backdating and accounting procedures rendered Quest's financial statements misstated. *See In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 144-45 (E.D. N.Y. 2008). Defendants were repeatedly confronted with warnings that their SEC filings must conform with GAAP principles. Defendants repeatedly certified that Quest recorded compensation expenses for stock options granted below market value. *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 (9th

Cir. 2000) ("When a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the documents are true."). Nevertheless, Defendants continued to backdate their stock options without recording the appropriate compensation expense.

It is far too convenient for Defendants to now argue that they did not understand the accounting implications of intentional backdating. Defendants were given ample warning and opportunity to conform with GAAP and failed to do so. At the very least, Defendants' actions show deliberate recklessness.

Defendants argue that proper application of APB 25 is complex and therefore cannot support a strong inference of scienter. The Court disagrees. Although in some circumstances application of APB 25 may be unclear, there is no plausible interpretation of APB 25 that can justify Defendants' intentional backdating and failure to record compensation expenses. *See United States v. Reyes*, 2007 WL 1574540, *3 (N.D. Cal. May 30, 2007) ("Whatever ambiguity may exist in APB 25, it is not possible to construe the rule's language as permitting the deliberate retroactive selection of a particular grant date..."). Furthermore, Defendants' positions on the Compensation and Audit Committees of Quest's Board of Directors likely caused them to be familiar with APB 25. *See In re Comverse Technology, Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 143 (E.D. N.Y. 2008) (individual defendants "were members of the Compensation and Audit Committee of Comverse's Board of Directors and therefore likely had significant familiarity with the accounting rules applicable to stock options, including the requirement that the grant of in-the-money stock options reduce a company's income to the extent it confers an immediate paper profit upon recipients.") *See also In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 956 (N.D. Cal. 2007) (Although there are a few instances where a company could misapply APB 25 through sloppy accounting practices without rising to the level of fraud, "intentionally employing hindsight to adjust the grant date to an advantageously low price, or 'backdating,' is fraud.").

### 3.     Defendants Were Aware of Quest's 1999 Stock Incentive Plan

On June 9, 1999, Quest stockholders adopted the 1999 Stock Incentive Plan (the "1999 Plan"). Pursuant to the 1999 Plan, all of the options granted to Quest employees or non-employee Board members would have an exercise price per share not less than 100% of the fair market value per share of Quest common stock on the option grant date. The Plan makes clear that one purpose for this is to ensure that Quest does not incur any compensation expense related to stock option granting.

Whether or not Defendants' intentional backdating violated the 1999 Plan, the policies of the 1999 Plan clearly constitute a "red flag." Defendants must have been aware of the 1999 Plan, which makes clear that options were not to be granted at an exercise price lower than fair market value on the option grant date to ensure that the Company would not incur any compensation expense. Thus,

if options were granted at a price lower than fair market value on the option grant date, the Company would be forced to incur compensation expense.

Because the 1999 Plan clearly describes the accounting implications of granting options at an exercise price lower than fair market value on the option grant date, Defendants either knew or were deliberately reckless in not knowing that their accounting procedures would render Quest's financial statements materially misstated.

### 4.  Defendants' Initially Denied Wrongdoing

Defendants argue that because their intentional backdating procedure, "bucket and best price methodology," was consistently applied across all ranks of Quest employees it was an innocent methodology devoid of scienter. The Court is not persuaded. It would make little sense if an intentional backdating scheme could be considered innocent simply because Defendants backdated in favor of all ranks of employees. Indeed, intentionally backdating all stock options benefitted Quest's stock price by artificially raising its purported revenue. In addition, Defendants received the largest blocks of backdated options and therefore gained significantly more from backdating than Quest's rank-and-file employees.

Moreover, Defendants initially denied wrongdoing. When confronted with the Goldman Sachs report in May 2006, Defendants explained that the grant dates were tied to specific board meetings and were thus not chosen at a later date. Later that month, a report released by Stifel, Nicolaus & Company noted that Quest continued to suggest that "it did not believe that it had backdated options and that the majority of executive option grants were done following board meetings." Pl.'s Second Am. Compl. ¶ 156. This too supports a strong inference that Defendants knew that backdating rendered their financial documents misstated.

