# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In Re Connetics Securities Litigation | )<br>)   Case No. C 07-02940 SI<br>)<br>) |

**<u>DECLARATION OF CHAD COFFMAN</u>**

**INTRODUCTION**

1.      My name is Chad Coffman.  I am the President of Winnemac Consulting, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation.

2.      Counsel for plaintiffs in this matter has asked me to analyze and opine on the efficiency of the market for the common stock of Connetics Corporation ("Connetics") during the putative Class Period of January 27, 2004 to July 9, 2006 (the "Class Period").

3.      The materials I have relied upon are summarized in **Appendix A**.  Winnemac Consulting is being compensated at my hourly rate of $450 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case.

**QUALIFICATIONS**

4.      I hold a Bachelors Degree in Economics with Honors from Knox College and a Masters in Public Policy from the University of Chicago.  I am also a CFA charter-holder.  The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three exams over three years that cover a wide variety of financial topics.

5.      I, along with several others, founded Winnemac Consulting in March of 2008.  Prior to starting Winnemac Consulting, I was employed by Chicago Partners for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination and antitrust.  I have been engaged numerous times as a valuation expert both within and outside the litigation context.  I

have extensive experience in class action securities cases and my experience includes work for

plaintiffs, defendants, D&O insurers and I have also been engaged by mediators to provide

neutral economic analysis and opinions in several securities class actions as well as other

matters.  As a result of my involvement in these cases, much of my career has been spent

analyzing how quickly, reliably and the degree to which information impacts securities prices.

6.      My qualifications are further detailed in my curriculum vitae, which is attached as

**Appendix B**.

## SUMMARY OF OPINIONS

7.      After analyzing the common stock of Connetics throughout the Class Period and

giving careful consideration to the efficiency factors described in detail throughout this report, I

have come to the conclusion that the market for Connetics common stock was efficient during

the Class Period.

## DISCUSSION OF THE RELIANCE REQUIREMENT AND MARKET EFFICIENCY

8.      The "fraud on the market" doctrine, first articulated by the Court in *Basic v.*

*Levinson* is based on the notion that:

> "In an open and developed securities market, the price of a company's stock is
> determined by the available material information regarding the company and its
> business… Misleading statements will therefore defraud purchasers of stock even
> if the purchasers do not directly rely on the misstatements. . . . The causal
> connection between the defendants' fraud and the plaintiffs' purchase of stock in
> such a case is no less significant than in a case of direct reliance on
> misrepresentations."[1]

---

[1] Basic Inc. v. Max L. Levinson, et al., Civil Action No. 86-279, U.S Court of Appeal for the Sixth Circuit, April 3rd, 1989. Pg. 485

9.      Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance is an empirical exercise. Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market".[2] He described different levels of efficiency which he called "weak-form", "semi-strong-form" and "strong-form" efficiency.

10.     "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time.

11.     "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns.

12.     "Strong-form" efficiency is the most stringent form of market efficiency. Here, all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

13.     Dr. Fama's categorization of different forms of efficiency makes clear that the efficiency exists on a continuum. The market efficiency standard adopted by the *Basic* court as necessary for the presumption of reliance conforms to "semi-strong form" efficiency. Recall that *Basic* stated, "In an open and developed securities market, the price of a company's stock is

_____

[2] Fama, E. Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. FIN. 383(1970).

determined by the available material information regarding the company and its business."[3]  The Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect all publicly available information.

## CAMMER & KROGMAN FACTORS

14.    In *Cammer v. Bloom*, the Court identified several factors as relevant to the determination of whether an efficient market exists for a given security.[4]  In *Krogman v. Sterritt,* the Court noted that economic theory includes other possibly relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer* factors.[5]  My understanding is that many courts have relied on evaluation of the efficiency factors set forth by the *Cammer* and *Krogman* decisions.

15.    The *Cammer* and the *Krogman* decisions each relied on Bromberg & Lowenfels' definition of efficiency.[6]  As articulated below, the adopted definition of efficiency is clearly consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt their definitions for the terms "open", "developed", and "efficient" as described below:

Open Market:  "An open market is one in which anyone, or at least a large number of

persons, can buy or sell."

---

[3] Basic, p. 485

[4] Rose Cammer, et al. v. Bruce M. Bloom, et al., Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19th 1989. The factors identified by the *Cammer* Court are 1) average weekly trading volume 2) analyst coverage 3) market makers 4) SEC Form S-3 eligibility 5) price reaction to unexpected information.

[5] Elmer Krogman, et al. v. R. Dale Sterritt, Jr., et al., Civil Action No. 3:98-CV-2895-M, U.S. District Court for the Northern District of Texas, Dallas Division, March 29th, 2001. The factors identified by the *Krogman* Court are 1) market capitalization 2) size of float of common stock 3) bid-ask spread.

[6] Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) as cited Cammer, p. 2

Developed Market:  "A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available.  It is principally a secondary market in outstanding securities.  It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes)."

Efficient Market:  "An efficient market is one which rapidly reflects new information in price.  These terms are cumulative in the sense that a developed market will almost always be an open one.  And an efficient market will almost invariably be a developed one."[7]

16.     While there is a clear and well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient".  In my view, the Courts through *Cammer* and *Krogman* have identified important metrics to at least consider.

17.     In the subsequent sections I evaluate each of the Cammer and Krogman factors, as well as two additional factors that I view as relevant to assessing market efficiency: (1) the fraction of shares held by institutional investors, and (2) autocorrelation.  I empirically evaluate each factor for Connetics common stock during the putative Class Period.

### CAMMER FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

18.     The first Cammer factor is the average weekly trading volume of a security.  According to one authority cited by the *Cammer* Court,

---

[7] Cammer, p. 2, 12 (citing Bromberg, et al.)

"turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption."[8]

19.     I concur that volume as a fraction of shares outstanding is an important indicia of market efficiency.  First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly supportive indicia of market efficiency.  Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security.  As Thomas and Cotter explain, "Trading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[9]  Fourth, substantial volume would generally support the notion that any arbitrage opportunities can be quickly exploited and the market price will impound information quickly.

20.     **Exhibit 1** plots Connetics trading volume as a fraction of shares outstanding for each week during the Class Period.  The average weekly turnover for Connetics was approximately 10.03%, much higher than the thresholds cited by the *Cammer* Court.[10]

21.     I also considered Connetics volume of trading relative to other stocks.  The average annualized turnover velocity ratio is the average of the annualized monthly dollar volume divided by the month-end market capitalization.  Total dollar trading volume of Connetics common stock during 2005 was approximately $4.1 billion and the average market

---

[8] Cammer, p. 28 (citing Bromberg, et al.)

[9] Randall S. Thomas, James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting." Law and Contemporary Problems, Vol. 63, p. 3

[10] For stocks traded on NASDAQ, volume data is often adjusted downward to correct for potential double counting of trades by NASDAQ market makers.  See *Unger* p. 12 with further support from M. Barclay & F. Torchio, A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation, 64 Law & Contemp. Probs. 105, 106 (Summer 2001).  It is not clear this adjustment is necessary in the context of evaluating market efficiency, but even if we adjust the NASDAQ volume by 50%, as is often done in damages calculations, the average weekly turnover for Connetics is well above the thresholds described by the *Cammer* Court.

capitalization for Connetics during 2005 was approximately $693.0 million.  The average annualized turnover velocity ratio for Connetics during 2005 was 600.67%.  In 2005, the average annualized turnover velocity ratio for the NASDAQ stock market was 250.4%.[11]  This indicates there is much greater trading activity in Connetics than the average NASDAQ stock.

22.     Connetics' average weekly trading volume and also its average annualized turnover velocity ratio as compared against a benchmark index provide support that Connetics traded in an efficient market during the Class Period.

## CAMMER FACTOR 2: ANALYST COVERAGE

23.     The *Cammer* decision stated the following related to analyst coverage,

 "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[12]

24.     I agree that analyst coverage, while not required for market efficiency, is important confirmatory evidence of efficiency.  Significant analyst coverage implies that there is sufficient interest in a security that there is an active market for information regarding the security and that information is widely distributed.  It is ambiguous what is meant by a "significant number" of securities analysts and overall I think the degree to which information is distributed is more important than simply counting the number of analysts.  However, the logic behind considering analyst coverage as a relevant factor for supporting an opinion of market efficiency is sound.

---

[11]  World Federation of Exchanges; http://www.world-exchanges.org/statistics.

[12] Cammer, p. 22

25. **Exhibit 2** demonstrates that many analysts covered Connetics throughout the Class Period. The exhibit shows that in 2004, 11 analyst firms issued a total of 98 reports on Connetics. In 2005, 14 analyst firms issued a total of 147 reports on Connetics. In 2006 through July 9, 2006, 13 analyst firms issued a total of 74 reports on Connetics.[13]

26. I have reviewed the reports issued by several of the analysts who covered Connetics throughout the Class Period, including the firms C.E. Unterberg, CIBC, RBC Capital Markets, Jefferies and Wachovia. Each of these analyst firms followed the Connetics consistently throughout the Class Period. These firms issued reports following important news releases from the company, including product development news and earnings announcements.

27. I have also reviewed the transcripts from conference calls that Connetics management had with industry analysts and other investors, either following earnings announcements or at times when the company had other news to report to the market place. In the transcripts to these calls, analysts asked questions of Connetics upper management and incorporated management's responses to their questions in analyst reports issued after these conference calls. The fact that several analysts regularly participated in Connetics management conference calls and reported back to the market following these calls provides further evidence that the information about the company was being disseminated quickly and widely. It is reasonable to conclude, therefore, that new information regarding Connetics would be disseminated widely and incorporated into the market price quickly.

## CAMMER FACTOR 3: MARKET MAKERS

28. The third Cammer factor covers market makers and states,

---

[13] I also understand that Connetics was covered by credit rating agencies during the Class Period.

"For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption."[14]

29.      In over-the counter markets, the basic premise that governed courts to assume a large number of market makers as an efficiency criteria relates to the notion that market makers are "presumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow").  Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price."[15]

30.      Cammer alludes to this factor as relevant for an over the counter market with no volume reporting.  That is not the case here.  Connetics common stock traded on the NASDAQ stock market throughout the Class Period with the ticker CNCT and volume was reported on a daily basis.

31.      Nevertheless, I evaluated the number of market makers for Connetics stock.  I randomly chose 30 trading days during the Class Period and obtained data regarding the number of active market makers on those days.[16]  **Exhibit 3** identifies each of the thirty days and the number of active market makers.  The summary statistics at the bottom of Exhibit 3 show that the average number of active market makers in Connetics stock during the randomly chosen days was 38 with a minimum of 26 and a maximum of 48.  In addition, of the active market makers, 19 were active on all of the 30 randomly chosen days.  The number of active market makers in

---

[14] Cammer, p. 28

[15] Barber et al., p.4

[16] Nasdaq Daily MP Position Reports obtained from www.nasdaqtrader.com. For a market maker's status to be "active market maker" requires the market maker to be "A quoting or order entering participant in the issue." This status is "The end-of-day status of the market participant's registration position within the issue, from the Previous Day. See http://www.nasdaqtrader.com/Trader.aspx?id=DailyMPPositionDefs

Connetics common stock consistently far exceeds the thresholds defined by the Cammer Court, thus providing further support that Connetics common stock traded in an efficient market.

