IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re CONNETICS CORPORATION
SECURITIES LITigation

_____/

No. C 07-02940 SI

**ORDER GRANTING LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

On May 11, 2009, the Court heard oral argument on lead plaintiff's motion for class certification. Having considered the arguments of the parties and the papers submitted, and for good cause shown, plaintiff's motion is GRANTED.

**BACKGROUND**

This securities fraud action alleges claims against Connetics Corporation and certain of its officers under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. The case is brought on behalf all purchasers of the publicly-traded securities of Connetics between January 27, 2004, and July 9, 2006. In its Second Amended Complaint ("SAC"), lead plaintiff alleges that Connetics, a pharmaceutical company specializing in prescription dermatological products, failed to disclose material information to investors. Specifically, while Connetics was developing an acne medication called Velac Gel ("Velac"), the company allegedly did not inform investors about the results of a test showing that Velac caused cancerous skin tumors in 89 out of approximately 160 mice. Connetics made a partial disclosure about problems with the new drug on April 26, 2005, but complete information was not revealed to the market until June 10, 2005, when Connetics received a formal FDA "non-approvable" letter stating that Velac was unsafe. The

SAC also alleges that Connetics engaged in "channel stuffing," i.e. shipping unneeded products to customers in order to inflate sales and revenue in the short term. According to the SAC, the company partially revealed this fraud on May 3, 2006, when it announced that it would likely have to restate its financial statements; it fully disclosed the fraud on July 10, 2006, by announcing that it would have to reduce its inventory by shipping less product.

The lead plaintiff in this action is the Teachers' Retirement System of Oklahoma. It bought and sold Connetics shares at various times between September 17, 2004 and May 9, 2006, summarized as follows:

| Date | Event | Total lead plaintiff shares |
| --- | --- | --- |
| 4/18/2005 | Lead plaintiff buys (52,200) | 52,200 |
| 4/19/2005 | Lead plaintiff buys (39,200) | 91,400 |
| 4/26/2005 | Partial disclosure of problems with Velac during investor phone call. SAC ¶¶ 116-18. | |
| 6/3/2005 | Lead plaintiff sells (12,000) | 79,400 |
| 6/6/2005 | Lead plaintiff sells (35,300) | 44,100 |
| 6/7/2005 | Lead plaintiff sells (44,100) | 0 |
| 6/10/2005 | Connetics received FDA "non-approvable" letter for Velac. SAC ¶ 128. | |
| 11/8/2005-2/13/2006 | Lead plaintiff buys (423,800) | 423,800 |
| 5/3/2006 | Connetics announces it will likely restate its financial statements. SAC ¶ 177. | |
| 5/8/2006-5/9/2006 | Lead plaintiff buys (243,000) | 666,800 |
| 7/10/2006 | Connetics announces it will have to reduce inventory. SAC ¶ 182. | |

*See* SAC; *see also* Decl. of David R. Stickney in Supp. of Pl. Mot. ("Stickney Decl."), ex B.

## LEGAL STANDARD

The decision as to whether to certify a class is committed to the discretion of the district court within the guidelines of Federal Rule of Civil Procedure 23. *See* Fed. R. Civ. P. 23; *see also Cummings v. Connell*, 316 F.3d 886, 895 (9th Cir. 2003). A court may certify a class if a plaintiff demonstrates that

all of the prerequisites of Federal Rule of Civil Procedure 23(a) have been met, and that at least one of the requirements of Federal Rule of Civil Procedure 23(b) have been met. *See* Fed. R. Civ. P. 23; *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Rule 23(a) provides four prerequisites that must be satisfied for class certification: (1) the class must be so numerous that joinder of all members is impracticable, (2) questions of law or fact exist that are common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a).

A plaintiff must also establish that one or more of the grounds for maintaining the suit are met under Rule 23(b), including (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. *See* Fed. R. Civ. P. 23(b).

In determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but, rather, whether the requirements of Rule 23 are met. *See Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). The Court is obliged to accept as true the substantive allegations made in the complaint. *See In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). Therefore the class order is speculative in one sense because the plaintiff may not be able to later prove the allegations. *See Blackie*, 524 F.2d at 901 n.17. However, although the Court may not require preliminary proof of the claim, it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements. Courts may also consider the legal and factual issues presented by plaintiff's complaint." 2 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, 7.26 (4th ed. 2005). Sufficient information must be provided to form a reasonable informed judgment on each of the requirements of Fed. R. Civ. P. 23. *See Blackie*, 524 F.2d at 901 n.17. In order to safeguard due process interests and the judicial process, the Court conducts an analysis that is as rigorous as necessary to determine whether class certification is appropriate. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005); *see also Gen. Tel. Co. of the Sw. v.*

*Falcon*, 457 U.S. 147, 161 (1982).