Defendants' denial of wrongdoing and their assertion that intentional backdating had not occurred strongly support an inference that Defendants knew the implications of intentional backdating. Defendants now admit that they were aware Quest had a practice of intentionally backdating. The fact that Defendants lied about their "bucket and best price" methodology indicates that they knew backdating rendered their financial statements misstated. *See In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (Defendants denials of improper accounting when confronted with accusations from the media "indicate that [they] were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial."). *See also Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("defendant's attempts to mollify public doubt about Eagle's financial health by putting an optimistic and reassuring "spin" on otherwise damaging credit loss reports, shows that defendants acted with knowledge...").

### 5.  Defendant Morse's Resignation

This Court has already found that the manner by which Defendant Morse left Quest was "highly suspicious" and leaned "heavily towards a finding of scienter." *Middlesex Retirement System*, 527 F. Supp. 2d at 1188. Plaintiffs have pleaded, and Defendants do not contest that Morse, the former CFO of Quest, refused to cooperate with the Special Committee, and instead chose to resign from Quest.

Morse now contends that the Court cannot consider his resignation or refusal to cooperate with the Special Committee as evidence of scienter for two reasons. First, he claims that resignation can only be "part of the scienter puzzle" where it occurs close to the announcement of the restatement and is accompanied by punishment. Second, he argues that there are a number of innocuous explanations for this conduct. Neither of these arguments overcomes the strong inference to be drawn from Morse's suspicious resignation.

Several cases hold that resignation, by itself, does not give rise to a strong inference of scienter. *See e.g. In re Read-Rite Corp. Sec. Litig.*, 115 F. Supp. 2d 1181, 1184 (N.D. Cal. 2000); *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005). A line of cases have held that terminations or resignations are "not part of the scienter puzzle" unless they occur at or near the time of a restatement and are accompanied by adverse actions against the individuals. *See In re Adaptive Broadband Sec. Litig.*, C 01-1092 SC, 2002 WL 989478, at *14 (N.D. Cal. April 2, 2002); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 347 (D.N. J. 2007).

However, the Court sees no reason to limit its consideration of Morse's resignation because it was not accompanied by an extraordinary punishment. While that fact may add to the inference of scienter, *In re McKeeson HBOC Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000), its absence does not preclude consideration of Morse's resignation. *See e.g. In re Nash Finch Co.*, 502 F. Supp. 2d 861, 882 (D. Minn. 2007); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 176 (S.D.N.Y. 2007) (resignations "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud.")

Although Morse's resignation is not sufficient alone to raise a strong inference of scienter, it is highly probative of scienter. Adding to the suspicion are the facts that Morse himself received a substantial number of stock options, that he was in charge of drawing up the allegedly misleading financials, and that he refused to cooperate with the Special Committee's investigation. The innocent explanations he presents are not more compelling than the inference that he left Quest before his wrongdoing could be uncovered.[3]

---

[3] Morse challenges Plaintiff's allegations as to his individual scienter as well. The allegations against Morse, which the Court must take as true, are extensive: he was one of the largest recipients of backdated options, he was in charge of Quest's financials, he resigned under suspicious circumstances, etc. There is certainly sufficient evidence to raise a strong inference of his scienter independent of other Defendants including Quest.

Accordingly, the Court considers Morse's resignation as circumstantial evidence of scienter.

### 6. Totality of Allegations

Plaintiff pleaded numerous particularized facts which give rise to a strong inference that Defendants knew or were deliberately reckless in not knowing that intentional backdating rendered Quest's financial documents misstated: (a) Defendants knowingly and intentionally backdated its stock options; (b) Defendants repeatedly certified that Quest's filings conformed with GAAP and that no options were granted at an exercise price below fair market value; (c) Quest's 1999 Plan clearly identified the accounting implications of granting stock options below fair market value; (d) Defendants initially denied that backdating was occurring when they were aware that the company had been intentionally backdating its stock options; and (e) Morse's choice to resign rather than cooperate with the Special Committee was highly suspicious.

Taken in toto, the allegations asserted in Plaintiff's SAC support a strong inference that Defendants knew or were deliberately reckless in not knowing that their intentional backdating procedures rendered Quest's financial statements misstated.

Accordingly, Defendants Quest, Smith, Morse, Doyle, and Brooks' Motions to Dismiss the § 10(b) claim are hereby DENIED.

### B. Section 10(b) Claim Against Jerry Murdock, Jr.

Murdock was not an employee or insider of Quest. As an outside director he did not receive any of the stock options at issue. He argues that (1) he was not responsible for any false or misleading statements; and (2) that Plaintiffs have not properly pleaded his scienter.