## CAMMER FACTOR 4: SEC FORM S-3 ELIGIBILITY

32.     The fourth Cammer Factor is SEC Form S-3 Eligibility, which states,

" It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[17]

33.     Through Form S-3, the SEC allows certain companies that have previously provided sufficient public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[18]  The logic behind this factor is that if the SEC had essentially determined that a firm's information is already widely-distributed, then it would be reasonable to assume the market price impounds this information.  There is nothing to suggest eligibility to file a Form S-3 is required for the market to be efficient, simply that eligibility to file an S-3 is confirmatory evidence of efficiency.  Interpreted in this way, the standard makes sense as an indirect indicator of efficiency.

34.     Connetics filed two Form S-3 registration statements on August 26, 2003 (for $90 million of convertible notes) and another in May 2004 for current shareholders selling 3,000,000 shares of common stock.  That Connetics was eligible and did in fact file a Form S-3 with the

---

[17] Cammer, p. 22

[18] To be eligible to issue a Form S-3, among other things a company must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year. In addition, the company must have filed all documents in a timely manner for the past twelve months and must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.  See www.sec.gov/about/forms/forms-3.pdf

SEC is another factor that supports the conclusion that its common stock traded in an efficient market.

### CAMMER FACTOR 5: PRICE REACTION TO UNEXPECTED NEW INFORMATION

35.     The fifth Cammer Factor relates to how a security reacts to new information. The Court opined,

> "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."[19]

36.     I concur that performing an event study to scientifically establish a causal connection between company specific news events and movements in the market price is convincing evidence of market efficiency.  An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[20]  Indeed, academics have used event studies as one tool for evaluating the efficient market hypothesis in the first place.  Event studies have now been used for over 30 years and appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how information affects securities prices.

37.     I performed an event study on Connetics common stock during the Class Period to determine whether there was a consistent cause and effect relationship between company-specific news and market price changes.  The event study accomplishes this by specifying a model of what price movements are "expected" based on outside market factors and then testing whether the deviation from expected price movements are sufficiently large that simple random movement can be rejected as the cause.  A well-accepted method for performing an event study is

---

[19] Cammer, p. 27

[20] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, Litigation Services Handbook, The Role of the Financial Expert, Third Edition, 2001.

to estimate a regression model over some period of time to observe the typical relationship between the market price of the relevant security and broad market factors. I have performed such an analysis where I evaluate the relationship between Connetics' daily return (percentage change in stock price) controlling for a broad market index (the NASDAQ composite).[21] The results of this regression are shown on **Exhibit 4.**[22] Unsurprisingly, the model suggests that there is positive correlation between Connetics stock price and the NASDAQ index. For example, the coefficient on the NASDAQ Index is 0.88 which suggests for every 1% increase (decrease) in the NASDAQ, we expect Connetics to rise (fall) 0.88%.

38.     Another important statistic from the regression is the Root Mean Squared Error, which in this case is 2.82%. The significance of this figure is that it measures the degree of imprecision in the predictions from the model (the "standard deviation" of the errors). For example, let's say the model predicts, based on movements in the NASDAQ composite that Connetics' stock price would rise 1% (this is the "predicted return"). Because of the inherent randomness observed in stock price returns, we do not expect the model to predict returns exactly. For our example, let's assume we observe an actual return of 1.6%. Thus, the "abnormal return" is 0.6% (1.6% actual return minus 1% predicted return).

39.     Is this 0.6% abnormal return sufficiently large that we reject random movement as the explanation? This is where we rely on the standard deviation of the errors (Root Mean Squared Error) from the regression model. A "t-statistic" measures the number of standard

---

[21] The Nasdaq Composite Index and the Nasdaq Pharmaceutical Index are used in the "Stock Performance" section in Connetics' Proxy filings (see, for example, Connetics Definitive Proxy Statement, Schedule 14-A, filed May 7, 2004, p. 16). I determined that a pharmaceutical index did not have additional predictive power beyond the NASDAQ. This is unsurprising given the idiosyncratic nature of drug companies and how their fortunes are tied to particular drugs and not necessarily the industry as a whole.

[22] In addition, I analyzed other indices such as the Amex Pharmaceutical Index. The Amex Pharmaceutical Index (DRG) is a market-capitalization weighted index designed to represent a cross section of widely held, highly capitalized companies involved in various phased of the pharmaceutical industry. This index did not have any additional predictive power for Connetics.

deviations our actual observation is from the prediction.  In the example, an abnormal return of 0.6% represents 0.21 standard deviations or a t-statistic of 0.21 (0.6% abnormal return divided by the root mean squared error of 2.82%).  Probability theory tells us that, based on randomness alone, the abnormal return should only have a t-statistic of greater than 1.96 standard deviations 5% of the time.[23]  Restating it another way, we have 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation.  Since our example only has a t-statistic of 0.21, we would say that the abnormal return is statistically insignificant and we could not reject randomness as the cause.  However, if on a particular day we observe an abnormal return that has a t-statistic of greater than 1.96 ("statistically significant") AND we observe firm-specific information, we reject randomness as the explanation and conclude that the information is what caused the stock price to move.

40.     **Exhibit 5** shows the abnormal returns I calculated for Connetics' equity prices on each day during the Class Period.  The horizontal lines represent the threshold for statistical significance at 1.96 standard deviations.  Therefore, for each vertical line that crosses the threshold and for which there is concurrent new firm-specific information, I am willing to infer the information caused the price movement.  For example, on July 10, 2006, Connetics announced that it expected second quarter 2006 and full year 2006 financial results to be materially below previous guidance and that the Company was withdrawing its full year earnings guidance.  At this time Connetics also announced that it was reducing shipments of inventory to wholesalers.  On this day, Connetics stock price had an abnormal return (i.e. after controlling for market factors) of -33.02% (or -$3.86 per share) and the t-statistic associated with this event is -

---

[23] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, Litigation Services Handbook, The Role of the Financial Expert, Third Edition, 2001.

11.70. This event is therefore highly statistically significant and I infer the news caused the stock price movement.

41.     When Connetics announced that the FDA did not approve the Velac acne treatment, there was a negative return of 27.15% and the price of Connetics common stock fell from $20.77 on June 10, 2005 to $15.13 on June 13, 2005.  Both of these sudden movements in the price of Connetics common stock showed that the price reacted quickly to unexpected new information coming from the company or those that followed the company.