**DISCUSSION**

**1.     Class Certification**

    **A.     Typicality**

Plaintiff contends, and defendants do not dispute, that plaintiff meets three of the four requirements of Rule 23(a): numerosity, commonality, and adequacy. *See* Fed. R. Civ. Pro. 23(a). Defendants argue, however, that class certification is not appropriate because lead plaintiff cannot show that its claims are typical of the class. "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class . . . . [C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted) (holding that proposed representative's claims were not typical because his "reliance on the integrity of the market would be subject to serious dispute as a result of his extensive experience in prior securities litigation, his relationship with his lawyers, his practice of buying a minimal number shares of stock in various companies, and his uneconomical purchase of only ten shares of stock" in defendant company). Defendants raise three arguments as to why lead plaintiff is not typical of the proposed class; each is discussed below.

        **i.     Trades after an adverse disclosure do not automatically render an investor atypical**

The Court rejects defendants' first argument, which is that in general, a plaintiff is atypical if it buys stock after the disclosure of an alleged fraud.[1] Lead plaintiff cites numerous cases in which courts have held that the proposed class representative's purchases of stock after adverse disclosures do not destroy typicality. *See, e.g.*, *In re Providian Financial Corp. Sec. Litig.*, 2004 WL 5684494, *4-5 (N.D. Cal. Jan. 15, 2004) (holding that lead plaintiff that bought stock after the adverse disclosures had

---

[1] Defendants argue that lead plaintiff is not typical of the class because the Velac fraud was revealed before the market opened on June 13, 2005, yet lead plaintiff purchased approximately 660,000 Connetics shares between November 8, 2005 and May 9, 2006. Defendants also argue that lead plaintiff's claims are not typical of the class because the accounting fraud was revealed on May 3, 2006, yet lead plaintiff purchased 243,000 shares on May 8 and 9, 2006.

4

satisfied the typicality requirement); *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 719 (C.D. Cal. 2002) (same); *In re Pilgrim Sec. Litig.*, 1996 WL 742448, *5 (C.D. Cal. Jan. 23, 1996) (same); *In re Adobe Systems, Inc. Sec. Litig.*, 139 F.R.D. 150, 155 (N.D. Cal. 1991) (same); *see also Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) ("We reject the argument that a proposed class representative in a fraud-on-the-market securities suit is as a matter of law categorically precluded from meeting the requirements of Rule 23(a) simply because of a post-disclosure purchase of the defendant company's stock. Reliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market.").

The Court finds these authorities persuasive. Lead plaintiff's claims arose from "the same set of events and course of conduct" that gave rise to other class members' claims. *Providian*, 2004 WL 5684494 at *5. Defendants do not explain why the timing of lead plaintiff's purchases automatically make it unique – other class members may also have purchased Connetics stock after partial adverse disclosures by the company. Even if lead plaintiff is revealed to be the only class member that bought additional stocks after the disclosures, defendants have not established that this issue "threaten[s] to become the focus of the litigation," *see Hanon*, 976 F.2d at 508, or that lead plaintiff was not relying on the integrity of the market when it made its purchases.

The Court recognizes that defendants cite authorities in which district courts have concluded that post-adverse disclosure purchasers cannot be certified as class representatives. *See, e.g.*, *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007); *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, *5 (N.D. Cal. Mar. 14 1996); *Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991). Nonetheless, the weight of authority appears to favor the position that the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement. *See Feder*, 429 F.3d at 137 (finding that view espoused in *Rolex* is "not generally accepted"). Accordingly, the Court finds that lead plaintiff's post-disclosure purchases do not automatically defeat typicality.

### ii. Lead plaintiff is entitled to a presumption that it relied on the integrity of the market

Defendants' second argument is that lead plaintiff is not typical because it is subject to the unique defense that it did not rely on defendants' alleged misrepresentations. Where, as in this case, an investor pursues a "fraud on the market" theory of securities fraud, the investor is entitled to a presumption that it relied on any material misrepresentations by the defendant. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). This presumption can be rebutted if the defendant shows, for example, that the plaintiff did not rely on the integrity of the market. *Id.* at 249. Defendants raise three issues in this regard. The first is that lead plaintiff will not be able to prove reliance because it increased its holdings in Connetics after adverse disclosures by the company. The Court has already rejected this argument, which is essentially a repetition of its contention that there is a per se rule of atypicality under these circumstances.