### 1. False Statements

An individual is liable for a false statement where he makes, substantially participates in making, or is intricately involved in making, the statement. *Howard*, 228 F.3d at 1061 n.5 (citing *In re Software Toolworks Inc.*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994)); *see also Central Bank of Denver, N.A. v. First Interstate Bank*, 511 U.S. 177-79, 114 S. Ct. 1439 (1994) (private cause of action under § 10(a) prohibits misstatements, not aiding and abetting misstatements).

Murdock claims that Plaintiff's has not properly alleged his responsibility for the false SEC filings. Some courts have found an outside director's signature on mandatory SEC filings insufficient. *See Wojtunik v. Kealy*, 294 F. Supp. 2d 1149, 1165 (D. Ariz. 2005); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1241-42 (N.D. Cal. 1994) ("mere fact that outside director signed a group published document, does not make the director liable for the contents of that document"); *In re*

*Ross Sys. Sec. Litig.*, C 94-0017 DLJ, 1994 WL 583114, at *6 (N.D. Cal. July 21, 1994) (same). The same is true of allegations that an outside director sat on the committee that approved or accepted false statements. *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1100 (N.D. Cal. 1994) (mere position on committee that had ability to prevent false filings is insufficient) *aff'd* 95 F.3d 922 (9th Cir. 1996); *Ross, supra.* (membership on Audit, Compensation, and Stock Option committees not sufficient). However, Plaintiff has pleaded more than Murdock's signature on misleading documents or his position on certain committees.

Plaintiff alleges that Murdock, as a member of Quest's Compensation Committee, was responsible for issuing the backdated options. The Compensation Committee was responsible for both overseeing Quest's stock option plan, and for issuing options to employees. Indeed, Murdock signed the UWCs that awarded the backdated options. These consents contained the "as of" dates, which were used as grant dates for accounting purposes. These allegations place Murdock at the very heart of the backdating.

Additionally, as a member of Quest's Audit and Compensation committees, Murdock was charged with certifying Quest's financials, reporting to Quest's board, and reviewing SEC filings. In these capacities he assured investors and board members that Quest's financials were accurate. He also made direct statements that Quest's options complied with APB No. 25.

Finally, although perhaps not dispositive, Murdock signed SEC filings and reports to Quest's board which contained false statements. As an outside director, Murdock is responsible for signing the very documents that are allegedly misleading. When a member of an Audit Committee signs an SEC filing, he or she is validating the financial statements in that filing. This signature is meaningless if a director can avoid responsibility by saying that he signed without actually verifying anything.

Accordingly, Plaintiff has pleaded sufficient participation for Murdock to be liable as a participant in Quest's false SEC filings.

2. **Scienter**

Murdock also contends that Plaintiff failed to adequately plead his scienter. For many of the reasons stated above, the Court finds that Plaintiff did plead facts sufficient to support a strong inference that Murdock knew, or was deliberately reckless in not knowing, that Quest made misleading statements to investors. Specifically, Plaintiff has identified Murdock's role in granting the options, certifying Quest's financials, and taking part in the preparation of SEC filings. If anyone had sufficient knowledge that something was amiss in Quest's financial statements, it was Murdock, the Chairman of Quest's Audit Committee. The Court merely pauses to address a number of specific issues he raises.

Murdock suggests that Plaintiff must plead "specific contemporaneous conditions known to the defendants that would strongly suggest that the defendants understood" that their conduct would

result in false statements. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1090-91 (9th Cir. 2002). He claims that his signature on certain documents is insufficient to establish his scienter. *See Hansen*, 527 F. Supp. 2d at 1159-60 (if a mere signature established scienter this would eviscerate the PSLRA). Additionally, he contends that his position on the Audit and Compensation committees cannot give rise to an inference of scienter. See *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (position alone cannot establish scienter); *Weiss v. Amkor Technology, Inc.*, 527 F. Supp. 2d 938, 949 (D. Ariz. 2007); *In re Peerless Sys., Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 993-94 (S.D. Cal. 2002) (collecting cases). Finally, he argues that he had no motive to commit fraud because he did not receive any backdated options.