42.     **Exhibit 6** provides a summary of the event study.  There are a total of 27 trading days with statistically significant price movements.  On 21 of these trading days, there is identifiable company-specific news or analyst coverage.  That leaves only 6 days with "unexplained" significant price movements.  Because we use a 95% confidence interval, we would expect by random chance alone to observe 5% of the remaining days to have statistically significant price movements.  Indeed, we only observe these unexplained movements on 6 out of 595 days or 1.01%.  **Appendix C** lists each of trading days with statistically significant price movements along with a reference for the company-specific news I was able to identify.

43.     The event study analysis provides strong scientific evidence that Connetics traded in an efficient market.  The vast majority of the days on which we observe statistically significant abnormal price movements have concurrent company-specific news.  This implies that there is a scientifically demonstrable cause and effect relationship between newly available public information and changes in Connetics' stock price.  Moreover, these price changes take place within a single day - suggesting new information is quickly reflected in the market price.  There are a small number of statistically significant price movements that are not associated with company-specific news, but this is an expected result.

## KROGMAN FACTOR 1: MARKET CAPITALIZATION

44.     The Krogman Court held, "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[24]

45.     The market capitalization for Connetics common stock ranged from $378 million to $1,066 million during the Class Period.  **Exhibit 7** shows that Connetics' market capitalization falls within the 84th percentile of companies on NASDAQ and the 62nd percentile of the combined NYSE and NASDAQ markets as of March 31, 2005.  Given that Connetics' market capitalization is not unusually small relative to other publicly traded companies, this factor is generally supportive of market efficiency.

## KROGMAN FACTOR 2: SIZE OF FLOAT OF COMMON STOCK

46.     The Krogman Court opined that the higher the float (shares held by the public) the higher the likelihood of market efficiency "because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."[25]  As summarized on **Exhibit 8**, I find that on average, 98% of the float was held by public investors.[26]  To the extent this factor is considered, it supports a finding of efficiency.

---

[24] Krogman, p. 11

[25] Krogman, p. 11

[26] Public float = shares outstanding + short interest – insider holdings

## KROGMAN FACTOR 3: BID-ASK SPREAD

47.     The Krogman Court's last additional efficiency factor considered the bid-ask spread for a security, saying, "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade".[27]  I concur that bid-ask spread is an important indicator of the degree to which a market is developed.  The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price.  In addition, wide bid-ask spreads would indicate that it would be too costly to arbitrage away small inefficiencies.

48.     I analyzed bid-ask spreads for Connetics and other publicly traded stocks during April 2005.[28]  During this period, the time weighted average bid-ask spread for Connetics was 0.14%, while the median of time weighted average bid-ask spread for a randomly selected group of 100 other NYSE and NASDAQ stocks during this same time was 0.34%.[29]  This analysis suggests Connetics' bid-ask spread compares favorably with other exchange traded stocks and further supports a finding of market efficiency.

## OTHER FACTOR 1: INSTITUTIONAL OWNERSHIP

---

[27] Krogman, p. 11

[28] Quote data for Connetics and other publicly traded stocks during April 2005 was obtained from the NYSE TAQ database. See www.nyxdata.com.

[29] The average bid-ask spread was calculated by taking a time-weighted average of the spread during trading hours on the primary exchange of each security.  Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread.  Compared to the random sample of 100 companies, Connetics has the 19th lowest bid-ask spread.

49.     Institutional investors are considered to be knowledgeable investors that have access to company specific news and information for the stocks that they own.  These investors consist of mutual funds, pension funds and investment banks and they have the resources required to analyze the value of the stocks they own in their portfolios.  Connetics common stock was mostly owned by institutions during the Class Period.  The percentage of the float owned by institutions between 2004 and 2006 ranged from 90.90% to 97.65%, according to CapitalIQ. This high level of institutional ownership of Connetics during the Class Period indicates that knowledgeable investors were actively trading on information about Connetics in their investment portfolios and funds.  To me this high level of institutional ownership is supportive of an efficient market because most of the owners of the securities are highly sophisticated, well-informed investors.

### OTHER FACTOR 2: AUTOCORRELATION

50.     Another test for efficiency often cited in the academic literature is autocorrelation. A security's returns are "autocorrelated" if past returns have the ability to predict future returns. If a security's returns are consistently autocorrelated, it would indicate the presence of an arbitrage opportunity – and thus a less efficient market.

51.     I performed a statistical test for autocorrelation in Connetics daily returns (net of market effects) during the Class Period and found no evidence of autocorrelation, which also supports the finding that Connetics traded in an efficient market.[30]

---

[30] The statistical test I used to test for autocorrelation is the Durbin-Watson test.  A Durbin-Watson test statistic of close to 2 indicates there is no presence of autocorrelation in the residuals from a regression.  The test statistic for Connects common stock is 2.02, which is not significant at a 95% confidence interval thus indicating a lack of evidence of autocorrelation.

**CONCLUSION**

52.     Each and every factor outlined by the Cammer and Krogman courts is supportive of an efficiency finding in this matter.  There is ample evidence of an active, open, well-developed market for Connetics common stock in which the market price quickly reflects the value of new information.  In other words, Connetics common stock traded in an efficient market during the putative Class Period.

53.     My opinion is based on information reviewed to date.  I reserve the right to amend or supplement this declaration to the extent additional information becomes available.  This declaration and the analyses described were prepared for the limited purpose of opining on market efficiency of Connetics stock during the Class Period and should not be relied upon for any other purpose, including, but not limited to, evaluations of materiality, loss causation or damages.

Respectfully Submitted on March 16th, 2009

Chad Coffman



**Exhibit 1
Connetics Corp. Average Weekly Turnover[1]
1/27/2004 - 7/9/2006**

[1] Average weekly turnover is the average of the weekly trading volume as a percentage of the outstanding shares.