Defendants next argue that lead plaintiff's Velac claim is not typical because it sold all of its Connetics shares at an inflated price, i.e. before the company fully disclosed the Velac fraud on June 10, 2005. Again, lead plaintiff's relevant trading history is summarized as follows:

| Date | Event | Total lead plaintiff shares |
| --- | --- | --- |
| 4/18/2005 | Lead plaintiff buys (52,200) | 52,200 |
| 4/19/2005 | Lead plaintiff buys (39,200) | 91,400 |
| 4/26/2005 | Partial disclosure of problems with Velac during investor phone call. SAC ¶¶ 116-18. | |
| 6/3/2005 | Lead plaintiff sells (12,000) | 79,400 |
| 6/6/2005 | Lead plaintiff sells (35,300) | 44,100 |
| 6/7/2005 | Lead plaintiff sells (44,100) | 0 |
| 6/10/2005 | Connetics received FDA "non-approvable" letter for Velac. SAC ¶ 128. | |

As the trading history shows, lead plaintiff sold all of its Connetics stock days before the full disclosure of the Velac fraud and thus before the stock price dropped an additional $5.72 on June 13, 2005. *See* SAC ¶ 343. Defendants also cite an e-mail sent by lead plaintiff's investment advisor on April 27, 2005. In the e-mail, the advisor predicted that the need for further preclinical studies would cause an additional

twelve-month delay in FDA approval. *See* Decl. of Christine A. Vogelei in Opp. to Pl. Mot. ("Vogelei Decl."), at ex. 3. In addition, defendants cite an "investment commentary" by lead plaintiff's investment management firm stating that it sold the Connetics stock on June 3-7 because of concerns about increased risk regarding FDA approval of Velac. *See id.* at ex. 1.

The Court disagrees with defendants that this evidence demonstrates that lead plaintiff did not rely on the integrity of the market when it made its sales on June 3-7. According to the allegations in the SAC, lead plaintiff traded on June 3-7 without full information about the problems with Velac, which were not revealed until after June 10. The April 27 e-mail underscores that even after the April 26 communications, the investment advisor did not comprehend the full scope of the problems with the drug, although he accurately predicted that the launch would be delayed. Defendants are correct that lead plaintiff sold all of its stock before the final June 13 drop in the stock price, but this fact does not establish that it sold for some reason other than its reliance on the integrity of the market. Defendants cite no evidence rebutting the presumption that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Basic*, 485 U.S. at 247.

Finally, defendants argue that lead plaintiff is subject to a unique non-reliance defense because it made at least some of its trades based on a computer program that was designed to mirror a stock index known as the Russell 2000 Growth Index. *See* Vogelei Decl., ex. E. This argument is not persuasive as there is no evidence suggesting that lead plaintiff's use of an index was unusual or that the index did not in turn rely on the integrity of the market. *Accord Providian*, 2004 WL 5684494 at *3 (citing cases) ("Institutional investors who rely on such things as the S&P 500 Index and other management and investment tools are not atypical.").

### iii. The timing of lead plaintiff's trades does not make its interests adverse to those of the putative class

Defendants' third argument is that lead plaintiff's interests are not aligned with the class because (1) it sold stock before full disclosure of the Velac fraud and (2) it did not repurchase Connetics shares until November 8, 2005. Lead plaintiff will therefore, according to defendants, have an incentive to overstate the degree to which the price was inflated when it bought stocks and to minimize the degree

7

to which the stock price was inflated when it sold.

The Court does not agree. According to defendants' reasoning, a lead plaintiff's interests will not be aligned with those of the putative class unless all class members bought and sold stock at exactly the same time. "Courts have . . . repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 277 (S.D.N.Y. 2008) (citing *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975)). Defendants' concern about intra-class conflict in this case is speculative. The Court agrees with lead plaintiff that it will share class members' interest in proving that the stock price was artificially inflated as a result of defendants' misrepresentations throughout the class period.

For these reasons, the Court finds that lead plaintiff has shown that it meets the requirements of Rule 23(a), including typicality.

### B. Predominance of common issues

Defendants argue that "the questions of law or fact common to class members" do not predominate over issues affecting only lead plaintiff, as required by Rule 23(b). *See* Fed. R. Civ. Pro. 23(b)(1)(3). According to defendants, individual issues of reliance will predominate over issues that are common to the class. Defendants cite a rule articulated by the Fifth Circuit in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007). In an effort to "tighten the requirements for plaintiffs seeking a presumption of reliance," *Oscar* requires plaintiffs to establish loss causation at the class certification stage in order to trigger the presumption. 487 F.3d at 265-66. Defendants point out that lead plaintiff has not yet proven loss causation and is therefore not entitled to the presumption of reliance.