Again, Quest's allegations go far beyond Murdock's position with Quest or his signature on certain documents. As noted, he signed the very UWCs that granted backdated options. These UWCs contained an "as of" date different from the date the UWC was signed. *In re Cabletron*, 311 F.3d 11, 39 (1st Cir. 2002) (that executive took part in the allegedly fraudulent activities relevant to scienter). At minimum, this should have raised an eyebrow or two on the Compensation Committee. After all, that committee was charged with administering Quest's Stock Option Plan, which prohibited just this sort of "creative accounting." In similar circumstances, the Eastern District of New York found a strong inference of scienter based in part on directors signing UWCs. *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 142-144 (E.D.N.Y. 2008). In *Comverse*, the court found as follows:

> Friedman, Oolie, and Hiram were members of the Compensation and Audit Committees of Comverse's Board of Directors and therefore likely had significant familiarity with the accounting rules applicable to stock options, including the requirement that the grant of in-the-money stock options reduce a company's income to the extent that it confers an immediate paper profit upon recipients. In addition, the terms of the incentive plans which Friedman, Oolie and Hiram were charged with administering, and which they presumably read, clearly indicated that they were not empowered to grant incentive stock options with an exercise price less than the closing price of a share of Comverse's stock on the date of grant, as published by NASDAQ. It is likely, therefore, that Friedman, Oolie and Hiram noticed that something was amiss when they signed the unanimous consent forms with the "as of [date]" lines that reflected purported grant dates 6-57 days in the past.

*In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 143 (E.D.N.Y. 2008) (internal citation and footnote omitted). The Court finds this reasoning persuasive. Murdock, a sophisticated business

person, should have at least investigated further when confronted with the UWCs that purported to date option grants far in the past.[4]

The other documents Murdock signed were SEC filings and reports to Quest's board. In these filings, Murdock assured the board and investors that nothing was wrong with Quest's financials. He did this at the same time that he was dating the option grants. Essentially, Murdock was charged with assuring that Murdock (and other directors) properly accounted for options.

Murdock was in a special position at Quest: he likely had more exposure to the option granting practices than any other individual defendant. As a consequence, he was uniquely situated to know that those practices were inappropriate. The fact that Murdock twice failed to recognize that the option grants were improper suggests that he knew they were improper and did nothing, or was deliberately reckless in failing to do something.

Although it would be helpful for Plaintiff to plead motive, the PSLRA has no such requirement. It is true that Murdock, unlike other Defendants, lacked a clear motive to reduce the exercise price of options. However, whether he would personally benefit is immaterial to his knowledge or recklessness as to Quest's false SEC filings. Any number of reasons might explain why Murdock signed off on Quest's option backdating: relationships with direct beneficiaries, a desire not to be seen as a problem, a devil-may-care nonchalance. It is not Plaintiff's responsibility to identify which of the myriad possible motivations was the one. It is sufficient to show strong circumstantial evidence that Murdock knew of the fraud.

Accordingly, Murdock's Motion to dismiss the § 10(b) claim against him is hereby DENIED.

C.  **Section 20(a) Claim**

Section 20(a) of the Securities and Exchange Act of 1934 creates secondary liability for securities fraud where a defendant controls the primary violator. 15 U.S.C. § 78t(a). To state a claim under § 20(a), Plaintiff need not allege that Defendants were "culpable participants" in the alleged fraud or that they actually controlled the misconduct. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Instead, Plaintiff must plead that (1) a primary violation of securities laws occurred and that (2) Defendants exercised actual power or control over Quest. *Id.* The burden then shifts to Defendants to establish a "good faith" defense – i.e. that they lacked scienter and took no part in the violation. *Id.*

---

[4] Although the Court does not address whether Murdock had a "duty to monitor" the dates of the options, *see Openwave*, 528 F. Supp. 2d at 250, it does find that the "as of" dates on the UWCs should have placed Murdock on notice that the grant dates of those options were suspicious.

As discussed above, Plaintiff has sufficiently pleaded a primary violation of the securities laws in the form of stock option backdating. Defendants do not presently raise a good faith defense. The only remaining question is whether Plaintiff has properly pleaded that the individual Defendants were "control persons."

Whether someone is a control person is an "intensely factual question" involving the degree of defendant's involvement in the day-to-day affairs of the primary violator and the specific violation. *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994); *see also Howard*, 1228 F.3d at 1067 n.13. Indeed, Plaintiff must plead that Defendants were "active in the day-to-day affairs" of Quest, or that they "exercised specific control" over the preparation of misleading documents. *Howard v. Hui*, 92-3742, 2001 WL 1159780, at *3 (N.D. Cal. September 24, 2001) (collecting cases); *cf.* 17 C.F.R. § 230.405 (control means "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.")