Source: Bloomberg

**Exhibit 2**
**Connetics Corp. Analyst Coverage**
**1/27/2004 to 7/9/2006**

| 2004 | |
|---|---|
| **Analyst** | **Reports** |
| C.E. UNTERBERG, TOWBIN | 24 |
| CIBC WORLD MARKETS CORP. | 17 |
| EMEDSECURITIES RESEARCH | 1 |
| JEFFERIES & COMPANY, INC. | 4 |
| LIFE SCIENCE ANALYTICS | 16 |
| PIPER JAFFRAY | 11 |
| RBC CAPITAL MARKETS (US) | 6 |
| ROTH CAPITAL PARTNERS, LLC | 8 |
| RYAN BECK AND CO. | 1 |
| WACHOVIA CAPITAL MARKETS, LLC | 2 |
| WELLS FARGO SECURITIES LLC | 8 |
| **Total Analyst Reports** | **98** |

| 2005 | |
|---|---|
| **Analyst** | **Reports** |
| AMERICAN TECHNOLOGY RESEARCH | 2 |
| BUCKINGHAM RESEARCH GROUP, INC. | 29 |
| C.E. UNTERBERG, TOWBIN | 18 |
| CIBC WORLD MARKETS CORP. | 12 |
| EMEDSECURITIES RESEARCH | 3 |
| JEFFERIES & COMPANY, INC. | 8 |
| JPMORGAN | 2 |
| LIFE SCIENCE ANALYTICS | 26 |
| NATIXIS | 8 |
| PIPER JAFFRAY | 13 |
| RBC CAPITAL MARKETS (US) | 7 |
| ROTH CAPITAL PARTNERS, LLC | 9 |
| SUNTRUST ROBINSON HUMPHREY CAPITAL MARKETS | 1 |
| WACHOVIA CAPITAL MARKETS, LLC | 9 |
| **Total Analyst Reports** | **147** |

| 2006 | |
|---|---|
| **Analyst** | **Reports** |
| AMERICAN TECHNOLOGY RESEARCH | 5 |
| BUCKINGHAM RESEARCH GROUP, INC. | 7 |
| C.E. UNTERBERG, TOWBIN | 9 |
| CIBC WORLD MARKETS CORP. | 5 |
| JEFFERIES & COMPANY, INC. | 3 |
| JPMORGAN | 2 |
| LIFE SCIENCE ANALYTICS | 19 |
| NATIXIS | 3 |
| PIPER JAFFRAY | 5 |
| RBC CAPITAL MARKETS (US) | 3 |
| ROTH CAPITAL PARTNERS, LLC | 5 |
| SUNTRUST ROBINSON HUMPHREY CAPITAL MARKETS | 3 |
| WACHOVIA CAPITAL MARKETS, LLC | 5 |
| **Total Analyst Reports** | **74** |

Note: Analyst Coverage Sorted in Alphabetical Order
Source: Thomson Financial

**Exhibit 3**
## Number of Connetics Corp. Market Makers
### for 30 Randomly Selected Dates Between 1/27/2004 - 7/9/2006

| Date | # of Market Makers |
|---|---|
| 3/2/2004 | 26 |
| 3/4/2004 | 27 |
| 3/15/2004 | 27 |
| 3/16/2004 | 27 |
| 4/2/2004 | 29 |
| 5/4/2004 | 29 |
| 6/4/2004 | 30 |
| 6/9/2004 | 30 |
| 6/28/2004 | 30 |
| 7/22/2004 | 34 |
| 7/23/2004 | 34 |
| 8/6/2004 | 34 |
| 10/6/2004 | 37 |
| 10/14/2004 | 37 |
| 11/18/2004 | 36 |
| 12/20/2004 | 42 |
| 12/30/2004 | 42 |
| 1/27/2005 | 44 |
| 3/28/2005 | 44 |
| 3/29/2005 | 43 |
| 4/5/2005 | 44 |
| 5/25/2005 | 46 |
| 6/28/2005 | 46 |
| 8/30/2005 | 48 |
| 10/6/2005 | 47 |
| 10/20/2005 | 46 |
| 1/5/2006 | 47 |
| 1/9/2006 | 47 |
| 5/5/2006 | 46 |
| 5/30/2006 | 45 |
| | |
| **Min (3/2/2004)** | 26 |
| **Max (8/30/2005)** | 48 |
| **Average** | 38 |

Source: NASDAQ Daily
MP Position Report

**Exhibit 4**
**Connetics Corp. Common Stock Market Model Regression**

| | | |
|---|---|---|
| **Time Period:** | 1/27/04 to 7/9/06 | |
| **Number of Observations:** | 617 | |

| | Coefficient | t Value |
|---|---|---|
| Intercept | -0.0006 | -0.49 |
| NASDAQ Composite Index[1] | 0.8797 | 7.25 |

| | |
|---|---|
| **Adjusted R-Square** | 0.0771 |
| **Root Mean Squared Error** | 2.82% |

[1] Bloomberg Ticker: CCMP

Source: Bloomberg

**Exhibit 5**
**Connetics Corp. Daily Abnormal Returns Based on Market Model Regression that Controls for Movements in the NASDAQ Composite Index**
**1/27/2004 - 7/10/2006**



Abnormal Return

Threshold for statistical significance : (+/-) 5.53%

6/13/05: Connetics receives FDA non-approval letter for Velac.

7/10/06: Connetics announced 2Q financial results to be below prior company guidance and the Company withdraws previous full-year financial guidance. Connetics also reported at this time that it was reducing shipments of inventory to wholesalers.

Source: Bloomberg

**Exhibit 6**
**Connetics Corp.**
**Summary of Event Study Days**

| | |
|---|---|
| Number of Significant Days[1] | 27 |
| Number of Significant Days With News | 21 |
| Number of Significant Days Without News | 6 |
| Number of Insignificant Days | 590 |
| Percentage of Unexplained Significant Days[2] | 1.01% |

[1] See Appendix C for detailed information.