District courts in this district have rejected the Fifth Circuit's requirement that plaintiffs prove loss causation at class certification. *See, e.g.*, *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009) ("This order declines to adopt *Oscar*'s loss-causation requirement for class-certification. *Oscar* placed the Fifth Circuit in a minority – indeed, apparently solitary – stance among the circuits;

8

it is in no small amount of tension with the Supreme Court's decision in *Basic v. Levinson*; and although the Ninth Circuit has yet to address the issue specifically in the context of class certification, this circuit's precedent strongly suggests it would reject such a rule."); *In re Micron Tech., Inc. Sec. Litig.*, 247 F.R.D. 627, 634 (D. Idaho 2007) ("*Oscar* has not been considered or adopted by the Ninth Circuit. It is unlikely that it would be adopted in this Circuit because it misreads *Basic*."). The Court finds these authorities persuasive and agrees with *Micron* that at this stage, lead plaintiff need show only that it traded on an efficient market. *Id.* Here, lead plaintiff cites the declaration of expert Chad Coffman, who opines that the market for Connetics common stock was efficient during the class period. *See* Stickney Decl., ex. A. As defendants offer no rebuttal evidence, lead plaintiff has met its burden at this stage in the litigation by demonstrating that it traded on an efficient market and is therefore entitled to the presumption of reliance.

Accordingly, the Court finds that lead plaintiff has shown it satisfies the Rule 23(b) requirement that common issues will predominate over issues relevant only to lead plaintiff.

### 2.     **Composition of the Class**

Defendants argue that, if the class is certified, the period proposed by lead plaintiff is overbroad. Lead plaintiff seeks to certify a class consisting of all persons and entities that suffered damage as a result of purchasing or otherwise acquiring the publicly traded securities of Connetics from January 27, 2004 through July 9, 2006.

Defendants' first argument is that the putative class should be divided into two classes: the Velac fraud class and the accounting fraud class. The Court agrees with lead plaintiff that defendants' proposal is a less efficient means of adjudicating this action. According to the SAC, the accounting misrepresentations began on January 27, 2004, when Connetics issued public guidance for its fourth quarter earnings per share and product revenue. SAC ¶ 208. Connetics fully disclosed the alleged accounting fraud on July 10, 2006, when it announced that it was curtailing its shipments to distributors because its inventories were too high. SAC ¶ 182. All events relating to Velac occurred during this period – defendants made a misrepresentation about Velac during a conference call on January 25, 2005, *see* SAC ¶ 240-43, and they finally disclosed in June, 2005 that FDA approval for Velac was not

9

1 imminent. Defendants' proposal complicates the case by requiring analysis of a Velac fraud class that
2 would overlap with the accounting fraud class, as many plaintiffs presumably owned Connetics stock
3 throughout the class period.

4 Defendants' second argument is that the class should exclude holders of bonds because lead
5 plaintiff held only common stock. Lead plaintiff alleges that the bond price tracked the common stock
6 price. SAC ¶ 343. As discussed above, lead plaintiff has put forward unrebutted evidence that the
7 market for Connetics common stock was efficient. At this stage, the Court finds that it is premature to
8 require independent evidence that the market for bonds was also efficient. Going forward, bond holders
9 can be decertified from the class if defendants show that Connetics bonds were not traded on an efficient
10 market.

11 Accordingly, the Court finds that lead plaintiff's proposed definition for the class is appropriate.

### 3. Notice to the Class

A case management conference was held in the afternoon of May 11, 2009. It was decided that notice to the class will be handled as follows: By **June 12, 2009**, defendants will provide to plaintiffs the names and addresses of the transfer agents for the affected Connetics stockholders. By **July 10, 2009,** counsel will submit to the Court a jointly proposed form of written notice to the class, including relevant dates for opting out, together with a written plan for mailing notice and publishing same. On **July 10, 2009, at 3:00 p.m.**, the court will hold a further case management conference to discuss any unresolved issues concerning notice to the class. (This conference may be cancelled by joint request of the parties if there are no unresolved issues concerning class notice.)

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS the motion for class certification and orders the notice procedures set out above.

**IT IS SO ORDERED.**

Dated: May 12, 2009

SUSAN ILLSTON
United States District Judge