As the Court previously held, the fact-intensive control issue is particularly difficult to resolve at the motion to dismiss stage. None of the arguments raised here alter that conclusion.

With respect to Lambert, Defendants again contend that he cannot be a control person because he was not employed by Quest during the backdating. This does not immunize him. Plaintiff alleges that he took part in filing a number of false financial statements in the period leading up to the restatement. His knowledge that the statements were false is irrelevant as Plaintiff need not establish his scienter apart from Quest's scienter. *Howard*, 228 F.3d at 1065. Because he was directly involved in the alleged misstatements, his control has been properly alleged.

Murdock also claims that he was not involved in the day-to-day affairs of Quest or the specific misstatements at issue. Indeed, as an outside director and non-employee of Quest he likely had little control over Quest's regular activities. *See In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1100 (N.D. Cal. 1994); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, C 99-00109 SBA, 2000 WL 17227405, at * 15 (N.D. Cal. Sept. 29, 2000). Likewise, the Court cannot presume control based on Murdock's position on the Compensation and Audit Committees, although his position is "a sort of red light." *See Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1397 (9th Cir. 1993).

However, Plaintiff specifically alleged that Murdock, in his role on the Compensation and Audit Committees was responsible for both the backdated option grants and the false financial statements. As a result, although he was an outside director, Plaintiff has properly pleaded Murdock's control over the specific wrongful conduct – i.e. the false SEC filings.

Accordingly, Plaintiff has adequately pleaded control person liability under § 20(a). Defendants' Motions are hereby DISMISSED.

### D.   Section 20A Claim

Defendants challenge Plaintiff's claim for violation of Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1, on two grounds: 1) that Plaintiff lacks standing to bring this claim because it did not trade "contemporaneously" with Defendants; and 2) that Plaintiff has failed to state a claim for insider trading against some or all Defendants.

#### 1. Standing: Contemporaneous Trading

Section 20A provides a private claim for insider trading. Only individuals that traded "contemporaneously" with an insider have standing to sue under this section. 17 U.S.C. § 78t-1. This requirement limits the private right of action to those who actually traded with someone who had an unfair advantage. *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993) (citing *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88 (2d Cir. 1981)); *Buban v. O'Brien*, C 94-0331 FMS, 1994 WL 324093, at *1 (N.D. Cal. June 22, 1994) ("The purpose of the 'disclose or abstain' rule is to protect only those who might actually have traded with insiders." (citing *Wilson*, *supra*)). Otherwise, an insider who failed to disclose non-public information might be "liable to all the world" although far fewer investors were actually harmed by his or her fraud. *Wilson*, 648 F.3d at 94.

Contemporaneous trading is a "circumstance constituting fraud" and must be pleaded with particularity under Fed. R. Civ. P. 9(b). *Neubronner v. Milken, supra*. Accordingly, the class representative must allege with specificity that it traded contemporaneously with defendants. *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1523 (N.D. Cal. 1990). It is insufficient that some class members traded contemporaneously as the lead plaintiff may not represent class members on claims it does not share. *See La Mar v. H&B Novelty & Loan Co.*, 489 F.2d 461, 465-55 (9th Cir. 1973); *see also Alfus v. Pyramid Tech. Corp., supra* (citing *La Mar, supra*).[5]

The "exact contours" of contemporaneous trading have never been defined. *See Neubronner, supra*. Some courts have confined "contemporaneous" to trades occurring the same day

---

[5] Plaintiff relies on *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255-56, 256 n.11 (S.D.N.Y. 2007) for the proposition that it is sufficient for any class member to trade contemporaneously with Defendants. However, as Defendants point out, *Openwave* is in conflict with *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1000-1002. In *Brody*, the Ninth Circuit declined to disturb the trial court's decision to dismiss insider trading claims in a class action suit because the named plaintiffs did not trade contemporaneously with the defendant. *Id.* at 1000. By implication this suggests that the named plaintiffs must trade contemporaneously. Additionally, even if it were enough that other members of the class traded contemporaneously with Defendants, the allegation that "Class members, including Lead Plaintiff, contemporaneously purchased Quest common stock . . ." would not be sufficient to satisfy Rule 9(b).