[2] The percentage of unexplained significant days was calculated by dividing unexplained significant days by the total number of class period days less the number of significant days with news.

**Exhibit 7**

**Market Capitalization Distribution of Companies in NYSE Composite Index and NASDAQ Composite Index as of**



| Percentile | NASDAQ | Combined NYSE & NASDAQ |
|---|---|---|
| 10% | $28,505,400 | $43,563,800 |
| 20% | $55,082,100 | $98,574,400 |
| 30% | $90,207,100 | $170,027,100 |
| 40% | $136,430,000 | $286,237,900 |
| 50% (median) | $192,871,000 | $485,803,000 |
| 60% | $286,738,500 | $812,514,700 |
| 70% | $423,479,600 | $1,386,358,400 |
| 80% | $700,345,800 | $2,724,706,300 |
| 90% | $1,485,782,300 | $8,086,422,400 |

Connetics' Market Capitalization as of 3/31/2005 was $908.6 million. This falls in the 84th percentile for the NASDAQ and the 62nd percentile for the combined NYSE and NASDAQ.

Source: Bloomberg

**Exhibit 8**
**Connetics Corp Average Insider Holdings as a**
**Percentage of Average Public Float**
**1/27/2004 – 7/9/2006**



Insider Holdings: 2%

Public Float: 98%

Sources: Capital IQ, SEC Filings, Bloomberg

## Appendix A

### List of Documents/Data Considered

**Court Documents**
- Second Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws, In Re Connetics Securities Litigation, U.S. District Court, Northern District of California, San Francisco Division, 3:07-CV-02940-SI
- Order Granting In Part And Denying In Part Defendants' Motions To Dismiss And Denying Defendants' Motions To Strike, In Re Connetics Corporation Securities Litigation, U.S. District Court, Northern District of California, 3:07-CV-02940-SI

**Court Decisions**
- Certiorary to the United States Court of Appeals for the Sixth Circuit, Basic, Inc. v. Levinson, U.S. Supreme Court, Civil Action No. 86-279, 485 U.S. 224 (1988)
- Rose Cammer, et. al. v. Bruce Bloom, et. al., Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19th, 1989
- Elmer Krogman, et al. v. R. Dale Sterritt, Jr., et al., Civil Action No. 3:98-CV-2895-M, U.S. District Court for the Northern District of Texas, Dallas Division, March 29th, 2001
- Francis Unger, et al. v. Amedisys, Inc., et al., Civil Action No. 03-30965, U.S. Court of Appeal for the Fifth Circuit, 401 F.3d 316, 323, February 23rd, 2005
- Adrian Freeman, et al. v. Laventhol & Horwath, et al., No. 89-6259, United States Court of Appeals for the Sixth Circuit, 915 F.2d 193, September 19th, 1990.
- Frances Unger, et al. v. Amedisys Inc., et al., No. 03-30965, United States Court of Appeals for the Fifth Circuit, 401 F.3d 316, February 17th, 2005.


**Connetics Corporation Analyst Reports & Conference Call Transcripts**
- List of available analyst reports for Connetics Corporation from Thomson Financial from 2003-2007.
- Selected analyst reports for Connetics Corporation written by C.E. Unterberg, Towbin; CIBC World Markets Corp; RBC Capital Markets; Jefferies & Company Inc; Wachovia Capital Markets, LLC; Buckingham Research Group; Life Science Analytics, Inc for 2004-2006.
- Fair Disclosure Financial Network Earnings Conference Call transcripts for Connetics Corporation

**SEC Filings**
- Connetics Corporation 10-K's, 10-Q's, Proxies, S-3's from 2003 to 2006

**SEC Documents**
- Form S-3 Eligibility Requirements. www.sec.gov/about/forms/forms-3.pdf

**Stock Data**
- Bloomberg historical data for Connetics Corporation common stock
- World Federation of Exchanges for the average annualized turnover velocity ratio for the NASDAQ stock market in 2006, http://www.world-exchanges.org/statistics
- NASDAQ Daily MP Position Reports for 30 randomly selected dates during the Class Period, www.nasdaqtrader.com
- Bloomberg historical price data for the NASDAQ Composite Index, Nasdaq Pharmaceutical Index, Amex Pharmaceutical Index and NYSE Composite Index
- Capital IQ data for institutional holdings for Connetics Corporation
- NYSE TAQ Data for April 2005

**Connetics Corporation News**
- News search results from Factiva for Connetics Corporation from 1/27/2004 to 7/9/2006

**Academic Articles**
- Barber, Br., Griffin, P., and Lev, B., "The Fraud-on-the-market Theory and the Indicators of Common Stock's Efficiency", The Journal of Corporation Law, University of Iowa, Winter 1994
- Barclay, M. & Torchio, F., " A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation", 64 Law & Contemporary Problems, Vol. 64, Nos. 2 & 3, Summer 2001, 105-136
- Fama, E., "Efficient Capital Markets: A Review of Theory and Empirical Work", The Journal of Finance, Vol. 25, No. 2, 1970, 383-417
- Tabak, David I. and Dunbar, Frederick C. , "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, Litigation Services Handbook, The Role of the Financial Expert, Third Edition, 2001
- Thomas, Randall S., Cotter, James F., "Measuring Securities Market Efficiency in the Regulatory Setting." Law and Contemporary Problems, Vol. 63, No. 3, 105-122

APPENDIX B

CHAD W. COFFMAN, CFA

Winnemac Consulting, L.L.C.
One South Wacker Drive, Suite 3800
Chicago, IL 60606
Office:          (312) 752-3329
Mobile:         (815) 382-0092
Email:          coffman@winnemac.com


**EMPLOYMENT:**

**Winnemac Consulting, LLC**
President (2008 - Current)

Winnemac Consulting is a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation. Principals of Winnemac Consulting have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


**EDUCATION:**

**C.F.A.**   Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**     Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**SELECTED EXPERIENCE:**

Experience in Securities and Valuation Cases:

- Expert consultant for Citigroup/Salomon Smith Barney in various matters related to Jack Grubman's analyst coverage of various companies.  This included supporting multiple experts at high-profile arbitration where plaintiffs claimed $900 million in damages.  Arbitration panel returned a verdict in favor of client (reported in Wall Street Journal).