as the insider's trades. *See In re AST Research Sec. Litig.*, 887 F. Supp. 231-234 (C.D. Cal. 1995); *Backman v. Polaroid Corp.*, 540 F. Supp. 667, 670-71 (D. Mass. 1982) (purchase two trading days after insider sale is not contemporaneous). At least one case, purportedly following *Wilson*, held that trading is "contemporaneous" until disclosure of the non-public information. *In re Am. Bus. Computers Corp. Sec. Litig.*, MDL No. 913, 1994 WL 848690, at *4 (Feb. 24, 1994).[6] The Ninth Circuit has advised that trades must occur at "about the same time" to be contemporaneous. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002) (two month gap would "gut the contemporaneous trading rule's premise" that the plaintiff purchased securities from the defendant). Generally this has meant that the trades must occur within a few days of each other. *Alfus*, 745 F. Supp. at 1522.

Doyle last sold Quest stock in early 2004, nearly two years before Plaintiff purchased that stock. A two year delay is far beyond the bounds of "contemporaneous" trading. Murdock last sold Quest stock on March 9, 2005. Plaintiff first purchased Quest stock on November 28, 2005. The nearly nine-month delay also rules out "contemporaneous" trading. Accordingly, Plaintiff's insider trading claim cannot survive against Murdock.

However, the remaining Defendants did trade contemporaneously with Plaintiff. Smith sold on the same day as Plaintiff on January 24 and January 30, 2006 and May 5, 2006. Brooks sold one trading day before Plaintiff: Brooks sold on Friday, November 25, 2005 and Plaintiff Purchased on Monday, November 28, 2005. Finally, Garn sold stock on December 8, 2005 and Plaintiff purchased stock on December 16, 2008. This is a one-week (five trading day) difference. All of these purchases are within the bounds of "contemporaneous" trading.

### 2. Failure to State a Claim

To state a claim for insider trading a plaintiff must plead that a defendant committed an independent violation of securities laws. *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007) ("Claims under Section 20A are derivative and therefore require an independent violation of the Exchange Act." (collecting cases)).

Plaintiff has adequately stated a claim against Defendants Smith, Morse, Lambert, Doyle, Murdock and Brooks for securities fraud under Rule 10b-5, and for control person liability under § 20(a). They have also adequately alleged that those defendants contemporaneously traded with

---

[6] The Court previously relied on *American Business Computers Corp.*, to hold that Plaintiffs did trade contemporaneously with Defendants. However, upon further briefing and consideration of additional authorities, that case appears to be the outer boundary of the contemporaneous trading requirement. This broad definition would permit the Court to hold that trades months apart were contemporaneous, a result inconsistent with binding authority.

Plaintiff on the basis of non-public information – i.e. Quest's backdating of stock options. Therefore, Plaintiff has properly alleged a § 20A claim against those Defendants.

However, Plaintiff clearly excludes Defendant Garn from its claims under §§ 10(b) or 20(a) of the Securities Exchange Act. Thus, Defendant Garn is not a "person who violate[d] any provision" of the Securities Exchange Act under § 20A. Therefore, he cannot be liable for insider trading. *See Johnson, supra.*

Accordingly, Defendants' Motions to Dismiss Plaintiff's § 20A claim are granted as to Doyle, Murdock and Garn and GRANTED as to all other Defendants.

## IV.   DEFENDANTS' MOTION FOR RECONSIDERATION

Defendants also moved for reconsideration of the Court's order compelling them to produce a Power Point presentation made to the SEC. Rather than produce this presentation as ordered, Defendants asserted the PSLRA's stay of discovery where a Motion to Dismiss is pending. *See* 15 U.S.C. § 78u-4(b)(3)(B). In light of this decision, resolving all pending Motions to Dismiss, the PSLRA discovery stay is inapplicable and Defendants' Motion for Reconsideration is moot.

Defendants are hereby ORDERED to begin producing discovery immediately. Quest SHALL produce the SEC presentation within seven (7) days. Defendants are also ordered to make all mandatory disclosures and respond to all pending discovery requests within thirty (30) days.

## V.   DISPOSITION

Defendants' Motions to Dismiss are hereby DENIED, except that Plaintiff's § 20A claim is hereby DISMISSED against Defendants Doyle, Murdock and Garn.

Defendants' Motion for Reconsideration is hereby DENIED AS MOOT. Defendants are hereby ORDERED to begin producing discovery posthaste.

The Clerk shall serve this minute order on all parties to the action.