- Expert damages consultant in dozens of 10b-5 and Section 11 securities litigation, including, but not limited to:
  - WorldCom
  - Enron
  - Tyco
  - Parmalat
  - Sears
  - Atlas Air
  - UnumProvident
  - XL Capital
  - Household Finance/HSBC
  - Dynegy
  - Anicom

- Expert consultant in multiple cases involving market timing and/or late-trading.  Developed models to estimate market timing profits.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in multiple 10(b)-5 securities cases as well as futures manipulation case.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Expert consultant to large hedge fund that owned bonds in WorldCom.  Responsible for directing analysis that led to favorable settlement of their claim in the bankruptcy.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division.

Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11th, 2009.

- Loss Causation expert in Re: Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP. Filed declaration August 5, 2008 re: plaintiffs' loss causation theory.

- Testifying expert in Re: DVI Securities Litigation, United States District Court, Eastern District of Pennsylvania, 2:03-CV-05336-LDD.  Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009.

- Testifying expert in Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007. Filed expert report October 31st, 2008.

- Expert declaration in Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York. Filed declaration February 18th, 2009.


Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant for Novartis regarding various labor related issues.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

- Testifying expert in Shirley Cohens v. William Henderson, Postmaster General, United States Postal Service.  United States District Court for the District of Columbia. C.A 1:00CV-1834 (TFH) – Filed report re: lost wages and benefits.

- Testifying expert in Richard Akins v. NCR Corporation.  Before the American Arbitration Association – Filed report re: lost wages.

Selected Experience in Antitrust, General Damages, and Other Matters:

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

> KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
> KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

> Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value."  *Journal of Real Estate and Finance*, 16:2, 191-204 (1998).

**PROFESSIONAL AFFILIATIONS:**

> Associate Member CFA Society of Chicago
> Associate Member CFA Institute
> Phi Beta Kappa

**AWARDS:**

> 1994  Ford Fellowship Recipient for Summer Research.
> 1993  Arnold Prize for Best Research Proposal.
> 1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

> Pro bono consulting for Cook County State's Attorney's Office
> Volunteer for Old Town Art Fair

# Appendix C
## Connetics Corp. Significant Event Study Dates with Selected News and Analyst Reports

| | Date | Price | Abnormal Return | t-Value | Selected News and Analyst Reports |
|---|---|---|---|---|---|
| 1 | 1/28/2004 | $22.02 | 5.97% | 2.12 | Q4 Earnings Report<br>"Connetics Reports Fourth Quarter EPS of $0.05...", PR Newswire, 1/27/2004<br>CIBC: "Seasonal Trends Drive another Strong Quarter; Raising Price Target", 1/28/04 |
| 2 | 2/9/2004 | $24.91 | 8.37% | 2.97 | "Connetics to Acquire U.S. Soriatane (Acitretin) Product Rights…" PR Newswire 2/9/2004<br>CIBC: "Connetics Acquires Soriatane Brand From Roche; Accretive This Year", 2/9/04 |
| 3 | 2/10/2004 | $23.30 | -7.04% | -2.49 | C.E. Unterberg: "Soriatane Purchase To Provide Earnings Boost", 2/10/2004<br>PIPER JAFFRAY: Downgrading To Underperform - Soriatane's A Dog |
| 4 | 7/12/2004 | $22.77 | 15.89% | 5.63 | Wells Fargo: "Weekly Prescriptions Heading Higher, Oral Taz Not a Slam Dunk" |
| 5 | 7/29/2004 | $27.28 | 16.46% | 5.83 | Q2 Earnings Report<br>CIBC: "Soriatane Again Drives Upside; Expanding Sales Force Ahead of Pipeline Events", 7/29/2004 |
| 6 | 9/27/2004 | $26.38 | 6.28% | 2.23 | "Connetics Commences Phase III Clinical Trial for Desilux...", PR Newswire, 9/27/2004 9:45am<br>C.E. Unterberg: "AGN's Competitive Product gets Not Approvable Letter from FDA", 9/27/2004 |
| 7 | 11/9/2004 | $28.64 | 5.56% | 1.97 | |
| 8 | 11/23/2004 | $26.35 | -5.77% | -2.04 | "Connetics Affirms Velac Patent Position",Business Wire, 11/22/2004 4:33pm<br>C.E. Unterberg: "CNCT goes public on a bully", 11/23/2004<br>CIBC: "Next Product Catalyst On The Horizon; Extina PDUFA Date 11/26", 11/23/2004 |
| 9 | 11/24/2004 | $21.72 | -18.29% | -6.48 | "Connetics Gets FDA Non-Approval Letter for Extina", Dow Jones News Service, 11/23/2004 9:18pm<br>CIBC: "Stumbles On Extina; Maintain Outperformer But Shares Set for Near-Term Beating", 11/24/2004 |
| 10 | 11/29/2004 | $20.30 | -5.86% | -2.08 | RBC: "Extina Non-Approvable, Lowering Estimates and Target Price", 11/29/2004 |
| 11 | 1/26/2005 | $24.00 | 7.91% | 2.80 | "Connetics Reports Fourth Quarter EPS of $0.17...", Business Wire, 1/25/2005 4:05pm<br>RBC: "Connetics reports 4Q04 and FY2004 Results", 1/26/2005<br>C.E. Unterberg: "Ends 04 strong, '05 driven by new growth", 1/26/2005<br>Jefferies: "2004 Was a Solid Year; Outlook Appears Even More Promising", 1/26/2005 |
| 12 | 2/23/2005 | $24.33 | 9.27% | 3.28 | |
| 13 | 3/10/2005 | $27.05 | 5.62% | 1.99 | "Connetics Announces 2005 Analyst and Investor Day...", Business Wire, 3/10/2005 7:00am<br>CIBC: "Infringement Claims by MRX on Velac", 3/10/2005<br>Buckingham: "Medicis Patent Filed for Re-issuance with USPTO; Remain With Strong Buy on CNCT Shares", 3/10/2005 |
| 14 | 4/14/2005 | $26.80 | 5.69% | 2.02 | "Connetics Announces Agreement with Ventiv...", Business Wire, 4/14/2005 7:00am<br>CIBC: "Analyst Day Highlights; All Eyes On Velac", 4/14/2005<br>Wachovia: "Co-Promote With VCS Positive--Raising 2006 Estimates", 4/14/2005<br>Buckingham: "Raising Estimates and Target Following Analyst Day", 4/14/2005 |
| 15 | 4/27/2005 | $22.30 | -19.20% | -6.80 | "Connetics Announces First Quarter Results with Product Sales up 79 Percent", Business Wire, 4/26/2005, 4:05pm<br>Buckingham: "Revenue Shortfall for 1Q05 and Concerns About Velac Approval Timing Should Pressure Shares; However, We Continue to See High Growth Ahead", 4/27/2005<br>CIBC: "1Q05 Results Just Hit The Mark: Will The FDA 'Rat Out' Velac?", 4/27/2005<br>RBC: "Connetics Reports 1Q05 Results - EPS $0.03 - Rev $42.4 million", 4/27/2005<br>Jefferies: "Velac Approval Will Most Likely Get Delayed", 4/27/2005 |
| 16 | 6/6/2005 | $20.27 | -6.50% | -2.30 | |

Sources: Bloomberg, Factiva, Thomson Financial

## Appendix C
## Connetics Corp. Significant Event Study Dates with Selected News and Analyst Reports

| | Date | Price | Abnormal Return | t-Value | Selected News and Analyst Reports |
|---|---|---|---|---|---|
| 17 | 6/13/2005 | $15.13 | -27.35% | -9.70 | "Connetics Receives FDA Non-Approvable Letter for Velac…", Business Wire, 6/13/2005 7:30am<br>Wachovia: "Velac Not Approvable, Lowering Estimates", 6/13/2005<br>CIBC: "Rats! Velac Non-Approvable Letter Means the Cheese Has Been Moved, Not Removed", 6/13/2005<br>Jefferies: "Velac Gets Non-Approvable Letter", 6/13/2005<br>Buckingham: "Downngrading Shares to Accumulate on Surprise Non-Approvable Letter for Velac; Shares Have Longer-Term Value but Lack Near-Term Catalysts", 6/13/2005 |
| 18 | 6/14/2005 | $16.30 | 7.79% | 2.76 | RBC: "Punishing Result of Not Meeting FDA's New Standard of Perfection," 6/14/05 |
| 19 | 10/28/2005 | $12.81 | -5.81% | -2.06 | |
| 20 | 11/8/2005 | $12.96 | 8.21% | 2.91 | "Patents; Dermatology-focused company files patent infringement lawsuit against Agis", Science Letter, 11/8/2005 |
| 21 | 5/3/2006 | $13.76 | -9.61% | -3.41 | CIBC: "Not Enough Foam On The Planet To Cushion Expected Post-1Q06 Blow", 5/3/2006<br>Wachovia: "Lowering 2006 Estimates, More Uncertainties Than Before ...", 5/3/2006<br>"Connetics Reports Preliminary Results for First Quarter 2006…", Business Wire, 5/3/2006 (After market)<br>Q1 Earnings Conference Call (After market) |
| 22 | 5/5/2006 | $15.10 | 5.69% | 2.02 | "Generic Drugs; Connetics files Citizen Petition for Soriatane with the U.S. FDA", Science Letter, 5/5/2006 |
| 23 | 5/31/2006 | $11.75 | -7.27% | -2.58 | "Connetics Receives Notice from Debt Holders of Failure to Comply…", Business Wire, 5/30/2006 4:51pm<br>C.E. Unterberg: "We've Lost Confidence", 5/31/2006<br>Buckingham: "Connetics Receives Notice From Convertible Debt Holders", 5/31/2006 |
| 24 | 6/7/2006 | $12.79 | 6.38% | 2.26 | "RESEARCH ALERT-Matrix Raises Connetics to 'hold'", Reuters News, 6/7/2006 8:10am |
| 25 | 6/27/2006 | $10.74 | -9.07% | -3.21 | |
| 26 | 6/28/2006 | $11.51 | 6.74% | 2.39 | |
| 27 | 7/10/2006 | $7.76 | -33.02% | -11.70 | "Connetics Commences Convertible Senior Notes Consent Solicitations", Business Wire, 7/10/2006 7:00am<br>"Connetics Expects Second Quarter Finanical Results to Be Below Prior Company Guidance; Withdraws Previous Full-Year Financial Guidance", Business Wire, 7/10/2006 7:00am<br>CIBC: "Never Say It Can't Get Worse; Latest News Doesn't Leave Us Foaming at the Mouth", 7/10/2006<br>Wachovia: "Wholesaler Inventory Bloated--Lowering Estimates. Management Withdraws 2006 Guidance", 7/10/2006<br>Buckingham: "Connetics' 2Q06 and 2006 To Be Affected By Trade De-Stocking and Potentially Higher Interest Costs", 7/10/2006 |

Note: Abnormal returns calculated from a linear regression modeling Connetics returns as a function of NASDAQ composite returns. t-value = (Abnormal Return)/(Root Mean Squared Error)

Sources: Bloomberg, Factiva, Thomson Financial